**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,
P.O. Box 837
Sells, AZ 85634

                *Plaintiff*,

 v.

MARKWAYNE MULLIN, in his official
capacity as Secretary of U.S. Department of
Homeland Security,
2707 Martin Luther King Jr Avenue, SE
Washington, DC 20528;

RODNEY SCOTT, in his official capacity as
Commissioner of U.S. Customs and Border
Protection,
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, DC 20229;

and

ROSARIO VASQUEZ, in his official
capacity as Chief of U.S. Border Patrol,
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, DC 20229

                *Defendants*.

Case No. 26-cv-2127

**COMPLAINT**

**INTRODUCTION**

1.      The Tohono O'odham Nation ("Nation") brings this suit to enjoin the Secretary of the United States Department of Homeland Security (the "Department") and other high-ranking officials in the Department (collectively, the "Secretary")[1] from directing the construction of sixty-two miles of border wall across the Nation's Reservation (and the associated destruction of Reservation resources) without the Nation's consent. Specifically, the Nation asks this Court to prohibit the Secretary from: (1) diminishing the boundaries of the Nation's Reservation in violation of clear statutory text and constitutional separation of powers principles that proscribe such diminishment absent the express assent of Congress; and (2) trespassing on the Nation's lands by authorizing and directing the destructive use and occupancy of those lands over the Nation's strenuous objections.

2.      The Nation has beneficial ownership of a 2.8-million-acre Reservation in the Sonoran Desert in Arizona, the southern boundary of which is co-extensive with approximately sixty-two miles of the international border with Mexico. Historically, the Nation's aboriginal lands and communities extended well north and south of the international line, and the establishment of that line in 1854 did not sever the Nation's cross-border ties. Today, there still exist seventeen O'odham communities and several thousand Nation members residing in Mexico, and Nation members regularly cross the border at multiple points (with the Department's knowledge) for important religious, family, and practical reasons.

---

[1] This Complaint uses the term "Secretary" to encompass Defendant Mullin as well as his subordinates, employees, and agents, including Defendants Scott and Vasquez, except where context makes clear that the reference is to the Secretary alone.

3.      Given its location, the Nation has long had a critical interest in border security measures and cooperates extensively with the federal government on them. It allows the Department to maintain residential operating bases, cutting-edge fixed and mobile surveillance technology, and sophisticated vehicle barriers stretching the length of the Reservation border except where the terrain does not allow. The Nation also participates in multi-agency task forces that have experienced considerable success in interdicting both human and drug trafficking operations. Illegal crossings of the border on the Reservation are presently at record lows.

4.      While the Nation values its close relationship with the Department, it has long opposed construction of a border wall on the Reservation. The Nation understands that construction of the wall would entail significant devastation on the Reservation, including the destruction of mountain peaks sacred to the O'odham. It would fray the ties between O'odham communities and families on opposite sides of the border, interfere significantly with O'odham religious rituals and practices, and destroy plant and animal resources sacred to the O'odham. Events as recent as two months ago in which Department contractors destroyed ancestral sites of great importance while constructing the wall in areas adjacent to the Reservation have only confirmed to the Nation the wisdom of not sanctioning construction of the wall across it.

5.      The Department, however, has insisted on moving forward. On May 15, 2026, the Department advised the Nation that it was releasing contract solicitations (that same day) for the construction of a primary and secondary border wall and associated infrastructure on the Reservation. The Department has since released further contract specifications, and is targeting a construction award in June 2026.

6.      The Secretary lacks the power to unilaterally alter the Nation's Reservation boundaries and indeed is flatly prohibited from doing so by longstanding legislation, which

2

provides that "[c]hanges in the boundaries of [Indian] reservations … *shall not be made except by Act of Congress.*" 25 U.S.C. § 398d (emphasis added). That statute in turn reflects constitutional separation of powers principles by which the authority to adjust reservation boundaries lies solely within the province of Congress. The Secretary's actions accordingly are ultra vires.

7.    Construction of the border wall and associated infrastructure will require the blasting and grading of mountain peaks that lie in the wall's path, and the building of miles of access roads and multiple staging yards (complete with concrete batching plants) that will stretch far inland from the border, all of which will be done in trespass and have a permanent, scarring impact on Reservation lands.

8.    The harms resulting to the Nation and its members if the Secretary is allowed to proceed with his plans will be serious and irreparable, and they cannot be justified by appeals to border security or other considerations. "Our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 594 U.S. 758, 766 (2021) (per curiam). The Nation accordingly comes to this Court seeking relief against the Secretary's further pursuit of illegal activity on its Reservation.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362 because the Nation maintains a government-to-government relationship with the United States and its governing body is duly recognized by the Secretary of the Interior, and because the Nation asserts claims under the Constitution, laws, or treaties of the United States.

10.    The Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of

Civil Procedure, 28 U.S.C. §§ 1651, 2201–02, and the Court's inherent equitable powers.

7.    Venue is proper in this District because each Defendant is an officer of the United States sued in his official capacity. 28 U.S.C. § 1391(e)(1).

## PARTIES

### Plaintiff

8.    The Nation is a federally recognized Indian tribe with a government-to-government relationship with the United States and whose governing body is duly recognized by the Secretary of the Interior. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 91 Fed. Reg. 4102, 4105 (Jan. 30, 2026).

9.    The Nation enjoys sovereignty and jurisdiction over its approximately 37,000 members and its 2.8-million-acre Reservation located in southern Arizona, which Reservation was established by Executive Orders of President Wilson on January 14, 1916 and February 1, 1917, and the boundaries of which were thereafter statutorily ratified and enlarged by Congress.

### Defendants

10.    Defendant Markwayne Mullin is the Secretary of the United States Department of Homeland Security (the "Department") and is sued in his official capacity. He is the federal official ultimately responsible under federal law for ensuring that the activities of the Department and its constituent agencies are carried out in compliance with federal law, and he possesses significant responsibilities with respect to the Department's border wall construction activity and planning.

11.    Defendant Rodney Scott is Commissioner of United States Customs and Border Protection ("CBP") and is sued in his official capacity. He is responsible under federal law for ensuring that the activities of CBP, a constituent agency of the Department, are carried out in

4

compliance with federal law, and he possesses significant responsibilities with respect to the Department's border wall construction activity and planning.

12.     Defendant Rosario Vasquez is Chief of the United States Border Patrol ("Border Patrol") and is sued in his official capacity. He is responsible under federal law for ensuring that the activities of Border Patrol, an agency within CBP, are carried out in compliance with federal law, and he possesses significant responsibilities with respect to the Department's border wall construction activity and planning.

## FACTUAL AND LEGAL BACKGROUND

### The Nation's Reservation

13.     The Nation exercises sovereignty and jurisdiction over its approximately 2.8-million-acre Reservation in the Sonoran Desert in Arizona, the southern boundary of which is co-extensive with approximately sixty-two-miles of the U.S.-Mexico international border:



**FIGURE 1**

14.     President Wilson initially established the Nation's main Reservation by Executive Order on January 14, 1916, setting apart approximately 2.8 million acres for the exclusive use

and occupancy of the Nation (then referred to by the United States as the "Papago Indians"). *See*

S. Doc. No. 70-53, at 1008–11 (1929) ("1916 Executive Order").[2]

15.     The following year, President Wilson reduced the size of the Reservation to

approximately 2.3 million acres by excluding certain lands from the northern portion of the

Reservation (which Congress would later restore in 1931). *See id.* at 1005–08 ("1917 Executive

Order").

16.     The southern boundary of the Reservation remained unchanged between the 1916

and 1917 Executive Orders. The 1917 Executive Order became the operative Order.

17.     The 1917 Executive Order provides in pertinent part that "all surveyed land and

all unsurveyed land … within the townships and ranges listed below be, and the same hereby are,

withdrawn and set apart as a reservation for the benefit of the Papago Indians in Arizona[.]" *Id.*

at 1005.

18.     The listed townships and ranges in both the 1916 and 1917 Executive Orders that

form the southern boundary of the Reservation—all lands within which were reserved to the

Nation—are contiguous with the U.S.-Mexico international border.

19.     On May 25, 1918, Congress expressly ratified the southern boundary of the

Reservation as being co-extensive with the international border when it appropriated funds "[f]or

the construction of a fence along the international boundary line between Mexico and the Papago

Indian Reservation, in Arizona[.]" Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561, 569.

20.     Department of the Interior officials shared Congress's understanding that the

Nation's southern boundary was contiguous with the international border. In a 1918

---

[2] https://bit.ly/4oBmpno.

correspondence discussing "the construction of the fence along the International Boundary line between Mexico and the Papago Indian Reservation," for example, United States Indian Service engineers declared that the "lines of the reservation, established in January 1917" were contiguous with the international boundary as marked by the monuments of "the International Boundary Commission." A letter from the Commissioner of Indian Affairs that same year similarly referred to the "international boundary line between Mexico and the Papago Indian Reservation."

21.     On March 3, 1927, Congress enacted a statute providing that "[c]hanges in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." 25 U.S.C. § 398d.

22.     In 1928, Congress again expressly ratified the Nation's Reservation boundaries as extending to the international border when it appropriated funds for "the construction of a fence on or near the east boundary of the Papago Indian Reservation, Arizona, beginning at the International boundary line and extending in a northerly direction for approximately sixty miles[.]" Act of May 21, 1928, ch. 645, 45 Stat. 617, 617.

23.     Congress has enacted several statutes changing the boundaries of the Nation's Reservation, adding tracts of land to it in 1926, 1931, 1937, 1939, and 1978. Those acts likewise statutorily ratified the Reservation boundaries while enlarging them.

**The Nation's Aboriginal Territory**

24.     The Nation's Reservation was established in recognition of and within the boundaries of its broader aboriginal territory, which, as shown in the shaded portion of Figure 1 above, extends throughout much of present-day southern Arizona and into Mexico.

7

25.     The present international border was established in 1854 when Mexico ceded the area to the United States by way of the Gadsden Purchase Treaty of December 30, 1853, 10 Stat. 1031 (ratified June 30, 1854).

26.     That border bisected the Nation's aboriginal territory, though the Nation has since continued to thrive as an integrated tribal community throughout that territory on both sides of the international border.

27.     Today, as Nation Chairman Verlon Jose testified to Congress in 2024:

Seventeen O'odham communities with approximately 2,000 members are still located in our historical homelands in Mexico. O'odham on both sides of the border share the same language, culture, religion and history, and we continue to cross the border for sacred pilgrimages and ceremonies at important religious and cultural sites.[3]

28.     Many O'odham families retain deeply rooted connections to Mexico. They have family there. They bury their dead in ancestral cemeteries there, which they visit regularly so that the dead know they are not forgotten, and because there are religious duties the O'odham must fulfill in the years following the loss of a loved one.

29.     Nation members cross the border for festivals, ceremonies, and other traditional cultural gatherings that bring O'odham communities together, including the Vígítha ceremony that takes place each July in the village of Quitovac in Mexico. They also maintain strong political ties between the O'odham communities in the United States and Mexico, and the Nation has long formally recognized and supported the Mexican O'odham community's traditional form of government.

---

[3] *Examining the Impacts of International Cartels Targeting Indian Country Before the Subcomm. on Oversight & Investigations of the H. Comm. on Nat. Res.*, 118th Cong. 1 (2024) (testimony of Hon. Verlon Jose, Chairman, Tohono O'odham Nation) ("Jose Congressional Testimony").

30.    Historically, travel was integral to O'odham religious practices, and that remains so today. Many O'odham traditional practices involve running across the sacred landscape on both sides of the border, including, for example, the annual Baboquivari Run. Baboquivari Mountain is the center of the universe for the O'odham community, home of the Creator, I'itoi. Every year, following an ancient trail that has been used for centuries, the runners travel from Pozo Verde in Mexico to Baboquivari Mountain on the Reservation to perform a blessing to I'itoi. Where that trail crosses the border, they cross too (with the knowledge and cooperation of Border Patrol). Likewise, each year, a group of O'odham boys crosses the border as part of the Salt Run, in which they pass among important religious landmarks while traveling from the Reservation to the Sea of Cortez in Mexico.

31.    The Magdalena Pilgrimage, which takes place every fall, involves O'odham pilgrims walking from the Reservation to the town of Magdalena de Kino in Mexico to pay homage to the town's patron saint of San Francisco Javier. And every July, O'odham from the Reservation attend the Feast of Our Lady of Mount Carmel at the Catholic church in Sonora, an important mass where they perform Catholic and traditional songs and rain dances to encourage rain to fall in their desert environment.

32.    Pursuing its constitutionally enshrined ability "to show our gratitude to I'itoi our Maker," Tohono O'odham Const., pmbl., to "provide for … morals … of the Tohono O'odham Nation and its members," *id.* art. VI, § 1(c)(2), and to "preserve and cultivate native … traditions," *id.* § 1(c)(8), the Nation officially fosters these traditional cross-border religious practices.

33.     The Nation also protects the sacred plants used in these ceremonies, many of which grow along the border, including the Ha:ṣan, or Saguaro cactus, which has held an essential place in the religious practices of the O'odham since time immemorial.

**The Nation's Commitment to Border Security**

34.     While maintaining its flourishing cross-border tribal community, the Nation's efforts on matters of border security and enforcement have been exemplary. As Chairman Jose testified in 2024:

> The Nation has long been at the forefront on border issues. Over the years we have developed a long-standing cooperative relationship with U.S. Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE) and other federal law enforcement agencies. Working in concert with CBP, our own Tohono O'odham law enforcement officers are regularly involved in drug interdiction and immigrant apprehension actions…. We have supported CBP efforts on our Reservation by providing lands for a checkpoint, forward operating bases, and integrated fixed towers to facilitate critical electronic surveillance efforts.[4]

35.     The Nation expends significant resources on border security issues. The Tohono O'odham Police Department has devoted substantial manpower over many years to patrolling the border and preventing illegal crossings, drug trafficking, and other forms of smuggling, with the Nation expending on average $3 million of its own funds annually in support of such efforts. In addition, the Nation has long-standing cooperative relationships with multiple federal law enforcement agencies, including the Federal Bureau of Investigations, the Department (including Border Patrol and Immigration and Customs Enforcement), the Drug Enforcement Agency, the Bureau of Indian Affairs, and the National Counterterrorism Center. The Nation also played a lead role in forming the Shadow Wolves, the Department of Homeland Security's only all-Native

---

[4] Jose Congressional Testimony, *supra* note 3, at 2.

American tactical security force, which combines traditional tracking knowledge with cutting-edge technology to identify, trace, and intercept smuggling operations within the Reservation.

36.     The Nation has an extensive relationship with the Department. The Nation authorized the first on-Reservation office for the Department's predecessor agency in 1974, and it has since authorized the construction and operation of two Customs and Border Protection Forward Operating Bases on the Reservation, which include administrative facilities and living quarters for CBP personnel and from which they conduct extensive surveillance and other operations. In 2012, the Nation approved the lease of ten sites across the Reservation on which CBP has constructed 160-foot tall Integrated Fixed Towers. Each tower is equipped with long-range and wide-angle surveillance cameras, night vision, thermal sensors, and ground sweeping radar, which feed real-time data to Border Patrol agents at Border Patrol's facilities within the Reservation.

37.     CBP also operates mobile vehicle surveillance units on the Reservation, which consist of sophisticated surveillance systems mounted on the beds of all-terrain pickup trucks. And the Nation has allowed CBP to maintain a vehicle checkpoint on the main highway leading from the Reservation to Phoenix. CBP maintains a separate checkpoint just outside of the Reservation's boundary, on the main highway connecting the Reservation to Tucson.

38.     In 2006, the Nation agreed to the construction of vehicle barriers and a patrol road along the vast majority of the border, with the exception of those areas where vehicle access is impossible due to mountainous terrain. That agreement grew out of numerous collaborative discussions between the Nation and the Department, as a result of which the Nation allowed the government to install vehicle barriers that did not disrupt the environment or disturb O'odham ancestors' resting places. The Nation and the Department also entered an agreement that Border

Patrol would continue to allow tribal members (from either side) to continue to cross freely through three traditional crossing gates. When the O'odham need to cross at places other than these gates, such as for ceremonial runs which must follow specific trails, or for certain gathering activities or other ceremonies, they let Border Patrol know.

39.     The vehicle barriers have eliminated unauthorized vehicle transit across the border. More generally, the measures that the Nation and Border Patrol have put in place on the Reservation have proven to be highly effective in preventing, deterring, and intercepting illegal crossings and smuggling within the Reservation. Illegal activity across the Reservation border has decreased significantly in recent years, with the Department's numbers confirming that apprehensions on the Reservation were down by roughly 90% over the last eighteen months compared to the same timeframe in the preceding period.

### The Illegal Immigration Reform and Immigrant Responsibility Act of 1996

40.     Congress enacted the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA) in 1996 to provide federal agencies direction regarding the construction of border barriers. *See* Pub. L. No. 104-208, § 102, 110 Stat. 3009-1, 554–55 (codified as amended at 8 U.S.C. § 1103 note).

41.     Section 102(a) directed the Attorney General (now the Secretary of the Department of Homeland Security) to "take such actions as may be necessary to install additional physical barriers and roads … in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." *Id.* § 102(a).

42.     Section 102(b) directed that specific border barriers be constructed and established deadlines and other requirements for the construction of such barriers. The only

border fence segment initially mandated by Congress under Section 102(b) was a 14-mile segment near San Diego, California. *See id.* § 102(b)(1).

### The 2005 REAL ID Act Amendments to IIRIRA Section 102

43.     Enacted in 2005 as an unrelated legislative rider to the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005," Section 102 of the REAL ID Act amended Section 102 of the IIRIRA. *See* Pub. L. No. 109-13, § 102, 119 Stat. 231, 306.

44.     That amendment permitted the Secretary "to waive all legal requirements [that] such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of … barriers and roads" in areas of high illegal entry. *Id.* § 102(c); *see* IIRIRA § 102(a).

### The 2006 Secure Fence Act Amendments to IIRIRA Section 102(b)

45.     The Secure Fence Act of 2006 further amended the IIRIRA. *See* Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2638–39. Congress removed the provisions in IIRIRA Section 102(b) referring specifically to the 14 miles of fencing in San Diego and instead directed the Secretary to "provide for [at] least 2 layers of reinforced fencing [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific segments along the U.S.-Mexico border totaling approximately 850 miles. *Id*.

### The 2008 Consolidated Appropriations Act Amendments to IIRIRA Section 102

46.     Section 564 of the 2008 Consolidated Appropriations Act again amended Section 102 of IIRIRA. *See* Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090–91. These modifications (which remain in effect) include eliminating Congress's prior directive that border barriers be built in specific locations and instead directed that such barriers be placed "along not less than

13

700 miles of the southwest border where fencing would be most practical and effective," and directed the Secretary to identify and construct 370 miles of border barriers in areas of high illegal entry by December 31, 2008. *Id.* (codified at 8 U.S.C. § 1103 note).

47.    That amendment preserved the Section 102 waiver authority, which provides that, "[n]otwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this Section." 8 U.S.C. § 1103 note.

48.    On April 8, 2008, the Secretary exercised his authority under this provision and waived the requirements of several laws including the Administrative Procedure Act with respect to areas along the international border that include the Nation's Reservation. *See* Determination Pursuant to Section 102 of the IIRIRA, as Amended, 73 Fed. Reg. 19078, 19078–80 (Apr. 8, 2008).

### The Secretary's Planned Construction of a Border Wall and Associated Infrastructure Within the Nation's Reservation

49.    In the spring of 2026, the Secretary informed the Nation of his plans to construct a border wall and associated infrastructure along the international border within the Nation's Reservation. Paul Enriquez, the Director of the Infrastructure Program for U.S. Border Patrol's Program Management Office Directorate, sent the Nation's Chairman Verlon Jose and Vice Chairwoman Carla Johnson an email in which he stated:

> I am writing to inform you that CBP will be releasing the contract solicitation for the border wall project located adjacent to the Tohono O'odham Nation (Tucson 5 Wall Project) today, Friday, May 15. The contract solicitation will include the construction of approximately 62 miles of primary and secondary border wall, technology, a patrol road, cameras, and lighting. CBP is targeting a construction contract award in June 2026, followed by design and schedule for construction. The construction schedules will be known following the contract award and CBP

14

will share the schedule with the Nation as soon as received by the construction contractor.

50.     On May 27, Director Enriquez provided the Nation with a "Statement of Work" and "contract project specs" for the proposed border wall project, including requirements and specifications for a "new 30-ft primary vertical barrier" and a "secondary vertical barrier [to] be contained within [sixty feet of the international boundary line]." The Statement of Work further provides that the contractors "shall have full use of the project real estate limits," but that "[l]ocating and acquiring staging areas on private lands" and "construction access road[s]" will be the "responsibility of the contractor." On June 1, Mr. Enriquez provided the Nation with a map including proposed access routes for the construction project running through the interior of the Nation's Reservation. And on June 4, CBP officials conducted a "planned bidders site visit" on the Reservation with representatives from five potential contractors.

51.     The Nation has not consented to the construction of a border wall or associated infrastructure across its Reservation. In 2017, the Nation's Legislative Council enacted a Resolution detailing the reasons for its opposition to a wall while reaffirming its commitment to vigorous border protection measures. *See* Resolution of the Tohono O'odham Legislative Council No. 17-053. The Nation remains firm in its position, as a border wall would have devastating effects on the Nation's lands and its people.

### Irreparable Harm to the Nation

52.     The Secretary's planned border wall and associated infrastructure will, if not enjoined, irreparably harm the Nation by permanently relocating the southern boundary of the Nation's Reservation from its current location on the U.S.-Mexico international border as established by the 1916 and 1917 Executive Orders and subsequent statutes, to a new location north of the existing border, demarcated by 30-foot-high steel walls set in concrete.

15

53. In so doing, the Secretary's border wall and associated infrastructure will permanently extinguish the Nation's federally guaranteed rights of exclusive use and occupancy and disestablish the reservation status of the lands occupied by the Secretary's border wall and associated infrastructure.

54. No Act of Congress exists authorizing the Secretary to alter the boundaries of the Nation's Reservation or to disestablish the reservation status of its lands.

55. The irreparable harm to the Nation will extend well beyond the walls and the border of the Nation's Reservation. Given the complex and varied desert and mountain topography along the Reservation's southern boundary, the Secretary's project will be a massive earth-moving and engineering endeavor, requiring the blasting of mountain features in the path of the wall; significant grading, leveling, and embankment fill work; the establishment of concrete batch plants and the blading of vast staging areas for equipment, materials, and personnel; the grading of a network of additional access roads for construction vehicles and equipment; and the permanent obliteration not only of mountain features but of the fragile vegetative mantle of the desert floor.

56. Again, no Act of Congress exists authorizing the Secretary to appropriate and degrade a vast swath of the Nation's Reservation lands in this or any other fashion.

57. The construction of the border wall and associated infrastructure will severely disrupt the Nation's cross-border community and family ties. It will destroy sacred peaks upon which the O'odham have prayed for generations. It will destroy petroglyphs that constitute "perpetual prayers." It will destroy access to specific Saguaro cacti that O'odham communities and their ancestors have used for generations to create the Saguaro wine essential for certain

16

religious ceremonies. And it will block the ancient trails used for the Baboquivari and Salt Runs that are central to O'odham culture.

## CLAIMS FOR RELIEF

## COUNT I

### *Ultra Vires Diminishment of the Nation's Reservation*

58.     The Nation restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

59.     The Secretary's planned construction of a border wall and associated infrastructure on the Reservation will permanently change and diminish the Nation's Reservation boundaries as established by the 1916 and 1917 Executive Orders and ratified and enlarged by subsequent acts of Congress.

60.     The Secretary's planned construction of a border wall and associated infrastructure is therefore ultra vires because it violates 25 U.S.C. § 398d, which prohibits changes to the boundaries of Indian reservations established by executive order absent the assent of Congress, and violates the constitutional separation of powers principle pursuant to which only Congress can divest a reservation of its land and diminish its boundaries.

## COUNT II

### *Federal Common Law Trespass*

61.     The Nation restates, realleges, and incorporates by reference all preceding paragraphs and allegations.

62.     The Secretary's planned construction of a border wall and associated infrastructure will permanently trespass on the Nation's Reservation lands adjacent to the international border and destroy the Nation's exclusive possessory rights to use and occupy those lands.

17

63.    The Secretary's planned construction of a border wall and associated infrastructure will entail destructive activities that will permanently alter and degrade Reservation lands and features extending well beyond the border itself.

**PRAYER FOR RELIEF**

**WHEREFORE,** the Nation respectfully requests that the Court:

A.    Declare that the Secretary's planned construction of a border wall and associated infrastructure on the Nation's Reservation is ultra vires because it violates 25 U.S.C. § 398d, which prohibits changes to the boundaries of Indian reservations established by executive order absent the assent of Congress, and violates the constitutional separation of powers principle pursuant to which only Congress can divest a reservation of its land and diminish its boundaries.

B.    Declare that the Secretary's planned construction of a border wall and associated infrastructure on the Nation's Reservation will constitute a trespass.

C.    Preliminarily and permanently enjoin the Secretary from taking, or authorizing or directing any other person to take, any steps in furtherance of construction of the planned border wall or associated infrastructure on the Nation's Reservation, including entering into any contracts or agreements in furtherance of such construction.

D.    Grant such other relief as the Court deems just and proper.

Dated: June 16, 2026

Howard M. Shanker, D.C. Bar 426359*
Attorney General
Logan Takao Cooper*
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

Respectfully submitted,

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji, D.C. Bar 455165
David A. Giampetroni*
Christopher C. Miller*
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
cmiller@kanjikatzen.com

Philip H. Tinker*
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

*Counsel for Plaintiff Tohono O'odham Nation*

*Pro Hac Vice Application Forthcoming