**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TOHONO O'ODHAM NATION, a federally recognized Indian tribe, <br><br> *Plaintiff*, <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol, <br><br> *Defendants*. | Case No. 26-cv-2127 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE TOHONO O'ODHAM NATION'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................iii

INTRODUCTION .............................................................................................................1

STATEMENT OF THE CASE..........................................................................................4

I.      The Nation's Aboriginal Lands and the Establishment of the International Border
        Through Them ........................................................................................................5

II.     The Establishment of the Nation's Principal Reservation ....................................6

III.    The Centrality of Cross-Border Traditions and Relationships for the Nation ....9

IV.     The Nation's Robust Border Security Efforts and Collaboration
        with the United States ..........................................................................................11

V.      The Grave Harms the Border Wall and Its Construction Would Cause the Nation. ..........13

VI.     The Secretary's Announced Intention to Move Forward with Border Wall
        Construction on the Reservation. .........................................................................17

ARGUMENT....................................................................................................................18

I.      The Nation Has Article III Standing. ..................................................................18

II.     The Secretary Is Not Immune to This Suit. ........................................................19

III.    Legal Standard ....................................................................................................20

IV.     The Nation Has a Strong Likelihood of Success on Its Ultra Vires Claim.........20

        A.      Judicial Review Is Not Expressly Precluded by Statute and There Is No
                Alternative Procedure for Review of the Nation's Statutory Claim. .....21

        B.      The Secretary's Actions Are Plainly in Excess of His Delegated Powers
                and Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory. ....21

                1.      Lands Subject to Tribal Aboriginal Rights Are Not "Public Lands" .........22

                2.      The Roosevelt Reservation Did Not Extend to Unextinguished
                        Aboriginal Lands. .......................................................................26

                3.      The Nation Possessed Unextinguished Aboriginal Rights
                        to the Lands that Became Its Reservation at the Time of the Roosevelt
                        Proclamation. ..............................................................................26

                4.      The Secretary's Proposed Border Wall Plainly Exceeds His
                        Delegated Powers.......................................................................32

i

5. The Secretary's Actions Are Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory. ....................................................33

6. An Attempted Secretarial Waiver of Section 398d Would Not Alter the Foregoing Conclusions. ...............................................................35

V. The Nation Has a Strong Likelihood of Success on Its Trespass Claim...........................37

A. The Nation Holds Rights of Property and Sovereignty over Its Reservation Lands ........................................................................................37

B. The Nation Has a Federal Common Law Right of Action to Prevent Unauthorized Appropriation of Its Reservation Lands by the Secretary. ..............38

C. The Construction of the Border Wall and Associated Infrastructure Will Trespass on the Nation's Lands .............................................................38

VI. The Nation Will Suffer Irreparable Injury Absent an Injunction. ......................................41

VII. The Balance of Equities and the Public Interest Weigh Heavily in Favor of an Injunction. ...............................................................................................................43

# TABLE OF AUTHORITIES

**Cases**

*Alabama Association of Realtors v. Department of Health and Human Services*,
 594 U.S. 758 (2021) ..................................................................................... 4, 44, 45

*Amoco Production Co. v. Village of Gambell*,
 480 U.S. 531 (1987) ............................................................................................ 23, 42

*Appalachian Power Co. v. E.P.A.*,
 249 F.3d 1032 (D.C. Cir. 2001) ................................................................................ 35

*Arizona v. Navajo Nation*,
 599 U.S. 555 (2023) .................................................................................................. 37

*Barker v. Harvey*,
 181 U.S. 481 (1901) .................................................................................................. 25

*Barry v. Islamic Republic of Iran*,
 437 F.Supp.3d 15 (D.D.C. 2020) .............................................................................. 39

*California Federal Savings and Loan Association v. Guerra*,
 479 U.S. 272 (1987) .................................................................................................. 35

*Chamber of Commerce of U.S. v. Reich*,
 74 F.3d 1322 (D.C. Cir. 1996) .................................................................................. 21

*Changji Esquel Textile Co. v. Raimondo*,
 40 F.4th 716 (D.C. Cir. 2022) ................................................................................... 21

*Chemehuevi Indian Tribe v. McMahon*,
 934 F.3d 1076 (9th Cir. 2019)................................................................................... 34

*Cramer v. United States*,
 261 U.S. 219 (1923) ........................................................................................ 23, 24, 38

*Donnelly v. United States*,
 228 U.S. 243 (1913) .................................................................................................... 7

*Dugan v. Rank*,
 372 U.S. 609 (1963) .................................................................................................. 19

*Edwardsen v. Morton*,
 369 F.Supp. 1359 (D.D.C. 1973)............................................................................... 38

*Federal Express Corp. v. U.S. Department of Commerce*,
  39 F.4th 756 (D.C. Cir. 2022) ......................................................................... 34

*Global Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ..................................................................... 21, 44

*\*Goodluck v. Biden*,
  104 F.4th 920 (D.C. Cir. 2024) ....................................................................... 45

*Greenbaum v. Islamic Republic of Iran*,
  67 F.4th 428 (D.C. Cir. 2023) ......................................................................... 36

*Hedges v. Dixon County*,
  150 U.S. 182 (1893) ........................................................................................ 45

*\*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) .................................................................... 44, 45

*Khalid v. Blanche*,
  172 F.4th 876 (D.C. Cir. 2026) ....................................................................... 18

*L.C. ex rel. Cali v. Trump*,
  Civil Case No. 26-688 (RJL), 2026 WL 1329750 (D.D.C. May 13, 2026) .............................. 42

*\*Lane v. Pueblo of Santa Rosa*,
  249 U.S. 110 (1919)............................................................................ 38, 40, 44

*\*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ........................................................................................ 19

*\*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 44

*\*Leopold v. Manger*,
  102 F.4th 491 (D.C. Cir. 2024) ................................................................. 19, 20

*Leopold v. Sullivan*,
  Civil Action No. 25-1026 (BAH), 2026 WL 663250 (D.D.C. Mar. 10, 2026)......................... 20

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ........................................................................................ 42

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ........................................................................................ 35

*Mashpee Wampanoag Tribe v. Bernhardt,*
Civil Action No. 18-2242 (PLF), 2020 WL 3034854 (D.D.C. June 5, 2020) ........................... 41

*\*McGirt v. Oklahoma,*
591 U.S. 894 (2020) ......................................................................................................... passim

*Media Matters for America v. Paxton,*
138 F.4th 563 (D.C. Cir. 2025) ................................................................................................... 20

*\*Merrion v. Jicarilla Apache Tribe,*
455 U.S. 130 (1982) ............................................................................................................ 2, 37

*Minnesota v. Hitchcock,*
185 U.S. 373 (1902) ................................................................................................................... 24

*Missouri, Kansas, & Texas Railway Co. v. Roberts,*
152 U.S. 114 (1894) ................................................................................................................... 33

*Missouri, Kansas, & Texas Railway Co. v. United States,*
235 U.S. 37 (1914) ..................................................................................................................... 24

*Mitchel v. United States,*
34 U.S. 711 (1835) ............................................................................................................. 23, 24

*More v. Steinbach,*
127 U.S. 70 (1888) ..................................................................................................................... 22

*Morton v. Ruiz,*
415 U.S. 199 (1974) ................................................................................................................... 30

*Narragansett Indian Tribe v. McMaster,*
No. 24-5193, 2026 WL 1450020 (D.C. Cir. May 22, 2026) ...................................................... 18

*\*National Association of Postal Supervisors v. U.S. Postal Service,*
26 F.4th 960 (D.C. Cir. 2022) .................................................................................................... 21

*Nebraska v. Parker,*
577 U.S. 481 (2016) ................................................................................................................... 32

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................................................................... 20

*\*Oneida County v. Oneida Indian Nation of New York State,*
470 U.S. 226 (1985) ......................................................................................................... 24, 32, 38

*Pollack v. Hogan*,
  703 F.3d 117 (D.C. Cir. 2012) ........................................................................ 19

*\*Pueblo of Jemez v. United States*,
  790 F.3d 1143 (10th Cir. 2015) ...................................................................... 24

*\*Pursuing America's Greatness v. Federal Election Commission*,
  831 F.3d 500 (D.C. Cir. 2016) .................................................................. 43, 44

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ........................................................................................ 43

*Schilling v. U.S. House of Representatives*,
  102 F.4th 503 (D.C. Cir. 2024) ...................................................................... 20

*Seymour v. Superintendent of Washington State Penitentiary*,
  368 U.S. 351 (1962) ...................................................................................... 33

*\*Shawnee Tribe v. Mnuchin*,
  984 F.3d 94 (D.C. Cir. 2021) ................................................................... 43, 44

*Shvartser v. Lekser*,
  308 F.Supp.3d 260 (D.D.C. 2018) .................................................................. 42

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) .......................................................................... 43

*Sioux Tribe of Indians v. United States*,
  316 U.S. 317 (1942) ...................................................................................... 34

*Solem v. Bartlett*,
  465 U.S. 463 (1984) ................................................................. 32, 33, 35, 41

*Sossamon v. Texas*,
  563 U.S. 277 (2011) ...................................................................................... 36

*Spector v. Norwegian Cruise Line Ltd.*,
  545 U.S. 119 (2005) ...................................................................................... 36

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  985 F.3d 1032 (D.C. Cir. 2021) ................................................................ 37, 45

*Swinomish Indian Tribal Community v. BNSF Railway Co.*,
  951 F.3d 1142 (9th Cir. 2020) .................................................................. 37, 38

*Tee-Hit-Ton Indians v. United States*,
  348 U.S. 272 (1955) ..................................................................................... 37

\**Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ................................................................ 20, 43

*United States v. Alaska*,
  521 U.S. 1 (1997) ......................................................................................... 7

*United States v. Auguisola*,
  68 U.S. 352 (1863) ...................................................................................... 23

*United States v. Celestine*,
  215 U.S. 278 (1909) .................................................................................... 32

*United States v. Dann*,
  873 F.2d 1189 (9th Cir. 1989) .................................................................... 38

\**United States v. Dion*,
  476 U.S. 734 (1986) ............................................................................... 33, 36

*United States v. Milner*,
  583 F.3d 1174 (9th Cir. 2009) .................................................................... 39

\**United States v. Santa Fe Pacific Railroad Co.*,
  314 U.S. 339 (1941) ..................................................................... 23, 24, 25, 26

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
  790 F.3d 1000 (10th Cir. 2015) .................................................................. 41

\**Washington Legal Foundation v. U.S. Sentencing Commission*,
  89 F.3d 897 (D.C. Cir. 1996) ...................................................................... 19

*Watson v. Perdue*,
  410 F.Supp.3d 122 (D.D.C. 2019) .............................................................. 42

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................ 20

**Statutes & Constitutional Provisions**

8 U.S.C. § 1103 ............................................................................................ 32, 33

25 U.S.C. §§ 70–70n-2 ...................................................................................... 26

25 U.S.C. § 398d ......................................................................................... passim

25 U.S.C. § 5123(e) ................................................................................................ 37

Act March 3, 1851, ch. 41, § 13, 9 Stat. 631 ....................................................... 25

Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292 .................................................. 24

*Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561 ............................................. 7, 31

Act of June 28, 1926, ch. 701, 44 Stat. 775 ........................................................ 8

*Act of May 21, 1928, ch. 645, 45 Stat. 617 ................................................. 8, 31

Act of Feb. 21, 1931, ch. 267, § 2, 46 Stat. 1202 ............................................... 8

Act of July 28, 1937, ch. 527, § 1, 50 Stat. 536 ................................................. 8

Act of June 13, 1939, ch. 203, § 2, 53 Stat. 819 ................................................. 8

Act of Sept. 10, 1978, Pub. L. No. 95-361, 92 Stat. 595 ..................................... 8

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of
1996, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes:
Improvement of Barriers at Border) ........................................................... passim

*Tohono O'odham Nation Resolution No. 17-053 (Feb. 8, 2017) ...................... 39

Tohono O'odham Nation Resolution No. 21-115 (Apr. 12, 2021) ...................... 40

U.S. Const. art. I .................................................................................................. 37

## Treaties

Gadsden Purchase Treaty of December 30, 1853, 10 Stat. 1031 ...................... 6, 23

Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat. 922 .................................... 22

## Legislative Materials

S. Doc. No. 70-53 (1929) ...................................................................................... 6

## Regulations

Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996, as Amended,
73 Fed. Reg. 18,293-01 ................................................................................. 21

Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of
Indian Affairs,
91 Fed. Reg. 4,102 ............................................................................................ 4

**Other Authorities**

\*1916 Executive Order (S. Doc. No. 70-53, at 1008–11)..................................................................6

\*1917 Executive Order (S. Doc. No. 70-53, at 1005–08)................................................................6

"Authority of Secretary of the Interior to Enter Into Agreement Fixing Boundaries of Tribal, Allotted, and Ceded Indian Lands," 57 Interior Dec. 219, 1940 WL 4175 (D.O.I. 1940) ............34

National Park Service, *Apache Before 1861* (website)...................................................................22

Proclamation of May 27, 1907, 35 Stat. 2136 .........................................................................3, 26

\*Restatement (Second) of Torts (A.L.I. 1965) ..............................................................................39

Revocation of Prior Monument Designations, 2025 WL 1719535 (O.L.C. 2025)........................34

ix

**INTRODUCTION**

The Tohono O'odham Nation ("Nation") brings this suit to enjoin the Secretary of the United States Department of Homeland Security (the "Department") and other high-ranking officials in the Department (collectively, the "Secretary") from directing the construction of sixty-two miles of border wall across the Nation's Reservation (and the associated destruction of Reservation resources) without the Nation's consent. Specifically, the Nation asks this Court to prohibit the Secretary from: (1) diminishing the boundaries of the Nation's Reservation in violation of clear statutory text and constitutional separation of powers principles that proscribe such diminishment absent the express assent of Congress; and (2) trespassing on the Nation's lands by authorizing and directing the destructive use and occupancy of those lands over the Nation's strenuous objections.

The Nation has beneficial ownership of a 2.8-million-acre Reservation in the Sonoran Desert in Arizona, the southern boundary of which is co-extensive with approximately sixty-two miles of the international border with Mexico. Historically, the Nation's aboriginal lands and communities extended well north and south of the international line, and the establishment of that line in 1854 did not sever the Nation's cross-border ties. Today, there still exist seventeen O'odham communities and several thousand Nation members residing in Mexico, and Nation members regularly cross the border at multiple points (with the Department's knowledge) for important religious, family, and practical reasons.

Given its location, the Nation has long had a critical interest in border security measures and cooperates extensively with the federal government on them. It allows the Department to maintain residential operating bases, cutting-edge fixed and mobile surveillance technology, and sophisticated vehicle barriers stretching the length of the Reservation border except where the

1

terrain does not allow. The Nation also participates in multi-agency task forces that have experienced considerable success in interdicting both human and drug trafficking operations. Illegal crossings of the border on the Reservation are presently at record lows.

While the Nation values its close relationship with the Department, it has long opposed construction of a border wall on the Reservation. The Nation understands that construction of the wall would entail significant devastation on the Reservation, including the destruction of mountain peaks sacred to the O'odham. It would fray the ties between O'odham communities and families on opposite sides of the border, interfere significantly with O'odham religious rituals and practices, and destroy plant and animal resources sacred to the O'odham. Events as recent as two months ago in which Department contractors destroyed ancestral sites of great importance while constructing the wall in areas adjacent to the Reservation have only confirmed to the Nation the wisdom of not sanctioning construction of the wall across it.

The Department, however, has insisted on moving forward. On May 15, 2026, the Department advised the Nation that it was releasing contract solicitations (that same day) for the construction of a primary and secondary border wall and associated infrastructure on the Reservation. Declaration of Chairman Verlon Jose ¶ 31 & Attach. F. The Department has since released further contract specifications, *id.* ¶ 31 & Attachs. G–I, and is "targeting a construction award in June 2026," *id.* ¶ 31.

"Over tribal lands, the tribe has the rights of a landowner as well as the rights of … sovereignty," including the "sovereign power of determining the conditions upon which persons shall be permitted to enter its domain[.]" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 n.12 (1982) (citation modified). The Secretary appears to understand that he cannot lawfully authorize border wall construction on the Reservation absent the Nation's consent. Rather, he

seems to base his plans on the dual contentions that he can exempt out from the Reservation a sixty-foot strip of land adjacent to the international border, and that border wall construction can be confined to that sixty-foot strip. *See* Chairman Jose Decl. ¶ 31 & Attach. H at PDF p. 2 ("The secondary vertical wall barrier will be contained within the 60-ft. Roosevelt Reservation."). Neither proposition is correct.

In a 1907 Proclamation, President Theodore Roosevelt "reserved from entry, settlement or other form of appropriation under the public land laws and set apart as a public reservation, all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico[.]" Proclamation of May 27, 1907, 35 Stat. 2136, 2136 ("Roosevelt Reservation"). By its terms, however, the Roosevelt Reservation was limited only to "public lands" along the international border. And as detailed below, in 1907 the lands that would become the Nation's Reservation in 1917 were not public lands. Instead, they were subject to the Nation's unextinguished aboriginal rights of exclusive use and occupancy and accordingly had never entered the public domain. In 1916 and 1917, they were confirmed to the Nation as its reservation lands by Executive Orders of President Wilson that were subsequently ratified by Congress. Thus, the Roosevelt Reservation never attached to those lands, and the legal basis for the Secretary's asserted authority to direct border wall construction across them is illusory.

The Secretary lacks the power to unilaterally alter the Nation's Reservation boundaries and indeed is flatly prohibited from doing so by longstanding legislation, which provides that "[c]hanges in the boundaries of [Indian] reservations … *shall not be made except by Act of Congress.*" 25 U.S.C. § 398d ("Section 398d") (emphasis added). That statute in turn reflects constitutional separation of powers principles by which the authority to adjust reservation

3

boundaries lies solely within the province of Congress. *McGirt v. Oklahoma*, 591 U.S. 894, 913–14 (2020). The Secretary's actions accordingly are ultra vires.

Even if the Roosevelt Reservation did exist on the Nation's Reservation, the Secretary's plans would still place him and his designated contractors in trespass on the Reservation. As Professor Chris Swenseney—a Professor of Civil Engineering at the University of Colorado-Boulder with over twenty years of experience as an engineer in the United States Air Force and several years of experience as an engineer of record working on border wall construction—attests in his attached Declaration, any notion that border wall construction can be confined to a 60-foot-wide strip adjacent to the border is fanciful at best. Such construction will require the blasting and grading of mountain peaks that lie in the wall's path, and the building of miles of access roads and multiple staging yards (complete with concrete batching plants) that will stretch far inland from the border, all of which will have a permanent, scarring impact on Reservation lands.

The harms resulting to the Nation and its members if the Secretary is allowed to proceed with his plans will be serious and irreparable, and they cannot be justified by appeals to border security or other considerations. "Our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 594 U.S. 758, 766 (2021) (per curiam). The Nation respectfully requests that an injunction issue.

## STATEMENT OF THE CASE

The Nation is a federally recognized Indian Tribe with over 37,000 members, approximately 3,000 of whom live in seventeen O'odham communities in Mexico. Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 91 Fed. Reg. 4,102-01, 4,105 (Jan. 30, 2026); Chairman Jose Decl. ¶ 2. The Nation

exercises sovereignty over an approximately 2.8-million-acre reservation ("Reservation") in the

Sonoran Desert in Arizona, the southern boundary of which is coextensive with approximately

sixty-two miles of the international border with Mexico:



Figure 1: Map of Tohono O'odham Current Reservation and Ancestral Territory[1]

## I.    The Nation's Aboriginal Lands and the Establishment of the International Border Through Them

In the O'odham language, "Tohono means 'Desert' … and O'odham means 'people.' We

are the people of the desert." Decl. of Kendall Jose ¶ 9. As illustrated in Figure 1, the Nation's

"traditional homeland stretches from the Gila River in the North to Hermosillo, Sonora, in the

South, and from the Sea of Cortez in the West to the San Pedro River in the East." *Id.* The

O'odham "moved with the seasons," making use of "the animals, the plants, and the water across

the Sonoran Desert." *Id.* They did so for centuries predating the establishment of an international

---

[1] Chairman Jose Decl. ¶¶ 23 & Attach. D (*Examining the Impacts of International Cartels Targeting Indian Country: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Natural Resources*, 118th Cong. 2 (2024) (statement of Verlon Jose, Chairman, Tohono O'odham Nation of Arizona)).

border. Decl. of Samuel Fayuant ¶ 8 ("The O'odham have lived, worked, and worshipped in the Sonoran Desert since time immemorial.").

Mexico ceded lands including the northern portion of the Nation's aboriginal territory to the United States through the Gadsden Purchase Treaty of December 30, 1853, 10 Stat. 1031. With the ratification of that treaty on June 30, 1854, 10 Stat. at 1037, the international border was established directly through the Nation's traditional lands.

## II.    The Establishment of the Nation's Principal Reservation

President Wilson initially established the Nation's main Reservation by Executive Order on January 14, 1916, setting apart approximately 2.8 million acres for the exclusive use and occupancy of the Nation (then referred to by the United States as the "Papago Indians"). *See* S. Doc. No. 70-53, at 1008–11 (1929) ("1916 Executive Order").[2] The following year, the President reduced the size of the Reservation to approximately 2.3 million acres by excluding certain lands from the northern portion of the Reservation (which Congress would later restore in 1931). *See id.* at 1005–08 ("1917 Executive Order"). The Reservation was created out of lands lying at the heart of the Nation's aboriginal territory. *Infra* pp. 26–31.

The southern boundary of the Reservation remained unchanged between the 1916 and 1917 Executive Orders, the latter providing in pertinent part that "all surveyed land and all unsurveyed land … within the townships and ranges listed below be, and the same hereby are, withdrawn and set apart as a reservation for the benefit of the Papago Indians in Arizona[.]" S. Doc. No. 70-53, at 1005. The listed townships and ranges in both the 1916 and 1917 Executive

---

[2] https://bit.ly/4oBmpno. The United States had previously reserved for the Nation small tracts of land at Gila Bend and San Xavier, Arizona.

Orders that form the southern portion of the Reservation (*all* lands within which were reserved to the Nation) are contiguous with the international border. *See* Decl. of Rebecca Ortega ¶¶ 6–7.

On May 25, 1918, Congress ratified the Reservation—and its southern boundary as coextensive with the international border—when it appropriated funds "[f]or the construction of a fence along the international boundary line between Mexico and the Papago Indian Reservation, in Arizona, created by Executive order of [January 14, 1916.]" Act of May 25, 1918, ch. 86, § 2, 40 Stat. 561, 569; *see United States v. Alaska*, 521 U.S. 1, 44 (1997) (holding that "Congress ratified" an executive order reserving federal lands "by explicitly recognizing" the reservation and its boundaries in a later statute); *Donnelly v. United States*, 228 U.S. 243, 258 (1913) (deeming Indian reservations established by executive orders to be statutory reservations where Congress "ratified" the executive orders by referencing them in later statutes).

Department of the Interior correspondence implementing that 1918 statute confirms that Executive Branch officials, including the Commissioner of Indian Affairs and staff, shared Congress's contemporaneous understanding that the Nation's southern boundary is contiguous with the international border.[3] Indeed, engineers in the Indian Service could not have expressed this understanding in terms any more precise: In discussing "the construction of the fence along

---

[3] *See* Declaration of Riyaz A. Kanji ¶ 2 & Attach. A (Mar. 31, 1919 letter from Assistant Commissioner of Indian Affairs to Superintendent of Sells Indian School referring to the "international boundary fence between the Papago Indian Reservation and Mexico"); *id.* ¶ 3 & Attach. B (Dec. 28, 1918 letter from Department of the Interior engineer to Superintendent of Sells Indian School discussing "construction of the fence between the Papago Reservation and Mexico" and stating that "the International Boundary line … is now monumented with permanent monuments" such that "the line might be flagged out with sufficient accuracy for fence building"); *id.* ¶ 4 & Attach. C (Nov. 21, 1918 letter from Superintendent of San Xavier Indian School to Commissioner of Indian Affairs referring to "the erection of the fence on the international boundry [sic] line between Mexico and the Papago Indian Reservation"); *id.* ¶ 5 & Attach. D (Apr. 23, 1925 letter from Superintendent of Sells Indian School to Consulting Engineer referencing that "five years ago … [a] fence was built along the border separating the Papago Indian Reservation from Mexico").

7

the International Boundary line between Mexico and the Papago Indian Reservation," they declared that, according to "the new lines of the reservation, established in January 1917" and "the report of the International Boundary Commission," the south boundary of the Reservation runs between "Boundary Monument No. 142 and … practically to Monument No. 157," and because "the boundary is now monumented …. there seems to be no particular reason for chaining out this line in advance of building the fence[.]" Declaration of Riyaz A. Kanji ¶ 6 & Attach. E (Dec. 27, 1918 letter between U.S. Indian Service Engineers at 1, 2).

On March 3, 1927, Congress enacted legislation providing that "[c]hanges in the boundaries of reservations created by Executive order, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." 25 U.S.C. § 398d. The following year, Congress again affirmed that the Nation's Reservation boundaries extended to the international border when it appropriated funds for "the construction of a fence on or near the east boundary of the Papago Indian Reservation, Arizona, *beginning at the International boundary line* and extending in a northerly direction for approximately sixty miles[.]" Act of May 21, 1928, ch. 645, 45 Stat. 617, 617 (emphasis added). Congress, which had already recognized and added to the Reservation in 1926 legislation, thereafter enacted several statutes again ratifying the Nation's Reservation while adding tracts of land to it in 1931, 1937, 1939, and 1978.[4]

---

[4] *See* Act of June 28, 1926, ch. 701, 44 Stat. 775, 775 (setting apart lands as "an addition to … the Papago Indian Reservation" ); Act of Feb. 21, 1931, ch. 267, § 2, 46 Stat. 1202, 1202 (same); Act of July 28, 1937, ch. 527, § 1, 50 Stat. 536, 536 (stating that "the boundary of the Papago Indian Reservation … shall be extended to include" certain tracts of land which "shall become a part of said reservation in all respects and upon all the same terms as if said lands had been included in the Executive order issued by the President on February 1, 1917" ); Act of June 13, 1939, ch. 203, § 2, 53 Stat. 819, 819 (adding lands to "the Papago Indian Reservation"); Act of Sept. 10, 1978, Pub. L. No. 95-361, 92 Stat. 595, 595 (stating that tract of land "is hereby

8

### III.    The Centrality of Cross-Border Traditions and Relationships for the Nation

While the international border bisects the Nation's aboriginal territory, it did not sever the shared heritage of the O'odham and their deep connection to sites and rituals on either side of it. As the Nation's Chairman, Verlon Jose, testified to Congress in 2024:

> O'odham on both sides of the border share the same language, culture, religion and history, and we continue to cross the border for sacred pilgrimages and ceremonies at important religious and cultural sites.

Chairman Jose Decl. ¶ 23 & Attach. D at 1.

Many O'odham families retain deeply rooted connections to Mexico. They have family there. Chairman Jose Decl. ¶¶ 4–7; Decl. of Mary Lucy Zazueta ¶¶ 2–3. They bury their dead in ancestral cemeteries, which they visit with regularity "so that they know that they are not forgotten," Decl. of Thomasa Rivas ¶ 3, and because "[t]here are religious commands and duties we must fulfill in the immediate years following the loss of a loved one," K. Jose Decl. ¶ 26. They cross the border for practical reasons, including for meetings on matters of mutual importance, and since 1995 the Nation has formally recognized and supported the traditional governmental structure of the O'odham communities in Mexico. Chairman Jose Decl. ¶¶ 8-9, 12; K. Jose Decl. ¶¶ 7-8. They cross the border for significant festivals and ceremonies that bring O'odham communities together, including the Vígítha ceremony that takes place each July in the village of Quitovac in Mexico. Rivas Decl. ¶ 6; Decl. of John Robert Welch ¶¶ 17–19. And, as with their care for those who have passed on, they cross the border for religious purposes.[5]

---

declared to be an addition to … the Papago Indian Reservation" with "the same benefits and protection as other tribal trust lands within the boundaries of the Papago Indian Reservation").

[5] The crossings described in this and the next paragraph typically do not take place at normal ports of entry, but occur with the knowledge and cooperation of the United States Border Patrol.

Historically, travel was integral to O'odham religious practices, *id.* ¶¶ 16–26, 32–33, and it remains so today. "Our people are runners, and many of our traditional practices require us to run across the sacred landscape from point to point on both sides of the border. Our runs, like so many of our other religious ceremonies and practices, are tied to specific places in our homeland. Landmarks in the natural landscape identify our sacred sites and other places of great cultural and religious significance to us. They are how we pray." K. Jose Decl. ¶ 13.

The Baboquivari Run is a prime example. "[Baboquivari Mountain] is the center of the universe for my community. It is a home of the Creator, I'itoi. Every year, our people run from Pozo Verde in Mexico to Baboquivari Mountain on the Reservation to perform a blessing to … I'itoi.… Our runners follow the ancient trail from San Juan that has been used for centuries. Where it crosses the border, they cross too." K. Jose Decl. ¶ 14. The Magdalena Pilgrimage, which takes place every fall, involves O'odham pilgrims walking from the Reservation to the town of Magdalena de Kino in Mexico to "pay homage to the town's patron saint of San Francisco Javier." Fayuant Decl. ¶ 14. "The Sea of Cortez is another location that is sacred to us. When we pray, we pray to the sea so that the sea can take away our sickness and grief. And we run to the sea. Each year, a group of boys makes the Salt Run .… along traditional sacred paths marked by important religious landmarks on the visual landscape." K. Jose Decl. ¶ 16. Every July, O'odham from the Reservation attend the Feast of Our Lady of Mount Carmel at the Catholic church in Sonora, an important mass where "[w]e perform Catholic and traditional songs and rain dances to encourage the rain," prayers that are all-important in the desert environment. K. Jose Decl. ¶ 22. Additional examples abound of the close link between cross-border travel and O'odham religious practices. Zazueta Decl. ¶ 8; Welch Decl. ¶¶ 14–16; Decl. of Gary Nabhan ¶ 15; K. Jose Decl. ¶¶ 14–24, 26–38, 40–42; Decl. of Eldellda Francisco ¶ 3.

IV.     **The Nation's Robust Border Security Efforts and Collaboration with the United States**

Given its location, the Nation has an especially "critical interest in eliminating illegal activity at the border—be it in the form of drug trafficking, human trafficking, or other dangerous activity—and in ensuring the safety of migrants who want to cross into the United States in a safe and legal way. We as a Nation and a community work with Border Patrol every single day to help accomplish these goals." Chairman Jose Decl. ¶ 16.

The Nation expends significant resources on border security. The Tohono O'odham Police Department has devoted substantial manpower over many years to preventing illegal crossings, drug trafficking, and other forms of smuggling at the border, Decl. of James Cook ¶¶ 8–17, with the Nation expending on average three million dollars of its own funds annually in support of such efforts, Chairman Jose Decl. ¶ 23 & Attach. D at 2. In addition, the Nation "has long-standing and highly cooperative relationships with multiple federal law enforcement agencies, including the Federal Bureau of Investigation, the [Department] (including Border Patrol and Immigration and Customs Enforcement), the Drug Enforcement Agency, the Bureau of Indian Affairs, and the National Counterterrorism Center." Cook Decl. ¶ 9. Since 2013, the Nation has led a multi-agency High Intensity Drug Trafficking Task Force (the NATIVE Task Force) that "has successfully completed numerous high-value efforts, including the dismantling of major drug trafficking operations and the seizure of millions of dollars' worth of illicit drugs and other contraband." *Id.* ¶ 11. The Nation also played a lead role in forming the Shadow Wolves, the Department's "only all-Native American tactical security force, which combines … traditional knowledge with modern cutting-edge techniques to identify, trace, and intercept smuggling operations within the Reservation." *Id.* ¶ 12. In addition to its significant on-Reservation successes, "[t]his elite unit has also been deployed abroad to train border guards and

11

customs agents in multiple allied nations and has participated in anti-terrorism operations and trainings in Afghanistan and Pakistan." *Id.*

The Nation has an extensive relationship with the Department. It authorized the first on-Reservation office for the Department's predecessor agency in 1974. Chairman Jose Decl. ¶ 23 & Attach. D at 4. The Nation has since authorized the construction and operation of two Customs and Border Protection ("CBP") Forward Operating Bases on the Reservation, which include administrative facilities and living quarters for CBP personnel and from which they conduct extensive surveillance and other operations. Cook Decl. ¶ 16. In 2019, the Nation approved the lease of ten sites on the Reservation on which CBP has constructed 160-foot-tall Integrated Fixed Towers. *Id.* ¶ 16(c). "Each tower is equipped with night vision, thermal sensors, and ground sweeping radar, which feed real-time data to Border Patrol agents at Border Patrol's facilities within the Reservation. The towers also have long-range and wide-angle surveillance cameras. Border Patrol uses the combination of cameras, sensors and radar to monitor every person and vehicle along the entire span of the international border[]." *Id.* CBP also operates "vehicle surveillance units, which consist of sophisticated camera and surveillance systems mounted on the beds of all-terrain pickup trucks[.]" *Id.* ¶ 16(d). And the Nation has allowed CBP to maintain a vehicle checkpoint on the highway leading from the Reservation to Phoenix. *Id.* ¶ 16.

In 2006, moreover, the Nation agreed to the construction of vehicle barriers and a patrol road along the vast majority of the border. *Id.* ¶¶ 13–14; *see* Chairman Jose Decl. ¶ 20 & Attach. B. That agreement grew out of numerous, collaborative discussions between the Nation and DHS, as a result of which the Nation "allow[ed] the government to put in vehicle barriers that did not disrupt the environment, or disturb our ancestors' resting places.… We also have an agreement since that time, that Border Patrol will continue to allow tribal members (from either

side) to continue to cross freely through three traditional crossing gates …. When we need to cross at places other than these gates, such as for ceremonial runs which must follow specific trails, or for certain gathering activities or other ceremonies, we call Border Patrol to let them know[.]" *Id.* ¶¶ 20–21.

The vehicle barriers "have virtually eliminated unauthorized vehicle transit across the border." Cook Decl. ¶ 15. More generally, "[t]he measures that the Nation and Border Patrol have put in place on the Reservation have proven to be highly effective in preventing, deterring, and intercepting illegal crossings and smuggling within the Reservation." *Id.* ¶ 17 (detailing successful operations). Data from both DHS and the Nation evidence that illegal activity across the Reservation border has decreased by roughly 90% in recent years. *Id.* ¶¶ 18–19.

## V.    The Grave Harms the Border Wall and Its Construction Would Cause the Nation

While the Nation has worked intensively with DHS and other federal agencies to secure the border, it has long been opposed to the construction of a border wall through the Reservation. In 2017, the Nation's Legislative Council enacted a Resolution detailing the reasons for its opposition to a wall while reaffirming its commitment to vigorous border protection measures. Chairman Jose Decl. ¶ 32 & Attach. J. The Nation remains firm in its position, as a border wall would have devastating effects on the Nation's lands and its people.

Christopher Senseney is currently a Professor of Civil Engineering at the University of Colorado Boulder and prior to that served for over twenty years as a civil engineer in the United States Air Force and then for three years in industry. While in industry (from 2018–2020), Professor Senseney worked on the design and construction of two border wall projects located in close proximity to the Nation's Reservation. In his Declaration, he concludes that construction of

the border wall "will have permanent and lasting impacts on the natural landscape and the

drainage on the Reservation," Decl. of Christopher Senseney ¶ 13, for several key reasons:

a. [C]onstruction of 30-foot-tall barriers requires extensive staging areas, material storage, equipment parking, and portable concrete batch plants that extend hundreds to thousands of feet beyond the immediate border corridor … These activities result in substantial and long-lasting disturbances to soils, hydrology, desert pavement, and vegetation communities, and these impacts are unlikely to be fully reclaimed for centuries in the arid environment of the Reservation.

b. Numerous construction access roads … would be necessary to transport materials, equipment, and personnel to active work areas. The construction and subsequent abandonment of these roads would permanently alter desert pavement, natural drainage patterns, and landscape features.

c. The rugged and mountainous terrain along the southern Reservation border includes areas with slopes ranging from approximately 30 percent to more than 80 percent, creating significant engineering and construction challenges for barrier and patrol road installation. Construction in these areas would require substantial earthwork, blasting, mountaintop removal … resulting in permanent and irreversible alterations to the natural landscape and topography of the Reservation.

d. … The extensive cut-and-fill earthwork, embankment construction, terrain leveling, and equipment access requirements necessary to accommodate steep slopes, valleys, and mountainous terrain would … result in substantial, long-term alterations to the natural landscape.

e. The construction of border barriers, patrol roads, access roads, and associated drainage structures has the potential to significantly alter natural hydrologic patterns on the Reservation by impeding water flow, increasing sediment accumulation, and exacerbating erosion and flooding in washes and low-lying areas. These drainage impacts could extend beyond the immediate construction corridor, increasing flood risks to nearby communities, agricultural operations, livestock, and other natural and cultural resources located along the southern border of the Reservation.

Senseney Decl. ¶ 43. Professor Senseney's conclusions are supported by those of Gary Nabhan,

an expert in desert ecology who discusses the vulnerability of the biocrust—the protective, living

foundation that holds the desert soil in place and nurtures the plant life sacred to the O'odham—

to construction vehicles and activities. "Once the living composition of the biocrust is destroyed,

it will not resolidify or regenerate within our lifetime." Nabhan Decl. ¶¶ 13, 26.

14

The sweeping changes to the landscape described by Professor Senseney would seriously and permanently degrade O'odham Reservation lands. They would also have a profoundly detrimental effect on the Nation's members. As a poignant example, the Nation's Chairman describes one of the peaks that would need to be blasted and graded as "a place that is sacred to our people and very significant for my family. It is the place where I go to pray, where I can walk up the slope and see all of our lands to the north and south, and I pray for all of the people across all of these lands.… If a wall were built across this peak, it would completely destroy this sacred and special place." Chairman Jose Decl. ¶ 30. The same would be true for other sacred peaks that lie in the wall's path, *see, e.g.*, Welch Decl. ¶ 28, and for trails and associated materials, including petroglyphs, left by O'odham ancestors on their religious expeditions for millennia as "perpetual prayers," *id.* ¶ 31, and markers "akin to sacred texts" to impart "religious training and resulting wisdom, inspiration, and guidance to new generations of salt pilgrims," *id.* ¶ 25. "[C]onstruction of walls … would disturb the sacred natural-cultural landscape that is, in effect, the origin, destination, medium, and altar for O'odham religious belief and practice." *Id.* ¶ 34.

Destruction and disruption would take place in other ways too. The wall would directly affect rituals including the Baboquivari and Salt Runs that depend on following ancient trails that that the wall would block or destroy. K. Jose Decl. ¶¶ 13–18. And the wall would sever the sense of connectivity that underpins the O'odham belief system. "We do not simply visit these lands; we maintain a living relationship with them." Francisco Decl. ¶ 3. "Our ancestors['] …. footsteps, prayers, songs, and teachings remain connected to these places." *Id.* Without the ability to maintain connection to the objects of prayer, our "prayers and songs will not reach the intended places[.]" Fayuant Decl. ¶ 10. The wall "will damage the connectivity that is the basis of all of our ceremonies." Rivas Decl. ¶ 8; *see also* Welch Decl. ¶ 34.

15

The wall would also directly impair access to dozens of plant varieties sacred to the O'odham and necessary for their religious rituals, including the revered Ha:san or saguaro cactus. *See* Nabhan Decl. ¶¶ 15–16, ¶ 21 & Attachs. B & C; Welch Decl. ¶¶ 18–19; K. Jose Decl. ¶ 33; Fayuant Decl. ¶ 26 & Attach. A. The wall will also impede the natural flow of summer floodwaters, diverting them from habitats that rely on them to sustain unique vegetation communities and toward naturally drier areas, where plants will be flooded and killed. Nabhan Decl. ¶ 27. Harm to the saguaros, or any single plant species, can have "cascading effects" that "jeopardize traditional … gathering habitats" used by O'odham for centuries. *Id.* ¶ 28.

Animal migration will also suffer if a wall divides traditional O'odham lands. Many animals rely on the connectivity of vast stretches of the desert landscape north and south of the border to find food and water, including the endangered jaguar, Sonoran pronghorn, and ocelot. Declaration of Miles Traphagen ¶¶ 8–9; 16–46. The cross-border movement of these animals is critical to the maintenance of genetically diverse breeding populations. *Id.* ¶¶ 30, 32, 37 & 45.

Finally, the Nation is painfully familiar with the damage federal contractors have caused on the Nation's aboriginal lands near the Reservation. Border wall construction in 2020 caused substantial damage to Quitobaquito Springs, which the O'odham have treasured for millennia, and Monument Hill, "the final resting place of many of our people." Chairman Jose Decl. ¶ 26. CBP contractors "conducted blasting on Monument Hill without even notifying the Nation beforehand, critically desecrating the site without paying any heed to our pleas." *Id.* Unfortunately, this cavalier and destructive behavior is ongoing. Just two months ago, CBP contractors working on border wall construction in the Cabeza Prieta National Wildlife Refuge roughly 50 miles west of the Nation's Reservation destroyed part of the Las Playas Intaglio, a geoglyph "created by our O'odham ancestors at least 1,000 years ago …. The destruction of our

16

Intaglio is a direct and irreversible act against our culture, identity and existence as O'odham people.… The Nation mourns this loss." Chairman Jose Decl. ¶ 28 & Attach. E.

## VI.   The Secretary's Announced Intention to Move Forward with Border Wall Construction on the Reservation

Despite the Nation's opposition, the Secretary has resolved to construct a wall on the Reservation. On May 15, 2026, Paul Enriquez, the Director of the Infrastructure Program for Border Patrol's Program Management Office Directorate, advised the Nation as follows:

> I am writing to inform you that CBP will be releasing the contract solicitation for the border wall project located adjacent to the Tohono O'odham Nation (Tucson 5 Wall Project) today, Friday, May 15. The contract solicitation will include the construction of approximately 62 miles of primary and secondary border wall, technology, a patrol road, cameras, and lighting. CBP is targeting a construction contract award in June 2026, followed by design and schedule for construction.

Chairman Jose Decl. ¶ 31 & Attach. F. On May 27, Director Enriquez then provided the Nation with a "statement of work" for the proposed border wall project, *id.* ¶ 31 & Attachs. G–I, including requirements for a "new 30-ft. primary vertical barrier" and a "secondary vertical barrier [to] be contained within the 60-foot Roosevelt Reservation," *id.* ¶ 31 & Attach. H at PDF pp. 1, 2. The statement of work documents further provide that the contractors "shall have full use of the Project real estate limits" but that "[l]ocating and acquiring staging areas on private lands" and "construction access roads" would be the "responsibility of the contractor." *Id.* ¶ 31 & Attach. H at PDF pp. 5, 6. On June 1, Mr. Enriquez provided the Nation with a map including proposed access routes for the construction project running through the interior of the Nation's Reservation. *Id.* ¶ 31 & Attach. I. And on June 4, CBP officials conducted a "planned bidders site visit" on the Reservation with representatives from five potential contractors. *Id.* ¶ 31.

Confronted with the very real and imminent threat that unless it acts, border wall construction will soon commence on its Reservation, the Nation filed this lawsuit.

17

## ARGUMENT

### I.    The Nation Has Article III Standing.

The Nation brings two claims: first, the Secretary's border wall plans are ultra vires because he lacks the authority to unilaterally diminish Reservation boundaries, Compl. ¶¶ 58–61; and second, the plans will place the Secretary and his designated contractors in trespass on the Reservation, *id.* ¶¶ 62–65. Both claims satisfy Article III's requirements that the Nation "have suffered an injury in fact that is (1) concrete, particularized, and actual or imminent; (2) caused by the defendant; and (3) redressable by judicial relief," *Narragansett Indian Tribe v. McMaster*, No. 24-5193, 2026 WL 1450020, at *5 (D.C. Cir. May 22, 2026) (citation modified).

As to the first requirement, the Nation's ultra vires and trespass claims allege that it is the beneficiary of a federally guaranteed Indian reservation over which it exercises sovereignty and enjoys exclusive rights of use and occupancy, and that the Secretary proposes to destroy those rights by confiscating and degrading Reservation land and diminishing its boundaries, which certainly qualify as concrete and particularized injuries. The claims further allege that injury is imminent, given the Department's solicitation of bids for construction on the Reservation and its intention to award the contract this month. *See* Chairman Jose Decl. ¶ 31 & Attach. F.

The Nation's alleged injuries are clearly "traceable to the challenged action of the defendant," *Khalid v. Blanche*, 172 F.4th 876, 884 (D.C. Cir. 2026). They flow directly from the Secretary's plan to proceed with border wall construction on the Reservation. And the injury is redressable because should this Court grant the requested relief, the injury will be averted.

18

## II.    The Secretary Is Not Immune to This Suit.

It is well settled that, under certain circumstances, injunctive relief may be obtained against a federal official without implicating the sovereign immunity of the United States. Those circumstances exist here, where the Nation alleges that the Secretary is acting in violation of a federal statute and federal common law. In *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949), the Supreme Court explained that

> where [an] officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief.

*Id.* at 689; *see also Wash. Legal Found. v. U.S. Sent'g Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996) (quoting same and citing *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963)).

Pursuant to this principle—which courts sometimes refer to as the *Larson-Dugan* exception—"a Federal officer acting in excess of his authority," *Larson*, 377 U.S. at 691, "cannot claim immunity from injunction process" by claiming that the United States' sovereign immunity has not been waived, *id.* at 690. This is because, "[i]n these circumstances, there is no sovereign immunity to waive—it never attached in the first place," *Leopold v. Manger*, 102 F.4th 491, 494 (D.C. Cir. 2024) (citation modified); *see also, e.g.*, *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) ("sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority" (emphasis and citation omitted)).

The *Larson-Dugan* exception applies squarely to the Nation's claims that the Secretary is acting in excess of statutory authority in attempting to diminish the Nation's Reservation. It likewise applies squarely to the Nation's claim of federal common law trespass because "sovereign immunity does not prevent an injunction against a state officer who abridges a

19

common law duty without statutory authorization," *Leopold*, 102 F.4th at 495; *see also, e.g.*, *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024) ("*Larson-Dugan* is triggered" where "defendants acted outside of the scope of their duty … imposed by the common law"); *Leopold v. Sullivan*, Civil Action No. 25-1026 (BAH), 2026 WL 663250, at *3 (D.D.C. Mar. 10, 2026) (*Larson-Dugan* exception applies to claims "against an officer acting in violation of statutory, constitutional, or common law command").

## III.    Legal Standard

To obtain a preliminary injunction, the Nation "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 573 (D.C. Cir. 2025) (same). "The balance of harms and the public interest factors merge when the government is the opposing party." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

## IV.    The Nation Has a Strong Likelihood of Success on Its Ultra Vires Claim.

In Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("Section 102"),[6] Congress authorized the Secretary to fortify sections of the U.S.-Mexico border with additional barriers and roads and empowered him "to waive all legal requirements … necessary to ensure expeditious construction of the barriers and roads under this section." Section 102(c)(1). The Secretary subsequently waived the requirements of the

---

[6] Pub. L. No. 104-208, div. C, title I, § 102(a)–(c), 110 Stat. 3009 (1996), as amended by Pub. L. No. 109-13, div. B, title I, §102, 119 Stat. 231, 306 (2005); Pub. L. No. 109-367, § 3, 120 Stat. 2638 (2006); Pub. L. No. 110-161, div. E, title V, § 564(a), 121 Stat. 2090 (2007), codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border.

20

Administrative Procedures Act ("APA") with respect to stretches of border that include the

Reservation. Determination Pursuant to Section 102 of the Illegal Immigration Reform and

Immigrant Responsibility Act of 1996, as Amended, 73 Fed. Reg. 18,293-01 (Apr. 3, 2008). But

as the D.C. Circuit has made clear, in cases in which APA review may not be had, "judicial

review is [still] available when an agency acts *ultra vires*[.]" *Nat'l Ass'n of Postal Supervisors v.*

*U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (citation modified); *see also Chamber of*

*Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–29 (D.C. Cir. 1996) (same).

To establish an ultra vires claim, the Nation must demonstrate that "(1) review is not

expressly precluded by statute, (2) there is no alternative procedure for review of the statutory

claim and (3) the challenged action is plainly in excess of [the Secretary's] delegated powers and

contrary to a specific prohibition in the statute that is clear and mandatory." *Glob. Health*

*Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (citation modified). It does so here.

**A.      Judicial Review Is Not Expressly Precluded by Statute and There Is No
         Alternative Procedure for Review of the Nation's Statutory Claim.**

The first two elements of the test are readily met. The Nation is aware of no statute

precluding review of the Nation's claim. And the only alternative procedure for review of the

Nation's statutory claim would have been the APA, which has been waived.

**B.      The Secretary's Actions Are Plainly in Excess of His Delegated Powers and
         Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory.**

The third element of the ultra vires test is "especially demanding," *Changji Esquel Textile*

*Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022), but it likewise is met here. The Secretary

lacks authority to diminish Reservation boundaries absent congressional approval, and his effort

to do so runs afoul of Section 398d. To understand why the Secretary's plans would effectuate an

21

illegitimate alteration of the Reservation borders, it is necessary to understand the legal status of

the lands the Secretary seeks to burden with the walls and associated infrastructure.

        **1.**        **Lands Subject to Tribal Aboriginal Rights Are Not "Public Lands."**

In the Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat. 922, Mexico ceded to the

United States a vast portion of the modern southwestern United States. Mexico ceded additional

lands in the southern portions of modern-day Arizona and New Mexico by way of the 1853

Gadsden Purchase Treaty. That latter cession included the lands that would eventually become

the Nation's Reservation. Both cessions are shown in Figure 2.



Figure 2[7]

Importantly for purposes of this suit, not all lands covered by those treaties became

public lands of the United States upon being ceded. The Treaty of Guadalupe Hidalgo required

that pre-existing property rights in the ceded lands "shall be inviolably respected" by the United

States. Art. VIII, 9 Stat. at 929. *See, e.g.*, *More v. Steinbach*, 127 U.S. 70, 78 (1888) ("[T]he

---

[7] National Park Service, *Apache Before 1861*, https://www.nps.gov/chir/learn/historyculture/pre-apache-wars.htm.

rights of the inhabitants to their property [within the ceded area] were not affected. They remained as before."); *United States v. Auguisola*, 68 U.S. 352, 358 (1863) (recognizing "the obligation devolved upon [the United States] by the treaty of Guadalupe Hidalgo to protect the rights of property of the inhabitants of the ceded territory"). The Gadsden Purchase Treaty stipulated that this protection of pre-existing property rights would likewise "apply to the territory ceded" by Mexico in the latter agreement. Art. V, 10 Stat. at 1035.

As a unanimous Supreme Court explained in *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339 (1941), these provisions for the protection of pre-existing property rights extended to lands claimed by Indian tribes by virtue of longstanding use and occupancy, or "aboriginal possession." *Id*. at 345. Aboriginal possession or title "is a right of exclusive use and occupancy held by Natives in lands and waters used by them and their ancestors prior to the assertion of sovereignty over such areas by the United States." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 536 n.4 (1987) (citation modified). *Santa Fe* explains that "'[u]nquestionably it has been the policy of the federal government from the beginning to respect the Indian right of occupancy'" and that "lands within the Mexican Cession were not excepted from th[at] policy[.]" 314 U.S. at 345 (quoting *Cramer v. United States*, 261 U.S. 219, 227 (1923)). Thus, "the assumption that aboriginal possession would be respected in the Mexican Cession …. should now be considered no longer open." *Id.* at 346.

Aboriginal title "was considered with reference to [tribes'] habits and modes of life; their hunting grounds were as much in their actual possession as the cleared fields of the whites." *Mitchel v. United States*, 34 U.S. 711, 713 (1835). To establish aboriginal title, a tribe had to show that the lands in question "constituted definable territory occupied exclusively" by the tribe. *Santa Fe*, 314 U.S. at 345. The resulting rights in those lands, as the *Santa Fe* Court

23

reiterated in distilling over a century's worth of case law, were "considered as sacred as the fee-simple of the whites." *Id*. (quoting *Mitchel*, 34 U.S. at 746). And they did not depend "upon a treaty, statute, or other formal government action." *Id*. at 347. Rather, "[t]he right … flows from a settled governmental policy." *Cramer*, 261 U.S at 229.

Because tribal aboriginal rights of occupancy have been protected since the Founding, lands subject to them did not become public lands that could be conveyed to others under the general land laws unless and until Indian title was extinguished by Congress. The *Santa Fe* Court applied these principles directly to a tribal claim of aboriginal title in Arizona. An 1866 statute granted a railroad a "right of way through the public lands" in the Arizona Territory. Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292, 294. Because a tribe had aboriginal rights of use and occupancy to certain lands claimed by the railroad, and because Congress had never extinguished the rights, the Court held that those lands did not fall within the statutory grant of public lands. *Santa Fe*, 314 U.S. at 347–356; *see also Missouri, Kansas, & Texas Railway Co. v. United States*, 235 U.S. 37, 40 (1914) ("The land has remained continuously appropriated to the use of the Indians, or has been sold for their benefit. It never for a moment has become a part of the public domain in the ordinary sense."); *Minnesota v. Hitchcock*, 185 U.S. 373, 394 (1902) (upon "a cession of the Indian rights of occupancy, … the lands would have become public lands").

Thus, any lands to which a tribal nation possessed aboriginal rights of use and occupancy on the date of the Gadsden Purchase Treaty remained subject to those rights after that date unless extinguished. "The power of Congress in that regard is supreme," *Santa Fe*, 314 at 347, and "congressional intent to extinguish Indian title must be 'plain and unambiguous,'" *Oneida Cnty. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 247–48 (1985) (quoting *Santa Fe*, 314 U.S. at 346); *see also, e.g, Pueblo of Jemez v. United States*, 790 F.3d 1143, 1162 (10th Cir. 2015)

24

("[T]his right of occupancy may only be extinguished by Congress's 'plain and unambiguous' intent, which will not be 'lightly implied[.]'") (quoting *Santa Fe*, 314 U.S. at 364, 354)).

Congress has long recognized and legislated based on these principles. In 1851, shortly after ratifying the Treaty of Guadalupe Hildago, it enacted a statute providing that pre-existing claims to land within the Mexican cession in California, including Indian claims, would be extinguished if not asserted in a tribunal established by Congress to adjudicate such claims. Only upon extinguishment would the land become "part of the public domain of the United States[.]" Act March 3, 1851, ch. 41, § 13, 9 Stat. 631, 633. In *Barker v. Harvey*, 181 U.S. 481 (1901), the Supreme Court explained that because the Indians claimed "the right of occupation, … it could not well be said that [the] lands … were a part of the public domain[.]" *Id*. at 491. The Indian claimants in *Barker*, however, had not asserted their claims within the statutory period, which effected an extinguishment of their rights and "made the land, within the language of the statute, 'part of the public domain of the United States.' 'Public domain' is equivalent to 'public lands,' and these words have acquired a settled meaning in the legislation of this country." *Id*. at 490.

In *Santa Fe*, the Court reiterated that "the Act of 1851 was interpreted [in *Barker*] as containing machinery for extinguishment of claims … based on Indian right of occupancy," rendering the lands public lands upon such extinguishment. 314 U.S. at 350. But that Act did not apply to the New Mexico and Arizona Territories. The statutes applicable to those territories were "quite different," *id*., as they included no provision for extinguishing tribal aboriginal claims, *id*. at 347–53. They instead made clear that "*Congress desired to continue in these territories the unquestioned general policy of the Federal government to recognize such right of occupancy*." *Id*. at 348 (emphasis added). An extinguishment of aboriginal rights in those territories could stem only "from action of Congress," which had not yet occurred. *Id*. at 351.

25

### 2.    The Roosevelt Reservation Did Not Extend to Unextinguished Aboriginal Lands.

President Roosevelt, then, lacked any authority to extinguish tribal aboriginal rights when he issued his 1907 Proclamation. And he nowhere purported to do so. Similar to the grant at issue in *Santa Fe*, the Roosevelt Reservation

> hereby reserved from entry, settlement or other form of appropriation under the public land laws and set apart as a public reservation, *all public lands* within sixty feet of the international boundary between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico[.]

Proclamation of May 27, 1907, 35 Stat. 2136, 2136 (emphasis added). The presidential reservation hence applied only to "public lands," which as detailed above were well understood not to encompass unextinguished aboriginal lands. Accordingly, if the Nation held aboriginal rights of use and occupancy to the lands within its present-day Reservation, and if those rights had not previously been extinguished by Congress when the Roosevelt Reservation was established in 1907, then the lands were not public lands and the Roosevelt Reservation, by its express terms, did not attach to them. As discussed next, that is precisely the case.

### 3.    The Nation Possessed Unextinguished Aboriginal Rights to the Lands that Became Its Reservation at the Time of the Roosevelt Proclamation.

In 1951, the Nation (then still referred to by the United States as the Papago Tribe) sued the United States under the 1946 Indian Claims Commission Act, 25 U.S.C. §§ 70–70n-2. Kanji Decl. ¶ 7 & Attach. F (*Papago Tribe of Ariz. v. United States*, Docket No. 345, 19 Ind. Cl. Comm. 394, 394 (1968)) ("ICC Op."). The Nation alleged, inter alia, that the United States had taken lands to which it held aboriginal rights without just compensation. *Id.* ¶ 8 & Attach. G (Land Petition, *Papago Tribe of Ariz. v. United States*, Docket No. 345, ¶¶ 38–44 (Ind. Cl. Comm. 1951)). Throughout the litigation, the parties and the Indian Claims Commission ("ICC")

26

divided the land area to which the Nation claimed aboriginal rights into three zones—Western,

Central, and Eastern—for purposes of analyzing the Nation's claims. *See* ICC Op. 398, 426. The

Central Zone was roughly coterminous with the boundaries of the Nation's Reservation (outlined

in red in Figure 3 below) as established by Executive Orders of President Wilson in 1916 and

1917 and supplemented by later statutes. The light green band in Figure 3 outlines all three

zones:



Figure 3[8]

The parties and the ICC understood that the southern boundary of the area encompassed

by the three zones was not the Roosevelt Reservation but rather the international border. The

ICC described the area's boundaries as

> bounded on the west by the Gila Mountains from the Mexican border northward;
> on the north by a line running just south of the Gila River to the vicinity of Gila
> Bend, then to Table Top Mountain, Picacho Peak and Red Rock, then on the east
> along the Santa Catalina-Patagonian mountain ridge to the Mexican Border; *and
> on the South by the Mexican border*.

---

[8] Bernard L. Fontana, Papago Indian Use and Occupancy in Southern Arizona (1964) (National
Archives and Records Administration, College Park, MD, Cartography, Record Group 279,
Records of the Indian Claims Commission, Docket 345, Petitioner's Exhibit 275).

*Id*. at 395 (emphasis added). The United States agreed as to that southern boundary. *See* Kanji Decl. ¶ 9 & Attach. H (Defendant's Requested Findings of Fact, Objections to Petitioner's Proposed Findings of Fact, and Brief) ("U.S. Br.") at 143 (referring to "the south line [of the three zones] being the international boundary").

The United States disputed the Nation's takings claim with respect to the Western and Eastern Zones on the basis that the Nation held no aboriginal rights in those zones. Relying on a range of authorities with expertise in the Indian history of the Southwest, it argued instead that the Central Zone (which, again, corresponds to the 1917 Reservation boundaries) formed the heart of the Nation's aboriginal territory. "[T]he central zone … has been recognized as the homeland of the Papago Indians by every ethnographer who has studied them." U.S. Br. 98 (citation omitted); *see also* ICC Op. 426 ("It is not contested that the Central Zone has been occupied and used by the Papago since time immemorial.").

The United States fleshed out its argument with repeated and detailed reference to the Central Zone reservation lands as constituting the aboriginal lands of the Nation. "The aboriginal occupancy areas of the Papago Indians within the United States at the date of the Gadsden Treaty of 1854, 10 Stat. 1031, lie within the areas of the present Sells Papago Reservation of 1917, as supplemented." U.S. Br. 31.[9] According to the United States, "[g]ame animals, food stuffs and construction materials necessary to the economy of the Papagos were found in good quantity in this area in the mid-19th century." *Id*. at 35 (citations omitted). Moreover, the Central Zone "covered practically the whole territory in which Papagos had established villages or over which they were accustomed to range." *Id.* at 71 (citation omitted).

---

[9] The Papago Reservation was sometimes also referred to as the "Sells Papago Reservation" in reference to the town of Sells, which lies within the Reservation and was the location of the Bureau of Indian Affairs regional office. Today, Sells is the seat of the Nation's government.

The United States then explained that the 1917 Reservation boundaries had been established specifically in recognition of the fact that the Nation had long occupied the subject lands as its aboriginal territory. The government noted that

> [i]n 1915 the Commissioner of Indian Affairs selected a group of men which was to become known as the "Committee of Eight" to make recommendations concerning the location of a reservation for the Papago Indians.…
> The report of this group recommended the establishment of the Sells Papago Indian Reservation and *the boundaries outlined in the report substantially conform to the present boundaries of the Sells Reservation in southern Arizona.*

U.S. Br. 203 (emphasis added) (citation omitted).

The Committee of Eight Report ("Report")[10] referenced by the government explained that the tract it recommended be reserved for the Papago was bounded by "the Mexican boundary on the south" and that the Papago "have inhabited this country from time immemorial[.]" Report 1, 5. Their longstanding "exclusive use" of the area gave rise to "a right of occupancy" and "a title or right of possession, of which they cannot be deprived without authority from Congress." *Id*. at 31. And in endorsing the Committee's recommendation, the Secretary of the Interior stated:

> A careful investigation in connection with these Indians has been in progress during the past two years, from the information gathered *it is conclusively shown that the Indians have been in undisturbed possession of the lands described* [in the enclosed draft executive order] *for over three hundred years past.* Every consideration of humanity and justice, therefore, points to the necessity of establishing a permanent reservation for their benefit.

---

[10] Kanji Decl. ¶ 10 & Attach. I (Committee of Eight, The Papago Indians in Southern Arizona (Aug. 18, 1915) (National Archives and Records Administration, Washington, DC, Record Group 75, Central Classified Files 1907-1939, General Services, Box 850, 6842-1915-305)).

29

U.S. Br. 115 (emphasis added); *see also id*. at 56–57, 70–71 (discussing same).[11] President Wilson adopted the recommendation in issuing his Executive Orders.

Presented with this overwhelming evidence that the Nation's Reservation had been created out of its aboriginal territory, the ICC had no difficulty concluding that the Central Zone constituted aboriginal lands of the Nation. Indeed, it concluded that the Nation had further established its aboriginal title to all three zones, including the lands in each zone abutting the international border:

> The Papago claim of aboriginal title to the lands of the three zones is adequately supported by the evidence …. *The southern boundary of the subject lands is the International American-Mexican Boundary*. The evidence and arguments of the parties leave no doubt that the petitioner exclusively used and occupied in Indian fashion from time immemorial all the lands [within the three zones].

ICC Op. 431 (emphasis added); *see also id*. at 422, 423 (describing same area as lands that "the Papago Tribe … exclusively occupied … and hence had aboriginal title to" and describing south boundary as "along the International Boundary Line to the point of beginning"). And the United States Supreme Court has likewise described those same boundaries as "the borders of the Papago aboriginal tribal land." *Morton v. Ruiz*, 415 U.S. 199, 202 n.2 (1974) (citing ICC Op. 422–23, 426).

Notably, in the ICC proceedings the United States asserted that there had been no taking of the lands within the Central Zone because "[t]he Sells Papago Reservation substantially includes the aboriginal use and occupancy areas of the Papagos prior to 1854, and they have not been removed from the lands which they occupied at the date of the Gadsden Purchase." U.S. Br.

---

[11] *See* Kanji Decl. ¶ 11 & Attach. J (Letter from Franklin K. Lane, Sec. of Interior, to President (Jan. 13, 1916) (National Archives and Records Administration, Washington, DC, Record Group 75, Central Classified Files 1907-1939, General Services, Box 850, 6842-1915-305, Part I, 3 of 3)).

67–68 (citations omitted). Accordingly, "the Papagos have not been deprived of their aboriginal land areas by either cession or removal." *Id*. at 68. The ICC agreed and concluded that lands within the Reservation boundaries would be "subtracted from the gross area" of the three zones for purposes of calculating just compensation for the taking. ICC Op. 434.

The lands within the Nation's 1917 Reservation boundaries, then—bounded on the south by the international border—never became public lands.[12] In 1907 those lands remained subject to the Nation's unextinguished and unceded aboriginal rights, and in 1917 they were confirmed as the Nation's reservation lands. As such, the lands were never encompassed by the 1907 Proclamation reserving "all *public lands* within sixty feet of the international boundary," 35 Stat. at 2136 (emphasis added), and their southern boundary is instead the international border. Indeed, as noted above, *supra* pp. 7, 8, Congress contemporaneously legislated with the express understanding that the southern boundary of the Nation's Reservation was co-extensive with "the international boundary line," § 2, 40 Stat. at 569; *see also* Act of May 21, 1928, ch. 645, 45 Stat. 617, 617. And Department of Interior officials repeatedly expressed that same understanding in the years immediately following the establishment of the Reservation when discussing "the erection of the fence on the international boundry [sic] line between Mexico and the Papago Indian Reservation[.]" Kanji Decl. ¶ 2 & Attach. C. *See supra* pp. 7, 8 & n.3.

---

[12] To be sure, the ICC described President Wilson's executive orders as withdrawing "public lands" for the Nation's Reservation. ICC Op. 421. But the ICC's reference in dicta to "public lands" merits no deference and is simply incorrect, as it conflicts with the ICC's own holding and Supreme Court precedent: The ICC held that the Nation possessed unextinguished aboriginal title to the land placed in the 1917 Reservation, and Supreme Court precedent is unambiguous that such land is not "public land."

31

4.    **The Secretary's Proposed Border Wall Plainly Exceeds His Delegated Powers.**

If allowed to proceed, the Secretary's authorization of a border wall and associated infrastructure north of the Nation's actual southern Reservation boundary will disestablish the reservation status of the lands so occupied and move the Reservation boundary northward to the extent of the occupation. Nowhere has Congress conferred such powers on the Secretary. Congress has delegated to the Secretary the power "to control and guard the boundaries and borders of the United States against the illegal entry of aliens[.]" 8 U.S.C. § 1103(a)(5). It has further provided that "[t]he Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads … in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Section 102(a). These provisions nowhere delegate the power to alter the boundaries of, or otherwise diminish, the Nation's Reservation.

As the Supreme Court has repeatedly held and recently reaffirmed, "once a block of land is set aside for an Indian reservation …, the entire block retains its reservation status until *Congress explicitly indicates* otherwise," *McGirt*, 591 U.S. at 914 (citation modified); *see also, e.g.*, *United States v. Celestine*, 215 U.S. 278, 285 (1909) (all tracts within an Indian reservation "remain a part of the reservation until separated therefrom by Congress"). Thus, "[i]f Congress wishes to break the promise of a reservation, it must say so…. Congress knows how to withdraw a reservation when it can muster the will." *McGirt*, 591 U.S. at 904; *see also, e.g.*, *Solem v. Bartlett*, 465 U.S. 463, 470 (1984) (stating that Congress's intent to alter the boundaries of an Indian reservation "will not be lightly inferred" and that for a court to find such intent requires that "Congress clearly evince an intent to change boundaries" (citation modified)); *Nebraska v. Parker*, 577 U.S. 481, 488 (2016) (Congress's "intent to do so must be clear").

32

Because the Nation's Reservation has been ratified by statute, moreover, it enjoys the same protection against the diminishment of tribal rights to the lands within it as do reservations established by treaty. *See, e.g.*, *Mo., Kan. & Tex. Ry. Co. v. Roberts*, 152 U.S. 114, 118 (1894) (discussing equivalent status of reservations "set apart by statute or treaty"). And the standard for finding congressional intent to diminish such rights is exacting: "What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating" the latter. *United States v. Dion*, 476 U.S. 734, 739–40 (1986); *see, e.g.*, *Solem*, 465 U.S. at 470 (finding standard for diminishment met where statute made "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests" in specific reservation lands); *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 355 (1962) (finding standard for diminishment met by statute "expressly vacating the South Half of the reservation and restoring that land to the public domain").

A delegation to the Secretary of "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens," 8 U.S.C. § 1103(a)(5)—one that makes no mention whatsoever of the Nation's Reservation or other rights, or even of tribal rights more generally—hardly constitutes an explicit expression of intent by Congress that the Secretary be empowered to diminish the Nation's Reservation. The Secretary's proposed actions accordingly go well beyond his delegated powers.

**5.    The Secretary's Actions Are Contrary to a Specific Statutory Prohibition that Is Clear and Mandatory.**

Not only do the Secretary's plans exceed his delegated authority, but they run headlong into an unambiguous statutory prohibition. Section 398d speaks in terms that are both clear and mandatory: "Changes in the boundaries of reservations created by Executive order,

33

proclamation, or otherwise for the use and occupation of Indians *shall not be made except by Act of Congress*." 25 U.S.C. § 398d (emphasis added). As the Supreme Court has recognized, this provision admits of no doubt. It allows changes to reservation boundaries to be made "by Congress alone." *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 325 n.6 (1942); *see also, e.g.*, *Chemehuevi Indian Tribe v. McMahon*, 934 F.3d 1076, 1081 (9th Cir. 2019) (explaining that in Section 398d, "Congress prohibited any change to the boundaries of existing executive-order reservations except by Congressional act."). The Department of the Interior has likewise acknowledged that "[t]he words of this statute are too plain and explicit to require interpretation." 57 Interior Dec. 219, 227, 1940 WL 4175, at *8 (D.O.I. 1940). And in 2025, the Department of Justice Office of Legal Counsel stated that, with Congress's enactment of Section 398d, "the boundaries of Indian reservations were effectively permanent…. They were permanent because Congress said so … [in] an explicit statement of legislative policy[.]" Revocation of Prior Monument Designations, 2025 WL 1719535, at *28 (O.L.C. 2025) (emphasis omitted).

As noted, the Secretary's permanent commandeering of a strip of land adjoining the southern boundary of the Nation's Reservation would completely eradicate the Nation's rights in that land, thereby disestablishing the Reservation within the strip and establishing a new boundary, marked by dual thirty-foot-high steel walls north of the international border where the boundary presently lies. Section 398d unambiguously prohibits the Secretary from acting in this fashion. "[*U*]ltra vires claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022). That requirement could not be met more plainly or literally than it is here.

### 6.      An Attempted Secretarial Waiver of Section 398d Would Not Alter the Foregoing Conclusions.

Section 102 authorizes the Secretary "to waive all legal requirements … necessary to ensure expeditious construction of the barriers and roads under this section." Section 102(c)(1). But any attempt by the Secretary to waive Section 398d in response to this suit would not undermine the Nation's entitlement to relief. To begin, Section 102(c) limits the Secretary's waiver authority to legal "requirements," and Section 398d is not a requirement. It is instead a prohibition, and "requirement" and "prohibition" are not synonymous. *See, e.g.*, *Cal. Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 287 (1987) ("[I]f Congress had intended to *prohibit* preferential treatment, it would have been the height of understatement to say only that the legislation would not *require* such conduct."); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 549 (2001) (interpreting statute precluding a state "requirement or prohibition" of certain acts and stating that by adding "prohibition," "Congress wished to ensure that a State could not do through negative mandate … that which it already was forbidden to do through positive mandate" (citation modified)); *Appalachian Power Co. v. E.P.A.*, 249 F.3d 1032, 1041–42 (D.C. Cir. 2001) (finding argument that the terms "requirements" and "prohibitions" "are interchangeable stretches the ordinary meaning of the term 'prohibition'" (citation modified)).

Moreover, even if Section 102(c) extended to prohibitions, it cannot be read to waive Section 398d, as it evidences no intent on the part of Congress to empower the Secretary to diminish reservation boundaries. It is instead entirely silent on the subject. Congress may not be found to have accomplished by implication what it may only accomplish expressly. As discussed above, for Congress to legislatively alter reservation boundaries, it must evince a "a clear congressional purpose to diminish" the specific reservation at issue. *Solem*, 465 U.S. at 476; *see also McGirt*, 591 U.S. at 914 (same). By the same token, had Congress wished to authorize the

35

Secretary to diminish the Nation's Reservation, there would have needed to be "*clear evidence that Congress actually considered* the conflict between its intended action" and a tribe's rights "and chose to resolve that conflict by abrogating" the latter, *Dion*, 476 U.S. at 739–40 (emphasis added). Section 102(c)'s generalized grant of waiver authority says not a word about Indian reservations, much less about the Nation's Reservation. To hold that it nevertheless implicitly allows the Secretary to diminish the Nation's boundaries would be to flatly circumvent the Supreme Court's exacting clear statement rule and indeed subvert its very purpose. *See, e.g.*, *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) ("[C]lear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation."); *Sossamon v. Texas*, 563 U.S. 277, 290 (2011) ("The requirement of a clear statement in the text of the statute ensures that Congress has specifically considered [an issue] and has intentionally legislated on the matter.").

Circumventing the clear statement rule would be especially misplaced here because, as applied to tribal reservation rights, the rule is grounded in the Constitution. In *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428 (D.C. Cir. 2023), the Circuit held that a waiver of federal sovereign immunity "may not" be implied from general statutory terms, *id.* at 434, because "[f]ederal sovereign immunity reinforces the separation of powers. It protects the Congress's power of the purse, Art. I, § 9, cl. 7," which belongs to "[o]nly the Congress," and waiving it therefore "requires clarity," *id*. at 433. Congress's exclusive authority to diminish an Indian reservation also requires clarity, and for the same reason. It is a "constitutional authority," *McGirt*, 591 U.S. at 903 (describing diminishment of reservation boundaries as a "constitutionally assigned prerogative[]" that belongs to "only Congress" (citation modified)). To

36

hold that a reservation may be diminished absent the clear and express intent of Congress would accordingly "be at odds with the Constitution," *id*. (citing U.S. Const. art. I, § 8)).

*       *       *

In sum, the Nation has demonstrated a clear likelihood of success on the merits of its ultra vires claim. As addressed next, the same is true for its claim of trespass.

## V.    The Nation Has a Strong Likelihood of Success on Its Trespass Claim.

### A.    The Nation Holds Rights of Property and Sovereignty over Its Reservation Lands.

"When the United States establishes a tribal reservation, the reservation generally includes (among other things) the land" and the rights to associated resources, and "[e]ach of those rights is a stick in the bundle of property rights that makes up a reservation." *Arizona v. Navajo Nation*, 599 U.S. 555, 563 (2023). Such rights are not only constitutionally protected property rights, *see Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 282 & n.15 (1955), but are also sovereign in nature. "Over tribal lands, the tribe has the rights of a landowner as well as the rights of … sovereignty," including "the sovereign power of determining the conditions upon which persons shall be permitted to enter its domain[.]" *Merrion*, 455 U.S. at 146 n.12 (citation modified); *see also, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1044 (D.C. Cir. 2021) (tribes enjoy "sovereign authority …. to manage the use of their territory and resources" (citation modified)); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1160 (9th Cir. 2020) (same). Congress, too, has recognized and confirmed this tribal power. *See* 25 U.S.C. § 5123(e) (affirming tribal authority "to prevent the … encumbrance of tribal lands … without the consent of the tribe"); *id*. § 324 (prohibiting rights of way across tribal land "without the consent of the proper tribal officials").

37

**B.     The Nation Has a Federal Common Law Right of Action to Prevent Unauthorized Appropriation of Its Reservation Lands by the Secretary.**

It is "well-established" that tribes have a right of action for "violation of their possessory rights based on federal common law." *Oneida Indian Nation of N.Y. State*, 470 U.S. at 236; *see also id.* at 235–36 & n.6 (collecting cases); *Swinomish*, 951 F.3d at 1160 (holding tribe could maintain a trespass claim under the "federal common law right of tribes to exclude non-Indians from Indian lands"). This includes actions against federal officials. *See Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113 (1919) (stating that "we entertain no doubt" of the Indians' "capacity to maintain … a suit" for an injunction against the unauthorized appropriation of Indian lands by federal officials); *Cramer*, 261 U.S. at 234 (absent congressional assent, encumbrance of tribal lands by federal officials could not "deprive the Indians of their rights"). And it specifically includes trespass actions. For example, in *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C. 1973)—one of the cases cited by the Supreme Court in *Oneida Indian Nation* in support of its recognition of tribes' federal common law right to sue for trespass, *see* 470 U.S. at 236 n.6—the court explained that "officers of the United States …. are themselves liable in trespass if their actions caused third parties to enter [Indian] land." 369 F.Supp. at 1371; *see also, e.g.*, *United States v. Dann*, 873 F.2d 1189, 1196 n.5 (9th Cir. 1989) (stating that where federal officials attempt to impair tribal land rights, tribes "must be able to protect" those rights "by asserting [them] against the official or agency.").

**C.     The Construction of the Border Wall and Associated Infrastructure Will Trespass on the Nation's Lands.**

As discussed above, the Secretary threatens to subject the Nation's Reservation lands not only to permanent occupation by the border walls and associated infrastructure, but also (as a necessary corollary to the construction of that infrastructure) to a swath of destructive occupation

38

and impairment of the Nation's lands both along and inland from the border. *Supra* pp. 13–17. These threatened trespasses would substantially infringe on the Nation's exclusive use and occupancy of its own lands, in patent violation of federal law.

Courts in this Circuit generally rely on the Restatement (Second) of Torts (A.L.I. 1965) ("Restatement") when addressing federal common law tort claims. *See, e.g.*, *Barry v. Islamic Republic of Iran*, 437 F.Supp.3d 15, 43–44 (D.D.C. 2020) ("district courts in this jurisdiction rely on well-established principles of law, such as those found in the Restatement (Second) of Torts … to define the elements" of a federal common law claim (citation modified)). Courts more generally take this approach in the context of claims for trespass on Indian lands. *See United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009) ("Federal common law governs an action for trespass on Indian lands …. [and] generally comports with the Restatement of Torts[.]").

Under Section 158 of the Restatement, one is liable for trespass if, without consent, one "enters land in the possession of the other, or causes *a thing or a third person to do so*, or … remains on the land[.]" Restatement § 158 (emphasis added). These requirements are readily met here. The Secretary has not obtained the Nation's permission to allow Department officials or their agents or contractors to enter the Nation's Reservation to construct the proposed border walls, roadways, and other associated infrastructure. Indeed, the Nation's Legislative Council has enacted Resolutions explicitly opposing any efforts by the Secretary to build a wall across the Nation's southern boundary. Resolution No. 17-053 at 5 (Feb. 8, 2017) ("[T]he Tohono O'odham Legislative Council opposes … the construction of a physical wall on the Nation's

39

southern boundary[.])";[13] Resolution No. 21-115 at 2 (Apr. 12, 2021) (reaffirming Resolution No. 17-053).[14]

The variable terrain on the Reservation means that a border wall and associated infrastructure construction would be a massive endeavor, requiring significant grading, leveling, and embankment fill work, as well as the permanent obliteration of mountain features. *See* Senseney Decl. ¶¶ 29–36. A construction project of this magnitude would further require the establishment of concrete batch plants and the blading of vast staging areas for equipment and materials, destroying the fragile vegetative mantle over extensive lands. *See id*. ¶¶ 14–19; *see also* Nabhan Decl. ¶ 26. Additionally, a significant network of access roads would need to be graded across the Reservation, again permanently scarring the landscape. Senseney Decl. ¶¶ 20–32. Even if the Roosevelt Reservation exists on the Nation's Reservation, any notion that these construction-related activities could be confined to a sixty-foot strip adjacent to the international border would be fanciful, as Professor Senseney explains in detail. *Id.* ¶¶ 33–35.

As he must, the Secretary appears to understand that such encroachments on the Reservation cannot lawfully be accomplished without the Nation's consent, declaring in the project specifications that "locating and acquiring staging areas on private lands is the responsibility of the Contractor." Chairman Jose Decl. ¶ 31 & Attach. H at PDF p. 5. But the Secretary lacks that consent, and the Nation confirms here that it will not grant it. And absent that authorization, the Secretary's threatened appropriation and destruction of the Nation's Reservation lands would be nothing less than a blatant "act of confiscation," *McGirt*, 591 U.S. at 926 (citation modified); *see also, e.g.*, *Lane*, 249 U.S. at 113 (unauthorized appropriation of

---

[13] https://tolc-nsn.org/docs/Actions17/17053.pdf.
[14] https://tolc-nsn.org/docs/Actions21/21115.pdf.

Indian lands by federal executive branch officials "would not be an exercise of guardianship, but an act of confiscation").

Finally, any attempt by the Secretary to invoke Section 102(c) to waive the common law prohibition against trespassing on Reservation lands would be as ineffectual as an attempt to waive Section 398d, and for the same reasons. *Supra* pp. 35–37. There is no circumventing "[t]he first and governing principle … that only Congress can divest a reservation of its land," *Solem*, 465 U.S. at 470, and that Congress must "clearly express its intent to do so," *McGirt*, 591 U.S. at 904. Congress made no reference to Indian reservations in Section 102(c), much less did it authorize the takeover and destruction of the Nation's lands that the Secretary threatens to accomplish unilaterally.

## VI.   The Nation Will Suffer Irreparable Injury Absent an Injunction.

If the Secretary has his way, an army of contractors will soon invade the Nation's Reservation and utilize a vast arsenal of heavy equipment and dynamite to reshape the Reservation landscape, causing significant devastation and forever altering the relationship of the Nation and its members to their lands, their relatives and neighbors, and their Creator. The Nation would suffer several distinct forms of irreparable injury as a result.

First, the Secretary's authorization of such activity would undermine the Nation's sovereign control over the use of its lands. And the "loss of sovereign authority over [a] Tribe's historic lands" is irreparable as it "is not one that can be calculated in terms of money." *Mashpee Wampanoag Tribe v. Bernhardt*, Civil Action No. 18-2242 (PLF), 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (citation modified); *see also, e.g.*, *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (Gorsuch, J.) ("[We have] repeatedly stated that an invasion of tribal sovereignty can constitute irreparable injury." (citation

41

modified)). It is difficult to imagine a more complete abrogation of the Nation's sovereignty than for the federal government to move unilaterally over the Nation's vehement objections to reshape the Nation's own homeland.

Second, such unilateral action would likewise undermine the Nation's proprietary control over its lands. "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). And it is well-settled that "'unauthorized interference with a real property interest constitutes irreparable harm as a matter of law' since real property is a 'unique commodity for which a monetary remedy for injury is an inherently inadequate substitute.'" *L.C. ex rel. Cali v. Trump*, Civil Case No. 26-688 (RJL), 2026 WL 1329750 (D.D.C. May 13, 2026) (quoting *Watson v. Perdue*, 410 F.Supp.3d 122, 131 (D.D.C. 2019), *appeal filed*, *Massimiliano Cali v. Trump*, No. 26-5172 (D.C. Cir. May 20, 2026); *see also, e.g.*, *Shvartser v. Lekser*, 308 F.Supp.3d 260, 267 (D.D.C. 2018) (same). *Cf. Loretto*, 458 U.S. at 426 ("[W]e have long considered a physical intrusion by government to be a property restriction of an unusually serious character[.]").

Third, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co*, 480 U.S. at 545. That is unquestionably the case here, where the Secretary's plan would result in the flattening of mountaintops, the scarring of the Reservation landscape, and marked impacts on Reservation resources. *Supra* pp. 13–17. Put succinctly, peaks and other lands sacred to the O'odham cannot be put back together once the government and its contractors eviscerate them.

Fourth, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted); *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (quoting same). As detailed above, the construction of the border wall would seriously burden O'odham religious exercise, interfering with the ability of Nation members to engage in ages-old religious observances and rituals and destroying lands and resources they hold sacred.

An injunction is warranted, then, to prevent the serious, irreparable injury that the Nation will suffer if the Secretary moves forward with his plans.

\*    \*    \*

"The likelihood of success and irreparability of harm 'are the most critical' factors. *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749, 173 L.Ed.2d 550 (2009)," *Trump v. Thompson*, 20 F.4th at 31, in determining the propriety of injunctive relief, and here they strongly counsel in favor of granting the Nation's motion.

## VII.    The Balance of Equities and the Public Interest Weigh Heavily in Favor of an Injunction.

"The balance of harms and the public interest factors merge when the government is the opposing party." *Thompson*, 20 F.4th at 31. That is because the government does not have interests that transcend the public interest. Its interests are instead defined by the public interest, such that the "[government's] harm and the public interest are one and the same[.]" *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021).

As detailed above, the Nation would suffer substantial harms if the Secretary is able to move forward with his plans. The Nation's sovereign and proprietary control over its lands would be annihilated, those lands and the resources they support would be forever damaged, and

43

the rights of its people to engage in religious activities they hold dear would be substantially curtailed. The inequities involved cannot be overstated. We are long past the time in this Nation's history when federal officials can override the interests of Tribal Nations with impunity and commandeer Indian lands they are meant to protect. If allowed to proceed, the Secretary's plans "would not be an exercise of guardianship, but an act of confiscation," *Lane*, 249 U.S. at 113, and devastation simply not countenanced by federal law.

The Secretary may make claims about the imperatives of border security in an effort to justify his actions. There exists basis for skepticism about such claims as applied to the Nation's lands when border crossings on the Reservation are at historic lows, and when the Nation remains steadfast in its commitment to working in a collaborative, creative, and effective manner with the Secretary on border security issues. *Supra* pp. 11–13; Cook Decl. ¶¶ 8–19, 21.

But the more fundamental point is that any such claims would be seriously misplaced. The government's interests are equivalent to the public interest, *Pursuing Am's Greatness*, 831 F.3d at 511, and the D.C. Circuit has repeatedly stated that "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation modified); *see also, e.g.*, *Glob. Health Council*, 153 F.4th at 22 (same); *Shawnee Tribe*, 984 F.3d at 102 (D.C. Cir. 2021) (same).

That is because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 594 U.S. at 766 (rejecting argument that "the public['s] … strong interest in combating the spread of the COVID-19 Delta variant" justified agency action in excess of statutory authority). In *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir.

44

2022), the D.C. Circuit catalogued *Alabama Association of Realtors* and other notable examples in which the Supreme Court has rejected arguments that overriding public interests warrant the perpetuation of unlawful agency activity:

> In *Youngstown Sheet & Tube Co. v. Sawyer*, for example, the Supreme Court affirmed the district court's preliminary injunction of an illegal executive order even though a wartime President said his order was necessary to avert a national catastrophe.… [*Alabama Association of Realtors*]; *see also NFIB v. Department of Labor*, [595 U.S. 109] (2022) (staying an illegal vaccine mandate even though the government said the mandate would save more than 6,500 lives).

*Id.* at 734 (citation modified).

Here, as detailed above, the Secretary lacks the authority to unilaterally diminish the Nation's reservation boundaries or to impair the Nation's rights to use and control the use of the lands found therein. "If Congress wishes to break the promise of a reservation, it must say so." *McGirt*, 591 U.S. at 904; *supra* pp. 32–41. The Secretary's proposed course of action runs headlong into Congress's clear proscription that "[c]hanges in the boundaries of reservations created … for the use and occupation of Indians shall not be made except by Act of Congress," 25 U.S.C. § 398d, and the Nation's "sovereign authority …. to manage the use of [its] territory and resources," *Standing Rock Sioux Tribe*, 985 F.3d at 1044 (citation modified). The public interest lies in enforcing these limits on the Secretary's lawful authority, not in sanctioning his efforts to overcome them. The D.C. Circuit has been crystal clear that "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Goodluck v. Biden*, 104 F.4th 920, 924 (D.C. Cir. 2024) (citation omitted) (quoting *Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893)). If the Secretary wishes to abrogate the Nation's reservation boundaries and its rights to exercise sovereign and proprietary control over the lands within them, his resort is to Congress, not to his own conception of the public interest as carried out in violation of the law.

45

Dated: June 17, 2026                          Respectfully submitted,

                                              /s/ *Riyaz A. Kanji*
Howard M. Shanker, D.C. Bar 426359*           Riyaz A. Kanji, D.C. Bar 455165
Attorney General                             David A. Giampetroni*
Logan Takao Cooper*                          Christopher C. Miller*
Assistant Attorney General                   KANJI & KATZEN, P.L.L.C.
TOHONO O'ODHAM NATION                        P.O. Box 3971
P.O. Box 830                                 Ann Arbor, MI 48106
Sells, AZ 85634                              (734) 769-5400
Howard.Shanker@tonation-nsn.gov              rkanji@kanjikatzen.com
Logan.Cooper@tonation-nsn.gov                dgiampetroni@kanjikatzen.com
                                             cmiller@kanjikatzen.com

                                             Philip H. Tinker*
                                             KANJI & KATZEN, P.L.L.C.
                                             12 N. Cheyenne Ave., Ste. 220
                                             Tulsa, OK 74103
                                             (206) 344-8100
                                             ptinker@kanjikatzen.com

*Counsel for Plaintiff Tohono O'odham Nation*

*Pro Hac Vice Application Forthcoming

46