**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,

*Plaintiff*,

v.

MARKWAYNE MULLIN, in his official
capacity as Secretary of U.S. Department of
Homeland Security; RODNEY SCOTT, in his
official capacity as Commissioner of U.S.
Customs and Border Protection; and
ROSARIO VASQUEZ, in his official
capacity as Chief of U.S. Border Patrol,

*Defendants*.

Case No. 26-cv-2127

**DECLARATION OF CHAIRMAN VERLON M. JOSE**

I, Verlon Jose, declare the following on the basis of personal knowledge to which I am competent to testify:

1.      I am a citizen of the Tohono O'odham Nation and a member of the Chukut Kuk District, from the community of Tecalote. Since September of 2023, I have served as Chairman of the Tohono O'odham Nation.

2.      The Nation is a federally recognized tribal government with a federally protected Reservation consisting of over 2.8 million acres in the Sonoran desert region of southern Arizona, virtually all of which are held in trust for the Nation by the United States under a 1917 Executive Order which established the Reservation's initial boundaries. Executive Order 2524, Reserving Certain Lands in the State of Arizona for the Papago Indians in Arizona (Feb. 1, 1917). Today, the Nation has over 37,000 members, 13,300 of whom live within the Nation's

1

Reservation within the United States. Another approximately 3,000 Nation members live within the Nation's traditional territories in Mexico. There are 17 traditional O'odham communities in Mexico which O'odham members call home to this day.

3. Other than a brief period during my childhood where I left the Reservation to attend boarding school, and another brief period as a young man when I went to Tucson for work, I have lived my entire life on the Nation's Reservation and within the Nation's traditional territory.

4. I was born on the Reservation, in Sells, Arizona, in 1967. My family were ranchers. In the summers we lived and worked on our land approximately four miles north of the border. In the winter, we would go to our land in the south, on the Mexico side about five miles south of what is now Serapo's gate, because there was water there during that season. It was all hard work back then, but I loved to do it. I would travel from Sells on the weekends and during the summer, so that I could work the land and take care of the cattle and horses and crops.

5. My father trained horses, and I am told that I was riding horses before I could walk. I would go out onto the land and gather the horses and bring them back. I would have to control them with no saddle or bridle, just bareback. I would ride down south across the border and back all the time.

6. I would travel with my father a lot, down across the border. We would go to visit my grandparents and other relatives, and we would go for community meetings. I was not aware of any border at that time. It was just an imaginary line that did not mean anything to us. In most places there were no markers or barriers along the border at all, except for maybe a barbed-wire fence and a cattle guard at the road crossings. There were no indications at those places that you were crossing over into a different country.

7.      There was a church that we would go to every year, on the Mexico side, where they had a fiesta, a big community celebration. I never knew until I was older why we always went to this church, but later I learned that my grandfather had helped to build that church. So every year we went, and we helped to prepare the feast. My dad would meet with community elders. They held a traditional council, where all the men would gather and talk.

8.      My father and my grandfather before him had been involved with helping the O'odham communities in Mexico since long before I was born. There were problems that the community members were having with ranchers taking their lands or their water, problems with accessing healthcare and schools and other things. So my father would go around to all of the communities and talk to people, attend community meetings to address these issues. He would drive out to an elder's home and spend all day visiting with them under a tree or on the porch, share what he had heard. This is how we communicated, before computers and cell phones. He would pick people up in his truck and take them into town to get medical treatment or groceries or to visit family, bring them water from the wells in big barrels, and help them with whatever they needed. If someone was stranded on the road, he would always stop to help them. When I asked my Dad why we always helped everyone, he said because that's just what we do, because we can. And later, that's what I told my own son when he asked me the same thing.

9.      I would go with my dad on these visits and to these community meetings before I was even old enough to understand what we were doing. My father understood that, even though I was just a small child, I was still able to watch and learn about what was happening, learn why it was important to listen to people, and to help people. He told me that one day I would understand what the people were saying, and that I would remember, and be glad that I learned

what they had to say. When my son was little I did the same thing with him, took him with me to see how things were done, the same way my father did with me.

10.     While my son was still young, I was going to school in Tucson but I also needed a job, so I began working at the Nation's Attorney General's office. I did not have any experience with the law, but I knew our people's traditional ways, our customs and teachings, that I learned from my father and his father, and I had seen them in our community all of my life growing up. I worked as an independent lay advocate for several years.

11.     It was during this time that I first ran for public office. I was first elected to the District Council for my district, Chukut Kuk, in 1999. Later I ran for and served two terms, or eight years, on the Nation's Legislative Council. In 2011, I ran for Chairman of the Chukut Kuk district council, where I served for four years. I was then asked by one of my elders to run on a ticket for Chairman with him, with him as the Chairman and myself as the Vice Chairman. We won that election and served for four years, until 2019, when we lost our re-election bid.

12.     After the 2019 election I was no longer an elected representative of the Nation, but I had other projects to keep me busy. I was serving on the board of a non-profit organization called First Americans Resources & Services, and it was during this time that they asked me to be President of that Board. I was also serving as the Governor of the Traditional O'odham Leaders, a governing council for the Mexican O'odham that was recognized in 1995. A true and correct copy of the Tohono O'odham Legislative Council's December 5, 1995 Resolution No 95-562 recognizing the Traditional O'odham Leaders' traditional form of governmental structure is attached as **Attachment A** of this Declaration.

13.     When the COVID-19 pandemic struck, I was in a position to help provide services, food, and protective equipment to the O'odham communities in Mexico. We organized

the delivery of medical supplies, food, and donations across the border. The border gates were closed at that time, because of the pandemic. But we needed to provide these supplies to the communities, which had no other means of getting these things at that time. So we organized supply drop-offs, where we would back trucks full of supplies up to the vehicle barriers across the border, and transfer them to trucks on the other side. We coordinated with Border Patrol for these drop-offs, who would come out to make sure that we were not moving contraband. Once they had verified that everything was on the level, they would often help us pass supplies over the border.

14.     When the vaccine was released, we organized a vaccination site for our O'odham community in Mexico at the CBP Port of Entry in Lukeville, Arizona. It was not feasible to have people crossing the border through the regular process in order to be vaccinated, so CBP allowed us to set up a vaccine station in their sally-port at the way-station. O'odham in Mexico would be allowed to come in, ten or twenty at a time, receive their vaccination, and go back out without having formally crossed over into the United States. After we had vaccinated all of the O'odham who chose to receive it, we opened the program up to anyone in Mexico who wished for it and could make it to the site. All told, we gave out about 17,000 vaccinations.

15.     In 2023 I ran again for tribal office, this time to be the Chairman. I won that election and I have been honored to serve as the Nation's Chairman since that time.

16.     The Nation has a long history of working with the United States, including the Department of Homeland Security, Customs and Border Protection (CBP), and Border Patrol, to protect the United States and the Nation and Nation citizens from problems such as crime and drugs and violence that can occur across an unregulated border in this modern world. The Nation is well aware of these problems, and has a critical interest in eliminating illegal activity at the

border—be it in the form of drug trafficking, human trafficking, or other dangerous activity—and in ensuring the safety of migrants who want to come and cross into the United States in a safe and legal way. We as a Nation and a community work with CBP and Border Patrol every single day to help accomplish these goals.

17. When the federal government first started to put in border walls in the 1990s, we reached out to discuss security measures for the Nation. At that time, a big problem for the Nation was cattle rustlers coming over from Mexico to take O'odham livestock back across the border. Another problem was abandoned cars. Cartel members would go to Tucson or Phoenix and steal a vehicle and drive across the border to bring back drugs or people. When Border Patrol would catch them on the way back, oftentimes those vehicles would become disabled and abandoned on the Nation's lands, and it was very difficult to remove them.

18. The Nation worked with the United States to come up with a solution. But it was not an easy process. Any solution on the Nation's lands would have to be approved by the people. We make our decisions based on consensus. We do not simply do something because a person who is in charge says that we should. We take our time to make decisions. First, we will inform everyone of what the issue is. Everyone must go back to their districts, go back to their families, and talk about it, hear everyone's point of view, and decide together what they want. Not everyone is going to agree with every decision. But it is important that everyone is given a chance to speak their piece, and to take their time to think through their decision along with their family and neighbors. This is a fundamental part of our community organization, it is part of who we are.

19. For the border crossings, people were concerned about any structures digging up our lands around the border and potentially disturbing the resting places of our ancestors, or

desecrating or violating cultural sites. They also insisted that any barriers not affect the migration of the animals, which must be able to cross freely to roam, eat, and mate as they have always done. Lastly, they insisted that there be a way for them to still cross the border freely, to visit family in Mexico, perform and attend ceremonies, and take care of their relatives who have passed on and, like many of our people, are buried in churches and traditional resting places on the Mexico side of the border.

20.     We worked through these issues with CBP and Border Patrol and came to an agreement to allow the government to put in vehicle barriers that did not disrupt the environment or disturb our ancestors' resting places. Before the barriers were installed, the Cultural Affairs Office worked with contractors hired by Border Patrol to conduct a cultural resources survey across the entire southern border of the Nation. For areas with particular cultural or ecological sensitivities, Border Patrol agreed to install non-invasive "Normandy-Style" barriers that sit on top of the soil but do not penetrate the earth so as not to disturb whatever important resources the survey had identified. A true and correct copy of the Tohono O'odham Legislative Council's July 19, 2006 Resolution No 06-465 authorizing the installation of these barriers is attached as **Attachment B** of this Declaration.

21.     We also have an understanding since that time that Border Patrol will continue to allow tribal members (from either side) to continue to cross freely through three traditional crossing gates—the San Miguel Gate towards the eastern side of the Reservation, the Papago Farms Gate in the west, and Serapo's Gate in the center. These gates are locked when unattended, but tribal members who wish to cross can call Border Patrol, who will come out and open the gate and also make sure that the tribal members are not involved in any dangerous or inappropriate activities. When we need to cross at places other than these gates, such as for our

ceremonial runs which must follow specific trails, or for certain gathering activities or other ceremonies, we call Border Patrol to let them know that we will be crossing at different locations. This arrangement does not always function perfectly, for our members or for Border Patrol, and some tribal members do not like that they have to show their I.D.s and have their vehicles searched by border patrol whenever they are going across to see their families or for ceremonies or to take care of their relatives who have passed on. But this is a compromise that we have made with the government to ensure the safety of all of our people, and we work with Border Patrol as best we can to make sure that our members have the right and the ability to continue to travel and to conduct our ceremonies as we always have.

22.     We have also agreed to allow Border Patrol to install a surveillance system of ten Integrated Fixed Towers (IFTs) on our lands, from which Border Patrol can monitor virtually the entire border at all times, day and night. This again was a security measure that we had to work through with our community to overcome their significant concerns. While the purpose of these towers is to monitor the border for potential illegal activity, they have the ability to monitor the homes and lands and ceremonial grounds of all O'odham citizens who live in the border regions. Our people understandably had very significant privacy concerns about these towers going in. We took our time to meet with everyone and explain the situation, explain why this monitoring would be important to keep us all safe from unlawful border activity. We explained that, when we are having ceremony or doing other traditional activities that require privacy, we can call border patrol and let them know to black out the cameras in those areas during those times. Again, not everyone is happy with this compromise that we made. Some people do not feel that they have true privacy if they have to call and tell the government when they are going to do something that is private. Allowing those towers to go up was not an easy decision for us. But we

8

understand the importance of keeping our border safe, and we wanted to help Border Patrol have the resources that it needed to do this. It took years for us to come to this decision as a community, to conclude that the loss of some of our privacy was a price that we were willing to pay in exchange for the safety benefits that these towers would provide. A true and correct copy of the Tohono O'odham Legislative Council's March 25, 2019 Resolution No 19-088 authorizing the installation of these towers is attached as **Attachment C** of this Declaration.

23.     In 2024, I spoke to the United States House of Representatives Committee on Natural Resources, Subcommittee on Oversight and Investigations, regarding the Nation's longstanding and successful partnership with CBP and Border Patrol, including these and numerous other border security and safety measure. A true and correct copy of this testimony is attached as **Attachment D** to this Declaration.

24.     The wall that the government wants to build across our lands is a different matter. This is a drastic measure that we cannot accept. It would cost us too much as a people to do so, and we do not believe that it will make us any safer if we do.

25.     We have no word for "wall" in our language, or for "barrier." These concepts are not part of our cultural traditions. We believe in hospitality, in being welcoming. When someone comes to our homes, we invite them in. We give them food. If we don't have any food, we give them water, or at least a place to sit and rest. We do not know what it means to turn people away, to block them out of our lives. A wall is a physical representation of these things that we do not believe in, a symbol of something that is fundamentally in opposition to everything that we stand for as a people.

26.     We know what this wall has done in other places where it has been put up. Border wall construction in 2019 and 2020 caused significant destruction to our traditional sacred sites

9

to the west of the Reservation, at Quitobaquito Springs and Monument Hill, in what today is called the Organ Pipe National Monument. These sites are extremely important to our people. For all of our history, the O'odham have used Quitobaquito Springs for its waters and the plant and animal life that these waters support. It is a place that we visit on our pilgrimages and the site of many important ceremonies that have been handed down from our ancestors. And Monument Hill is the site that was used for ceremonies by our O'odham ancestors and is the final resting place of many of our people. Although we informed the government in 2019 of the importance of these sacred sites and requested consultation regarding how they might be protected, in 2020 CBP contractors conducted blasting on Monument Hill without even notifying the Nation beforehand, critically desecrating the site without paying any heed to our pleas to identify alternatives and mitigation measures.

27.    After the government built the wall at Organ Pipe, I traveled to the site with a group of O'odham elders to see what had been done. The elders cried to see the wall there. It affected them so deeply. They knew that it was not right for the wall to be there, and they felt that pain deep within their spirits.

28.    I wish that we could believe that the government has learned to take greater care after the desecration of our cultural sites at Organ Pipe. Unfortunately, we know that it has not. Just two months ago, CBP contractors working on border wall construction in the Cabeza Prieta National Wildlife Refuge roughly 50 miles west of the Nation's Reservation destroyed part of the Las Playas Intaglio, a geoglyph created by our O'odham ancestors at least 1,000 years ago, and which some experts estimate to be as much as 8,000 years old. As I informed Commissioner Scott of CBP after the devastating event:

> The destruction of our Intaglio is a direct and irreversible act against our culture, identity, and existence as O'odham people. Our Intaglio are not artifacts of the

10

past. They are living expressions of *Himdag*, *Our way of life*, our laws, our relationship to the land, and our responsibility to all living things. These sacred formations encode our history, migration, and ceremonies. They mark spiritual relationships between land, water, and people. They serve as places of prayer, teaching, and cultural continuity. To destroy the Intaglio is to erase a living record of O'odham existence, one that predates the United States and continues into the future through our children. The Nation mourns this loss. The impact of the destruction of this ancient, sacred place on the Nation's members cannot be overstated.

Letter from V. Jose to R. Scott, May 4, 2026. A true and correct copy of my letter is attached as **Attachment E** to this Declaration.

29.     If I had to see a 30-foot wall across our lands, separating our people between the north and the south, separating and dividing our communities and keeping families apart from each other, keeping people away from the graves of their relatives and ancestors, it would break my heart. I could not bear to see that. The wall would cut me and my family, and our people, off from one other, and from our important ceremonial places.

30.     There is a mountainous peak along the border, a place that is sacred to our people and very significant for my family. It is the place where I go to pray, where I can walk up the slope and see all of our lands to the north and south, and I pray for all of the people all across those lands. It is where my family harvest the Saguaro fruits during the season. The border passes right through this place, directly across the peak. If a wall were built across this peak, it would completely destroy this sacred and special place. They would need to reshape the mountain, to blow holes in it by blasting or carve it up with heavy machinery. They would need to build roads all up and down the slopes for their equipment and machinery. They would have to plow over or tear up the saguaro, and the wall would block us from gathering the fruit on the other side.

11

31.    The government has told us that they intend to construct this wall within the Nation's territory, that we have no choice but to accept this inevitability. On May 15, 2026, Paul Enriquez, the Director of the Infrastructure Program for U.S. Border Patrol's Program Management Office Directorate, sent me and Vice Chairwoman Johnson an email in which he stated:

> I am writing to inform you that CBP will be releasing the contract solicitation for the border wall project located adjacent to the Tohono O'odham Nation (Tucson 5 Wall Project) today, Friday, May 15. The contract solicitation will include the construction of approximately 62 miles of primary and secondary border wall, technology, a patrol road, cameras, and lighting. CBP is targeting a construction contract award in June 2026, followed by design and schedule for construction. The construction schedules will be known following the contract award and CBP will share the schedule with the Nation as soon as received by the construction contractor.

A true and correct copy of Director Enriquez's email is included as **Attachment F** to this Declaration. On May 27, Director Enriquez provided the Nation with a statement of work on the best management practices and contract project specifications for the proposed border wall project within the Nation, and on June 1 he provided the Nation with a Reservation map identifying proposed access routes for the project. True and correct copies of these documents are included as **Attachments G to I** to this Declaration. Furthermore, on June 4, CBP officials conducted a "planned bidders site visit" with representatives from five potential contractors, in order to look at sensitive areas along the proposed wall on the southern border of the Nation.

32.    The Nation, in an exercise of its sovereign governmental authority to uphold and effectuate the will of the O'odham people, has already spoken on this issue. On February 8, 2017, the Tohono O'odham Legislative Council enacted Resolution No. 17-053 which, while affirming the Nation's ongoing commitment to working with the United States to meet our mutual border security goals, enshrined into law the Nation's opposition to the construction of

any wall along the Nation's southern border. A true and correct copy of this Resolution is included as **Attachment J** to this Declaration.

33.     Because the Nation cannot accept a border wall across our Reservation as an inevitability, because we will not consent to use and destruction of our lands for such a purpose, and because we cannot fathom a wall being placed across our lands to divide our territory in two and to forever keep our people apart from one another, we have no other option but to bring this lawsuit, to protect our rights and our way of life. This is an obligation that we owe to our ancestors, who have given us everything that we have in this life and shown us the way that we are to live. And it is one that we owe to our children, and to the generations that will come after them, so that they will be able to continue to follow this way of life after we are gone.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 16, 2026                    _/s/ Verlon Jose_____
                                        Verlon Jose, Chairman
                                        Tohono O'odham Nation

13

# ATTACHMENT A

# RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL
## (Recognition of the O'odham in Mexico Communities and Traditional Government)

RESOLUTION NO. __95-562__

WHEREAS,    The Tohono O'odham Tribe has occupied lands from Onk Akimel (Salt River) to Ge Pisin (Hermosillo) and from Kawk Su:d (San Pedro River) to Ge Ka:ck (Gulf of California) since time immemorial; and

WHEREAS,    from the time of European Arrival to today these lands remain with the O'odham people who have resisted assimilation for over 500 years; and

WHEREAS,    regardless of the artificial barrier made by the United States of America (USA) and the United States of Mexico, the O'odham are one people through blood, language, culture, and tradition; and

WHEREAS,    as it was the will of the elders expressed in meetings in the 1970's that solutions be sought for O'odham in Mexico to be legally recognized by the Governments of the USA and Mexico that we are from time immemorial one people; and

WHEREAS,    Papago Council Resolution #43-79 (exhibit A) states [in lines 1-5]: "the lands traditionally constituting the patrimony of the Papago Indian People, known as the Papagueria, were by the Treaty of

**RESOLUTION NO. 95-562**
(Recognition of the O'odham in Mexico Communities and Traditional Government)
Page 2 of 6

Guadalupe Hidalgo and the Gadsden Purchase bisected by the international border separating the United States from Mexico; and

WHEREAS, [in lines 6-9] such actions dividing historical Papagueria into two areas under separate flags and allegiances were accomplished without consultation with or consent of the indigenous Papago population; and

WHEREAS, [in lines 10-14] such division nessitated the creation of two separate tribes under independent governments, i.e., the Papago Tribe of Arizona and the Papago Tribe of Mexico now established under the separate government in the State of Sonora; and

WHEREAS, [in lines 14-17] ...recognize[d] the Papago Tribe of Mexico and its government, and that the officials of both governments meet as necessary on issues of common concern to both tribes; and

WHEREAS, recognizing the first step for unity needs to be the Tohono O'odham Nation's recognition of the O'odham of Mexico's traditional governmental structure, the Traditional O'odham Leaders (T.O.L.) and their representatives (exhibit B), and recognizing that the second

**RESOLUTION NO. 95-562**
(Recognition of the O'odham in Mexico Communities and Traditional Government)
Page 3 of 6

step will be the inclusion of these people as a 12th District of the Tohono O'odham Nation; and

WHEREAS, O'odham in Mexico live in the I) Legally Titled Communities of Pozo Verde, San Francisquito (and annex Carrizalito), Sonoyta, Quito Vac (and annex Chujubabi), Las Norias (and annex Santa Elena), Pozo Prieto (and annex Calenturas) and other II) O'odham Communities held by Possession: El Bajio, Cumalito, Cubabie, Mochomera, Rancho Espuma, Rancho San Pedro; and

WHEREAS, III) O'odham Live in the Communities of: Caborca, Pitiquito, Puerto Penasco, Magdalena, Hermosillo, and Sasabe, and IV) O'odham hold in their memory many other villages, ranches and sacred sites considered within the O'odham Patrimony (partial listing in (exhibit C); and

WHEREAS, All O'odham people have a right to share in the traditional knowledge and wisdom of O'odham elders and their families who live in the lands described herein; and

RESOLUTION NO. 95-562
(Recognition of the O'odham in Mexico Communities and Traditional Government)
Page 4 of 6

WHEREAS, the O'odham people, regardless of where they live, have guarded and struggled to preserve the integrity and character of O'odham as one people and so desire to support the aspirations of the Traditional O'odham Leaders through their recognition as legitimate representatives of the communities where Traditional O'odham Leaders reside and as legitimate representatives concerned for the patrimony of O'odham Lands.

WHEREAS, O'odham Unity is crucial for the present and future generations of all O'odham.

NOW, THEREFORE, BE IT RESOLVED that the Legislative Council of the Tohono O'odham Nation hereby starts the process of undertaking the will of its people by officially and formally recognizing the Traditional O'odham Leaders' (TOL) Traditional form of governmental structure and its notes on traditional government as binding (Exhibit D).

**RESOLUTION NO. 95-562**
(Recognition of the O'odham in Mexico Communities and Traditional Government)
Page 5 of 6

The foregoing Resolution was passed by the Tohono O'Odham Council on the 05TH. day of DECEMBER, 1995 at a meeting at which a quorum was present with a vote of 910.5 FOR; 808.5 AGAINST; 157.0 NOT VOTING; and [01] ABSENT, pursuant to the powers vested in the Council by Section 3 of Article II and Article VI Section 1(b) of the Constitution of the Tohono O'Odham Nation, adopted by the Tohono O'Odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984).

TOHONO  O'ODHAM LEGISLATIVE COUNCIL

Dennis  Ramon, Legislative Chairman

13th day of December, 19 95

ATTEST:

Frances Antone

Frances Antone,  Legislative Secretary

13th day of December, 19 95

Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'Odham Nation on the 13th day of December, 19 95 at 2:17 o'clock, P .M., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon his approval or upon his failure to either approve or disapprove it within 48 hours of submittal.

**RESOLUTION NO. 95-562**
(Recognition of the O'odham in Mexico Communities and Traditional Government)
Page 6 of 6

**TOHONO O'ODHAM LEGISLATIVE COUNCIL**

_____
**Dennis Ramon, Legislative Chairman**

☒ **APPROVED**         on the _14_ day of _December_ , 19 _95_

[ ] **DISAPPROVED**         at _9:35_ o'clock, _A_.M.

_____
**EDWARD D. MANUEL, Chairman**
**TOHONO O'ODHAM NATION**

Returned to the Legislative Secretary on the _14th_ day of _December_ , 19 _95_ , at _11:00_ o'clock, _A_.M.

_____
**Frances Antone,  Legislative Secretary**

RESOLUTION NO. 95-562

ACTION:    RECOGNITION OF THE O'ODHAM IN MEXICO COMMUNITIES AND TRADITIONAL GOVERNMENT

MOVED:    COUNCILWOMAN MARY JANE JUAN-MOORE    SECOND:  COUNCILMAN DAVID GARCIA

DATE:    DECEMBER 05, 1995

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| SIF OIDAK 160.0 | 1. MARY ANN ANTONE (Nellie Miguel) | 80.0 | | X | | X |
| | 2. RITA MARTINEZ (Maxine Norris) | 80.0 | | X | | |
| SELLS 314.0 | 1. JOSEPH T. JOAQUIN (Allen W. Garcia, Jr.) | 157.0 | | | X | |
| | 2. LUCILLE ENCINAS (Cynthia Chico) | 157.0 | | X | | |
| SCHUK TOAK 117.0 | 1. KENNETH J. ANTONE ( ) | 58.5 | X | | | |
| | 2. MARY JANE JUAN-MOORE ( ) | 58.5 | X | | | |
| SAN XAVIER 142.0 | 1. DENNIS RAMON ( ) | 71.0 | X | | | |
| | 2. TONY BURRELL ( ) | 71.0 | X | | | |
| BABOQUIVARI 257.0 | 1. EDWARD KISTO ( Idella Stanley) | 128.5 | X | | | |
| | 2. FRANCES MIGUEL (Kenneth Chico, Sr.) | 128.5 | | X | | |
| GU ACHI 187.0 | 1. ALEX J. RAMON (Marian Johnson) | 93.5 | | X | | |
| | 2. WILLARD ANITA (Louis Johnson) | 93.5 | | X | | |
| PISINEMO 135.0 | 1. JOHNSON JOSE (Roseleen Antone) | 67.5 | X | | | |
| | 2. BARBARA SALVICIO ( ) | 67.5 | X | | | |
| SAN LUCY 105.0 | 1. ALBERT MANUEL, JR. ( ) | 52.5 | | X | | |
| | 2. JOHN RENO (Mary Hoffman) | 52.5 | | X | | |
| GU VO 134.0 | 1. MICHAEL FLORES ( ) | 67.0 | X | | | |
| | 2. FERN SALCIDO (Larry Montana) | 67.0 | X | | | |
| HICKIWAN 142.0 | 1. LLOYD FRANCISCO  . ( ) | 71.0 | | X | | |
| | 2. ALEX JOSE ( ) | 71.0 | X | | | |
| CHUKUT KUK 183.0 | 1. KENNETH WILLIAMS ( ) | 91.5 | X | | | |
| | 2. DAVID GARCIA (Marvin Thomas ) | 91.5 | X | | | |
| TOTAL | | 1,876.0 | 910.5 | 808.5 | 157.0 | [01] |

**PASSED VOTES

# ATTACHMENT B

## RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL
**(Approving Border Vehicle Barrier Design Pursuant to Resolution No. 04-095, "Supporting Vehicle Barriers and All-weather Road Project Along the International Boundary Within the Tohono O'odham Nation")**

**RESOLUTION NO. 06-465**

WHEREAS, the Tohono O'odham Legislative Council is vested with the power to "administer land and other public property, and by law, ordinance or resolution .... to manage, protect, preserve and regulate the use of the property, wildlife, land, air and natural resources (including surface and ground waters) of the Tohono O'odham Nation" and the power to consult "appropriate federal agencies regarding federal activities that affect the Tohono O'odham Nation" (Constitution of the Tohono O'odham Nation, Article VI, Section 1(i)(2) and 1(j)); and

WHEREAS, the Tucson Sector of the United States Border Patrol ("USBP") is responsible for enforcing homeland security within the United States of America, including the Tohono O'odham Nation ("Nation") lands along the international boundary with Mexico ("International Boundary"); and

WHEREAS, the USBP has consulted with the Nation and has developed designs, construction processes, and enforcement techniques utilizing border vehicle barriers and all-weather roads in conjunction with other technologies to prevent and deter illegal entry into the Nation's lands within the United States by motor vehicles; and

WHEREAS, the USBP has agreed, subject to Congressional appropriation, to design, build, manage and maintain an effective border enforcement barrier and an all-weather road along the International Boundary within the Nation in consultation with the Nation's Districts, Legislative Committees, Legislative Council and Executive Branch, at no cost to the Nation; and

WHEREAS, pursuant to Resolution No. 04-095, the Tohono O'odham Legislative Council did support "the USBP's border vehicle barrier and all-weather road construction proposal along the entire International Boundary within the Nation's lands, and supports Congressional appropriation for the project," subject to several conditions, including that "that the design of the border vehicle barriers and the all-weather road is subject to the approval of the Nation"; and

WHEREAS, Chukut Kuk District, by Resolutions No. 2003-18 and No. 2003-57, and Gu Vo District, by Resolution No. GV03-80, previously expressed support for the border vehicle

RESOLUTION NO. 06-465
(Approving Border Vehicle Barrier Design Pursuant to Resolution No. 04-095, "Supporting Vehicle Barriers and All-weather Road Project Along the International Boundary Within the Tohono O'odham Nation")
Page 2 of 4

barrier and the all-weather road project, as well as a preference for the "corral fence" or "rail on rail" design of barrier; and

WHEREAS, the USBP is now requesting that the Nation approve the use of three types of vehicle barriers, corral (rail-on-rail), temporary (Normandy), and Bollard-style fencing, based on terrain features, soil quality, and the presence of cultural or natural resources; and

WHEREAS, the USBP has made presentations on the use of the three vehicle barriers to the Chukut Kuk and Gu Vo Districts, which have passed resolutions supporting the installation of a variety of barriers by Chukut Kuk District Resolution No. 2006-35 and Gu Vo District Resolution No. GV03-80 as amended by Resolution No. GV06-082; and

WHEREAS, the USBP has further requested that the vehicle barrier be augmented with cable and/or barbed wire fencing to prevent cattle rustling and keep undesirable livestock from entering the United States.

NOW, THEREFORE, BE IT RESOLVED that the Tohono O'odham Legislative Council hereby reaffirms its support for the USBP's border vehicle barrier and all-weather road construction project along the International Boundary within the Nation's lands, and supports congressional appropriation for the project, subject to the conditions set forth in Resolution No. 04-095 and further provided that the barrier contain openings at the traditional crossing areas along the border known as San Miguel Gate, Serapo's Gate, and Papago Farms Gate with 24 hour surveillance by US Customs and USBP.

BE IT FURTHER RESOLVED that, pursuant to the terms of Resolution No. 04-095, the Tohono O'odham Legislative Council hereby approves the use of (1) Bollard-style, corral (rail-on-rail), and/or temporary (Normandy) fencing in the design and construction of the USBP's border vehicle barrier as appropriate depending upon factors including the location of washes, archaeological sites, mountainous areas and areas deemed biologically sensitive to the Nation, etc. and (2) cable and/or barbed wire fencing to augment the vehicle barrier to prevent cattle rustling and keep undesirable livestock from entering the United States.

BE IT FINALLY RESOLVED by the Tohono O'odham Legislative Council that the Nation's approval of the USBP's border vehicle barrier is subject to the terms and conditions set forth in this Resolution and Resolution No. 04-095; the USBP must therefore receive

**RESOLUTION NO. 06-465**
(Approving Border Vehicle Barrier Design Pursuant to Resolution No. 04-095, "Supporting Vehicle Barriers and All-weather Road Project Along the International Boundary Within the Tohono O'odham Nation")
Page 3 of 4

prior approval from the Nation before taking any action contrary to the terms and conditions embodied in these Resolutions.

The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 12TH. Day of JULY, 2006 at a meeting at which a quorum was present with a vote of 2,440.80 FOR; -0- AGAINST; -0- NOT VOTING; and [02] ABSENT, pursuant to the powers vested in the Council by Article VI, Section 1 (i)(2) and 1 (j) of the Constitution of the Tohono O'Odham Nation, adopted by the Tohono O'Odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984).

TOHONO O'ODHAM LEGISLATIVE COUNCIL

_____
Evelyn B. Juan Manuel, Legislative Chairwoman

19ᵗʰ day of _July_____, 2006

ATTEST:

_____
Lucille Lopez, Acting Legislative Secretary

12 day of _July_____, 2006.

Said Resolution was submitted for approval to the office of the Chairwoman of the Tohono O'Odham Nation on the 19ᵗʰ day of _July_____, 2006 at 4:07 o'clock, P .M., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon her approval or upon her failure to either approve or disapprove it within 48 hours of submittal.

TOHONO O'ODHAM LEGISLATIVE COUNCIL

_____
Evelyn B. Juan Manuel, Legislative Chairwoman

[✓] APPROVED                    on the 19 day of _July_____, 2006

[  ] DISAPPROVED                at 6:50 o'clock, P .M.

_____
VIVIAN JUAN-SAUNDERS, CHAIRWOMAN
TOHONO O'ODHAM NATION

**RESOLUTION NO. 06-465**
(Approving Border Vehicle Barrier Design Pursuant to Resolution No. 04-095, "Supporting Vehicle Barriers and All-weather Road Project Along the International Boundary Within the Tohono O'odham Nation")
Page 4 of 4

Returned to the Legislative Secretary on the _____ day of

_____, 2006, at _____ o'clock, _____.M.

_____
Lucille Lopez, Acting Legislative Secretary

RESOLUTION NO.  06-465

**ACTION:**    APPROVING BORDER VEHICLE BARRIER DESIGN PURSUANT TO RESOLUTION NO. 04-095, "SUPPORTING VEHICLE BARRIERS AND ALL-WEATHER ROAD PROJECT ALONG THE INTERNATIONAL BOUNDARY WITHIN THE TOHONO O'ODHAM NATION"

**MOVED:**    VICE CHAIRMAN VERLON JOSE                    **SECOND:**    COUNCILWOMAN FRANCES ANTONE

**DATE:**    JULY 12, 2006

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| **BABOQUIVARI** 310.8 | 1.  FRANCES MIGUEL *(Absent)* (Vernon J. Smith) *(Present)* | 155.40 | X | | | |
| | 2.  FRANCES G. ANTONE (Lucilda J. Valenzuela (Norris)) | 155.40 | X | | | |
| **CHUKUT KUK** 258.7 | 1. ETHEL GARCIA (            ) | 129.35 | X | | | |
| | 2. VERLON M. JOSE (David Garcia) | 129.35 | X | | | |
| **GU ACHI** 221.6 | 1.  TIMOTHY L. JOAQUIN (Jonas Robles) | 110.80 | X | | | |
| | 2.  CYNTHIA E. MANUEL (Louis L. Johnson) | 110.80 | X | | | |
| **GU VO** 193.1 | 1. RAYMOND VICTOR (            ) | 96.55 | X | | | |
| | 2. MICHAEL FLORES (Grace Manuel) | 96.55 | X | | | |
| **HICKIWAN** 167.4 | 1. DELMA GARCIA (Mary E. Sam) | 83.70 | X | | | X |
| | 2. SANDRA ORTEGA (            ) | 83.70 | X | | | |
| **PISINEMO** 171.8 | 1. BARBARA SALVICIO (            ) | 85.90 | X | | | |
| | 2. GERALD FAYUANT (            ) | 85.90 | X | | | |
| **SAN LUCY** 169.0 | 1. JOHN W. LAWSON, SR. (            ) | 84.50 | X | | | |
| | 2. GLORIA RAMIREZ (            ) | 84.50 | X | | | |
| **SAN XAVIER** 193.8 | 1. FELICIA NUÑEZ (            ) | 96.90 | X | | | X |
| | 2. OLIVIA VILLEGAS-LISTON (Eileen A. Estrada-Lopez) | 96.90 | X | | | |
| **SCHUK TOAK** 146.9 | 1. FRANCES B. CONDE (            ) | 73.45 | X | | | |
| | 2. PHYLLIS JUAN (            ) | 73.45 | X | | | |
| **SELLS** 421.0 | 1. MARLENE SARAFICIO-JUAN (            ) | 210.50 | X | | | |
| | 2. EVELYN B. JUAN MANUEL (Kimberly Listo) | 210.50 | X | | | |
| **SIF OIDAK** 186.7 | 1. WAVALENE SAUNDERS (Isidro Lopez) | 93.35 | X | | | |
| | 2. DARLENE ANDREW *(Absent)* (Rita Martinez) *(Present)* | 93.35 | X | | | |

# ATTACHMENT C

# RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL
(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the
United States Customs and Border Protection's Integrated Fixed Tower Project)

RESOLUTION NO. 19-088

WHEREAS,    "The unallotted lands of the Tohono O'odham Nation and all lands hereafter acquired by the nation, or held for the use of the nation or its members, are a valuable public resource and shall be held as national lands forever. Control and management thereof are vested in the Tohono O'odham Council, which may enact laws governing the use, assignment, permit, lease or other disposition of lands, interests in land and resources of the nation consistent with Federal law." (Constitution of the Tohono O'odham Nation, Article XVI, Section 1); and

WHEREAS,    the Legislative Council has a duty "to manage, protect, preserve and regulate the use of the property, wildlife, land, air and natural resources (including surface and ground waters) of the Tohono O'odham Nation" and to "administer land and other public property, and by law, ordinance or resolution . . . to prevent the sale, disposition, lease, use or encumbrance of Tohono O'odham national lands, interests in lands, rights-of-way, or other public resources when such sale, disposition, lease, use or encumbrance will, in the opinion of the Tohono O'odham Council, be injurious to the best interests of the Tohono O'odham Nation as a whole" (Constitution, Article VI, Section 1(i)(1) and (2)); and

WHEREAS,    uses of unallotted national lands by federal agencies must be approved by Legislative Council resolution, Nation's law, or a lease or other agreement authorized or approved by the Legislative Council, and the Council is accordingly empowered to "consult, negotiate and conclude agreements and contracts on behalf of the Tohono O'odham Nation" with federal agencies and to consult with "appropriate federal agencies regarding federal activities that affect the Tohono O'odham Nation" (Constitution, Article VI, Section 1(f) and (j)); and

WHEREAS,    when federal agencies propose uses of national lands, the Legislative Council strongly supports consultation with affected members, communities, and districts before the Council considers approving any proposed use; and

WHEREAS,    unlike national forests, wilderness areas, and other federal lands on the international boundary dividing the United States and Mexico, the Nation's reservation is not public land, and the Nation has a duty to ensure that tribal members' interests and the Nation's jurisdiction to perform its constitutional obligations are protected; and

WHEREAS,    the duty to protect Nation's lands, its jurisdiction, and members' interests, including in the Nation's dealings with the United States Customs and Border Protection ("CBP"), is consistent with the Department of Homeland Security's

RESOLUTION NO. 19-088
(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the United States Customs and Border Protection's Integrated Fixed Tower Project)
Page 2 of 7

Tribal Consultation Policy in which, "The United States recognizes the right of Federally-recognized Indian Tribes ("Indian Tribes") to self-government. Indian Tribes exercise inherent sovereign powers over their members and territories." DHS Tribal Consultation Policy, I.A.; and

WHEREAS, the Tucson Sector of the United States Border Patrol, as part of CBP of the Department of Homeland Security, is responsible for securing the border along the international boundary with Mexico ("International Boundary"), including the areas on the Nation's lands; and

WHEREAS, CBP has proposed to construct an Integrated Fixed Tower ("IFT") system on the Nation and has requested that the Nation consent to grants of easement for rights of way for IFT tower sites and related roadways; and

WHEREAS, pursuant to Resolution Nos. 12-121 and 13-142, the Legislative Council authorized CBP to conduct initial site visits and pre-development activities; and

WHEREAS, by Resolution No. 15-479, the Legislative Council gave its preliminary support to the IFT Project subject to the following five conditions being met:

1. CBP's completion of environmental, cultural and other requirements identified by the Nation's Cultural Affairs, Planning, Realty, Roads, and Wildlife and Vegetation Management staff (the "IFT Conditions");

2. the Nation's final evaluation of the IFT project;

3. negotiation and approval of compensation for related rights-of-way for the IFT project;

4. the approval and execution of a written agreement between the Nation and CBP that will protect the Nation's lands, its jurisdiction, and members' interests; and

5. a resolution granting the Nation's consent for a grant of easement for rights-of-way for the IFT project; and

WHEREAS, the five conditions of support listed in Resolution No. 15-479 have been met or will be met with the approval of this Resolution; and

WHEREAS, the Domestic Affairs, Cultural Preservation and Agricultural and Natural Resources Committees have reviewed the following documents relating to the grants of easement for rights-of-way for the IFT project and recommend their approval:

1. Grant of Easement for Right-of-Way for TCA-AJO-0450 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

RESOLUTION NO. 19-088
(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the United States
Customs and Border Protection's Integrated Fixed Tower Project)
Page 3 of 7

2. Grant of Easement for Right-of-Way for TCA-AJO-0448 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

3. Grant of Easement for Right-of-Way for TCA-AJO-0446 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

4. Grant of Easement for Right-of-Way for TCA-CAG-0442 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

5. Grant of Easement for Right-of-Way for TCA-CAG-0440 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

6. Grant of Easement for Right-of-Way for TCA-CAG-0438 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

7. Grant of Easement for Right-of-Way for TCA-CAG-0436 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

8. Grant of Easement for Right-of-Way for TCA-CAG-0434 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

9. Grant of Easement for Right-of-Way for TCA-CAG-0430 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

10. Grant of Easement for Right-of-Way for TCA-CAG-0444 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

11. Grant of Easement for Right-of-Way for Portions of the Traditional Northern Road.

12. Grant of Easement for Right-of-Way for Low Water Crossings

13. The Agreement between the Tohono O'odham Nation and United States Customs and Border Protection for Conditions for Grants of Easement for Right-of-Way for Integrated Fixed Tower Project, Access and Approach Roads, Low Water Crossings and Traditional Northern Road.

14. The Right-Of-Way Compensation Agreement between the U.S. Department of Homeland Security/Customs and Border Protection and the Tohono

RESOLUTION NO. 19-088
(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the United States Customs and Border Protection's Integrated Fixed Tower Project)
Page 4 of 7

O'odham Nation for Integrated Fixed Tower sites, approach roads, access roads, the Traditional Northern Road and Low Water Crossings.

NOW, THEREFORE, BE IT RESOLVED that the Legislative Council consents to the following grants of easement for rights-of-way by the U.S. Bureau of Indian Affairs to the U.S. Department of Homeland Security/Customs and Border Protection for the IFT project, subject to the finalization and signing by all parties of the documents and agreements attached to or incorporated by this reference in the following grants of easement for rights-of-way:

1. Grant of Easement for Right-of-Way for TCA-AJO-0450 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

2. Grant of Easement for Right-of-Way for TCA-AJO-0448 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

3. Grant of Easement for Right-of-Way for TCA-AJO-0446 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

4. Grant of Easement for Right-of-Way for TCA-CAG-0442 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

5. Grant of Easement for Right-of-Way for TCA-CAG-0440 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

6. Grant of Easement for Right-of-Way for TCA-CAG-0438 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

7. Grant of Easement for Right-of-Way for TCA-CAG-0436 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

8. Grant of Easement for Right-of-Way for TCA-CAG-0434 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

9. Grant of Easement for Right-of-Way for TCA-CAG-0430 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

RESOLUTION NO. 19-088
(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the United States Customs and Border Protection's Integrated Fixed Tower Project)
Page 5 of 7

10. Grant of Easement for Right-of-Way for TCA-CAG-0444 Tower Site and associated Access Road, Approach Road, and Temporary Construction Easement.

11. Grant of Easement for Right-of-Way for Portions of the Traditional Northern Road.

12. Grant of Easement for Right-of-Way for Low Water Crossings.

BE IT FURTHER RESOLVED that the Legislative Council approves the "Agreement between the Tohono O'odham Nation and United States Customs and Border Protection for Conditions for Grants of Easement for Right-of-Way for Integrated Fixed Tower Project, Access and Approach Roads, Low Water Crossings and Traditional Northern Road" in substantially the form attached and authorizes the Chairman of the Nation to execute it and any related documents reasonably necessary to carry out the intent of this Resolution.

BE IT FURTHER RESOLVED that the Legislative Council approves the "Right-Of-Way Compensation Agreement between the U.S. Department of Homeland Security/Customs and Border Protection and the Tohono O'odham Nation for Integrated Fixed Tower sites, approach roads, access roads, the Traditional Northern Road and Low Water Crossings" in substantially the form attached and authorizes the Chairman of the Nation to execute it and any related documents reasonably necessary to carry out the intent of this Resolution.

BE IT FURTHER RESOLVED that the compensation received from U.S. Department of Homeland Security/Customs and Border Protection for the rights-of-way shall be distributed as follows: Fifty percent (50%) to the Nation and fifty percent (50%) to be divided between the Chukut Kuk and Gu Vo Districts based on the percentage of the total acreage of the rights-of-way approved through this Resolution present in each District, as determined by the Nation's Office of Real Estate Management Program.

BE IT FINALLY RESOLVED that, pursuant to 25 C.F.R. §169.110, the Legislative Council:

(1) finds that the compensation agreed to in the "Right-Of-Way Compensation Agreement between the U.S. Department of Homeland Security/Customs and Border Protection and the Tohono O'odham Nation for Integrated Fixed Tower sites, approach roads, access roads, the Traditional Northern Road and Low Water Crossings" is satisfactory to the Tohono O'odham Nation;

(2) waives valuation by the Bureau of Indian Affairs; and

RESOLUTION NO. 19-088
(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the United States
Customs and Border Protection's Integrated Fixed Tower Project)
Page 6 of 7

(3)    determines that accepting the agreed-upon compensation and waiving valuation is in the Nation's best interest.

The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 22ND day of MARCH, 2019 at a meeting at which a quorum was present with a vote of 3,084.6 FOR; -0- AGAINST; -0- NOT VOTING; and [03] ABSENT, pursuant to the powers vested in the Council by Article VI, Section 1(f) 1(i) and 1(j); Article XVI of the Constitution of the Tohono O'odham Nation, adopted by the Tohono O'odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat.984).

TOHONO O'ODHAM LEGISLATIVE COUNCIL

_____
Timothy Joaquin, Legislative Chairman

_25_ day of _March_____, 2019

ATTEST:

_____
Evonne Wilson, Legislative Secretary

_25_ day of _March_____, 2019

Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'odham Nation on the _25_ day of _March____, 2019 at _1:03_ o'clock, _P_ .m., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon his approval or upon his failure to either approve or disapprove it within 48 hours of submittal.

TOHONO O'ODHAM LEGISLATIVE COUNCIL

_____
Timothy Joaquin, Legislative Chairman

[X] APPROVED                on the _25_ day of _March____, 2019

[ ] DISAPPROVED            at _4:26_ o'clock, _P_ .m.

_____
EDWARD D. MANUEL, CHAIRMAN
TOHONO O'ODHAM NATION

RESOLUTION NO. 19-058
(Consenting to Grants of Easement for Rights-of-Way across Nation's lands for the United States Customs and Border Protection's Integrated Fixed Tower Project)
Page 7 of 7

Returned to the Legislative Secretary on the _____ day of

_____, 2019, at _____ o'clock, _____ .m.

_____
Evonne Wilson, Legislative Secretary

RESOLUTION NO. 19-088

**ACTION:** CONSENTING TO GRANTS OF EASEMENT FOR RIGHTS-OF-WAY ACROSS NATION'S LANDS FOR THE UNITED STATES CUSTOMS AND BORDER PROTECTION'S INTEGRATED FIXED TOWER PROJECT

**MOVED:** COUNCILWOMAN GLORIA RAMIREZ    **SECOND:** COUNCILWOMAN LUCINDA J. ALLEN

**DATE:** MARCH 22, 2019

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| SIF OIDAK 235.8 | 1. MARY LOPEZ ( ) | 117.9 | X | | | |
| | 2. LUCINDA ALLEN (Yolonda Garcia) | 117.9 | X | | | |
| SELLS 527.2 | 1. ARTHUR WILSON (Evelyn Juan Manuel) | 263.6 | X | | | |
| | 2. ADRIANNE TILLER ( ) | 263.6 | X | | | X |
| SCHUK TOAK 185.7 | 1. ANTHONY J. FRANCISCO JR. *(Absent)* (Teresa F. Donahue) *(Present)* | 92.85 | X | | | |
| | 2. QUINTIN C. LOPEZ (Agnes V. Joaquin) | 92.85 | X | | | |
| SAN XAVIER 232.3 | 1. DANIEL L.A. PRESTON III (Felicia Nunez) | 116.15 | X | | | X |
| | 2. JANICE FELIX (Adam Andrews) | 116.15 | X | | | |
| SAN LUCY 231.1 | 1. JANA MONTANA (Diana Manuel) | 115.55 | X | | | |
| | 2. GLORIA RAMIREZ (Lorraine Eiler) | 115.55 | X | | | |
| PISINEMO 225.9 | 1. CHESTER ANTONE *(Absent)* (Caroline D. Garcia) *(Present)* | 112.95 | X | | | |
| | 2. MONICA K. MORGAN ( ) | 112.95 | X | | | |
| HICKIWAN 209.0 | 1. LOUIS R. LOPEZ *(Absent)* (Shirley Molina) *(Present)* | 104.5 | X | | | |
| | 2. SANDRA D. ORTEGA ( ) | 104.5 | X | | | |
| GU VO 256.9 | 1. GRACE MANUEL ( ) | 128.45 | X | | | |
| | 2. DALLAS LEWIS (Nacho Flores) | 128.45 | X | | | |
| GU ACHI 270.9 | 1. TIMOTHY L. JOAQUIN (Louis L. Johnson) | 135.45 | X | | | |
| | 2. LORETTA LEWIS (Victoria Hobbs) | 135.45 | X | | | |
| CHUKUT KUK 337.7 | 1. BILLMAN LOPEZ (Patricia Antone) | 168.85 | X | | | |
| | 2. VIVIAN JUAN-SAUNDERS (Juanita Homer) | 168.85 | X | | | |
| BABOQUIVARI 372.1 | 1. FRANCES MIGUEL *(Absent)* (Roberta E. Harvey) *(Present)* | 186.05 | X | | | X |
| | 2. LEANDER MASE (Francine Schooling) | 186.05 | X | | | |
| **TOTAL** | | **3,084.6** | **3,084.6** | **-0-** | **-0-** | **[03]** |

# ATTACHMENT D



**THE TOHONO O'ODHAM NATION OF ARIZONA**

**TESTIMONY OF THE HONORABLE VERLON JOSE, CHAIRMAN**

**U.S. HOUSE OF REPRESENTATIVES COMMITTEE ON NATURAL RESOURCES**
**SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS**
**ON**
**EXAMINING THE IMPACTS OF INTERNATIONAL CARTELS TARGETING INDIAN COUNTRY**

**April 10, 2024**

---

### INTRODUCTION & HISTORICAL BACKGROUND

Good morning Chairman Gosar, Ranking Member Stansbury and distinguished Members of the Subcommittee. I am Verlon Jose, the Chairman of the Tohono O'odham Nation of Arizona. It is an honor to have the opportunity to testify before you today on behalf of my Nation and our more than 36,000 enrolled Tribal members.

The O'odham have lived in what is now Arizona and northern Mexico since time immemorial. In 1854, the international boundary between the United States and Mexico was drawn through the middle of our ancestral territory. As a result, today the Tohono O'odham Nation shares a 62-mile border with Mexico – the second-longest international border of any tribe in the United States, and the longest on the southern border. Seventeen O'odham communities with approximately 2,000 members are still located in our historical homelands in Mexico. O'odham on both sides of the border share the same language, culture, religion and history, and we continue to cross the border for sacred pilgrimages and ceremonies at important religious and cultural sites.



**Map of Tohono O'odham Ancestral Territory**

The Nation has long been at the forefront on border issues. Over the years we have developed a long-standing cooperative relationship with U.S. Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE) and other federal law enforcement agencies. Working in concert with CBP, our own Tohono O'odham law enforcement officers are regularly involved in drug interdiction and immigrant apprehension actions, which have been made more challenging due to international criminal cartel activity. Every year, the Tohono O'odham Nation spends its own funds to help meet the federal government's border security responsibilities. We have supported CBP efforts on our Reservation by providing lands for a checkpoint, forward operating bases, and integrated fixed towers to facilitate critical electronic surveillance efforts.

### THE NATION'S UNIQUE BORDER SECURITY AND LAW ENFORCEMENT CHALLENGES

The Nation faces major, unique law enforcement and public safety challenges due to its shared border with Mexico and the large size of its main Reservation. The Tohono O'odham Police Department (TOPD) must police a huge geographic area with limited resources, including remote and isolated areas and land along the border. The Nation also devotes significant resources to these efforts, spending an *annual* average of **$3 million of its own tribal funds** on border security and enforcement to help meet the United States' border security obligations. The Tohono O'odham Police Department (TOPD) responded to over 100,000 incidents in 2023, some of which are of a

general non-border criminal nature but many of which are related to drug seizures, illegal immigration, border-related criminal activity.

Further, the Nation is responsible for the recovery and disposition of immigrants who have perished on our Reservation. Since 2003, our Nation's law enforcement has spent nearly $6 million dollars on over 1,500 *migrant death investigations and recoveries* without any federal financial assistance. The Nation's police force typically spends about half of its time on border issues, including the investigation of immigrant deaths, illegal drug seizures, and human smuggling.[1] In addition, the Nation has incurred hundreds of thousands of dollars and hundreds of hours of police investigative time to address the impacts of drug trafficking, including overdose investigations, criminal evidence analysis, and Narcan (Naloxone HCL) training. Criminal cartel activity has exacerbated the negative effect of drug and migrant smuggling on the Nation. As the Government Accountability Office has reported, smugglers have held tribal families hostage, damaged and stolen property, and recruited tribal youth to engage in smuggling activity.[2]

Despite strained resources, the Nation has initiated innovative law enforcement solutions to meet these challenges:

- **High Intensity Drug Trafficking (HIDTA) Task Force**

    o Studies show that most illicit drug seizures occur at legal ports of entry (*i.e.,* outside the Nation's Reservation). Nevertheless, the Nation's is not immune from illicit drug activity and its location creates unique drug interdiction challenges. To address these challenges, in 2013, the Nation formed and now leads a multi-agency anti-drug smuggling task force staffed by Tohono O'odham Police Department detectives, ICE special agents, Border Patrol agents, and the FBI. This is the only tribally-led High Intensity Drug Trafficking (HIDTA) Task Force in the United States. In 2018, the Nation's Task Force Commander W. Rodney Irby received an award recognizing him as the National Outstanding HIDTA Task Force Commander.

    o In 2020, the Nation's HIDTA Task Force partnered with two other task forces to conduct a year-long investigation into a major cell of the Sinaloa Cartel that was smuggling drugs through the Tohono O'odham Nation. That single investigation resulted in the seizure of 575,000 counterfeit Oxycodone pills, 140 pounds of heroin and 9 kilograms of pure fentanyl powder. The seized fentanyl powder had the capacity to kill every person in Arizona eight times over. As of the first quarter of

---

[1] Government Accountability Office, GAO-24-106385, U.S. Immigration and Customs Enforcement: Improvements Needed to Workforce and Expansion Plans for Unit of Native American Law Enforcement Personnel 2 (January 30, 2024).

[2] *Id.*

3

this year, the Nation's HIDTA Task Force has seized or assisted in the seizure of 727.9 pounds of methamphetamine, 97.5 kilograms of heroin, 626,303 illicit Oxycodone pills, 10 kilograms of fentanyl powder, and nearly 2 million dose units of fentanyl.[3]

- **Shadow Wolves, an ICE tactical patrol unit**

  o The Nation has officers that are part of the Shadow Wolves, a tactical patrol unit based on our Reservation that the Nation helped create in 1974. Thanks to recent bipartisan legislation championed by Congressman John Katko in the House and enacted in the 117th Congress, the Shadow Wolves are now reclassified as ICE Special Agents.

  o The Shadow Wolves are the only Native American tracking unit in the country, and its officers are known for their ability to track and apprehend immigrants and drug smugglers using traditional tracking methods, including "cutting for sign," which involves identifying physical evidence left behind by smugglers, such as footprints, tire tracks, or clothing. The Shadow Wolves have apprehended countless smugglers and seized thousands of pounds of illegal drugs. To better combat cartel activity, the Shadow Wolves have increased investigative efforts in recent years, including plainclothes actions to blend in with the population.

In addition, the Nation has entered into several cooperative agreements with CBP and ICE, and pursuant to numerous Tohono O'odham Legislative Council resolutions has authorized a number of border security measures on its sovereign lands to assist CBP. Some examples include:

- **ICE office and CBP forward operating bases:** Since 1974, the Nation has authorized a long-term lease for an on-Reservation ICE office. The Nation also approved leases for two CBP forward operating bases that operate on the Nation's lands 24 hours, 7 days a week. One of these forward operating bases (at Papago Farms) was recently renovated and upgraded with state-of-the-art improvements and technology, including an expanded perimeter fence, helipad, and new officer living quarters and administrative facilities.

- **Vehicle barriers on our lands:** CBP has constructed extensive vehicle barriers that run the entire length of the Tribal border and a patrol road that runs parallel to the border.

- **CBP checkpoint on our lands:** The Nation has authorized a CBP checkpoint on the major highway that runs through the Nation.

---

[3] Figures provided by the Tohono O'odham Department of Public Safety, 2015-2024.

- **Integrated Fixed Towers:** The Nation approved a lease of its lands to allow CBP to build an Integrated Fixed Tower (IFT) system that includes surveillance and sensor towers with associated access roads on the Nation's southern and eastern boundaries to detect and help interdict illegal entries.

## ADDITIONAL FEDERAL RESOURCES ARE DESPERATELY NEEDED TO ADDRESS THESE CHALLENGES

While the Nation is unique in the nature of its law enforcement and border security needs, it is not alone when it comes to Indian Country public safety concerns. Existing federal funding is wholly inadequate to meet the public safety and justice needs of Indian Country and to support tribal law enforcement generally. In 2018, the Bureau of Indian Affairs provided a report to Congress that estimated that $1 billion was needed for tribal law enforcement, with another $1 billion needed for tribal courts,[4] just to provide a minimum base level of service to all federally recognized tribes. The estimated need has only grown since that time as federal appropriations levels are nowhere near the amounts needed.[5] This failure to fund tribal justice systems undermines public safety in Indian Country.

**Drug Treatment Funding Deficits Exacerbate Public Safety Funding Deficits.** The epidemic of drug trafficking facing the Nation and the rest of the country is just that – an epidemic, and one that requires a sustained public health response. Unfortunately, this public health response has been subject to the same chronic underfunding as Indian Country public safety services. Most notoriously, the federal government has repeatedly failed to adequately fund the Indian Health Service (IHS), including behavioral health, mental health, and substance abuse services. Alongside the increase in drug trafficking over the past decade, the Nation has witnessed a steady rise in addiction, and in drug-related deaths. Unfortunately, the same rural environment that imposes significant challenges for drug interdiction efforts also imposes barriers to tribal members seeking treatment. Due to a lack of funding, there is no dedicated facility to address addiction recovery on the Nation, and while the Nation contracts for these services off-Reservation, a lack of public transportation infrastructure means that Tribal members must drive several hours (sometimes 100 miles or more) to obtain these services. Moreover, as in any culture, Tribal members are most comfortable (a threshold behavioral health requirement for treatment) seeking recovery in their own communities, with access to traditional healing and other culturally appropriate methods.

---

[4] *See* Bureau of Indian Affairs, Office of Justice Services, Report to the Congress on Spending, Staffing, and Estimated Funding Costs for Public Safety and Justice Programs in Indian Country, 2018 at 1 (July 2020).

[5] *See* National Congress of American Indians, U.S. Senate Committee on Indian Affairs, Oversight Hearing on the President's FY 2020 Budget Request at 4 (May 8, 2019).

At the same time, aging IHS infrastructure is inadequate to meet these needs.  The Nation's 50-year-old hospital in Sells, Arizona is one of the oldest IHS facilities.  Due to its age and lack of updated equipment and facilities, the Nation's Sells Hospital can only address minor medical issues and is entirely inadequate to serve the healthcare needs of the Nation's members.  The Sells Replacement Hospital has been on the IHS facilities construction priority list for over thirty years, since 1993.  Although the Nation, beginning in FY 2018, has begun to receive funding for the Sells Replacement Hospital, construction has not yet begun, and it will be several years before construction of the new facility will be complete (assuming it continues to receive the funding that is projected in the IHS budget).

**Border Security Goals Are Better Met With Public Health And Safety Funding Than Border Barrier Construction.**  As we know, border wall construction came at great cost to the American taxpayer.  Thanks to the no-bid contracts, diversion of badly needed drug interdiction and defense resources, and the massive environmental mitigation efforts required to address construction, we may never know the true cost.  The Government Accountability Office found that by the end of 2020, the Army Corps of Engineers had obligated more than $10 billion to border wall construction alone.[6]  Billions more have and will continue to be needed to mitigate the environmental and cultural harms caused by construction.

As the Nation and others have warned for years, the border wall is particularly ineffective in remote geographic areas like our homelands, where it can easily be circumvented by climbing over, tunneling under, or sawing through it.  And that is precisely what has taken place.  As noted by the Cato Institute:

> Immigrants used cheap ladders to climb over it, or they free climb it.
> They used cheap power tools to cut through it.  They cut through
> small pieces and squeezed through, and they cut through big sections
> and drove through.  In one small section in 2020, they sawed through
> at least 18 times that Border Patrol knew about in a month.  They
> also made tunnels.  Some tunnels were long, including the longest
> one ever discovered, but some were short enough just to get past the
> barrier.[7]

CBP records have revealed that the border wall is breached with staggering (but unsurprising) regularity – between more than 2,000 times and more than 4,000 times per year between 2017 and

---

[6] Government Accountability Office, Southwest Border: Award and Management of Border Barrier Construction Contracts, GAO-23-106893, at 6 (July 23, 2023).

[7] Id.

2022.[8]  These breaches typically are performed with "inexpensive power tools widely available at retail hardware stores,"[9] or with five dollar ladders.[10]

Unsurprisingly, the border wall does not effectively deter illegal immigration and drug trafficking. CBP data shows that most illegal drugs (including the vast majority – 90% – of illegal fentanyl) are smuggled through ports of entry rather than in between them.[11] Moreover, the drug couriers (known as mules) who ferry these drugs through ports of entry are predominantly U.S. citizens, not migrants.[12]



**Source: NPR analysis of U.S. Customs and Border Protection data, October 2022- June 2023.**

---

[8] David J. Bier, "Border Wall Was Breached 11 Times Per Day in 2022," Cato Institute (December 30, 2022), available at https://www.cato.org/blog/border-wall-was-breached-11-times-day-2022-2.

[9] Nick Miroff, "Trump's border wall has been breached more than 3,000 times by smugglers, CBP records show," The Washington Post (March, 2, 2002), available at https://www.washingtonpost.com/national-security/2022/03/02/trump-border-wall-breached/.

[10] Jenna Romaine, "Trump's $15 billion border wall is being easily defeated by $5 ladders," The Hill, April 22, 2021), available at https://thehill.com/changing-america/resilience/refugees/549758-trumps-15-billion-border-wall-is-being-easily-defeated/.

[11] *See, e.g.,* Joel Rose, "Who is sneaking fentanyl across the southern border? Hint: it's not the migrants," NPR (August 9, 2023), https://www.npr.org/2023/08/09/1191638114/fentanyl-smuggling-migrants-mexico-border-drugs; Christian Penichet-Paul, "Illicit Fentanyl and Drug Smuggling at the U.S.-Mexico Border: An Overview," National Immigration Forum (October 25, 2023) https://immigrationforum.org/article/illicit-fentanyl-and-drug-smuggling-at-the-u-s-mexico-border-an-overview/.

[12] NPR, *supra* n.11.

Rather than constructing ineffective barriers, the data clearly shows that federal funds would be put to much better use supporting tribal and federal law enforcement and border security services and public health services.

**CONCLUSION**

The Nation genuinely appreciates the Subcommittee's interest in the impact of cartels in Indian Country. We welcome a continued dialogue with you on these issues.

# ATTACHMENT E

# TOHONO O'ODHAM NATION OFFICE OF THE CHAIRMAN AND VICE CHAIRWOMAN



| | | |
|---|---|---|
| **Verlon M. Jose**<br>CHAIRMAN | | **Carla L. Johnson**<br>VICE CHAIRWOMAN |

May 6, 2026

Rodney Scott, Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security
1300 Pennsylvania Avenue NW
Washington, DC 20229

Re:  **Tohono O'odham Nation Opposition to Secondary Border Wall Construction Destroying Sacred Sites in Organ Pipe Cactus National Monument and the Cabeza Prieta National Wildlife Refuge**

Dear Commissioner Scott:

Thank you for meeting with the Tohono O'odham Nation's Border Security Delegation on May 2, 2026.  We appreciate your willingness to discuss issues of great importance to the Tohono O'odham Nation (the Nation).  I am writing this letter to reiterate the Nation's strong opposition to the construction of any new border wall, border security infrastructure, or border roads within Organ Pipe Cactus National Monument (ORPI) and Cabeza Prieta National Wildlife Refuge (CPNWR) that impact sites that are sacred to the members of the Tohono O'odham Nation.  In our meeting with Secretary Mullin we explained that the Nation opposes any wall construction impacting the Nation's cultural resources.  Moreover, given the drastic reduction in illegal immigration that has been accomplished without a secondary wall, the urgency to construct a secondary wall through ORPI and CPNWR is not apparent to the Nation.

As you know, as part of ground scraping for secondary wall construction in CPNWR, the Department of Homeland Security destroyed our sacred O'odham Intaglio known as the Las Playas Intaglio.  The Intaglio was carved into the ground by our ancestors over 1,000 years ago (and some experts estimate maybe as long as 8,000 years ago).  The destruction of our Intaglio is a direct and irreversible act against our culture, identity, and existence as O'odham people.  Our Intaglio are not artifacts of the past.  They are living expressions of *Himdag, Our way of life*, our laws, our relationship to the land, and our responsibility to all living things.  These sacred formations encode our history, migration, and ceremonies.  They mark spiritual relationships between land, water, and people.

They serve as places of prayer, teaching, and cultural continuity.  To destroy the Intaglio is to erase a living record of O'odham existence, one that predates the United States and continues into the future through our children.  The Nation mourns this loss.  The impact of the destruction of this ancient, sacred place on the Nation's members cannot be overstated.  We are urging you to ensure that construction activities will not damage or impact, for example, the remaining Huhugam burial site in CPNWR.

The Nation also has grave concerns about the safety of *A'al Waipia*, also known as Quitobaquito Springs (Quitobaquito) in ORPI.  Quitobaquito is an O'odham Traditional Cultural Landscape.[1]  It is an irreplaceable sacred site, one of the only remaining perennial water sources in the Sonoran Desert.  It also provides critically important habitat to three federally protected endangered species.  The proposed construction of a "secondary wall" adjacent to the existing border wall—which is currently only approximately 175 feet from the southern edge of Quitobaquito—poses a direct, imminent, and existential threat to Quitobaquito's continued existence as a Traditional Cultural Landscape and a rare riparian Sonoran Desert ecosystem.  It is the Nation's understanding that DHS plans to build a secondary wall between 150-200 feet from the existing wall, which would require the new wall to be built directly through the Quitobaquito pond.  Moreover, the secondary wall will be built much closer to the geological fault from which Quitobaquito's sacred waters emerge, potentially severely diminishing, or even halting, the production of water from its springs for the first time in human history.  The proposed construction/destruction appears to be moving forward without adequate government-to-government consultation and/or even a full understanding of the significant cultural and environmental impacts this project will have.

**Government-to-Government Consultation**

It is imperative that the federal government honor its trust responsibility to the Nation and avoid any further desecration of sacred places.  Meaningful government-to-government consultation not only acknowledges the sovereign status of the Nation, it helps to ensure that DHS fully understands the significant cultural and environmental impacts of the proposed project.  Consultation would have helped avoid the destruction of the Las Playas Intaglio, and it would have

---

[1] "Quitobaquito can be considered a Traditional Cultural Property due to its long and ongoing association with the cultural practices, traditions, beliefs, and lifeways of the indigenous people of the Sonoran Desert, specifically the O'odham and their ancestors. Indigenous people have sought the resources of the Quitobaquito oasis for subsistence and to carry out traditional cultural and religious practices for millennia. The site continues to hold importance to the O'odham people for ritual and ceremonial purposes." Gina Chorover and Teresa Dekoker, QUITOBAQUITO ORGAN PIPE CACTUS NATIONAL MONUMENT CULTURAL LANDSCAPE REPORT (January 2024), https://capla.arizona.edu/sites/default/files/2024-06/Quitobaquito%20Cultural%20Landscape%20Report%20FINAL%201-11-24.pdf.

helped to avoid the earlier destruction of Monument Hill in Quitobaquito, a sacred site near Quitobaquito where ancestral remains are buried.

In 2019, federal contractors bulldozed and bladed a large area near Quitobaquito, with no advance notice to the Nation, and blasted through Monument Hill. These wall-related construction activities irreparably damaged the areas of ORPI adjacent to the US-Mexico Border. There was no advance consultation about the destruction of these sites, no advance notice given, and no effort to mitigate or avoid damage. During DHS's construction of the first border wall, excavation for the wall's foundation and the building of a new road caused extensive and severe ground disturbance in the Quitobaquito area. Again, DHS damaged numerous cultural sites and shrines, disturbed ancestral remains, and destroyed portions of the historic pilgrimage trails. In addition, surface hydrology at Quitobaquito was significantly altered by sediment buildup and the excavation of a ditch running alongside the road next to the border wall.

Hopefully, similar missteps will not be repeated with exponentially greater and more disastrous results. The Nation respectfully requests formal government-to-government consultation on the construction of the secondary border wall at ORPI and CPNWR before it proceeds through or near our sacred sites. We also urge DHS to consider technological alternatives to a secondary wall. The Nation's understanding is that illegal immigrants cannot, for example, go through or over a linear ground detection system without being identified.

**<u>Quitobaquito is Sacred and of Ongoing Cultural Importance to the Nation</u>**

Quitobaquito and the surrounding lands in ORPI and CPNWR are part of our O'odham ancestral lands, lands our ancestors have lived in and utilized for thousands of years. Since 1937, Quitobaquito has been contained within ORPI, which encompasses more than 330,000 acres, and borders the Nation's main reservation along part of its western boundary. The entirety of ORPI and CPNWR are of great cultural significance to the Tohono O'odham Nation. They are, however, of particular importance to the Hia-Ced O'odham, who historically inhabited these lands and whose descendants are enrolled members of the Tohono O'odham Nation.

Our ancestors' use of Quitobaquito is well-documented. Human habitation in and around Quitobaquito dates back approximately 16,000 years. It is the second largest spring-fed oasis in the Sonoran Desert. The water that emerges from the ground at Quitobaquito is sacred to O'odham, as it has sustained our people, and the plants and wildlife that we have in turn relied on for millennia. It has always served as a vital stop along our traditional salt pilgrimage trails, which start from villages on our reservation, stretch across what is now northern Sonora, Mexico, and end at the salt

flats at the Sea of Cortez.[2] O'odham have also lived around Quitobaquito throughout history. As early as 1698, the Jesuit Missionary Eusebio Kino wrote about visiting the spring and an O'odham farming community there. The last O'odham family to live at Quitobaquito was forced by the federal government to leave the area in 1957.

Quitobaquito is not solely an archaeological site. Although O'odham were forced to stop residing at Quitobaquito in the 1950s and our O'odham traditional homes, fencing, and grinding stones were removed from the area by the National Park Service in the 1960s, we continue to travel to Quitobaquito for traditional cultural, religious, and ceremonial purposes of deep importance to our O'odham *himdag,* our O'odham Way of Life. We still visit Quitobaquito to gather plants and engage in our traditional ceremonies. There is an O'odham cemetery located adjacent to Quitobaquito containing thirty-four graves, and O'odham families continue to travel to this area to pray and pay their respects. Additionally, six miles of the main access road to Quitobaquito, Puerto Blanco Road, runs immediately adjacent to the existing border wall. The destruction of this road would likely disrupt tribal members' ability to visit their ancestors' graves at the O'odham cemetery. It will also likely prevent ORPI's ecologists from accessing the spring to monitor all three protected species and the mud turtle critical habitat.

## **Quitobaquito is an Integral Part of the Sonoran Desert Ecosystem in ORPI and Critical Habitat to Three Endangered Species**

In addition to its deep cultural significance to the Nation, Quitobaquito is an integral part of the pristine Sonoran Desert ecosystem in ORPI, which has been designated a Biosphere Reserve by the United Nations Education, Scientific, and Cultural Organization (UNESCO) because of its global significance. Again, it is a unique riparian oasis that, in part, contains critical habitat for three endangered species: the Sonoyta mud turtle (*Kinosternon sonoriense longifemorale*); Sonoyta pupfish (*Cyprinodon eremus*); and the Quitobaquito Tryonia (*Tryonia quitobaquitae*). There are only five known wild populations of the Sonoyta mud turtle globally, and Quitobaquito contains the only population in the United States. Because the four populations in Mexico have been steadily decreasing, the population at Quitobaquito is crucial to ensuring the Sonoyta mud turtle does not go extinct. Similarly, the Quitobaquito populations of Sonoyta pupfish—which can persist in water nearing 100 degrees Fahrenheit with a salinity three times that of the ocean—and Quitobaquito Tryonia—a snail the size of a peppercorn—are the only wild populations of these species that exist in the world. Quitobaquito also provides rare aquatic habitat for migratory waterfowl and other mammals such as the Mastiff Bat. Quitobaquito is also most likely the only U.S. breeding habitat for the Giant White

---

[2]  Our O'odham salt pilgrimage is also well-documented in the historical record. *See* Eric Jay Toll, *The Ancient Salt Trails: Once a Journey for Life; Now It's a Ceremonial Quest*, National Parks Traveler (May 8, 2023), https://www.nationalparkstraveler.org/2023/05/ancient-salt-trails-once-journey-life-now-its-ceremonial-quest.

(*Ascia howarthi*), a rare butterfly, that is dependent upon the desert caper (*Atamisquea emerginata)*, a rare tree whose only known location in the United States is within ORPI.

Wall-related construction activities will further degrade Quitobaquito. The use of heavy equipment and prolonged pedestrian activity in and around Quitobaquito will cause severe disturbances to the Sonoyta mud turtle, Sonoyta pupfish, the Quitobaquito Tryonia, and the multitude of non-endangered species that also rely on its rare aquatic Sonoran Desert habitat. Construction activities in the pond will alter natural basking, breeding, and foraging behavior for these species, as they are normally very isolated from human activity. Fuel leaks from heavy equipment, erosion, and road degradation will negatively impact the water quality at Quitobaquito, in turn harming all species that live in, and rely on, the water.

Overuse of the area's extremely limited subsurface water resources for construction of a secondary border wall and associated road and other infrastructure is also an issue. Water is a scarce and valuable commodity in the southwest desert. For construction of the first border wall, U.S. Customs and Border Protection (CBP) installed two wells to the west and to the east of Quitobaquito. CBP drew water from these two wells, along with a third existing well between the Nation and Highway 85, for constructing the road and mixing cement for the wall footer. The massive increase in use of water from these wells for secondary border wall construction, roads, and dust control throughout ORPI would likely permanently alter the subsurface hydrology in and around Quitobaquito.

This type of disruption to Quitobaquito's subsurface hydrology will have a catastrophic impact on all species, animal and plant, that rely entirely on the water at Quitobaquito for their continued survival. It would potentially affect the connectivity of all of Quitobaquito's linked aquatic habitats, including the main pond and the channel, which is crucial habitat for smaller turtles and, essentially, the *only* habitat for Tryonia. Construction of a second border wall through their only stable habitat will lead to degradation, fragmentation, and potentially complete habitat loss.

The Nation appreciates the enduring and positive relationship DHS has otherwise maintained with the Nation over many decades, as well as DHS's recognition of the Nation as a strong partner in ensuring the security of the United States border. However, the Nation has always made clear that border walls are not the most effective nor efficient use of the federal government's resources. The cost of a border wall through Quitobaquito—which would amount to the destruction of one of our most important Traditional Cultural Landscapes—is simply too high for the Nation to endure. Quitobaquito is a living Traditional Cultural Landscape that reflects the spiritual, historical, and ongoing lifeways of the O'odham (people). It is an interconnected system of sacred water, land, and the salt pilgrimage that continues to sustain our cultural identity. Any disruption to its waters, landforms, access, or surrounding environment directly impacts our religious practices, cultural continuity, and responsibilities to future generations, including disruption

The Hon. Rodney Scott, Commissioner
May 6, 2026
Page 6

of traditional pathways such as the salt pilgrimage routes, which are essential to the exercise of our cultural practices.

These concerns apply broadly across the Nation's traditional lands along the international border, where similar construction actively threatens, and has already destroyed, other culturally significant landscapes, sacred sites, and traditional use areas.  Some harms are irreversible and unacceptable, like the destruction of the Las Playas Intaglio.  The Tohono O'odham Nation does not consent to the construction of a secondary border wall or related infrastructure at or near Quitobaquito or any other culturally significant O'odham sites, including the remaining Huhugam burial site in CPNWR.

The Nation urgently requests that DHS: (1) not construct a secondary border wall where it will impact sacred sites including the area of Quitobaquito or the Huhugam burial site in CPNWR; (2) immediately engage in meaningful government-to-government consultation, which would include, if necessary, a discussion of alternatives to construction of a secondary border wall near sacred sites in ORPI and CPNWR; and (3) utilize a Nation-selected, independent Compliance Inspection Contractor to ensure that any construction activity will avoid impacts to areas of cultural significance.

Thank you.  Again, we greatly appreciate your willingness to discuss these important issues with the Nation.

Sincerely,

Verlon M. Jose
Chairman

# ATTACHMENT F

| | |
|---|---|
| **From:** | ENRIQUEZ, PAUL |
| **To:** | Verlon M. Jose; Carla L. Johnson |
| **Cc:** | SCOTT, RODNEY S; VITIELLO, RONALD D.; SLOSAR, WALTER N; SINGLETON, RUYNARD R; WATKINS, DORION D; HYLAND, MARY; GITHENS, DANIEL A; ALMETICA, SUZANNE N (OCC); FELTS, MICHAEL F (OCC); SHAW, CHRISTOPHER D (OCC); Howard Shanker; Michael Ehlerman; Sibbison V. Heather; MODLIN, JOHN R |
| **Subject:** | CBP Notification of the Border Wall Contract Solicitation |
| **Date:** | Friday, May 15, 2026 5:16:31 AM |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Chairman Jose and Vice Chairwoman Johnson,

I am writing to inform you that CBP will be releasing the contract solicitation for the border wall project located adjacent to the Tohono O'odham Nation (Tucson 5 Wall Project) today, Friday, May 15. The contract solicitation will include the construction of approximately 62 miles of primary and secondary border wall, technology, a patrol road, cameras, and lighting. CBP is targeting a construction contract award in June 2026, followed by design and schedule for construction. The construction schedules will be known following the contract award and CBP will share the schedule with the Nation as soon as received by the construction contractor.

CBP will coordinate with the Nation to identify an alignment for the barrier that avoids identified sacred sites and burials and will have environmental and tribal monitors present during construction activities.  CBP remains committed to ongoing communication and coordination with the Tohono O'odham Nation throughout the planning and implementation of this project. We look forward to our next meeting on May 18th to discuss additional aspects of the project.

Please feel free to reach out to me directly with any questions or concerns.

Thank you,

**Paul Enriquez**
Director
U.S. Border Patrol
Program Management Office DIrectorate
Infrastructure Program
(202) 222-5170

# ATTACHMENT G

# ATTACHMENT B

**Best Management Practices (BMPs)**

**TCA-5 Tohono O'odham Vertical Barrier & Attributes Design Build Construction Project**

Pima County, AZ

# US CUSTOMS and BORDER PROTECTION (CBP) BORDER PATROL PROGRAM MANAGEMENT OFFICE DIRECTORATE (PMOD)

1

**Customs and Border Protection Best Management Practices**

| | |
|---|---|
| Project Name: | TCA-5 |
| Project Type: | Replacement Vehicle Barrier and Secondary Border Wall |
| Created: | April 2026 |
| Updated: | |

**General Construction Activities**

1. Implement Customs and Border Protection (CBP) best management practices (BMPs) during all construction activities including proper handling, storage, and disposal of hazardous or regulated materials.

2. Collect and store all fuels, waste oils, and solvents in tanks or drums within a secondary containment system that consists of an impervious floor and earthen dike capable of containing 125 percent of the volume of the containers stored therein. These materials will be removed from the site during demobilization.

3. Refuel machinery following accepted guidelines, including refueling and storage shall take place away from the aquatic habitat; (not within 100 feet of a drainage channel, wetland, or other surface waters). A designated refueling area with spill protections readily available shall be reviewed by CBP prior to implementation. A contingency plan to control petroleum products accidentally spilled during the project shall be developed as part of all aquatic/in-water projects.

4. A CBP-approved Spill Protection Plan (SPP) must be prepared and implemented by the contractor at the construction site to ensure that toxic substances are properly handled, stored, and disposed of. Contain spills immediately and use an absorbent (e.g., granular, pillow, sock) to absorb and contain the spill. Immediately report any spill of a hazardous or regulated substance to the CBP Project Manager and on-site environmental monitor. Drip pans will be used beneath equipment, and containment zones will be used when equipment is not being used, or when refueling vehicles and equipment.

5. Collect non-hazardous solid waste (trash and waste construction materials) and deposit in on-site receptacles. Maintain solid waste receptacles and dispose as required.

6. Only authorized contractors and Government personnel are allowed within the construction site. With the exception of service dogs, no pets including emotional support pets, owned or under the care of any and all construction workers will be permitted inside the project's construction boundaries, adjacent native habitats, or other associated work areas. Service animals shall have formal official documentation from a licensed physician for CBP approval prior to being allowed onsite.

7. If construction or maintenance work activities will occur during nighttime hours, all lights will be shielded to direct light only onto the work site, the minimum wattage needed will be used, and the number of lights will be minimized. If birds are roosting on temporary light poles and other pole-like structures used for construction activities, then anti- perch devices would be used to discourage roosting by birds. Light poles will be designed to prevent hunting perches for ravens and raptors. Unnecessary lights will be turned off to avoid attracting wildlife.

8. A Stormwater Pollution Prevention Plan (SWPPP) will be prepared prior to construction activities. Additional site-specific BMPs will be implemented as described in the SWPPP to reduce erosion and the impact of non-point source pollution during construction

activities, giving special consideration to areas with highly erodible soils. Address highly erodible soils in the SWPPP. BMPs include such things as buffers around washes to reduce the risk of siltation and installation of water bars to slow the flow of water downhill.

9. Vehicular traffic associated with the construction activities must remain on established roads to the maximum extent practicable. No off-road vehicle activity will occur outside of the project footprint. Vehicle parking will be confined to the project footprint. Vehicles will not exceed 25 mph within the project area.

10. The project site will be accessed exclusively via designated access roads. Any new or improved access roads will include road construction and maintenance BMPs in their design and plan.

11. Maintain existing roads during construction and return the existing roads and staging areas to pre-construction conditions, if requested by the Government, once construction is complete. The widening of existing or created roadbed beyond the design parameters due to improper maintenance and use will be avoided or minimized. The width of all roads that are created or maintained by CBP should be measured and recorded using GPS coordinates and provided to the Government. Photo document and provide GPS coordinates where correction is needed. Government to acquire GIS shape files from construction contractor at end of project.

12. The minimum number of roads needed for proposed actions must be constructed and maintained to proper standards. Roads constructed for project access must be closed and restored to natural surface and topography using appropriate techniques once no longer needed for the project. The GPS coordinates of roads that are thus closed must be recorded and provided to the Government. A record of acreage or miles of roads taken out of use must be maintained. Photo document efforts if they occur prior to completion of project. GIS files from the Contractor must be provided to CBP.

13. Areas disturbed by past activities must be used for staging, parking, and equipment storage. All staging, parking, equipment storage areas, and access roads, with their requested uses, will be approved by CBP. Prior to beginning any construction activity (including equipment mobilization, tree- trimming, clearing and grubbing, and road grading), contractor must stake and flag the perimeter of the work area, access routes, laydown yards, staging areas, turnarounds, and other areas approved for use. Recommend flagging and staking occur every 25-linear feet to prevent unauthorized impacts outside of the approved work area. Photo document and provide GPS coordinates of these areas to CBP.

14. If soil-binding agents are utilized, they must be applied during the late summer/early fall months to avoid impacts on federally listed species. Soil-binding agents must not be used in or near surface (within 100 feet) of waters (e.g., wetlands, perennial streams, intermittent streams, washes). Only apply soil-binding agents to areas that lack any vegetation.

15. All disturbed soils not paved that will not be landscaped or otherwise permanently stabilized by construction must have topsoil set aside to be used with species native to the project vicinity. CBP will provide a list of seed mix for each project area.

16. To prevent invasive species seeds, all hauling and construction equipment, including work and personal vehicles, must be washed at the identified facility prior to mobilization to the project area. All vehicles and equipment must be free of all attached soil, mud, vegetation, and other debris prior to mobilization to the construction site.

17. Invasive plants on any work area must be treated through chemical or mechanical means. Herbicides must be used according to label directions. Herbicide application must be

conducted by a licensed applicator, and daily report of chemical application rate must be reported to CBP Construction Project Manager or Environmental. Mechanical removal must be done in ways that eliminate the entire plant and remove all plant parts to a disposal area, with the exception of root mass left in-place for bank stabilization.

18. Any off-site materials (e.g., fill and gravel, straw bales, wattles, fiber rolls) must be weed-free to prevent the introduction of non-native species.

19. Preventative measures will be implemented to avoid the introduction of invasive plant species, including soil sourcing, topsoil oversight, and material inspection.

20. Dust control measures will be implemented to prevent hazardous conditions in terrestrial land associated with the project (staging areas, access roads).

21. Concrete wash water will be collected in an area with an impervious floor and removed off-site for proper disposal to prevent toxicity to aquatic life.

22. A CBP-approved Fire Prevention and Suppression Plan (FPSP) must be developed and implemented for all activities that require welding or otherwise have a risk of starting a fire.

23. Groundwater extraction can occur with written approval by CBP. Groundwater wells shall be metered daily and meter readings provided to the onsite environmental monitor and CBP Project Manager daily.

24. Activities will pause during heavy rain or hazardous weather conditions, including avoiding traversing vehicles or equipment across flowing or standing watercourses.

25. Spray painting bollards shall be performed using equipment designed to minimize overspray. Spray painting bollards should not be conducted in high winds to prevent over spraying into adjacent vegetation.

26. Areas that are hydro-seeded for temporary erosion-control measures must use only native plant species appropriate to surrounding habitat types. Seed list must be approved by CBP Environmental prior to application.

27. If cultural resources (artifacts, features, sites, structures) are encountered work shall stop in the immediate area (100-foot radius) until the environmental monitor can assess the significance of the find.

28. If human remains are encountered, work will stop within 250 feet of the find. Appropriate Tribal, Federal and State agencies will be consulted for a path forward.

29. Areas around and beneath equipment in terrestrial and aquatic settings must be checked for listed species and wildlife to avoid "take" situations.

30. Tree and brush removal in threatened and endangered species habitats will be minimized and will not interfere with active nesting as per the Migratory Bird Treaty Act.

31. Ground disturbing activities (e.g. vehicular travel, grubbing, vegetation removal, grading, storage of materials, installation of aerial targets, excavation, scraping, removal of large boulders etc.) shall not be undertaken outside the approved project area.

32. Prior to ground disturbing activities, vegetation removal or trimming, a Government biologist will present an environmental awareness program to all personnel who will be onsite, including but not limited to Government employees, contractors, contractor employees, supervisors, inspectors, and subcontractors. Included also will be general identification of the species, description of habitat, sensitivity of the species to human activity and describe measures for avoidance and protection of the species during construction. Following the education program, the photograph of the species will be posted in the office of the Contractor and resident engineer, where they must remain

through the duration of the project. The Contractor will be responsible for ensuring that all their employees are aware of these species and that they may be present within the project area.

33. If construction or clearing activities are scheduled during the nesting season (typically March 1 - September 15) the Government will perform a preconstruction survey for migratory bird species to identify active nests prior to the start of any construction or clearing activity. If construction activities will result in the disturbance or harm of a migratory bird, then CBP may coordinate with the U.S. Fish and Wildlife Service (USFWS). Establish buffer zones around active nests until nestlings have fledged and abandoned the nest.

34. When an individual of a federally listed species is found within the project limits, notify the Project Manager or CBP Construction Site Manager. Work may resume when the Government biologist safely removes the individual, or it moves away on its own. Individuals of federally listed species found in the project area and requiring relocation will be relocated by the Government biologist.

35. To prevent entrapment of wildlife species during construction, all excavated, steep walled holes or trenches more than 2-feet deep will either be entirely covered at the close of each working day with plywood or trench cover plates or provided with one or more escape ramps constructed of earth fill or wooden planks. The ramps will be located at no greater than 1,000-foot intervals and will be sloped less than 45 degrees. Each morning before the start of construction and before such holes or trenches are filled, they will be thoroughly inspected for trapped animals. Any animals discovered will be allowed to escape voluntarily (by escape ramps or temporary structures), without harassment, before construction activities resume, or removed from the trench or hole by a qualified biologist and allowed to escape unimpeded.

**Species Specific**

36. Cactus Ferruginous Pygmy-owl (*Glaucidium brasilianum cactorum*): In Arizona, this species can nest in columnar cacti. Pre-construction surveys will be performed by Government biologists in suitable habitat of the pygmy-owl to determine the presence or absence of the species prior to any clearing or grubbing. If present, a buffer of a 1,000-foot radius will be marked for avoidance. If a pygmy-owl is sighted, the construction contractor should immediately inform the environmental monitor and the CBP Project Manager. CBP Environmental will contact the US Fish and Wildlife Service to report sightings. The environmental monitor will document and report any sightings.

37. Sonoyta Mud Turtle (*Kinosternon sonoriense longifemorale*): No in-water work would occur within ponds, pools, streams or other waterbodies with known occurrences, suitable habitat or designated critical habitat for the Sonoyta Mud Turtle without CBP approval. To the extent practicable, removal of riparian vegetation within 100 feet of aquatic habitats would be avoided to provide a buffer area to protect the habitat from sedimentation. Cleaning or modification of culverts and other work within drainages that could cause sedimentation or otherwise affect water quality or quantity would not occur within, or within, 0.25 miles upstream of, critical habitat or other suitable habitat without further CBP approval.

38. Chiricahua Leopard Frog (*Rana chiricahuensis*): Endangered and sensitive aquatic and riparian species are known to occur in this project area. Prior to construction activities,

CBP biologist would survey project footprint and mark areas for avoidance. If construction is to occur in an intermittent or perennial waterway, species relocation may be required.

39. Snakes: If more than 5 venomous snakes a day are appearing in the construction area, contractor must hire a snake relocation company to survey the project area at the start of every day.

40. Mesquite: All removed mesquite with a diameter of 4 inches or more shall be salvaged.

41. Columnar Cactus: The Contractor will subcontract a certified arborist for the relocation of columnar cacti 10 feet in height or greater. Cacti less than 10 feet in height would be replaced with a nursery stock at a 3:1 ratio in an area proximate to the project area. The Contractor will work with a certified arborist in preparing and modifying a relocation plan, prior to scheduled work in impacted areas. CBP's Natural Resources SME will oversee the operation of the relocations.

   o Relocate affected plants north of the project area. Species should be relocated a minimum of 10' away from proposed lighting & electrical features.

   o The north face of cactus will be marked so that the species are translocated in the same position.

   o Provide a 12-month establishment period for all relocated affected plant species.

   o Impacts to all saguaros that provide the suitable nesting habitat for the cactus ferruginous pygmy-owl (*Glaucidium brasilianum cactorum*) will be avoided. If any saguaros are damaged during construction activities, CBP will be notified and the Contractor shall replace at an appropriate ratio. Qualifications - Certified Arborist

   o The certified arborist must adhere to the existing plant relocation BMPs. The relocation of the saguaro and organ pipe cacti will be scheduled prior to any impacts from work in designated areas.

      ▪ The certified arborist subcontractor must provide the following prior to plant salvage and relocation:

      ▪ Record of certification;

      ▪ Method of removal and placement;

      ▪ Procedures for feeding & watering, if applicable;

      ▪ Methods of bracing & for providing physical stability;

      ▪ Marking provisions for relocated plants identifiable during establishment period;

      ▪ Establishment period measures to be employed; and

      ▪ A monitoring plan for relocated species.

**Tribal Specific**

42. For any maintenance and repair service to access roadways outside of the immediate project area: CBP will provide written notice via email, including a scope of work and schedule, in advance to the Tohono O'odham Nation (TON).

43. Construction and maintenance crews will avoid traversing roads through saguaro fruit harvesting areas during the saguaro cactus harvesting festival to the maximum extent practicable.

44. The project corridor will deviate in certain areas to avoid sensitive resources to the greatest extent possible.

45. Construction crew will be respectful to the cultural heritage of the Tohono O'odham.

# ATTACHMENT H

**[Page 6]**

b.      **BASE WORK** – TCA-5 Primary Vertical Barrier, Patrol Road & Design and Construction Segments 1, 2, 3a and 3c:  Provide the design and construction of approximately 23.72 miles in segment 1, 23.36 miles in segment 2, 5.52 miles in segment 3a and 4.95 miles in segment 3c of new 30-ft primary vertical barrier, demolition of legacy vehicle barrier and 20-ft wide patrol road.  The Contractor shall provide full design and construction for the alignment shown in SOW Attachment A – Location Maps.

1.      The West and East ends of each segment shall be tied into the adjacent segment terminations.  Note the following special requirements:

a)      Segment 1 West termination shall be tied into the TCA-4 project East terminations. This will require extending approximately 50 feet West of the Tohono Oodham boundary. Demolition of the North-South connector at this location is required as part of the TCA-5 project scope.

b)      Segment 3c East termination shall be tied in with the TCA-2 project West termination.

c)      The legacy vehicle barrier shall be demolished and disposed of at an approved offsite facility.

2.      Primary vertical barrier steel is contractor provided.


**[Page 7]**

d.      **BASE WORK** – Access Road Repair Work: Repair of existing access road pavement sections shall be comprised of road blading and placement of 4-in of compacted aggregate base (no caliche) across a maximum 20-ft road width up to the mileage indicated in the price schedule. For purposes of this Work, access road is considered any road approved for use to access a project segment. Contractor to provide not to exceed (NTE) cost per mile of access road repair. Notice to Proceed (NTP) for this work can be requested at any time within the overall project duration. To request NTP, the Contractor shall submit the request via email to the COR for review and approval. The request shall include a map of the access road(s) to be repaired with end coordinates and the total mileage being requested.  Access road repair requests made by the Contractor shall be made by the Contractor as they become necessary for construction access to one or more project segments associated with new vertical barrier work.  The exact roads approved for access are To Be Determined. The roads shown on the location maps shall not be assumed to be approved for accessing the TCA-5 work area.

**[Page 7]**

f.      **OPTION WORK:** TCA-5 Secondary Vertical Barrier  Design and Construction Segments 1, 2, 3a, 3b and 3c:  Provide the design and construction of approximately 23.72 miles in segment 1, 23.36 miles in segment 2, 5.52 miles in segment 3a, 4.14 miles in segment 3b and 4.95 miles in segment 3c of new 30-ft primary vertical barrier.  The Contractor shall provide full design and construction for the alignment shown in SOW Attachment A – Location Maps.

      1.      The secondary vertical barrier shall be contained within the 60-ft Roosevelt Reservation. The standard secondary vertical barrier requirements of a patrol road on the South side of the secondary vertical barrier and a maintenance road on the North side of the secondary vertical barrier do not apply however the south side of the secondary vertical barrier shall be provided with unobstructed access for four wheel drive maintenance vehicles. As indicated in the BASE Attribute scope section, the design shall ensure that all of the following features can be contained to the Roosevelt Reservation: primary vertical barrier, primary LGDS, 20-ft wide patrol road, attributes, secondary LGDS and secondary vertical barrier. This may require alternative (and more expensive) construction equipment, techniques and methods.

**[Page 8]**

i.      **BASE and OPTION WORK** – Vertical Barrier Requirements: All vertical barriers shall be per the TIDS and shall be 30-ft steel bollard panels with anti-climb plates and mitered tops with plate and in-ground foundation. Grout filling and capping of bollards shall be completed within 5 calendar days of bollard panels being set. All new vertical barrier Work shall be painted and include associated drainage and erosion control, vegetation/debris clearing, structures/obstructions clearing, patrol road maintenance road, all along the entire length all vertical barrier segments. In no case shall any road surface be caliche. Vertical barrier Work shall require flood mitigation measures consisting of either rotated bollard panels or drainage gates to be designed and constructed by the Contractor. For bid purposes, assume all flood mitigation is handled by use of rotated bollards. All drainage gates shall be AVLG for flood mitigation measures and rotating drainage gates local drainage crossings. Final flood mitigation requirements shall be included as further described in Design After Award below. Automated slide gates shall be provided per GFI – Automated Vehicle Gate Sizing, Quantities and Preliminary General Placement KMZ (exact location DOR responsibility). Small wildlife passages are required; base bid shall assume

124 the primary vertical barrier and 124 in the secondary vertical barriers. The exact locations will be provided after contract award.

**[Page 12 & 13]**

r.      **BASE AND OPTION WORK** – Vegetation, Debris, Structures & Obstructions Clearing and Relocation Requirements: The Contractor shall remove all structures and obstructions including but not limited to culverts, chain link fence, razor/concertina wire and temporary fence panels within the project limits. All structures and obstructions shall be salvaged or disposed of by the contractor and approved location. ~~The contractor shall remove vegetation from the patrol road to the river's edge to a height not to exceed 6-in.~~ Native trees, that are outside the limits of barrier, road and drainage control construction, with a diameter of more than 6-in shall not be removed. In no case shall vegetation removal result in ground disturbance of more than 10% (no root removal). All debris within the enforcement zones, including vegetation, shall be disposed of by the Contractor at an approved off-site landfill. No burning of either live vegetation or any debris shall be permitted. See provided KMZ files within GFI links for use in estimating quantity of vegetation clearance.

1. Cacti Relocation. The following outlines requirements associated with the avoidance and/or relocation of certain plant species: Avoidance of impacts to federally and state listed plant species is the preferred conservation measure. However, if it is determined that columnar cactus and other protected species cannot be avoided in place, salvage and translocation of plants to an area adjacent to the project area will be required. The contractor's ISA certified arborist shall prepare a plant salvage and translocation plan identifying plant species of concern that will be impacted by construction operations within the TCA-5 project area prior to scheduled construction activities. The plan shall include the following information:

i. An ISA certified arborist will be on site to oversee all translocation of plants identified in Attachment B - BMPs. Protected Native Plants by Category of the Arizona Native Plant Law and other vegetation identified by Customs and Border Protection (CBP) Natural Resources Subject Matter Expert (SME).

ii. Record of ISA arborist certification.

iii. Method of removal and placement.

iv. Procedures for feeding & watering, if applicable.

v. Methods of bracing & for providing physical stability.

vi. Marking provisions for relocated plants identifiable during establishment period.

vii. Establishment period (minimum 12 months) measures to be employed.

viii. A monitoring plan for relocated species.

ix. Relocate affected plants north of the TCA-5 project area.

x. Species should be relocated a minimum of 10' away from proposed lighting & electrical features.

xi. The north face of cactus, ocotillo, and agave species will be marked so that the species are translocated in the same position.

xii. Impacts to all saguaros that provide suitable nesting habitat for the cactus ferruginous pygmy-owl (Glaucidium brasilianum cactorum) will be avoided. If any saguaros are damaged during construction activities, CBP will be notified and the Contractor shall replace at an appropriate ratio.


**[Page 13]**

l.      **BASE WORK** – Local Drainage & Erosion Control Requirements: The Contractor shall provide full design and construction of drainage control that enables the local design storm per the TIDS to be conveyed across the vertical barrier enforcement zone and the waterborne barrier patrol road and protects against associated scour and erosion. At each drainage crossing, the Contractor shall complete the necessary site grading, approach road construction, erosion and scour protection, guardrail, wingwalls, inlets/outlets, concrete low water crossings, flow dissipaters, debris posts, culverts, and bridges as needed to complete the drainage control Work. Construction of all roadside ditches as needed to convey site drainage to road drainage crossings shall be included under drainage control work.

•       Loose riprap shall have a minimum D50 of 12-inches.

•       All local drainage crossings at the vertical barrier location shall be analyzed as concrete low water crossings (LWC), unless otherwise specified to require culverts in these Project Specifications, with rotated bollard panels and zero drainage gates. If the solution produces 12-in or less of rise in water surface elevation (WSE) for rural settings and 3-in or less for urban settings, then the information shall be fully documented within the WSE waiver template, and no further analysis is required. If the rise in WSE due rotated bollard panels within the drainage crossing is greater than 12-in for rural settings and 3-in or less for urban settings, then the Contactor shall analyze up to three additional solutions that

could include grading, culverts at the patrol road, rotating drainage gates or a combination thereof that result in lowering the rise WSE. Details associated with the approved waiver request shall be incorporated into the drainage report and construction plans.

• All local drainage crossings within vertical barrier segments shall be completely closed off by either vertical barrier or vertical barrier with rotating drainage gates. All drainage crossings that do not specifically call for VB culvert shall be designed to meet TIDS requirements using LWC, culverts or combination.  All culverts at or over 5-ft clear height shall have rotating drainage gates installed. See SOW Attachment H – Rotating Drainage Gates Concept Design

• The Contractor is responsible for removing all sediment and debris from all the drainage crossings within the project limits at the start of the project and following storm events.

**[Page 14]**

t.    **BASE WORK** – External stakeholder Coordination: The Design-Build Contractor shall coordinate with external stakeholders impacted by this project that include, but are not limited to, the International Boundary & Water Commission (IBWC), Tohono O'odham, County and local landowners. The Design-Build Contractor is required to obtain final IBWC concurrence (excluding local drainage gates) that all BASE design meets IBWC requirements for construction within the Roosevelt Reservation. See Attachment D – TIDS v6. The Contractor shall not reach out to any stakeholder until CBP provides the initial introduction and point of contact. The Contractor shall be the lead for all US-IBWC coordination and shall include CBP on all coordination. CBP shall be the lead for all other stakeholder coordination. Contractor participation for all external coordination shall include attending in-person meetings, proposed design exhibits and/or design documents and meeting minutes for all meetings attended by the Contractor. A minimum of twenty on-site meetings will be required for purposes of coordinating with stakeholders regarding details of the project design. The Tohono O'odham reviewers require an in-person presentation of every design submission so depending on how the contractor breaks up the design packages, there could be more than twenty in person meetings required.

**[Page 15]**

1.3    CONTRACTOR'S USE OF SITE AND PREMISES

A.    The Contractor shall have full use of the Project real estate limits, upon availability as notated in the SOW, to complete the work. All work shall be contained within

the project easements. Locating and acquiring staging areas on private lands is the responsibility of the Contractor. Locating and acquiring staging areas on federal/public lands is the responsibility of the Contractor but shall be coordinated through CBP. Maps showing staging areas size and location shall be provided to CBP, in addition to other staging area requirements as described throughout these specifications.

B.    See Attachment A – Location Maps for depiction of the areas of Work and construction access road locations for all BASE Work. Any additional construction access through public/federal lands may be requested by the Contractor. Availability of additional construction access through public/federal lands will be researched by CBP and results will be reported back to the Contractor. CBP does not guarantee and additional construction access through public/federal lands will be available beyond what is shown in Attachment A. Any additional construction access through private lands may be acquired by the Contractor and is the responsibility of the Contactor. Upon completion of construction, the Contractor shall be responsible

**[Page 28 & 29]**

14.    The Contractor shall coordinate and attend one design site visit covering all areas of the project site(s) with CBP and any stakeholders identified by CBP prior to the submission of the 100% design submittal. The Contractor shall be responsible for coordinating the specific day(s) and duration of the site visit and attendees that are agreeable to both CBP and the Contractor. The design site visit shall occur at least 10 working days prior to the 100% design submittal date and the Contractor shall initiate coordinate of the site visit at least 10 working days prior to the proposed site visit dates. The purpose of the site visit will be to clarify design questions and approach throughout the project. Within 5 working days of the completion of the site visit, the Contractor shall submit meeting minutes covering the topics of discussion, agreed upon resolutions and action items.

# ATTACHMENT I

# ATTACHMENT A

## Location Maps

**TCA-5 Tohono O'odham**
**Vertical Barrier & Attributes**
**Design Build Construction Project**

Pima County, AZ

# US CUSTOMS and BORDER PROTECTION (CBP) BORDER PATROL PROGRAM MANAGEMENT OFFICE DIRECTORATE (PMOD)

1

**TCA-5 Project: Tucson Sector**

*Route 1*

## LEGEND

Ports of Entry

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))

Segment 1 Secondary VB (Option (~23.72 miles))

**State Land**

State Land

**Federal Land**

Tribal Land

National Park Service Land

U.S. Fish and Wildlife Service Land

Bureau of Land Management Land

TUCSON SECTOR

AREA ENLARGED

*"If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:237,000          1:237,000

1:237,000

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 1172v2          May 8, 2026

32.17643, -112.26252

32.20622, -112.57192

31.799464, -112.554072

31.815802, -112.607948

Schuchuli

Wahak Hotrontk

Pisinimo

Takk Ka'n Vo

Kom Vo

Kupk

Stan Shuatuk

Gu Vo

Sweetwater

Siovi Shuatak

Pia Oik

Ali Ak Chin

Organ Pipe Cactus National Monument

Vivo

Lukeville POE

La Copa

Desierto de Sonora

MEXICO

General

# TCA-5 Project: Tucson Sector

*Route 21*

## LEGEND

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))

Segment 1 Secondary VB (Option (~23.72 miles))

Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))

Segment 2 Secondary VB (Option (~23.36 miles))

**Federal Land**

Tribal Land

National Park Service Land

*"If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:248,000

1:248,000

TUCSON SECTOR

MEXICO

AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 1172v2        May 8, 2026

31.921365, -111.888259

Casa Grande Station Three Points Station

Ko Vaya

Vamori

86

Vainom Kug

Vakamok

32.17643, -112.26252

86

Kupk

Maish Vaya

Tohono O'odham Nation Reservation

Pisini Vo

Tatk Kam Vo

Kom Vo

Stan Shuatuk

31.729389, -112.327446

31.698799, -112.229123

Wahak Hotrontk

31.799464, -112.54072

Gu Vo

Sweetwater

Pia Oik

Ali Ak Chin

Siovi Shuatak

31.815802, -112.607948

# TCA-5 Project: Tucson Sector

*Route 19*

## LEGEND

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))

Segment 2 Secondary VB (Option (~23.36 miles))

Segment 3a Primary VB Full Attributes Vehicle Barrier Demolition (Base (~5.52 miles))

Segment 3a Secondary VB (Option (~5.52 miles))

Segment 3b (Fast Track) Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.14 miles))

Segment 3b Secondary VB (Option (~4.14 miles))

Segment 3c Primary VB Full Attributes Vehicle Barrier Demolition (Base (~4.95 miles))

Segment 3c Secondary VB (Option (~4.95 miles))

**State Land**

State Land

**Federal Land**

Tribal Land

U.S. Fish and Wildlife Service Land

National Forest Service Land

Bureau of Land Management Land

1:210,000                      1:210,000

*"If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

AREA ENLARGED

Tucson

TUCSON SECTOR

MEXICO

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO).** It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 1172v2        May 8, 2026

Uhs Kug

Puertocito

286

Three Points Station
Tucson Station

31.533653, -111.703623

31.554478, -111.769375

31.554854, -111.770358

31.582141, -111.856982

31.921365, -111.888259

Sells

Chiawuli Tak

Ali Molina

Kahachi Miluk

South Komelik

Chukic

San Miguel

Vamori

Vakamok

Casa Grande Station
Three Points Station

**TCA-5 Project: Tucson Sector**

*Ajo Station/Casa Grande Station*

**LEGEND**

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))

Segment 1 Secondary VB (Option (~23.72 miles))

**Federal Land**

Tribal Land

National Park Service Land

*"If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:63,000                1:63,000

AJO STATION

CASA GRANDE STATION

MEXICO

☐ AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Ali Ak Chin

Ali Chuk

Menagers Lake

31.799464, -112.554072

31.815802, -112.607948

Map Request 1172v2         May 8, 2026



## TCA-5 Project: Tucson Sector

### Casa Grande Station

### LEGEND

Potential Access Roads (Not Yet Cleared for Access or Construction)

**Proposed Alignment**

Segment 1 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.72 miles))

Segment 1 Secondary VB (Option (~23.72 miles))

**Federal Land**

Tribal Land

31.729389, -112.327446

Stan Shuatuk

Papago Farms

Tohono O'odham Nation

Laguna Scota

*"If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:58,000                    1:58,000

CASA GRANDE STATION

AJO STATION

MEXICO

☐ AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 1172v2    May 8, 2026

# TCA-5 Project: Tucson Sector

*Casa Grande Station*



31.698799, -112.229123

Vakamok

## LEGEND

**Proposed Alignment**

〰 Segment 1 Primary VB Full Attributes
Vehicle Barrier Demolition (Base
(~23.72 miles))

〰 Segment 1 Secondary VB (Option
(~23.72 miles))

〰 Segment 2 Primary VB Full Attributes
Vehicle Barrier Demolition (Base
(~23.36 miles))

〰 Segment 2 Secondary VB (Option
(~23.36 miles))

**Federal Land**

☐ Tribal Land

*\*If sheet measures less than 11x17" it is a reduced print.
Reduce scale accordingly.*

1:80,000          1:80,000

TUCSON SECTOR

MEXICO

☐ AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**.
It contains information that may be exempt from public release under
the Freedom of Information Act (5 U.S.C. 552). It is to be controlled,
stored, handled, transmitted, distributed, and disposed of in accordance
with DHS policy relating to FOUO information and is not be released to
the public or other personnel who do not have a valid "need-to-know"
without prior approval of an authorized DHS official.

Map Request 1172v2

May 8, 2026

Case 1:26-cv-02127-RJL   Document 3-2   Filed 06/17/26   Page 78 of 87

## LEGEND

**Proposed Alignment**

Segment 2 Primary VB Full Attributes Vehicle Barrier Demolition (Base (~23.36 miles))

Segment 2 Secondary VB (Option (~23.36 miles))

Segment 3a Primary VB Full Attributes Vehicle Barrier Demolition (Base (~5.52 miles))

Segment 3a Secondary VB (Option (~5.52 miles))

**Federal Land**

Tribal Land

Casa Grande Station
Three Points Station

31.582141, -111.856982

San

*If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:74,000                    1:74,000

CASA GRANDE STATION

THREE POINTS STATION

MEXICO

☐ AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 1172v2                                              May 8, 2026

# ATTACHMENT J

# RESOLUTION OF THE TOHONO O'ODHAM LEGISLATIVE COUNCIL
## (Border Security and Immigration Enforcement on the Tohono O'odham Nation)

RESOLUTION NO. **17-053**

WHEREAS,    the Tohono O'odham and our ancestors have from time immemorial inhabited lands from the Gila River area in present-day Arizona south to the Sea of Cortez in northern Mexico and the Constitution of the Tohono O'odham Nation provides, "It shall be the policy of the Tohono O'odham Nation to seek the return to the Tohono O'odham Nation of lands and natural resources, including minerals and water rights, within or adjacent to the Tohono O'odham Nation, or which originally were a part of the historic Papagueria." (Constitution, Article XVI, Section 9); and

WHEREAS,    in 1854 the United States created an international boundary with Mexico that cuts through Tohono O'odham lands and that forms the 62-mile southern boundary of the Tohono O'odham Nation's main reservation; and

WHEREAS,    the Nation's members experience the direct negative impacts from illegal immigration and drug trafficking across the international boundary, including violence and crime, damage to the Nation's cultural resources, increased demands on tribal law enforcement, illegal dumping, and environmental degradation; and

WHEREAS,    unlike national forests, wilderness areas, and other federal lands on the international boundary dividing the United States and Mexico, the Nation's reservation is not public land, it is reserved for the benefit of the Nation and its members, and the Nation has a duty to ensure that tribal members' rights and the Nation's sovereignty are protected; and

WHEREAS,    the Constitution of the Tohono O'odham Nation vests the Tohono O'odham Legislative Council with the power to consult with the Congress and federal agencies regarding federal activities that affect the Tohono O'odham Nation, and federal agencies are required by Executive Order No. 13175, presidential memorandums, and departmental and agency policies to consult and collaborate with affected Indian tribes on federal policies and actions having a substantial direct effect on tribes (Constitution, Article VI, Section 1(f) and (j)); and

RESOLUTION NO. 17-053
(Border Security and Immigration Enforcement on the Tohono O'odham Nation)
Page 2 of 6

WHEREAS, the duty to protect Nation's lands and resources, and its sovereignty and jurisdiction, including in the Nation's dealings with the United States Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and other agencies within the United States Department of Homeland Security ("DHS") operating on the Nation's boundary with Mexico, is consistent with the DHS Tribal Consultation Policy in which, "The United States recognizes the right of Federally-recognized Indian Tribes ("Indian Tribes") to self-government. Indian Tribes exercise inherent sovereign powers over their members and territories." DHS Tribal Consultation Policy, I.A.; and

WHEREAS, the Nation has for decades authorized border security measures designed to counter drug- and human-trafficking and other border crimes when those measures protect Nation's members, lands and resources, and the security of the United States while respecting the Nation's sovereignty and members' rights; and

WHEREAS, the Nation has authorized the construction and maintenance of physical vehicle barriers along the Nation's southern border subject to compliance with the National Environmental Policy Act, Federal Water Pollution Control Act, the National Historic Preservation Act, Native American Graves Protection and Repatriation Act and additional laws (Resolution No. 04-095, as amended; Resolution No. 08-705); and

WHEREAS, the Nation has supported the construction and operation of two CBP forward operating bases on the Nation's lands, an on-reservation ICE office, and CBP checkpoints on reservation highways, provided that human and civil rights of the Nation's members are respected and subject to additional conditions; and

WHEREAS, the Nation leads a multi-agency anti-drug smuggling task force staffed by Tohono O'odham Police Department detectives, ICE Homeland Security Investigations special agents, Border Patrol agents, and the Federal Bureau of Investigation through the Native American Targeted Investigations of Violent Enterprises task force, the only tribe-led High Intensity Drug Trafficking Area ("HIDTA") task force in the United States, and the Nation continues to support

RESOLUTION NO. 17-053
(Border Security and Immigration Enforcement on the Tohono O'odham Nation)
Page 3 of 6

the federal funding, full staffing, and deployment of ICE's all-Native American Shadow Wolf tactical unit on Nation's lands; and

WHEREAS,    the Nation has supported the construction and maintenance of the roadway along the Mexican border that CBP uses to patrol the international boundary, and the Nation continues to work on and seek funding to improve its roadways near the border, which are heavily used and impacted by CBP, for the benefit of Nation's members and law enforcement; and

WHEREAS,    the Nation supports entering into a government-to-government agreement with the DHS as recommended by the Government Accountability Office Report GAO-13-352 to improve coordination between DHS and the Nation; and

WHEREAS,    on January 25, 2017, President Trump issued Executive Order 13767, "Border Security and Immigration Enforcement Improvements," directing the construction of a physical wall on the United States's southern border with Mexico (Executive Order 13767, Section 2(a) and Section 4(a)); and

WHEREAS,    while the Nation coordinates closely with CBP and ICE and has supported the construction of vehicle barriers, the Nation opposes the construction of a wall on its southern boundary with Mexico; and

WHEREAS,    a continuous wall on the Nation's southern boundary would
- further divide the Nation's historic lands and communities; and
- prevent Nation's members from making traditional crossings for domestic, ceremonial, and religious purposes, including the annual St. Francis pilgrimage to Magdalena, Mexico and cultural runs;
- deny tribal members access to cultural sites, ceremonies, and traditional cemeteries for burying family members;
- prevent wildlife from conducting migrations essential for survival and general life, health and existence;
- injure endangered species such as the jaguar and other wildlife sacred to the Tohono O'odham;
- destroy saguaro cactus and other culturally significant plants;
- militarize the lands on the Nation's southern boundary;

RESOLUTION NO. 17-053
(Border Security and Immigration Enforcement on the Tohono O'odham Nation)
Page 4 of 6

• disturb or destroy tribal archeological, sacred sites, and human remains; and

WHEREAS,     the Nation has likewise opposed the waiver of federal, state, and other laws under section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), as amended, for the construction of border fencing and roads as unnecessary, destructive, and in violation of the federal obligation to interact with Indian tribes on a government-to-government basis and to respect tribal sovereignty and self-determination (Resolution No. 08-062); and

WHEREAS,     Executive Order 13767 also cites the need for additional federal agents on the southern border but does not provide funding for ICE's Shadow Wolf tactical patrol unit, an all-Native American force of ICE tactical officers operating on the Nation's lands that is staffed at less than 50% of its originally authorized strength; and

WHEREAS,     the Domestic Affairs, Agricultural and Natural Resources, Appropriations, and Cultural Preservation Committees, in consultation with the Nation's Chairman, recommend that the Legislative Council affirm the Nation's position on border security and immigration enforcement on the Tohono O'odham Nation.

NOW, THEREFORE, BE IT RESOLVED that the Tohono O'odham Legislative Council supports

(1)     the construction and maintenance of vehicle barriers on the Nation's southern boundary with Mexico in accordance with prior Legislative Council resolutions and laws of the Nation, and federal laws and regulation governing the use of tribal lands;

(2)     consultation, collaboration, and direct tribal participation by the Nation and all affected tribes in the development of the DHS Secretary's comprehensive study of the security of the southern border and any policies or actions implementing Executive Order 13767 and other border security measures;

(3)     entering into a government-to-government agreement with the DHS to improve on-reservation border security coordination; and

(4)     adequate funding for the maintenance and repair of reservation roadways jointly used by CBP and Nation's members;

RESOLUTION NO. 17-053
(Border Security and Immigration Enforcement on the Tohono O'odham Nation)
Page 5 of 6

(5)      funding for the Native American Targeted Investigations of Violent Enterprises HIDTA Task Force;

(6)      funding and restored staffing of the ICE Shadow Wolf tactical unit; and

(7)      funding to fill on-reservation public safety radio coverage gaps and allow for Tohono O'odham Department of Public Safety to communicate directly with CBP and other law enforcement partners.

BE IT FURTHER RESOLVED that the Tohono O'odham Legislative Council opposes

(1)      the construction of a physical wall on the Nation's southern boundary; and

(2)      the application of IIRIRA Section 102(c) waivers of federal and other laws on the Nation's lands.

BE IT FINALLY RESOLVED that the Nation's official representatives are authorized to present the terms of this resolution and other resolutions and positions previously approved by the Tohono O'odham Legislative Council to the federal government, state and local governments and other Indian tribes or their departments, agencies, or political subdivisions, private persons and organizations, including but not limited to the National Congress of American Indians and Inter Tribal Council of Arizona.

The foregoing Resolution was passed by the Tohono O'odham Legislative Council on the 07TH day of FEBRUARY, 2017 at a meeting at which a quorum was present with a vote of 2,279.3 FOR; 742.1 AGAINST; -0- NOT VOTING; and [04] ABSENT, pursuant to the powers vested in the Council by Article III; Article VI, Section 1(c)(f)(i)(j), and Section 2(d); Article XVI; and Article XVIII of the Constitution of the Tohono O'odham Nation, adopted by the Tohono O'odham Nation on January 18, 1986; and approved by the Acting Deputy Assistant Secretary - Indian Affairs (Operations) on March 6, 1986, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat.984).

TOHONO O'ODHAM LEGISLATIVE COUNCIL

Timothy Joaquin, Legislative Chairman

7th day of February, 2017

RESOLUTION NO. 17-053
(Border Security and Immigration Enforcement on the Tohono O'odham Nation)
Page 6 of 6

ATTEST:

_____
**Evonne Wilson, Legislative Secretary**

___7___ day of _____, 2017

Said Resolution was submitted for approval to the office of the Chairman of the Tohono O'odham Nation on the ___7___ day of _____, 2017 at 5:40 o'clock, __P__ .m., pursuant to the provisions of Section 5 of Article VII of the Constitution and will become effective upon his approval or upon his failure to either approve or disapprove it within 48 hours of submittal.

TOHONO O'ODHAM LEGISLATIVE COUNCIL

_____
**Timothy Joaquin, Legislative Chairman**

[X] APPROVED                    on the ___8___ day of __February__, 2017

[ ] DISAPPROVED                 at 11:05 o'clock, __A__ .m.

_____
**EDWARD D. MANUEL, CHAIRMAN**
**TOHONO O'ODHAM NATION**

Returned to the Legislative Secretary on the 8th day of __February__, 2017, at 11:15 o'clock, __A__ .m.

_____
**Evonne Wilson, Legislative Secretary**

RESOLUTION NO. **17-053**

**ACTION:**   BORDER SECURITY AND IMMIGRATION ENFORCEMENT ON THE TOHONO O'ODHAM NATION

**MOVED:**   COUNCILMAN BILLMAN LOPEZ          **SECOND:**  COUNCILMAN ANTHONY J. FRANCISCO, JR.

**DATE:**      FEBRUARY 07, 2017

| DISTRICT | LEGISLATIVE REPRESENTATIVES | # OF VOTES | FOR | AGAINST | NOT VOTING | ABSENT |
|---|---|---|---|---|---|---|
| BABOQUIVARI 367.2 | 1. FRANCES MIGUEL (Roberta E. Harvey) | 183.60 | X | | | |
| | 2. VERNON J. SMITH *(Absent)* (Gloria Zazueta) *(Present)* | 183.60 | X | | | X |
| CHUKUT KUK 332.1 | 1. ETHEL GARCIA (Marla Kay Henry) | 166.05 | X | | | |
| | 2. BILLMAN LOPEZ (Patricia Vicenti) | 166.05 | X | | | |
| GU ACHI 265.0 | 1. TIMOTHY L. JOAQUIN (Louis L. Johnson) | 132.50 | X | | | X |
| | 2. LORETTA LEWIS ( ) | 132.50 | X | | | |
| GU VO 250.6 | 1. GRACE MANUEL (Dallas Lewis) | 125.30 | X | | | |
| | 2. PAMELA ANGHILL (Jeffery Antone, Sr.) | 125.30 | X | | | |
| HICKIWAN 205.8 | 1. LOUIS R. LOPEZ *(Absent)* (Shirley Molina) *(Present)* | 102.90 | X | | | |
| | 2. SANDRA ORTEGA ( ) | 102.90 | X | | | |
| PISINEMO 219.9 | 1. CHESTER ANTONE *(Absent)* (Caroline D. Garcia) *(Present)* | 109.95 | X | | | |
| | 2. MONICA K. MORGAN ( ) | 109.95 | X | | | |
| SAN LUCY 226.5 | 1. DIANA MANUEL (Lorraine Eiler) | 113.25 | X | | | |
| | 2. JANA MONTANA (Gloria Ramirez) | 113.25 | X | | | |
| SAN XAVIER 228.6 | 1. DANIEL L.A. PRESTON III *(Absent)* (Felicia Nunez) *(Present)* | 114.3 | | X | | |
| | 2. RACHEAL VILSON-STONER (Olivia Villegas-Liston) | 114.3 | | X | | |
| SCHUK TOAK 180.6 | 1. ANTHONY J. FRANCISCO JR. ( ) | 90.3 | X | | | |
| | 2. QUINTIN C. LOPEZ (John Fendenheim) | 90.3 | X | | | |
| SELLS 513.5 | 1. ARTHUR WILSON (Beverly Rivas) | 256.75 | | X | | |
| | 2. BARBARA HAVIER (Idaleen Reyes) | 256.75 | | X | | X |
| SIF OIDAK 231.6 | 1. LUCINDA ALLEN ( ) | 115.80 | X | | | |
| | 2. MARY LOPEZ ( ) | 115.80 | X | | | X |
| | **TOTAL** | **3,021.4** | **2,279.3** | **742.1** | **-0-** | **[04]** |