**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,

    *Plaintiff,*

v.

MARKWAYNE MULLIN, in his official
capacity as Secretary of U.S. Department of
Homeland Security; RODNEY SCOTT, in his
official capacity as Commissioner of U.S.
Customs and Border Protection; and
ROSARIO VASQUEZ, in his official
capacity as Chief of U.S. Border Patrol,

    *Defendants*.

</td><td>

Case No. 26-cv-2127

</td></tr>
</table>

**DECLARATION OF RIYAZ A. KANJI**

I, Riyaz A. Kanji, declare the following on the basis of personal knowledge to which I am competent to testify:

1.  I am an attorney at law, duly admitted to practice before this Court. My law firm represents the Tohono O'odham Nation ("Nation") in the above-captioned lawsuit. I am fully familiar with the facts and circumstances of this case. I make this declaration in support of the Nation's Memorandum of Points and Authorities in Support of the Nation's Motion for Preliminary Injunction.

2.  **Attachment A** is a true and correct copy of a letter from the Assistant Commissioner of Indian Affairs to the Superintendent of the Sells Indian School, dated March 31, 1919.

1

3.      **Attachment B** is a true and correct copy of correspondence between a Department of the Interior engineer and the Superintendent of the Sells Indian School, dated December 28, 1918.

4.      **Attachment C** is a true and correct copy of a letter from the Superintendent of the San Xavier Indian School to the Commissioner of Indian Affairs, dated November 21, 1918.

5.      **Attachment D** is a letter from the Superintendent of the Sells Indian School, dated April 23, 1925.

6.      **Attachment E** is a true and correct copy of a letter between U.S. Indian Service engineers dated December 27, 1918.

7.      **Attachment F** is a true and correct copy of the Indian Claims Commission's Decision, including its Findings of Fact and its Opinion, in *Papago Tribe of Ariz. v. United States*, Docket No. 345, 19 Ind. Cl. Comm. 394 (1968).

8.      **Attachment G** is a true and correct copy of the Papago Tribe of Arizona's Land Petition in *Papago Tribe of Ariz. v. United States*, Docket No. 345 (Ind. Cl. Comm. 1951).

9.      **Attachment H** is a true and correct copy of the United States' Requested Findings of Fact, Objections to Petitioner's Proposed Findings of Fact, and Brief in *Papago Tribe of Ariz. v. United States*, Docket No. 345 (Ind. Cl. Comm. 1965).

10.     **Attachment I** is a true and correct copy of a report by the Committee of Eight, "The Papago Indians in Southern Arizona" (Aug. 18, 1915).

11.     **Attachment J** is a true and correct copy of a letter from Franklin K. Lane, Secretary of the Interior, to the President of the United States (Jan. 13, 1916).

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 16th day of June, 2026

By: /s/ *Riyaz A. Kanji*
Riyaz A. Kanji
Attorney at Law
Kanji & Katzen, P.L.L.C.

# ATTACHMENT A

REFER IN REPLY TO THE FOLLOWING:

Pur-Sup
28648-18
C  H  S

5-1100

**DEPARTMENT OF THE INTERIOR**

OFFICE OF INDIAN AFFAIRS

WASHINGTON

MAR 31 1919

ADDRESS ONLY THE
COMMISSIONER OF INDIAN AFFAIRS

3

Mr. Thomas F. McCormick,

Supt., Sells School.

My dear Mr. McCormick:

Referring to your recent advertisement
for barbed wire and staples with which to erect
an international boundary fence between the Papago
Reservation and Mexico, you are advised that the
American Steel and Wire Company is not satisfied
with the result, because it understood that de-
livery was required at Tucson, Arizona, and the
company bid that way, whereas, award was made to
the Pittsburgh Steel Company, which had offerred
the same materials delivered at Monessen, Penna.,
these costing slightly less because of our advantage
in the way of land grant freight rates.

It appears that this dissatisfaction
has arisen from the fact that in your proposal
blank form 5-086, you named the delivery point
as Tucson, Arizona.  Please be advised that this
part of the blank should not have been filled by
you, but you should have given the bidder the
privilege of naming the point of delivery for him-
self.  Please follow this procedure in the future.

Very truly yours,

3 RF 26.

Assistant Commissioner.

Land - International Boundary
Between Papagos + Mexico

1918 - 1925

# ATTACHMENT B

Re International
Boundary fence.

5—1143

## DEPARTMENT OF THE INTERIOR

### UNITED STATES INDIAN IRRIGATION SERVICE

SUPERINTENDENT OF IRRIGATION
528 FEDERAL BUILDING
LOS ANGELES, CAL.

December 28, 1918.

Mr. Thos. F. McCormick, Supt.,

Tucson, Arizona.

Dear Sir:

I am in receipt of a letter dated December 20
from the Chief Engineer in regard to the construction of
the fence between the Papago Reservation and Mexico.
In this letter he suggests that, in accordance with your
request, a survey party from the irrigation service be
sent down there to run out this line and determine just
what portions should be fenced.   In my reply of December
27, a copy of which is enclosed for your personal informa-
tion, I have suggested that, in view of the limited funds
available for this work, $10,000, which must be distributed
over about 50 miles of fence, it would be almost impossible
to build that amount of fence if any extensive survey work
were done upon this line.

I am quite familiar with the conditions along
the International Boundary line through personal observa-
tion and, as it is now monumented with permanent monuments
established by the International Boundary Commission, and
as these monuments are so located that each one is visible
from the adjacent monuments, and only about three miles
apart, it would seem entirely feasible to dispense with the
chaining of this line, which would necessitate a large
amount of brush cutting and careful work in chaining out
the line.   As suggested in my letter to Mr. Reed, it would
seem entirely practicable, in view of the fact that we
already have the approximate length of the line, to order
the fencing and, when the construction is started, to send
a good transitman down there with sufficient extra help so
that the line might be flagged out with sufficient accuracy
for fence building.   This could be done much easier and
quicker and at much less expense than if we were required
to chain out the line.   To my knowledge there are very
few places along this line where cattle would not graze
across the line with ease.   A greater portion of the line
over the mountains is quite rough and inaccessible by wagon
but at the same time it is not so rough but that cattle
graze over practically the whole area.   The only exception,

T.F.McC.--2

as noted in my letter, is at the monument on the peak in the La Lesna Mountains where for a very short distance the line is broken by abrupt cliffs.  I have been on top of this peak and, as I recall, the distance which would not require fencing is probably not over a few hundred yards.

The great disadvantage in work along this line is that the roads cross the line and in only one case is there any kind of a road parallel to the line, this being between San Miguel and Poso Verde, a distance of about four miles.

I have taken the liberty of sending you a copy of my letter to Mr. Reed in order that no delay may be incurred in sending this information back from Washington, so if you desire to correspond with Washington in connection with this matter you may take it up without delay.

If you have any further suggestions, I would be glad to entertain them and make whatever arrangements seem to be necessary at any time.  If you could give me some idea as to what the fencing would cost per mile, I could form a better idea of the amount which could be allowed for survey work, as the two must necessarily be adjusted to get the best results.

Very truly yours,

Herbut C. Olotta
Supervising Engineer.

enc.

HVC/MBT


cc-Chief Engineer.

# ATTACHMENT C

Ed-Ind
T B B

San Xavier Indian School.

Tucson, Ariz. Nov. 21, 1918.

The Hon. Commissioner of Indian Affairs,
Washington, D.C.

Sir:-

Replying to Office letter of October 31st. I wish to say that I believe that I can get at least fifty per cent of the labor for the erection of the fence on the international boundry line between Mexico and the Papago Indian Reservation from the Indians gratis. The posts can all be cut on the Reservation, with the exception of a few gate posts which we will have to buy. The greatest cost excepting the wire, will be the freighting of the wire from Tucson to the boundary line. The Indians are anxious for the fence and are willing to give as much of their time free as possible and I am satisfied that by giving them wages which would be sufficient to off-set their living expense that they would be willing to build the entire fence.

The most important thing at the present time is the location of the line fence and the distance which it is necessary to fence along the border as there are some places along the border mountainous and it would be impossible to try to fence there. I request the Office to see if one of the engineers from the Irrigation Service could not be deatiled on this work.

Very respectfully,

Superintendent.

AA



Land - International Boundary
Between Papagos & Mexico

1918 - 1925

# ATTACHMENT D



INTERNATIONAL BOUNDARY COMMISSION
UNITED STATES AND MEXICO
AMERICAN SECTION
OFFICE OF THE CONSULTING ENGINEER

Sells Indian School, Sells, Arizona,
April 23, 1925.

MR. P.E. Fishburn,
Consulting Engineer,
El Paso, Texas.

My dear Mr. Fishburn:

In reply to your letter of April 18,
I wish to say that the $10,000 appropriated for
the construction of a fence along the Mexican
border was used about five years ago when a
fifty mile fence was built along the border
separating the Papago Reservation from Mexico.
and give me your views re above.

Sincerely yours,

R. E. Fishburn
Superintendent.

RECEIVED
APR 21 1925
SELLS INDIAN AGENCY

# ATTACHMENT E

(COPY)

about 49.65 miles.

December 27, 1918.

Mr. W. M. Reed, Chief Engineer,
U. S. Indian Service,
Washington, D. C.

Dear Sir:

In reply to your letter of December 20, enclos-
ing copy of letter from the Assistant Commissioner regard-
ing the construction of the fence along the International
Boundary line between Mexico and the Papago Indian Reser-
vation, with request for statement regarding the necessary
crew and equipment for making the survey, I submit the
following reply:

I note that Superintendent McCormick has stated
that the most important thing at the present time is the
location of the line fence and the distance which it is
necessary to fence along the border, as there are some
places which are mountainous and it would be impossible
to try to fence there. In your letter you state that
you presume this work would require an engineer of con-
siderable skill and care, together with chainman, driver,
cook, etc. It is also noted that the authority for this
work is a total of $10,000, to be available until expended.

During the time I was in the Papago country in
1914, I became very familiar with this section of the
Papago Reservation. According to the new lines of the
reservation, established in January 1917, the southern
boundary will extend from the divide on the Poso Verde
Mountains on the east to the west line of Range 1 West,
Salt River Base and Meridian. Although there are some
discrepancies in the boundary measurements which we have
obtained from the General Land Office at Phoenix and which
were taken from the report of the International Boundary
Commission are sufficiently correct upon which to base
the length of fence line required.

According to our maps, the reservation begins
about two miles southeast from Boundary Monument No. 142 and
extends practically to Monument No. 157, a distance,
according to the figures of the Boundary Commission, of

about 49.65 miles.

In regard to Mr. McCormick's statement that there are portions of this distance which are mountainous and which it would be impossible to fence, I would state that the line crosses two considerable mountain ranges, the Sierra de la Union, where the line rises gradually to a point approximately 1,000 feet above the lowest point of the valley, and La Lesna Mountains, which are also about 1,000 feet above the adjacent valley. In both cases, however, the rise is very gradual, approaching the summits on long even slopes. As the best grazing is usually found on these summits and on the slopes, and as there are no precipitous walls which would prevent cattle from crossing this line at almost any point, I believe it would not be advisable to omit fencing of any portion of the line, as it would be a continual source of trouble. There is only one exception to this and that is at Boundary Monument No. 160 or 161, which is a very sharp and precipitous peak. However, there would be only a few hundred yards of fencing to be omitted at this place and at all other places it would be very probable that cattle would graze back and forth without restraint.

It is true that some of this line is so rough that it would be difficult to build a fence, but that is no great reason for leaving out any considerable portion along the whole line. It is believed absolutely safe to order 50 miles of fence and it certainly would cost more to make a close survey to obtain a more accurate length than any fencing which might be saved would cost. To send a survey party down there to chain out this line and locate it definitely by stakes, say every hundred feet, would mean that much more brushing would have to be done and much more care used than would seem necessary for the building of the fence. The fact that the boundary is now monumented with permanent stone or steel monuments, approximately three miles apart and located so that each monument is visible from the adjacent monuments, would seem to make it necessary to do only a limited amount of instrument work.

As there seems to be no particular reason for chaining out this line in advance of building the fence, I would suggest that the most economical way would be to order the fencing material and when the construction crew goes down there to build the fence that a good instrument man accompany them with sufficient extra laborers to flag

Re International
Boundary fence.

B-343

## DEPARTMENT OF THE INTERIOR

### UNITED STATES INDIAN IRRIGATION SERVICE

out the line with poles located, say, every half mile, so that the foreman of the fence gang could line his fence according to these poles. This would not require a large survey party, including extra transportation and cook, as would be necessary if the survey party were sent down before work was started. As the authority is for only $10,000, it would seem almost impossble to build the full amount of fencing, if a very large deduction must be made for preliminary surveys. Chaining out the line would add very largely to the expense because of the large amount of brushing which would be necessary and, if the exact distance is not required, I believe the method as suggested would be entirely satisfactory.

If it is not deemed advisable to purchase the full amount of fencing, thinking that portions of the line could be omitted, it would be feasible to purchase, say, only 45 or 40 miles at first, leaving out the unnecessary portions as they are found during construction.

It is roughly estimated that it would cost $30 per day for a survey party alone and that it would require at least thirty days, possibly more, to run out this line with transit and chain. This would make a total of approximately $1,000, whereas if an instrumentman and one or two rodmen accompanied the construction crew, the extra cost for surveys should not amount to more than $300 or $400.

If upon further consideration you deem it necessary to send a survey party down there, it will probably be necessary for us to employ an additional instrumentman and furnish him with a complete outfit, camp equipment and transportation. If it is your desire that we shall do this survey work, we shall be able to begin on very short notice.

Very respectfully,

(Signed) Herbert V. Clotts,
Supervising Engineer.

HVC/MBT

# ATTACHMENT F

19--394

Papago Tribe

    v.

United States, Docket No. 345       19 Ind.Cl.Com. 394, 424
                                       Decided September 10, 1968

FACTS:  Aboriginal title claim.  Defendant contended western portion of area claimed too arid to provide use sufficient to establish Indian title; that another portion of the area claimed was owned and occupied by a now-extinct tribe.  Held: Arid area sufficiently used and occupied; Commission finds Papago Indian title to a very substantial portion of the area claimed.

     1.  Tribe, Band, or Other Identifiable Group. Papago were in Santa Cruz Valley jointly with Sobaipuri and were not imported into that area by the Spanish; they absorbed the Sobaipuri and continued to use the lands.  The merged tribe succeeded to rights of aboriginal title of the Sobaipuri.  p. 429.

     2.  Original Indian Title - Abandonment.  "Without considering whether Indian title could have been acquired or reacquired after 1854" (when U.S. sovereignty attached), or whether raiding alone could defeat the aboriginal title, Commission finds as a matter of fact that Papagos continued to use the land to the full extent possible under threat of the Apaches.  p. 430.

19 Ind. Cl. Comm. 394                                                    394

BEFORE THE INDIAN CLAIMS COMMISSION

THE PAPAGO TRIBE OF ARIZONA,        )
                                    )
                                    )
                    Petitioner,     )
                                    )
        v.                          )          Docket No. 345
                                    )
THE UNITED STATES OF AMERICA,       )
                                    )
                    Defendant.      )

Decided: Sept. 10, 1968

FINDINGS OF FACT

The Indian Claims Commission makes the following Findings of Fact:

1.  On August 11, 1951, the Papago Tribe of Arizona filed its petition and thus began the instant case before this Commission which was assigned Docket No. 345.

2.  Jurisdiction.  The Petitioner is a tribe of American Indians residing within the territorial limits of the United States, and it has the capacity and authority to bring and maintain the instant case under Section 2 of the Indian Claims Commission Act (25 U.S.C.A. 70a).  The Papago tribal constitution, as developed under the provision of the Indian Reorganization Act (49 Stat. 984), was approved on January 6, 1937 by the Secretary of the Interior.

3.  The Claim.  The instant case is concerned with the petitioner's claim of aboriginal title to a tract of land in Southwestern Arizona shown most handily and easily as very approximately Royce Area 687,

described below (see map, Petitioner's Exhibit No. 275).  The Papago Tribe never signed a treaty with the United States, and thus was not listed by Royce in connection with Royce Area 687.

The claimed lands are generally bounded on the west by the Gila Mountains from the Mexican border northward; on the north by a line running just south of the Gila River to the vicinity of Gila Bend, then to Table Top Mountain, Picacho Peak and Red Rock, then on the east along the Santa Catalina - Patagonian mountain ridge to the Mexican border; and on the south by the Mexican border.  Finding No. 25, infra, details the boundaries of the area we find to have been exclusively used and occupied by petitioners for a long time.

4.  The Claim:  Surface, Subsurface, Reservations.  The Petitioner claims title to the surface and the subsurface minerals of the tract described in Finding No. 3 through aboriginal use and occupancy from time immemorial.  Petitioner excludes from its surface claim reservations created for the Papago by the United States.  They are:

a.  The San Xavier Reservation, by Executive Order dated July 1, 1874.

b.  The Gila Bend Reservation, by Executive Order dated December 12, 1882, as reduced by Executive Order dated June 17, 1909.

The above two reservations were and are known as "River Reservations."

c.  The Papago Indian Reservation, by Executive Orders dated January 14, 1916 and February 1, 1917.

      d.  The Petitioner also excludes from its surface claim additions to the Papago Indian Reservation effected by the Congress.  These additions are set forth in the Acts of February 21, 1931, 46 Stat. 1202; July 20, 1937, 50 Stat. 536; and June 13, 1939, 53 Stat. 819.

The Petitioner further claims interests in lands, including minerals, within the above reservations before they were established, to the extent that the Petitioner was denied use of such lands.  And finally, the Petitioner claims interests in lands, including minerals, within the above reservations after they were established, to the extent that the Defendant disposed of such interests in lands, including minerals, to parties other than the Petitioner.

    5.  <u>Spanish Designations</u>.  In the 15th and 16th centuries, the Spanish settlers of Mexico gave that land its geographical nomenclature. It was the Spanish who named the Province of Sonora.  They designated as Pimeria that part of Sonora north of the Altar and San Ignacio Rivers. They divided that Pimeria, in turn, into Pimeria Alta and Pimeria Baja, upper and lower Pimeria.  The Spanish named that part of Pimeria Alta including the subject lands, the Papagueria.

The name Pimeria derives from the fact that the Spanish found the region occupied by aborigines speaking a common language -- Piman. These aborigines had various group labels -- Papagos, some of whom were called Arenenos, or Sand Papagos; Sobaipuri, long since merged with Papagos; and, on the borders of the Papagueria, the Pimas (Gila River and Baja), as well as the Maricopas, the Yumas, Yavapais and Apaches of other language groups.

19 Ind. Cl. Comm. 394                                          397

The name Papagueria derives from the fact that the Spanish found the dominant group there to be the Papago, as will be further discussed in these findings. "Papagueria" and "Papago Country" will be used interchangeably in these findings to designate the country generally described as between Sonora and the Gila River, south and north; and, east and west, between the Santa Cruz River Valley and the Colorado River.

6. <u>Flora and Fauna</u>. The Papagos ranged freely over the entire Papago Country, from Sonora to the Gila River, and from the Colorado River to the Santa Cruz Valley. They roamed between summer and winter locations, and set up temporary camps for use during their gathering expeditions for wild products of the soil, governed as to time by the growing cycle of those products (see report of Bernard L. Fontana, Petitioner's Exhibit No. 278, p. 38).

In the main, particularly in the western zone, the Papago Country was a grim and uninviting land. For this reason, the Papago Tribe needed truly immense per capita land areas to subsist. And, they occupied and used to the utmost the large tracts they needed.

The arid Papago lands did support a large variety of plant life, much of which was edible or partly so, and was there for the foraging at harvest time. Some of this wild produce was useful also as medicine, as construction material -- the giant reeds, for example -- and for various other purposes helpful to the aboriginal life, such as wood for hunting weapons, and fibers, leaves and rods for domestic implements.

19 Ind. Cl. Comm. 394                                      398

Robert A. Hackenburg, Ph.D, anthropological expert for the Defendant, has supplied a comprehensive account of useful flora and fauna in the Papagueria. (Def. Ex. 250, pp. II-38, et. seq.) Dr. Hackenburg lists some 60 varieties of plant life throughout the subject lands, all useful for food, medicines and other purposes of aboriginal life. No doubt the list could be extended indefinitely, for in times of hardship, the Papagos, especially of the western zone, like other desert dwellers, consumed "just about everything that grew." They likewise hunted almost any animal life large enough to eat, though large game was preferred. Among the animals hunted for food and other uses were several varieties of deer, mountain sheep, wild pig, coyote; many varieties of wild birds were also used by the Papagos.

Since the Papagueria is a large tract of land, for convenience it may be discussed in terms of three zones: western, central and eastern. The parties have used this classification and the Commission adopts it in the discussion contained in some of the following findings.

The northern and southern boundaries of all the zones are those delineated in Finding No. 25. The western zone is generally bounded on the west by the Tinajas Altas-Gila mountain complex, and on the east by the Growler Mountains and their extension. The central zone is generally bounded on the west by the Growler Mountains and their extensions and on the east by the Baboquivari Mountains and their extension. The eastern zone is roughly bounded on the west by the Baboquivari Mountains and

19 Ind. Cl. Comm. 394                                        399

their extension, and on the east by the Santa Catalina Patagonia mountain complex.

Many of the facts and some of the language in the following findings on zonal physiography, ecology and ethnology were found in, or resulted from examination of reports by Dr. Fontana (Pet. Ex. 278) and Dr. Hackenburg (Def. Ex. 250).

7. Western Zone Physiography. The Growler Mountains, on the eastern boundary of the zone, and the Tinajas Altas-Gila Mountain complex on the west, are of only medium elevation. The greatest altitude is about 3,000 feet. Much of the valley land between the two ranges consists of bajadas, long outward detrital slopes. The rest of the valley land consists of level plains, gravelly outwash and sand. The valley land is desert or semi-desert in the main. Average annual rainfall has varied from 3.48 inches at Yuma to 5.06 inches at Tule Tank, with a median rainfall of 4.13 inches.

8. Western Zone, Plant and Animal Ecology. The general land formations of the western zone are largely intermontane plains, low-lying slopes, and mountain slopes. The plains and lower slopes are least desirable for living. On the higher slopes and in the mountains are most of the important food plants of the western zone. Favorable conditions for water penetration and hence viable country are found along the mountain side drainageways.

400

About 80 percent of the sand areas are level plains bearing blue-green algae and ground lichens.  The dunes are frequently stabilized by growths of coarse grass.  Intermountain perennials intrude into the sandy areas.  In general, distribution of plant life in the sandy areas is sporadic.  Relative scarcity of large drainageways and tanks or seepages of water limits the prevalence of trees and other plants of high water need.

Many varieties of cactus and other useful plants were found in the western lowlands, but the vegetation was sparse, and life was grim for a food-gathering people.  Most desert perennials prefer the soil and moisture condition of the upper slopes; mountain tanks and other natural water deposits made life possible.

The western zone shares with the rest of the Papagueria in the distribution of larger game animals, such as mountain sheep, prong-horned antelope, white-tailed deer, and bobcat.  Large and small game animals peculiar to the western zone are black-tailed jack rabbit, antelope squirrel, pocket mouse, kangaroo rat, wood rat, mountain lion, and mule deer.  Many of the larger animals have now disappeared from the western zone, although some, notably the big-horn sheep, a chief food article to the Papagos, still survive.

Generally, the southern and eastern parts of the western zone have the richest plant cover, from a Papago subsistence viewpoint.  A larger

19 Ind. Cl. Comm. 394                                              401

area in the north, in and about the Mohawk mountain complex, however, is

rich in animal and plant life necessary to Papago subsistence; and the

same is to be remarked about the zone's mountain areas in general, notably

the Tinajas Atlas-Gila Mountain chain.

9. Western Zone, Indian Use.  Excluding the Gila River bed and that

portion of the lower Colorado River Valley west of the Tinajas Atlas-Gila

Mountain chain, neither of which are part of the subject lands, the Indians

who inhabited the western zone in early times were called Papagos Arenenos

(Sand Papagos).  The reason seems obvious -- they lived in country largely

covered with sandy deserts.

Anthropologists call their mode of living central-based wandering.

Papagos from one village might wander from the vicinity of Growler Pass

and Bates Well, to Las Playas with its great evaporating lake, then north-

west to the Tule Tank and Cabeza Prieta Tanks, across the Lechuguilla

Desert to the Tinajas Atlas Mountains in the westernmost reaches of the

subject lands.

There were Papago villages or camps throughout the western zone

from the earliest times.  We here list some of them with their general

geographical location.  Quitobaquito is west of longtitude 113° and

further west of the present Papago Reservation.  Ajo is about 30 miles

north by northeast of Quitobaquito.  Northward from Ajo about ten miles

is Child's Ranch, and some 15 miles north of Child's Ranch lie the

19 Ind. Cl. Comm. 394                                              402

Black Tanks.  The Rock Tanks are about 25 miles west of Child's Ranch, in

the Aguilla Mountains.  Red Tank lies about 25 miles south by southwest

of the Rock Tanks, in the Growler Mountains.  Taking Quitobaquito again as

a starting point and traveling westward above the International Boundary

toward the Colorado, one passes Las Playas, the Cabeza Prieta Tanks in

the Cabeza Prieta Mountains, and the Tinajas Altas Tanks at the western

boundary of the subject lands.  Northward from the Tinajas Altas Tanks,

lie the Coyote Tanks and Copper Mountain Tanks.

On the paths followed by the Papagos, outlined above, the nature of

use and occupancy of the Papagos depended upon the conjunction of food and

water resources at each point.

The Organ Pipe Cactus Monument area was rich in plant resources.  The

Papagos had a general gathering area there, especially for the purpose of

collecting cactus fruit.  The large tanks of the Cabeza Prieta and Tinajas

Altas Mountains provide permanent water sources.

10. Central Zone, Physiography.  The central zone includes what

ecologists call the Arizona Upland.  The Upland is situated between the

Growler Mountains and the Baboquivari Mountains.  The central zone con-

tained a much smaller area of low fertility bajadas (i.e., valley slopes)

than the western zone.  There was a correspondingly greater relative area

of the more fertile upper mountain slopes.  The lowland portion generally

increases in elevation from west to east.

The important mountain ranges of the central zone are of mixed

volcanic a 1 sedimentary composition, and have furnished large quantities

of copper and lesser amounts of gold and silver.  The mountain slopes are less steep than those of the western zone; pediments are wider.  Generally, valley floors are no longer flat, but sloping; and drainage lines at valley centers are more clearly accentuated.  Favorable drainage features allow for the formation of alluvial fans at the mouths of washes.  The heavier erosion of the mountain slopes has promoted soil building in the bajadas below them.

There were some 50 watering places in the central zone.  In general, as compared with the western zone, the central zone is one of increasing precipitation, following the usual west-east pattern of the Papagueria.  Average annual rainfall has varied from 8.78 inches at Ajo to 12.22 at San Manuel (just west of the Baboquivari Mountains), with a median rainfall of 9.84 inches.

11.  Central Zone, Plant and Animal Ecology.  Vegetation in the central zone exceeds that in the western zone both in density and number of species.  Plant cover occupies 20 to 60 percent of the surface.  The broad valleys have creosote bush, bur-sage, palo verde, ironwood, mesquite, and various cacti.  Trees increase on the upper slopes.

In the alluvial flood plains, mesquite is the dominant tree, with cottonwood and willow as well.  \

The central zone was rich in game animals in the early days.  Natural ponds and artificial charcos, made by the Indians, augmented the water supply.

19 Ind. Cl. Comm. 394                                            404

12.  Central Zone, Indian Use.  As in the western zone, the general

picture was one of mountain ranges and valleys flanked by low hills, in

many of which wells were dug.  There was a fairly well distributed supply

of permanent water.  Dependence on seasonal plants dictated a migratory

life to the Papagos, but migration in the central zone, between fixed

locations, could be more limited than in the western zone.

After the summer rains, the inhabitants moved to the valleys to

plant their fields, and to scatter out in gathering groups.  The women

brought in leaves, fruits, seeds, and roots.  The boys hunted game and

birds.  The men attended to whatever agriculture was possible.  They dug

a well for drinking and wash water while it lasted, after which the whole

group had to move.

The Papago type of farming was called flood water farming.  Fertility

was secured through the action of the natural washes, helped by the

Papagos by the placement of earthen dikes for water spreading and

collection; that is to say for water control or irrigation.  In the pre-

historic times, before the Spanish, the Papagos cultivated maize, beans

and pumpkins.  The Spanish added wheat to the crops.

Summer camps were known as "fields."  When the fields dried up the

Papagos left them and repaired to other fields, and eventually to winter

homes called "wells."  But here, as in the western zone, life was

necessarily mobile; and many inhabitants made long trading, gathering

or hunting visits to other parts of the Papago Country.  By the 19th

century, cattle raising was of increasing importance to the Papagos.

Most of the central zone has been included in the Papago Indian Reservation of today.  It is not contended that the Papago have had exclusive use and possession of the area for a long time.

13.  Eastern Zone.  Physiography.  The lower Santa Cruz Valley is part of the Arizona Upland described in connection with the central zone. The upper Santa Cruz Valley and the Baboquivari Mountains, however, introduce physiographic components quite different from those previously prevailing in the central zone.

The upper Santa Cruz region, bounded on the west by the Baboquivari Mountains, also includes the Altar Valley and the Sierrita, Tumacacori, Pajarito, and Atascosa Mountains.

The Papagueria is bounded on the east by the Santa Cruz River Valley. The elevation of the valley floor rises generally as one proceeds southward, from 2362 feet at Tucson to 3873 feet at Nogales.  The Baboquivari Mountains are the highest range in the Papago Country; and also the longest: over 40 miles.  Average annual rainfall has varied from 11.29 inches at Tucson to 18.20 inches in the Baboquivari Mountains.

14.  Eastern Zone, Plant and Animal Ecology.  As in all Papagueria, the upper slopes are rich in vegetation, as in the large alluvial flood plain of the Santa Cruz River.  Also as is common in the Papagueria, the bajadas are generally the least fertile of eastern zone land.

19 Inc. Cl. Comm. 394                                    406

Proceeding from the Arizona Upland of the lower eastern zone to the upper Santa Cruz Valley, there is a marked increase in grassland. The river bottoms in the Upper Santa Cruz area produce a good supply of materials for basketry such as arrow-weed, carrizo, and cat-tails. Mesquite trees have been abundant in the upper eastern zone.

In addition to more vegetation, the animal life of the eastern zone was more numerous. There were increased opportunities, of which the Papagos availed themselves, to hunt and gather, to plant and to pasture animals. The relative richness of the environmental components of the eastern zone, and to a lesser degree the central zone, afforded one reason for the raiding by the Apaches.

15. Eastern Zone, Indian Use. The best-watered area of the Papagueria, the Santa Cruz Valley supported an Indian population from earliest times. Some irrigation could be carried out; life was more sedentary along the river. Associated with the mission founded at San Xavier del Bac was a village of Papago Indians uncontestedly resident at this place in the Eastern Zone throughout the entire historical period.

In early times, the San Xavier Papagos were directly related linguistically, even dialectically, to those of the Santa Rosa Valley. The Santa Rosa Valley was in the mid-central zone. Northward was the Papago region known as Kohatk. Kohtk Papagos, too, were closely related to those of San Xavier.

Tradition, before documented history, has it that Papagos from the Santa Rosa Valley had fields in the Santa Cruz to which their rights were conceded, and to which they returned annually to plant irrigated crops. The pattern of seasonal mobility was well-established in the eastern zone from earliest times, as it was in the central zone, and even more so the western zone, due to the thinner distribution of wild edibles in that country.

When the Spanish came to the Papagueria in the 17th century, they brought winter grains, especially wheat. The Papago life pattern soon became gathering their sahuaro fruit in season, harvesting their regular summer and autumn crops of corn, beans, and squash and then migrating to the river villages like San Xavier to plant their winter wheat.

There were other influences on Papago mobility -- missionaries and Apaches. As to the missionaries, it is not certain that they forced or cajoled desert Papagos from further west to settle at San Xavier, but it appears to be consistent with general Spanish policy. Apache raiding worked the opposite result; permanent settlement as riverine agriculturists would provide inviting targets for raids.

Apparently all permanent settlements in the Eastern Zone, except San Xavier were abandoned in the mid-19th century because of the Apache raiding. However, at least one traveler (Bartlett, 1852) found evidence of contemporaneous gathering encampments as far east as the Santa Rita Mountains.

19 Ind. Cl. Comm. 394                                              408

Of all Papago communities, San Xavier, with its good soil and irrigation water, was the only one where the inhabitants probably did not leave in a body for outgoing seasonal migration.  Even the San Xavier Papagos, nevertheless, did migrate outward to a considerable extent for seasonal gathering of wild plant foods, to the Tucson Mountains for cactus, and to the Santa Catalina Mountains for mescal.

16.  Spanish Rule.  Cabeza De Vaca may have been the first Spaniard to see the subject lands.  He and Pamphilo De Narvaez, a Mexican Governor, explored the land north of Mexico, chiefly Texas, in the early 1520's.  After years of imprisonment by warlike Texas Indians, the two explorers crossed northern Mexico in 1535.  Father Marcos De Niza, a Spanish Jesuit, led a party of explorers to northern Sonora in 1539.  Francisco De Coronado led a party of about 1000 men to explore what is now southern Arizona in 1540.

The early Spaniards gave the lands in northern Mexico and southern Arizona their names.  They named the Province of Sonora, in northern Mexico.  The Spanish called that part of Sonora north of the Altar and San Ignacio Rivers the Pimeria, Alta and Baja (Upper & Lower).  The Spanish called that part of Pimera Alta in which the subject lands are found the Papagueria.

The names Pimeria and Papagueria were derived from the names of the aborigines who lived in the areas.  Pimeria came from the Piman Indians, a large group with the common bond of the Piman language.  The Spanish

19 Ind. Cl. Comm. 394                                                    409

found three main Indian groups in the Papagueria:  The Pimas, the Sobaipuris,
and the Papagos.  The dominant group in the Papagueria, as the name suggests,
were from very early times the Papagos.  The Pimas, called Gila Pimas,
settled in the north, on the Gila River.  The Sobaipuris were in the San
Pedro and Santa Cruz Valleys, then moved westward to the Santa Cruz River
and beyond in retreat from the raids of the bellicose Apaches.  The
Sobaipuris were wholly absorbed within the Papago Tribe in the 18th century.

In the 16th century, the northern limit of Spanish missionary and
military activity was south of present day Sonora.  The Spanish made peace
with the Yaqui Indians of Sinaloa Province in 1610.  The first Spanish
Missions in southern Sonora began in 1615.  The Jesuits estimated that they
had made about 60,000 converts to Catholicism in the upper Pimeria in 1621.

Father Eusebio Kino was a well-known Jesuit missionary in the Papago
Country.  He was active and peripatetic in the Papagueria from 1687 for
about 15 years; in the last ten years of his life, he died there in
1711.  Father Kino considered the Papagos reliable converts to his faith,
unlike the Gila Pimas and Maricopas and the Yumas of Colorado.  His first
mission was for the Sobaipuris, at Guebavi on the Santa Cruz, to which
the Sobaipuris had come from their homes in the San Pedro River.  Kino
and other Jesuits founded missions at Tumacacori, Tubac, Tucson, and San
Xavier Del Bac.

For some 20 years after Kino's death in 1711, there were no Spanish
priests in present day Arizona.  Missionary activities began again in

19 Ind. Cl. Comm. 394                                          410

1731, but for some years were merely holding operations at San Xavier and Guervavi. Jesuit Father Balthasar traveled across the Papagueria in 1745. He wrote in his memoirs that the region west of the eastern mission of Pimeria Alta was dotted with homes of Indian descendants of the Pimas, who were called Papagos, and who numbered about "six thousand souls." Another Jesuit, Father Pfefferkorn, wrote of his Papagueria travels in 1750 that the Papagos occupied all the country from the Gila River south to Mexico.

After the expulsion of the Jesuits, 1767, missionary activity in the Papago Country was taken over by the Franciscan Order. In 1774, Franciscan Father Francisco Garces made a missionary journey across the Papagueria. He saw Papagos everywhere between San Xavier del Bac and the Colorado River on the west, and everywhere he went from Sonora on the south to the Gila River on the north. Franciscan Father Bringas, in 1795, listed Papago villages throughout the Papagueria. By the end of the 18th century, these literate contemporaries had observed Papagos and only Papagos throughout the subject lands.

17. The Sobaipuris and other Indians. The Sobaipuris were a Piman speaking group, identified by the first Spanish as the residents of the San Pedro River and the Santa Cruz River Valleys. In the 18th Century, the tribe moved westward to the Santa Cruz River Valley. The migration was in part spurred by Apache raids in their San Pedro homeland, and, partly in the 18th Century, to join the Papagos who were well-organized in defense of presidios at Tubac, San Xavier del Bac and Tucson. Whatever

distinction they may have had from the Papago, as a group they had disappeared before 1800. They intermarried with the Papagos and became completely merged with them by the end of the 18th Century.

Other Indian groups in the area did not attempt residence in the Papago domain. The Arivaipa and Pinal Bands of the San Carlos Apaches occupied the lands from the Santa Catalina Mountains northward and north of the subject lands. Since the Apaches drove the Sobaipuris west from the San Pedro Valley in the late 18th Century the Rincon Patagonia Mountain complex was the western limit of Apache settlement. They ranged westward in their raiding parties into eastern Papagueria -- enemy country to them --- but never settled in the Papago lands. The Apache occupation was east and north of the perimeter of the subject lands.

The Gila River Pimas were a Piman speaking group related to and friendly with the Papagos and Sobaipuris. They occupied the lands near the junction of the Santa Cruz and Gila Rivers. Their villages, and their hunting and gathering territories were all north of the subject lands. Apparently both Papago and Pima recognized a boundary between their lands running from Table Top Mountain to Red Rock. The Maricopas were spread thinly west of the Gila River Pimas, north of the Gila River, westward to the area to the north of the Mohawk Mountains. The Yavapais were located on the north bank of the Gila River, westward from the Maricopas to the Gila Mountains. The Maricopas and Yavapais were both located north of the subject lands. The Yumas occupied the lower

19 Ind. Cl. Comm. 394                                             412

portions of the Colorado River and the Gila River Valley west of the subject lands.

18.  The Apache Raids.  The Apache Indians, who lived east and \ north of the Santa Cruz and San Pedro Rivers, made a practice of raiding the Sobaipuris and Papagos from the early 18th Century.  They decimated the Sobaipuris, driving survivors west to the Papagos and completely out of the San Pedro Valley.

The Apaches continued their raids sporadically through the 18th and into the 19th Century, with considerable intensity during the ten year period after 1811.  They never settled in the Papago Country.  They did, nevertheless, inflict serious damage and bloodshed on the Papagos.  The Papago were driven from permanent settlements on the Santa Cruz River south of San Xavier.  Without the intense and steadfast Papago attitude toward their land, the Papagos might have been driven permanently from eastern Papagueria.  As it turned out, they were not and this was understood by the United States when it established the first Papago Reservation in easternmost Papagueria at San Xavier del Bac, July 1, 1874.  This understanding by the United States was further evidenced by a series of reports by Indian Agents for many years previous to 1874.

One result of the long period of Apache raiding was that the Papagos prepared fairly large settlements to retire to during raids.  Over the 150 years of Apache raids, Papago settlements increased from 25 or 30 villages to more than 100.  They are sometimes called "defense villages."

Most of them remain today in the same place they were when founded as long as two centuries ago.

Papago scouts accompanied the U.S. troops in the campaigns against the Apache hostiles. As the Apache threat was reduced, there was a rapid expansion of Papago cattle raising over the affected area, and a general dispersal in a more efficient search for food resources.

19. American Acquisition. United States sovereignty attached to the Papagueria through the Gadsden Purchase ratified June 30, 1854. By the Act of July 22, 1854, 10 Stat. 309, the United States authorized the disposition of the public lands resulting from the Gadsden Purchase. The Act provided for the application of the pre-emption laws of the Territory of New Mexico to the new Arizona public lands. Lands covered by claims based on Spanish or Mexican law were excluded. The right of pre-emption could be exercised only by American citizens or by persons who had filed declarations of intention to become American citizens.

By the Act of May 20, 1862, 12 Stat. 392, the United States opened the public lands in present southwestern Arizona to homesteaders who were American citizens or who had filed declarations of intention to become American citizens. By the Act of July 26, 1866, 14 Stat. 251, the United States opened the public lands, except for lands covered by claims based on Spanish or Mexican law, to mineral entry.

In addition, in the Papagueria and elsewhere in Arizona, the United States disposed of public lands to railroads. There was further disposition

19 Ind. Cl. Comm. 394                                          414

of the Arizona public lands for governmental purposes -- parks, schools
and national forests.

20.  Settlers.  The white settlers moved into the Papago Country
in steadily increasing numbers after the Gadsden Purchase.  Mining
claims were staked throughout the subject lands.  The white settlers
established ranches and homesteads, particularly in the Santa Cruz
River Valley, in the eastern zone of Papagueria.

The eastern zone was the best of the Papago Country for agriculture
and cattle raising.  The Sobaipuri-Papago had used and occupied the
eastern zone from time immemorial.  Their use and occupancy, discussed
at length in earlier findings, had been exclusive despite 150 years of
sporadic Apache raiding activities.

The encroachments by non-Indian settlers after the Gadsden Purchase,
was in an important respect distinguishable from Apache raiding -- the
Apache rode through the zone from time to time and plundered, but never
settled.  The white man, with the encouragement of the United States
Government, came there to stay, to settle and make his permanent home.

In 1867, Indian Agent Ruggles filed a typical report with the
Arizona Superintendant of Indian Affairs.  He reported finding Papago
Indians in occupancy of the territory "bounded on the north by the
river Gila, on the east by the Rio Santa Cruz, on the south by the State
of Sonora, and in the west by Sonora and the valley of the Gila and Rio

19 Ind. Cl. Comm. 394                                             415

Colorado." The differences between the Papagos and the whites pushing
into the Papago Country formed one of the strongest arguments, Agent
Ruggles wrote, for "their concentration on a reservation."

The Papagos had needed, occupied and used very large per capita
land holdings from time immemorial. White encroachment continued at an
ever-increasing pace after the Gadsden Purchase. Differences thus arose
between the Papagos, with their natural desire to continue their ab-
original ways, and the white settlers, whose solution for the friction
was concentration.

21. The River Reservations. In 1870, representatives of the
Papagos met Captain F. E. Grant, Special Indian Agent. The purpose of
the meeting was to air the wounded feelings of the Papagos, and to protest
the growing non-Indian encroachment on the Papago lands along the Santa
Cruz River. Agent Grossman reported on the meeting to George L. Andrews,
Arizona Superintendant of Indian Affairs. The Papagos, he wrote, had
harvested their crops along the Santa Cruz, but the return was subnormal.
The Papagos attributed the disappointing harvest to the presence of non-
Indians on the most fertile Papago lands.

The Papago delegation called on the United States, through its
agent Grossman to restore their fertile Santa Cruz lands. As Grossman
put it: "It is wrong indeed that a friendly and industrious nation
are being left without aid and advice from the Government." From Agent

19 Ind. Cl. Comm. 394                                     416

Grossman's language, we infer Government recognition of the Papagos as
the tribe to deal with in the Santa Cruz Valley, and gain the further
impression that the United States was failing in its duty to its Papago
Indian wards, at least up to 1870.

Edward P. Smith, Commissioner of Indian Affairs, in his November
1874 report to the Secretary of the Interior, expressed his own mis-
givings as to the treatment of the Papagos by the Government.  He
classifies the Papagos among the most peaceful of Indians, "who have
come into possession of allotted lands...."  He was troubled, however,
by governmental neglect of the Papagos:  "These Papagos are liable at
any time to have their lands, which they have cultivated for many
generations, entered under the pre-emption act by white settlers."

Arizona Indian Agent Wilbur, concerned about the steady erosion
of the rights of the Papagos to use and occupancy of their ancestral
homelands, reported to the Commissioner of Indian Affairs in 1874.  He
sent appraisals of land involved, with description of natural boundaries
of San Xavier del Bac, urging designation of the area as a Papago reser-
vation, to thus restore to them some of the land from which they had been
removed.  The plan was to erase private title to land within the natural
boundaries of San Xavier del Bac.

The Commissioner for Indian Affairs partially approved of Agent
Wilbur's recommendations, but excluded those areas with relatively dense

19 Ind. Cl. Comm. 394                                                417

private ownership.  Agent Wilbur protested some of the exclusion, on the ground that they "would give great dissatisfaction to the Indians."  These particular exclusions related to land which "is now and has been from time immemorial cultivated and held by these Indians," and contained the most fertile land in the area.  The United States nevertheless excluded these most fertile parts of the Papago lands from the San Xavier Reservation when it was created under the Executive Order of July 1, 1874.  The exclusion of the fertile lands from the reservation was, in the view of Indian Agent Wilbur, a "great injustice to these (Papago) Indians."

Another reservation was created near Gila Bend for Papagos and other Indians in the vicinity.  This was above the northern boundary of the Papago area of exclusive use.  The Gila Bend Reservation was created by the Executive Order of December 12, 1882.

22.  Inadequacy of the River Reservations.  Indian Agent J. H. Stout reported to the Secretary of the Interior in 1878 on the San Xavier Reservation:  "it contains about 70,000 acres of land, most of which, like the Pima Reservation, is worthless.  A part of it is tolerably well timbered, but it is poorly watered, and is wholly inadequate to the wants of its Indians."  The non-reservation Papagos, he continued, "are scattered over a tract about 300 miles in length by over 100 in width, extending from Tucson to the Colorado River.  They are for the most part a pastoral people, and have located wherever they could find springs, marshes, or

lowlands, that would furnish water for their stock.  They also do some farming when their supply of water permits."

In 1893, Indian Agent Cornelius Crouse reported that the San Xavier Reservation contained 363 Papagos, and "that nine-tenths of the number of Papagos have no land at all.  They are roving all over the mountains..."

In 1889, Indian Agent Crouse had reported to the Arizona Commissioner of Indian Affairs on his mission to the Gila Bend Reservation to attempt an adjustment of differences between the Papagos and settlers surrounding the reservation.  Mr. Crouse recommended Government help "in securing water to properly irrigate their rich land."

Agent Crouse said he had found no Papagos at Gila Bend, although he had heard there were 30 on the reservation.  He did meet one, nevertheless, before returning, who told Mr. Crouse that the Papagos from Gila Bend were at "a safe retreat" a hundred miles from the reservation, a place where they had constant trouble with the white settlers.

As the 19th Century drew to its close, the Papagos were still on their ancestral lands.  But their life had become one of grim choice between discomfort within riverine reservations at San Xavier or Gila Bend, surrounded and harassed by settlers, on the one hand; or, on the other, discomfort outside the reservations, due to the steady encroachment and aggression of the non-Indian settlers.

23.  The 20th Century.  The 20th Century began in the Papagueria with steadily mounting ferment in Papago-settler relations.  Hopefully,

19 Ind. Cl. Comm. 394                                             419

Papago delegations and the Government's Indian Agents combined in urging

the United States officials that a suitable reservation home be provided

for the Papagos.

In 1905, the Government reacted in an apparently purposeful manner,

with an attempt toward a solution of the Papago problem.  The Commissioner

of Indian Affairs, Francis E. Leupp, reported on the possibility of

securing lands for the Papago Indians in southwestern Pima Country.

"These Indians," he wrote, "have lived in that neighborhood for generations,

sustaining themselves by stock raising and by some farming during the

rainy season.  Upon the receipt of more specific information as to the

lands actually in use and occupation of the Indians, measures will be

taken to protect their interests."

Seven years later, Special Allotting Agent Aspaas was sent to

the Papago Country to study use and occupancy patterns with a view to

providing a 160 acre allotment for each Papago.  He proposed reservations

at Ajo, Quitovaquito, Santa Rosa, and Altar Valley, as well as extension

of the San Xavier Reservation, with detailed maps of the various Papago

villages and holdings in Pima, Pinal and Maricopa Counties.

"The lands described in these plats have been occupied by these

Indians for many generations," wrote Agent Aspaas on January 21, 1914.

He mentioned a new cause of unrest:  "At present there is a railroad

survey being made through the heart of the Indian country, which will

19 Ind. Cl. Comm. 394                                                420

draw more or less white settlers, and they may probably try and encroach
on the Indians rights to these lands."

Agent Aspaas pressed for his proposed reservations as absolutely
necessary if the Papagos were "to continue as a self-supporting race..."
He realized Papago dependence on cattle raising, so his proposed areas,
shown on his maps, put the 160 acre allotments in continuous areas where
possible, and also where possible recommended retention of the best
Papago grazing lands.

Commissioner of Indian Affairs Cato Sells reported in 1915:  "There
are nearly 6,000 of these (Papago) Indians, of whom about 200 have re-
ceived allotments on the San Xavier Reservation, but the larger number
have been for more than 200 years scattered over the public domain in
southern Arizona.  ...They have been self-supporting in this very arid
country..."

The allotment plan was dropped in 1916, primarily because white
cattlemen had already pre-empted Papago use and occupancy of much of
their best grazing land.  An Executive Order Reservation was sub-
stituted on January 14, 1916, which left out most of the areas recommended
by Aspaas.

Of the five areas recommended by Agent Aspaas on the express basis
of his mission in Arizona, "occupation for many generations," only the
relatively small Santa Rosa area was accepted by the Government.  The

19 Ind. Cl. Comm. 304                                                421

United States rejected his recommendation on the Ajo, Quitivaquito,

Altar Valley and San Xavier areas.

24.  The Papago Indian Reservation.  By Executive Orders numbered

2300 and 2524, dated January 14, 1916, and February 1, 1917, respectively,

the United States withdrew some 2,225,000 acres from the public lands in

southwestern Arizona and set the tract aside, exclusive of mineral rights,

for the Papago Indian Reservation.

In his recommendation of the earlier order, the then Secretary of

the Interior reported:

> "A careful investigation in connection with these
> (Papago) Indians has been in progress during the
> last two years.  From the information gathered it is
> conclusively shown that the Indians have been in
> undisturbed possession of the lands described in
> the enclosed order for over 300 years past."

Executive Order No. 2524 completed the establishment of the Papago

Indian Reservation on February 1, 1917.  A jagged path called "the strip,"

generally east-to-west in direction and about six miles wide, was cut

from the reservation.  This action restored about 475,000 acres of the

more fertile and desirable reservation lands to the status of public

lands.

The practicable reasons for eliminating the strip were the private

interests of white settlers and business groups.  Such organizations

as chambers of commerce, cattle growers associations and town councils

generated great pressures on the Government, both in Arizona and in

19 Ind. Cl. Comm. 394                                                     422

Washington.  In the early 20th century context of burgeoning settlement,
rich mining stakes, cattle raising, and agriculture, it was felt in
white circles that the rich centercut of the reservation was extremely
desirable land for development.

The formal reason for the  elimination of the strip in official
language, was that this was "for the purpose of uniting the two noncon-
tiguous parts of Pima Country."

Additions to the Papago Indian Reservation were effected by the
Act of February 21, 1931 (46 Stat. 1212); by the Act of July 28, 1937
(50 Stat. 536); and by the Act of June 13, 1939 (53 Stat. 819).  In
creating the Papago Indian Reservation on February 1, 1917, the United
States provided that it was to be open to mineral entry.  The reservation
lands were closed to mineral entry on October 28, 1932, by Order of
the Secretary of the Interior, but reopened by the Act of June 18, 1934
48 Stat. 984).  The reservation lands were finally closed to mineral
entry by the Act of May 27, 1955 (69 Stat. 67).

25.  Boundaries of the Papago Land.  The Commission finds that at the
date of American accession in 1854 and subsequently until taken from them,
the Papago Tribe of Arizona exclusively occupied and used in Indian fashion,
and hence had aboriginal title to the tract bounded and described as
follows:

> Commencing at a point on the International Boundary
> in the Tinajas Altas Mountains which divides the
> eastern and western drainage of those mountains
> (T13S R17W Gila and Salt River Meridian); thence

northwest on a line down the crest of the Tinajas and Gila Mountains to the 3141 foot peak on the border of the Yuma land as found in Docket No. 319; thence east to the Mohawk Mountains peak of 2900 feet in T10S R13 Gila and Salt River Meridian; thence northwest along the crest of the Mohawk Mountains to Mohawk Pass; thence east to the present town of Gila Bend; thence east southeast on a line through Lost Horse Tank to the peak of Table Top Mountains in T8S R2E. thence east to the northwest corner of the Papago Indian Reservation in R3E; thence east along the northern border of that reservation to its northeast corner in T7S; thence on a line east southeasterly to Picacho Peak and to Red Rock, Arizona; thence east to the peak of Oracle; thence in a southerly direction on a line following the ridge dividing the waters which flow into the San Pedro River from the waters which flow into the Santa Cruz River to the International Boundary Line; thence west and northwest along the International Boundary Line to the point of beginning.

The following areas are excluded to the extent not taken by the defendant:

a.   The San Xavier del Bac Reservation

b.   The Papago Indian Reservation as enlarged by the post-1917 additions enumerated in Finding No. 24.

c.   Confirmed Spanish and Mexican land grants

John T. Vance, Chairman

Jerome K. Kuykendall, Commissioner

Richard W. Yarborough, Commissioner

19 Ind. Cl. Comm. 394                                                424

BEFORE THE INDIAN CLAIMS COMMISSION

THE PAPAGO TRIBE OF ARIZONA,    )
                                )
                  Petitioner,   )
                                )
        v.                      )          Docket No. 345
                                )
THE UNITED STATES OF AMERICA,   )
                                )
                  Defendant.    )

Decided: Sept. 10, 1968

Appearances:

Royal D. Marks, with whom were Arthur Lazarus, Jr., and David E.
Birenbaum, Attorneys for the Petitioner.

Lester Reynolds, with whom was Mr. Assistant Attorney General,
Clyde O. Martz, Attorneys for the Defendant.

## OPINION OF THE COMMISSION

Yarborough, Commissioner, delivered the opinion of the Commission.

This case is timely filed against the United States under Section 2
of the Indian Claims Commission Act of 1946 (25 U.S.C. 70a). The peti-
tioner is a tribe of American Indians residing within the territorial
limits of the United States.

The petitioner alleges Indian title based upon aboriginal use and
occupancy of a large area of land in southwestern Arizona. The tract
is bounded generally by the Tinajas Altas - Gila Mountain Range, the
Gila River, the Santa Catalina - Rincon - Patagonia Mountain Range,
and the American - Mexican International Boundary.

19 Ind. Cl. Comm. 394                                            425

Since the earliest Spanish exploration, Papago ("the Bean Eaters")
has been the name ascribed to the desert-dwelling Indians found in this
area (and south into Mexico).  There is virtually continuous documentation
of their presence in this area to the present time.

The subject tract was under Spanish dominion from the early 16th
Century until Mexico succeeded to it in 1821.  Mexican sovereignty lasted
until the Gadsden Purchase in 1854, when the Mexican Government ceded
lands including the subject tract to the United States.  Due to the
constantly expanding non-Indian settlement within the subject tract
after 1854, the United States Government decided to concentrate the
Papago Tribe within a reservation.  Two former attempts to locate all
the Papagos on a reservation had failed -- the San Xavier Reservation,
in 1874; and the Gila Bend Reservation in 1882.  Finally, a generally
satisfactory solution, at least to the United States, was arrived at,
and the present Papago Indian Reservation was established on February 1,
1917.  Thereafter, adjustments and additions were effected and the
Papago Indian Reservation emerged in its present form.

The Spanish called that part of Sonora north of the Altar and San
Ignacio Rivers "Alta (Upper) Pimeria."  The Spanish called that part
of the Upper Pima Country in which the subject lands are found the
"Papagueria."

The names Pimeria and Papagueria were derived from aborigines
who lived in the areas.  Pimeria came from the Pima  Indians, a large

19 Ind. Cl. Comm. 394                                                426

group with the common bond of the Piman language.  The Spanish found

three main Indian groups in the Papagueria -- the Pimas, the Sobaipuris

and the Papagos, all speaking Piman languages and mutually peaceful.

The dominant group in the Papagueria, as the name suggests were from

very early times the Papagos.  The Pimas, called Gila Pimas, were settled

in the north on the Gila River, where the tribe is found yet.  The

Sobaipuris were settled along the San Pedro and Santa Cruz Rivers and

were wholly absorbed within the Papago Tribe in the 18th Century.

For convenience, we shall discuss the Papago claim of aboriginal

title to the area in the terms of three zones:  Western, Central and

Eastern.  The Western Zone extends from the area of Yuma occupancy along

the Colorado River to the west to the Growler Mountains on the east, be-

tween the Gila River and the International Boundary.  The Central Zone

includes the land between the Growler and Baboquivari Mountains, from

the boundary north to the line of Pima occupancy.  The Eastern Zone

includes the Altar and Santa Cruz River Valleys, from the boundary north

to beyond Tucson.

It is not contested that the Central Zone has been occupied and used

by the Papago since time immemorial.  Much of their population has been

centered here, and most of the area has been incorporated into the Papago

Indian Reservation of today.

In this arid area, the necessary search for water and food forced

19 Ind. Cl. Comm. 394    427

constant movement on the Papago -- movement from permanent water in the mountains to agriculture in valleys during the rainy season, to gathering the fruit of the saguaro cactus when ripe, to gathering all the many other edibles they managed to find in their land of little rain. Although in historical times aggregated into larger "defense villages," the normal economic unit seems to have been the extended family band, moving often in search of food. Of necessity, a far greater area was used for food gathering than that area immediately associated with a permanent village. For the purpose of finding aboriginal title, we are obliged to look to the whole area used in an Indian fashion.

In the Western Zone, this principle becomes of great importance. West of Ajo, the land becomes more arid and supports less vegetation and game. The defendant denies that any Indians did live or could have lived in this forbidding area. Nevertheless, the record shows sufficient use of water holes and food resources for us to find that the area as far as the Tinajas Altas-Gila Mountains was capable of use and was occupied to a sufficient extent by Papago Indians to support a finding of aboriginal title.

Most of the Papago lands were not used for agriculture. The bulk of the evidence is that the Papago population stayed at 5000 to 6000 persons for about four centuries, and that only about 20% of their food came from farming. There is voluminous evidence and testimony of record showing the nomadic character of Papago life, and of their hunting and

19 Ind. Cl. Comm. 394                                                    428

gathering activities throughout the Western Zone.  Though thinly dispersed,
wild plants and game were present throughout the zone.  Mesquite beans,
a Papago staple, were found in abundance in the northwestern portion of
the subject lands.  The Papagos of the western zone survived largely
through hunting and foraging; some of their villages and hunting camps,
and many of their water tanks, were in the Western Zone, north and south.
The Court of Claims' comments in a recent case are applicable:

> "Had the Seminoles chosen to live by food-raising alone, we
> would regard the 'village' evidence (stressed by the
> Government) as a persuasive consideration in limiting
> the Seminoles' 'title' to the land falling within the
> compass of their permanent home sites, i.e., the northern
> half of the peninsula.  Cultures that stake their survival
> upon a close union with the soil, as in the case with
> primitive food-raising economies, would not demand the
> vast tracts of land required for a nomadic, hunting
> existence.  But the Seminoles - as was the case with
> many other Indian groups - survived not simply through
> farming, but by food-gathering and hunting as well.
> In other words, Seminole land-use clearly encompassed
> more than the soil actually 'possessed.'  Therefore,
> other aspects of the Seminole pattern of life demand
> consideration."  United States v. the Seminole Indians
> of Florida, et. al., Ct. Cl., App. No. 11-65, decided
> June 9, 1967 (Slip Opinion,  p. 9).

However short a time the Indians could stay at one spot before
exhausting its food and water resources and having to move on, their
exclusive use of the area as a whole "for a long time" establishes their
aboriginal title.  Defendant has assembled many reports of travelers who
failed to sight Indians in this area during the period of acquisition of
sovereignty, but we feel the evidence establishes that the Papago were

present and using the Western Zone to a sufficient extent for Indian title.

The Eastern Zone is composed of the Santa Cruz River Valley and its surrounding mountains. The earliest Spaniards found Indians here and this Valley was chosen by the famed Father Eusebio Kino for the founding missions for the Indians at Tumacacori, Guebavi and San Xavier del Bac in the years after 1687.

It is defendant's contention that the Indians found by the Spanish in the Santa Cruz Valley (and the San Pedro Valley to the east) were the Sobaipuri, a separate and distinct tribe from the Papago or Pima, although speaking a related language, and that the Sobaipuri were extinct as a tribe by the end of the 18th Century because of disease and heavy Apache raiding. Further, that the Papago came to the Santa Cruz Valley only after recruitment by the Spanish to replace the decimated Sobaipuri at the missions.

The Commission feels that it is unnecessary to find whether the Sobaipuri were a separate tribe. It is undisputed that there were Papago in the Santa Cruz Valley in the latter half of the 18th Century when the Sobaipuri were absorbed into that Papago population. Insofar as those Papago continued to occupy and use lands formerly used in an Indian fashion by the Sobaipuri, the Papago succeed to their rights of aboriginal title. Undoubtedly this is correct here, where the merger took place

19 Ind. Cl. Comm. 394                                          430

several generations before any dealings between the merged tribe and the
United States.  See United States v. The Seminole Nation, supra, at 11;
Confederated Salish and Kootenai Tribes v. United States, 8 Ind. Cl. Comm.
40 (1959).

In any event, defendant further contends, Apache raiding had forced
abandonment of the Santa Cruz Valley in 1854, when U. S. sovereignty
attached to the area.  Without considering whether Indian title could
have been acquired or re-acquired after 1854, or whether as a matter of
law the raiding alone could cause defeat of the Papagos aboriginal title
claim (see Omaha Tribe v. United States, 4 Ind. Cl. Comm. 627; Confederated
Salish and Kootenais Tribes, etc. v. United States, 8 Ind. Cl. Comm. 40
(1959)) we find that the Papagos were using the Santa Cruz Valley during
the period in question, at least to the full extent possible under the
Apache threat.

The Apaches had engaged in raiding forays in the Santa Cruz Valley
since the time of Father Kino.  The raiding was intensified in the 1811-
1821 decade during the Mexican War for Independence.  The raids cost the
Papagos dearly in pillage and bloodshed, but the Apaches never "took" the
Papago land.  They did not settle west of their mountain ridge boundary,
the Santa Catalina - Patagonia Mountain Range.  Apache raiding continued,
however, until after the Civil War when the United States finally sub-
dued them.  Papago hunting and gathering and farming, to the extent

possible, continued throughout the 18th and 19th Centuries in the Santa Cruz Valley.

The defendant maintains that the Apaches dominated the valley until after the Civil War and that the Apache ascendancy ended Papago use and occupancy sometime before 1854. The Commission is aware that evidence of Papago use and occupancy in and after 1854 is meagre. Defendant's evidence negativing Indian presence in this period has much force, but falls before positive evidence of continued Indian use. In 1852, John R. Bartlett found Papagos at St. Xavier del Bac, and found their recent camp sites between the Santa Cruz River and the eastern boundary of the subject lands. We must conclude that there was no abandonment and the Apache raids did not terminate petitioner's use and occupancy of the subject lands to their eastern boundary, the Santa Catalina to Patagonia ridge line.

The Papago claim of aboriginal title to the lands of the three zones is adequately supported by the evidence and is more fully detailed in our Findings of Fact. The southern boundary of the subject lands is the International American-Mexican Boundary. The evidence and arguments of the parties leave no doubt that the petitioner exclusively used and occupied in Indian fashion from time immemorial all the lands from the Sonoran Altar Valley in the south to near the Gila River in the north.

On the western end of the northern boundary, the line is fixed in relation to the Gila River, but stops short of it. No doubt the Papago

19 Ind. Cl. Comm. 394                                              432

made some use of the River, but did not settle there or attempt agriculture there; the boundary as drawn includes only the area where the desert-dwelling Papago undoubtedly had exclusive use.  In the Gila Bend area, despite the Papago population of the Gila Bend Reservation on the Gila River, we find no evidence of exclusive aboriginal use of the River area by the Papago.  To the northeast, the evidence supports a rather clear demarcation between lands traditionally Pima and lands traditionally Papago.

The Gadsden Purchase of 1854 brought the subject lands under United States sovereignty and they became public lands by the Act of July 22, 1854 (10 Stat. 309).  Among other things, that Act provided for the application to the new public lands of the pre-emption laws of the Territory of New Mexico other than on lands covered by claims based on Spanish or Mexican law.  Only American citizens or persons who had filed declarations of intention to become American citizens could exercise the right of pre-emption.  The United States opened the Arizona public lands to homesteaders by the Act of July 26, 1866 (14 Stat. 251).  The United States also disposed of some of the subject lands to railroads, and for parks, schools and national forests.

The laws mentioned above caused a large incursion of non-Indian settlers into the subject lands.  The settlers established homes and ranches, and staked out mining claims.  Unlike the Apaches, who invaded

the subject lands, raided the Papagos and left, the settlers came to stay. The white settlers were there to raise cattle, to trade, to farm and to work the rich mines of the Papago Country.

Friction between the settlers and the Papagos became so pronounced that the United States Government began to think in terms of Indian reservations. The San Xavier del Bac Reservation was created by Executive Order on July 1, 1874 and the Gila Bend Reservation was created by Executive Order on December 12, 1882.

The river reservations proved to be a highly unsatisfactory solution for the Papagos. Both of them confined the Papagos who went to them in very small and inadequately productive areas. The San Xavier and Gila Bend Reservations were surrounded by non-Indian settlers of aggressive intent, who constantly encroached upon the small reservation areas. Papago-settler relations were distinctly unpleasant as the 20th Century began. The United States Government was again thinking in terms of "concentrating" the Papagos on an adequate reservation. Upon the basis that Papagos had lived in the area for many generations, the Papago Indian Reservation was established there by Executive Orders 2300 and 2525, dated January 14, 1916 and February 1, 1917 respectively.

The Papago Indian Reservation was a sizeable land area -- some 2,225,000 acres. A jagged strip about six miles wide, running roughly east-west across the waist of the reservation, was excepted. As the

19 Ind Cl. Comm. 394                                             434

strip consisted of about 475,000 acres of the best land in the area, even this large reservation was not a completely successful cure for Papago discontent.  Restoration of the strip and other additions to the Papago Indian Reservation were effected by the Act of February 21, 1931, (46 Stat. 1212), the Act of July 28, 1937 (50 Stat. 536), and the Act of June 13, 1939 (53 Stat. 819).

The Papago Indian Reservation was open to mineral entry from its inception in February 1, 1917, to October 28, 1932.  On the latter date, the Secretary of the Interior closed the reservation to mineral entry, but Congress reopened it to mineral entry by the Act of June 18, 1934, (48 Stat, 984).  Finally, by Act of May 27, 1955 (69 Stat. 67), Congress withdrew Papago reservation lands from future mineral entry.

This Commission concludes that the Petitioner in the instant case had Indian title to the lands described in Finding No. 25.  The two present Papago Reservations within this boundary are to be subtracted from the gross area of the lands described in Finding No. 25.  The Spanish and Mexican land grants will be excluded as in previous decisions.  Pueblo de Cochiti v. United States, 7 Ind. Cl. Comm. 422 (1959).

As the defendant declined to submit evidence on the date or dates of taking under his view of the claim, the case will now proceed to the

19 Ind. Cl. Comm. 394                                           435

determination of that issue, all other issues being reserved for future

proceedings.

An order consistent with the foregoing opinion will be issued.


Richard W. Yarborough, Commissioner


We concur:

John T. Vance, Chairman

Jerome K. Kuykendall, Commissioner

BEFORE THE INDIAN CLAIMS COMMISSION

THE PAPAGO TRIBE OF ARIZONA,      )
                                  )
            Petitioner,           )
                                  )
      v.                          )        Docket No. 345
                                  )
THE UNITED STATES OF AMERICA,     )
                                  )
            Defendant.            )

### INTERLOCUTORY ORDER

Upon findings of fact this day filed herein and which are hereby made part of this order, the Commission concludes as a matter of law:

1.  That the petitioner herein, the Papago Tribe of Arizona, is entitled to prosecute this action.

2.  That the petitioner has satisfactorily established that the Papago Tribe of Arizona held original Indian title to that land in the present State of Arizona described in Finding No. 25 with the following exclusions:

    a.  The San Xavier del Bac Indian Reservation and the Papago Indian Reservation; and

    b.  The confirmed Spanish and Mexican land grants within the aforesaid area.

It is therefore ordered and adjudged that the case proceed for the purpose of determining the date or dates of taking of the above-described tract, all other issues being reserved for future proceedings.

Dated at Washington, D. C., this 10th day of September, 1968.

_____
John T. Vance, Chairman

_____
Jerome K. Kuykendall, Commissioner

_____
Richard W. Yarborough, Commissioner

# ATTACHMENT G

BEFORE THE

# Indian Claims Commission

OF THE UNITED STATES

THE PAPAGO TRIBE OF ARIZONA,
                        *Petitioner,*

—v.—

THE UNITED STATES OF AMERICA,
                        *Defendant.*

Docket No. 345

## LAND PETITION

ROYAL D. MARKS.
*Attorney of record for the Petitioner,*
Title & Trust Building,
Phoenix, Arizona.

MARKS & MARKS,
  Title & Trust Building,
  Phoenix, Arizona,
    *Of Counsel.*

BEFORE THE

# Indian Claims Commission

OF THE UNITED STATES

| | |
|---|---|
| THE PAPAGO TRIBE OF ARIZONA,<br>*Petitioner,*<br>—v.—<br>THE UNITED STATES OF AMERICA,<br>*Defendant.* | Docket No. 345 |

## LAND PETITION

### Jurisdiction

1. The Papago Tribe of Arizona, hereinafter frequently referred to as the Petitioner, is and has been since time immemorial a tribe of American Indians residing within the present territorial limits of the United States. Petitioner is composed of, and represents, the pueblos of Gu Achi (sometimes known as Santa Rosa), Kohatk, San Xavier, Gila Bend, Ak Chin, Hotai-shon-vo, Pisinemo, Chukut-kuk, Topawa, Gu Oidak and Pan-dak, and their sub-villages, which have existed since time immemorial, and also the remnants of all other Papago pueblos and rancherias, which had existed from time immemorial until after the incorporation of the Papago country into the United States, when said villages were broken up and the Indians were evicted from their lands and homes by white settlers, miners and ranchers.

2. Petitioner possesses a Tribal Council which is recognized by the Secretary of the Interior as the tribal organi-

2

zation having exclusive authority to represent and act for the Petitioner, and this action is instituted by and under the direction of said Papago Tribal Council.

3. Petitioner is represented in this proceeding by its attorneys, Marks & Marks, Title and Trust Building, Phoenix, Arizona, according to the terms of a written contract of employment duly executed on behalf of the Petitioner, and filed with and approved by the Commissioner of Indian Affairs on November 29, 1950, under Symbol I-1-Ind. 42425 and recorded in Volume 17 of Miscellaneous Records at page 50.

4. Petitioner files the claims asserted herein pursuant to the Act of Congress of August 13, 1946 (60 Stat. 1049), hereinafter referred to as the Act, and in accordance with the General Rules of Procedure promulgated by the Indian Claims Commission.

5. The claims presented herein accrued prior to August 13, 1946. No suit is pending in the Court of Claims or the Supreme Court of the United States with respect to said claims, nor have said claims been filed in the Court of Claims under legislation existing at, or prior to, the date of the approval of said Act.

6. The instant claims are founded upon (1) the acquisition by the United States of lands belonging to the Petitioner outside of the various Papago Reservations; (2) the acts of the Defendant which deprived the Petitioner of the use of lands within said Reservations before such Reservations were created; (3) the failure of the Defendant to protect the Petitioner in the use, occupancy and possession of its lands and other property; and (4) the expropriation by the Defendant of mineral, water and other rights belong-

3

ing to the Petitioner within said Reservations both prior to and after the establishment of such Reservations. No part of any of said claims has heretofore been considered or acted upon by Congress, by any department of the United States Government, or by any commission, agency or court of the United States. Petitioner, however, has filed a Petition for a General Accounting before the Indian Claims Commission (Docket No. 102).

### Subject Matter of this Proceeding

7. From time immemorial the Petitioner exclusively owned and enjoyed the sole and undisputed use, occupancy and possession of a tract of land in the southern part of the area presently known as the State of Arizona. This territory, which is known and has been known for centuries as the "Papagueria," and over which the Petitioner exercised dominion and control, was bounded and described as follows:

Beginning at a point 2½ miles south of the middle of the channel of the Gila River at or near the present town of Dome and approximately 14 miles east of the city of Yuma, Arizona; thence northeast on a line running 2½ miles south of the middle of the channel of said Gila River to the western boundary of the Gila Bend Indian Reservation; thence north and east along the boundaries of said Reservation to the northeastern corner thereof; thence south on a line following the eastern boundary of said Reservation and continuing to the tracks of the Southern Pacific Railroad Company; thence east on a line roughly paralleling the route of said Railroad, passing south of the Maricopa Indian Reservation, and following along the channel of the Santa Cruz River north of the town of Casa

4

Grande to a point directly west of the south end of the Picacho Reservoir; thence east on a line to Black Mountain near the town of Barkerville; thence in a southerly direction on a line following the ridge dividing the waters which flow into the San Pedro River from the waters which flow into the Santa Cruz River to the International Boundary Line; thence west and northwest with said Boundary Line to a point where it is crossed by an extension of the Gila Mountains, about 4 miles southwest of Tinajas Altas Tank; thence northwest on a line along said Gila Mountains to the point and place of beginning.

At all times herein material, no Indian tribe or nation other than the Petitioner ever established a permanent encampment in, or occupied any part of, said territory.

8. Within the area above-described, members of the Petitioner, a measurably civilized and industrious people, lived in substantial houses in villages of fixed and permanent location, and engaged in agricultural and pastoral pursuits. In and about 1853, at least 6,000 Papago Indians, or more than 1,200 families, occupied pueblos and rancherias scattered throughout said territory.

9. Horses and cattle had been introduced into the Papago country by Spanish missionaries and explorers during the seventeenth century. By 1853, the herds of horses, burros and horned cattle within the Papago country had multiplied to a point where several head of horses and other livestock were available to each member of the Petitioner. Each head of such livestock required between 100 and 200 acres of land for year-round forage; many portions of the Papagueria, however, were too far removed from any natural or artificial sources of water to be available for

5

grazing. The total area occupied by the Papago Indians thus was barely sufficient to provide enough forage and water to support the livestock they needed for their own use and subsistence.

10. Characteristic of the country above-described, and a determining factor in the life of the Indian inhabitants, was a scarcity of water supplies. In the areas of the Papagueria where water runs off from the mountains during sudden storms, the Petitioner had built an extensive system of reservoirs, known as charcos, which were used both for stock water and for irrigation farming. Along the Santa Cruz River and its tributaries, other small tracts of land capable of irrigation by simple methods were utilized for agricultural purposes. In addition, during the winter months the Papago Indians established camps in the mountainous regions of the tract above-described to hunt, gather mesquite beans and other wild plants, and otherwise make use of the resources of the country. The semi-annual movement between summer and winter quarters was a fixed event in the Papago way of life.

11. In the course of growing crops, grazing livestock, hunting wild game, gathering natural food products of the soil, and obtaining raw material for clothing, tools, domestic utensils, fuel, medicines, ornaments, and other necessary equipment, the Petitioner fully utilized and received benefits from every section of said territory. Conversely, because of the irregular water supplies, desert character, and otherwise limited resources of said area, the Petitioner required every part of said tract in order to derive a modest subsistence from an unfriendly environment.

6

### Recognition of Papago Title

12. Under Spanish and Mexican rule, prior to the acquisition by the United States of sovereignty over the territory of the Petitioner, the Papago enjoyed the privileges of citizenship, exercised a large measure of local self-government and were recognized as having capacity to acquire and hold lands and other property, such rights in the area they occupied being superior to those accorded their warlike and nomadic neighbors. The Spanish and Mexican authorities recognized the advanced civilization of the Petitioner and the intelligence, skill and industry with which it managed its affairs, rewarded its peaceful behavior and its assistance in the campaigns against the savage tribes, established missions at its principal pueblos or rancherias, and generally honored its aboriginal claims to the soil.

13. Petitioner's rights, title and interests in the lands above-described, and also in the waters located thereon, were confirmed and protected by Spanish law which prohibited any grant of lands which might be prejudicial to Indian occupancy (Recopilacion de las Leyes de las Indias, Book 4, Title 12, Law 9) ; recognized "immemorial custom" as entitling the Indian occupants of land to protection (*Ibid.*, Book 10, Title 17, Law 1) ; guaranteed to Indians who settled in villages that their traditional possessions away from the villages would continue to be recognized and protected (*Ibid.*, Book 6, Title 3, Law 9) ; required the removal of any non-Indian ranches which operated to the prejudice of the Indians (*Ibid.*, Book 2, Title 31, Law 13, and Instructions to Viceroys, 1596, ch. 21) ; required the King's attorney to appear on behalf of the Indians for the protection of their land rights in all cases where such land

7

rights might be affected (*Ibid.*, Book 2, Title 18, Law 36) ; and provided for the designation of a special attorney for the Indians by the court wherever Indian rights adverse to the Crown might be involved (Law 35, approved February 13, 1554).

14. The principle that the Indians owned the areas which they used and occupied, and also all the waters they needed, continued to be recognized and implemented throughout the period of Spanish authority, and subsequently was reaffirmed by the Mexican government. Under Mexican rule the Plan of Iguala of February 24, 1821, incorporated into the Mexican Declaration of Independence of October 16, 1821, further declared that "all the inhabitants of New Spain, without distinction, whether European, Africans, or Indians, are citizens of this monarchy, * * * " and also that "the person and property of every citizen will be respected and protected by the government."

15. Petitioner does not know of any Spanish or Mexican grant that was ever given within the territory occupied by the Papago Tribe to any other person, and alleges, upon information and belief, that no such grant was ever given, that no such grant could lawfully have been given since to do so would have been to deprive the Indians of lands, water and other property guaranteed them by law, and that Spain and Mexico fully recognized and safeguarded the exclusive occupancy rights of the Petitioner in said area. Petitioner further alleges that the Defendant has expended large sums to gather and collect such Spanish and Mexican grants covering lands in the Mexican Cession area, and has held numerous hearings and entered into various arrangements with the Republic of Mexico for the purpose of investigating Mexican Archives and securing

8

copies of such grants, and if the Defendant has copies of any such grant to any person other than the Petitioner within the area used and occupied by said Indians, as described in Paragraph 7 herein, the Petitioner hereby demands that such grants or copies thereof be produced and presented to this Commission for the Petitioner's inspection.

16. Petitioner first came under the political jurisdiction and protection of the United States by virtue of the Treaty of Guadalupe Hidalgo of February 2, 1848 (9 Stat. 922), as amended and supplemented by the Treaty of December 30, 1853 (10 Stat. 1031), known as the "Gadsden Purchase," with the Republic of Mexico. In said treaties, the Defendant, ratifying the policies regarding land tenure adopted by the previous sovereigns, specifically promised inhabitants of the former Mexican territory, including the Petitioner, peaceful use and enjoyment of the lands which they occupied and of the water and other property within their possession.

17. By the Act of February 27, 1851 (9 Stat. 574), as supplemented by the Act of August 4, 1854 (10 Stat. 575), and by subsequent statutes and executive rulings, extending to the Petitioner the operation of the various federal laws and regulations controlling and protecting Indians and assuming certain continuing obligations to safeguard the rights and interests of the Petitioner, and by various official statements of its authorized agents, the Defendant expressed its intent to respect Indian property protected under Spanish and Mexican law and to continue in New Mexico (which then included Arizona) the unquestioned general policy of the United States to recognize Indian occupancy rights.

9

18. In theory the Defendant accorded the Petitioner at least the same rights and privileges that the Papago had enjoyed under Spanish and Mexican dominion, recognized the Pueblo status of the Papago villages, and reaffirmed and protected the Petitioner's use and occupancy of the lands, water and other property which it owned. From time to time certain agents of the Defendant sought to implement such policies.

### The Taking

19. In fact, however, the Defendant simultaneously adopted a course of conduct which deprived the Petitioner, without its consent and without compensation, of its rights, title and interest in all but a portion of the above-described lands which it had owned and used since time immemorial. Such action, effecting the expropriation of the Petitioner's lands and other property, occurred despite the existence of the aforementioned obligations and of the recognition of Papago possessory title, and despite the fact that the Petitioner was known for its maintenance of friendly relations with the whites and its assistance to the United States in the campaigns against the Apache.

20. By the Act of July 22, 1854 (10 Stat. 308), for example, the Defendant established the post of Surveyor-General for New Mexico, and directed said officer to ascertain the character and extent of all claims under Spanish and Mexican law in the Territory of New Mexico. Said Act authorized the disposition under pre-emption laws applicable to the public domain of all lands *not* covered by such claims, providing that "all lands covered thereby shall be reserved from sale or other disposal by the government" (Sec. 8, 10 Stat. 308, 309). Pursuant to such legislation, the Surveyor-General reported upon some of said claims

10

to Congress in 1858, but failed and neglected to include therein the claims of the Petitioner. In 1861, the Surveyor-General submitted an additional report to Congress which listed eleven Papago pueblos in the country which had been owned and occupied by the Petitioner from time immemorial. Upon information and belief, no action was ever taken by the Defendant upon such report, nor was there ever an investigation of and report upon other claims of the Petitioner within the Papago territory.

21. Similarly by the Act of July 15, 1870 (16 Stat. 291, 304), the Surveyor-General for Arizona (then separated from New Mexico) was ordered to ascertain, in accordance with the provisions of the aforementioned Act of July 22, 1854, the character and extent of all claims under Spanish and Mexican law within the Territory of Arizona. Upon information and belief, said Surveyor-General never did make the required investigation and never did make the required report as to the claims of the Petitioner, and failed to inform the Petitioner that any such investigation or report was in progress, and if he did make any such report on the claims of the Petitioner he failed to furnish the Petitioner with any copy of such report, and the Petitioner hereby demands that it be furnished with a copy of such report, if any such report was ever made.

22. Under said Acts of July 22, 1854, and July 15, 1870, however, agents of the Defendant proceeded to administer the public lands laws in such fashion as to disregard any occupancy claims of the Petitioner in the Papago country, and published numerous maps indicating that said area was open to settlement under the public land laws.

23. Along with said failure to implement recognition of the claims of the Papago Indians, the Defendant assisted

11

whites and other non-members of the Petitioner to settle upon farming lands, commence mining operations, graze stock, and otherwise trespass in the aforementioned original Papago domain. Such encroachments, for which the Petitioner received no recompense and to which it gave no permission, frequently were accompanied by depredations against, and forcible evictions of Papago Indians, and agents of the Defendant were aware of these facts and frequently reported thereon.

24. Simultaneous to the foregoing, agents of the Defendant permitted and encouraged non-members of the Petitioner to divert rivers and streams, drill wells and otherwise appropriate water in the original Papago domain for agricultural and grazing uses. The resultant lowering of the water table in the Papagueria deprived the Petitioner of the necessary means to irrigate lands and furnish water for livestock and domestic purposes which it had used and possessed for centuries; such activities further caused sufficient erosion to destroy valuable Papago farming and grazing lands.

25. At the same time, agitation commenced among non-Indians to confine the natives within the narrow limits of reservations. Agents of the Defendant, to accomplish that purpose, repeatedly importuned the Petitioner both to withdraw from the territory which it occupied and to accept a reservation. Petitioner unconditionally rejected these offers. Nevertheless, in response to said pressure for the removal of the Indians, army officers acting on behalf of the Defendant on August 8, 1870, and from time to time thereafter, proclaimed that any Indian not found upon a reservation could be treated as "hostile." Since the Petitioner did not then possess a reservation, every

12

Papago Indian was threatened with loss of life and property, even in his own domain.

26. Upon information and belief, agents of the Defendant continued to disregard the Petitioner's land claims, and to classify and hold the Petitioner's territory as within the public domain, until October 1, 1886, at which time the Defendant assumed complete legal and equitable title to the country belonging to the Petitioner. Defendant thereafter publicly proclaimed its acquisition of Petitioner's lands in the following terms: "No treaty of purchase was ever made with this tribe. The U. S. assumed title to their country, the boundaries of which are here shown * *ₑ* " (Royce, 18th Annual Report of the Bureau of American Ethnology, Pt. II, p. 923). Both before and after the Defendant asserted its ownership of the lands theretofore owned, occupied and possessed by the Petitioner, and with the exception of the lands included in reservations more particularly described hereinafter, the Defendant, without the consent of, or compensation to, the Petitioner, took said lands for various public uses, such as the granting of homesteads to settlers and mineral patents to prospectors, the creation of national parks and monuments, the granting of rights of way to railroads and other utilities, and otherwise appropriated said lands and water and devoted them to public uses. The times when and the transactions in which said lands were taken by the Defendant for public uses, as well as the values thereof when so taken, are largely unknown to the Petitioner, but well known to the Defendant.

27. While the aforementioned expropriations of the property of the Petitioner were taking place, the Defendant, in assuming to act as guardian of the Petitioner's

13

interests, not only prohibited the Petitioner from exercising self-help in the protection of its lands and waters, but also denied to the Petitioner recourse to the political agencies of government available to the Petitioner's non-Indian neighbors. Thus, on February 16, 1854, an agent of the Defendant, to wit, the Governor of the Territory of New Mexico, approved an act of the legislature of that Territory which excluded the Papago Indians from the right to vote. Members of the Petitioner accordingly were denied the right to vote in Federal, Territorial, State, County, and municipal elections until the decision of the Supreme Court of Arizona on July 15, 1948, holding such denial of  franchise improper. As a result, the Papago Indians were unable to protect their property rights through measures of Congressional, Territorial or State legislation and through other measures available to their voting neighbors. Petitioner and its members were likewise deprived, by the Act of March 3, 1871 (16 Stat. 544, 570), and by various later statutes, of the privilege of being represented by attorneys of their own choosing in the defense of their land rights, and were similarly deprived of the opportunity to contract for other services with respect to their property. Furthermore, the Defendant neglected to furnish adequate facilities for the education of the Papago Indians and, by denying them the right to vote, encouraged State, Territorial and local authorities to withhold free public education from them.

28. In addition to the foregoing, the Defendant also denied members of the Petitioner rights under the public land laws. The aforementioned Act of July 22, 1854, for example, restricted pre-emption rights to white males, a stipulation which disqualified the Papago Indians. The Act of May 20, 1862 (12 Stat. 392), limited homestead

14

rights to citizens and aliens who had declared their intention of becoming citizens. Until the Act of March 3, 1875 (18 Stat., Pt. III, pp. 402, 420), the members of the Petitioner were thus barred even from establishing a homestead in their original territory. Furthermore, since the Papago Indians were then ignorant of the English language and of the customs of the white man, and since said Act conditioned the acquisition of a homestead upon the abandonment of tribal relations, the Petitioner was incapable of taking advantage of the provisions of such legislation.

29. At no time prior to 1916 did the Defendant make provision to restrain encroachments upon the territory which the Petitioner had possessed since time immemorial or to assist the Petitioner to hold or recapture its property, except unilaterally to assign certain small reservations within that country for the use and occupancy of the Papago Indians, as follows:

a. By Executive Order, dated July 1, 1874, President U. S. Grant set apart as a Papago reservation a tract around the Mission of San Xavier del Bac comprising approximately 70,000 acres, or less than twelve acres for each member of the Petitioner.

b. By Executive Order, dated December 12, 1882, President Chester A. Arthur withdrew from sale and settlement for the benefit of the Petitioner a second tract at Gila Bend comprising approximately 22,400 acres, or less than four additional acres for each Papago Indian.

c. By the General Allotment Act of February 8, 1887 (24 Stat. 388), as amended by the Act of February 28, 1891 (26 Stat. 794), the Defendant, in providing that

15

Indian title to Executive Order reservations was equal to that in treaty reservations, confirmed and ratified Papago title to the aforementioned reservations. By said Acts the Defendant determined that Indians, including the members of the Petitioner, were entitled, upon allotment of their reservations, to 80 acres of land for each man, woman and child, or, with respect to lands "only valuable for grazing purposes," to 160 acres each. Where the reservations were insufficient to provide for the statutory allotments, said Acts authorized the agents of the Defendant to reduce the allotment of each Indian to a figure representing his proportionate share in the area available for distribution; in the alternative, said Acts authorized the agents of the Defendant to allot 80 acre and 160 acre tracts within said reservations to a fraction of the membership of the Petitioner, and the remainder of the Papago Indians would then be entitled, without payment of any fee, to receive allotments in similar amounts, "upon any surveyed or unsurveyed lands of the United States not otherwise appropriated," including the territory surrounding the reservations. Although the Papago reservations were grossly inadequate to meet the needs of the Petitioner and were far too small to furnish the acreage promised the Indians under the aforementioned General Allotment Acts, President William H. Taft, by Executive Order dated June 17, 1909, reduced the Gila Bend reservation by more than one half.

d. By the Act of January 1, 1889 (25 Stat. 639), the Defendant granted, without compensation to the Petitioner, a right of way across the Gila Bend reservation to the Citrous Water Company. Although said Act guaranteed the Papago Indians water "free of cost," agents

16

of the Defendant subsequently administered its provisions so as to deprive the Petitioner of the use of water from the Gila River which it had enjoyed from time immemorial.

e. By Executive Orders, dated June 16, 1911, and May 28, 1912, President Taft reserved for the benefit of the Petitioner two other small tracts in Pima and Pinal Counties, Arizona.

30. The reservations so set aside for the benefit of the Petitioner, even if subjected to maximum utilization, were incapable of furnishing support and subsistence to the Petitioner, and a majority of the Papago Indians refused to remove from their original homes to settle thereon.

31. As a consequence of the aforementioned events and circumstances, the members of the Petitioner came to be treated as trespassers on the public domain, their lands and waters available to those who desired to take them. Deprived of all rights and most means of livelihood, the Papago Indians began to die off at a rate many times higher than that of any other white or colored group in the United States, and further caused special concern to their neighbors because of the high incidence of contagious diseases among them. At this point, the "Papago Problem" came forcibly to the attention of the Defendant. All who gave consideration to that problem agreed that in order to rehabilitate the Papago Indians and restore them to the economic and social position they enjoyed at the time of the Gadsden Purchase, it would be necessary to set aside for them a substantial part of their original country, and to provide them with some equivalent for the lands and waters which could not be returned because of intervening rights and expectations of third parties.

17

32. In recognition of the losses and injuries suffered by the Petitioner since 1854, and in order so to minimize future damage to the Papago Indians, President Woodrow Wilson, by Executive Order dated January 14, 1916, finally withdrew from entry and settlement approximately one-fourth of the former Papago territory as a reservation for the Petitioner, "exclusive of the tribal right to the minerals contained therein."

33. By Executive Order dated February 1, 1917, President Wilson revoked said Order of January 14, 1916, and, in lieu thereof, withdrew and set apart a similar tract "as a reservation for the benefit of the Papago Indians in Arizona," again "exclusive of a tribal right to the minerals therein contained." Said Order of February 1, 1917, further stipulated:

"The foregoing reservation is hereby created with the understanding that all mineral lands within the reservation which have been or which may be shown to be such and subject to exploration, location, and entry under the existing mining laws of the United States and the rules and regulations of the Secretary of the Interior applying thereto, shall continue to be subject to such exploration, location, and entry notwithstanding the creation of this reservation; and town sites necessary in connection with the development of the mineral resources of the reservation may be located within the reservation under such rules and regulations as the Secretary of the Interior may prescribe, and patented under the provisions of the town-site laws of the United States: *Provided,* That nothing herein contained shall effect any existing legal right of any person to any of the lands herein described."

18

34. By the Acts of June 28, 1926 (44 Stat. 775), February 21, 1931 (46 Stat. 1202), July 28, 1937 (50 Stat. 536), and June 13, 1939 (53 Stat. 819), the Defendant added to the Petitioner's reservation other lands within the original Papago country, subject to the issuance of mineral patents to non-members of the Petitioner.

35. Under the direction of President Herbert Hoover, Secretary of the Interior Ray Lyman Wilbur attempted to restore to the Papago Indians the mineral rights within their reservation by a Departmental Order dated October 28, 1932, which withdrew that tract from all forms of entry or claim under the public land mining laws.

36. Said Order, however, was annulled by a rider to the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), which was presented on the floor of the Senate in the last days of a Congressional session when sponsors of the measure were forced to accept such a provision as the price for enactment of major legislation. Said Act, therefore, again declared said lands open to exploration and location, under the existing mining laws of the United States, in accordance with the terms declared in the Executive Order establishing said reservation and providing certain damages or rents were paid to the Petitioner. As a consequence of the foregoing, the Petitioner's reservation in Arizona remains the only Indian reservation in the United States in which tribal mineral lands are subject to alienation by the Government to non-members of the tribe.

37. As a consequence of the events set forth in Paragraphs 19 to 31, the Petitioner lost nearly all the rights and property it possessed when it first came under the jurisdiction of the Defendant, and after all the remedial measures taken at the direction of Presidents Wilson and

19

Hoover, was still, on August 13, 1946, and remains to this day, in a state of dire poverty and afflictions, requiring drastic measures in order to regain the economic status it enjoyed in 1853, before the acts herein complained of. Under the direction of President Harry S. Truman, Secretaries of the Interior Krug and Chapman have advised the Congress that the rehabilitation of the Papago Indians, if carried out by the Bureau of Indian Affairs, would require an appropriation of not less than $23,000,000.

### First Cause of Action

38. Although the Defendant promised to protect Papago ownership of the lands, water and other property involved herein, the Defendant in fact has failed and refused to respect any rights, title or interest based upon immemorial use and possession by the Petitioner in any part of the Papagueria outside of the various Papago reservations, or within said reservations before their establishment, and has accorded only limited protection to the Petitioner upon said reservations after their creation.

39. Defendant has treated every part of the former Papago territory outside of the various reservations as public lands of the United States, to be disposed of freely and for a profit to private citizens or to be owned and managed by the Defendant for governmental purposes, has unilaterally reduced the size of the Papago reservations after their establishment, has administered lands of the Petitioner and has allowed the use of lands in the Papago country by non-Indians in a manner which deprived the Petitioner of the waters which it had used from time immemorial, has fostered a course of conduct which prevented the Petitioner from acting on its own behalf to

20

protect its rights, and has ordered the Papago reservation set apart on February 1, 1917, to be open to mineral entry and settlement by non-members of the Petitioner.

40. At no time and in no manner did the Defendant ever give any consideration or compensation of any nature to the Petitioner for the loss of rights, title and interests in any section of its original area. Similarly, the Defendant, by failing to secure the right to vote to the members of the Petitioner, by neglecting to furnish facilities for the education of the Papago Indians, and by withholding from the Petitioner the right to employ independent counsel or other assistance, prevented the Petitioner from protecting its lands, water and other property, and from obtaining a reasonable price for such assets of which it might wish to dispose.

41. Under the facts and circumstances hereinabove set forth, standards of fair and honorable dealings required that, in addition to performing other duties, the Defendant should have (1) accorded to the members of the Petitioner the rights of citizenship they had enjoyed under Mexican sovereignty; (2) advised the Petitioner of the investigation and report to be prepared pursuant to the aforementioned Act of July 22, 1854; (3) allowed the Petitioner to present its claims to lands and other property to the Surveyor-General of the New Mexico Territory and to be represented in all matters pertaining thereto by counsel of its own choosing; (4) refused to adjudicate land titles and to donate lands under said Act until a full and final report upon the Petitioner's claims had been prepared and acted upon; (5) restrained its military forces from declaring Papago Indians "hostile" merely because they had no reservation; (6) accorded to the members of the Petitioner

21

rights under the public land laws equal to those enjoyed by non-Indians, and equal protection under the laws of the United States and the State of Arizona; (7) informed the Petitioner of its rights under the treaties and statutes of the United States; (8) protected the Petitioner in the use and possession of its property; (9) safeguarded the Petitioner from the encroachments of white settlers, miners and ranchers; (10) prevented the alienation of mineral and water rights belonging to the Petitioner; (11) carried out the promises made by its authorized agents that Indians would be protected in their land occupancy rights; (12) assisted the Petitioner to protect its rights and property and to obtain a reasonable market price for any assets of which it might wish or be forced to dispose; (13) refrained from sacrificing the interests of the Petitioner for the benefit of the Defendant and white citizens thereof; (14) accounted to the Petitioner for the profits realized or benefits obtained by the Defendant upon disposition of the lands and other property here involved; and (15) administered such property of the Petitioner as came within its control in accordance with the stands of a prudent and honorable trustee.

42. Defendant failed to conform to the foregoing standards of fair and honorable dealings in that, among other acts and omissions, it (1) allowed non-members of the Petitioner to use, occupy and appropriate lands and other property belonging to the Papago Indians; (2) authorized its military forces to support the eviction of the Petitioner from said lands; (3) neglected to require its agents to carry out the terms of legislation which provided for ascertaining and reporting upon the Petitioner's claims to said lands, water and other property; (4) failed to inform the Petitioner of its rights under such statutes and other

22

laws and treaties of the United States; (5) sanctioned the disposition of the Petitioner's lands and other property without the consent of the Petitioner, and in disregard of previous Papago occupancy; (6) appropriated lands and other property belonging to the Petitioner for the benefit of the Defendant and non-Indian citizens thereof; (7) allowed the alienation of minerals and water rights which had been possessed by the Petitioner for centuries; (8) withheld from the Petitioner and its members the right to vote, the benefits of the public land laws, the right to public school education, and the right to employ independent attorneys and other employees, and (9) neglected to obtain for the Petitioner a reasonable market price or to give the Petitioner any consideration whatsoever for the lands, water and other property of which it was deprived.

43. Standards of fair and honorable dealing as contemplated by the Act further require that, in determining the amount of recovery under this or under any subsequent Causes of Action, there should be given effect to the fact that, subsequent to the occurrence of the events the subject of this petition, there has been a substantial decrease in the value of the dollar and of its purchasing power and that the present dollar is not, as a measure of value, the equivalent of the then dollar, and therefore, whenever the amount of damages to be recovered under this petition is measured and expressed in terms of the present dollar, an appropriate adjustment increasing the amount should be made in respect thereto. Standards of fair and honorable dealing as contemplated by the Act further require that in determining the amount of recovery under this or any subsequent Causes of Action there should, in each instance, be included in the recovery an amount sufficient to produce the present full equivalent of the claim on which the recovery is based.

23

44. The aforementioned acts and omissions of the Defendant were contrary to its moral obligations to protect the Petitioner and in violation of standards of fair and honorable dealings, for which recovery is authorized under Section 2(5) of the Act.

WHEREFORE, the Petitioner prays:

A. For a determination that the Defendant is obligated to compensate the Petitioner for the lands, minerals, water rights and other property wrongfully appropriated as aforesaid;

B. For a determination of the reasonable compensation due and owing to the Petitioner for said lands, minerals, water rights and other property wrongfully obtained by Defendant;

C. That judgment be entered in favor of the Petitioner against the Defendant for the amount so determined, together with an appropriate adjustment for the decline in the value of the dollar and with the reasonable use value of said property from the time of its expropriation to the date of payment of judgment herein;

D. That the Petitioner have such other and further relief as to this Commission may appear just and equitable.

### Second and Alternative Cause of Action

45. For a second and alternative cause of action, the Petitioner realleges each and every allegation contained in Paragraphs 1 through 40 inclusive, and also alleges that the action of the Defendant (1) in failing to protect the Petitioner's ownership of the Papago country outside the aforementioned reservations or to safeguard the Peti-

24

tioner's rights within said tracts prior to their withdrawal from the public domain, (2) in authorizing non-members of the Petitioner to appropriate said lands to the exclusion of the Petitioner, (3) in returning portions of the Papago reservations to the public domain after said reservations first were created, (4) in depriving the Petitioner of tribal mineral rights within the 1917 reservation, (5) in failing to protect the water supply of the Petitioner upon said reservations, (6) in neglecting to secure to the members of the Petitioner rights and privileges equal to those enjoyed by non-Indians, and (7) in failing to give the Petitioner any compensation for such wrongs and losses, constituted a violation of the Defendant's duties and obligations as guardian and fiduciary with respect to the Petitioner, and of its agreement under the Treaty of Guadalupe Hidalgo, for which acts and omissions recovery is authorized under Section 2(2) of the Act.

WHEREFORE, the Petitioner prays:

A. For a determination that the Defendant be required to account to the Petitioner for the value of all lands, minerals, water rights and other property belonging to the Petitioner of which it was deprived as a result of acts or omissions of the Defendant;

B. For a determination of the sums due and owing to the Petitioner from the Defendant therefor;

C. That judgment be entered in favor of the Petitioner against the Defendant for the amount so determined, together with an appropriate adjustment for the decline in the value of the dollar and with the reasonable use value of said property from the time of its loss to the date of payment of judgment herein;

25

D. That the Petitioner have such other and further relief as to this Commission may appear just and equitable.

### Third and Alternative Cause of Action

46. For a third and alternative cause of action, the Petitioner realleges each and every allegation contained in Paragraphs 1 through 40 inclusive, and also in Paragraph 43, and further alleges that, by reason of the matters and things hereinabove set forth, the Defendant wrongfully expropriated lands, minerals, water rights and other property owned and used by the Petitioner, which property was located both outside the boundaries of the various Papago reservations or within said boundaries but not included within said reservations, without payment of just compensation, contrary to the Constitution, laws and treaties of the United States, for which wrongful taking recovery is authorized under Section 2(1) and Section 2(4) of the Act.

WHEREFORE, the Petitioner prays:

A. For a determination that the Defendant be required to make a full and true discovery and disclosure of all lands, minerals, water rights and other property used and occupied by the Petitioner and taken by the Defendant for public uses;

B. For a determination that said property belonging to the Petitioner was wrongfully taken by the Defendant;

C. For a determination of the just compensation for the property wrongfully taken as aforesaid;

D. That judgment be entered in favor of the Petitioner against the Defendant for the amount so determined, to-

26

gether with an appropriate adjustment for the decline in the value of the dollar;

E. That the Petitioner have such other and further relief as to this Commission may appear just and equitable.

## Fourth and Alternative Cause of Action

47. For a fourth and alternative cause of action, the Petitioner realleges each and every allegation contained in Paragraphs 1 through 40 inclusive, and also in Paragraph 43, and further alleges that, if it is determined that the Petitioner ever consented to relinquish any part of the territory or property which it had owned and used since time immemorial, any such purported agreement was secured through fraud and duress and based upon an unconscionable consideration, for which wrongful acts recovery is authorized under Section 2(3) of the Act.

WHEREFORE, the Petitioner prays:

A. For a determination that the Defendant is obligated to reimburse the Petitioner for the value of the lands, minerals, water rights and other property purportedly relinquished as aforesaid;

B. For a determination of the fair market value of said lands, interests in lands, and other property;

C. That judgment be entered in favor of the Petitioner against the Defendant for the amount so determined, together with an appropriate adjustment for the decline in the value of the dollar and with the reasonable use value of said property from the time of said purported relinquishment to the date of payment of judgment herein;

27

D. That the Petitioner have such other and further relief as to this Commission may appear just and equitable.

Respectfully submitted,

ROYAL D. MARKS,
*Attorney of Record for the Petitioner,*
Title & Trust Building,
Phoenix, Arizona.

MARKS & MARKS,
Title & Trust Building,
Phoenix, Arizona,
*Of Counsel.*

# ATTACHMENT H

AUG 2 1965

# Before the Indian Claims Commission

DOCKET No. 345

THE PAPAGO TRIBE OF ARIZONA, PETITIONER,

$v.$

THE UNITED STATES OF AMERICA, DEFENDANT.

DEFENDANT'S REQUESTED FINDINGS OF FACT, OBJEC-
TIONS TO PETITIONER'S PROPOSED FINDINGS OF FACT,
AND BRIEF.

EDWIN L. WEISL, JR.,
*Assistant Attorney General.*

LESTER REYNOLDS,
Attorney.

# INDEX

| | | | Page |
|---|---|---|---|
| STATEMENT OF THE CASE | | | 1 |
| | | | |
| DEFENDANT'S REQUESTED FINDINGS OF FACT | | | 1-72 |
| | | | |
| Finding | 1 | Location of area | 1 |
| Finding | 2 | Absence of treaty relations | 2 |
| Finding | 3 | History of the area | 2 |
| Finding | 4 | History continued | 2 |
| Finding | 5 | History continued | 5 |
| Finding | 6 | First missionary exploration of Pimeria Alta | 6 |
| Finding | 7 | Spanish missionaries in Pimeria Alta (continued) | 9 |
| Finding | 8 | First description of the Papago and their country according to early church records | 12 |
| Finding | 9 | Father Garces—Franciscan missionary on the north frontier of Mexico | 15 |
| Finding | 10 | Papagueria | 16 |
| Finding | 11 | Sobaipuri tribe—a separate unit of the Piman family | 18 |
| Finding | 12 | Pimeria—the Indian country of northern Sonora | 20 |
| Finding | 13 | Tribes of the Papagueria | 22 |
| Finding | 14 | First Papago contacts after 1853 | 23 |
| Finding | 15 | Life zones of the Papagueria | 26 |
| Finding | 16 | Tribal organization | 27 |
| Finding | 17 | Apache corridor | 28 |
| Finding | 18 | Neighboring tribes | 29 |
| Finding | 19 | Neighboring country | 30 |
| Finding | 20 | Aboriginal Papago settlements | 31 |
| Finding | 21 | Papago use and occupancy in 1854 in Pimeria Alta, western zone | 32 |
| Finding | 22 | Non-exclusive Indian use in the northern areas of the western zone of Papagueria | 34 |
| Finding | 23 | Gila river valley | 35 |
| Finding | 24 | Central zone of the Papagueria: its location and description | 35 |
| Finding | 25 | Papago Indian use and occupancy in 1854 in the central zone of the Papagueria | 36 |

II

|  |  | Page |
|---|---|---|
| Finding 26 | Absence of gathering areas in central Papagueria | 41 |
| Finding 27 | Eastern zone of the Papagueria | 41 |
| Finding 28 | Papago Indian use and occupancy in 1854 in the eastern zone of the Papagueria | 42 |
| Finding 29 | Abandonment of the upper Santa Cruz valley—Apache corridor | 44 |
| Finding 30 | Lower Santa Cruz river valley | 45 |
| Finding 31 | Ehrenberg map of Arizona territory confirms use and occupancy confined to central zone | 46 |
| Finding 32 | Use and occupancy pattern the same in 1858 as in 1775 | 47 |
| Finding 33 | Early American agency reports (1853-1865) on Papago area and villages | 49 |
| Finding 34 | Extension and increase of Papago villages—Papago emigrants after 1853 | 52 |
| Finding 35 | San Xavier reservation | 53 |
| Finding 36 | Sells Papago Indian reservation | 54 |
| Finding 37 | Reservations continued | 58 |
| Finding 38 | Right in minerals in the Gadsden Purchase area | 58 |
| Finding 39 | Confirmed land grants and Spanish titles in the claimed areas | 66 |
| Finding 40 | There was no taking of Papago aboriginal lands | 66 |
| Finding 41 | Papago Indians have been deprived of nothing by the United States | 72 |

DEFENDANT'S OBJECTIONS TO PETITIONER'S PROPOSED FINDINGS OF FACT........................................73-142

| Finding 1 | 73 |
|---|---|
| Finding 2 | 73 |
| Finding 3 | 73 |
| Finding 4 | 74 |
| Finding 5 | 74 |
| Finding 6 | 77 |
| Finding 7 | 83 |
| Finding 8 | 89 |
| Finding 9 | 90 |
| Finding 10 | 93 |

III

|  | Page |
|---|---|
| Finding 11 | 100 |
| Finding 12 | 101 |
| Finding 13 | 102 |
| Finding 14 | 105 |
| Finding 15 | 106 |
| Finding 16 | 106 |
| Finding 17 | 109 |
| Finding 18 | 110 |
| Finding 19 | 114 |
| Finding 20 | 114 |
| Finding 21 | 114 |
| Finding 22 | 114 |
| Finding 23 | 117 |
| Finding 24 | 121 |
| Finding 25 | 125 |
| Finding 26 | 134 |
| Finding 27 | 137 |
| Finding 28 | 139 |
| Finding 29 | 140 |
| Finding 30 | 142 |
| Finding 31 | 142 |

BRIEF AND ARGUMENT.................................143-214

| The nature of the Papago claim to lands in Arizona | 143 |
|---|---|
| The Pimeria and Pimeria Alta | 145 |
| The so-called Papagueria | 151 |
| Use and occupancy in Papagueria in mid-19th century | 157 |
| Central zone | 159 |
| Eastern zone | 172 |
| Western zone | 186 |
| Right or interest of the Papago Indian tribe in minerals in the Gadsden Purchase area | 199 |
| No taking of Papago lands | 209 |

REPLY TO PETITIONER'S BRIEF.........................215-222

| Papago domain boundaries | 215 |
|---|---|
| Merger of the Sobaipuri tribe with the Papago tribe | 215 |
| Continued Papago use of the Santa Cruz valley | 218 |
| Taking date | 222 |

CONCLUSION ........................................ 222

IV

*Cases:*                                                        Page

*Chouteau* v. *Molony,* 16 How. 203 (1853)................    200
*Confederated Tribes of the Umatilla Indian Reservation* v.
   *United States,* 14 Ind. Cl. Comm. 14 (1964)............144, 215
*Iowa Tribes* v. *United States,* 6 Ind. Cl. Comm. 496 (1958)    2
*Lockhart* v. *Johnson,* 181 U.S. 516 (1960)................    140
*United States* v. *Castillero,* 2 Black 17 (1862).........59, 110, 200


*Treaties:*

Treaty of February 2, 1848, 9 Stat. 922...................   3, 59
Treaty of June 30, 1854, 10 Stat. 1031....1, 2, 3, 5, 31, 34, 59, 60, 62,
                66, 67, 72, 73, 127, 140, 143, 201, 209

*Acts:*

Act of July 22, 1854, 10 Stat. 308...........59, 60, 66, 67, 140, 201
Act of August 4, 1854, 10 Stat. 575...................60, 67, 140
Act of February 24, 1863, 12 Stat. 664...................    60
Act of July 15, 1870, 16 Stat. 291.....................60, 67, 202
Act of March 3, 1891, 26 Stat. 854...................60, 66, 202
Act of February 21, 1931, 46 Stat. 1202..................    141
Act of June 18, 1934, 48 Stat. 984.......................64, 207
Act of July 28, 1937, 50 Stat. 536.......................65, 207
Act of May 11, 1938, 52 Stat. 347........................    56
Act of May 27, 1955, 69 Stat. 67.................56, 65, 137, 208

# Before the Indian Claims Commission

DOCKET No. 345

THE PAPAGO TRIBE OF ARIZONA, PETITIONER,

*v.*

THE UNITED STATES OF AMERICA, DEFENDANT.

**DEFENDANT'S REQUESTED FINDINGS OF FACT, OBJECTIONS TO PETITIONER'S PROPOSED FINDINGS OF FACT, AND BRIEF.**

## STATEMENT OF THE CASE

This is a claim of Indian title by virtue of exclusive aboriginal use and occupancy to a large area of land in the State of Arizona, south of the Gila River and west of the easterly slopes of the watershed of the San Pedro River.

### DEFENDANT'S REQUESTED FINDINGS OF FACT

#### Finding 1
*Location of Area*

The lands claimed by the Papago Indians are entirely within the area of cession by Mexico to the United States in the Gadsden Treaty or Purchase dated December 30, 1853, proclaimed June 30, 1854,

(1)

2

10 Stat. 1031 (Pet. par. 16; Amendment of May 1, 1964 to Petition).

### Finding 2

#### *Absence of Treaty Relations*

The United States has had no treaty relations with the Papago Indians and has never recognized the right of aboriginal occupancy to lands claimed by them.

### Finding 3
#### *History of the Area*

The claim of aboriginal title by the Papago Indians depends upon the area which they exclusively used and occupied on June 30, 1854 the date of ratification of the Treaty of 1853. The Papago Indians have no greater rights in said lands as against the United States than they held when the United States acquired sovereignty. Any evidence of occupancy by petitioner subsequent to the date of the Treaty of 1853 is not material to the issue of the right of aboriginal possession.[1]

### Finding 4
#### *History Continued*

In 1854 the United States received possession from Mexico under the said Gadsden Purchase, 10 Stat. 1031, dated December 30, 1853, of a large area of land in the southwestern part of the present United States

---

[1] *Iowa Tribes v. United States*, 6 Ind. Cl. Comm. 496, 502 (1958):
* * * the 1803 date is critical to the issue of aboriginal title, since * * * these Indians were powerless to increase their aboriginal holdings after 1803. * * * petitioner must satisfy the Commission that it owned in Indian fashion the claimed subject lands or any portion thereof as of 1803, * * *.

3

which included all of that part of the present State of Arizona south of the Gila River. The several articles and paragraphs of the treaty which relate to the rights in land and property of those residing in the area of cession at the date thereof and which are essential to a consideration of the alleged claims of the Papago Indians includes Article 5 as follows:

> All the provisions of the eighth and ninth, sixteenth and seventeenth articles of the treaty of Guadalupe Hidalgo, shall apply to the territory ceded by the Mexican Republic in the first article of the present treaty, and to all the rights of persons and property, both civil and ecclesiastical, within the same, as fully and as effectually as if the said articles were herein again recited and set forth.

Articles 8 and 9 of the Treaty of Guadalupe Hidalgo, 9 Stat. 922, 929-930, are as follows:

> Article 8. Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax, or charge whatever.
>
> Those who shall prefer to remain in the said

4

territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty; and those who shall remain in the said territories after the expiration of that year. without having declared their intention to retain the character of the Mexicans, shall be considered to have elected to become citizens of the United States.

In the said territories, property of every kind. now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guarantees equally ample as if the same belonged to citizens of the United States.

Article 9. Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican republic, conformably with what is stipulated in the preceding article, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States) to the enjoyment of all the rights of citizens of the United States, according to the principles of the constitution; and in the mean time, shall be maintained and protected in the free enjoyment of

5

their liberty and property, and secured in the free exercise of their religion without restriction.

Also Article 6 of the Gadsden Treaty which is pertinent to these questions is as follows:

No grants of land within the territory ceded by the first article of this treaty bearing date subsequent to the day—twenty-fifth of September—when the minister and subscriber to this treaty on the part of the United States, proposed to the Government of Mexico to terminate the question of boundary, will be considered valid or be recognized by the United States, or will any grants made previously be respected or be considered as obligatory which have not been located and duly recorded in the archives of Mexico.

### Finding 5
#### *History Continued*

The Governments of Spain and Mexico exercised complete political jurisdiction over the area of land ceded in the Treaty of 1853 and the possession thereof was deemed to be in the Crown. Only those rights and titles in land which were derived from the Crown were recognized by it and were of any force or effect (Docket Nos. 31-37, Tr. 3422-3445; Def. Exs. G-1, pp. 14-16; G-239; G-255, p. 846).

6

### Finding 6

*First Missionary Exploration of Pimeria Alta*

In 1691 Father Francisco Kino, a Jesuit missionary stationed in Spanish Mexico, made a survey of the country later to be known as Pimeria Alta which is the northern Spanish frontier, including the area of present Arizona south of the Gila River and the locale of the Piman Nation of Indians (Def. Exs. G-80; G-81; G-241).

The bounds of Pimeria Alta extended from the Altar River on the south to the Gila River on the north and from the San Pedro River on the east to the Colorado River and the Gulf of California on the west (Def. Ex. G-80, pp. 246-247).

The Piman tribes at that time occupied all of the country known as Pimeria Alta except for the Yuman groups on the lower Gila and Colorado Rivers.

Father Kino had been actively engaged in missionary work among the Indians in Sonora, Mexico, where he had established several missions and from this location he made many journeys into what is now southwestern Arizona, where he found the Piman Indians. He first visited the Sobaipuri Tribe, a branch of the Piman Indian group, in the Santa Cruz River at Tumacacori where later a mission was established (Def. Ex. G-241).

In 1692 he travelled to San Xavier del Bac on the Santa Cruz River north of Tumacacori where he found 800 of the Sobaipuri Tribe (Def. Ex. G-241).

Due to the activities of the Apache Tribe in Pimeria Alta at this time, the Mexican Government sent a mili-

7

tary escort with the missionaries into the country. Lieutenant Mange escorted Kino in his missionary journeys. Mange travelled from Tubutuma to the area west of the Baboquivari Mountains to the Papago country and their villages, being one of the first white men to tour this area.

Five missionaries were assigned in 1695 to assist Kino in Pimeria Alta (Def. Ex. G-80). In 1698, Kino, escorted by Cerrasco, in charge of a company of soldiers, made the first journey across Pimeria Alta (Def. Ex. G-254, p. 154). The route of travel included, first, San Xavier, then down the Santa Cruz to the Gila River west of Casa Grande. At San Andres in the Maricopa area they turned south to the Papago country where they visited several old Indian villages in the Cocklebur and the Santa Rosa Valley. The journey continued through the Akchin area and the Mesquite Charcos on to Akchin and Sonoita. Kino's account of this trip is the first authentic report of travel through the Papago country (Def. Exs. G-18; G-80; G-254, p. 154).

In 1699 Kino and others, attended by soldiers, crossed from San Xavier in the Santa Cruz Valley westward to Tupo and the Santa Cruz Valley. This was the first journey over the present-day route from the Santa Cruz Valley into the Papago country (Def. Ex. G-241, pp. 10-11). The Kino reports do not refer to Papago Indians by name. However, those found in the interior in dry desert areas were later to be known as Papagos, a separate branch of the Piman Tribe (Def. Ex. G-241).

Kino in his travels also included Sonoita and the

8

Camino del Diablo in his journeys and the Indians met en route, at Sonoita, later came to be known as Papagos.

In 1699 near the end of his explorations in Arizona, Kino, continuing his search for a route from Mexico to California, travelled to Guevavi near Nogales where he established a church and continued from that point southwest to Sonoita, passing Saric and La Quituni and travelled as far as the Colorado River. En route he had passed through Papago country as far west as Sonoita and Tinajas Altos; at the latter place were found the water holes in the desert country visited by the Indians.

The biography of Father Kino written by the eminent historian, Dr. H. E. Bolton, in reviewing the explorations of Kino in the Piman country says (Def. Ex. G-80, p. 248):

> West of Santa Cruz River were the Papagos, the name meaning "The Bean Eaters." They lived in scattered villages and occupied a wide range. Some of the Papago settlements south of the Arizona line have been abandoned. North of that line the Papagos still live in the same general area [1960] and to a great exent on the very sites they occupied in Kino's day. They are among the tribes which have been least disturbed by the white man.

In recounting the contents of the Kino diary relative to the trip from San Andres and Quitovac (in Sonora) across the Papago country for a distance of 200 miles, Bolton says (Def. Ex. G-80, pp. 396-397):

9

> * * * When he now set forth from San Andres he was on new ground. His diary and that of Carrasco from here to Quitobac give us our first knowledge of a two hundred mile stretch across Papago Land. As we ride with him we too become explorers of a new region. The most remarkable thing about the journey is that Kino found the Papago villages exactly or nearly where they are today [1960], and bearing the same names, to which he and Carrasco added the names of saints.

Other and earlier historians in reporting on their travels and investigations into the Papago ethnohistory have stated that the Papagos have continued to live in the village areas where they were found in Kino's day, such as Lumholtz (1910), Gabel (1938), Macdougal (1908) and Underhiil (1939) (Def. Exs. G-43; G-48; G-56; Def. Ex. 20).

### Finding 7

#### Spanish Missionaries in Pimeria Alta (continued)

In the latter part of the 17th century the Spanish Jesuits began the first intensive exploration of Pimeria Alta. In 1687 Father Kino established the first Spanish mission in northern Sonora at Dolores (Def. Ex. G-43, p. 24) and thus started the evangelical crusade among the Indian natives which continued until the period of 1810-1830 when the Apache raids in northern Sonora reached such intensity and extent that a greater part of the area became uninhabitable and was largely abandoned except for the sections

10

nearest to the military presidios, such as Tucson (Def. Exs. G-83; G-89; G-92; G-241, pp. 7-9; G-253; G-254, pp. 160-163; Def. Exs. 139, pp. 132-134; 250, Ch. V, pp. 2-5). Father Kino was the first of many Spanish churchmen who explored the entire area of the Sonoran Desert country as far north as the Gila River and west to the Colorado River over a long period of time for the purpose of bringing Christianity to the natives and to "reduce" them to civilization (Def. Exs. G-79; G-80; G-81, p. 53; G-239; Def. Ex. 139, pp. 121-123).

Several missions were established by the Jesuits—most of them located in the area of present Sonora—while three were located in the Santa Cruz Valley at Guevavi, Tumacacori and San Xavier del Bac in the Gadsden Purchase area (Def. Ex. 139, p. 122). These missions were all established before 1700 and were in the Sobaipuri country (Def. Ex. 139, p. 126), the largest being San Xavier del Bac, which was located nine miles south of Tucson and was known as a Sobaipuri mission (Def. Exs. G-5, pp. 388-393; G-6; G-17; G-18, p. 119; G-20; G-21; G-47; G-79; G-80, pp. 498-499, 502, 507; G-254, p. 18). At this time the Papago country of the western deserts (Def. Ex. G-80, pp. 502-503), although rather well explored by Kino, remained undeveloped (Def. Ex. G-254, p. 164; Def. Ex. 139, p. 128). There were no missions established in the Papago country north of the international boundary in present Arizona (Def. Exs. G-4, p. 18; G-5, p. 226) for it was found after many years of effort by the Jesuits that the country west of the Santa Cruz, due to the lack of water and

11

adverse conditions, would not sustain the operation of a mission (Def. Exs. 127; 250, Chs. I, p. 4; IV, p. 141).

It was the policy of the Spanish churchmen to bring the Indians from the desert areas into the mission villages (Def. Ex. G-5; Def. Exs. 20; 127, p. 78; 250, Ch. IV, pp. 141-142). This practice of bringing the Indians into the missions on the Santa Cruz at Tumacacori and chiefly San Xavier del Bac was in keeping with the greater plan to bring Christianity to the Indians and to "reduce" them to civilization (Def. Ex. G-254, pp. 19, 157; Def. Exs. 127, p. 72; 250, Ch. IV, pp. 141-142). At the end of the Jesuit mission period (about 1767) Papago Indians were induced to remove to the Santa Cruz River Valley missions, particularly San Xavier del Bac, from the Papago desert areas, west of the mountains (Def. Ex. G-247, p. 157; Def. Exs. 127, p. 79; 139, p. 132; 250, Ch. IV, p. 141). In this manner the Papagos were to be found in the Santa Cruz Valley at the San Xavier and Tumacacori missions before 1800, during the last years of the Sobaipuri occupancy at these missions (Def. Ex. G-254, pp. 19, 157; Def. Ex. 139, p. 132). The mission period ended about 1810-1830 and there had been no missions located in the Papago country north of the international boundary line (Def. Exs. G-4, p. 18; G-5, p. 226; G-18, p. 53; G-30; G-254, pp. 18, 158, 371; Def. Ex. 139, pp. 129, 131).

12

### Finding 8

*First Description of the Papago and Their Country According to Early Church Records*

The journey of one of the last of the Spanish Jesuit missionaries made in 1763 is the source of the first detailed information on the Papago Indians as a separate branch or tribe of the Piman Indian Nation. The record of this exploration was prepared by the Church and is entitled "Rudo Ensayo" (Def. Ex. G-5).

It was found that the Indians of Pimeria Alta speak the same language as those of the lower country and that the various branches of the Piman family include the Sobaipuris, Papagos and Gila Pimas. The "Rudo Ensayo" states at page 166 (Def. Ex. G-5):

> The Pimas in the low lands speak the same language as those of the high lands, and these together with all the other tribes of Indians who people the sandy lands and deserts of the Papagos, the beautiful valleys of the Sobahipuris, the open plains of the rivers Gila (the Apaches excepted) and Colorado, and even the opposite side of the latter, a great number of people, differ only, according to Fr. Kino and Fr. Sedelmayr, from one another in dialect, in the same way as I have shown it to be the case between the Opatas and the Eudebes. * * *

The northern Pimas (Pimos Altos) are divided into four groups or tribes with relation to the nature of the country in which they live (Def. Ex. G-5, p. 190):

13

> The genuine Pimas of the mountains may be divided into four sections: the first comprehends those congregated in villages; the second, the Papagos already mentioned; the third, the Sobahipuris; and the fourth, those who live on the Gila river. * * *

The reference made earlier to the Papagos or "Papapootam" is as follows (Def. Ex. G-5, p. 190):

> The only Mission established in the year 1751, sometime about May, in San Miguel of Ssonoitag, nearly fifty leagues Northwest of Coborca [in Sonora], suffered great scarcity of water; and for this reason it has been impossible to gather together the Papagos or Papapootam, as they are called. The Pimas who live in these deserts support themselves by eating the seeds of the zacate, herbs, wild fruits, and even mice and rabbits for the same reason. It is not so bad at Tucsson, Santa Catherina at Baigatz, etc., as far as the Gila river; so that a road might easily be opened, * * * extend the Christian Faith, and * * * the dominions of * * * the King.

With reference to the activities of the Apaches and the location of the Sobaipuris the report relates (Def. Ex. G-5, p. 192):

> The most warlike among all the Pimas are those we call Sobaipuris, for they are born and reared on the border of the Apaches; but they have become tired of living in constant warfare and have, during the present year of 1762, abandoned their

14

beautiful and fertile valley, retiring, some to Santa Maria Soanca, and some to San Xavier del Bac and to Tucson, thus leaving to the enemies a free entrance to the high region of the Pimas.

The first record of the use of the name Papago is about 1700 when Kino used the name Pima-Papabotas (Def. Ex. G-5, p. 388). Kino stated that the Papago was:

* * * a wandering tribe, roving about a bleak wilderness, and refusing to settle down in villages. They evidently had no fixed habitation and it is quite probable that what constituted part of their territory at one time did not belong to them at another. * * *

In this record the territory occupied by the Papago at this time is described as a broad area but taking in the upper part of Mexico and the lower part of Arizona, between latitude 30° and 32°. The area is described as largely desert and unproductive with the eastern portion as mountainous with some fertile valleys.

The neighbors of the Papagos were: on the east, the Sobaipuris; on the north, the Apaches and the Coco-Maricopas; on the west, the Yumas; and on the south, many of the small tribes of the low Pimas (Def. Ex. G-5, pp. 388-389).

The Indians that Kino found and visited twice between the Gila and the Altar in a desert 200 miles in width were the Pimas, who at present bear the name of Papago (Def. Ex. G-3, pp. 17-18).

15

### Finding 9

*Father Garces—Franciscan Missionary on the North Frontier of Mexico*

In 1765 the Jesuit brothers who had made the first missionary explorations among the Indians of northern Sonora (southern Arizona) were replaced by the Franciscan Order. At this time only two frontier missions remained and Father Garces was sent to re-establish the church at San Xavier del Bac in 1768.

From this location Father Garces made several journeys through the Indian country south of the Gila River and he applied the term "Papagueria" to the area of country within which the Papago Indians were found at this time (Def. Ex. G-254, p. 159). He described the Papagueria as an area extending 60 to 70 leagues (180-210 miles) north and south and 30 to 40 leagues (90-120 miles) east and west with a population of 2,500 souls (Def. Exs. G-3; G-254, p. 160; Def. Exs. 214; 215).

The word "Papagueria" as used in the literature in describing an area of country in which Papago Indians were found does not connote an exclusive use and occupancy by said Indians in the sense of an aboriginal right to the entire area but rather the term defines an area of unexplored country beyond which bounds the Papago Indian family is not found (Def. Ex. 250, Chs. II, pp. 1-4; III, pp. 1-3).

As will appear in subsequent findings, the evidence in this case shows that the Papago did not, as a matter of fact, use or occupy all of "Papagueria," but only a

16

portion of the area which is now included within the Sells Papago Reservation. The term "Papagueria," as used hereafter in these findings refers to area described in Finding 10 and does not refer to the actual aboriginal territory of the Papago.

### Finding 10
#### *Papagueria*

The great Sonoran Desert of western North America, present southern Arizona and northern Mexico all west of the Santa Cruz and Altar Valleys, comprehends the native country of the Piman speaking Indians in the time period of 1750-1850 and was known as Pimeria Alta (Def. Ex. G-5, p. 387).

The several tribes of the Pima natives within the Pimeria Alta during the 18th and 19th centuries included the Pimos Altos, Pima Maricopa, CocoMaricopa, Sobaipuris and Papagos (Def. Ex. G-5). The area within the Pimeria Alta, which was referred to as the Papagueria by the early explorers and missionaries, was believed to be the native country of the Papagos. The boundaries of this area have been given varying locations but it is generally described by most writers and historians as that portion of the Sonoran Desert lying between the Altar Valley on the south, the Gila River on the north, the valley of the Santa Cruz River on the east and the Yuma Mountains and the Colorado River on the west (Def. Exs. 3; 4; 10; 19; 48; 57).

The part of Pimeria Alta which has been designated as "Papago Country," in which the early inhabitants

17

came to be known as Papagos, was designated on the maps as the Papagueria, the Spanish name meaning Papago country (Def. Ex. G-4, p. 10; Def. Ex. 250, Ch. II, p. 1).

The boundaries of the Papagueria have been variously described by different travellers and explorers. One of the first descriptions of the area is that of the Keller map of 1745 (Def. Ex. 250, Ch. II, p. 1) which places the easterly boundary at the Santa Cruz River, with the north line marked by the Gila River and the westerly limits at the Colorado River (Def. Exs. G-79, p. 83; G-241, p. 1; Def. Ex. 250, Ch. II, p. 37). Others place the east boundary of the Papagueria at the Baboquivari Mountain range and the western limits at the Growler Mountains (Def. Exs. G-43, p. 16; G-65). Another definition of the Papagueria boundaries places the easterly line at the 111° meridian and the west boundary at the 113° meridian on the present location of the Southern Pacific Railroad (Def. Ex. G-76, p. 4). There is definite information available to the effect that the Papago Indians considered the easterly boundary of the Papago country to be at the Baboquivari Mountains, the westerly line at the Ajo Mountains, with the northerly limits in line with Picacho Peak to the east and the Big Table Mountains to the west (Def. Ex. G-254, p. 133). The bounds so defined would place substantially all of the Papago country within the area assigned to the Sells Papago Indian Reservation of 1917 (Def. Ex. G-254, p. 133).

The variations shown in the information relative to the limits of the Papago country could be due to the fact that the Papago country in 1853 was an isolated

18

and remote area about which little was known at that time (Def. Ex. G-254, p. 164).

### Finding 11

*Sobaipuri Tribe—a Separate Unit of the Piman Family*

The Piman family of Indians is the name which includes several related tribes inhabiting southern Arizona and northern Sonora, namely, Sobaipuri, Gila Pimas, Maricopas, CocoMaricopas and Papagos.

The Sobaipuri Tribe was the first group of the Piman family to be distinguished from the collective group by the Jesuit missionaries, including Father Kino who established the mission at San Xavier del Bac, nine miles south of Tucson in 1700.

This was a Sobaipuri Indian mission since this tribe lived in the San Pedro and Santa Cruz Valleys (Def. Exs. 20, p. 15; 250, Ch. III, p. 3). In 1775 San Xavier was known as a Sobaipuri-Pima Indian mission (Def. Ex. 27, p. 27). The Pima Indians from the desert country who were to become known as Papagos moved into the area of San Xavier as the Sobaipuri Indians gradually abandoned their areas on the Santa Cruz due to the pressure from the Apaches. Thus, San Xavier was a village of mixed occupation in the late 18th century (Def. Ex. 28, pp. 222-223).

The Pima Indians who came from the villages in the desert west of the Baboquivari Mountains were called Papagos by Balthasar as early as 1744 when he stated that (Def. Exs. 127: 250, Ch. IV, p. 141):

* * * Beyond the last missions of Pimeria Alta there lies a broad belt of land of some 60 leagues.

19

This land is dotted with the rancherias of a people descended from the Pimas, who are called Papagos, and they number about 6,000 souls. All of this country is so wretched and so lacking in water that there is no spot where a mission pueblo could be established. These Indians, from sheer hunger, leave their haunts in order to work in the missions and to steal whatever they can. With this they go back to their own lands and remain there for the rest of the year. I have seen very many of these people in the above-mentioned missions * * *. With little effort they could be induced to group themselves within our missions. Many of these who lived at not too great a distance were thus brought together by Father Jacobo Sedelmayr and he intends to carry on this good work * * *. The mission of San Javier del Bac is on the fringe of the land of these people. * * *

The old mission at San Xavier was repopulated by the Papagos after the Sobaipuri abandoned the Santa Cruz River Valley. It is believed that these Papagos came from the village of Akchin to San Xavier.

The Apache marauding at this (1740-1750) in the Santa Cruz and San Pedro Valleys was in a large measure the cause of the abandonment of the area by the Sobaipuri.

It is clear from the reports of all informed observers at the time that the Papago and Sobaipuri were distinct and separate tribal groups, both descended from the Piman family. Underhill, the leading Papago

20

anthropologist, states (Def. Exs. 5, p. 16; 250, Ch. IV, p. 142):

> * * * Akchin, * * * is the direct parent of San Xavier, where desert Papago moved in after the original Pima Soba Jipuri had been decimated by disease. * * *

and again Underhill states:

> * * * The Apache attacks were highly influential in producing the present distribution of Pima and Papago. As the comfortable river settlements were devastated, their Pima inhabitants fled or were killed and after more or less time the desert Papagos seeped in to take their places. The Soba Jipuris after defending the San Pedro Valley for years finally abandoned it and settled in the next valley to the west, the Santa Cruz. Even this proved untenable and Bac which had had irrigation "more than the city of Mexico" became at last a Papago town and the first set aside as a Papago Reservation. * * *

It has been the uniform opinion of both ethnologists and historians that the Sobaipuris and the Papagos were separate tribes (Def. Ex. 251).

### Finding 12

*Pimeria—The Indian Country of Northern Sonora*

The northerly part of the province of Sonora, Mexico in Spanish and Mexican history, according to contemporary maps (Def. Exs. G-18; G-189; G-195;

21

G-199; G-200; G-201), was designated as Pimeria due to the presence of its principal inhabitants who were members of the Piman Indian ethnic group or family. The area north of the Altar and San Ignacio Rivers (in present Sonora) was named Pimeria Alta and to the south the country was designated as Pimeria Baja (Def. Exs. G-3; G-5; G-18; G-21; G-38; G-43; G-80; G-254, p. 152; Def. Ex. 20). The Gadsden Purchase area (which comprehends all of the lands in suit) is entirely within the bounds of Pimeria Alta and is a part of the north Piman country extending from the international boundary line north to the Gila River (Def. Exs G-18; G-189; G-195). A large section of Pimeria Alta is in the present State of Sonora, Mexico.

The Indians found in Pimeria Alta before the date of the Gadsden Purchase included many bands and tribes not of the Piman ethnic stock (Def. Ex. G-254, pp. 151-154; Def. Ex. 250, Ch. II, pp. 27-30). However, they were in the minority since several tribes of the Piman family group composed the principal tribes and bands of the Pimeria Alta. The tribes found here include the Gila River Pimas, Sobaipuris, Papagos, Arenenos, Maricopas, Yavapais, Yumas, Apaches and several southern tribes, principally the Cocopa, Soba, Opata and the Yachi (Def. Exs. G-4; G-254, pp. 151-154; Def. Exs. 139, p. 119; 250, Ch. II, pp. 37-40).

The Gila Pimas, Sobaipuris and the Papagos were the closely related groups of the Piman family and were the major bands of Pimeria Alta.

There were only slight differences in the religion, language, customs and habits of the Papagos and Gila Pimas (Def. Exs. G-3, pp. 13-16; G-254, pp. 153-156).



22

The earliest reported travels and explorations among these Piman groups emphasized the one distinguishing feature between the Papago and the Gila Pima Indians which was very clear, i.e., the areas of habitation (Def. Ex. 139, p. 134). The Pima villages were always found to be located on the rivers and streams while the Papagos were found to be located in the dry and remote areas of the desert country in which no streams were to be found (Def. Exs. G-3, pp. 3-4, 13-14; G-4, pp. 3, 10; G-38; G-43; G-65; G-70; G-85; G-90).

Father Kino, the Jesuit missionary, was, as previously stated, the first historian and geographer of the Pimeria country and in his travels from 1687 to 1711 among the Indians of the Pimeria area referred to the people which we now know as Papagos, as the desert people, and the Gila Pimas and the Sobaipuris as the river people, and it would appear from his reports that he found them in the same locations in which they were to be found 250 years later (Def. Exs. G-3, pp. 13-15, 18-19; G-38, pp. 40, 49-50; G-241, p. XVII; G-254, pp. 153-155; Def. Ex. 250, Ch. III, pp. 23-24). It would seem that the primary factor in the economy of these Piman tribes was the presence or absence of water (Pet. par. 10, p. 5).

### Finding 13

#### *Tribes of the Papagueria*

The broad territorial limits ascribed to the "Papago Country" or the Papagueria may have been due to the fact that the Papago Indians found it necessary to search continually for water supplies, ranging freely over a large area of country from Sonora to the Gila

23

River and from the Santa Cruz River valley to the Colorado River on the west. Much of this territory was not necessarily "Papago Country" since it included the villages of the Gila River Pimas, Sobaipuris of the Santa Cruz, Yuman territory on the Colorado and the Mexican settlements in Sonora (Def. Ex. 250, Ch. II, p. 37). However, one may not conclude that the Papago country, or the area used and occupied by them, was the residue of "Papagueria" which was not used or occupied by non-Papago neighbors, which would include the Maricopa, Yuma, Yavapai, Pima, Apache and Sobaipuri tribes and bands (Def. Ex. G-79, pp. 449-454). A substantial area of the Papagueria was not used by the Papagos or any other tribe or group due to the fact that vast areas of the so-called "Papago Country" were unusable by anyone for environmental reasons or because of vulnerability to Apache attack (Def. Ex. 250, Ch. III, p. 1). So it is that the area of country used and occupied in an aboriginal manner by the Papago Indians is much less in area and extent than the description of boundaries commonly given for the Papagueria.

### Finding 14

#### *First Papago Contacts After 1853*

Apparently little was known about the Papago Indians by the agents of the United States in 1854, the date of the Gadsden Purchase, since all of the early agency, as well as the exploratory reports, state that the principal Papago village was located in the vicinity of Tucson on the Santa Cruz River at the mission



24

village of San Xavier del Bac (Def. Exs. G-82; G-84; G-36; G-88; G-90; G-91; G-92). The Apaches at this time and for several years thereafter had carried on such raids and depredations up the Santa Cruz Valley into Sonora, Mexico, that the villages and missions at this time were abandoned (Def. Exs. G-30; G-43), except at San Xavier del Bac which was a mixed community of Mexicans and Indians under the protection of a military fort at Tucson (Def. Ex. G-35). The principal body of the Papago nation lived in defense villages in the remote desert areas west of the Baboquivari Mountains, a distance of four days travel (Def. Ex. G-85), west of San Xavier (Def. Exs. G-13; G-31; G-38).

The military and agency reports for the period were vague and indefinite as to the number of village locations of the Papagos west of San Xavier del Bac (Def. Exs. G-82; G-84; G-85).

In 1856 Meriweather, the Agent for Indian Affairs, reported (Def. Ex. G-82) from Sante Fe that the Papago Indians lived in six villages near Tucson (Def. Ex. G-254, p. 166).

In 1857 Lieutenant Mowry of the United States Army stationed in New Mexico territory reported to the effect that the entire area of southern Arizona for several years past had been in the hands of the Apaches except "a small district" in the vicinity of Tucson and the several village areas on the Gila River occupied by the Pima and Maricopa Indians (Def. Ex. G-254, p. 176).

In 1858 the agent, Bailey, reported (Def. Ex. G-254, p. 177) that the Papago Indians occupied an unpro-

25

ductive tract of land west and southwest of Tucson and that the principal village was in the vicinity of San Xavier del Bac, with a total number of 19 villages (Def. Ex. G-84).

In 1859 Walker, the agent then located at Tucson (Def. Ex. G-254, pp. 178-179), reported that he had visited the Papagos who "* * * lived at the remotest distance from the agency. I found them after 4 days travel, through a desert plain, * * *" (Def. Ex. G-85).

In 1860 Walker reported that there were eight small Papago "pueblos" west of the mission (Def. Ex. G-254, p. 179).

In 1861 the surveyor general for the Territory of New Mexico, in his report to the Congress (Def. Ex. G-254, pp. 122-123, 181-182), listed 11 Papago pueblos, ten of them west of Tucson and one at the San Xavier del Bac mission and stated in the report that "* * * the Papagos inhabit the country between Tucson and the Colorado on the west and between the Gila and the international boundary line, and are similar in nearly all respects to the Pimas, speaking the same dialect * * *" (Def. Ex. G-88).

At this period of time, however, the Santa Cruz Valley was controlled by the roving Apache bands and all of the area of the Santa Cruz Valley except at the village of Tucson and Tubac was abandoned and there were no permanent occupancy areas east of the Baboquivari Mountains (Def. Exs. G-5; G-12; G-23; G-24; G-49; G-51; G-134; G-135).

(The Santa Cruz Valley at this time and prior to 1853 was described as the "Apache Corridor" (Def.

26

Ex. 139) because of the regular movements of the Apaches from the area north of the Gila River southward into Sonora. See Fdg. 17.)

The Baboquivari Mountains at this time were said to be the boundary between the country of the Apache and the Papago (Def. Ex. G-24).

Activities in the cattle industry in the Santa Cruz Valley for a period of 50 years, from 1822 to 1872, were completely suspended because of the raiding and marauding Apaches (Def. Ex. G-39).

### Finding 15

#### Life Zones of the Papagueria

The anthropological study of the area of the Papagueria, as of mid-19th century, indicates a natural division of the area into three life zones based upon varying factors of biological and cultural features peculiar to each zone.

Zones one and two fall within the area described by scientists as the Sonoran Desert province, which for the purpose of comparative study is divided into separate areas, the western portion of which is identified as the lower Colorado Valley and the eastern portion of which is identified as the Arizona uplands (Def. Ex. 250, Ch. IV, p. 2).

The first or western zone, which is within the area of the Sonoran Desert, extends from the Colorado River to the Growler Mountains. This area is extremely dry and arid with very little rainfall for the greater part of the year.

The southern portion of this area at the international

27

boundary line includes the northern range of the nomadic subsistence pattern of the Sand Papagos whose principal villages and use areas are located in Sonora, Mexico, south of the boundary, at Quitovac and the immediate surrounding country.

The second or central zone extending from the Growler Mountains eastward to the Baboquivari Mountains includes an area of increased rainfall and greater population. Plant life and other factors essential in the Papago economy are present in this area of the Papagueria which contains the locations of aboriginal defense villages of the Papago together with related field and well locations identified with the villages.

The Sells Papago Reservation of 1917 is entirely within the central zone of the Papagueria (Def. Ex. 250, Ch. IV, p. 1).

The third or eastern zone extends east from the Baboquivari Mountains to the Santa Cruz River. This is the area of greatest rainfall and greater population density and includes the only Papago village east of the central zone as well as the San Xavier del Bac Reservation of 1884 established at the location of the early mission church.

The qualities of the environment for human habitation are greatly improved in this zone when compared with the central and western zones.

### Finding 16
#### Tribal Organization

The Papago Indians at mid-19th century were apparently an identifiable tribe, possessing the characteristics of self-sufficiency, political autonomy and group-

28

wide interdependence (Def. Ex. 250, Ch. III, p. 27). However, with respect to internal political structure, the tribe was never united or organized under a centralized form of self government prior to 1930 (Def. Exs. 20, p. 70; 250, Ch. III, p. 24). This comparative difference from other Piman tribes, particularly the Sobaipuri and the Pimos Altos, was due to the varying subsistence pattern of the Papago who lived in the arid desert territory and were compelled to depend upon flash flood cultivation at the confluence of drainage in the inter-mountain valleys of their desert homes and as a consequence lived in small isolated locations, whereas the Sobaipuri and Pimos Altos were irrigation farmers living in the rich river valleys (Def. Ex. 250, Ch. III, pp. 23-24).

### Finding 17
#### *Apache Corridor*

As previously mentioned, in the mid-19th century the Santa Cruz Valley from the Pima villages to the Altar Valley south of the Mexican border was the corridor or route employed by the Apaches in carrying on continuous raids against the Pimas, Papagos and Mexicans in Sonora. The extent of marauding expeditions was such that for many years both before and after the date of the Gadsden Purchase of 1854 the entire Santa Cruz Valley was abandoned except for the mission settlement at San Xavier del Bac and the settlement at Tucson, nine miles to the north.

Before 1854 the Mexican Government maintained soldiers at Tucson and, at intervals, at Tubac, a small village south of San Xavier, for the purpose of pro-

29

tection for Tucson and San Xavier. Also, Tucson for a long period of time had been a Mexican village composed of Mexicans and Indians, including Sobaipuri from Tumacacori capable of resisting the Apache attacks. The small mining villages south of Tucson were abandoned by Mexican and American mine operators due to the Apache hostilities (Def. Exs. 29, p. 65; 31, p. 10; 139, pp. 237-241, 246; 250, Ch. IV, pp. 17, 150; Tr. 217, 245-248).

### Finding 18
#### *Neighboring Tribes*

The several tribal groups of Indians which occupied and used the territory peripheral to the area called the Papagueria and their general locations from east to west at the mid-19th century and earlier are as follows:

1. *Sobaipuri Indians.* A group recognized as separate and distinct from the Pimas and the Papagos through the 17th and 18th centuries. The tribe became extinct before the 19th century as the result of Apache raids and pestilence. They had been occupants of the San Pedro and upper Santa Cruz River Valleys (Def. Exs. 20; 24; 25; 26; 28; 250, Ch. III, pp. 2-5).

2. *Arivaipa and Pinal Bands of San Carlos Apaches.* These groups, alleged to have been responsible for the defeat and extinction of the Sobaipuris, occupied the northern perimeter of the Papagueria, from the Santa Catalina Mountains northward (Def. Exs. 27; 29; 30; 31; 139, pp. 237-241; 250, Ch. III, pp. 2, 5-9).

3. *Gila River Pimas.* Closely related to the Papagos and Sobaipuri. They occupied villages near the junction of the Santa Cruz and Gila Rivers. These villages to-

30

gether with their hunting and gathering territories mark the northern boundary of the Papagueria (Def. Exs. 33; 34; 35; 37; 39; 250, Ch. III, pp. 2, 9-13).

4. *Maricopa Indians.* From the Gila Pima villages west along the Gila River to the Mohawk Mountains, the various component villages of the Maricopa confederacy were thinly scattered (Def. Exs. 30; 33; 41; 250, Ch. III, pp. 3, 13-15).

5. *Yavapai Indians.* The territory of the western Yavapai was located in the north bank of the Gila River opposite the Maricopa villages from just below the Pima villages to the Yuma country (Def. Exs. 22; 30; 42; 250, Ch. III, pp. 3, 15-18).

6. *Yuma Indians.* The territory of the Yuma Indians extends from the Mohawk Mountains westward to the junction of the Gila and Colorado Rivers and down the Colorado to the international boundary (Def. Exs. 45; 250, Ch. III, pp. 3, 18-19; Tr. 207-212).

### Finding 19

#### *Neighboring Country*

Although the peripheral boundaries of the aboriginal use and occupancy areas of the several neighboring tribes did not define the Papago aboriginal occupancy boundaries, they did show and locate the perimeter of the tracts or areas of country identified as the Papagueria (Def. Ex. 250, Ch. III, p. 1; see also Def. Req. Fdg. 10).

The area of country remaining in the Sonoran Desert and adjoining territories of Arizona and Mexico, after excluding the use and occupancy areas of the neighbor-

31

ing tribes and groups, was only in part used and occupied by the Papago Tribe in the mid-19th century and earlier in view of the fact that much of the country was uninhabitable as the result of the extreme heat, lack of natural water supplies required for minimum agriculture and the constant raids and attacks by the hostile Apaches. Apache raids in the eastern area, particularly the Santa Cruz Valley, extended from the Gila River to the Mexican boundary just east of the Baboquivari Mountain range. In the central western area of the Papagueria, particularly in the greater Ajo Valley, the raiding extended from Gila Bend south to the area of Sonoita and Quitovac. The latter area was also subject to the periodic raids of the Yavapai (Def. Ex. G-5; Def. Exs. 20; 32; 49; 139; 250, Ch. III, p. 1; Tr. 212-213).

### Finding 20

#### *Aboriginal Papago Settlements*

The aboriginal occupancy areas of the Papago Indians within the United States at the date of the Gadsden Treaty of 1854, 10 Stat. 1031, lie within the areas of the present Sells Papago Reservation of 1917, as supplemented. The Papago lived in large village groups, which have been described as defense villages (see Def. Req. Fdg. 25), as the result of the Apache raids in the Santa Cruz and Ajo Valleys which compelled them to congregate in large numbers for defense and safety purposes in remote and inaccessible areas south and west of the Baboquivari Mountains (Def. Ex. 253; Tr. 240-243). Historians and ethnologists are in agreement with the reports of explorers and

32

Government Indian agents relative to the location of the Papago defense village areas, showing that said settlements are in the reservation area and at Quitovac in present Sonora, Mexico near the boundary line (Def. Exs. 5; 75; 92; 99; 145; 150; 152).

Although San Xavier was thought by many of the Americans who first came to the area to be the principal village of the Papago (Def. Ex. 250, Ch. IV, pp. 118-133), the settlement of Papago Indians at San Xavier was not regarded as a Papago defense village (see Def. Req. Fdgs. 11, 27, 28).

A summary of the literature and data relative to the aboriginal defense villages is given in Defendant's Exhibit 252, with a correlation between their early names as presented by each source and the present-day official village name in the Papago Reservation community.

### Finding 21

*Papago Use and Occupancy in 1854 in Pimeria Alta, Western Zone*

The area of Pimeria Alta extending from the Growler Mountains west to the Colorado River was referred to as the western zone. The Sand Papagos, or Arenenos, were located in the southern portion of this zone principally south of the international boundary at Quitovac, the defense village, one of the 11 aboriginal Papago Indian villages (Def. Ex. G-13; Def. Ex. 250, Ch. IV, pp. 20-21). They were a small group of the Papago Tribe, which, because of deaths from disease, numbered about four families in the 1840 to 1860 period (Def. Ex. 250, Ch. IV, p. 33). From

33

the head village of Quitovac in the Pinacate Mountains of Sonora, they ranged into the border village of Quitovaquito. Although there is a tradition to the effect that they used the water sources at Tinajas Altas, Cabeza Prieta, Tule Mountains and the Sierra Pinta, all west of Quitovaquito, there is no specific historical documentation of such use of these areas by the Sand Papagos in 1854 and circumstances indicate that they did not use or occupy these areas (Def. Ex. 250, Ch. IV, pp. 20, 27, 45; Tr. 227-229).

The Ehrenberg map of 1858 (Def. Ex. 75; see Def. Req. Fdg. 31) based on earlier explorations (1853) shows the territory of the Sand Papagos to be located between the Pinacate Mountains and Adair Bay all south of the international boundary line (Def. Ex. 250, Ch. IV, p. 27). The Sand Papagos made very little use of areas or locations within the present United States, except for temporary uses at Quitovaquito and they were never seen in the region to the west of Quitovaquito (Def. Ex. 250, Ch. IV, p. 44). Dr. Hackenberg, defendant's expert witness, has found (Def. Ex. 250, Ch. IV, p. 45) no evidence of use of the area west of Quitovaquito within the United States after the Gadsden Purchase date.

Other settlements in this southwestern area including Ajo Indian village, Darby Well, Bacamote and Child's Ranch are much later than the Gadsden date of 1854 and clearly not aboriginal (Def. Ex. 250, Ch. IV, p. 45; Tr. 218-224).

In the northern part of the western zone at the date of the Gadsden Purchase, the Gila River Valley was not occupied and at no time within the period from

34

1775 to 1900 did the Papago Indians exclusively use and occupy the area between Gila Bend and the Colorado River (Def. Ex. 250, Ch. IV, p. 60). All use and occupancy in the areas was either of a mixed type including several tribes or began subsequent to the Gadsden Treaty (Def. Ex. 250, Ch. IV, pp. 46, 59-61; Tr. 218-224).

### Finding 22

*Non-exclusive Indian Use in the Northern Areas of the Western Zone of Papagueria*

In the northern portion of the western zone of the Papagueria in the mid-19th century the Papago Indians did not exclusively occupy or use any part of the country between Gila Bend and the Colorado River.

Several Indian tribes or groups including Opas, CocoMaricopas, Yumas and Maricopas used and ranged through the area throughout the period from 1775 to 1900 and any substantial use or occupancy in the area which included the Papago Tribe occurred after 1858 and was not exclusive but jointly with others including non-Indians (Def. Ex. 250, Ch. IV, p. 60).

In the area south of the Gila Valley and just north of the Camino del Diablo there is no evidence of exclusive use or occupancy by Papagos or any others due to extremeness in heat and aridity (Def. Ex. 250, Ch. IV, p. 60).

The use and occupancy of areas by Papagos on the lower Gila River began much after 1854 and were non-exclusive at all times (Def. Ex. 250, Ch. IV, pp. 61-63; Tr. 218-222).

35

### Finding 23

*Gila River Valley*

The Gila River Valley from the Pima villages west to the Colorado River was included in the use areas of the several adjoining tribes of Indians including the Yuma, Pima-Maricopa, Yavapai and Pima, so that the Papago country in the mid-19th century did not include any part of the Gila River Valley (Def. Ex. 250, Ch. III, p. 21; Tr. 218-219, 222).

### Finding 24

*Central Zone of the Papagueria; its Location and Description*

The central zone of the Papagueria includes the southwest portion of Arizona between the Growler Mountains and the Baboquivari Mountains and is referred to as the Arizona upland (Def. Ex. 250, Ch. IV, p. 63).

Game animals, food stuffs and construction materials necessary to the economy of the Papagos were found in good quantity in this area in the mid-19th century (Def. Exs. 57; 118; 250, Ch. IV, pp. 77-80).

The central zone of the Papagueria has been recognized to include the location of the aboriginal of the Papago Indians by every ethnographer and anthropologist who has made a study of them (Def. Ex. 250, Ch. IV, p. 80). At mid-19th century the Papagos lived in large villages all within the central zone except for two locations: (1) one near San Xavier del Bac on the Santa Cruz River in the eastern zone of the Papagueria and (2) the other at Quitovac in Sonora, south of the

36

boundary near to the Sonoita Valley (Def. Ex. 250, Ch. IV, p. 88).

### Finding 25

*Papago Indian Use and Occupancy in 1854 in the Central Zone of the Papagueria*

The central zone of the Papagueria is, as said before, the area of country between the Growler Mountains and the Baboquivari Mountain range in the east.

The aboriginal use and occupancy areas in the mid-19th century, and earlier, of the Papago Indians was confined to the area of the central Papagueria (Def. Ex. 250, Ch. IV, p. 80). The present-day Papago villages are derived from 12 common centers or defense villages, dating from the period prior to 1860 (Def. Ex. G-13; Def. Ex. 38).

J. W. Hoover, one of the leading anthropologists, has made a special study of Piman origin and found that (Def. Ex. G-13, p. 259) "The present day [1935] Papago villages may be traced to about twelve common centers prior to 1860. Each of these represents a tribe which, spreading from the main village or pair of villages, has established new communities. * * *" He further stated that "* * * Disregarding several considerable outlying villages or groups such as those at San Xavier and in Tucson, the Papago villages are confined to that part of the area [the Papagueria] which is bounded on the east by the Baboquivari Mountain range and related low mountain groups extending northward. These also roughly bound the Papago Indian Reservation [Def. Ex. G-13, p. 257]. On the north, white settlement is approaching the reservation

37

boundary line. * * *" There is much evidence in the literature to support the view that the Baboquivari Mountains formed the boundary between the Apaches and the Papagos (Def. Ex. G-24, p. 37; Def. Exs. 249, p. 37; 250. Ch. IV, p. 124). "The western boundary is less definite, as in this direction the desert becomes increasingly inhospitable, merging into great precarious empty waste spaces, too barren to support even Papagos" (Def. Ex. G-13, p. 257; Def. Ex. 250, Ch. IV, p. 87).

This village complex, which includes the 12 defense or parent villages and the many related field and well villages, were used seasonally due to the aridity of the country (Def. Ex. 250, Ch. IV, pp. 87-89; Tr. 239-241, 251). The north boundary of the Papago aboriginal village area which contains all of the village groups, except at Tucson and San Xavier del Bac, is at Table Mountain (Def. Ex. 250, Ch. IV, p. 127). This line corresponds with the bounds of the Sells Papago Indian Reservation as finally composed in 1932, which includes all of the aboriginal defense villages located before 1860, except Quitovac, in Sonora, as described by Hoover (Def. Exs. G-13, p. 257; G-80, pp. 224, 397; G-254, pp. 133-134; Def. Exs. 139, p. 140; 250, Ch. IV, pp. 132-133; 253; Tr. 241-242).

There is no substantial disagreement in the scientific or historical literature with the Papago aboriginal data contained in the Hoover village study (Def. Exs. 250, Ch. IV, pp. 117-127; 252; Tr. 240-244). The Ehrenberg map of 1858 (Def. Ex. G-203), which Dr. Hackenberg regards as a historical document of considerable importance (Def. Ex. 250, Ch. IV, p. 117) and which is



38

based upon the personal observations of several explorations in the area in 1853, completely supports the Hoover village study (Def. Ex. 250, Ch. IV, pp. 117-118; Tr. 222, 251).

Underhill, another leading anthropologist who explored the ancestral defense villages as observed by Kino, stated as follows (Def. Ex. 20, pp. 58-59):

* * * We shall refer to the whole group of mother village, daughter villag*, and Wells, as a village unit.

The three reservations number eleven such village units whose location has changed very little in the two hundred and more years since Kino visited most of them. The reason is obvious. They were placed in spots which were, then as now, the best for cultivation. Usually, the main villages are found in the middle of the north-to-south valleys, with their daughter villages stretching along the valley in bo'    .ections and their Wells perched in the mountain walls at either side. * * *

Our knowledge of the daughter villages dates only from 1860 and it is possible that their settlement is recent and due to the cessation of Apache raids. Kino, who visited several of the mother villages, says nothing about the daughters and we do not know whether the * * * people who greeted him lived in town or in the environs. But we know that during the eighteenth and most of the nineteenth century there could be no daughter villages. That was the time of the Apache attacks, when the people were obliged to concentrate and.

39

no matter how far away their fields were: "They could not live apart. They were afraid."

But when the Apache ceased to trouble, toward the end of the nineteenth century, the large villages began to break up and groups moved out, either to the fields they had been cultivating, or to new ones. * * * In the last few years there has appeared a factor which will influence residence even more than freedom from attack. This is the digging of government wells * * * so that movement in the dry season is unnecessary. * * *

The eleven village units form the outstanding divisions in Papago country * * *.

The Papago claim to Indian title by aboriginal use and occupancy can be based only upon field and well village locations, since there is no evidence whatever for the accurate demarcation of gathering areas in either ethnological or historical sources with reference to the mid-19th century (Def. Ex. 250, Ch. IV, p. 132; see Def. Req. Fdg. 26). All of the information on the entire central district of the Papagueria indicates no occupied areas which are not presently (1964) contained within the Sells Papago Indian Reservation (Def. Ex. 250, Ch. IV, p. 132).

The Papago village locations were at the mid-19th century period, without doubt, determined by the activities of the hostile Apaches, their raids and depredations. The Papago Indians were compelled to take refuge from the Apache raids in the great desert expanse behind and to the west of the Baboquivari Mountain range. Lieutenant Chapman of the United States

40

Army stationed in the Santa Cruz Valley in 1856 reported (Def. Exs. 145; 250, Ch. IV, pp. 118-120) that he had attended a council held with the Papago chiefs at Tucson in January of 1858 and that he had "* * * collected all of the information in my power of these Indians, the names of their Chief and principal Captains, the names of their different pueblos, and their population, their habits of life and quantity of arable land * * *. The report contains a list of Papago villages and continues with the statement "These Indians [Papagos] seem to have selected these locations for their towns on account of the Apaches. To them, now, the Apaches cannot approach, without crossing extensive arid plains" (Def. Ex. 250, Ch. IV, p. 120).

In the mid-19th century the central Papago country was hemmed in on three sides by hostile groups. These groups included the Mexicans to the south, Yavapais and Apaches (Def. Ex. 250, Ch. V, p. 4) in the Gila Bend-Ajo Mountain corridor in the west (Tr. 222) and the Apaches in the Santa Cruz Valley on the east (Def. Ex. 139, pp. 236-251; Tr. 239, 246-248).

The three Papago aboriginal villages identified by Hoover (Def. Ex. G-13; Def. Ex. 38) which were not within the boundaries of the Sells Papago Reservation (Def. Ex. 253) were the village of Quitovac, which was in Sonora, Mexico, south of the international boundary; Quitovaquito, a field village on the boundary line; and San Xavier del Bac, which was the Indian mission village near Tucson in the eastern Papagueria in the Santa Cruz Valley (Def. Ex. 253).

41

## Finding 26

### *Absence of Gathering Areas in Central Papagueria*

There is no evidence from either ethnological or historical sources of the existence of gathering areas as contrasted with field and well village locations in the period of the 19th century in central Papagueria.

The ethnological evidence relates only to field and well villages which have been identified with the major defense village locations with the possible exception of the eastern community of Fresnal at the base of the Baboquivari Mountains.

The probability of the existence of gathering areas in central Papagueria beyond the Sells Papago Reservation is very remote in view of the location and of the materials in the reservation area (Def. Ex. 250, Ch. IV, pp. 129, 133; Tr. 239-241, 251, 262-263).

## Finding 27

### *Eastern Zone of the Papagueria*

The eastern zone of the Papagueria extends from the Baboquivari Mountain range to the Santa Cruz River Valley (see Def. Req. Fdg. 15). North of Tucson the area continues as a part of the Sonoran Desert region of the Arizona upland extending from the central zone, while the area south of Tucson is known as the upper Santa Cruz region.

The quality of the lands of the eastern area as well as the environmental habitat is an improvement over the western area (Def. Ex. 250, Ch. IV, pp. 134-140).

The upper Santa Cruz Valley which extends south



42

from Tucson into Sonora, Mexico is the most valuable as well as useful for habitation due to the availability of water for agricultural purposes (Def. Exs. 6; 10; 57, Ch. 7, p. 59; 68; 250, Ch. IV, pp. 135-140).

### Finding 28

*Papago Indian Use and Occupancy in 1854 in the Eastern Zone of the Papagueria*

The Santa Cruz River Valley forms the eastern boundary of the area of Arizona historically designated as Papagueria. The westerly boundary of the eastern zone of Papagueria (see Def. Req. Fdg. 26) is the Baboquivari Mountain range which was frequently designated by leading ethnologists as the boundary line between the Papago and Apache (Def. Ex. G-24; Def. Exs. 26, p. 110; 249, p. 37; 250, Ch. IV, p. 124).

The Sobaipuri Tribe of Indians, a branch of the Pima family, were the original occupants of the San Pedro and Santa Cruz River Valleys (Def. Exs. 5; 25; 250, Ch. IV, p. 142). The Indian village described by Hoover (Def. Ex. G-13) near Tucson at San Xavier del Bac was an Indian mission village founded by Kino (Def. Ex. G-254, p. 156) for the Sobaipuri (Def. Exs. G-5; G-14; Def. Ex. 250, Ch. III, pp. 2-4).

The Sobaipuri as a tribe gradually became extinct as the result (Tr. 213) of disease and repeated Apache attacks (Def. Ex. 250, Ch. IV, pp. 142, 144). Papago Indians were brought by the missionaries from the desert areas of the Papago villages to the Sobaipuri missions in the Santa Cruz Valley to replace the declining Sobaipuri Tribe (Def. Exs. 135, pp. 175-176; 170,

43

pp. 4-5; 250, Ch. IV, pp. 146, 148; Tr. 208). These mission villages were always of mixed Indian identity and were never exclusively occupied and held by Papago Indians (Def. Ex. 250, Ch. IV, pp. 141-142, 150, 156).

In the extended areas of the lower Santa Cruz Valley at mid-19th century the entire country except the village at Tucson was depopulated and abandoned by reason of the Apache raids and depredations (Def. Ex G-254, pp. 160-164, 174-175; Def. Exs. 30, pp. 285-302; 250, Ch. IV, pp. 149, 152). The upper Santa Cruz Valley in 1848 from Tucson to the Mexican boundary was depopulated and abandoned (Def. Exs. 27; 116; 135, p. 166; 250, Ch. IV, p. 147; Tr. 217).

There is no evidence to support the claim that at Tucson there continued to be a separate Indian community after the Anza expedition of 1775 which identified the occupants at that time as Pimos Altos (Def. Ex. 250, Ch. IV, pp. 156-157; See Def. Req. Fdg. 32).

The village at the San Xavier del Bac mission survived, when all other Indian villages in the Santa Cruz Valley were abandoned, only by reason of the military post and presidio at Tucson which had been established for many years before 1853 (Def. Exs. G-79, p. 80; G-254, pp. 162-164; Def. Ex. 250, Ch. IV, p. 57).

In 1874 the Indian village and surrounding area of 70,000 acres at the San Xavier del Bac mission (Def. Ex. G-254, pp. 211, 255; Def. Ex. 250, Ch. IV, p. 90) was included in the San Xavier Papago Indian Reservation. However, its identification as an aboriginal occupancy and use area in 1854 cannot be supported or justified in view of the fact that the Indian village was

44

a mission village established by Father Kino in 1700 for the Sobaipuri Indians or tribe then occupying the Santa Cruz River Valley. The later entrance and tenure of the Papago for mission purposes was not the type of use and occupancy which establishes Indian title. Moreover, such use and occupancy as there was by the Papago was not exclusive, since, as said before, the area was populated and used by the Mexicans and other Indians extensively before and during the tenure of the Papago (Def. Exs. 70; 127; 250, Ch. IV, pp. 141-148; Tr. 213-217).

### Finding 29

*Abandonment of the Upper Santa Cruz Valley— Apache Corridor*

The lack of Papago or other Indian use or occupancy of the Upper Santa Cruz Valley in Arizona (in the eastern zone) at the time the United States acquired sovereignty over the area is confirmed by the reports of the travellers and explorers, including Bartlett in 1852 (Def. Ex. 30), Poston in 1854 (Def. Ex. 31) and Sylvester Mowry in 1857 (Def. Ex. 93), who found the entire area abandoned and deserted as far south as Nogales, Sonora, except the mission village at San Xavier del Bac (Def. Exs. G-12; G-23; G-24; G-30, p. 32; G-35; G-66).

This condition of the country was also confirmed by the reports of Collins (Def. Ex. 101), Pumpelly (Def. Ex. 249) and the 49'ers (Def. Exs. 126; 206; 207; 208; 209; 210; 211; 250, Ch. IV, p. 156) relative to this area south of Tucson.

45

The Apache raids and depredations which brought about the abandonment of this area were so frequent and so devastating for such a long period of time that the historians and anthropologists have described the valley of the Santa Cruz as the Apache Corridor (Def. Ex. 139, pp. 237-241).

### Finding 30

*Lower Santa Cruz River Valley*

The lower portion of the Santa Cruz River Valley (in the eastern zone) extending from Tucson north to the Pima villages on the Gila River was explored by Anza in 1774 and he found one Papago Indian settlement at La Aquituni just west of Picacho Peak (Def. Ex. 120, p. 242). In the following year on another journey through the area he found an abandoned Indian village just north of Tucson at Oit Par (Def. Exs. 121, p. 11; 250, Ch. IV, pp. 143-144).

Papagos from the defense village of Kohatk, which was located in the northern area of the central zone of the Papagueria in the mid-19th century, had work villages among the Pimas on the Gila River. However, the area between Tucson and the Gila River was explored by Cook and the Mormon Battalion (Def. Ex. 27) in the 1840's and they reported no Indians of any kind in the Santa Cruz Valley between Tucson and the Pima villages. It is clear that the area north of Tucson was completely clear of Papago occupancy in the early 19th century (Def. Exs. 123; 124; 125; 250, Ch. IV, pp. 146-150; Tr. 213, 215-217).

46

### Finding 31

*Ehrenberg Map of Arizona Territory Confirms Use and Occupancy Confined to Central Zone*

Herman Ehrenberg, a mining engineer, prepared a map of southern Arizona after he had personally made extensive mining explorations of the area in 1854 with Poston, who later became Superintendent of Indian Affairs for the Territory of Arizona. He employed his own data as well as that of the military explorations of Major Heintzelman, Lieutenant Parks and others who served in the area (Def. Ex. G-203; Def. Exs. 75; 250, Ch. IV, pp. 116-117).

This map shows the location and occupancy of Papago villages in the years 1854 to 1858. It also correctly locates the gold placer mines of Quijotoa, Sonoita and Quitovac, the Ajo mine and the extensive mineral claims between Arivaca and Cerro Colorado in the Santa Cruz Valley.

The map is evidence of the occupancy of the Papago defense village units as of 1854 to 1858 and is consistent with the Hoover defense village concept (Def. Ex. G-13). However, certain mines of importance are not shown on the map, Fresnal and Cababi, indicating that they were not generally known at the time.

The Papago village locations shown on the Ehrenberg map are as follows: San Xavier, Komelik, Kui Tatk, Gu Oidak, Santa Rosa (Gu Achi), Quijotoa, Sil Nakya, Ko Vaya (Cababi), Kom Vaya (Comobabi), Stoa Vaya, Hickiwan (Perigua), Chiulikam, Kaka,

47

Tecolote (Chukut Kuk), Kohatk, Corral and El Mezquite (Vatjeki) (Def. Ex. 250, Ch. IV, pp. 117-118; Tr. 222, 251-253).

### Finding 32

*Use and Occupancy Pattern the Same in 1858 as in 1775*

In 1858 Lieutenant Chapman, who was stationed with the Army at Fort Buchanan, located in the Santa Cruz Valley near the Calabasas Ranch, attended at the direction of the Indian agent a council held by the Papago chiefs at Tucson.

Chapman reported in a letter dated February 20, 1858 (Def. Ex. 145) the information obtained at the council meeting which included among other things the names of the Papago Indian "pueblos."

The village names given by Chapman are listed in a report (Def. Ex. 99) published by him in 1858 based upon the Chapman letter. The Bailey report, according to Dr. Hackenberg (Def. Ex. 250, Ch. IV, p. 119), gives a more accurate interpretation of the village names than the listing in the letter by Chapman. The Bailey interpretation of the Chapman list of Papago villages is as follows (Def. Ex. 250, Ch. IV, p. 119): San Xavier, Elogio, Del Llano, Del Bajio, La Boca del Arroyo, Santa Rosa, Del Raton, Tnitjotobar, Misquito, Del Teculote, Del Cumero, Anicam, Del Cojate, Del Arroyo Grande, Del Caca, Del Perique, Sierra Blanca, Pisanomo and Del Charco.

The Chapman letter (Def. Ex. 145, p. 6) is of additional value in that it contains a statement of an eye-

48

witness with relation to the location of the Papago villages in mid-19th century as follows:

> These Indians seem to have selected *these locaties* [sic] for their town on account of the Apaches. To them, now, the Apaches cannot approach, without crossing extensive arid plains. * * *

This observation in the letter by Chapman would clearly indicate that the Papago villages in the mid-19th century were located in the area west of the Baboquivari Mountains (the central zone of the Papagueria) and not in the Santa Cruz River Valley.

The Hoover thesis as to the location of the aboriginal Papago villages (Def. Ex. G-13; Def. Ex. 48) in the central zone of the Papagueria is in accord with the Chapman statement, except for Chapman's inclusion of San Xavier.

A similar statement was reported by Father Font at the Pima village of Sutaquison in 1775 (Def. Ex. 35, p. 30 (footnote)):

> * * * We asked the Indians why they lived so far from the river * * *. They replied that * * * by living apart from the river they were able to have a clear field for pursuing and killing the Apaches when they came against their town [Def. Ex. 250, Ch. IV, p. 120].

49

## Finding 33

*Early American Agency Reports (1853-1865) on Papago Area and Villages*

The Indian agents of the United States who served in the southwest during the years immediately following the purchase of the Gadsden area in 1854 had very limited knowledge concerning the Papago and their village locations. They thought (because it was the only group of Papagos known to them) that the principal settlement of the Papagos at this time was located in the area of Tucson near the mission church at San Xavier del Bac (Def. Exs. G-82; G-84; G-86; G-88; G-90; G-91; G-92). The agency reports for the ten year period (1856-1866) were uncertain and indefinite as to the number and location of the Papago villages which were west and south of Tucson in the desert area (Def. Ex. G-84).

Meriwether, who was Superintendent of Indian Affairs for the Territory of New Mexico (which included Arizona at this time), reported in 1856 from the agency at Santa Fe that the Papagos lived in six villages near Tucson (Def. Ex. G-82).

Lieutenant Mowry who was stationed with the Army in the Territory of New Mexico made the agency report in 1857 to the effect that the entire area of southern Arizona for several years past had been in the hands of the Apaches except "* * * a small district in the vicinity of Tucson, * * *" and the small areas on the Gila occupied by the Pima and Maricopa (Def. Ex. G-83).

Bailey, the agent in 1858, reported for that year that



50

the Papagos occupied an unproductive tract west and southwest of Tucson and that the principal village was in the vicinity of San Xavier del Bac, the total being 19 (Def. Ex. G-84).

In 1859 the agent, Walker, was located at Tucson and in his report for that year stated that he had visited the Papagos "* * * who lived at the remotest distance from the agency. I found them after a travel of four days through a desert plain, nearly all at their villages * * *" (Def. Ex. G-85).

Walker's report in 1860 stated that 50 families of the Papago Indians lived at "* * * the old mission Pueblo at San Xavier * * *" and that the eight pueblos west of the mission were small (Def. Ex. G-86).

The surveyor general for the Territory of New Mexico for 1861 in his report to the Congress listed by name 11 Papago pueblos including San Xavier and remarked that (Def. Ex. G-88, p. 582):

> The Papagos inhabit the country between Tucson and the Colorado of the West and between the Gila and the international boundary line, and are similar in nearly all respects to the Pimas, speaking the same dialects, etc.

In 1861 the Superintendent of Indian Affiars for the Territory of New Mexico (which included Arizona) located at Santa Fe, reported that the southern and southwestern parts of the territory had been invaded by armed companies from the State of Texas and that the agents for the Indians (including Papago) had been driven from their agencies and that the Indians were

51

overrunning the country without restraint (Def. Ex. G-87).

Poston, who was Superintendent of Indian Affairs for the Territory of Arizona, reported in 1863 that the Papagos "* * * inhabit that triangular space of arid land bounded by the Santa Cruz, Gila and Colorado Rivers, and the Mexican boundary line * * *." He listed 18 villages by name, designating the principal village as San Xavier (Def. Ex. G-90).

In 1864 agent Browne reported that the Papagos "* * * live south of the Gila in the arid triangle known as the western part of the Gadsden Purchase * * *."

In 1865, the special agent, Davidson reported (Def. Ex. G-92, p. 181) that "* * * The Papagos occupy villages and the adjacent country, in the southwest portion of Arizona, having for their centre and most important point the old mission church of San Xavier del Bac, and number some 5,000 souls * * *." And at page 301 further states:

> The Papago country extends from the Gila on the north to the Sonora border on the south, and from the Santa Cruz river on the east to the California Gulf on the west. Although roaming at times over vast tracts of desert lands, their homes are necessarily located near permanent water. In some instances, as at Cahuabi, they have, with considerable labor, excavated tanks, where the waters that accumulate during the rainy season are carefully preserved against a time of scarcity.



52

This report identifies by name 12 villages in addition to the principal group at San Xavier the residence of the principal chief.

In the same year George Leihy the Superintendent of Indian Affairs for the Arizona territory reported (Def. Ex. G-92, p. 690):

> The hostile Apaches are composed of numerous bands extending over at least two-thirds of the Territory, and occupying the portion east from a line drawn north and south about one hundred miles east from Colorado river, ranging from the northern settlements of Arizona to the very centre of the border States of Mexico. * * *

### Finding 34

#### *Extension and Increase of Papago Villages—Papago Emigrants After 1853*

Papago land use expanded beyond the area of the aboriginal defense villages following the termination of the Apache hostilities. Many Papagos came north from Sonora after 1865 when employment was available to Indians in the ranching and mining operations in the eastern and central Papagueria area.

A detailed survey of the territory comprehending the Papago village areas was made in the early 1900's (Def. Exs. G-156; G-225; G-226) as a part of a plan of the Government of the United States to protect the Indians in the extensive use areas which followed the expansion of the original village areas (Def. Ex. G-31; Def. Exs. 4; 202). The plan ultimately resulted in the establishment of the Sells Papago Indian Reserva-

53

tion in 1917 (Def. Exs. G-2; G-161; G-162; G-166; G-168; G-254).

Although the area described in the extensive surveys of land use long after the 1853 period did not represent aboriginal use, it included all of the defense villages described by Hoover north of the international boundary and (Def. Ex. G-13) also the field and well locations to which the Papago had expanded after the Apaches were subdued (Def. Ex. 250, Ch. V, p. 2; Tr. 243-244, 254-258).

### Finding 35

#### *San Xavier Reservation*

In 1874 by executive order a reservation for Papago Indians was established at San Xavier del Bac. It consisted of 70,080 acres in the Santa Cruz Valley including the mission village and the agricultural areas adjoining it on the Santa Cruz River (Def. Exs. G-179; G-254, pp. 211-212, 255).

Agricultural lands as well as irrigation water sources were included in the area designated for the reservation. The literature and historical documents describing the extent and location of the total reserve make reference to the use areas connected with the occupation areas of the village at the San Xavier del Bac mission. However, there is no information in these documents that would relate to use of areas beyond the boundaries designated (Def. Exs. G-28, p. 202; G-54; G-63; G-64; G-76; G-101; G-107; G-109; G-125; G-204; G-227, p. 23; Def. Ex. 250, Ch. IV, p. 158).

In the mid-19th century the San Xavier Reservation area had a comparatively small population (Def. Ex.



54

G-254, p. 212). In 1870 there were only 30 Indians at San Xavier; the large number residing there in 1918 moved to the area long after the 1853-60 period (Def. Ex. G-254, p. 212). Allotments were made within the reservation area to more than 291 family groups (Def. Ex. G-254, p. 212).

### Finding 36

*Sells Papago Indian Reservation*

In the first years of the 20th century, when it was apparent that the Papago Indians were in need of assistance and protection in the use of the lands which they occupied, a plan for the award of allotments of land to the individual Indians was undertaken (Def. Ex. G-254, pp. 226-231). Small reserves were created by executive order for the protection of village well sites (Def. Ex. G-254, p. 230).

In 1909 an allotting agent was appointed to survey allotments for individual Indians (Def. Ex. G-254, p. 227) to include the area of occupancy and improvement of the individual where possible. Many individual allotments were surveyed in the Papago country (Def. Ex. G-205). However, none were granted when it was concluded after extensive study that the prevailing conditions in the Papago country were such that an individual family could not sustain itself when restricted to an allotment area (Def. Exs. G-172; G-183).

The Bureau of Indian Affairs devoted much study and investigation to the Papago land problem over a number of years. Finally, the recommendations of a "Committee of Eight" was requested upon a plan for the solution of the Papago land problems (Def. Exs.

55

G-2; G-254, p. 246). This committee was composed of men with special knowledge of the country and broad experience in Indian service including two leading members of the Papago Tribe. The report of this group described an area of country of approximately 2,700,000 acres located within the area of the aboriginal claim in this suit, which, with the exception of a "strip" eliminated due to the protest of the people of Arizona, became the Sells Papago Indian Reservation by Executive Order of February 1, 1917 (Def. Ex. G-254, p. 257). Mineral lands within the reserve (in accordance with the recommendation of the "Committee of Eight") were left open to public entry (Def. Exs. G-2; G-166; G-254, p. 247).

The present size of the reservation was not attained until 1940 after the acquisition of several tracts of land which were held by individuals were purchased by the United States for the Indians (Def. Exs. G-168; G-179; G-232; G-234; G-236). The "strip" (Def. Ex. G-162) was added to the reservation in 1931 (Def. Ex. G-226).

In 1932 the Secretary of the Interior issued an order closing the public mineral exploration under the mining laws of the United States in the area of the Sells Papago Indian Reservation established in 1917 (Def. Exs. G-163; G-164). The Papago Indians (Def. Exs. G-119; G-141) sought to have the order rescinded, for the work afforded to the Papago Indian laborers at the mines was a principal item in their economy. Other protests were made by private industry and the State of Arizona (Def. Exs. G-120; G-128; G-166).

In 1937 (Def. Ex. G-150) the order of 1932 was revoked and the reservation lands were restored to pub-

56

lic mineral exploration under the general mining laws of the United States. In the order of 1937 (Def. Ex. G-150) provision was made for the payment of fees as well as damages to the tribe for losses or damages which might result from mining operations in the reservation.

In 1955 (Def. Ex. G-237) Congress terminated the right of public mineral entry, 69 Stat. 67, in the lands comprising the Sells Papago Indian Reservation and restored the mineral right as incident to the possession of the surface. This statute made exceptions for those areas within the reservation already under lease. The special statute of 1938 (52 Stat. 347, 25 U.S.C. sec. 396a, Def. Ex. G-235) relative to leaseholds for mineral operations on Indian reservations now became applicable to Papago lands and permitted the tribe to continue to control the surface of the entire area as well as to obtain mining royalties.

The Sells Papago Reservation as it is presently constituted with the additional areas acquired after 1917 substantially represents the boundaries of the aboriginal occupancy and use areas of the Papago Indians as of 1853 (Def. Exs. G-3, p. 18; G-13, p. 257; G-45; G-48; G-80, pp. 248, 397; G-254, pp. 133-134; Def. Exs. 139, p. 140; 250, Ch. IV, pp. 132-133; 252; 253; Tr. 241-242). In fact, when the Secretary of the Interior recommended to the President of the United States in January 1916 the creation of a reservation for the Papago Indians, he said (speaking of the area which was to become the present Sells Reservation), that a careful investigation of the problems of the Papago Indians had been in progress for more than two years by the Indian office and from the information obtained it was

57

conclusively shown that the Papago Indians had been in undisputed possession of the lands described in the proposal for the establishment of the reservation for over 300 years, last past, and that every consideration of humanity and justice, therefore, pointed to the necessity of establishing a permanent reservation for their benefit (Def. Ex. G-254, pp. 247-248).

The area of country comprehended within the Sells Papago Indian Reservation when finally completed in 1933 under the Executive Order of 1917 (Def. Ex. G-179) and subsequent authorization (Def. Exs. G-76, p. 27; G-168; G-171; G-232) included substantially all of the aboriginal defense village and well cite area locations as defined and described by the writings and reports of the leading ethnologists, anthropologists and historians (Def. Exs. G-13; G-43; Def. Exs. 3; 32; 243; 252; Tr. 241, 251-253, 261).

There were only two village areas described by Hoover (Def. Ex. G-13) and other authorities which were not within the bounds of the Sells Reservation of 1917-1933. They were Quitovac (Tr. 241), the defense area village of the Sand Papagos (Def. Exs. G-15; G-25; G-49; G-146) located in present Sonora, Mexico, and San Xavier del Bac at the mission church near Tucson (Tr. 241). As of the mid-19th century, the Sand Papagos of the Quitovac-Sonoita area were in very small number and were largely south of the international boundary line. However, they had well villages at Quitovaquito on the boundary line and tinjas areas at Growler Pass and Bates Well near to the village of Quitovaquito (Def. Exs. G-184; G-185).

The Papago village locations shown on the Ehren-

58

berg map of 1858 (Def. Ex. G-203) corresponds in all particulars with the location of the villages as shown within the Sells Reservation area (Tr. 251) and with the reservation map showing the Hoover villages and the well locations (Def. Ex. 253).

### Finding 37

#### *Reservations Continued*

The Gila Bend Reservation consisting of approximately 22,000 acres was established in 1882 by Executive order for the convenience and benefit of Papago Indians who had left their village areas to obtain employment in railroad construction north of the Papago country on the Southern Pacific Railroad (Def. Ex. 250, Ch. IV, pp. 56-58). In 1909 the area of the reserve was substantially reduced, returning to the public domain the unused area (Def. Ex. G-254, p. 255). The present area of the reservation is approximately 10,000 acres and is situated north of the Papago aboriginal occupancy area (Def. Ex. 250, Ch. IV, p. 56).

In the period from 1910 to 1916 several small reservations were established by Executive order for the use and convenience of the Papago Indians (Def. Exs. G-179; G-254, pp. 255-258). They ultimately became a part of the present Sells Reservation.

### Finding 38

#### *Right in Minerals in the Gadsden Purchase Area*

The laws and customs of Spain and Mexico regarded an estate or right in minerals as separate and distinct from an estate or right in lands. The Crown never

59

parted with the title or estate in minerals when land was granted and all mine and mineral operations were carried on under a license or permit from the sovereign. Neither Spanish nor Mexican land grants conveyed any title or right in minerals in the subject land (Def. Exs. G-1, pp. 19-20; G-91; G-239; G-247, pp. 10-11; G-249, p. 477; G-254, p. 336). *United States v. Castillero*, 2 Black 17, 169 (1862).

Indian tribal groups could not obtain any right or interest to minerals in lands held under Spanish sovereignty; individual Indians like other citizens under Spanish sovereignty could obtain rights in minerals only by written grant or license (Def. Ex. G-1, p. 20).

Under the Gadsden Treaty or Purchase the United States acquired full and complete title to all minerals in the area ceded which had not been specifically granted under Spanish or Mexican sovereignty.

The Legislative and Executive branches of the Government of the United States have recognized the ownership of the mines and minerals by Spain and Mexico and the succession thereto under the Gadsden Treaty by the United States (Def. Ex. G-1, pp. 21-22).

In 1854, 10 Stat. 308, a surveyor general was appointed for the Territory of New Mexico, which was acquired from Mexico in the Treaty of Guadalupe Hidalgo dated February 2, 1848, 9 Stat. 922. In the Statute of 1854, 10 Stat. 308, the surveyor general of New Mexico was directed to investigate and report to Congress upon all claims to land in the Territory of New Mexico. It also provided for land donations to settlers and residents under prescribed conditions, and

60

section four specifically excluded mineral lands from the operation of the act. Rights in mineral could not be obtained under the donation feature of the statute.

After the proclamation of the Gadsden Treaty, 10 Stat. 1031, the Congress on August 4, 1854, 10 Stat. 575, provided that the area of lands acquired in the Gadsden Purchase should be incorporated with the Territory of New Mexico and made subject to the laws of said territory. Thus, the title to lands within the area of the Gadsden Purchase became available to white male residents and settlers of the area under the Donation Statute of 1854, 10 Stat. 308, but the mineral rights remained in the sovereign, in the absence of a specific grant or conveyance creating a special estate in the minerals.

In 1870, 16 Stat. 291, 304, Congress established the office of surveyor general for the Territory of Arizona imposing upon the office all of the duties and limitations pertaining to the surveyor general of the Territory of New Mexico as provided in the statute creating that office, 10 Stat. 308, sec. 8.

In 1891 Congress established the Court of Private Land Claims, 26 Stat. 854, for the purpose of adjudicating all claims to lands in the several western territories, including the Territories of New Mexico and Arizona, the Territory of Arizona having been established as a separate territory in February of 1863, 12 Stat. 664 (Def. Ex. G-254, p. 315). This statute expressly provided that a confirmation of a claim to lands under the jurisdiction of the Court would not carry with it any right or interest in minerals unless the original grant specifically included such mineral right. The grant

61

of a land area did not imply or include any right or interest in minerals.

The Indian occupants of the Spanish and Mexican cession areas, including the Gadsden Purchase area, had no right or claim to minerals under the law or customs of either Spain or Mexico (Def. Exs. G-4, p. 35n; G-153; G-243; G-247) and it was the apparent understanding of those in charge of Indian Affairs in the United States Government that the Papago Indians had never been concerned with mining operations (Def. Ex. G-166).

The report of the "Committee of Eight" (Def. Ex. G-2), which recommended the establishment of the Sells Papago Indian Reservation and outlined the boundaries therefor, also recommended that the mineral lands of the reservation area be left open for public entry for mineral exploration and mining (Def. Ex. G-254, pp. 246-248).

In the same manner and consistent with the prevailing principles of law relating to minerals and mining rights in the land areas acquired from Mexico, when, by the Executive order of the President in 1917 a large area of land (2,600,000 acres) was withdrawn for the use of the Papago Indian Tribe of Arizona, the order expressly excluded all minerals and reserved unto the United States the right of public entry for mineral exploration and mining therein under the existing public mining laws of the United States (Def. Exs. G-128; G-145; G-153; G-179).

The Sells Papago Reservation was the only Indian reservation in which the mineral rights were reserved by the United States for the purpose of public entry

62

and exploration under the mining laws of the United States. It was considered that the Papago and other Indians in the Gadsden Purchase area had, under the United States, exactly the same rights they had under the sovereignty of Mexico and, since they had never engaged in mining before 1854, mining rights were not included in the use of the Sells Reservation (Def. Exs. G-3, p. 28; G-145; G-162; G-166).

In 1935 Dr. Underhill wrote (Def. Ex. G-3, p. 28) as follows:

> * * * It was the last reservation to be established and its provisions contained a ruling not made with other reservations, to the effect that the Indians' right to the land did not include a right to the minerals. The Indians were considered to have, under the United States, exactly the rights they had had under Mexico and, since they had never done any mining, mining rights were not included.

When the size and area of the proposed Sells Papago Indian Reservation was made public following the report of the "Committee of Eight" (Def. Ex. G-2), many protests were made by officers of the State of Arizona and numerous civic bodies concerning the resultant loss of such a large area of the state from its economy (Def. Ex. G-254, pp. 248-250). It was believed at the time that vast mineral deposits were located in the area of the proposed reservation which should not be removed from public development. Objection to the size of the land area in the proposed reserve was quieted when it was made known that the minerals therein would be reserved for public entry and

63

exploration under the public mining laws of the United States (Def. Exs. G-122; G-128; G-145).

In 1932 the Secretary of the Interior issued an order withdrawing the right of public entry for mineral exploration on the Sells Papago Indian Reservation. It was believed that although the Papago Indians were not entitled to any interest to the minerals in the reservation, the exploration and operation of the mineral areas resulted in interference with the administration of the reservation and the right of public entry was terminated (Def. Exs. G-119; G-121; G-128; G-142; G-150; G-163).

The order of closure was protested by many of the Papago Indians as well as the mining industry. Petitions were presented by the Papagos requesting that the closure order be withdrawn. The reason in support of the request was that the Papago economy was seriously affected by the closing of the mineral operations since a large number of the Indians found employment with the mining operations. In fact it was the chief source of wage income for the group at one time (Def. Exs. G-119; G-121; G-123; G-124; G-141; G-143; G-144; G-145).

Father Bonaventure Oblasser, the Franciscan missionary to the Papago Indians and their chief adviser and spokesman at this time (1933), disapproved the closure order and accordingly advised his superior church officer by letter (Def. Ex. G-123, p. 4) as follows:

> Tucson, too, was interested, since Mr. Graves had been instrumental in the signing of an order by the Secretary of the Interior, which closed the Papago Reservation to mining operations. This

64

order was against the wishes of the Papagos, who benefited by the presence of miners, and who had always allowed them free entrance, as long as they left undisturbed the surface rights of the Indians, since the hoary days of 1756. (see Bancroft). By the way, this order is a violation of the pledge given by the United States Government to the people of this state, when, at the time of the forming of the Reservation of 1917, it allowed mining operations to continue in the Papago Country.

Many other protests were made to the order of withdrawal of the right of public entry in the Sells Reservation by individuals (Def. Ex. G-163), by the State of Arizona (Def. Ex. G-128) and by many public organizations (Def. Exs. G-139; G-140) in the belief that the economy of the state would be affected by the withdrawal order. Also, there was a general opinion that the mineral operations within the reservation were not of disadvantage to the Papago Indians but in fact had resulted in beneficial improvements to the reservation and the Indians had been benefitted in their economy (Def. Exs. G-34; G-43; G-119; G-143).

In 1934 the withdrawal order issued by Secretary Wilbur was revoked by Congress, 48 Stat. 984, and the lands of the Sells Reservation, including the areas added thereto after the Executive Order of 1917 (Def. Exs. G-231; G-232; G-234; G-236), were restored to public exploration and mining operations under the general mining laws of the United States as provided by the first Executive Order of 1917. At this time in

65

order to compensate the Papago Indians for possible losses and damages to lands that might result from mining operations on the reservation, a rental fee payable to the Papago Indian Tribe was imposed on all mining operations within the reservation area (Def. Ex. G-233).

In 1937 when the purchase of the Menanger Dam area within the bounds of the Sells Reservation was authorized, 50 Stat. 536, provision was made for additional fees and liquidated damages to be payable to the Papago Tribe for the use of mineral lands in the reservation and for resultant damages to lands in the reservations adjoining the mining operations as well as for interference with or damage to water supplies, 50 Stat. 536 (Def. Ex. G-234).

In 1939 additional lands were purchased by the United States to increase the area of the Sells Reservation and these lands, when they became a part of the reservation, were made subject to mineral entry to conform to the restrictions in the Executive Order of 1917 (Def. Ex. G-236).

In 1955 by Act of Congress, 69 Stat. 67, the right of public entry to all mineral lands in the Sells Papago Indian Reservation was terminated and vacated (Def. Ex. G-237) and all minerals and mineral rights in said reservation lands merged with the title to the surface of said lands except the areas held under prior leases.

From the record and all of the evidence in this case it would seem clear that the mineral rights in the subject lands as claimed by the Papago Indians were distinctly different and separate from the surface and surface rights and that the mineral rights in the

66

claimed area were vested in the United States under the provisions and effect of the Gadsden Treaty and clearly were not subject to an Indian claim or right by Indian use or occupation in any aboriginal manner. But, as shown in the series of events related herein, the mineral rights in said claimed lands were at all times exclusively subject to disposition by the Congress of the United States.

### Finding 39

*Confirmed Land Grants and Spanish Titles in the Claimed Areas*

Numerous grants in fee were made to lands by the Spanish and Mexican Governments in the area under claim long prior to the date of the change in sovereignty under the Gadsden Treaty of 1854. Most of these grants were ratified and confirmed by either the Congress of the United States or the Court of Private Land Claims, established in 1891, so that said areas are not subject to a claim of aboriginal use and occupancy by Indians either Papago, Sobaipuri or others (Def. Ex. G-23; Def. Exs. 1; 250, Chs. III, pp. 6-7; IV, p. 59; 10 Stat. 308; 26 Stat. 854; Tr. 248-249).

### Finding 40

*There was no Taking of Papago Aboriginal Lands*

The area of country under claim by the Papago Indian Tribe of Arizona was acquired by the United States by the Gadsden Treaty or Purchase of 1854, 10 Stat. 1031, which was ratified on June 30, 1854 (Def. Ex. G-254, pp. 305-306). The territory so acquired was incorporated into the Territory of New Mexico by

67

Congress by the Act of August 4, 1854, 10 Stat. 575, and made subject to all of the laws of the territory.

The Congress in July of 1854, 10 Stat. 308 (Def. Ex. G-254, pp. 308-309), appointed a surveyor general for the Territory of New Mexico who was directed to ascertain the origin and nature of all claims to title to lands in the territory and to make report thereon to Congress. This statute also established donation grants to eligible residents and settlers of the territory depending upon the duration of use and occupancy of the lands claimed. Thus, when the area of the Gadsden Purchase was incorporated into the Territory of New Mexico, title to the lands therein became available to residents and settlers under the patent of the United States.

In 1856, the United States took military possession of the Gadsden area by sending to Tucson and Calabasas four companies of soldiers (Def. Ex. G-41, p. 496).

The United States held no treaties with the Papago Indians (Def. Ex. G-254, pp. 128-130).

Three Executive order reservations were established for the Papago Indians including the land areas which they had occupied or used at the date of the Gadsden Purchase (Def. Exs. G-179; G-226; G-254, pp. 34-35, 255-257).

When these reservations were established, the Indians were in no manner disturbed, dislocated or required to move to the reservations from their then habitations (Def. Exs. G-4, pp. 10-13; G-45, p. 10; Def. Ex. 111).

The Sells Papago Reservation substantially includes the aboriginal use and occupancy areas of the Papagos prior to 1854, and they have not been removed from the

68

lands which they occupied at the date of the Gadsden Purchase (Def. Exs. G-43; G-80, p. 397; G-254, pp. 133-134; Def. Exs. 139, p. 140; 250, Ch. IV, pp. 132-133; 252; 253).

The Papago Indians have been deprived of nothing to which they were legally entitled. In fact they have benefitted to a large extent by the white contact and the lands which they have occupied have in many instances been improved (Def. Exs. G-34; G-43, p. 26; Def. Ex. 250, Ch. V, pp. 6, 15-16).

Dr. Underhill, the foremost ethnological specialist in the study of the Papagos (Tr. 207), supports the view that the Papagos have not been deprived of their aboriginal land areas by either cession or removal. In one of her Papago studies (1946), she states (Def. Ex. 111, p. 4) as follows:

> It was not until the present century and the time of the first world war, that the main Papago reservation was established. It was the last of the Indian reservations and differed from most of the others in that it was not based on any removal, treaty or relinquishment of land. The Papagos continued to live where they were and, unknown to most of them, a governmental decree protected their habitat from encroachment by Whites.* * *

Also, in 1939 Dr. Underhill wrote (Def. Ex. G-3, p. 18):

> Between the Gila and the Altar stretched two hundred miles of desert whose full length Kino traversed only twice. Here lived those Pimas who, at present, bear the name of Papago. * * *.

69

> The villages are, at the present day, almost where Kino found them and they still bear the nickname bestowed by their neighbors, papavi o'otam, Bean People. * * *

Lumholtz who travelled in the Papago country in 1910 also shows in his report of this travel entitled *New Trails in Mexico* that the Papagos in 1910 have not been disrupted from their aboriginal occupancy area (Def. Ex. G-43, p. 16) as follows:

> The Papago Indians of to-day, the principal natives of the desert * * *. They occupy much the same land as they did when first discovered in the seventeenth century by the Spaniards. The region was early named Papagueria, or, in its greater extension, Pimeria Alta. It is part of the great arid region called the Sonora Desert.

In the report by Joseph entitled *Desert People* (1960) it is said (Def. Ex. G-45, p. 10):

> It is no wonder that the Papago were not pushed off their land as were many other Indians. This area is one of the hottest and driest in the country, a land in which, with experience and hard work, a family can make a living; but if offers little in the way of surplus.

Dr. Bolton, a leading historian wrote in *Rim of Christendom* (1960), a biographical study of Father Kino and his travels in describing the Pimeria Alta (Def. Ex. G-80, pp. 248, 396-397):

> West of Santa Cruz River were the Papagos, the name meaning "The Bean Eaters." They



70

lived in scattered villages and occupied a wide range. Some of the Papago settlements south of the Arizona line have been abandoned. North of that line the Papagos still lived in the same general area [1960] and to a great extent on the very sites they occupied in Kino's day. They are among the tribes which have been least disturbed by the white man.

\*        \*        \*        \*        \*

\* \* \* His [Kino] diary and .'iat of Carrasco from here [San Andres on the Gila] to Quitobac give us our first knowledge of a two hundred mile stretch across Papago Land. As we ride with him we too become explorers of a new region. The most remarkable thing about the journey is that Kino [1699] found the Papago villages exactly or nearly where they are today, [1960] and bearing the same names, to which he and Carrasco added the names of saints.

In 1916 the boundaries and area of the present Sells Papago Indian Reservation were recommended in a report by the "Committee of Eight" who were directed to make a study of Papago needs (Def. Exs. G-2; G-254, p. 246). The total area recommended was finally included in the present area of the reservation. When the Secretary of the Interior in 1916 wrote to the President of the United States approving the recommendations of the committee, he recommended the creation of a reservation for the Papago Indians to include the area proposed in the report and he stated (Def. Ex. G-254, pp. 247-248):

71

A careful investigation in connection with these Indians has been in progress during the past two years, from the information gathered it is conclusively shown that the Indians have been in undisturbed possession of the lands described \* \* \* for over three hundred years last past. Every consideration of humanity and justice, therefore, points to the necessity of establishing a permanent reservation for their benefit.

In 1960 in his study of the Indians of the southwest, Spicer, in *Cycles of Conquest* wrote (Def. Ex. 139, p. 140):

\* \* \* Not until 1917 was a reservation proposed for Papagos to embrace the area between Tucson and Ajo and south to the Mexican border. In 1918 the reservation was established by executive order to include two million acres, the disputed strip of territory through the center being excluded from the reservation. The reservation areas now covered practically the whole territory in which Papagos had established villages or over which they were accustomed to range. \* \* \*

The area referred to as the strip was restored to the reservation in 1931 (Def. Ex. G-232).

The defense village locations and the relative field and well locations as described by Hoover (Def. Ex. G-13) represented in the opinion of Dr. Hackenberg the aboriginal village areas as of the 1854 period and all of these villages and the field and well locations are within the bounds of the present Sells Papago

72

Indian Reservation, except the defense village of Quitovac in Sonora and its related field village on the international boundary line. The map of the Sells Reservation (Def. Ex. 253) illustrates the related location in terms of the aboriginal area of 1854 (Def. Ex. 250, Ch. IV, pp. 90, 132-133; Tr. 239-242).

The expanded village areas as described by the Clotts survey (Def. Exs. G-76; G-156; G-225) which followed the termination of the Apache hostilities are all within the bounds of the Sells Reservation as shown by the map (Def. Ex. 253; Tr. 260-261).

### Finding 41

### *Papago Indians Have Been Deprived of Nothing by the United States*

The Commission finds that the United States has not deprived the Papago Indians of any territory which they exclusively occupied on June 30, 1854, the date when the United States acquired from Mexico the area claimed by the Papago Indians.

73

### DEFENDANT'S OBJECTIONS TO PETITIONER'S PROPOSED FINDINGS OF FACT

### Finding 1

Objected to for the reason that the Papago Tribe did not constitute a separate and independent tribe from time immemorial since the Papago Indians had never been united under a centralized form of government prior to the establishment of the Indian Reorganization Act of the 1930's (Def. Ex. 250, Ch. III, pp. 24, 26).

According to the ethnologist, Dr. Ruth Underhill, "The Papago had no central government. Each village unit was autonomous and when two units occasionally joined, for war or games, the union was temporary" (Def. Ex. 20, p. 70).

### Finding 2

No objection. However, paragraph seven of the answer of defendant made no admission except as to the identity of the attorney of record for the petitioner.

### Finding 3

No objection. However, the Sells Papago Indian Reservation as finally constituted in 1940 (Def. Exs. G-179; G-232; G-234), includes substantially all of the aboriginal occupancy areas of the Papago Indians as of 1854-1860 (Def. Exs. G-3, p. 18; G-13, p. 257; G-45; G-80, pp. 248, 397; G-254, pp. 133-134; Def. Exs. 139, p. 140; 250, Ch. IV, pp. 132-133; 252; 253; Tr. 241-242; see Def. Reg. Fdg. 36).

74

### Finding 4

Objected to for the reason that the record in this case will not support the statement that the area described in this proposed finding was aboriginally used and occupied by the Papagos, as of the critical date in this case.

Much of the area was uninhabitable (Def. Ex. G-241).

The Santa Cruz Valley from the Gila River to Sonora was controlled and dominated by the Apache in the period of 1840-1860 and the valley was abandoned and deserted at that time except for the mission village at San Xavier del Bac, which was under the military protection of the presidio at Tucson (Def. Exs. G-79, p. 80; G-83; G-89; G-92; G-254, pp. 160-162, 174-175; Def. Ex. 250, Ch. III, p. 19).

The Ehrenberg map (Def. Ex. G-203) alone will show that the claimed area was not totally used and occupied as described in the mid-19th century period (Def. Ex. 250, Ch. IV, p. 117).

### Finding 5

Objected to, see reasons assigned in objection to Proposed Finding 4.

The evidence in the record clearly shows that there were no living streams in the "Papago Country" north of the international boundary line (Def. Ex. G-65).

Hoover says (Def. Ex. G-13, p. 258):

Water, or rather its absence, is the critical factor or resource of the Papagueria; limiting

75

in turn habitable sites where water may be had for domestic purposes; limiting the economically useful vegetation to short lived annuals and low scattered xerophytic perenniels suited to limited grazing; severely restricting the tillable lands in spite of extensive areas of flat land with deep fertile soils of the lime accumulating type. The rainfall varies from less than five inches in the west to as much as eighteen inches or more in the Baboquivari Mountains.

In recompense, the aridity has afforded a degree of security, for the area has offered little to hostile marauding Indians, or even to the covetous white man. Few white families could make a living on as much of this land as may support an entire Papago village. The very poverty of his land has been the Papago's guarantee, and his peaceful record is in large part due to the fact that he has had comparatively little provocation or interference. A high degree of adaptation through centuries of adjustment, combined with a low standard of living, have made it possible for over 5,000 Papago to live on about 5,000 square miles of this region, desertic both in climate and resources.

The reference to lands east of the Sells Papago Indian Reservation as Papago domain is objected to as inaccurate and misleading since the evidence in the record is abundant and ample to show that there was no exclusive use and occupancy, aboriginal in its nature, by any Indian tribe in the Santa Cruz

76

Valley in the 1840-1860 period (Def. Exs. G-30; G-83; G-89; G-92; G-254, pp. 160-163, 174-175; Def. Ex. 250, Ch. III, p. 19; Tr. 197).

There is much evidence showing that the Papago Indians regarded the eastern boundary of the "Papago Country" to be at the Baboquivari Mountains, which is also the easterly boundary of the Sells Reservation (Def. Ex. G-254, p. 133). Some describe the Baboquivari Mountain range at this time as the division line between the Papagos and the Apaches (Def. Ex. G-24, p. 37).

Lumholtz, the traveller, says (Def. Ex. G-43, p. 16) that the eastern boundary of the area of residence of the Papago is the Baboquivari Mountain range.

In 1859, Walker, the Papago Indian agent, in his report to the Commissioner of Indian Affairs said that the "* * * Papagos live distant from Tucson (agency location), four days travel through a desert plain. The villages have no running water, the flood tanks soon become dry and the Papagos are forced to find employment wherever they can * * *" (Def. Ex. G-85, pp. 351-352).

In 1862 the agent wrote about the decline of the area of southern Arizona after the Spanish left. The entire country was in a destitute condition for many years (Def. Ex. G-89).

In his report for 1863 the Commissioner of Indian Affairs wrote that the big problem for the Papagos was that they had no water (Def. Ex. G-90).

77

## Finding 6

Objected to for the reason that there is no evidence of any actual merger either in fact or in law between the two independent Piman tribes, Sobaipuri and Papago, that would lay the base for a claim by the Papago Indians to abandoned areas in the Santa Cruz Valley once occupied by the Sobaipuri but deserted under pressure from the attacks of the Apaches.

There was no merger of the Sobaipuri and Papago Tribes of the Piman family. They were separate and distinct tribal groups, occupying separate aboriginal areas until the Sobaipuri Tribe was annihilated by a combination of two factors; (1) the Apache raids in the San Pedro and Santa Cruz Valleys and (2) disease (Def. Exs. 20, p. 23; 135, p. 175; 250, Ch. IV, pp. 142, 148).

Leading ethnologists and historians, including Underhill, De Peso, Bolton and Bancroft (Def. Ex. 251) as well as Henry Dobyns (Def. Ex. 135) so regard them.

The Sobaipuri occupied the San Pedro Valley, east of Santa Cruz, from earliest time and were finally forced by Apache pressure to withdraw in 1762 to the Santa Cruz Valley to the west. They settled there as refugees in the mission villages and at Tucson. At this time the Papago Indians were brought to the missions in the Santa Cruz Valley (Def. Ex. 250, Ch. IV, p. 148) since there were no missions in the Papago country. It was said that the Papago country could not maintain one mission (Def. Ex. G-254, p. 158).

The Papago Indians at no time occupied the vil-

78

lages in the Santa Cruz Valleys, as aboriginal occupants, holding exclusive control of a defined area against all others. Wherever they went in the Santa Cruz Valley they found other occupants (Def. Ex. 250, Ch. IV, p. 156).

Tucson was a presidio from 1775 and its population subsequent to that date was a mixed group of Europeans and Indians of various tribes (Def. Ex. 250, Ch. IV, p. 156).

Dobyns says (Def. Ex. 135, pp. 175-176):

* * * It is impossible to identify which San Pedro River Valley aboriginal settlements contributed to the surviving populace since the Sobaipuri withdrawal from the San Pedro in 1762 caught the Spaniards so by surprise that most details went unrecorded. All that can be said here is that the Sobaipuris did contribute some persons to the middle Santa Cruz River Valley settlements in 1762 since there were approximately 400 refugees roaming among the various Santa Cruz Valley villages besides the 250 who settled at Tucson and some others settled at Santa Maria Soamca.

*14. The Desert Papagos.* As the native riverine Indians perished in epidemics and endemic disease mortality and Apache raids, they were partially replaced in the Spanish missions by Papago neophytes from the deserts. Underhill noted that Apache attacks influenced modern Gila River Pima and Papago distribution greatly because "the desert Papagos seeped in" to take the place of their extinct relatives. It should be emphasized that disease mortality was much higher than war

79

casualties. San Ignacio, Magdalene, Bac and Tucson received heavy increments of Papago converts during the 18th century, and the middle Santa Cruz River Valley missions were no exception. Many of the 103 residents of Tumacacori enumerated in 1796 were identified as Papagos.

It is, therefore, necessary to keep in mind that the total depopulation of the middle Santa Cruz Valley wiped out not merely the local northern Piman population, but also additional contingents of unknown size from both the San Pedro River Valley to the east, and the semi-desert Papagueria to the west.

### *Extent of Depopulation*

The native Indian population of the middle Santa Cruz River Valley vanished between roughly 1700 and 1850, the major reduction occurring by 1800. The extent of depopulation has been indicated in the preceding outline of the documented history of settlement amalgamation which contributed to the survival of just one of the enduring northern Piman villages on this river, Bac. At least a dozen settlements existed in the middle valley during the first quarter of the 18th century, but only one remained at the end of that century, even with reinforcements brought from the San Pedro River and the desert to the west beyond the immediate Santa Cruz valley.

The occupancy of San Xavier continued to contain Sobaipuri in its mixture of use and occupancy. Dr.



80

Fontana in writing relative to the decline of the San Xavier mission in the period before 1848 (Pet. Ex. 175, p. 12) said, "The unattended building began to fall into ruin. The Papagos and Sobaipuris now living at Bac moved to salvage church furnishings by placing them in their homes * * *."

In 1775 San Xavier del Bac was described as a pueblo of Sobaipuri-Pima Indians (Def. Ex. 250, Ch. IV, p. 144). At this time the members of the Anza expedition were able to differentiate Papagos from Gila Pimas and Sobaipuri Pimas (Def. Ex. 250, Ch. IV, p. 144).

Further evidence that the Papago Indians were brought to the Santa Cruz Valley by the missionaries is shown in the excerpt from Whiting (Def. Exs. 70; 250, Ch. IV, p. 148):

> As the Pima population decreased in many of the frontier missions an attempt was made to replace them with Papago. An attempt to augment the population of Tumacacori and the neighboring mission station of Calabasas with Papago failed when the Papago fled back to their native villages in 1763 shortly before the Jesuit explusion.
>
> * * * there is very convincing evidence that many pagan Papago were added to the mission population in the early 1770's. In 1796 they constituted about one-half the total population.
>
> * * * The abruptness of this change indicates that most of these conversions were made at approximately one time, such as might have occurred had there been a concerted attempt to draw them

81

into the missions. These conversions must have taken place some twenty-five to thirty years before the date of the census, i.e., 1766-1771.

However, in 1851 the entire Santa Cruz River Valley was abandoned as the result of Apache raids and depredations, except the villages of Santa Cruz (in Sonora) and Tucson, where a Mexican presidio had been established many years earlier (Def. Exs. G-79, p. 80; G-254, p. 162).

Sylvester Mowry of the United States Army visited the Santa Cruz Valley in 1851 and he reported in part (Def. Exs. 116, p. 187; 250, Ch. IV, p. 151; Tr. 217):

> The towns and settlements in the Santa Cruz valley are Santa Cruz and San Lorenzo (south of our line), Calabazas, Tumacacori, Tubac, Sopori, the mission of San Xavier, and Tucson. Santa Cruz, Tubac and Tucson were presidios. With the exception of Santa Cruz and Tucson, this entire valley was abandoned to the savage Apaches at the time of my first visit in 1851, and the population of these was greatly diminished; * * *.

The remainder of the Santa Cruz Valley at this time was devoid of Indian settlements and abandoned (Def. Ex. 250, Ch. IV, p. 150).

Dr. Hackenberg has said in his report (Def. Ex. 250, Ch. III, p. 1) that the Sobaipuri and Papago are separate and distinct tribes. In his plan for establishing the identity of the Papagos, Dr. Hackenberg states (Def. Ex. 250, Ch. III, p. 1), "The identity of the Papagos will first be established by setting them and

82

their territories apart from those of their non-Papago neighbors: Yuma, Maricopa, Yavapai, Pima, Apache, and Sobaipuri."

In the further identification of the Papago neighbors in the Papagueria, Dr. Hackenberg says (Def. Ex. 250, Ch. III, p. 2):

> *Sobaipuri Indians.* A group recognized as separate from the Papagos through the 17th and 18th centuries. Extinct as a separate tribe by the 19th century. Sobaipuri were occupants of the San Pedro and Upper Santa Cruz River valleys.

The story of the decline of the Sobaipuri is told by Dr. Hackenberg in Defendant's Exhibit 250, Chapter III, pages 3-5.

In the retreat of the Sobaipuri before the raiding Apaches, they scattered to several areas beyond the Santa Cruz and San Xavier areas (Def. Ex. 250, Ch. III, p. 4).

From the *Rudo Ensayo* (Def. Ex. 25, p. 41):

> The most warlike among all the Pima (tribes?) are those we call the Sobaipuris, for they are born and reared on the border of the Apaches; but they have become tired of living in constant warfare, and have, during the present year of 1762, abandoned their beautiful and fertile valley, retiring some to Santa Maria Soanca, and some to San Xavier del Bac and to Tucson, thus leaving to the enemies a free entrance to the high region of the Pimas.

83

### Finding 7

Objected to. The exhibits and documents referred to do not support the claim that the area bounded and described in Petitioner's Proposed Finding No. 4 "* * * has been identified consistently as the domain of the Papagos."

There is no evidence in this record that will in any manner support the contention that the Papagos were at any time prior to 1854 aboriginal occupants of any part of the San Pedro River.

Documents cited in support of the claim of aboriginal use and occupancy in the Santa Cruz Valley by the Papago Indians show that prior to 1800 the Santa Cruz Valley was used and occupied from time to time by several different tribes of Indians as well as Mexican residents (Def. Ex. 250, Chs. III, p. 7; IV, p. 156).

Further it is clear from these several documents, including Anza (Pet. Ex. 17a) and Bringas (Pet. Ex. 25), that the "Papago Country" was west of the Santa Cruz River Valley and that all of the Spanish Indian missions were in the Santa Cruz Valley. There were none in the Papago country within the area of the Gadsden Purchase (Def. Ex. G-253, p. 158), and all except three of the many Spanish missions were in Sonora, south of the international boundary line.

But notwithstanding all of the claims made for the historical documents cited in the proposed finding, it is true that "The Apache Indians, who inhabited the country east and north of the Santa Cruz and

84

San Pedro Rivers, made frequent raids upon the Sobaipuris, Pimas, and Papagos from early in the eighteenth century. The Sobaipuris were exterminated and the Pimas and Papagos forced to abandon the Santa Cruz River. These raids continued up until about 1870, * * *" (Def. Ex. G-254, pp. 160-161).

The Bringas report dated 1796 (Pet. Ex. 25) has a description of the "Papago Country" at page seven. In order to understand the full extent of this description of the area and its comparative location in relation to the Santa Cruz River Valley north of the present international boundary line, one should locate on a map of the Spanish mission areas the Spanish mission of Caborca, which is about 60 miles south of the international boundary (Def. Ex. 76), and then trace the geographic directions of the Bringas statement which are:

> If your Majesty would deign to turn your fine attention to the map which I insert, you will find that the numerous nation of the Papagos covers an extension of 80 leagues of land. Almost in a square, in more than 15 rancherias located almost from southeast to northwest, from the outskirts of the mission of Caborca running almost in a parallel of 18 villages which, with the exception of the presidios, are in the care of my College, and ending near the banks of the Gila to the west of the Gila Pimas, this nation which borders on the number of 40 souls, always allied with the Gilas, constantly enemies of the Apaches, continually accustomed to our towns.

85

peaceful and subordinate to the orders of the captains of the presidios of Altar, Tubac, and Tucson, and who yearly, although it is a very small number, gather to the fold in the Church of our missions: This nation which is subordinate to the direction of the judges who, of their very number, assign the said captains to them, is one of those (nations) which most needs the benign protection of the sovereign, and which, reduced to missions, would strengthen the passage for those (nations) of the Gila and would form a double line of communication between our old nations and the new ones, making sure in this way of the progress of both pacifications without leaving at our backs any nation which does not acknowledge law and submission.

This is a description of the Papagueria both south and north of the international boundary line and the principal villages or rancherias of the Papagos are placed by this description north of the boundary line and west of the Baboquivari Mountain range and not in the Santa Cruz or San Pedro River Valleys.

The Bowie report of the Papago Indians gives an account and description of the conditions of the Santa Cruz Valley from mission period to the Gadsden Purchase (Def. Ex. G-254, p. 162) as follows:

> The missions of Arizona, which, as heretofore indicated, were located solely on the Santa Cruz River, according to Bancroft, [no missions were ever established in that part of the Papago Country proper which was transferred to the

86

United States under the Gadsden Purchase (Def. Ex. G-254, p. 158)] had their days of greatest prosperity under the Franciscan Fathers during the period from 1790 to 1810. It seems that the Spanish Government adopted the policy of making gifts to the Apaches and dealing with them kindly with the result that a comparatively quiet period existed during the time stated. A presidio had been established at Tubac, on the Santa Cruz above San Xavier near Tumacacori, in 1752. This had been transferred to Tucson presumably about 1777. A company of Pima allies was organized at Tubac within a few years thereafter, which was supplemented later by Spanish soldiers. In 1826 a presidio was again established at Tubac in addition to the one at Tucson. These presidios formed the frontier outpost for that country from that time then until the purchase of that territory by the United States under the Gadsden Treaty.

Papagos were present at San Xavier as early as 1762, but it was a village of mixed occupancy (Def. Exs. 28, pp. 222-223; 250, Ch. III, p. 5).

The Papago Indians were brought to the Santa Cruz missions in the 18th century to replace the Pima and Sobaipuri who died in epidemics and Apache raids (Def. Ex. 250, Ch. IV, p. 148).

There were no Indian settlements on the Santa Cruz River in the 1750-1850 period except in the San Xavier—Tucson vicinity (Def. Ex. 250, Ch. IV, p. 149).

87

Dr. Hackenberg says (Def. Ex. 250, Ch. IV, p. 156):

* * * No evidence has been located to support the contention that at Tucson there continued to be a separate Indian community following the Anza expedition account of 1775, which was definite in its identification of the occupants of Tucson as "Pimas Altos."

One of the documents referred to by petitioner in this proposed finding relative to the "domain of the Papagos" is the report of Balthasar of 1744-1745 (Pet. Ex. 8) which gives helpful information on pages 78-89, 81-82:

* * * Beyond the last missions of Pimeria Alta there lies a broad belt of land of some sixty leagues. This region is dotted with the rancherias of a people descended from the Pimas, who are called Papagos, and they number about six thousand souls. All of this country is so wretched and so lacking in water that there is no spot where a mission pueblo could be established. These Indians, from sheer hunger, leave their native haunts in order to work in the missions and to steal whatever they can. With this they go back to their own lands and remain there for the rest of the year. I have seen very many of these people in the above-mentioned missions. They are a humble, servile, timid, and cowardly people. With little effort they could be induced to group themselves within our missions. Many of these who lived at not too great a distance

88

were thus brought together by Father Jacobo Sedelmayr and he intends to carry on this good work. But to complete it a certain constancy, fortitude, and just a hint, no more, of soldiery will be necessary.

The mission of San Javier del Bac is on the fringe of the land of these people. But it has rarely possessed a resident missionary although it is among the last of those founded through the munificence of the King. There is a bad lot of Indians here and they are poorly instructed. Moreover, there are those who abandon the mission because pueblo life is not to their liking. There are many and powerful medicine men here and they slay one another. The missionaries who have resided here have become bewitched and it was necessary to withdraw them before they should die. This mission requires the assistance of soldiers who will force these Indians to live in the pueblo, since they are baptized, to labor in their fields which are fertile, to punish the medicine men and, as a warning to others, to drive forth those who are most prejudicial to the common weal of the mission. * * * Thus some Papagos could be incorporated into this mission [San Javier del Bac] and a famous reduction could be created here, for this center is among the most populous of all.

The mission of Father Keller, Santa Maria Suamca, comprises many pueblos de visita whose inhabitants are badly trained and poorly in-

89

structed. His mission borders on the land of the Papagos * * *.

*     *     *     *     *

* * * In my opinion three or four missions can be formed on the banks of the Gila, because this is fertile country and there can still be seen the great reservior dug by the Mexicans. To these new missions those other Papagos should be assigned who would have made a part of the missions already organized in Pimeria Alta. Since this nation, as I have said, is scattered over sixty leagues of terrain, those who are closer could be taken in by Caborca, Tubutama, San Javier del Bac, Santa Maria Suamca, and Sobaipuris, and those farther away could become part of the new missions of the Gila Pimas. The Papagos are a people whom circumstances force to work for the Pimas and with slight differences they speak the same languge.

### Finding 8

Objected to for there is no evidence in this case that the Papago Indians engaged in cattle farming in the Santa Cruz Valley in the period of 1821-1854 (Def. Ex. G-254, pp. 13, 141-143).

Dr. Hackenberg said (Tr. 255) that the expansion of cattle raising took place in the 1870's. This date would relate to the termination of Apache raids (Def. Ex. G-254, p. 142). He also stated (Tr. 254) that the cattle farming area of the Papagos was west of

90

the Baboquivari Mountains in the region of the Mexican border, which would clearly indicate a location within the area of the Sells Papago Indian Reservation of 1917-40.

Further objection is made for the reason that the proposed finding undertakes to create an erroneous impression that, when the Santa Cruz Valley area was deserted and abandoned in the period of 1840 to 1860, only the whites withdrew and the Indians remained. This is contrary to the evidence in the record for the Apache raids resumed in intensity in 1840 and continued until 1870 and the entire area of the Santa Cruz Valley except at Tucson, the site of a presidio, was at this time completely deserted and abandoned by all. The Apaches controlled the use and occupancy of the entire area (Def. Exs. G-23, p. 290; G-24; G-30; G-35; Tr. 215-217).

The Papagos were located in the defense village complex (Def. Ex. G-13) west of the Baboquivari Mountains.

### Finding 9

Objected to for the reason that the area defined in Petitioner's Proposed Finding No. 4 is not the Papago domain as of 1854. See Defendant's Objection to Petitioner's Proposed Finding No. 4.

Objection is made to the claim for the Bartlett report of 1852. See the letter of Bartlett, boundary commissioner, in the Mowry report (Def. Ex. G-254, p. 174) as follows: "With the exception of Santa Cruz, ten miles south of the Mexican line, and Tucson, the entire Santa Cruz Valley was abandoned to the savage Apaches at the time of my first visit in 1851."

91

In 1855 Lieutenant Gray found the mission village at San Xavier del Bac deserted and the region controlled by Apaches (Def. Ex. G-254, p. 175). In his report for 1855 (Def. Ex. G-30, p. 32) Lieutenant Gray reported that in the period of 1850-1853, the area of the Santa Cruz and Gila Rivers in the east was deserted due to Indian depredations.

In Dr. Hackenberg's testimony (Tr. 215-217), he states that the Santa Cruz Valley was abandoned in 1854.

In 1857 Lieutenant Mowry of the Army reported to the Commissioner of Indian Affairs relative to the Indian tribes of Arizona and the Gadsden Purchase area (Def. Ex. G-83). At page 585 he said:

> * * * Until within a year or two past, the whole country, with the exception of a small district in the vicinity of Tucson, (an old Mexican town on the Santa Cruz river, near the centre of the Territory,) was in the hands of the Indians, and these Indians the Apaches. * * *

and at page 586:

> * * * The valley of the San Pedro is one trail much frequented by them; another is across the opening of the Santa Cruz valley to the north, near Tucson, and south by Sonoita, a Mexican village just on the boundary line between Sonora and the Gadsden Purchase, about one hundred and fifty miles east of the Colorado. There are several other trails used by them, and it is their habit to go by one and return by another. * * *

92

The claim to the great Ajo mine area here asserted by petitioners and its discovery by Papago Indians is based solely upon tradition according to the document referred to (Pet. Ex. 55).

There is no evidence in this record that the Papago Indians had occupied and used the village site and ore deposits at Ajo (Def. Ex. 250, Ch. IV, p. 21):

> * * * Confirmation of the absence of Papago cultural remains throughout the major portion of the western regions between the Growler Mountains and the Colorado River is found in the material culture collections made by Breternitz (Def. Ex. No. 52) and by Schroeder (Def. Ex. No. 39).

Dr. Hackenberg's report (Def. Ex. 250, Ch. IV, p. 114) relates sources for the information that the Ajo mines were visited in 1847 and were found abandoned, showing evidence of having been worked.

The Mexicans knew of this mine before 1800 (Def. Ex. 250, Ch. IV, p. 113).

The Ehrenberg map of 1858 (Def. Ex. 75) does not show an Indian village at Ajo (Def. Ex. 250, Ch. IV, pp. 36-37, 116-117).

Dr. Hackenberg's report (Def. Ex. 250, Ch. IV, p. 41) says, "The Indian settlement at Ajo, dated by Childs as no earlier than 1884, is described by Clotts * * *" who says that this point is the westerly limits of the Papago Indians in Arizona (1914) (Def. Ex. 4, p. 57).

Dr. Hackenberg states (Def. Ex. 250, Ch. IV, p. 45):

> 5. Other settlements, such as the Ajo Indian Village, and settlement at Darby Well, Bacamote,

93

Child's Ranch, Cipriano's Well (El Pozo), and Chico Shunie's Well, are clearly much more recent than the date of the Gadsden Purchase, even though each has some claim to consideration as an instance of Indian land use or occupancy. According to the definitions and terms employed in the present study, however, such use and occupancy is not aboriginal.

and at page 112 further states:

> Between 1848 and 1875, the calendar stick record reports almost three decades of events pertaining to Papago life at the time when Apache hostilities had them confined to defense village units of residence and land use. * * *

### Finding 10

Objected to for the reason set forth in Defendant's Objection to Petitioner's Proposed Finding No. 4 and further for the reason that this claim that the Papago homeland can be located by defining the boundary locations of those tribes in nearest proximity to the areas claimed is erroneous.

Dr. Hackenberg states (Def. Ex. 250, Ch. III, p. 1):

> * * * The identity of the Papagos will first be established by setting them and their territories apart from those of their non-Papago neighbors: Yuma, Maricopa, Yavapai, Pima, Apache, and Sobaipuri. This is the technique of residual definition. It presumes that the territory used and occupied by the Papagos fell within the area re-

94

maining after the location of all surrounding groups has been fixed. This does not mean that the Papago Indians made use of the entire tract of land unoccupied by any other Indian tribe. Vast areas were unusable for environmental reasons, or because of vulnerability to Apache attack, even though unoccupied by the permanent settlements of any other Indian tribe. Residual definition establishes the perimeters of the tract within which the territory of the Papagos may be delimited, however.

In *Cycles of Conquest* by Edward Spicer (Def. Ex. 139) at page 140, he states in discussing the Papago development and governmental aid:

> * * * Not until 1917 was a reservation proposed for Papagos to embrace the area between Tucson and Ajo and south to the Mexican border. In 1918 the reservation was established by executive order to include two million acres, the disputed strip of territory through the center being excluded from the reservation. The reservation areas now covered practically the whole territory in which Papagos had established villages or over which they were accustomed to range. * * *

The description of the Apache area is objected to for it is not correct. The Bowie report (Def. Ex. G-254, pp. 160-161) states:

> The Apache Indians who inhabited the country east and north of the Santa Cruz and San Pedro Rivers, made frequent raids upon the Sobaipuris,

95

Pimas, and Papagos from early in the eighteenth century. The Sobaipuris were exterminated and the Pimas and Papagos forced to abandon the Santa Cruz River. These raids continued up until about 1870, after which time United States troops got control of the situation * * *.

*        *        *        *        *

On account of these raids of the Apaches in the Papago Country, the Papagos, as it later appears, resided in quite large settlements, for defensive purposes.

The description of the location of the Apache country as well as other tribes in Pimeria is employed in order to define and locate the periphery of the homeland of the Papago Indians in 1854 and is a method both inaccurate and misleading. If Apache country is to be referred to for the purpose of establishing the periphery of Papago territory, reference must be made not only to the area which the Apaches actually occupied, but also to that area which they so completely dominated that it could not be occupied or used by others.

The Apache raids in the San Pedro, Santa Cruz, Gila and Ajo Valleys resumed in 1811 to such point of frequency and intensity that in the mid-19th century Spicer (Def. Ex. 139, p. 241) wrote:

> * * * During the 1850's the Apache raiding extended more widely than it ever had before. Not only was central Sonora raided repeatedly along with eastern Sonora, but now the raids extended to Tucson and even west of the Santa Cruz River

96

well into the country of the Papagos. The Mexicans seemed powerless, as had the Spanish before them, to devise any lasting means for bringing about peace on the margins of the Apache territory. This was the situation when the Anglo-Americans took over control of southern Arizona in 1853.

Spicer (Def. Ex. 139, p. 237) on a map showing the Apache area of control in this period of time described the area of the Santa Cruz Valley from the Pima on the Gila to the Sonoran area as the "Apache Corridor."

Dr. Hackenberg summarizes the extent and effect of the Apache raids as follows (Def. Ex. 250, Ch. III, p. 19):

1. At mid-19th century, the Santa Cruz Valley from the Pima villages to the Mexican border was an Apache "corridor" employed for conducting raids against the Pimas, Papagos, and Mexicans in Sonora. The exception to this statement occurs in the immediate vicinity of Tucson, including the settlement at San Xavier del Bac, which Mexicans and Papagos continued to inhabit throughout the period. Intermixed with the Papagos at San Xavier were remnants of the Sobaipuri who had previously occupied Tumacacori, Tubac and settlements on the San Pedro River to the east. This statement does not imply that the "corridor" was land occupied or used beneficially to contribute to Apache subsistence. But simply that it was uninhabitable by anyone else as a result of Apache activity.

97

In his testimony, Dr. Hackenberg discussed the Apache raids in the Santa Cruz Valley. There were no Indian villages in the upper Santa Cruz Valley between Tucson and the Gila River in 1848 (Tr. 216).

Dr. Hackenberg stated that the Boundary Commissioner, Bartlett, found the Santa Cruz Valley below Tucson abandoned in 1852 (Def. Ex. 30, pp. 285-302; Tr. 216-217). Mowry found the entire country from the Gila River to the border, except Tucson, abandoned to the Apaches in 1851.

Dr. Hackenberg further concludes (Tr. 222) from the historical reports that the Gila River was unoccupied at the date of the Gadsden Purchase and that a raiding corridor extended from Gila Bend south toward Sonoita.

The statement of Rose (Def. Ex. 218) shows that at this time Tom Childs, Sr., found the Ajo copper mines abandoned (Tr. 222).

Poston, on his visit to Ajo in 1854, mentions no occupation there and the Ehrenberg map of 1858 shows no village at Ajo (Tr. 222).

Dr. Hackenberg documents three Apache massacres (Tr. 250) in the 1840's and 1850's that are reported by the Pima and Papago calendar sticks. They occurred at Red Rock, Table Top Mountain and Mesquite Root, all in the area west of the Baboquivari Mountains. Table Top Mountain is the line of the boundary between the Pima and Papago (Tr. 250).

Dr. Hackenberg (Tr. 251) states that the village settlement locations of the Papagos were determined by these Apache raids at the date of the Gadsden Purchase.

98

The Ehrenberg map (Def. Ex. G-203; Def. Ex. 250, Ch. IV, p. 117; Tr. 252-253) locates the Papago villages on the basis of personal surveys which he and Poston made in 1854, and the village locations correspond to the defense village study of Hoover (Def. Ex. G-13) who reported the Papagos before 1860 (Def. Ex. 250, Ch. IV, pp. 80-85) to be located in large defense settlements west of the Baboquivari Mountains, due to Apache control of the east and west areas of central Papagueria (Def. Exs. 20; 48).

Dr. Hackenberg in his report (Def. Ex. 250, Ch. IV, pp. 80-81) states:

> The central zone of the Papagueria has been recognized as the homeland of the Papago Indians by every ethnographer who has studied them. The problem of how they should be categorized for classificatory purposes has never been resolved. Hoover (Def. Ex. No. 48) takes the position that the group should be divided in terms of defense villages. The defense villages were concentration points to which members of scattered field and well villages took refuge in the years between 1830 and 1880 when continuous raiding by the Apaches made this necessary. The old defense villages began to break up in the 1870's as people either returned to field and well villages previously occupied, sought work at the mines reopened since the Civil War, or entered the cattle business at new locations more favorably situated with respect to wells and pasture. * * *

99

The Chapman report of 1858 (Def. Ex. 250, Ch. IV, pp. 118-120) after a council with the Papago chiefs at Tucson (Def. Ex. 145) reads (Def. Ex. 250, Ch. IV, p. 120):

> These Indians seem to have selected these locations for their towns on account of the Apaches. To them, now, the Apaches cannot approach, without crossing extensive arid plains.

So, it would seem that the Proposed Finding No. 10 in its evaluation of the Apache country and boundaries is not helpful in location of the Papago aboriginal occupancy areas as of 1854.

The raiding habits of the Yavapai, in the same manner as the Apache Tribe, has directly affected the aboriginal occupancy areas of the Papagos.

Dr. Hackenberg's testimony (Tr. 220-222) tells of a raiding path or corridor used by the Yavapai in the 1850's extending from Gila Bend Mountains south through Ajo to Sonoita in Sonora. The Apaches used a trail at this time south through Ajo into Mexico. These raiding paths correspond to the western boundary of the Papago village areas (Def. Ex. G-13; Def. Ex. 253; Tr. 232).

Dr. Hackenberg (Tr. 222) summarizes the effect of the raiding areas through Ajo:

> We conclude from this that the Gila River was unoccupied at the date of the Gadsden Purchase and that a raiding corridor existed from Gila Bend south towards Sonoita. In confirmation of this latter point we have the statement from Rose in

100

Defendant's Exhibit 218, Page 15 that Tom Childs, Sr. found the Ajo Copper Mines abandoned by both Mexican and Papagos.

Again referring to the Papago aboriginal use and occupancy areas of the mid-19th century, Dr. Hackenberg in his testimony (Tr. 239) says:

* * * To the west boundary of this central Papago area a Yavapai raiding corridor existed as I have already indicated in discussing this western area and east of the Baboquivari Mountain an Apache corridor was located at mid 19th Century. The documents in support of which I have already discussed. Therefore, at mid 19th Century the central Papago country was circumscribed on these three sides by a Yavapai raiding corridor and an Apache raiding corridor and the Mexicans to the south and within this area, so identified we find the Papagos concentrated in what Hoover in Defendant's Exhibit 48 [Def. Ex. G-13] has referred to as defence villages [Def. Exs. 252; 253; Tr. 240]. * * *

### Finding 11

Objected to. There is no evidence in this record that the Papago Indians, particularly before 1854, devoted any part of their activities to the search for minerals. It has been shown (Def. Ex. G-166) that the Indians were not concerned with mining.

The implication in this proposed finding that cattle were owned and used by the aboriginal Papagos as a part of their "way of life" is not correct. Papagos

101

had very few cattle until the end of the Apache raids in 1870 (Def. Ex. G-254, pp. 141-145).

The statement in the "Supporting Evidence" to this proposed finding that Dr. Hackenberg changed his position and conceded that the Papagos made use of the Gila River Valley prior to 1854 is in our view not correct and the record (Tr. 233, 235, 272-274) amply speaks for the fact that Papagos never used the Gila River Valley.

### Finding 12

Objected to. There were no Papago Indians in the Santa Cruz Valley in 1854 except at the mission village at San Xavier del Bac. All other areas of the valley from the Pima villages to the international boundary line had been abandoned by reason of the Apache raids.

The Hackenberg report shows (Def. Ex. 250, Ch. IV, p. 112) that "Between 1848 and 1875, the calendar stick record reports almost three decades of events pertaining to Papago life at the time when Apache hostilities had them confined to defense village units of residence and land use * * *" (Def. Ex. 5).

The history of the Papago Indians would seem to clearly show that they went to the Santa Cruz Valley to populate the missions as neophytes and they did not occupy the land in the aboriginal sense (Def. Ex. 250, Ch. IV, pp. 139-149).

Dr. Hackenberg summarizes the findings thus (Def. Ex. 250, Ch. IV, pp. 149-150):

The conclusion indicated from this series of references to Indian settlement on the Santa Cruz

102

River between 1750 and 1850 is unmistakable: with the exception of the San Xavier del Bac-Tucson vicinity, the area was abandoned. While the question of Indian identity of the population components of the different villages on both the Upper and Lower Santa Cruz remains unresolved, it is of no real significance since the groups had ceased to occupy the area before the effective date of the Gadsden Purchase.

that the San Xavier settlement in 1850 was not exclusively Papago.

The documents and exhibits cited in "Supporting Evidence" to this proposed finding regarding use and occupancy of Ajo fail to establish this claim. There is no direct statement given on this point except in Petitioner's Exhibit 55 and that is based only on tradition.

Ajo does appear on the Ehrenberg map (Def. Ex. G-203) but only as a mineral location, not as an Indian village (Def. Ex. 250, Ch. IV, p. 107).

The historian Bancroft reports that (Def. Ex. 250, Ch. IV, p. 113) Poston made an exploratory trip through the Gadsden Purchase area in 1854-1855 and that "* * * The Ajo copper mines in the Sonoita region, which had been discovered by Mexicans, was worked by a San Francisco company from 1855. * * *"

### Finding 13

Objected to. There is no evidence or proof in this record that the Papago Indians in 1854 or within a reasonable time theretofore occupied exclusively the

103

area of country between the Growler and Gila Mountains.

The Santa Cruz Valley was vacated and abandoned in 1854 by Indians and others except for the mission village at San Xavier. See Defendant's Objection to Petitioner's Proposed Findings Nos. 5-12 inclusive.

Defendant further objects to the proposed findings for there is no evidence in the record to show that the Papago Indians made exclusive use, as of 1854 or prior thereto, of the following named areas for gathering purposes as set out in the proposed finding; namely, the foothills of the Santa Catalina, Tanque Verde, Santa Rita and Tucson Mountains.

The aboriginal area of the Sand Papagos (or Arenenos) was in the Pinacate Mountain area in Sonora with the principal village at Quitovac (Def. Ex. G-13, pp. 261-262; Def. Ex. 250, Ch. IV, p. 20).

This very small group ranged north in hunting activities into the United States at the village of Quitovaquito on the international boundary line (Def. Ex. 250, Ch. IV, p. 21). However, Dr. Hackenberg says that he has found no proof of use and occupancy of the areas to the west by Papago Indians.

Dr. Hackenberg further states, with reference to claims of use and occupancy in the areas of Tinajas Altas and the related country to the west and north, that there is no historical documentation of the use of these areas by Papagos subsequent to the date of the Gadsden Purchase and circumstances indicate, so he reports, that there was no such use and occupancy (Def. Ex. 250, Ch. IV, p. 45).

104

Dr. Hackenberg states further with reference to the Quitovaquito area (Def. Ex. 250, Ch. IV, pp. 45-46):

> The tradition of Sand Papago use of the Quito-vaquita Springs, and the Growler Well-Bates Well area also appears to be sound. For these locations, Sand Papago use and occupancy are supported by historical evidence either at the time of the Gadsden Purchase (Quitovaquita), or at the time the territory was first opened to non-Indian settlement (Growler Well-Bates Well).
>
> Other settlements, such as the Ajo Indian Village, and settlement at Darby Well, Bacamote, Child's Ranch, Cipriano's Well (El Pozo), and Chico Shunie's Well, are clearly much more recent than the date of the Gadsden Purchase, even though each has some claim to consideration as an instance of Indian land use or occupancy. According to the definitions and terms employed in the present study, however, such use and occupancy is not aboriginal.
>
> The remainder of the southern portion of the western zone [west of Growler Mountain] appears to have been devoid of aboriginal land use and occupancy by any identifiable Indian tribe at any historical period.

Dr. Hackenberg further states in his report (Def. Ex. 250, Ch. IV, p. 44) that ethnological sources agree that the Sand Papagos were the only users of the southern areas of the western Papagueria and the use was limited to Quitovaquito and there was no use of

105

the area to the west of that village (Def. Ex. 250, Ch. IV, pp. 44-45).

The Ehrenberg map (Def. Ex. G-203) shows all Papago villages at the time period 1853-1858 to be east of Ajo or south of the international boundary line (Def. Ex. 250, Ch. IV, p. 37).

Relative to the land use in the central Papagueria, Dr. Hackenberg states (Def. Ex. 250, Ch. II, pp. 32, 50):

> In the vast area between the Growler Mountains and the Baboquivari Mountains dwelt the main body of the Papago people, probably numbering between 2,500 and 5,000 at various times during the historic period. * * *
>
> *    *    *    *    *
>
> * * * in times of extreme hardship the Papagos, like other desert dwellers, consumed "just about everything that grew" (E. B. Sayles, personal communication). Likewise, the animals hunted by the Papagos included almost everything large enough to eat, insects and worms included, though large game was preferable. * * *

### Finding 14

Objection. It is recognized that the Papagos were hunters by necessity and utilized the aboriginal area for this purpose. However, as we have shown in our objection to Proposed Finding No. 4, the area claimed greatly exceeds the aboriginal use area according to the record.

106

### Finding 15

No objection. However, the uses claimed in this proposed finding were in no manner exclusive and the areas traversed for trading purposes were not used or occupied in such manner as to give rise to Indian title.

### Finding 16

Objected to. The proposed finding would give the impression that the country of the Papagos was a prosperous farming country.

Hoover states (Def. Ex. G-13, pp. 258-259; Pet. Ex. 201):

> Water, or rather its absence, is the critical factor or resource of the Papagueria; limiting in turn habitable sites where water may be had for domestic purposes; limiting the economically useful vegetation to short lived annuals and low scattered xerophytic perenniels suited to limited grazing; severely restricting the tillable lands in spite of extensive areas of flat land with deep fertile soils of the lime accumulating type. The rainfall varies from less than five inches in the west to as much as eighteen inches or more in the Baboquivari Mountains.
>
> In recompense, the aridity has afforded a degree of security, for the area has offered little to hostile marauding Indians, or even to the covetous white man. Few white families could make a living on as much of this land as may support an entire Papago village. The very poverty of his land has

107

been the Papago's guarantee and his peaceful record is in large part due to the fact that he has had comparatively little provocation or interference. A high degree of adaptation through centuries of adjustment combined with a low standard of living, have made it possible for over 5,000 Papago to live on about 5,000 square miles of this region, desertic both in climate and resources.

The Papago are the premier dry farmers, producing wheat on driest lands where it is known to be successfully grown, with as little as five inches of rainfall or less. Some years the crop fails entirely, for the rains do not always come. But yields as high as twenty-five bushels to the acre have been grown. A good harvest will furnish wheat enough to last several years, and the Papago have learned the wisdom of keeping a reserve on hand. After a crop failure they prepare for a new crop with as much care as if a harvest were assured.

In the Papago country, dependable sources of water and land which could be tilled were seldom found close together. The Papago adjusted themselves by a compromise between settled village life and nomadism through inter-village migration, commonly between two villages. Those of one type were reserve villages located at the foot of the mountains or in the foothills where there were sources of water that could be relied on. The other villages were out on the open plains adjacent to the fields and were farming communities temporarily occupied. In recent years, with the digging of deep

108

wells near the latter villages, their relative importance has been reversed and the inter-village migrations have lost their seasonal character.

Castetter and Bell state as follows (Pet. Ex. 214, p. 18):

Our Papago land as delimited is an arid, forbidding, isolated desert region in which life was conditioned largely by the scarcity of water. Long ago Font tersely aired his opinion of the area thus: "In short, in all this land of Papagueria which we passed through, I did not see a single thing worthy of praise." Formerly it was thinly populated throughout by Papagos who at present live almost wholly in its eastern and central portions. * * *

Joseph states as follows (Def. Ex. G-4, p. 10):

It is no wonder that the Papago were not pushed off their land as were many other Indians. This area is one of the hottest and driest in the country, a land in which, with experience and hard work, a family can make a living; but it offers little in the way of surplus.

*    *    *    *    *

Rainfall in Papagueria is not only scarce but unpredictable. * * *

109

### Finding 17

Objected to. Cattle raising among the Papago or in Arizona generally was of no consequence prior to 1870. The proposed finding creates an erroneous impression.

The Bowie report (Def. Ex. G-254, pp. 13-14) says:

* * * Very few horses or cattle were owned by the primitive members of the Papago Tribe until recent years,—one or two cows or ponies being about the average number owned by each family until very recently. Of course, these animals were introduced by the Spanish padres, and they were distributed through the missions. Outside of the Mission Indians few owned live stock. Very little land was used, therefore, for grazing purposes.* * *

Due to Apache raids in Arizona in the period of 1822-1872 the livestock industry was practically nonexistent (Def. Ex. G-39).

The testimony of Dr. Hackenberg (Tr. 254-256) shows that the Papago had few, if any, cattle before 1870 and that such cattle farming then was confined to the area west of the Baboquivari Mountains for the reason that the area had grass and afforded protection from the raiding Apaches.

Dr. Hackenberg quotes sources to the effect that Papagos had almost no cattle or horses (Def. Exs. 110; 250, Ch. V, p. 10; Tr. 255).

Dr. Hackenberg suggests (Tr. 256) that the cattle industry among Papagos in the 1870's began to develop

110

largely due to the arrival of the Anglo-Americans in the area.

In 1864 Ross Browne made a tour through the Papago country and he reported (Def. Ex. G-254, p. 187) *"* * * that the San Xavier Indians had only sufficient live stock for ordinary agricultural purposes.* * *"*

### Finding 18

Objected to. There is no adequate evidence in this record to establish a right in the nature of an aboriginal use in and to the minerals in the area of the Gadsden Purchase or any part thereof.

Under the laws of Spain and Mexico no one, either white or Indian, could acquire any right or interest to the minerals even though a discovery by exploration had been made without a special grant or license from the sovereign. The Crown held minerals under a separate title and estate from surface lands and always retained this estate until it was parted with under a specific transfer relating to minerals. See Defendant's Proposed Finding 38, relating to minerals (Def. Exs. G-142; G-249). *United States* v. *Castillero,* 2 Black 17, 167 (1862).

The United States Government has treated the estate or right in minerals in the same manner (see finding referred to above) and held this interest or estate subject to the control of the Congress (Def. Exs. G-91; G-128; G-145; G-247).

That there is no adequate evidence of an aboriginal mineral use by the Papago Indians in 1854 or prior thereto, see Bancroft (Def. Ex. G-41, p. 399):

111

Of mining operations in Arizona, during any portion of the Spanish or Mexican period, nothing is practically or definitely known. The records are barely sufficient to show that a few mines were worked, and that the country was believed to be rich in silver and gold. In several districts have been found traces of these early workings; * * *.

Indians are not mentioned relative to mineral operations.

Sylvester Mowry, an explorer in the Gadsden area before 1860 and later a mining operator, reported in 1859 (Def. Ex. G-12) that Spaniards and Mexicans had operated mines in the area but at the date of the Gadsden Purchase all were closed as a result of the Apache raids. He makes no reference to the operation of mines or minerals by the aboriginal Indians in the area.

In 1855 Major Emory, a member of the boundary line commission, reported (Def. Ex. G-62) that he saw everywhere the remains of mining operations conducted by Spaniards and later by Mexicans, that their prospecting was in progress and that a mine in the Ajo Mountains was then being operated. He described the location of many mining sites but he does not in any way connect aboriginal Indians with the mineral operations.

The one and only reference defendant has found of a substantial nature which refers to mineral use and operations by Papago Indians is that of Charles D. Poston, Superintendent of Indian Affairs for the

112

Territory of Arizona, who, in discussing the needs of the Papago Indians, wrote in 1863 (Def. Ex. G-90, p. 505) after listing by name 18 Papago villages:

The most of these villages are watering-places, around which these simple-minded people gather for the scanty sustenance accorded them by nature. Water, water, water, is the great desideratum.

The requirements of these Indians would be, first, the implements necessary to increase their supply of water and prepare irrigating ditches, then agricultural and mining implements. They wash considerable gold in the rainy season, which commences in June and last two or three months, with occasional showers in the winter. A number of very rich silver mines have recently been opened in their territory, and questions are already arising as to the rights of Americans, Mexicans, and Indians to the mines, wood, water, and grass in the vicinity.

In former times rich gold placers have been worked here, and as the drifted gold must have had some origin, it is probable that gold mines will be discovered in the vicinity.

The region abounds in copper ore of great richness, which, from its proximity to the Gulf of California, will soon be mined for transportation.

The Indians can be made useful to the Americans, and derive benefit from their enterprise, if their interests can be harmonized and protected.

113

The Mexicans of Sonora, to the number of several thousand, of the worst class, are mining and carrying off the ores and precious metals from this region, without paying any tribute to commerce or government. It scarcely seems proper to pay ten millions of dollars for a territory, and then allow the natural enemies of our race and nation to carry away the most valuable property upon it without let or hindrance.

The writing of Rose (Pet. Ex. 55, p. 2) cited by petitioner to support a claim to aboriginal use of the Ajo mines by the Papagos will be observed to be, when examined, based solely on tradition and would clearly have no factual value.

Dr. Hackenberg in his report (Def. Ex. 250, Ch. IV, pp. 40-41, 45) shows the date of Indian occupancy at Ajo to be after 1880 and the Childs letter (Def. Ex. 22) which is referred to in the report does not give any information concerning mining operations by Indians in the area.

Information that the Ajo copper mines were worked by a San Francisco company in 1855, was reported by Poston in 1855 according to the historian Bancroft (Def. Ex. 250, Ch. IV, p. 113).

Rose, who is cited by petitioner in the proposed finding, describes a visit to the Ajo mine by Childs (Def. Ex. 218, p. 15) in 1847 at which time the mines were abandoned but showed evidence of having been worked. Rose further reported (Def. Ex. 218, p. 23) that a Papago Indian told one Brady at Gila Bend about the Ajo mines and that in the next year, 1854, Brady opened



114

the mines with Indian labor (Def. Ex. 250, Ch. IV, p. 114).

### Finding 19

No objection, except to the reference to use of lands outside the Papago reservations.

### Finding 20

Objected to. As pointed out in Defendant's Objection to Petitioner's Proposed Finding No. 4 and subsequent findings, the area claimed in those findings as an aboriginal area of exclusive use and occupancy is not supported by the record.

### Finding 21

No objection.

### Finding 22

Objected to. The defendant has not failed to "respect and protect" the ancient homeland of the Papago. This is shown by the several reservations which have been established by the United States for the exclusive use of the Papago Indians (Def. Exs. G-179; G-254, pp. 211, 255).

At no time did the United States by the establishment of any of the reservations hereinafter described or in any other manner or by any order, require the Papago Indians to remove or relocate their homes or occupancy areas. The establishment of the Sells Reservation in 1917 did not involve the relocation of any of the Papago Indians (Def. Ex. 111).

The aboriginal use and occupancy area of the Papago Indians is included in the area set aside for them un-

115

der the Executive Order of February 1, 1917 to which has been added several tracts of land so that now a single area of approximately 2,750,000 acres is held and controlled for the exclusive use of the Papago Tribe.

The view is held in a wide variety of sources that the present Sells Reservation includes all of the aboriginal lands of the Papago Indians and that they have been in undisturbed possession, with few exceptions, for more than 300 years.

In 1916 when the Secretary of the Interior recommended to the President of the United States the creation of a reservation for the Papago Indians embracing the lands described in the report of the "Committee of Eight" (Def. Exs. G-2; G-254, p. 246) appointed to make recommendation upon the needs and problems of the Papago Indians, he said:

> A careful investigation in connection with these Indians has been in progress during the past two years, from the information gathered it is conclusively shown that the Indians have been in undisturbed possession of the lands described * * * for over three hundred years last past. Every consideration of humanity and justice, therefore, points to the necessity of establishing a permanent reservation for their benefit. [Def. Ex. G-254, pp. 247-248.]

At the mission village of San Xavier del Bac, a reserve of 70,080 acres was established in 1874 (Def. Exs. G-179; G-254, pp. 211-212). The area included was in excess of the area used and occupied in the mis-

116

sion village and adjoining areas according to Poston in 1863 (Def. Ex. G-90).

Historian Bolton's study of the missionary, Frances Kino, in *The Rim of Christendom* (Def. Ex. G-80, p. 248) refers to the Papago country thus:

> West of Santa Cruz River were the Papagos, the name meaning "The Bean Eaters." They lived in scattered villages and occupied a wide range. Some of the Papago settlements south of the Arizona line have been abandoned. North of that line the Papagos still live in the same general area and to a great extent on the very sites they occupied in Kino's day. They are among the tribes which have been least disturbed by the white man.

The substance of this statement will also be found in Hoover (Def. Ex. G-13), Joseph, *The Desert People* (Def. Ex. G-4), Underhill (Def. Ex. 20), Lumholtz (Def. Ex. G-43) and others. At page 397 of Defendant's Exhibit G-80, Bolton said in describing the journey of Kino south from the Gila to Quitovac:

> * * * The most remarkable thing about the journey is that Kino found the Papago villages exactly or nearly where they are today, and bearing the same names, to which he and Carrasco added the names of saints.

In 1960 Dr. Spicer in his volume on southwestern Indians entitled *Cycles of Conquest* at page 140 states that the present Sells Papago Indian Reservation in-

117

cludes all of the lands the Papagos used and occupied before the end of the Apache marauding and raids.

Dr. Hackenberg (Def. Ex. 250, Ch. IV, p. 90) says that all of the aboriginal defense villages of the Papago Indians before 1860, except Quitovac which is in Sonora and San Xavier the mission village in the Santa Cruz Valley, were located within the area of the present Sells Papago Indian Reservation (1964) (Def. Exs. 250, Ch. IV, p. 132; 252; 253; Tr. 241-242).

The Gila Bend Reservation was established in 1882 by Executive order in the country northwest of the Papago aboriginal area for the benefit of the Papago Indians who were working on the railroad in the Gila Bend area or who were there to establish fields after 1854 (Tr. 236).

### Finding 23

Objected to. There is no evidence in this record and none known to the defendant that would support the claim in the proposed finding that the Papago Indians obtained the food stuffs necessary to support the Papago population from the Santa Cruz Valley during the period of the Apache raids when the entire valley was deserted and abandoned except for the small group at the mission village at San Xavier.

Dr. Hackenberg in his report (Def. Ex. 250, Ch. IV, pp. 157-158) states:

> The final conclusion is that, as of 1848, there were no Indians living on the Santa Cruz River at any point between the present international

118

boundary and the Gila River except at San Xavier del Bac. * * *

However, the occupancy at this place was not an exclusive occupancy, for Dr. Hackenberg says (Def. Ex. 250, Ch. IV, p. 156):

The Papagos' claim to occupation of San Xavier del Bac at the time of the Gadsden Purchase appears to be a substantial one. However, there are no records to disclose the amount and location of lands actually in their possession at this time. It should be borne in mind that Tucson was a presidio of Spain following 1775, the date of its transfer from Tubac, and that its population subsequently (if not before) was a mixed group of Europeans and Indians of various tribal origins. Bartlett (Def. Ex. No. 30: 296-298) mentions only the Mexican garrison in residence at Tucson in 185?, and Cozzens in 1858-1859, reported that one-half the population of Tucson was "a mixture of Apaches, Papagos, Pimas and cut-throats" (Def. Ex. No. 141: 153). This need not be taken literally, but the population was undoubtedly a mixed one. No evidence has been located to support the contention that at Tucson there continued to be a separate Indian community following the Anza expedition account of 1775, which was definite in its identification of the occupants of Tucson as "Pimas Altos."

119

and at page 157:

* * * There is abundant proof that the area was abandoned at mid-19th century. While it is a hypothetical point, we may speculate that if it were not for the movement of the presidio from Tubac to Tucson, it would have been impossible for the community of San Xavier del Bac to have persisted.

At mid-19th century the Papago Indians as the result of the long period of Apache raids and terrorism which did not end until 1869, were concentrated in the Hoover defense villages (Def. Ex. G-13) behind and west of the Baboquivari Mountains.

Dr. Hackenberg (Def. Ex. 250, Ch. V, p. 3) says that these village units were small in number and that the special concentration was intense and that the "Apache Menace" was responsible. He here quotes Dr. Underhill:

* * * During the 18th and most of the 19th century there could be no daughter villages. That was the time of the Apache attacks when people were obliged to concentrate, and, no matter how far away their fields were, "They could not live apart. They were afraid."

The documents referred to in the proposed finding, namely, Ruggles (Pet. Ex. 253) and Bill (Pet. Ex. 88) do not place the Papago Indians in the Santa Cruz Valley at any time.

Dr. Hackenberg says (Def. Ex. 250, Ch. V, p. 4) further that the net result of the Apache hostilities, for

120

which there are many references for the mid-19th century, was to force a relocation of Papago settlements.

Dr. Hackenberg states (Def. Ex. 250, Ch. V., p. 6):

The removal of Apache pressure from the Papago communities was largely a phenomenon of the decade following the Civil War. Military installations were located east of the Santa Cruz Valley to protect its thriving mining activity, and the Papagos were incidental beneficiaries. Of primary importance in restraining the Apaches from Pima and Papago territory were Fort Lowell, Camp Crittendon, and Fort Huachuca had some effect.

By the middle 1870's, Apache pressure was removed from the Papago settlements. Coterminous, however, was their isolation from non-Indian interference. With the elimination of the fear of death, settlers were no longer restrained from the development of Southern Arizona. Instead of suffering from this interference, however, the Papago for the most part were participants in it.

The Papago Indians were in every way improved and benefitted as a result of the termination of the Apache hostilities, which permitted the expansion of the settlements from the defense villages and the advent of the non-Indian into the areas.

Dr. Hackenberg (Def. Ex. 250, Ch. V, pp. 1-2) summarizes the Papago development following the end of Apache hostilities which permitted the settlement expansion of the Indians as follows:

121

The expansion of Papago settlements from defense village units in the decades following 1870. This expansion is, in part, a result of expansion of economic opportunities resulting from settlement of non-Indians in this region after the Civil War. The principal development was the Papago cattle industry.

Also the advent of the white non-Indian at this time to engage in ranching and mining proved a great benefit to the Papago economy at this period (1860-1880) (Def. Ex. 250, Ch. V, pp. 15-16; Tr. 256-257).

Another important factor in Papago village expansion and relocation was the Papago fugitives from Mexico who came after the Apache hostilities ended to increase the village areas in the Sells Reservation (Def. Ex. 250, Ch. V, p. 8).

### Finding 24

Objected to. At the date of the Gadsden Purchase and prior thereto from 1848, the Santa Cruz Valley was devoid of all Indians except at the mission village at San Xavier del Bac as the direct result of the Apache hostilities.

It was only by reason of the military establishment maintained by the Mexican Government and later by the defendant that made it possible for the few to remain at the mission village during this period. The Apaches were not eliminated as a hostile factor until 1869. See Defendant's Objections to Petitioner's Proposed Finding No. 22.

122

The area of country claimed in the San Xavier Reservation as described in this proposed finding has never been exclusively used and occupied by Papago Indians in such a manner as would lay the basis of a claim of Indian title by exclusive aboriginal use and occupancy as of the date of the Gadsden Purchase of 1854.

The first Indian occupants in the Santa Cruz Valley were the Sobaipuris. The Jesuit missionaries, particularly Father Kino, founded a number of Indian missions in the Santa Cruz Valley, the most northerly being the one located at Tucson, San Xavier del Bac, about 1700. This mission was established for the Sobaipuri Indians (Def. Ex. G-254, p. 156).

The Sobaipuri group gradually deteriorated to extinction by reason of disease and the Apache raids, and the Papagos from the desert were brought into the Santa Cruz area to maintain the missions (Def. Ex. 250, Ch. IV, pp. 140, 142, 146, 148).

It is clear that neither Tucson nor the mission village area were ever occupied and exclusively used by the Papago Indians (Def. Ex. 250, Ch. IV, p. 156).

For many years during the Apache hostilities the church and mission at San Xavier del Bac was completely neglected and not used. It was not until 1864, ten years after the purchase of the Gadsden area, that the church activities were resumed (Def. Ex. G-254, p. 188).

The population at San Xavier for the year 1858 is given as 120 (Def. Ex. G-254, p. 178).

In 1863 Charles D. Poston, who had toured the Arizona mining areas with Ehrenberg in 1853 (Def. Exs.

123

G-203; G-254, p. 184), was appointed as Superintendent of Indian Affairs for the Territory of Arizona. He recognized that the principal village of the Papago Indians was at San Xavier del Bac and he recommended that a reservation for the benefit of the Indians be established at the mission. In a letter to the Commissioner of Indian Affairs in 1863 (Def. Ex. G-90, p. 505) he wrote:

> * * * I presume a league square around the mission church of San Xavier would include all the land they have in cultivation, and the water necessary for its irrigation. They have guarded this grand old church with religious reverence, and naturally they look upon it as their property held in sacred trust. [See also Def. Ex. G-254, p. 188.]

The population for the year 1870 as reported by Captain Grossman, the agent at San Xavier (Def. Ex. G-254, p. 212), was only 30 Indians.

Other agents including Davidson and Wilbur (Def. Ex. G-254, pp. 192-195, 207) recommended that a reservation be established at San Xavier for the Indians.

In 1874 the reservation at San Xavier was established by Executive order according to the recommendations of Dr. Wilbur as submitted in March of 1874 (Def. Ex. G-254, pp. 209-210) as follows:

> * * * with the exception of six sections of land located in the northeast corner of the tract recommended to be reserved by Dr. Wilbur, which were evidently excluded from the reservation on account of the fact that private parties owned

124

considerable improved land located within those sections. This accounts for the chimney shaped piece of land projecting toward Tucson, as this strip was not improved and was left in.

The agent for the year 1875 reported that there were 2,000 Indians on the reservation and in the vicinity of Tucson. The average number on the reservation has been about 400 since the reservation was created (Def. Ex. G-254, p. 212).

Bowie reports (Def. Ex. G-254, p. 212) that it is his information that the present inhabitants of the reservation all moved there after the reservation was created and that they came principally from the Santa Rosa villages.

Dr. Hackenberg in his report (Def. Ex. 250, Ch. IV, pp. 158-159) makes an interesting observation relative to the establishment of the San Xavier Reservation as follows:

It should be noted that, in the correspondence pertaining to the establishment of the San Xavier Indian Reservation in 1874, no reference to gathering areas was encountered. The reservation included the agricultural lands of the Papagos, and their source of irrigation water. The locations from which the San Xavier people secured wild plant foods such as sahuaro cactus and agave must have been beyond its limits. Sahuaro was probably secured very nearby in the Tucson Mountains, while the Santa Catalina Mountains and Rincon Mountains would provide resources for this plant as well. These mountain ranges also

125

contain sufficient agave to make them an attractive source of this food plant. The Santa Catalina Mountains were equally attractive to Apaches for this purpose.

This statement would seem clearly to negative the probability of exclusive use of the areas beyond the reservation by Papagos as of 1854.

### Finding 25

Objected to. The proposed finding undertakes to present a picture of wide and extensive land use and occupancy by Papago Indians much greater in scope and extent than the aboriginal use and occupancy areas of the 1854 period, the date of the Gadsden Purchase, giving rise to the erroneous inference that the land use and occupancy of the Papago Indians after 1870 was a continuation of the use and occupancy of the Papago areas of the aboriginal period.

Examination of the total history of the Gadsden area of the 1825-1875 period completely disproves the claim of petitioner to aboriginal use and occupancy of the extended areas claimed.

The first factor is that the long period of Apache raids and hostilities in Sonora and Arizona came to an end in 1870, resulting in expansion out from the Papago defense village units (Def. Ex. 250, Ch. V, pp. 1-10), and starting the great influx of Papago Indians and Mexicans from Mexico into southern Arizona. This movement from Sonora into the United States resulted from the internal pressures and civil unrest

126

in Mexico at this period (Def. Ex. 250, Ch. V, pp. 1, 8).

The literature and the reports of the Indian agents of the mid-19th century following the transfer of sovereignty refer to only one Papago Indian village to be found east of the Baboquivari Mountains at that time (Def. Exs. G-13; G-30; G-38; G-43; G-59; G-82; G-83; G-84; G-90; G-91).

For several years prior to 1854, the entire area east of the Baboquivari Mountain range which included principally the Santa Cruz Valley was deserted and abandoned except for the village at San Xavier del Bac mission (Def. Ex. 250, Ch. IV, pp. 149-158).

The Papago Indians at this time with the exception of the small number that were at the missions at Tucson, San Xavier, under the protection of the presidios at Tucson (Def. Exs. G-79, p. 80; G-254, p. 162) were located in the defense village units west of the Baboquivari Mountains (Def. Ex. G-38, pp. 50-51) in the area which was eventually to become the Sells Papago Indian Reservation (Def. Ex. 253; Tr. 231-232). A small group known as the Sand Papagos whose principal village was Quitovac (Def. Ex. G-13) had a temporary settlement at the village of Quitovaquito on the border near the village of Sonoita (Def. Ex. 250, Ch. IV, pp. 130-132, 149-151, 156-157; Tr. 240-241).

The Apache menace was eliminated about 1870 and the Papagos began to extend and increase their settlements beyond the concentrated village areas (Def. Ex. 250, Ch. V, p. 6; Tr. 243-244). This period of expansion continued for many years and the areas and villages were greatly amplified and extended over the

127

entire period by Papago Indians and Mexicans who came from the Sonoran area (Def. Ex. 250, Ch. V, pp. 7-10). This is the explanation for the large number of Papago villages reported by Herbert Clotts in his survey of the Sells Reservation area (Def. Ex. G-79) in 1914, as compared with the village locations of 1854 described by Hoover as the defense villages in mid-19th century which are located on Defendant's Exhibit 253 and shown thereon to be within the area of the Sells Reservation area, except San Xavier del Bac at Tucson and Quitovac in Sonora. The map exhibit (Def. Ex. 253) is a delineation of the defense villages and the field and well locations as of the period prior to 1860 as described by Hoover (Def. Ex. G-13; Tr. 260-261).

It will be observed that the Clotts maps (Def. Ex. G-225) of 1914 represent the same outside boundaries as contained in the map (Def. Ex. 253) which locates the defense villages and the well and field locations as described by Hoover (Def. Ex. G-13; Def. Exs. 250, Chs. IV, pp. 107-124; V, pp. 7-11; 252).

Dr. Spicer, one of the leading anthropologists of Arizona, in his volume *Cycles of Conquest* (1960) (Def. Ex. 139) is helpful in understanding the import of the Apache depredations on the Papago history following the Gadsden Treaty. At page 132 of Defendant's Exhibit 139 he states:

> * * * By 1800 there were no Pimans east of a line between San Ignacio near Magdalena and San Xavier. Many had been killed, and few had been absorbed into the central Sonoran communities of Opatas and Spaniards. The remaining Pimans,

128

who were not at the mission sites along the Santa Cruz and Magdalena, were living in desert villages in the present area of the Papagos or the river villages along the Gila. The Apache raiding affected them profoundly. The raids became more frequent during the 1830's and 1840's. In 1848, as the war between the Anglo-Americans and the Mexicans over Texas was ending, the presidio of Tubac was abandoned. The 1850's were a period of widespread Apache raiding extending through the whole southern Upper Pima country past the Altar Valley to the coast of the Gulf of California. Occasional harassment of settlements in what is now northern Sonora continued until the 1870's.

At the same time two different kinds of relationships with Mexicans developed in northern Sonora. In the first place, a certain dependency of the desert Pimans on the Mexican farmers and ranchers grew up. They often came southward into the Altar Valley especially to work in the harvest, taking goods and sometimes money back with them from these seasonal expeditions, but maintaining their homes far removed from their employers. On the other hand, Mexican settlers steadily encroached on Indian lands, and hostile relations also developed. These were most intense for the scattered rancherias in the northern Sonora valleys and at the margins of these valleys, where Mexican cattle raising became more and more important. They often involved small wars over water holes. Indians and, occasionally, Mexicans were killed. Fighting of this sort was

129

especially intense in the early 1830's and continued sporadically through the century. The hostilities were similar to those that took place between Seris and Mexican cattlemen. Slowly the Indians were killed off or, after the Gadsden Purchase in 1853, withdrew to the United States' side of the new international boundary.

* * * There were very few, perhaps not over a thousand in the whole of their territory included in Sonora after the Gadsden Purchase. * * *

Gradually crowded out of the Altar and Magdalena valleys into the desert, many emigrated northward into the Papago villages in the United States. By 1950 there remained in Sonora only some ten small villages with an over-all population of less than five hundred. The Pimans who remained in the Mexican towns in northern Sonora were nearly assimilated to Mexican ways.

and at page 134:

The incoming Anglo-Americans almost immediately began to make a distinction between the Indians who lived on the Gila River, whom they often called "Pimos," and those who lived farther south in the vicinity of Tucson and westward. For the latter they took over the term which had come into use among Spaniards for the desert dwellers north of the line of Altar River missions, namely, Papagos. As more Anglo-Americans entered the area this distinction became solidly established, so that the term "Pima" was applied exclusively to the residents of the Gila Valley, while the term

130

"Papago" came into use for all Piman-speaking peoples south of them.

\*     \*     \*     \*     \*

During the twenty years following the Gadsden Purchase, the Apache raids nevertheless continued. Small parties of Apaches continued to swing deeply into Papago territory. The small eastern outpost of less than two hundred Papagos at San Xavier del Bac continued to suffer occasional losses of young men or captured women and children. \* \* \*

and at page 136:

\* \* \* Even though there was no tribal-wide intervillage organization either for war or peace among Papagos, Indians in the desert area west of Tucson were brought into the coalition against the Apaches.

\* \* \* A survey was made which led to the conclusion that there were in the neighborhood of sixty-three hundred Papagos. A distinction was made between the two hundred Indians at San Xavier and the "nomadic" Papagos of the west. \* \* \*

and further at pages 138-139:

During this period when there was no government supervision among the main body of Papagos, important new developments in the distribution of population began to take place. The band-

131

ing together of Papago villages for defense was no longer necessary because of the cessation of Apache raids. Consequently small village units began to separate out from the confederated village groups throughout Papago country, increasing the number of separate settlements.

At the same time there was an augmentation of Papago population by migration of Piman-speaking people from Sonora. This was stimulated in part by friction with Mexican cattlemen, in part by job opportunities and better living conditions. In 1898 a battle broke out in a dispute between Papagos near the mine of El Plomo in Sonora and Mexican ranchers. So serious was the conflict that the Papagos involved fled for their lives to the United States. This was followed by other flights, so that the villages on the west side of the Baboquivaris increased in population. Many Sonoran Papagos also came to Tucson and took up permanent residence there. At the same time there was some movement of others from Sonora into the Papago country. Several hundred Yaqui Indians in flight from the deportation program of the Mexican government crossed the international line and settled in Papago villages on the west side of the Baboquivari Mountains and among Papagos who were living in Tucson. At the same time, the traditional visits to the Altar Valley by Papagos from the north were slowly cut off as extensive opportunities for work for wages in bad years began to appear with the coming of the railroad

132

through Tucson, the growth of irrigation in central Arizona, and many other opportunities of which the Papagos took immediate advantage.

The Gila Bend Reservation was reduced in area when it was determined that the area of land withdrawn in the order of 1882 was in excess of the area required for the small group of Papagos who had removed to the Gila Bend area.

The Commissioner of Indian Affairs in a letter in 1890 to the Secretary of the Interior reports upon the conditions then existing at Gila Bend and explains the reduction in area of the reserve which was created by Executive order in 1882. Petitioner's Exhibit 118 at page 3 reads as follows:

> The reservation in question embraces one township of land, less one section, and was established by executive order in 1882, for the use and occupancy of the Papago Indians then settled there and such other Indians as the Secretary of the Interior might see fit to settle thereon.
>
> There are ten Indian families—about forty people, men, women, and children—residing within the reservation so established. They cultivate small patches of ground in their rude way, and do odd jobs for the whites at the neighboring railway stations. Their huts are all in one quarter section, and their farming operations are confined to one other quarter section, where they cultivate about 25 acres, raising but scanty crops, owing to lack of a suitable system of irrigation.
>
> The reservation was set apart as a means of

133

> protection for these Indians against the whites who were trying to get them out of the country, and with a view to settling them upon individual tracts to which they might acquire permanent title; but owing to the difficulty met with in finding suitable lands that could be irrigated at a reasonable cost and where the Indians would consent to settle, the determined hostility of the whites against their remaining there, and the absence of any agent or other representative of the Government to look after them—the reservation is 60 miles from the nearest agency—the latter object (the allotment of lands in severalty) has failed of accomplishment, although the Indians have been protected from the attempted encroachments of the whites; at least they have not been dispossessed of the lands embracing their habitations. They probably belonged to that large community of Papagoes found scattered over the arid wastes lying between the Southern Pacific Railroad and the Mexican line. The Papagoes have no treaty relations with the Government, but a reservation embracing some 70,000 acres was set apart for them in 1874, by order of the President. (See also act of August 5, 1882, 22 Stats., 299.)

These Gila Bend families drifted north to the Gila River, attracted, no doubt, by the better conditions for cultivating the soil and the hope for securing employment from the whites, and but for the attempt on the part of the whites to have them forcibly removed, through false accusations respecting their conduct, it is not at all likely that

134

the lands embracing their habitations would have been withdrawn from settlement and set apart for their use. An entire township, 6 miles square (except one section), was withdrawn, not because it was all needed for the protection of the Indians, but because a surveyed township could easily be described and identified and would be sure to cover all the lands settled upon by the Indians, and with the purpose of restoring the surplus lands to the public domain as soon as allotments could be made to the Indians whose protection was the object mainly desired.

See also Defendant's Exhibit G-254, page 255, with reference to the reduction in area of the Gila Bend Reservation.

### Finding 26

Objected to. The import of this proposed finding is to the effect that, when the Papago Indian Reservations were finally established, many areas in use by Papago Indians as of the time of the allotment surveys by Aspaas (Def. Ex. G-161) in 1909-1911 were not included in the Sells Reservation area which was substituted for the allotment program.

The report of the Granville survey with attached map of the Papago occupancy areas as of 1911, clearly is in contradiction to the import of the proposed finding.

J. W. Granville, Superintendent of the Irrigation Branch of the Indian Service, in 1911 made an inspection tour of the Papago villages for the purpose of

135

ascertaining the conditions and needs among them (Def. Ex. G-254, pp. 228-230). His report with the attached map showing the proposed allotment areas is Defendant's Exibit G-183. His tour of inspection covered the area from the Baboquivari Mountains to the Ajo Mountains. The report reads at page 25 as follows:

> Nearly all of the nomadic Indians live in the Valleys between the Babouquivari and Ajo Ranges, and * * * Indian Oasis is a central point from which these Indians should be governed.

The report clearly shows that both the field and well villages of the Papago Indians were west of the Baboquivari Mountains and within the boundaries of the area included in the Sells Papago Indian Reservation when completed.

The allotment program, which was thoroughly examined in the effort to aid the Papago in holding the occupancy areas which they had used for many years, was abandoned when it was agreed that the individual allotments of the acreage assigned would not be adequate to sustain the allottee and his family due to the aridity of the country. The reservation program was deemed much more advisable for the needs of the individuals (Def. Exs. G-127; G-161; G-254, pp. 226-227).

The Granville map attached to the exhibit (Def. Ex. G-183) shows that the areas designated for allotments were within the area withdrawn for the Sells Reservation.

A brief history of the allotment program among the

136

Papago Indians is given in the Bowie report (Def. Ex. G-254, pp. 227-228, 230, 232-233).

In 1913 Mr. Oldberg, Superintendent of Irrigation for the Arizona area, recommended that the allotment plan be dropped since the result would be entirely inadequate for the needs of the Papagos (Def. Ex. G-254, pp. 235, 237).

In 1914 further inspections of the Papago areas were made resulting in the appointment of the "Committee of Eight" to recommend the boundaries of the areas to be withdrawn from the public domain as an Indian reservation in lieu of the allotment plan. The recommendation of this committee (Def. Ex. G-2) resulted in the establishment of the Sells Papago Indian Reservation (Def. Ex. G-254, pp. 245-257). The areas of the present Sells Papago Indian Reservation which had its beginning in this report is larger than the boundaries recommended in the committee report and it comprises, as of today (Def. Exs. G-179; G-181; G-231; G-232; G-234; G-236), substantially all of the Papago lands historically used and occupied by them in the mid-19th century, except the Mexican village at Quitovac and San Xavier (Def. Exs. G-80, pp. 248, 397; G-254, pp. 133-134; Def. Exs. 139, p. 140; 252; 253; Tr. 241-242).

The several men composing the "Committee of Eight" which proposed the boundaries for the Sells Papago Indian Reservation were men of experience in the Indian service or were well acquainted with the needs of the Papago people. Two members of the committee were "full-blood Papago Indians" (Def. Ex. G-254, pp. 246-249).

137

### Finding 27

No objection. It should be made clear, however, that when the area for the Sells Reservation was first proposed to include approximately 2,600,000 acres (Def. Ex. G-76, p. 35), many complaints were made by the State of Arizona and civic organizations on the theory that the large area was not justified in terms of the Papago Indian story and that removal of such an area of land from the economy of the state would be unduly detrimental to the public interest (Def. Ex. G-254, pp. 248-250).

The protest (Def. Ex. G-79, p. 36a) resulted in the elimination of an area of approximately 475,000 acres, known as "the strip" from the area described of 1916 (Def. Ex. G-76, pp. 36-36a). The strip was later restored to the reservation along with additional areas (Def. Exs. G-231; G-232; G-234; G-236), including the purchase of all private interests within the original bounds resulting in the present reservation with an area of approximately 2,800,000 acres (Def. Ex. G-181).

On May 27, 1955 by Act of Congress, 69 Stat. 67, the right of mineral entry in the Sells Papago Indian Reservation was terminated and all mineral rights not then under lease were deemed to be a part of the land and subject to the control and supervision of the Papago Tribe under special regulations (Def. Ex. G-237).

We repeat again that many commentators on the ethno-history of the Papago Tribe of Indians have written that the present Sells Papago Indian Reservation contains practically all of the aboriginal use and

138

occupancy areas of the Papago Indians of the period at and prior to the mid-19th century.

Underhill (1939) (Def. Ex. G-3; Def. Ex. 20) states that the Papago villages at the present day are almost where Kino found them.

Dr. Hackenberg says (Def. Ex. 250, Ch. IV, pp. 132-133):

> The information on the entire district of the central Papagueria, furthermore, indicates no occupied area which is not presently contained within the Sells Papago Reservation. * * *

Dr. Hackenberg further states (Def. Ex. 250, Ch. IV, p. 80):

> The central zone of the Papagueria has been recognized as the homeland of the Papago Indians by every ethnographer who has studied them. * * *

In 1960 Spicer wrote (Def. Ex. 139, p. 140):

> * * * Not until 1917 was a reservation proposed for Papagos to embrace the area between Tucson and Ajo and south to the Mexican border. * * * The reservation areas now covered practically the whole territory in which Papagos had established villages or over which they were accustomed to range. * * *

It is of interest to remember one of the unique features with relation to the establishment and location of the Sells Papago Indian Reservation and that is that it was one of the very rare occasions where such

139

an act did not involve a removal of the Indians or any relinquishment of lands.

The leading anthropologist of the Papago area, Dr. Ruth Underhill, comments (Def. Ex. 111, p. 4):

> It was not until the present century and the time of the first world war, that the main Papago reservation was established. It was the last of the Indian reservations and differed from most of the others in that it was not based on any removal, treaty or relinquishment of land. The Papagos continued to live where they were and, unknown to most of them, a governmental decree protected their habitat from encroachment by Whites. * * *

### Finding 28

No objection. It is of interest to note that the withdrawal order issued by Secretary Wilbur in 1932 closing the Sells Papago Indian Reservation to mineral entry brought vigorous protests from several quarters.

The Papago Indians filed a protest and petition requesting that the order be revoked so that private mining operations could be resumed.

The petition indicated that the Papago Indians had no interest in the minerals and mining operations except as laborers. At this time it was indicated that the Indians depended upon wages as mine laborers as the principal source of income (Def. Ex. G-119). Many protests from other interests were made to the withdrawal order (Def. Exs. G-123; G-128; G-163) which resulted in the recision of the Wilbur withdrawal order (Def. Ex. G-233).

140

### Finding 29

Objected to. There is no evidence in the record to show that Congress at anytime undertook to determine the so-called "Papago land title" to lands in Arizona.

The Papago reservations in Arizona were established by executive orders (Def. Exs. G-179; G-226; G-227; G-254, pp. 211, 247, 255). The modification of the area of reservations was effected by Congressional action, including the addition of several tracts to the Sells Reservation (Def. Exs. G-231; G-232; G-234; G-236; G-237).

The lands under claim in this suit were ceded to the defendant by Mexico under the Gadsden Treaty of 1853, 10 Stat. 1031, which was proclaimed on June 30, 1854, subject to prior valid accruing claims under the laws of Spain and Mexico (Def. Ex. G-23), as provided in said treaty.

The area of the Gadsden Purchase was incorporated into the Territory of New Mexico, subject to all of the territorial laws relating thereto on August 4, 1854, 10 Stat. 575.

The public lands of the territory of New Mexico were opened to public donation and disposition on July 23, 1854, 10 Stat. 308. A surveyor general was at this time appointed for the Territory of New Mexico to examine and report on all claims to lands arising under the laws of Spain and Mexico and to supervise the donation feature of the Act. At this time all lands in the Gadsden area, not under prior claim, were public lands of the defendant and were subject to public sale and other disposition. *Lockhart* v. *Johnson,* 181 U.S. 516 (1901).

141

Lands were disposed of from time to time including areas within the boundaries of the present Sells Papago Indian Reservation. These tracts were purchased by defendant, from the individual owners, for the reservation as it is presently constituted under the provisions of the Act of February 21, 1931, 46 Stat. 1202, cited in the proposed finding (Def. Ex. G-232).

There is no evidence in the record that, in the process of the location and establishment of the several Papago reservations for the use and benefit of the Papago Indians, the defendant entered into any treaty with the Indians; or that it caused any of them to surrender physical possession of any lands or holdings then in occupancy, or caused the said Indians to remove from any lands which they claimed in the Gadsden Purchase area (Def. Ex. 111).

The said Sells Papago Indian Reservation as now constituted includes all of the aboriginal village occupancy areas of the Papago Indians as of 1854, the date of sovereignty of the defendant to the area, except the village of Quitovac, which is in the Pinacate Mountain area in Sonora, and the mission village of San Xavier del Bac at Tucson (Def. Ex. 250, Ch. IV, pp. 86-90).

The record evidence does not establish exclusive use and occupancy which would support a claim of Indian title to any area beyond the limits of the boundary of the present Sells Papago Indian Reservation.

142

### Finding 30

Objected to. The record in the case discloses no evidence of any right or interest in minerals or mining in any part of the Gadsden Purchase area which would entitle the Papago Indians to lay the basis for a right of recovery in this suit.

See Defendant's Proposed Finding 38, relating to rights in minerals and mining.

### Finding 31

Objected to. The record as a whole does not support the claims made in this proposed finding, particularly with reference to the area of country described in Proposed Finding No. 4. See defendant's objections to all proposed findings and particularly to Proposed Finding No. 4.

143

### BRIEF AND ARGUMENT

The Papago Tribe of Indians of Arizona claims Indian title based upon alleged aboriginal use and occupancy of a large area of country situated in the present State of Arizona south of the Gila River, extending westerly from the westerly ridges of the San Pedro River Valley area to the Gila Mountains, the south line being the international boundary. It seeks to recover compensation for the taking of part of these lands and of the alleged subsurface rights therein. The area is described in detail in Petitioner's Proposed Finding No. 4 and shown on a map, Petitioner's Exhibit 275. The area of country which includes all of the lands claimed by petitioner was acquired by defendant under the Treaty or Purchase of Gadsden dated December 30, 1853 and proclaimed on June 30, 1854, 10 Stat. 1031. The claim is based upon alleged exclusive use and occupancy for a long period of time prior to the date of acquisition by defendant under the said treaty (Pet. pp. 3-4).

#### The Nature of the Papago Claim to Lands in Arizona

In the absence of a right or title to lands accruing under a grant or a recognition of a right by the Spanish or Mexican Governments, and no proof was offered in the record of such a right or interest, the claim in this case is limited to such rights as an Indian tribe may be entitled by virtue of exclusive use and occupancy of a defined area. This use and occupancy must be related to the date (1854) at which the defendant acquired sovereignty of the claimed lands and must

Case 1:26-cv-02127-RJL    Document 3-15    Filed 06/17/26    Page 155 of 237

144

be established and supported as continuous for a long period of time.

In the case of the *Confederated Tribes of the Umatilla Indian Reservation* v. *United States,* 14 Ind. Cl. Comm. 14, 116 (1964), the Commission said relative to the elements of proof required in a claim of Indian title by aboriginal use and occupancy:

> * * * that to prove original title the petitioner must establish certain basic facts: first, that at some period an Indian entity held exclusive use and possession of a specific tract continuously for "a long time" or "from time immemorial" as it is sometimes described, so that within such period original title developed in that entity; secondly, that this title was perfected in such entity before sovereignty of the United States attached to the land involved; and, thirdly, that such title was not lost or abandoned prior to the date of alleged extinguishment by defendant. * * *

and at page 118:

> While immemorial possession of an exclusive nature can only be inferred and requires a great amount of proof * * * it must be shown to have existed "for a long time" and from the use of the word "ancestral" appearing in the *Santa Fe Pacific Railroad Co.* v. *United States,* supra, decision, it would seem such period must encompass at least several generations: * * *

145

### The Pimeria and Pimeria Alta

The early maps of the Republic of Mexico, that is before 1850, designate the State of Sonora as the Pimeria due to the predominantly Indian population. Northern Sonora, the land of the upper Pimas was designated as Pimeria Alta and extended from the San Ignacio River north to the Gila River and from the San Pedro River on the east to the Gulf of California on the west (Def. Ex. G-18).

Father Kino was the first of the Jesuit missionaries to visit the Indians and explore this area. His first journey was made in 1687.

Dr. Bolton, one of the leading historians of the southwest, in his *Memoirs of Pimeria Alta* (1919) gives an account of this journey (Def. Ex. G-18, p. 50):

> Kino found Pimeria Alta occupied by different divisions of the Pima nation. Chief of these were the Pima proper, living in the valleys of the Gila and the Salt Rivers, especially in the region now occupied by the Pima Reservation. The valleys of the San Pedro and the Santa Cruz were inhabited by the Sobaipuris, now a practically extinct people, except for the strains of their blood still represented in the Pima and Papago tribes. West of the Sobaipuris, on both sides of the international boundary line, were the Papagos, or the Papabotes, as the early Spaniards called them. On the northwestern border of the region, along the lower Gila and the Colorado Rivers, were the different Yuman tribes, such as the Yumas, the Cocomaricopas, the Cocopas, and the Quiquimas.

146

All of these latter spoke the Yuman language, which was, as it is today, quite distinct from that of the Pima.

In 1700 Kino founded the mission of San Xavier del Bac near Tucson and, in the next two years, those of Tumacacori and Guebavi located south of San Xavier on the Santa Cruz River all in the present State of Arizona. He located many other missions but all were south of the international boundary line.

The three missions were established for the Sobaipuri Indians who had occupied areas on the San Pedro River before this time (Def. Exs. G-17; G-18, pp. 53, 119; G-80, p. 247).

In describing the Indians of Pimeria Alta visited by Kino in his missionary work Dr. Bolton writes in *The Rim of Christendom* (Def. Ex. G-80, pp. 247-248):

> * * * In the eighteenth century, after Kino departed, the eastern Sobaipuris were destroyed or driven from San Pedro River by the Apaches. Their descendants today, and the descendants of the Santa Cruz River group, are to be found mainly on the Pima and San Xavier reservations.
>
> West of Santa Cruz River were the Papagos, the name meaning "The Bean Eaters." They lived in scattered villages and occupied a wide range. Some of the Papago settlements south of the Arizona line have been abandoned. North of that line the Papagos still live in the same general area [1960] and to a great extent on the very sites they occupied in Kino's day. They are among the

147

> tribes which have been least disturbed by the white man.

In 1796 in his report to the King of Spain relative to conditions in the missions in Pimeria Alta, Father Bringas, as Dean of the "Colegio de Santa Cruz" (Pet. Ex. 25, p. 1) wrote:

> * * * as a result of repeated trips which have been made through these countries which include the missions of this College from the year 1768 to last year—1795, taking the heights of the places where there are some villages, or small gatherings (congregaciones); it is clear, Sir, the numerous nation of the Gentiles (heathens) called Papagos exceeds the number of 4,000 souls and is located and extended in 19 rancherias through the area of more than 80 leagues, almost from southeast to northwest, facing the 14 pueblos which form new missions * * *.

Several missions are listed in the report but only three, Tumacacori, San Xavier and Tucson, were north of the international boundary. At pages 7-8 of this exhibit the description of the Papago Nation continues:

> If your Majesty would deign to turn your fine attention to the map which I insert, you will find that the numerous nation of the Papagos covers an extension of 80 leagues of land. Almost in a square, in more than 15 rancherias located almost from southeast to northwest, from the outskirts of the mission of Caborca running almost in a

148

parallel of 18 villages which, with the exception of the presidios, are in the care of my College, and ending near the banks of the Gila to the west of the Gila Pimas, this nation * * * continually accustomed to our towns, peaceful and subordinate to the orders of the captains of the presidios of Altar, Tubac, and Tucson, and who yearly, although it is a very small number, gather to the fold in the Church of our missions: * * *

Examination of a map of Pimeria Alta (Def. Ex. 139, p. 122) in the mission period prior to 1800, showing the location of the mission Caborca, will show that the area of the location of the Papago Nation, as described by Father Bringas quoted above, lies altogether west of the Baboquivari Mountain range.

Bowie in his report (Def. Ex. G-254, p. 18) states:

> * * * The Spanish padres never established any mission in that part of the Papago Country proper which is located in what is now Arizona. The San Xavier Mission, on the Santa Cruz River, above Tucson, although for many years past a Papago Mission, is located twenty-five miles east of the nearest point of the Papago Country proper. For many years this has been the only Papago Catholic Mission. It was first established, however, as a Pima or Sobaipuri Mission. The Sobaipuri Indians were a branch of the Pima stock, now extinct. They inhabited principally the San Pedro Valley, east of San Xavier, but either mixed with the Pimas in their villages on the Santa Cruz,

149

between Tucson and Nogales, or had a few separate settlements there. Many Papagos were induced to leave the Papago Country, however, and take up residence there and at the Tumacacori Mission (abandoned since about 1828), which was located about twenty miles above San Xavier. There were also a few missions established in the southern end of the Papago Country *in what is now Mexico.* * * * [See also Defendant's Exhibit G-253, page 371.]

The history ⌐ the Papago Tribe, one of the components of the Piman-speaking family of Indians, with relation to the decline of the Spanish mission period after 1800 when the Apache Indian raids in the Santa Cruz and San Pedro Valleys increased in frequency and intensity is one of increasing isolation in the defense villages west of the Baboquivari Mountains (Def. Ex. G-13; Def. Ex. 253).

Dr. Spicer in *Cycles of Conquest* (1960), which is one of the best expositions of the many factors affecting the Indian picture in the southwest in historic times, says (Def. Ex. 139, pp. 132-134):

> * * * In the early 1800's a concerted effort was made by Franciscans to bring Pimas into the Santa Cruz River missions, and there are indications that a number of new converts were made at that time at, for example, Tumacacori. * * * The vigorous mission communities of the early 1700's were a thing of the past.
>
> Contacts were with prospectors, miners, and

150

ranchers, and there were few of these in what is now northwestern Sonora and southern Arizona. * * *

An important factor in the increasing isolation was the intensification of the Apache raids after about 1810. During the late 1700's Piman-speaking people had steadily retired westward from their border position on the San Pedro River. By 1800 there were no Pimans east of a line between San Ignacio near Magdalena and San Xavier. Many had been killed, and a few had been absorbed into the central Sonoran communities of Opatas and Spaniards. The remaining Pimans, who were not at the mission sites along the Santa Cruz and Magdalena, were living in desert villages in the present area of the Papagos or the river villages along the Gila. The Apache raiding affected them profoundly. The raids became more frequent during the 1830's and 1840's. In 1848, as the war between the Anglo-Americans and the Mexicans over Texas was ending, the presidio of Tubac was abandoned. The 1850's were a period of widespread Apache raiding extending through the whole southern Upper Pima country past the Altar Valley to the coast of the Gulf of California. * * *

*        *        *        *        *

Gradually crowded out of the Altar and Magdalena valleys into the desert, many emigrated northward into the Papago villages in the United States. * * *

151

The Gadsden Purchase in 1853 caused immediate important consequences for the Upper Pimas. * * * The new international boundary, surveyed in 1858, traversed the region of the headwaters of the San Pedro and Santa Cruz rivers and ran through the middle of the desert lands to the west. This automatically placed at least three-quarters of the remaining Upper Pimas as residents of the United States. * * *

*        *        *        *        *

During the twenty years following the Gadsden Purchase, the Apache raids nevertheless continued. Small parties of Apaches continued to swing deeply into Papago territory. The small eastern outpost of less than two hundred Papagos at San Xavier del Bac continued to suffer occasional losses * * *.

We submit that the several historical excerpts picturing varying time periods show clearly that, as of mid-19th century and for a long period prior, the Papago country was in the desert areas west of the Baboquivari Mountains (Def. Ex. G-254, p. 159).

### The so-called Papagueria

The general area within Pimeria Alta which was ascribed to the Papago Indians by the early historians, travellers and missionaries, has long been known by the name of the Papagueria (Def. Ex. G-13, p. 257; Def. Ex. 250, Ch. II, pp. 1-10). However, as will be pointed out later, this was only a general indication

152

of the part of the country in which they were to be found—not a location of boundaries of territory which they exclusively used and occupied (see also Def. Req. Fdg. 10).

The region identified as the Papagueria by Keller before 1745 is located in the Pimeria Alta within the area which is bounded on the east by the Santa Cruz River, on the north by the valley of the Gila, on the west by the Colorado River and on the south by the international boundary line between the United States and Mexico (Def. Ex. 250, Ch. II, p. 1). In commenting upon the Keller map, Dr. Hackenberg states (Def. Ex. 250, Ch. II, pp. 1-2):

> * * * Keller's map likewise names the other Indian tribes whose occupation of lands to the north, east and west restricted the Papago people to the barren region from which they took their name "tohono auautam" (the Desert People). * * *

The non-Papago occupants of the three river valleys according to Keller were the Sobaipuri on the east in the Santa Cruz Valley, the Gila River Pimas to the northeast, the CocoMaricopas in the Gila River Valley to the northwest and the Yumas in the valley of the Colorado River to the west (Def. Ex. 250, Ch. II, p. 1).

The Papagueria is described by Lumholtz, who made an exploratory trip through Arizona and New Mexico in 1909, as follows (Def. Ex. G-43, p. 16):

> The Papago Indians of to-day, the principal natives of the desert, live in Arizona to the west and south-west of Tucson, as far as the Growler

153

Mountains in the west, the Gila River in the north, and the range of Baboquivari in the east. In the neighboring state of Sonora, Mexico, a number of them are scattered, roughly speaking, from the Altar River, in the east, as far as Quitovac and Sonoita in the west, most of them at present living near the boundary line. Until recent times they were found as far as the Colorado River. They occupy much the same land as they did when first discovered in the seventeenth century by the Spaniards. The region was early named Papagueria, or, in its greater extension, Pimeria Alta. It is part of the great arid region called the Sonora Desert.

In 1860 Raphael Pumpelly toured the area of Pimeria Alta and in describing the country of the Papagos he wrote (Def. Ex. G-24, p. 37):

> Taking a diagonal course over the plain, we reached the foothills of the Baboquiveri range at the approach to Aliza pass. * * *
>
> Early the next morning we reached the summit of the pass. The Baboquiveri range forms the boundary between the Papagoes and Apaches, two tribes differing widely in appearance, character, and habits, and between whom there has ever been hostility.
>
> The Papagoes guard carefully the approaches to their country, and these passes have been the scenes of many desperate battles. But the desert character of the Papagoria is its best defence, since, in view of the great scarcity of water over

154

an immense area, it would be almost certain death to a party of Apaches to penetrate far into it. At the summit of the pass stands a large pile of stones, literally bristling with arrows, both old and new. Whether this was a landmark or battle monument I did not learn.

The Bowie report (Def. Ex. G-254) of a personal investigative tour of the Papago Indian areas in 1917, describes the Papagueria as follows (p. 11):

* * * The Papago Indians, as a tribe, have evidently always considered that they had a right to occupy, against all new-comers, a stretch of country (practically a desert), lying west of Tucson and south of the Gila River, and generally termed "Papagueria," or the "Papago Country," probably containing five to ten thousand square miles of land. This claim is based on immemorial possession as a tribe, although as a matter of fact, they have actually occupied and used only a small part of it. The Government has always dealt with and regarded them as a tribe.

and at page 14:

* * * The Papagos reside in small settlements of from two to sixty families. There are to-day more than one hundred of these settlements scattered over an area of more than five thousand square miles in western Pima County, Arizona, although the total population of this tribe is not more than five or six thousand. This is practically a desert

155

country. The most of the Papagos have two principal homes, one located in a valley where the flood waters from the mountains are depended upon to water their cultivated fields and another home in the nearby mountains, where they have been enabled to procure water in shallow wells. The water in the valleys is from three to eight hundred feet deep. Prior to 1875 or 1880 the villages were larger, the Papagos being congregated together as a means of defense against the Apache Indians. * * *

also on page 133 it is stated:

The Ajo Mountains are considered by the Papagos as forming the western boundary of their country, the Baboquivari range and the mountains north of it forming an eastern line, and the northern limits joining the ancient "Pima country." This northern limit is an imaginary line drawn from Picaho Peak on the east to Big Table Mountain on the west. This line would touch the northern line of the present Papago Reservation. The original "Papago Country" of Arizona is practically all embraced in the original Executive Order Reservation of January 14, 1916, there being some land left out on the east-central side, this land having been taken up by the State as school land. The original "Papagueria", however, extended for perhaps one hundred miles over into present Mexico. Papagueria was located altogether in Sonora.

156

The Hoover study of the origin and location of the aboriginal Papago village areas entitled "Generic Descent of the Papago Villages" (1935) is regarded as one of the most valuable contributions to the literature. It defines the "Papagueria" in the following manner (Def. Ex. G-13, p. 257):

The region of southern Arizona and northern Sonora, Mexico, occupied by the Papago Indians, was called Papagueria by the Spaniards. The name is again coming into use as the area is made to stand out in sharper contrast with the lines of settlement and civilization drawing more closely about it. Broadly considered, it is the area south of the Southern Pacific Railway and west of the Santa Cruz River, and north of the Altar Valley, Sonora. Disregarding several considerable outlying villages or groups such as those at San Xavier and in Tucson, the Papago villages are confined to that part of the area which is bounded on the east by the Baboquivari Mountain range and related low mountain groups extending northward. These also roughly bound the Papago Indian Reservation. On the north, white settlement is approaching the reservation boundary line. The western boundary is less definite, as in this direction the desert becomes increasingly inhospitable, merging into great precarious empty waste spaces, too barren to support even Papago.

The area of country within Arizona and Sonora broadly defined as the "Papagueria" by the several references quoted above did not define and locate the

157

aboriginal use and occupancy area of the Papagos prior to the mid-19th century period for Dr. Hackenberg says (Def. Ex. 250, Ch. II, p. 37):

* * * with respect to occupancy, we may note that Papagos ranged rather freely over a large area from Sonora to the Gila River and from the Colorado River to the Santa Cruz River Valley. Much of this territory was not necessarily "Papago Country", since it included the villages of the Gila River Pimas, the Sobaipuris of the Santa Cruz, Yuman territory on the Colorado, and Mexican settlements in Sonora. * * *

These several groups included the following tribes: Yuma, Maricopa, Yavapai, Pima, Apache and Sobaipuri (Def. Ex. 250, Ch. III, p. 1).

Furthermore, vast areas of the country described as the Papagueria were unusable for environmental reasons or because of vulnerability to Apache attacks, even though unoccupied by the permanent settlements of any other Indian Tribe (Def. Ex. 250, Ch. III, p. 1).

### Use and Occupancy in Papagueria in mid-19th Century

The area designated as the "Papagueria" is such a broad expanse of land, in which are found greatly varying factors and conditions of environment which directly affect the usefulness of the lands, that it will be helpful in locating the use of occupancy areas of the Papago Indians in mid-19th century (at the time sovereignty of the United States first attached to the Gadsden Purchase area) to divide the territory into three zones (Def. Ex. 250, Ch. IV, pp. 1-3). A map

158

will show that the distance from the Santa Cruz Valley to the Colorado River is approximately 150 miles and the north-south line is roughly 90 miles. Dr. Hackenberg describes the three zones as follows (Def. Ex. 250, Ch. IV, p. 1):

> * * * This conformity between types of environment and types of cultures is sufficient to make it possible for us to speak of "life zones," * * * each possessing peculiar biological and cultural features: the western zone (Colorado River to the Growler Mountains) correlated extremely arid conditions with low population density and the nomadic subsistence pattern of the Sand Papagos; the central zone (Growler Mountains to the Baboquivari Mountains) correlated greater precipitation with greater population density, and the semipermanent residence pattern of field and well village locations; the eastern zone (Baboquivari Mountains to Santa Cruz River) correlated most rainfall with densest settlement in a permanent village, together with irrigation cultivation.

The central and western zones which comprise most of the area are located in the great Sonoran Desert and the eastern zone lies within the valley of the Santa Cruz River and affords an area of habitation much more desirable from every standpoint than the central and western zones (Def. Ex. 250, Ch. IV, pp. 136-137).

159

### Central Zone

The central zone will be considered first because, as stated by Dr. Hackenberg (Def. Ex. 250, Ch. IV, pp. 63-64) this area between the Growler Mountains and the Baboquivari Mountains "* * * has been recognized as the homeland of the Papago Indians by every ethnographer who has studied them. * * *" (Def. Ex. 250, Ch. IV, p. 80.) Dr. Hackenberg further states (Def. Ex. 250, Ch. II, pp. 28, 32):

> * * * In the vast desert upland between the Growler Mountains and the Baboquivari Mountains, the great body of the tribe was found. * * *

The central area of Papagueria in mid-19th century was described by Dr. Hackenberg in his oral testimony (Tr. 239):

> This area of Central Papago country is again very large one but it is an area which is woven together and capable of being treated as a unit because it was the area of primary Papago occupancy throughout the mid 19th Century and it was the area of primary Papago occupancy for several historical reasons, the first of which was that the Papagos had engaged in hostilities with the Mexicans to the south of them throughout the early 1840's * * *. To the west boundary of this central Papago area a Yavapai raiding corridor existed * * * and east of the Baboquivari Mountain an Apache corridor was located at mid 19th Century. * * * Therefore, at mid 19th Century the central Papago country was circumscribed on



160

these three sides by a Yavapai raiding corridor and an Apache raiding corridor and the Mexicans to the south and within this area, so identified we find the Papagos concentrated in what Hoover in Defendant's Exhibit 48 [G-13] has referred to as defense villages. * * *

The reference to the Hoover defense villages relates to the ethnological study of the Papago aboriginal village areas of the Papago Indians published by J. W. Hoover in 1935 (Def. Ex. G-13; Def. Ex. 48), wherein he locates and identifies the Papago village areas of the period before 1860 and shows the relation of the present field and well villages to the 12 primary defense areas.

Hoover states (Def. Ex. G-13, p. 259):

The present day Papago villages may be traced back to about twelve common centers prior to 1860. Each of these represents a tribe which, spreading from the main village or pair of villages, has established new communities. Some of these parent villages no doubt sprang from a few of the very oldest villages as Kaka, Achi * * *. The tribal areas coincide fairly well with the large units of plains or drainage basins, imperfectly set apart by mountain ranges or groups. * * *

A map attached to the Hoover paper shows the relationship and descent of the present-day field and well villages with the 12 parent centers as developed in the text of the article.

161

Dr. Hackenberg at pages 80-81 of the fourth chapter of his report (Def. Ex. 250) says:

* * * The defense villages were concentration points to which members of scattered field and well villages took refuge in the years between 1830 and 1880 when continuous raiding by the Apaches made this necessary. The old defense villages began to break up in the 1870's as people either returned to field and well villages previously occupied, sought work at the mines reopened since the Civil War, or entered the cattle business at new locations more favorably situated with respect to wells and pasture. * * *

Due to the scarcity of water west of the Baboquivari Mountains in the aboriginal village areas, the use pattern of the area involved two homes for each family. In the winter period the people lived in the so-called well villages in the mountainous areas where water was to be found and when the summer rains came they moved into the valleys to plant crops, making use of the surface waters from the rainfall, impounded at strategic points in charcos.

The Apache Indians in their raiding and pillaging forays were a very real factor, in addition to the great scarcity of water, which compelled the Papagos to live in the area west of the Baboquivari Mountains. Hoover states in his paper "The Indian Country of Southern Arizona" (1929) (Def. Ex. G-38, p. 51):

The desert scarcity of water had also its compensation in that it was the Papago's best defense

162

against the marauding Apaches. By the middle of the eighteenth century the Papagos had been driven west of the Baboquivari mountain wall, except for a group about the San Xavier Mission under the protection of Tucson. But the approaches to their country west of the Baboquivari were carefully guarded, and the passes were the scenes of desperate battles.

Lieutenant Chapman of the United States Army stationed at Tucson in 1858 gave information in a letter to the Indian service (Def. Ex. 145) concerning the Papago Indian villages which clearly supports the view that the Papago villages were located behind the Baboquivari Mountains in remote areas to escape the Apache raids (Def. Ex. 250, Ch. IV, p. 118). Chapman gives a list of the Papago Indian villages (Def. Ex. 250, Ch. IV, p. 119) which are in the central zone of the Papagueria and he comments in the letter as follows (Def. Ex. 250, Ch. IV, p. 120):

> * * * These Indians seem to have selected these locations for their towns on account of the Apaches. To them, now, the Apaches cannot approach, without crossing extensive arid plains.

The Apache raids in Sonora continued with increased ferocity into the 1840-1870 period in southern and eastern Arizona after the Gadsden Purchase (Def. Ex. 139, pp. 131-133). Concerning the ferocity and extent of the Apache depredations at this time (1820-1870) in the Piman areas, Spicer writes (Def. Ex. 139, pp. 132-133):

163

* * * By 1800 there were no Pimans east of a line between San Ignacio near Magdalena and San Xavier. Many had been killed * * *. The remaining Pimas, who were not at the mission sites along the Santa Cruz and Magdalena [Sonora], were living in desert villages in the present area of the Papagos or the river villages along the Gila. The Apache raiding affected them profoundly. The raids became more frequent during the 1830's and 1840's. In 1848, * * * the presidio of Tubac was abandoned. * * *

The United States accepted military possession of the Gadsden Purchase area in 1856 (Def. Ex. 219, p. 496) by sending a military detail to Tucson and Calabasas on the Santa Cruz River. The troops replaced a Mexican garrison at Tucson. In 1852 Bartlett wrote that the entire Santa Cruz Valley area extending from he Gila-Pima Maricopa villages to the Mexican presidio at Santa Cruz was unoccupied except the mission village at San Xavier and the garrison towns of Tucson and Tubac (Def. Exs. G-30; G-51; G-52; Def. Ex. 250, Ch. III, p. 8).

We can further support the statement that the Papagos in mid-19th century were living west of the Santa Cruz Valley except for the mission village at Tucson. The Indian agent for the area of Arizona reported in 1857 (Def. Ex. G-83, p. 585) as follows:

> * * * Until within a year or two past, the whole country, with the exception of a small district in the vicinity of Tucson, (an old Mexican town on the Santa Cruz river, near the centre of the Terri-

164

tory,) was in the hands of the Indians, and these Indians the Apaches. I should also except the small district on the Gila occupied by the Pimos and Maricopas.

The information contained in the agency reports immediately following 1857 clearly shows that the mission village of San Xavier was the only village located in the eastern zone of Papagueria in the Santa Cruz River Valley and all other Papago villages were located west of the Baboquivari Mountains (Def. Exs. G-84; G-85; G-86; G-254, p. 177).

The agent Walker reported from the agency at Tucson in 1859 (Def. Ex. G-85, p. 351) as follows:

I only returned yesterday from a visit to the Papago Indians, who live at the remotest distance from this agency. I found them, after a travel of four days, mostly through a desert plain, nearly all at their villages. * * *

The literature of the Papago ethnology provides several lists of the aboriginal Papago Indian villages by name. The village name lists include those of Hoover (Def. Ex. 48) which is the basis of his paper on the generic descent of the Papago villages, also Lumholtz (Def. Ex. 3), Underhill (Def. Ex. 20), Oblasser (Def. Ex. 49), Mark (Def. Exs. 32; 243) and Chapman (Def. Exs. 99; 145). These lists are compared and analyzed in terms of the Hoover study (Def. Ex. 48) by Dr. Hackenberg in his report (Def. Ex. 250, Ch. IV, pp. 80-107). Dr. Hackenberg also prepared an exhibit (Def. Ex. 252) which correlates the

165

various lists with that of Hoover. He illustrated this correlation by a map (Def. Ex. 253) also prepared by him. Dr. Hackenberg has explained the usefulness of such a comparison of various village lists in his testimony (Tr. 239-242).

The exhibit (Def. Ex. 252), which is a summary of the related village lists, was prepared to explain the documentation relative to the Papago aboriginal village areas as of the mid-19th century and supplements the exhibit map (Def. Ex. 253) which locates the defense villages of Hoover (Def. Ex. 48) and the related Papago settlements. The map (Def. Ex. 253) identifies by numbers the settlements occupied at mid-19th century and the numbers on the map are keyed to the village names which appear in the analysis exhibit (Def. Ex. 252). The evidence for these village and settlement locations span the years 1848-1865 and is contained in Defendant's Exhibits G-203; 5; 32; 92; 99; 150 and 152.

The map (Def. Ex. 253) which identifies the defense village areas of Hoover (Def. Ex. 48), as well as the corresponding "mother" villages of Underhill (Def. Ex. 20; Def. Req. Fdg. 25), links each with the particular field and well village locations of the people who would go to that defense village in time of danger. The defense village is identified by a circle which is linked to the related field villages identified by a square on the exhibit (Def. Ex. 253). In some instances it will appear that a defense village may be related to six or more field and well locations (Tr. 240-241).

It is of importance to observe that the map (Def. Ex. 253) which is used to illustrate the location of the

166

defense villages and the related field and well villages is a map of the Sells Papago Indian Reservation.

This map demonstrates that only one of the defense villages is located outside of the United States, and that is Quitovac (No. 25) which is located in Sonora, Mexico, 60 miles south of the international boundary line in the Pinacate Mountains. It is of further interest to note that only one of the field village locations related to a defense village area on the map (Def. Ex. 253) falls outside of the perimeter of the present existing Sells Papago Indian Reservation, and that is the mission village of San Xaxier del Bac on the Santa Cruz River near Tucson in the eastern zone of the Papagueria.

Outside the present Sells Papago Indian Reservation to the west is the location of Quitovaquito shown at the westerly edge of the map (Def. Ex. 253). Aside from the mission village at San Xavier, this is the only field or well location related to a defense village area which is not within the Sells Papago Indian Reservation. Quitovaquito is located on the international boundary line and is identified with the defense village Quitovac in Sonora, Mexico (Tr. 241-242).

There is evidence among the calendar stick records that supports the conclusion that the Papago Indians were confined to the defense villages at mid-19th century by the hostilities of the Apache.

Dr. Hackenberg states in his report (Def. Ex. 250, Ch. IV. p. 112) as follows:

Between 1848 and 1875, the calendar stick record reports almost three decades of events pertaining to Papago life at the time when Apache

167

hostilities had them confined to defense village units of residence and land use. * * *

One of the most valuable evidentiary documents in the Papago literature is the Ehrenberg map of the Gadsden Purchase, Sonora, dated 1858 (Def. Ex. G-203; Def. Ex. 75). This map was prepared in 1858 by Herman Ehrenberg, a mining engineer, based upon his personal mining explorations made in company with C. D. Poston and upon the notes of Major Heintzelman, Lieutenant Parks and others. The map locates all Papago villages known at the time (1854), and the list substantially conforms to the Hoover analysis of aboriginal defense villages (Def. Ex. 250, Ch. IV. pp. 116-118). The Ehrenberg map data is correlated with the analysis of the various village lists in Defendant's Exhibit 252.

In his oral testimony, Dr. Hackenberg evaluates the Ehrenberg map as follows (Tr. 252-253):

* * * this Ehrenberg Map of 1858 is based on surveys conducted by Poston and Ehrenberg between 1854 and 1858 for the purpose of mineral exploration. Now, part of their mineral exploration took them right through center of Papago country and they crossed from east to west approximately in the middle of the present Papago Indian Reservation. * * *

Now, the thing that is of interest here is that the range of Papago occupation according to Ehrenberg's map, the region in which the Papago Indian villages are located is substantially the same as that which Hoover in Defendant's Exhibit No. 48 [Def.

168

Ex. G-13] identifies as the location of the Papago
defense villages and it is also the same as that
which Dr. Underhill in Defendant's Exhibit No.
20 identifies as the location of defense villages.

All Ehrenberg villages fall within the area
between Ajo and the Baboquivari Mountains with
the exception of San Xavier.

The gathering areas related to the central zone of
the Papagueria are all located within the areas of the
Baboquivari, Comobabi and Quijotoa Mountains and
their extensions (Def. Ex. 250, Ch. IV, p. 129).

Dr. Hackenberg states with reference to gathering
areas marginal to the central zone at mid-19th cen-
tury (Def. Ex. 250, Ch. IV, p. 132) as follows:

Since there is no evidence whatever for the
accurate demarcation of gathering areas in either
ethnological or historical sources with reference
to the mid-19th century, we must confine asser-
tions to the locations of field and well villages.
Here, as the review of the evidence discloses, the
historical sources confirm conclusions based on
ethnological materials. The historical materials
reveal no village or settlement which has not al-
ready been related as an element of one or the
other of the major defense locations, with the
exception of the eastern community of Fresnal
(Chiuli Shaik) located at the base [west] of the
Baboquivari Mountains.

The information on the entire district of the
central Papagueria, furthermore, indicates no

169

occupied area which is not presently contained
within the Sells Papago Reservation. * * *

The materials examined by Dr. Hackenberg indicate
a possibility that some gathering areas may have ex-
tended beyond the limits of the Sells Papago Indian
Reservation. The claim to gathering areas to the north-
west of the reservation in the vicinity of Gila Bend is
of very remote possibility since Dr. Hackenberg says
that the claim is made by one document only and is
without any time reference. This claim is adequately
disposed of by the statement of Dr. Hackenberg (Def.
Ex. 250, Ch. IV, p. 133):

* * * The many eyewitness accounts reported * * *
fail to substantiate Papago use of the Gila Bend
area at mid-19th century.

The use and gathering areas beyond the reservation
limits to the north in the Table Top Mountain region
were in the nature of joint uses with the Pima Mari-
copas (Def. Ex. 250, Ch. IV, pp. 131, 133).

There is no evidence that the Papago villages on
the western slope of the Baboquivari Mountains ex-
tended these activities beyond the limits of the present
reservation (Def. Ex. 250, Ch. IV, p. 133).

On the lack of necessity for the Papago extension of
use areas beyond the limits of the present reservation,
Dr. Hackenberg offers this comment (Def. Ex. 250,
Ch. IV, p. 133):

This possibility of extension of use areas beyond
the present limits of the Sells Papago Reserva-

170

tion should be balanced against the positive knowledge that vast areas of the present reservation were unoccupied in the mid-19th century, since, as Mark demonstrates, all Papago fields were concentrated to the west at 112 degrees of longitude with the exception of those at Komalik, Pan Tak and San Xavier, and the newly documented Papago village of Fresnal, which was not described by ethnological sources.

The evidence relating to use and occupancy by the Papago Indians of the areas in the westerly part of the central zone, particularly in the Ajo Mountains and beyond, shows that these areas were included in the raiding corridor of hostile tribes so that the lands were vacant and contained no villages. At the time the Indian tribes to the west and northwest, including the Yavapai, Yuma and Mohave, engaged in raids to the extent that the Ajo area was unoccupied.

In his testimony relating to this area, Dr. Hackenberg said (Tr. 220-221):

Desertion of the northern area along the Gila River was partly due to raiding eastward by the Yuma and Mohaves against the Pima and Maricopa warfare which continued until 1857 and it was partly due to raiding by the Yavapai situated north of the Gila River. The Yavapai had an important raiding trail from the Gila Bend Mountains just north of the present location of Gila Bend on Petitioner's Exhibit 275 running south through the Ajo Valley east of Ajo, and down

171

across the present International Boundary to Sonoita.

John C. Cremony in Defendant's Exhibit 43, Pages 110, 130, 132, who was on the Gila in 1852 with Bartlett's boundary survey party wrote that the fifty-mile strip between Maricopa wells and Gila Bend was "without water and is the highway for the Coyoteros and some of the Sierra Blanca Apaches making raids upon Sonora."

We conclude from this that the Gila River was unoccupied at the date of the Gadsden Purchase and that a raiding corridor existed from Gila Bend southward to Sonoita. In confirmation of this point we have the statement from Rose in Defendant's Exhibit 218, page 15, that Tom Childs, Sr., found the Ajo copper mines abandoned by both Mexicans and Papagos.

Poston's account of his visit (Def. Ex. 31, p. 16) to Ajo in 1854 mentions no occupation there of any sort and the Ehrenberg map (Def. Ex. G-203) shows a mineral deposit at Ajo, but no Indian village in 1858 (Def. Ex. 250, Ch. IV, p. 114).

The evidence in the record submitted relative to the use and occupancy at mid-19th century by Papago Indians in the central area of Papagueria warrants the conclusion that all such areas were contained within the area of the present Sells Papago Indian Reservation (Def. Ex. 250, Ch. IV, pp. 132-133; Tr. 241-242).

Dr. Spicer stated relative to the Papago use and occupancy areas (Def. Ex. 139, p. 140):

* * * Not until 1917 was a reservation proposed for Papagos to embrace the area between Tucson

172

and Ajo and south to the Mexican border. In 1918 the reservation was established by executive order to include two million acres, the disputed strip of territory through the center being excluded from the reservation [restored in 1931]. The reservation areas now covered practically the whole territory in which Papagos had established villages or over which they were accustomed to range. * * *

Dr. Underhill, regarded as the leading ethnologist to study the Papago people, wrote (Def. Ex. 111, p. 4):

It was not until the present century and the time of the first world war, that the main Papago reservation was established. It was the last of the Indian reservations and differed from most of the others in that it was not based on any removal, treaty or relinquishment of land. The Papagos continued to live where they were and, unknown to most of them, a governmental decree protected their habitat from encroachment by Whites. * * * [See also Def. Ex. G-254, pp. 133-134.]

### Eastern Zone

The eastern life zone of the Papagueria extends from the Baboquivari Mountains to the Santa Cruz River Valley and is the most desirable part of the Papagueria for habitation since it has a greater rainfall and contains areas that may be cultivated by irrigation (Def. Ex. 250, Ch. IV, p. 1). It included the upper and lower Santa Cruz River Valleys which were regarded by the early Spanish missionaries as the most

173

desirable place in the Territory of Arizona for the three Indian missions which they located north of the international boundary line (Def. Ex. 250, Ch. IV, p. 139).

In the early mission period of 1650-1720 missions were built at Guebavi, Tumacacori and San Xavier del Bac in the Santa Cruz Valley for the Sobaipuri Indians, a branch of the Piman family (Def. Ex. 250, Ch. III, pp. 2-3). The Sobaipuri Indians were the early occupants of the Santa Cruz and San Pedro Valleys and had a riverine culture as contrasted with the desert type culture of the Papagos who lived in the desert areas west of the Baboquivari Mountains (Def. Exs. 20, pp. 14-20; 250, Ch. III, pp. 2-3, 5, 23; Tr. 205-206).

The Sobaipuri and Papago Tribes, while they were of Piman extraction, were distinct and separate tribes and occupied separate areas when the missions were built in the Santa Cruz Valley (Tr. 207). All of the leading ethnologists have regarded the Sobaipuris as an independent and separate tribe when they occupied the river valleys of the eastern zone of the Papagueria. Defendant's Exhibit 252, compiled by Dr. Hackenberg, shows a distinct and separate identity of the Sobaipuris from that of the Papago and that they occupied separate areas before the Papagos came to the missions in the Santa Cruz Valley.

Due to the continued raiding of the Apaches in the San Pedro Valley in the mid-18th century the Sobaipuris were forced to abandon the valley and moved to the Santa Cruz Valley as wandering fugitives (Def. Ex. 250, Ch. III, p. 4; Tr. 208) to seek refuge at the

174

Jesuit missions in 1762 (Def. Exs. 25, p. 175; 250, Ch. IV, p. 148; Tr. 209).

The Apache raids increased in intensity and the Sobaipuris were given no aid by the Spanish. In fact, in their position they were used as a buffer from the raids to the east and over a period of time the Sobaipuri Tribe, also the victims of epidemics of disease, (Tr. 212-213) suffered disintegration and extinction, ultimately (Def. Ex. 139, pp. 127-128).

In 1775 Father Font who accompanied the Anza expedition described San Xavier del Bac as follows (Def. Exs. 122, p. 127; 250, Ch. IV, p. 144):

> * * * a pueblo of Sobaipuri Pima Indians. Once it was very large, but now it is much depleted by the hostilities of the Apaches * * *.

It was the policy of the Jesuit missionaries to bring the Papago converts to the missions on the Santa Cruz, since the Papago country, west of the Baboquivari Mountains was totally unsuited to the establishment and maintenance of an Indian mission and no missions were built in Papago territory (Def. Ex. G-254, p. 158; Def. Ex. 139, p. 129).

The statement of Balthasar, one of the Jesuit priests, on the Sonoran frontier in 1744-1745 shows the conditions within the Papago country as follows (Def. Ex. 127, pp. 78-79):

> * * * Beyond the last missions of Pimeria Alta there lies a broad belt of land of some sixty leagues. This region is dotted with the rancherias of a people descended from the Pimas, who are

175

called Papagos, and they number about six thousand souls. All of this country is so wretched and so lacking in water that there is no spot where a mission pueblo could be established. These Indians, from sheer hunger, leave their native haunts in order to work in the missions and to steal whatever they can. With this they go back to their own lands and remain there for the rest of the year. I have seen very many of these people in the above-mentioned missions. They are a humble, servile, timid, and cowardly people. With little effort they could be induced to group themselves within our missions. Many of these who lived at not too great a distance were thus brought together by Father Jacobo Sedelmayr and he intends to carry on this good work. But to complete it a certain constancy, fortitude, and just a hint, no more, of soldiery will be necessary.

The mission of San Javier del Bac is on the fringe of the land of these people. * * * Thus some Papagos could be incorporated into this mission (San Javier del Bac) and a famous reduction could be created here, for this center is among the most populous of all.

The mission of Father Keller, Santa Maria Suamca, comprises many pueblos de visita whose inhabitants are badly trained and poorly instructed. His mission borders on the land of the Papagos and likewise edges into the very heart of the sierra country of the Apacheria. * * * [See also Def. Ex. 250, Ch. IV, p. 141.]

176

Santa Maria Suamca is on the headwaters of the Santa Cruz in Sonora. See map in Defendant's Exhibit 139, page 122, for location of all the missions.

If the Santa Rosa Papagos first came to the San Xavier del Bac mission (Def. Ex. G-13) at the insistence of the missionaries, Dr. Hackenberg says that such a practice was consistent with Spanish policy (Def. Ex. 250, Ch. IV, p. 142).

In this connection, Dr. Underhill wrote (Def. Ex. 5, p. 16):

* * * Akchin [Santa Rosa], * * * is the direct parent of San Xavier, where desert Papago moved in after the original Pima Soba Jipuri had been decimated by disease. * * *

Dr. Dobyns, the leading ethnologist in the Sobaipuri literature, comments on the Sobaipuri extermination and the advent of the Papagos into Sobaipuri country (Def. Ex. 135, pp. 175-176) as follows:

* * * As the native riverine Indians [Sobaipuri] perished in epidemics and endemic disease mortality and Apache raids, they were partially replaced in the Spanish missions by Papago neophytes from the deserts. Underhill noted that Apache attacks influenced modern Gila River Pima and Papago distribution greatly because "the desert Papagos seeped in" to take the place of their extinct relatives. It should be emphasized that disease mortality was much higher than war casualties. San Ignacio, Magdalena, Bac and Tucson received heavy increments of Papago con-

177

verts during the 18th century, and the middle Santa Cruz River Valley missions were no exceptions. Many of the 103 residents of Tumacacori enumerated in 1796 were identified as Papagos.

The petitioner in this case contends that a merger of the Sobaipuri and Papago Tribes took place when the Sobaipuris were driven from the San Pedro Valley to the Santa Cruz Valley; however, it would seem to be clearly shown by the historical documentation recited above that the Sobaipuri became extinct as a tribe (Tr. 212) as the result of pestilence (Tr. 213) and Apache hostilities. The few survivors of the Sobaipuri affiliated with the Papago at the mission village of San Xavier since it was the plan of the Spanish Government and the Jesuit missionaries to repopulate the Santa Cruz missions with the only available people, the Papagos. There is no evidence that the two tribes joined or merged in such a manner that would give the Papago Tribe any right or interest in lands once occupied by the Sobaipuri and now occupied by the Papago, for there is no evidence in the record that the Papagos occupied any part of the Sobaipuri aboriginal areas of the San Pedro Valley.

We submit further in this connection that the Papago Indian occupancy in the eastern zone of the Papagueria had none of the elements of aboriginal use since the record clearly shows that the Papago Indians were brought to the Santa Cruz Valley as neophytes or mission Indians (Tr. 207-209); and there is no evidence that they exercised exclusive use and occupancy of a defined area of country in the Santa Cruz Valley.

178

The Apache raids in the southern and eastern areas of the Gadsden Purchase intensified about 1810 and became more frequent in the period of 1840-1860. These raids had a profound effect upon the activities of the Pimas and Papagos and the entire eastern zone of the Papagueria was deserted and abandoned at the date of the Gadsden Purchase, except the mission village at San Xavier (Tr. 213, 216).

In 1848 San Xavier del Bac was the remaining occupied position of all the old village locations on the upper Santa Cruz River (Def. Ex. 135; Tr. 216).

Also, there are many exhibits to show that in 1846 there were no Indian villages in the area of the lower Santa Cruz Valley between Tucson and the Gila River. In 1846 this area was devoid of settlement (Def. Exs. 27; 123; 124; 125; Tr. 216).

In 1852 the Boundary Commissioner, Bartlett, found the Santa Cruz Valley below Tucson abandoned (Def. Ex. 30, pp. 285-302; Tr. 216).

Sylvester Mowry in 1851 explored the mining properties in the Santa Cruz Valley and in his report stated (Def. Ex. 116, p. 187):

The towns and settlements in the Santa Cruz valley are Santa Cruz and San Lorenzo (south of our line), Calabazas, Tumacacori, Tubac, Sopori, the mission of San Xavier, and Tucson. Santa Cruz, Tubac, and Tucson were presidios. With the exception of Santa Cruz and Tucson, this entire valley was abandoned to the savage Apaches at the time of my first visit in 1851, and the population of these was greatly diminished; indeed, but

179

for the military the Indians would have had entire possession of it. * * *

Also, in 1857, Sylvester Mowry as an officer in the United States Army made a report to the Commissioner of Indian Affairs relative to the Indian tribes of the Gadsden Purchase and he stated (Def. Ex. 93, pp. 585-586):

* * * The centre of the Territory is more mountainous, and the western portions especially in the vicinity of the Gila, is traversed latterly by elevated ranges. Until within a year or two past, the whole country, with the exception of a small district in the vicinity of Tucson, (an old Mexican town on the Santa Cruz river, near the centre of the Territory,) was in the hands of the Indians, and these Indians the Apaches. I should also except the small district on the Gila occupied by the Pimos and Maricopas.

This Indian occupation had not always obtained. * * *

The early Spanish settlers reduced the Indians to slavery, and used them as laborers in their mines. Unused to this kind of servitude, and treated with great harshness, they rose, joined the wild tribes who had never been reduced to subjection, and massacred or drove out their oppressors. In this war of extermination, the Jesuits suffered the fate of the rest of the Spanish race. Settlements were again and again made, but as often destroyed, until, about 1820, the last mining op-

180

erations in the Territory were abandoned, and the country, so rich in every resource, mineral and agricultural, given over to the Apache. [See also Tr. 216-217.]

Dr. Hackenberg states in his report as follows (Def. Ex. 250, Ch. IV, pp. 157-158):

* * * In any case, the Bringas map, reported by Ezell (Def. Ex. No. 132) shows no human occupation of any sort between the Pima-Maricopa Villages and Tucson in 1795. There is abundant proof that the area was abandoned at mid-19th century. While it is a hypothetical point, we may speculate that if it were not for the movement of the presidio from Tubac to Tucson, it would have been impossible for the community of San Xavier del Bac to have persisted.

3. The final conclusion is that, as of 1848, there were no Indians living on the Santa Cruz River at any point between the present international boundary and the Gila River except at San Xavier del Bac. * * *

Indian title by aboriginal use and occupancy of San Xavier del Bac cannot be claimed by the Papagos as of mid-19th century, not only for the reason that the settlement at San Xavier was a mission village as contrasted with one aboriginal in nature, but also it is true that Tucson was a village of mixed population subsequent to the transfer of the Mexican presidio from

181

Tubac to Tucson. Dr. Hackenberg states (Def. Ex. 250, Ch. IV, p. 156):

* * * It should be borne in mind that Tucson was a presidio of Spain following 1775, the date of its transfer from Tubac, and that its population subsequently (if not before) was a mixed group of Europeans and Indians of various tribal origins. Bartlett (Def. Ex. No. 30: 296-298) mentions only the Mexican garrison in residence at Tucson in 1852, and Cozzens in 1858-1859, reported that one-half the population of Tucson was "a mixture of Apaches, Papagos, Pimas and cut-throats" (Def. Ex. No. 141: 153). This need not be taken literally, but the population was undoubtedly a mixed one. No evidence has been located to support the contention that at Tucson there continued to be a separate Indian community following the Anza expedition account of 1775, which was definite in its identification of the occupants of Tucson as "Pimas Altos."

The Santa Cruz Valley from the Pima villages to the Mexican border was controlled by the Apache Tribe during the periods of raiding and hostilities, including the mid-19th century, as a raiding corridor for the purpose of conducting raids against the Pimas, Papagos and Mexicans in Sonora (Def. Ex. 250, Ch. III, p. 19). The only occupied area in the eastern zone at this time was the settlement at San Xavier del Bac which Mexicans and Papagos continued to occupy during the raiding periods (Tr. 217). In de-

182

scribing the raiding corridor as defined by Spicer (Def. Ex. 139, pp. 237, 241) Dr. Hackenberg stated (Def. Ex. 250, Ch. III, p. 19) as follows:

* * * Intermixed with the Papagos at San Xavier were remnants of the Sobaipuri who had previously occupied Tumacacori, Tubac and settlements on the San Pedro River to the east. This statement does not imply that the "corridor" was land occupied or used beneficially to contribute to Apache subsistence. But simply that it was uninhabitable by anyone else as a result of Apache activity.

Dr. Spicer (Def. Ex. 139, p. 241) describes the Apache raids at mid-19th century thus:

* * * During the 1850's the Apache raiding extended more widely than it ever had before. Not only was central Sonora raided repeatedly along with eastern Sonora, but now the raids extended to Tucson and even west of the Santa Cruz River well into the country of the Papagos. The Mexicans seemed powerless, as had the Spanish before them, to devise any lasting means for bringing about peace on the margins of the Apache territory. This was the situation when the Anglo-Americans took over control of southern Arizona in 1853.

There are many documents in this record other than those referred above which amply sustain the fact that the eastern zone of the Papagueria was abandoned and deserted at mid-19th century except the settlement

183

at Tucson which was under the protection of a Mexican presidio (Def. Exs. G-12; G-23; G-30; G-38; G-39; G-49; G-66; G-83; G-89; G-92; G-93; G-254, pp. 160, 163-164, 174-175).

The mission village area around the church at San Xavier del Bac was designated as the San Xavier Papago Indian Reservation on July 1, 1874 by the executive order of the President of the United States (Def. Exs. G-179; G-227; G-254, pp. 211, 255; Def. Ex. 250, Ch. IV, pp. 154-155).

The area of the reservation was established upon the recommendation of the Indian agents of the Government who had served in the area and were advised as to the areas of land used by the Indians. The total acreage included 70,080 acres and the boundaries (Def. Ex. G-204 (map)) follow the recommendation of the agent Wilbur in 1873 (Def. Ex. G-254, p. 209) filed with the Indian office, except as to six sections which were eliminated from the area recommended due to the fact that they were substantially all under individual claim of ownership (Def. Ex. G-254, p. 210).

In 1863 the Indian agent for the Territory of Arizona, Charles D. Poston, who had before that time travelled extensively in the area with Ehrenberg and was well informed generally concerning the Indian affairs in the area, recommended that a reservation be established at San Xavier for the Papago Indians (Def. Ex. G-254, pp. 186-187). The boundaries recommended by Poston were as follows (Def. Ex. G-254, p. 187):

One Spanish league north from the centre of the mission church; one league south from the same

184

centre by one league in width and west from the same centre. * * *

In his report to the Commissioner of Indian Affairs for 1863, Poston wrote (Def. Ex. G-90, pp. 504-505):

* * * Their first and principal village is at San Xavier del Bac, a church erected by the Jesuits in 1698, and here they have lived, and planted, and watched their flocks and herds ever since, resisting the barbarous Apaches and assisting their Spanish, Mexican, and American protectors in many campaigns against the savage Indians.

\*        \*        \*        \*        \*

As these Indians were found in possession of the soil they cultivate, and have maintained themselves there continuously ever since, it would seem equitable that their rights should be recognized by the government of the United States. They are naturally anxious on this subject, and an allowance of land and adjustment of boundaries, at an early day, may avoid difficulties and complications with Americans who may ignorantly or maliciously encroach upon their ancient possession. I presume a league square around the mission church of San Xavier would include all the land they have in cultivation, and the water necessary for its irrigation. They have guarded this grand old church with religious reverence, and naturally look upon it as their property held in sacred trust. [See also Def. Ex. G-91, p. 21.]

185

Poston gave the population at that time at San Xavier to be 500 (Def. Ex. G-254, pp. 200-201).

The population of the Papago village at San Xavier in 1865 was reported by agent Davidson (Def. Ex. G-92, p. 301) to be 100 and by agent Grossman in 1870 to be 30 (Def. Ex. G-254, pp. 200-201).

The size and location of the San Xavier Reservation in 1874 was probably determined upon the information of the Indian agents of the Government as related above for Dr. Hackenberg says (Def. Ex. 250, Ch. IV, p. 156):

The Papagos' claim to occupation of San Xavier del Bac at the time of the Gadsden Purchase appears to be a substantial one. However, there are no records to disclose the amount and location of lands actually in their possession at this time. It should be borne in mind that Tucson was a presidio of Spain following 1775, the date of its transfer from Tubac, and that its population subsequently (if not before) was a mixed group of Europeans and Indians of various tribal origins. * * * No evidence has been located to support the contention that at Tucson there continued to be a separate Indian community following the Anza expedition account of 1775, which was definite in its identification of the occupants of Tucson as "Pimas Altos."

Dr. Hackenberg reported (Def. Ex. 250, Ch. IV, p. 158) that in the correspondence pertaining to the establishment of the San Xavier Reservation in 1874

186

no reference to gathering areas was encountered. He states:

> * * * The reservation included the agricultural lands of the Papagos, and their source of irrigation water. * * *

It is submitted that upon consideration of the evidence in this record pertaining to the eastern zone of the Papagueria as of mid-19th century there were no areas exclusively occupied and used by the Papago Indians; that the San Xavier Reservation of 1874 represents the area of the mission village of the Papago Indians that were brought to the Santa Cruz Valley by the Jesuit and Franciscan missionaries to replace the Sobaipuri Indians who occupied the several missions in the Santa Cruz Valley before their decimation by disease and the Apache hostilities.

### Western Zone

The western life zone of the Papagueria is located in the lower Colorado Valley portion of the Sonoran Desert between the Colorado and the Growler Mountains (Def. Ex. 250, Ch. IV, p. 3).

In describing the historical and ethnological data which relates to this western zone, Dr. Hackenberg in his testimony (Tr. 223) places its easterly boundary at Ajo between Gila Bend and Sonoita. The great expanse of the area from the Gila River to Sonora and east from Ajo to the Colorado River is such that the area may be examined in two separate sections or areas; one, north and two, south, for these locations are the areas with which we are most concerned and

187

also offer a convenient basis of comparison. The first or northerly area is that territory which lies in the Gila River Valley from Gila Bend to the Colorado River (Tr. 218) and the southerly section which is roughly the triangular area from Yuma in the west, Gila Bend to the east and Sonoita, Sonora, south of the international boundary (Def. Ex. 250, Ch. IV, p. 6).

The intervening territory between the northerly and southerly section of the western zones as described above is of no importance in the present discussion for Dr. Hackenberg says (Def. Ex. 250, Ch. IV, p. 60):

> 4. Of the vast central portion of the western zone—the area in between the Camino del Diablo and the Gila River Valley—little can be said. There is no ethnological record for this region and no historical evidence of occupation. The environmental materials suggest that it has been in the past as it is now, uninhabited.

This life zone lies within the area of the Great Sonoran Desert as does the central life zone of the Papagueria. However, the lower Colorado portion of the desert, which is the area of the western life zone, differs from the Arizona upland portion of the desert, which is the area of the central life zone, only in degree relative to the quality and quantity of water and materials to be found which are required for the sustenance of life. The availability and quantity of such vital elements recedes and lessens as one proceeds west from the Baboquivari Mountain range, the easterly boundary of the central life zone, towards the Colorado, and

188

the desert areas become more barren with a considerable part of the area west of Ajo not susceptible of supporting human habitation (Def. Exs. G-13, p. 257; G-241, p. XV I; Def. Ex. 250, Ch. IV, p. 2).

The problem of the availability of water was of primary concern in the Papago aboriginal picture and it was the determining factor in the western zone of the Papagueria (Def. Ex. 250, Ch. IV, pp. 6-12).

In the southern and eastern portions of the lower Colorado Valley of the Sonoran Desert between the Sierra Pinacate Mountains and that section of the international boundary from the Puerto Blanca Mountains to the playa south of the Sierra Pintas, lies the richest plant cover which the entire western life zone had to offer from a subsistence standpoint (Def. Ex. 250, Ch. IV, p. 14). This area is entirely south of the international boundary and not within the area of the Gadsden Purchase. This is the home of the Arenenos or Sand Papagos, the only Papago Indian group found in the aboriginal period west of the Growler Mountains (Def. Ex. 250, Chs. II, pp. 29-31; IV, pp. 15-16). The central defense village of the aboriginal Sand Papagos or Arenenos (of the period prior to 1860) as described by Hoover (Def. Ex. G-13; Def. Ex. 48) is Quitovac situated in the Pinacate Mountain range in Sonora, Mexico, 60 miles south of the international boundary (Def. Ex. 253). It will be recalled that the Papago aboriginal defense villages (Def. Ex. 252) were all located in the central life zone of the Papagueria and within the area of the present Sells Papago Indian Reservation except Quitovac

189

which was in Sonora and outside the Gadsden Purchase area (Def. Ex. G-13; Def. Exs. 48; 252; 253).

The Indians found in the western zone are described by Dr. Hackenberg (Def. Ex. 250, Ch. IV, p. 15) as follows:

Excluding the Gila River Valley and the portion of the Lower Colorado River Valley west of the Gila-Tinajas Altas Mountain chain, the sole occupants of the territory extending east to the Growler Mountains and south to the Mexican border were the Arenenos, or Sand Papagos. * * *

The Indians which Dr. Hackenberg refers to in the Gila River Valley are the Pimas and Maricopas and those to the west of the Gila Tinajas Altas Mountains are the Yuma and Yavapai Indians (Def. Ex. 250, Ch. III, pp. 3-18).

The Sand Papagos prior to the mid-19th century period were a truly nomadic people as contrasted with the Papagos of the central life zone, for their area of habitation was a total desert requiring a complete effort in order to obtain food and water.

Bryan's study of the Papago country made in 1925 describes the lands of the Sand Papagos as follows (Def. Exs. 10, pp. 26-27; 250, Ch. II, p. 29):

The Arenenos, or Sand Papagos, were a division of the Papagos who lived west of the Growler Mountains and spent a large part of their time in the sandy country of the Pinacate region of Sonora. Their native name was Hiatit Ootam

190

("sand people"). They probably numbered about 150 at the most, but about 1851 they were attacked by an epidemic in which all but four families perished. It is said that they were also decimated by military expeditions of the Mexican Government. A few survivors of the Sand Papagos are to be found near Ajo, in Sonoita, and scattered in other Papago rancherias. The principal headquarters were at Hotunikat ("sunset"), south of the Pinacate Mountains. The existence of these people depended on their knowledge of the few places in the mountains where there are tanks and of the localities on the seashore where water may be had by digging. * * *

Dr. Hackenberg in his report (Def. Ex. 250, Ch. II, pp. 30-32) states:

> * * * Their single agricultural site, called Suvuk, was southeast of Tinajas de Emilia, * * * located on the eastern slope of the Sierra de Pinacate, over 35 miles south of the international border. * * *
>
> Instead of agriculture, the Sand Papagos depended upon the edible plants of the sand dunes, * * *. They came [north] as far as Quitovaquita and Santo Domingo (below the Mexican border several miles to gather mesquite * * * and eat saguaro and pitahaya. * * *

*        *        *        *        *

191

There is practically no ethnographic data on the political organization of the Sand Papagos, * * * . It is important to remember that the Sand Papagos had no permanent habitations, although the tanks upon which they depended for water established points from which their movements extended in radial patterns. They were the smallest division of the Papagos, and the most truly nomadic.

Anthropologists have advanced the view that the area of country within the Gadsden Purchase lying within the western life zone which would have attracted the Sand Papagos in their constant search for food and water was confined to a very small territory in the southeastern section of the zone. It would have been limited to an area at the international boundary extending from Sonoita, Sonora, to Growler Pass and Bates Well and westerly to the Tule and Tinajas Altas tanks (Def. Ex. 250, Ch. IV, p. 16).

Quitovac is one of the defense villages described by Hoover (Def. Ex. G-13), who said that it was the principal village of the Sand Papagos north of the Pinacate area and was the parent village of Quitovaquito, a Sand Papago village of limited seasonal use on the international boundary west of Sonoita in what is now the Organ Pipe Cactus Monument (Def. Ex. 250, Ch. IV, p. 21).

Underhill also described it as a defense village (Def. Ex. G-3). Dr. Hackenberg's comment in his testimony explains the defense village complex of Quitovac and the related field and well villages on the map (Def. Ex.

192

253) of the aboriginal Papago village areas as follows (Tr. 241-242):

Now, one of the defense villages location Number 25 on Defendant's Exhibit No. 253 is that of Quitovac. This is the only defense village that falls outside the present continental United States. This falls within Sonora. The only location other than Quitovac which falls outside the perimeter of the existing Papago Indian Reservation is that of San Xavier del Bac on the Santa Cruz River. Now, the defense village of Quitovac in Sonora was related to several field and well locations presently within the United States, which may be seen by the lines I have drawn connecting the squares with the circles around Quitovac, the numbers 26, 2 and 28 identify these locations within the United States that were field and well locations for Quitovac. Outside the present Sells Papago Indian Reservation to the west is the location Quitovaquito which appears surrounded by a circle with the line drawn through it at the western edge of the map designated Defendant's Exhibit No. 253. This is the only one of the identified field or well locations related to a defense village that falls outside the present boundaries of the Papago Indian Reservation with the exception of the previously known community of San Xavier. So, our reading of the sources which I have identified as the basis for this map indicates that Papago occupation at mid 19th century was confined to these 50 numbered locations on this

193

map. The 50-numbered locations are the numbers indicating the presence of field or well locations, field or well villages and these in turn are related in the network of 11 village units as Dr. Underhill calls them, in Defendant's Exhibit No. 20. Each village unit consists of a defense location and a varying number related field and well villages.

However, the area south of the international boundary extending from Quitovac to the Pinacate Mountains, the center of the permanent location of the Sand Papagos, presented a much greater supply of both food and water for the needs of the Sand Papagos and for that reason they resided in the Pinacate Mountains and south of the boundary for the greater part of each year (Def. Ex. 250, Ch. IV, pp. 16-17). The extension of the wandering of the Sand Papago into the Gadsden Purchase area was temporary only and for a limited period of time (Def. Ex. 250, Ch. IV, pp. 16-17).

Epidemics of disease and military suppression by the Mexican Government during the period of the gold rush in 1847-1849 resulted in the almost complete annihilation of the Sand Papagos, and Lumholtz, the explorer, wrote (Def. Ex. 3, p. 329):

* * * According to my companion, the medicineman Pancho, who spent his early life in the dunes, they were not many in number and used to travel all together. He asserted that a peculiar disease * * * killed most of those natives, and thought that it was brought from Yuma. * * * It probably * * *

194

occurred in 1851. The remaining four families decided to retire to other parts and for the last forty or fifty years [1910] the sand dune country has been uninhabited. * * *

and on the same page he further states:

* * * According to Mexican accounts, the arenenos formerly made the roads dangerous to pass, and nobody could follow them into the sand dunes * * * at Pinacate.

The Mexican soldiers removed the Sand Papagos by force to the area south of Caborca (Def. Exs. 22, pp. 29-30; 250, Ch. IV, pp. 34, 40). For this reason the Arenenos who travelled through the said country and the Camino del Diablo at the time of the Gadsden Purchase saw no Indians west of Quitovaquito (Def. Ex. 250, Ch. IV, pp. 34-35).

The Ehrenberg map (Def. Ex. G-203) discussed hereinbefore in connection with the central life zone shows the location of the Sand Papagos or the Arenenos' territory as of 1854 to be altogether in Sonora, a considerable distance south of the international boundary and outside of the Gadsden Purchase. In the area marked "Arenenos I" on the Ehrenberg map there is found this notation (Def. Ex. G-203), "Explored in 1854 by Poston, Ehrenberg & C." Dr. Hackenberg discusses the Ehrenberg map (Def. Ex. G-203) in relation to the Sand Papagos (Def. Ex. 250, Ch. IV, pp. 36-37) as follows:

Of considerable interest for this time period is the Ehrenberg map of the Gadsden Purchase, pub-

195

lished in 1858 and compiled from "his private notes and those of Colonel Gray, Major Heintzelman, Lieutenant Parks and others" (Def. Ex. No. 75). Both Ehrenberg and Heintzelman had interests in the Colorado River Valley and in the Santa Cruz River Valley and were quite familiar with the territory in between. This map correctly shows the territory of the Arenenos located between the Sierra Pinacate and Adair Bay [Sonora]. The map also shows all Papago villages at this time period east of Ajo or south of the international boundary. The geographical knowledge of the mapmaker is attested by the relatively correct placement of water tanks in the Cabeza Prieta, Tule, Tinajas Altas, Wellton and Gila Mountain ranges.

Dr. Hackenberg summarizes his study of the southern part of the western life zone of the Papagueria as of the mid-19th century within the Gadsden area by concluding that the Sand Papagos were the only Indian users of any part of this region and that the area so used was extremely limited since their headquarters was between the Sierra Pinacate and Adair Bay on the Gulf of lower California in Sonora. He states that historical evidence supports only a limited use at the village of Quitovaquito on the international boundary in mid-19th century and to the north at Growler Pass and Bates Well. However, he finds no specific historical documentation to establish a use by the Papagos of the tank areas including the Tinajas Altas, Cabeza Prieta and Tule Mountain tanks at the date of the

196

Gadsden Purchase. He comments that circumstances indicate that there was no such use or occupancy of these areas by the Papagos at mid-19th century (Def. Ex. 250, Ch. IV, p. 45).

Other settlements in the southerly area of the western zone were made after the date of the Gadsden Purchase; they include according to Dr. Hackenberg (Def. Ex. 250, Ch. IV, pp. 45-46):

> 5. Other settlements, such as the Ajo Indian Village, and settlement at Darby Well, Bacamote, Child's Ranch, Cipriano's Well (El Pozo), and Chico Shunie's Well, are clearly much more recent than the date of the Gadsden Purchase, even though each has some claim to consideration as an instance of Indian land use or occupancy. * * *
>
> 6. The remainder of the southern portion of the western zone appears to have been devoid of aboriginal land use and occupancy by any identifiable Indian tribe at any historical period.

The northern portion of the western life zone as defined by Dr. Hackenberg consists of the lower Gila River Valley from Gila Bend to the Colorado River (Def. Ex. 250, Ch. IV, p. 46). In the time period between 1775 and 1846 the lower Gila River was exclusively occupied by tribal elements of the Yuman-speaking people and in the year 1846 both Emory and Cook explored the Gila River route from Gila Bend to the Colorado and they found Gila Bend abandoned and the lower course of the river also deserted (Def. Ex. 250, Ch. IV, p. 49).

197

The 49'ers who travelled the Gila-Santa Cruz River route to the gold fields in California (1846-1848) failed to report the presence of any Indians in the lower Gila River Valley (Def. Ex. 250, Chs. III, pp. 14-15; IV, pp. 49-50; Tr. 219).

Bartlett of the boundary commission in 1852 travelled the entire distance of the Gila River from the Pima-Maricopa villages to the Colorado River, a distance of more than 190 miles, and in his report of the survey did not mention Papago Indians at any time as among the people encountered in the Gila River Valley (Def. Ex. 250, Ch. IV, p. 51; Tr. 220).

Evidence is quoted in detail by Dr. Hackenberg to establish that the Papago Indians did not use or occupy exclusively any part of the Gila River Valley at the mid-19th century period. He summarizes the history of occupancy in the lower Gila River (Def. Ex. 250, Ch. IV, p. 60) as follows:

> 1. At no time within the period between 1775 and 1900 did Papago Indians exclusively use and occupy any point between Gila Bend and the Colorado River. Such Indian use and occupancy which took place during this period of more than a century was by non-Papagos (Opas, Cocomaricopas, Yumans, Maricopas). Pima or Papago Indians may have been present in these communities, since the populations of several appear to have been mixed, but they were evidently either individuals or a small minority.
>
> 2. At the two points where Papago Indians appear to have occupied positions on the Lower

198

Gila—at Gila Bend and at Gila City—there occupancy must be qualified as follows:

A. Such use and occupancy took place after the date of the Gadsden Purchase, since it was later than 1858 at Gila City, and later than 1870 at Gila Bend.

B. Such use and occupancy was not exclusive, since both settlements were jointly occupied with non-Indians.

3. Between the Anza Expedition accounts (1775) and Haskell's letter of 1880, this study did not disclose a single eye-witness to Papago occupation of any portion of this territory.

4. Of the vast central portion of the western zone—the area in between the Camino del Diablo and the Gila River Valley—little can be said. There is no ethnological record for this region and no historical evidence of occupation. The environmental materials suggest that it has been in the past as it is now, uninhabited.

It is clearly apparent from the evidence and exhibits in the record before this Commission that the only use and occupancy areas of the Papago Indians in the western life zone of the Papagueria as of mid-19th century were in a very limited area in the southeasterly corner at the village of Quitovaquito and at Growler Pass and Bates Well to the north about four miles. The use of this area was on a part-time basis rather than a continued occupancy and whether or not such use was exclusively by the Papago Indians, the record does not indicate.

199

The Gila Bend Reservation located in the northeasterly area of the western zone near Gila Bend was established by executive order in 1882 and contained about 24,000 acres. It was established at the particular location for the benefit of the Indians in the area including the Papagos who had gone north from the aboriginal villages after the end of the Apache hostilities to locate fields and to obtain employment on the railroad construction. The location of the reservation was not in the aboriginal area of the Papagos, for the Gila Bend group of Papagos removed to the area of the reservation after 1870 (Tr. 235-237).

The reservation was reduced when it was found that the original establishment was larger than required for the intended purpose (Def. Ex. G-227; Pet. Ex. 118, p. 3).

### Right or Interest of the Papago Indian Tribe in Minerals in the Gadsden Purchase Area

The Papago Indian Tribe of Arizona is not entitled to minerals or the value thereof in the aboriginal land area of the Papago Tribe in the Gadsden Purchase.

The United States acquired all right, title and interest in and to the minerals underlying the area of cession of the Gadsden Purchase of 1854, which had not been, prior to the cession, transferred by specific grant or license by the Governments of Spain or Mexico; and what, if any, surface rights the Papago Indian Tribe may have enjoyed in the Gadsden area lands, no interest or right in or to the minerals therein was accessary, incidental or appurtenant to said surface rights (Def. Ex. G-1, p. 25).

200

It is the position of the Government that an award, if any, made to petitioner herein may not reflect the value of the mineral content underlying the surface of aboriginal Papago lands.

Minerals in Spanish and Mexican territory at and before 1854 were the property of the Crown and subject to disposition only by the customs, rules and procedures promulgated by the sovereign. Since the cession to the United States of the Gadsden area, the courts of the United States have recognized the ownership of mines and minerals by Spain and Mexico before the cession and the succession of the United States to that ownership.

*United States* v. *Castillero,* 2 Black 17, 169, 190 (1862):

> 1. Property in mines not discovered, and registered according to law, whether the mine was on public or private lands, was vested, as has already appeared, exclusively in the Supreme Government, so that private persons could not acquire it or any interest in it in any other mode than that prescribed in the provisions of the mining ordinance. * * *

Minerals in the lands occupied by Indians under Spanish law were owned and held by the Crown and Indians as well as Spaniards could obtain the right to work and operate them only from the Crown upon compliance with the required regulations. *Chouteau* v. *Molony,* 16 Howard 203, 240 (1853):

> * * * But the privilege to work the mines in lands still in the occupancy of the Indians, he [the

201

Spanish Governor] could give, because the mines were a part of the royal patrimony of the crown, and the king had directed that they might be searched for and worked in all of his dominions by his subjects, both Spaniards and Indians. * * *

The Executive and Legislative branches of the United States Government likewise have recognized the succession of the Federal Govrnment to the ownership of mines in what was formerly Spanish and Mexican territory. In 1849 the Secretary of the Interior in his annual report to the Congress stated (Def. Ex. G-1, p. 22) as follows:

> By the laws of Spain these mines did not pass by a grant of the land, but remained in the crown, subject to be disposed of according to such ordinances and regulations as might be from time to time adopted. * * *
>
> This right to the mines * * * is believed to have been also retained by Mexico while she was sovereign of the Territory, and to have passed by her transfer to the United States. * * * [See also Def. Exs. G-164; G-243; G-249.]

When the Congress of the United States created the office of surveyor general for the Territory of New Mexico in July 1854, 10 Stat. 308 (to which the Gadsden area was later added August 4, 1854, 10 Stat. 1031), and provided the procedure for the establishment and confirmation of land claims existing under the laws of Spain and Mexico, it expressly excluded mineral lands from the operation of the statute, 10 Stat. 308,

202

sec. 4. The same statute included a provision whereby a resident or settler could obtain a donation grant of land in the territory. However, the exclusion of mineral rights under section four of the statute was applicable to the donation feature of the statute.

In 1891 after the Gadsden area had been included in the Territory of Arizona founded in 1870, 16 Stat. 291, the Court of Private Land Claims was established, 26 Stat. 854 (Def. Ex. G-254, p. 313), for the purpose of the conclusive determination of rights in land arising under the laws and customs of Spain and Mexico; and the act provided that the confirmation of a claim by the court would not imply or include the right to minerals in the lands in question. Article 13 provided in part as follows (26 Stat. 854, 860):

> Third. No allowance or confirmation of any claim shall confer any right or title to any gold, silver, or quicksilver mines or minerals of the same, unless the grant claimed effected the donation or sale of such mines or minerals to the grantee, or unless such grantee has become otherwise entitled thereto in law or in equity; but all such mines and minerals shall remain the property of the United States, with the right of working the same, which fact shall be stated in all patents issued under this act. * * *

It clearly was the legislative view of the United States that a grant or patent of land under the laws, usages and customs of Spain and Mexico did not carry with it or imply a right or interest in minerals in the area of lands so granted.

203

Thus, the United States, both as a matter of policy and law, treated surface and subsurface rights in lands acquired from Mexico as two separate and distinct estates—as they had been under Spanish and Mexican law. Neither white nor Indian occupants of the Spanish and Mexican lands included in the Gadsden Purchase cession had any right or claim to minerals under the laws or customs of either Spain or Mexico (Def. Exs. G-4, p. 35n; G-153; G-243; G-247). Moreover, it was the obvious understanding of those in charge of Indian affairs in the United States Government that the Papago Indians had never been concerned with mining operations (Def. Ex. G-166).

In 1915 the Commissioner of Indian Affairs selected a group of men which was to become known as the "Committee of Eight" to make recommendations concerning the location of a reservation for the Papago Indians. The group included several men with extensive experience and personal knowledge of the Indians of Arizona, as well as two members of the Papago Tribe.

The report of this group (Def. Exs. G-2; G-254, p. 246) recommended the establishment of the Sells Papago Indian Reservation and the boundaries outlined in the report substantially conform to the present boundaries of the Sells Reservation in southern Arizona. The report of the committee recommended that the mineral lands be left open for public entry and exploration (Def. Exs. G-2; G-254, pp. 246-248). The Executive Order of February 1, 1917 (Def. Exs. G-179; G-226), which established the Sells Reservation for the use of Papago Indians, withdrew from the

204

public domain approximately 2,600,000 acres and expressly reserved all mineral rights in the United States and also the right of public entry for mineral exploration and mining thereof under the public mining laws of the United States (Def. Exs. G-128; G-145; G-153; G-179).

This reservation was the only Indian reservation in the United States in which the mineral rights were reserved by the United States for the purpose of public entry and exploration under the mining laws of the United States. It was considered that the Papago and other Indians in the Gadsden Purchase area had under the United States exactly the same rights they had under the sovereignty of Mexico and, since they had never engaged in mining before 1854, mining rights were not included in the use of the Sells Reservation by the Papago Indians (Def. Exs. G-145; G-162; G-166).

In 1935 Dr. Underhill wrote (Def. Ex. G-3, p. 28) as follows:

> * * * It was the last reservation to be established and its provisions contained a ruling not made with other reservations, to the effect that the Indians' right to the land did not include a right to the minerals. The Indians were considered to have, under the United States, exactly the rights they had had under Mexico and, since they had never done any mining, mining rights were not included.

When the size and area of the proposed Sells Papago Indian Reservation was made public following the

205

report of the "Committee of Eight" (Def. Ex. G-2), many protests were made by officers of the State of Arizona and numerous civic bodies concerning the resultant loss of such a large area of the state from its economy (Def. Ex. G-254, pp. 248-250). It was believed at the time that vast mineral deposits were located in the area of the proposed reservation which should not be removed from public development. Objection to the size of the land area in the proposed reserve was quieted when it was made known that the minerals therein would be reserved for public entry and exploration under the public mining laws of the United States (Def. Exs. G-122; G-128; G-145).

In 1932 the Secretary of the Interior issued an order withdrawing the right of public entry for mineral exploration on the Sells Papago Indian Reservation. It was believed that although the Papago Indians were not entitled to any interest in the minerals in the reservation, the exploration and operation of the mineral areas resulted in interference with the administration of the reservation and the right of public entry was terminated (Def. Exs. G-119; G-121; G-128; G-142; G-150; G-163).

The order of closure was protested by many of the Papago Indians as well as the mining industry. Petitions were presented by the Papagos requesting that the closure order be withdrawn. The reason in support of the request was that the Papago economy was seriously affected by the closing of the mineral operations since a large number of the Indians found employment with the mining operations. In fact it was the chief source of wage income for the group at

206

one time (Def. Exs. G-119; G-121; G-123; G-124; G-141; G-143; G-144; G-145).

Father Bonaventure Oblasser, the Franciscan missionary to the Papago Indians and their chief adviser and spokesman at this time (1933), disapproved the closure order and accordingly advised his superior church officer by letter (Def. Ex. G-123, p. 4) as follows:

Tucson, too, was interested. since Mr. Graves had been instrumental in the signing of an order by the Secretary of the Interior, which closed the Papago Reservation to mining operations. This order was against the wishes of the Papagoes, who benefited by the presence of miners, and who had always allowed them free entrance, as long as they left undisturbed the surface rights of the Indians, since the hoary days of 1756 (see Bancroft). By the way, this order is a violation of the pledge given by the United States Government to the people of this state, when, at the time of the forming of the Reservation of 1917, it allowed mining operations to continue in the Papago Country.

Many other protests were made to the order of withdrawal of the right of public entry in the Sells Reservation by individuals (Def. Ex. G-163), by the State of Arizona (Def. Ex. G-128), and many public organizations (Def. Exs. G-139; G-140) in the belief that the economy of the state would be affected by the withdrawal order. Also, there was a general opinion that the mineral operations within the reservation were not

207

a disadvantage to the Papago Indians but in fact had resulted in beneficial improvements to the reservation and the Indians had been benefitted in their economy (Def. Exs. G-34; G-43; G-119; G-143).

In 1934 the withdrawal order issued by Secretary Wilbur was revoked by Congress, 48 Stat. 984, and the lands of the Sells Reservation, including the areas added thereto after the Executive Order of February 1, 1917 (Def. Exs. G-231; G-232; G-234; G-236), were restored to public exploration and mining operations under the general mining laws of the United States as provided by the Executive Order of 1917. At this time, in order to compensate the Papago Indians for possible losses and damages to lands that might result from mining operations on the reservation, a rental fee payable to the Papago Indian Tribe was imposed on all mining operations within the reservation area (Def. Ex. G-233).

In 1937 when the purchase of the Menanger Dam area within the bounds of the Sells Reservation was authorized, 50 Stat. 537, provision was made for additional fees and liquidated damages to be payable to the Papago Tribe for the use of mineral lands in the reservation and for resultant damages to lands in the reservations adjoining the mining operations, as well as for interference with or damage to water supplies, 50 Stat. 536 (Def. Ex. G-234).

In 1939 additional lands were purchased by the United States to increase the area of the Sells Reservation and these lands, when they became a part of the reservation, were made subject to mineral entry to

208

conform to the restrictions in the Executive Order of 1917 (Def. Ex. G-236).

In 1955 by Act of Congress, 69 Stat. 67, the right of public entry to all mineral lands in the Sells Papago Indian Reservation was terminated and vacated (Def. Ex. G-237) and all minerals and mineral rights in said reservation lands merged with the title to the surface of said lands except the areas held under prior leases.

From the record and all of the evidence in this case it would seem clear that the mineral rights in the lands claimed by the Papago Indians were distinctly different and separate from the surface and surface rights and that the mineral rights in the claimed area were vested in the United States under the provisions and effect of the Gadsden Treaty and clearly not subject to an Indian claim or right by Indian use or occupation in any aboriginal manner. But as shown in the series of events related herein the mineral rights in said claimed lands were at all times exclusively subject to disposition by the Congress of the United States.

It is submitted that from the record and exhibits before the Commission that the Papago Indian Tribe had no legal right or interest in and to the minerals underlying the aboriginal lands and that the value of such minerals should not be reflected in any monetary award that may result in the claim at bar. It is also clear that, as a matter of fact, the Papago Indians never used (exploited) the minerals and never considered them as a part of their aboriginal rights. They not only acquiesced in, but desired their exploitation by others.

209

### No Taking of Papago Lands

It is the position of the Government in this case that the United States did not and has not taken from the Papago Indian Tribe of Arizona, the petitioner herein, or the individual Papago Indians any lands within the area of the Gadsden Purchase, 10 Stat. 1031, exclusively held and used by Papago Indians in the aboriginal manner in 1854, the date of the Gadsden cession.

The Papago Indians did not remove from lands held by them nor were they requested to do so by the defendant; there were no treaties held with them and no cessions of land were either requested or obtained from them.

Dr. Underhill, the leading ethnologist in the Papago literature, wrote (Def. Ex. 111, p. 4):

> It was not until the present century and the time of the first world war, that the main Papago reservation was established. It was the last of the Indian reservations and differed from most of the others in that it was not based on any removal, treaty or relinquishment of land. The Papagos continued to live where they were and, unknown to most of them, a governmental decree protected their habitat from encroachment by Whites. * * *

The United States took possession of the Gadsden Purchase area (Def. Ex. G-41, p. 496) by sending several companies of soldiers to the Santa Cruz Valley.

The hostile Apache Indians continued to dominate the eastern areas of the Territory of Arizona south of the Gila River at this time and the Papago Indians

210

were confined to the defense villages west of the Baboquivari Mountains (Def. Ex. 250, Chs. III, p. 7; IV, p. 80; V, pp. 2-3), except the mission village group near Tucson. This situation had existed from the 1810-1820 period and continued until the late 1860's when the defendant brought the Apache hostilities to an end by the establishment of several military posts in eastern Arizona territory (Tr. 242-249).

The Papago Indians greatly benefitted as the result of the end of Apache hostilities for they moved about to the field and well villages again without danger and their whole economy changed and improved as the direct result of the advent of the defendant into the Gadsden area (Def. Ex. 250, Ch. I, p. 8; Tr. 254-257).

Dr. Hackenberg in his testimony (Tr. 256-257) shows that the Papago economy improved greatly with the coming of the white Americans and the establishment of new water sources. He quotes from Bryon's *Papago Country* (Def. Ex. 10, p. 27) as follows (Tr. 256-257):

> * * * In the late sixties and seventies American settlers came to find mines or to establish stock ranches. They immediately improved the springs or seeps used by the Indians and in many places dug new wells. Each white man's camp had its nearby Papago camp dependent upon the new or improved water supply. The Indians worked for wages when work was to be had. * * * As the prospects usually did not become mines, the white man moved away and the Indians inherited the watering places. * * *

211

A list of 25 village locations where water supplies were subsequently abandoned is given by Dr. Hackenberg (Def. Ex. 250, Ch. V, p. 16). Indians moved in after the whites left and "* * * took their places over and established industrial villages * * *" (Def. Ex. 32, p. 31; Tr. 257).

The cattle industry among the Papagos expanded in the 1870's after the termination of the Apache hostilities (Tr. 255).

It has been clearly established that the present Sells Papago Indian Reservation, as established under the Executive Order of February 1, 1917 and the subsequent additions thereto (Def. Ex. G-179), represents the aboriginal village field and well locations of the Papago Indians of mid-19th century (Def. Exs. 250, Ch. IV, pp. 90, 132-133; 252; 253; Tr. 241-242), except the defense village of Quitovac in Sonora, the related field village of Quitovaquito on the Mexican boundary in the Sand Papago area, and the mission village near Tucson of San Xavier del Bac. It is interesting to note here that the settlement and use expansion from the defense village areas following the end of Apache hostilities did not extend beyond the boundaries of the Sells Reservation (Tr. 261). This is established by the "Papago Nomadic Survey Report" of 1915 (Def. Ex. G-156; Def. Ex. 4) and the accompanying maps (Def. Ex. G-225; Def. Ex. 233) made by H. V. Clotts, an engineer of the Indian Bureau in 1914. Clotts was instructed to "* * * find and survey all areas presently [1914] used or occupied by the Papago for the purposes of farming, grazing or village location. * * *" (See Tr. 258.) The Clotts survey and report became

212

the basis for the establishment of the Sells Papago Indian Reservation and follows the boundaries contained in the report of the special committee designated the "Committee of Eight" recommended as the reservation area suitable to the Papago requirements (Def. Ex. G-2).

The Clotts survey report (Def. Ex. G-156) shows a large increase in the number of Papago villages, both field and well locations as compared with the aboriginal defense and village locations at mid-19th century, yet the map (Def. Ex. 253) upon which Dr. Hackenberg has demonstrated the location of the aboriginal village areas as of 1860, based upon the several early reports of villages as compared in the exhibit (Def. Ex. 252) is the outline of the Clotts survey of 1915 (Tr. 261) and the detail map of the present Sells Papago Indian Reservation (Def. Ex. G-179).

The Sells Papago Indian Reservation of today (Def. Ex. G-179) comprehends not only the mid-19th century defense villages and the field and well locations of the Papago Indians (Def. Ex. 253), but also the villages which were reactivated or established after the removal of the Apache danger in 1865-1870, after the Civil War, except the mission village near Tucson at San Xavier which was not aboriginal in its composition (Def. Ex. 250, Ch. IV, p. 157) and the use area at the village of Quitovaquito on the Mexican boundary in the sand dune country of the Arenenos, which was a use area related to the defense village at Quitovac in Sonora. There is no evidence in the record that the Papago use of this village has ever been disturbed by defendant.

213

It is submitted that the great preponderence of the evidence supports the Government view that defendant has taken nothing from the Papago Indians.

Dr. Spicer, a leading anthropologist in his book entitled *Cycles of Conquest* (1960), a history of "The Impact of Spain, Mexico, and the United States on the Indians of the Southwest, 1533-1960" (Def. Ex. 139, p. 140) states in part as follows:

> * * * Not until 1917 was a reservation proposed for Papagos to embrace the area between Tucson and Ajo and south to the Mexican border. In 1918 the reservation was established by executive order to include two million acres, the disputed strip of territory through the center being excluded from the reservation. The reservation areas now covered practically the whole territory in which Papagos had established villages or over which they were accustomed to range. * * *

Dr. Bolton, a prominent historian, in his biography of Father Kino, the first Jesuit missionary to explore the Indian areas of northern Sonora, the Pimeria Alta, which includes the area of country in suit, entitled *The Rim of Christendom* (1960) (Def. Ex. G-80, pp. 248, 397), states in part as follows:

> West of Santa Cruz River were the Papagos, the name meaning "The Bean Eaters." They lived in scattered villages and occupied a wide range. Some of the Papago settlements south of the Arizona line have been abandoned. North of that line the Papagos still live in the same general area [1960] and to a great extent on the very sites

214

they occupied in Kino's day. They are among the tribes which have been least disturbed by the white man.

\*        \*        \*        \*        \*

\* \* \* The most remarkable thing about the journey is that Kino [1699] found the Papago villages exactly or nearly where they are today [1960], and bearing the same names, to which he and Carrasco added the names of saints.

Upon the whole record in this case it seems clear that the facts fail to support a claim of Indian title by exclusive aboriginal use and occupancy in the Indian manner to lands and areas outside of the present Sells Papago Indian Reservation, and the use areas at the village of Quitovaquito and Growler Pass and Bates Well, the field areas nearby.

215

### REPLY TO PETITIONER'S BRIEF

#### Papago Domain Boundaries

The Government has set forth herein in detail an examination and analysis of the record before the Commission relative to the areas of exclusive aboriginal use and occupancy in the Indian manner by the Papago Indians within the area of the Gadsden Purchase at mid-19th century, as of the date of the cession thereof by Mexico to the defendant, under the rules applicable to the requirements of proof as to the fact of exclusive use and occupancy in the Indian manner as pronounced by the Commission in the case of *Confederated Tribes of the Umatilla Indian Reservation v. United States,* 14 Ind. Cl. Comm. 14, 104 (1964).

It will be observed from a casual examination of this analysis and the references quoted therein from the record that there is a wide area of disagreement between the parties regarding the alleged boundaries of the so-called "Papago Domain" as claimed by the Papago Tribe in its brief on pages 78-82.

We ask the Commission to regard the analysis of the record heretofore made as a specific reply to the claims and arguments made in the brief of petitioner at pages 78-82.

#### Merger of the Sobaipuri Tribe with the Papago Tribe

Petitioner, at page 82 et seq., of its brief makes the claim that the Sobaipuri Tribe of Indians merged with the Papago Tribe in such a manner that the claimant Papago Tribe is entitled to claim in its own name, and on its own behalf as the Papago Tribe of

216

Arizona, all of the area of country used and occupied by the Sobaipuri Tribe in the aboriginal manner in the areas west of the San Pedro Valley before its annihilation by the Apache hostilities and epidemic of disease (Tr. 213).

The petition filed by the Papago Tribe makes no allegation with reference to any relationship with the Sobaipuri Tribe or of any merger with it, nor does it contain an allegation of claim for the Sobaipuri Tribe.

There is no evidence in the record and none has come to our attention which supports a claim of merger between these two tribes. They were two distinctly separate tribes in the opinion of the leading authorities on Piman ethnology (Def. Ex. 251) and their aboriginal use and occupancy areas were in separate locations. The Sobaipuris were the residents of the river areas, the San Pedro and the Santa Cruz, whereas the Papagos were always known as the people of the desert areas (Def. Ex. 251; Tr. 205-207). Defendant's Exhibit 251 is a summary of a part of the evidence distinguishing between separate tribal entities. The Sobaipuri Tribe was located in the San Pedro and Santa Cruz Valleys in the 16th century. The Jesuit missionaries built Indian missions for them at this time at Guebabi, Tumacacori, Bacoancos, Santa Maria and several other places, the last one being established at Bac near Tucson before 1700 (Def. Ex. 139, p. 122). Before 1750 the Sobaipuri of the San Pedro were driven from their homes by the hostile Apaches and compelled to seek refuge in the missions on the Santa Cruz (Def. Exs. 139, pp. 126-132; 250,

217

Ch. IV, pp. 147-148; Tr. 212-213). The continued Apache hostilities in the Santa Cruz Valley and the epidemics of disease so depleted the ranks of the Sobaipuris that they suffered extinction and the remaining individual survivors took refuge among the Papagos and the Pimas of the Gila (Def. Exs. 24, pp. 50-51; 251; Tr. 212-213). At this time the Papagos were brought to the missions in the Santa Cruz from the desert areas to replace the declining Sobaipuri Tribe (Def. Ex. 250, Ch. IV, pp. 140-142, 148).

It is apparent from the many exhibits in the record that the inter-relation between the Sobaipuri and the Papago Indians of the Sobaipuri missions in the Santa Cruz Valley prior to 1854 did not serve to transfer to the Papago Tribe the rights, if any, which the Sobaipuri Tribe may have enjoyed in the Santa Cruz villages.

It is also true in our view that the claim of merger of the Sobaipuri and Papago Tribes is of no consequence since at the mid-19th century period both the upper and lower Santa Cruz Valleys (Def. Ex. 139, pp. 237-241; Tr. 216-217) from the Pima villages to the international boundary, except the mission village at San Xavier del Bac, were deserted and abandoned (Def. Ex. 250, Ch. IV, pp. 149-152; Tr. 215-216) and under Apache control for several years both before and after the date of the Gadsden Purchase.

It is also of interest to note that the use and occupancy of the Papago Indians in the Santa Cruz Valley at this time was not exclusive, but the area of habitation included other Indians and other nationals including Mexicans (Def. Ex. 250, Ch. IV, p. 156).

218

It is also true that the Tucson-Bac area was protected by a garrison of Mexican soldiers at this time who remained in the area until the American soldiers took over the area in 1858 (Def. Ex. G-79, p. 80; G-254, p. 162). It is stated that the village at San Xavier could not have survived at this time without the protection of Mexican troops (Def. Ex. 250, Ch. IV, p. 157). Can an Indian tribe or group either acquire or maintain a right of aboriginal use and occupancy at a mission village or in the area thereof under the required protection of the Mexican Army?

### Continued Papago Use of the Santa Cruz Valley

The brief of petitioner at page 83 et seq. makes the claim that the Papago right of aboriginal use and occupancy in the Santa Cruz River Valley was not affected by reason of the Apache raids in 1854, although admitting that the Papago settlements in the Santa Cruz Valley had been temporarily disrupted in 1854. It is stated that "* * * as the Papago regrouped to repel the Apache raiders, use of that area by petitioner continued unabated. * * *"

The evidence before the Commission strongly contradicts that viewpoint.

Dr. Hackenberg in his report (Def. Ex. 250, Ch III, p. 19) states:

1. At mid-19th century, the Santa Cruz Valley from the Pima villages to the Mexican border was an Apache "corridor" employed for conducting raids against the Pimas, Papagos, and Mexicans in Sonora. The exception to this statement occurs in the immediate vicinity of Tucson, including the

219

settlement at San Xavier del Bac, which Mexicans and Papagos continued to inhabit throughout the period. Intermixed with the Papagos at San Xavier were remnants of the Sobaipuri who had previously occupied Tumacacori, Tubac and settlements on the San Pedro River to the east. This statement does not imply that the "corridor" was land occupied or used beneficially to contribute to Apache subsistence. But simply that it was uninhabitable by anyone else as a result of Apache activity.

The Apache raids through northern and central Sonora left the Papago Indians confined to the defense centers west of the Baboquivari Mountains in the area of the present Sells Papago Indian Reservation for a period of approximately 50 years (Def. Ex. 139, pp. 237-241; Tr. 215-218) when the Apaches were suppressed and eliminated as a hostile tribe by the military agency of the United States.

In his testimony, Dr. Hackenberg said (Tr. 249):

* * * but as a result of the increase of raiding by the Apaches in this area, the ranches and land grants and Indians all contracted and withdrew. Now, this situation withdrew until the Apaches and the Yavapai, if they were so involved, were pacified and this took place only after the Civil War with the establishment of a string of forts by the United States largely in the area between the Santa Cruz and San Pedro. There was Fort McDowell, Fort Grant, Camp Crittenden, Fort Lowell, and Fort Huachuca, all established be-

220

tween 1865 and 1875. And, this established a containment of the Apache and prevented them from their former free access to this area and it was subsequent to that I say that we know the Papago broke up their defense concentrations and settled many other areas that were removed at some distance from the former points of concentration.

In 1857 a letter by Sylvester Mowry, the mining explorer, who had travelled the area as early as 1851 reported (Def. Ex. 250, Ch. IV, p. 152):

In his letter dated November 10, 1857, Mowry reports the "entire country" with the exception of "a small district in the vicinity of Tucson * * * was in the hands * * * of the Apaches" (Def. Ex. No. 93: 585). He adds, concerning the Apaches (*Ibid.*, p. 586):

"The valley of the San Pedro is one trail much frequented by them; another is across the opening of the Santa Cruz Valley to the north, near Tucson, and south by Sonoita, a Mexican village just on the boundary line * * *."

Dr. Underhill, the leading ethnologist wrote (Def. Ex. 20, p. 58) as follows:

But when the Apache ceased to trouble, toward the end of the nineteenth century, the large villages began to break up and groups moved out, either to the fields they had been cultivating, or

221

to new ones. * * *    [See also Def. Ex. 250, Ch. V, p. 6.]

This is a reference to the Papago defense **village** concentrations west of the Baboquivari Mountains, **25** miles west of the Santa Cruz River, where the Papagos, except those at San Xavier near Tucson, were compelled to seek refuge all during this episode of the Apache hostilities which continued for more than 40 years. These defense village centers were those described by Hoover (Def. Ex. G-13) and others (Def. Exs. 252; 253) as located beyond the mountains and away from the Apache raiding area (Def. Ex. 250, Chs. IV, pp. 112, 120; V, p. 3) for the purpose of safe refuge from attacks. It is indeed doubtful that there could have been any repopulation of the Santa Cruz Valley at this time. The valley was the "Apache raiding corridor" described by Dr. Spicer (Def. Ex. 139, pp. 237-241), and the Apache activity in this "corridor" was of such extent that it was sufficient to keep the main body of Papagos behind the Baboquivari Mountains until after the Civil War (Def. Ex. 250, Ch. V, p. 8).

Dr. Hackenberg in his report states (Def. Ex. 250, Ch. IV, pp. 149-150):

The conclusion indicated from this series of references to Indian settlement on the Santa Cruz River between 1750 and 1850 is unmistakable: with the exception of the San Xavier del Bac-Tucson vicinity, the area was abandoned. While the question of Indian identity of the population components of the different villages on both the

222

Upper and Lower Santa Cruz remains unresolved, it is of no real significance since the groups had ceased to occupy the area before the effective date of the Gadsden Purchase.

### Taking Date

Any discussion of a possible "taking date" is premature at this time. It is defendant's view, as evidenced by its Finding 40 and by the foregoing discussion, that there has been no taking of any area to which petitioner may rightfully claim to have had Indian title. Until the Commission resolves the dispute as to petitioner's title and defines the area to which it had Indian title, discussion of a taking date would be purely hypothetical. Defendant reserves its right to brief this point, should it become necessary, after such determination is made.

### CONCLUSION

For the foregoing reasons, it is submitted that the petition should be dismissed.

Respectfully submitted,

EDWIN L. WEISL, JR.,
        *Assistant Attorney General.*

LESTER REYNOLDS,
    *Attorney.*

223

### CERTIFICATE OF SERVICE

I hereby certify that on the        day of August 1965 ten (10) copies of Defendant's Requested Findings of Fact, Objections to Petitioner's Proposed Findings of Fact, and Brief were mailed to the attorney of record, Royal D. Marks, Esquire, Title & Trust Building, Phoenix, Arizona 85003.

LESTER REYNOLDS,
        *Attorney.*

# ATTACHMENT I

6842 - 1915 - 305 Gen. Serv.

OFFICE OF INDIAN AFFAIRS
RECEIVED
JAN 12 1913
#643

OF INDIAN AF
90726

The Papago Indians

in

Southern Arizona.

by a

Committee of eight.

# DEPARTMENT OF THE INTERIOR

## UNITED STATES INDIAN SERVICE



San Xavier Indian Agency,

Tucson, Arizona.

August 18, 1915.

The Honorable,

The Commissioner of Indian Affairs,

Washington, D. C.

My dear Mr. Commissioner :-

The undersigned, having been designated
by you as a committee to submit a report on the condi-
tion and needs of the Papago Indians in Southern Arizona,
respectfully present the following  :-

## HISTORICAL.

The Papago Indians inhabit that part of Arizona
lying between the Southern Pacific Railroad on the north,
the Mexican boundary on the south, the $110^\circ$ meridian on
the east, and the $113^\circ$ meridian on the west.  Roughly
speaking, this territory is about 120 miles long, (east
and west,) with an average breadth of about 90 miles.
The Indians live in bands or villages more or less widely
scattered and being about three to fifteen miles apart.

Just how long these Indians have occupied this
country is not known.  So far as known they have always
lived there.  The first authentic record of these people

is given in the diary of Father Eusebio Kino who made several trips through this country between 1698 and 1702. On February 13th, 1699, he stopped at the Papago village below Baboquivari peak, which village today is known as Fresnal. The following day he traveled westward through San Rafael, the Indian village of Tecalote today. Father Kino's diary is published in the appendix of Elliott Cowes' two volumes "On The Trail Of A Spanish Pioneer," and contains much valuable history regarding the Papagos in this country during the early days. Note the attached copy of a map by Rev. Miguel Vinegas, S. J., published in "Noticia de la California", Madrid, 1757, showing roughly the country occupied by the Papagos in those early days. (Map on Page 37).

In a report dated July 6, 1772, Fr. Antonio de los Reyes, in speaking of these Indians, says: "The Mission of San Xavier del Bac, which has one submission, is situated on a large plain. Towards the east is an unexplored territory which is inhabited by the vagrant and warlike Apaches. Towards the west there are countless villages of heathen Indians of a gentle and docile disposition." (the Papagos.)

In a report of the same year Father Francisco Garces writes the following:

The fifth institution should be placed half way between Sonoita and San Xavier at a place called Santa Rosa de Ache, (Ak-chin), which is the most tolerable site in the Papago country.  In my humble opinion, the demand for a mission at this place is the most urgent of any, and here one would produce the best results.  Although it will take a bit of work to found this mission and to make it permanent, (unless your Majesty give us greater assistance, which may God grant,) yet it would not be anything impossible, as may be concluded from the statements in my last Diaries, which possibly may not have reached you as yet. The fact is, we could place four missions in the Pap- ago country and still have more than one thousand souls at each mission, and also, that there are locations in that country showing up better conditions, but since the country is without water and it would be quite a work to make ponds and to dig wells, etc., and since all this would require a large expenditure of money, I have formed plans for only one place, and that Santa Rosa at Ache, which has the most favorable location and shows the greatest population."

Bancroft's history, Vol. XII, p. 550 contains
the following :

"The Papagos have been regarded as the best
Indians in Arizona. ****** More readily than other
Indians they adapt themselves to circumstances, tilling
the soil, raising livestock, working in the mines,
or doing anything that offers.  As the reader knows,
they have sometimes had trouble with the Spaniards
and Mexicans, but they have always been friends of the
Americans and deadly foes of the Apaches.  They have
received very little aid from the Government."

T e same History in speaking of this country at
the close of the Civil War, says, p.555 :

"Four companies of Arizona volunteers, two of
them composed of Pimas and Papagos were also mustered
in, doing excellent service."

The same volume, p. 617, states:

"Western and southern Pima county, the former
known as "Papagueria", is an arid plain, sparsely
covered in spots with grass and shrubs, not without
fertility, but having for the most part no water,
and dotted here and there with isolated mountains
and short ranges."

These extracts are given to establish the fact

that the Papago Indians who have inhabited this country from time immemorial are of a peaceful disposition, have been loyal to the Government, and that their country is practically a barren desert.

## PRESENT CONDITIONS.

The word "Papagueria" has a well-defined meaning locally. It includes the territory occupied by the Papagos. The Indians live in settlements averaging from twelve to fifteen miles apart. These settlements vary in size from a few to as high as one hundred and fifteen houses. The inhabitants of most of the villages have two homes, one in the valley near their small patches of cultivated land, and the other in the mountains, to which they are compelled to retreat during the dry seasons in search of water for domestic use and for their stock. Within the Papagueria there are 105 Papago settlements, as follows:-

| | |
|---|---|
| Agua la Vara | Ajo |
| Ak Chin ( Maricopa) | Ak Chin (Sta. Rosa) |
| Alvarez Spring | Anegam |
| Artesa | Babokirk |
| Babakirk Fields | Barrijita |
| Batamote | Bears Well |
| Big Fields | Bitter Wells |

Black Butte
Burro Pond
Cheweeton
Childs Ranch
Choulic
Cobabi
Cockleburr
Comobabi
Copeke
Corrigan
Cowlic
Day's Store (Quijotoa)
Escobosa Ranch
Geowic
Growler Wells
Gus' Well
Haynes' Well
Indian Oasis
James' Well
Kaka
Komilik (Pima Jur.)
Koopke
Little Tucson
Manuel's Well
Moivajea
Noolik
Perigua
Poso Blanco Fields
Poso Colorado (Sauceda)
Poso Verde
Quitovaquito
Road Runner Village
San Antone
San Miguel Wells
San Miguel
San Rafael
Santa Rosa
Secundino's Well
Taht Mahmeli
Tecolote
Tonoca
Vaheja
Ventana (Fresnal)
Walls Wells
Wickchoupai
Williams' Well

Brownell
Caterpillar Pond
Charco de la Piedra
Chiu Chuischu
Chuapa
Cochora's Well
Comeva
Comoti
Copperosity
Covered Wells
Coyote
El Poso
Fresnal
Geowic Wells
Gunsight
Harlemuhta
Hendricks' Well
Iron Pipe Village
Joaquin's Village
Kerwo
Komilik ( San Xavier Jur.)
La Lesna
Magdelena
Menager's dam
Noipokam
Pacinimoi
Poso Blanco
Poso Colorado
Poso Redondo
Quajote
Rincon
Rocky Point
San Juan
San Lorenzo
San Pedro
Santa Cruz
Santiergo's Ranch
Steam Pump
Tautobit
Toapit
Topawa
Vamori
Via Sentee
Weldon Village
Whites' Well

Wherever villages are so fortunately located as to have a permanent water supply from wells the Indians have but one home and that in the valley near their cultivated patches. Usually the houses are built of adobe plastered over stalks of the ocatilla or ribs of the saguaro cactus, the roof being of the same material but quite thick.



A typical Indian home with Jacal (shade) in front.



An "old style" Papago home.



A more modern dwelling.    Note the improvement.



A Papago family and its "home".  The house was
built of large balls of adobe laid up and carefully
kneaded into place.  The whole was then bound together
with Ochotillo branches.

The homes of some of the more progressive
Indians are of adobe brick with somewhat modern roofs,
doors, and windows, some even being equipped with
such articles as sewing machines and cooking ranges.
Poverty, however, has denied these luxuries ( neces-
sities with us) to most of the Papagos, who to to
this day still harvest their grain with a hand sickle,
thresh by tramping with ponies, winnow or clean by
tossing in the air on a windy day, and grind by hand
by rubbing one stone upon another.



Threshing grain.



Winnowing.    The grain is tossed in the air and
the wind does the rest.

At one village is to be found a remarkable improvement in the way of a "burro mill", - a crude stone affair to which is attached a blindfolded burro.



The entire output of this "mill" would not exceed 200-lbs per day. While the methods of grinding are crude, yet the product is exceedingly nutritious, as the process of "bolting" is unknown to the Indians.

Adjacent to each village in the valleys will be found one or more corralls, a charco,( stock pond ) and a limited acreage of cultivated land. The corralls

are usually built of mesquite logs or brush, a few being made of ribs of the sahuaro cactus.



Corrall and charco (watering pond)



Corrall with watering trough leading from charco. The metal trough was installed by the irrigation branch of the Indian service.



　　　　Another view of a charco.　　The barrals are
used for hauling water for domestic purposes to
the homes of the Indians.



A stone corrall in the mountains.

In many places the timbers in these corralls are bound together with raw hide thongs for want of nails or wire. Less than twenty years ago the ordinary slip scraper was unknown to these people, and the dirt used in building their charcos (ponds) was packed by hand in baskets of their own make. These charcos are earthen ponds in which storm waters are collected and stored for domestic and stock-watering purposes. This section of Arizona, while virtually a desert region has two so-called "rainy seasons" annually, one during July or August, and the other about December or January.



A typical desert scene in the Papago country.



The cholla or jumping cactus.



Ochotillo



Sahuaro cactus.



Yucca.



"Montezuma's Head"



A cultivated "grain-field" in the Papago country.
Note the threshing floor to the left.



( Creasewood.    When pressed it has a strong
odor of creosote. )

(the rainy season)
It is during these periods/that surface water for
domestic and stock supply is collected in the charcos,
this water being used by man and beast alike.  As the
dry season approaches and water becomes low in the
charcos, a green slime forms over the surface, making
it decidedly unpalatable to say the least.  When the
water in these charcos is exhausted, the entire village
including the stock and domestic animals,moves to its
mountain home, which is usually fortified by a well,
frequently several hundred feet in depth.  Here water
is drawn by hand or by the use of a saddle pony until

the rains come again, when the village returns to its
valley home and cultivated patches.



Drawing water from a well with a saddle pony.

We have no authentic record of the rainfall in
this country, but the official records at Tucson
for the past twenty years show an annual rainfall of
ten inches, and no doubt in the Papago country to the
west it would be less.  Certainly the rainfall in the

Papagueria country is not sufficient to mature grain in a hot climate like Southern Arizona, where the loss of water by evaporation is enormous. Under the same climatic and soil conditions where water has been developed by artificial means for irrigation, like the Roosevelt Project of Southern Arizona, the Reclamation Service allows four and one-half acre-feet annually, or the equivalent of fifty-two inches of annual rainfall.

One of the most interesting methods followed by these people is that of collecting water for their charcos and cultivated patches. These Indians have no extensive irrigation system, with reservoirs, canals, etc., but they have a very ingenious plan of throwing out long dykes or wings which converge on a few acres somewhat like the sides of a funnel. These dykes are frequently several miles in length, running trans- versely across the valleys. Thus the rainfall from thousands of acres is diverted into a "pocket" of a few acres where the soil is suitable for cultivation. Storm waters thus collected are sufficient in favorable seasons to mature crops of grain on a very few acres, which crops in the summer are followed by corn, beans,

squashes, melons, and other vegetables. In the same
manner they divert water from a large surface area
into the charcos heretofore described, these charcos
being so situated as to secure a more or less imper-
vious subsoil in order to prevent loss of water by
seepage, This charco or pond water is used for stock
and domestic purposes while caring for their crops
in their small cultivated patches. The Papago Indians
by several hundred years of desert experience are
thoroughly conversant with the conditions in their
country, and with consummate judgment have so located
their charcos and cultivated patches as to secure
maximum results from the limited rainfall available.
We cannot go into their country with the idea of
teaching them farming or irrigation under conditions
as we find them. Rather should we go to them to be
taught. In fact, experts of the Department of Agri-
culture have already discovered several important
agricultural products which by their continued use
in this desert country for a period of several hundred
years have adjusted themselves to these desert conditions
and are therefore of great value to all the arid sec-
tions of the world. Among these might especially be

mentioned the tepary bean which is an entirely new variety of bean discovered only a few years ago amongst these Papago Indians. Any attempt to introduce modern farming methods, as we understand them elsewhere, would result in disaster. The most we should do for these people is first to protect them in the possession of the land which they have beneficially used to the good of mankind for hundreds of years. They should also have educational facilities and such modern agricultural machinery as would be adaptable, with some assistance in improving the stock industry. It is quite probable that they could be aided in the conservation of their very limited water or moisture by instruction along the lines of our modern "dry farming" methods. If thus protected and left in peace they are fully capable of working out their own salvation, indeed they are particularly ambitious to do so. Thus it would be possible for them to retain their well-established industry, individuality and manhood.

By the primitive methods in vogue among the ancient Egyptians these people have brought under cultivation practically every acre for which water is available or for which water can be made available

under this necessary system of desert irrigation,
and owing to the slight rainfall and the depth of
the underground water supply.  Underground water
is seldom found at a depth less than two hundred and
fifty feet in the valleys, the average depth being
about four hundred feet.  The introduction of modern
farming machinery would probably not increase the
area cultivated nor the ultimate yield, but would
lift from the shoulders of these industrious people
weeks, aye, even months of back-breaking toil, thus
leaving them more time for educational and industrial
development.

As previously shown, the Papagos are a very friendly tribe.  They have never borne arms against the white man.  Their battles in the past have been against the warring Apaches, the marauding Mexicans, and particularly against the adverse climatic conditions of the desert with which they have still to contend.  Today the Papagueria is virtually "Indian country", being uninhabited by white men except a few miners prospecting for wealth, three or four Indian traders, and three or four cattlemen seeking the same thing.

The Federal Government has done practically nothing up to a few years ago to assist the Papago Indians. No educational facilities have been furnished other than what could be obtained from two mission schools located near Tucson, or from reservation schools provided for other tribes or from non-reservation boarding schools. Congressional appropriations within the past two years have enabled the construction of day schools with limited capacity at four of the Indian villages, and three more are now under way. Also a considerable number of mission day schools have recently been started.

The Papago Indians have erroneously been called "nomadic". Normally they are not a wandering tribe. Lack of water frequently compels them to leave their preferred valley field location temporarily, to which however, they always return when it rains and water is again available. Wherever a water supply for domestic and stock use can be obtained at the valley villages, there you find a fixed abode. Necessity rather than choice drives them to the mountains where water is more easily available during the dry season.

To the white agriculturist the Papago country is not attractive. It strikes the stranger as "virgin desert", dry, unproductive, sparsely covered with mesquite and greasewood, the home of the cacti, the desert rat, and the so-called "nomadic Papago".



Mesquite.    Excellent honey is made from the flowers of this "tree".



A dead sahuaro. (Giant cactus)



Barrel cactus.    Candy is made from this "plant".



(Pipe organ cactus).

Under normal conditions the small amount of grain raised by these people is barely sufficient for home consumption, leaving nothing to market. Excessively dry years frequently occur, at which times the inhabitants are reduced to the direst straits. Their food supply at best is very meager, and successive dry years sometimes reduce them to the necessity of living chiefly on mesquite beans, cactus fruit, or other typical desert products. The Indians are industrious

and frugal, however, and have learned no doubt from sad experience to save a supply of grain for the inevitable "rainy day", which with them may last two or three years.



( Grain baskets.    The Indians' "warehouse".    Grain is placed in these home-made baskets and they are then covered to protect the contents from the weather. )

Owing to the dry, desert character of the country, agriculture cannot be depended upon as a means of livelihood.  As a rule the comparatively few acres cultivated, as stated before, barely provide sufficient

grain and vegetables for home consumption. The chief
means of support of the Papagos is cattle raising, and
the lack of rainfall and its attendant scarcity of
vegetation necessitates a large acreage to support
the number of stock necessary for the maintenance of
these people. It is estimated that at least one hundred
acres per head of stock is necessary. Dry years play
havoc with the Indians' stock. In such years the cattle
die by hundreds for want of water and sufficient food.
As a stock proposition alone, the area of the reserva-
tion herein proposed, allowing one hundred acres per
head, would support only twenty-seven thousand head of
stock, which, divided amongst the 6,500 Papagos would
be approximately four head of stock to each Indian.

Under these adverse conditions the Papago Indians
have wrested a living from time immemorial for six
or seven thousand souls. The white agriculturist, as
heretofore suggested, does not want the country. A
few large cattle owners could, of course, find use for
the ranges, but are we going to deprive by our
inactivity, silence, or otherwise, thousands of worthy
Indian people of their means of livelihood which they
have enjoyed for centuries? In this report it is not

our desire to make such recommendation as would increase the already heavy burden of the Government as to its Indian population, rather is it our desire to detract from this burden by outlining a plan to protect an already well-developed people who are at this time ( no doubt by reason of their past experience and consequent necessary industrial activities,) nearer the goal of citizenship than any other Indians with whom we are familiar.

## CONCLUSIONS.

Your Committee is firmly convinced of the fact that this country is chiefly adapted to stock raising. In fact, it is the only safe means of support open to the Papago Indians. This fact is forcibly demonstrated by reason of the positive showing that only those members of the tribe who have made any material progress at all are those who have given special attention to the stock industry. While they take advantage of every opportunity that the country affords from an agricultural standpoint, yet insufficient rainfall prevents them from relying upon agriculture as a chief means of livelihood. The grazing capacity of the country is exceedingly limited, due to the scarcity

of water. As far back as history tells us the Indians have occupied and beneficially used this country for grazing purposes, - the one to which it is best adapted,- and your Committee understands that the Interior Department by its decisions recognizes the fact that the exclusive use of lands for grazing purposes is sufficient to sustain a right of occupancy or possession. ( 31 L. D. 446). This seems to be true even though the lands are not embraced within an Indian reservation. ( 12 L. D. 516: 13 L. D. 269: 16 L. D. 209). The Supreme Court itself has laid down the doctrine that occupancy by Indians presupposes a title or right of possession, of which they cannot be deprived without authority from Congress. ( Johnson vs. McIntosh, 8 Wheat 543, Ex. Parte Crow Dog 109 U. S. 556-572).

In view of the long-continued occupancy of this country by the Papago Indians, its barren and unproductive character, the number of Indians living within its confines, and the number of acres required to support one head of stock, it is the opinion of your Committee that the very existence of these people depends upon the creation of a reservation for their exclusive benefit, which from a careful examination of conditions on the ground, and a full consideration of all authentic information obtained from all available

sources, we are convinced should embrace the follow-
ing described lands, which are also shown on the
attached map, ( See p.38 ) :-

( See p.38 )

All surveyed land and all unsurveyed land
which when surveyed will fall within the following
townships and ranges :-

*H & S R.M.*

| | | |
|---|---|---|
| All of Township 8 S., | Range 1 E. | |
| do. 8 S. | " 2 E. | |
| The W/2 " 8 S. | " 3 E. | |
| Sections 13-36 8 S. | " 5 E. | |
| Secs. 19,20,29, | | |
| 30, 31, and 32, 8 S. | " 6 E. | |
| | " 1 E. | |
| All of Township 9 S. | " 2 E. | |
| do. 9 S. | " 3 E. | |
| " 9 S. | " 4 E. | |
| Secs. 13-36,inc.9 S. | " 5 E. | |
| All of Township 9 S. | | |
| | " 1 E. | |
| All of Township 10 S. | " 2 E. | |
| do. 10 S. | " 3 E. | |
| " 10 S. | " 4 E. | |
| " 10 S. | " 5 E. | |
| " 10 S. | " 1 W. | |
| " 10 S. | " 2 W. | |
| " 10 S. | " 3 W. | |
| " 10 S. | | |
| The E/2 " | " 1 E. | |
| All of Township 11 S. | " 2 E. | |
| do. 11 S. | " 3 E. | |
| " 11 S. | " 4 E. | |
| " 11 S. | " 5 E. | |
| " 11 S. | " 1 W. | |
| " 11 S. | " 2 W. | |
| " 11 S. | " 3 W. | |
| " 11 S. | | |
| The E/2 " | " 1 E. | |
| All of Township 12 S. | " 2 E. | |
| do. 12 S. | " 3 E. | |
| " 12 S. | " 4 E. | |
| " 12 S. | " 5 E. | |
| " 12 S. | " 6 E. | |

```
All of Township   12 S.,  Range  7 E. ✓
        do.       12 S.     "     8 E. ✓
         "        12 S.     "     1 W. ✓
         "        12 S.     "     2 W. ✓
         "        12 S.     "     3 W. ✓
The E/2  "        12 S.

All of Township   13 S.     "     1 E. ✓
        do.       13 S.     "     2 E. ✓
         "        13 S.     "     3 E. ✓
         "        13 S.     "     4 E. ✓
         "        13 S.     "     5 E. ✓
         "        13 S.     "     6 E. ✓
         "        13 S.     "     7 E. ✓
         "        13 S.     "     8 E. ✓
         "        13 S.     "     1 W. ✓
         "        13 S.     "     2 W. ✓
         "        13 S.     "     3 W. ✓
         "        13 S.     "     4 W. ✓

All of Township   14 S.     "     1 E. ✓
        do.       14 S.     "     2 E. ✓
         "        14 S.     "     3 E. ✓
         "        14 S.     "     4 E. ✓
         "        14 S.     "     5 E. ✓
         "        14 S.     "     6 E. ✓

Secs. 1-32 inc.    "
  "   1-9          "
  "   16-21        "       14 S.     "     7 E. ✓
  "   28-30        "
  "   1-15         "
  "   22-27        "       14 S.     "     8 E. ✓✓
  "   34-36        "       14 S.     "     9 E. ✓✓
  "   13-32        "       14 S.     "    10 E. ✓
  "   13-22        "       14 S.
```

The W/2 Sec. 23, NE/4 Sec. 23, and W/2 SE/4
Sec. 23; N/2 Sec. 24, SE/4 Sec. 24; W/2 Sec.
26, W/2 E/2 Sec. 26, and all of Secs. 27, 28,
29, and 30 in Twp.14 S., Range 10 E. ✓

```
                           "    11 E. ✓
Secs. 16-21 inc.T.14 S.,    "     1 W. ✓
All of Township   14 S.     "     2 W. ✓
        do.       14 S.     "     3 W. ✓
         "        14 S.     "     4 W. ✓
         "        14 S.
```

All lands in Township 15 S. of Range 1 East
    do.               15 S.       " 2 "
      "                15 S.       " 3 "
      "                15 S.       " 4 "
      "                15 S.       " 5 "

Secs. 5,6,7,8.17, 18,
19,20, 29, 30.31.
and 32, in Township 15 S.       " 6 "
      "                15 S.       " 8 "
The E/2 of
Secs. 5, 6, 7, 8, 17,             " 9 "
18,19, and 20, in Twp.15 S.       " 1 West
All lands in Township 15 S.       " 2 "
      Do                15 S.       " 3 "
      "                15 S.       " 4 "
      "                15 S.

                            " 1 East
All land in Township 16 S.       " 2 "
      do                16 S.       " 3 "
      "                16 S.       " 4 "
      "                16 S.       " 5 "
      "                16 S.

Secs. 5-8 inc. and             " 6 "
Secs. 17-36 inc. in T.16 S.
Secs. 1,2,3,10,11,12,13,14,15,22,23,24,25,29,30,
31,32,33,34, the S/2 35, NE/4 35, W/2 NW/4 35,
the SE/4 NW/4 Sec.35, and Sec. 36, Twp. N. R. 16 S.,
R. 7 E.
      Secs. 1-9 inc., N/2 Sec. 10, SE/4 Sec. 10,
      S/2 SW/4 Sec. 10, Secs. 11-24 inc. and Secs.
      29-32 inc. of Twp. 16 S., Range 8 E.
Secs. 7-11 inc., and Secs. 16, 17 and 18, in Twp.
16 S.,Range 9 E.
All land in Township 16 S. of Range 1 West.
      do.               16 S.       " 2 "
      "                16 S.       " 3 "
      "                16 S.       " 4 "
      "                16 S.

                            " 1 East
All land in Township 17 S.       " 2 "
      do.               17 S.       " 3 "
      "                17 S.       " 4 "
      "                17 S.       " 5 "
      "                17 S.       " 6 "
      "                17 S.       " 7 "
      "                17 S.
      "                           " 8 "
Secs. 5-8 inc. and      17 S.       " 1 West.
17-20 inc. in Twp.      17 S.       " 2 "
All land in Township 17 S.       " 3 "
      do                17 S.       " 4 "
      "                17 S.
      "

All land in Township 18 S. of Range 1 E.
do. 18 S. " 2 E.
do. 18 S. " 3 E.
" 18 S. " 4 E.
" 18 S. " 5 E.
" 18 S. " 6 E.
" 18 S. " 7 E.
" 18 S. " 1 W.
" 18 S. " 2 W.
" 18 S. " 3 W.
" 18 S. " 4 W.
" 18 S.

All land in Township 19 S. " 1 East.
do 19 S. " 2 "
" 19 S. " 3 "
" 19 S. " 4 "
" 19 S. " 5 "
" 19 S. " 6 "
" 19 S. " 7 "
" 19 S. " 1 West
" 19 S. " 2 "
" 19 S. " 3 "
" 19 S.

All land in Township 20 S. " 1 East
do. 20 S. " 2 "
" 20 S. " 3 "
" 20 S. " 4 "
" 20 S. " 5 "
" 20 S. " 6 "
" 20 S. " 7 "
The W/2 of Township 20 S. " 1 West
All land in " 20 S.
" 3 East
All land in Township 21 S. " 4 "
do. 21 S. " 5 "
" 21 S. " 6 "
" 21 S. " 7 "
The W/2 of " 21 S.
" 6 "
All land in Township 22 S. " 7 "
The W/2 of " 22 S.

The area above described lies within Pima,
Pinal and Maricopa Counties, Arizona, and aggregates
2,700,000 acres, of which it is estimated 650,000
acres are exceedingly rough and mountainous. Within



Cutganes 1761.

APACHES

Nijoras  Moqui.

Sierra grande divisada desde el Rio Gila año 1693.

Rio Gila

COCOMARICOPAS

YUMAS

PAPAGOS

APACHES

SONORA PURIS

Hoabonomas

Baqiopas

PIMERIA

SOBAS

GOLFO

PROVINCIA DE SONORA

Matape

Naciones de Gentiles no conocidas

SERIS

GUAIMAS

Provincia de Ostimuri

DE CALIFORNIA ó MAR ROXO DE CORTES

CALICOCHIMIE

Provincia de los Frayles

OMONQUISA

AL REY N.
LA PROVINCIA
de la Compañia
de JHS de
Nueva España
so O Dj C.
1757

PERICUES

Cabo de San Lucas





DEPARTMENT OF THE INTERIOR
GENERAL LAND OFFICE
FRED DENNETT, COMMISSIONER.

# STATE OF ARIZONA

Compiled from the official Records of the General Land Office and other sources
under the direction of
I. P. BERTHRONG

# ATTACHMENT J

1-18303

JAN 13 1916

My dear Mr. President:

I have the honor to transmit herewith the draft of an Executive Order creating a reservation for the Papago Indians in southern Arizona.

A careful investigation in connection with these Indians has been in progress during the past two years, and from the information gathered it is conclusively shown that the Indians have been in undisturbed possession of the lands described in the enclosed Order for over three hundred years last past. Every consideration of humanity and justice, therefore, points to the necessity of establishing a permanent reservation for their benefit.

It will be noted that the attached Order is so drawn as to permit a continuation of mineral locations, with a view of obtaining patents under our mineral land laws. This has been done because of the fact that the rough mountainous lands within the area covered by the enclosed Order are practically valueless to the Indians for grazing purposes, but they may contain mineral deposits of considerable value, as prospecting by white citizens has been going on there for a number of years.





INITIALING COPY - FOR FILE.   FILED BY M. A. K

The contemplated action comes to you with the
sanction of the entire State delegation and the Governor
of the State.

Believing it advisable for the future pro-
tection of these Indians, your approval of the enclosed
Order is respectfully recommended.

Cordially yours,

(Sgd.) FRANKLIN K. LANE

The President,

The White House.

Enclosure 18303.