**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe, | ) <br> ) <br> ) | |
| *Plaintiff,* | ) <br> ) | |
| v. | ) <br> ) | Case No. 26-cv-2127-RJL |
| MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br>*Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    I.    DHS employs border barriers as part of its border security mission. ...................... 3

        A.    IIRIRA Section 102: improvement of barriers at the border. ...................... 4

        B.    The Secretary's exercise of waiver authority ................................................. 6

    II.    The Roosevelt Reservation was established along the U.S.-Mexico border before the Tribal Reservation was established. .......................................................... 8

        A.    Roosevelt Reservation ..................................................................................... 8

        B.    The Tribal Reservation .................................................................................... 9

    III.    The United States has historically used the Roosevelt Reservation for barriers to protect the border, and developed the Tucson 5 Project to continue that mission. .................................................................................................. 10

        A.    The Current Border Barrier System ............................................................. 10

        B.    The Tucson 5 Project ...................................................................................... 11

LEGAL STANDARD ................................................................................................................ 12

ARGUMENT ............................................................................................................................. 12

    I.    Plaintiff is unlikely to succeed on the merits. ......................................................... 12

        A.    Plaintiff is unlikely to satisfy the high bar that it must meet to assert an *ultra vires* challenge to agency activity. ............................................... 12

            1.    Congress has authorized and directed DHS to build a barrier to secure the U.S. border. ..................................................... 15

            2.    Plaintiff cannot show that the challenged Tucson 5 Project is "entirely in excess" of DHS's delegated authority. ...................... 16

                a.    As a matter of law, constructing a border barrier would not "diminish" the Tribal Reservation. ................... 17

b.      Section 398d does not prohibit construction of a
        border barrier. ...................................................................19

c.      In any event, the United States' continuing use of the
        Roosevelt Reservation lands for border security
        purposes is not *ultra vires*. ..............................................20

3.      Allowing use of *ultra vires* claims as a collateral attack on
        border barriers would defeat the limits on judicial review that
        Congress established in IIRIRA.......................................................25

B.      Plaintiff's common law trespass claim is unlikely to succeed...................28

1.      A tribal challenge to federal actions on federally owned
        tribal trust lands is not governed by the common law of torts.......28

2.      Plaintiff's trespass claim would otherwise be barred by the
        United States' sovereign immunity................................................31

3.      Plaintiff's trespass claim is not ripe. .............................................33

II.     Plaintiff has failed to establish irreparable harm, and the balance of equities
        and public interest weigh against a preliminary injunction. ...................35

A.      An injunction will impose substantial and irreparable harms on the
        United States. ........................................................................36

B.      The United States' interests decisively outweigh Plaintiff's
        speculative harms.....................................................................39

III.    Any injunctive relief must be narrowly tailored, and a bond should
        accompany any injunctive relief. ..........................................................43

A.      Plaintiff's request for injunctive relief is overbroad and any
        injunction must be narrowly tailored. ........................................43

B.      A bond should accompany any injunctive relief.....................................45

CONCLUSION………………………………………………………………………45

# TABLE OF AUTHORITIES

**Cases**

*Am. Petroleum Inst. v. EPA*,
  683 F.3d 382 (D.C. Cir. 2012) ............................................................................. 33, 34, 35

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 ...................................................................................................................... 27

*Atl. States Legal Found. v. EPA*,
  325 F.3d 281 (D.C. Cir. 2003) ........................................................................................ 34

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) ................................................................................................ 12, 26, 27

*Biden v. Texas*,
  597 U.S. 785 (2022) .......................................................................................................... 37

*Blackie's House of Beef, Inc. v. Castillo*,
  659 F.2d 1211 (D.C. Cir. 1981) ...................................................................................... 37

*Block v. North Dakota*,
  461 U.S. 273 (1983) .......................................................................................................... 32

*Changji Esquel Textile Co. v. Raimondo*,
  40 F.4th 716 (D.C. Cir. 2022) ......................................................................................... 13

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981) .......................................................................................................... 29

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................................................... 43, 44

*Clearfield Trust Co. v. United States*,
  318 U.S. 363 (1943) .......................................................................................................... 29

*Cnty. of El Paso v. Chertoff*,
  No. EP-08-CA-196, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008) ........................... 7

*Cramer v. United States*,
  261 U.S. 219 (1923) .......................................................................................................... 29

*\*Ctr. for Biological Diversity v. McAleenan*,
  404 F. Supp. 3d 218 (D.D.C. 2019) .......................................................................... passim

*Ctr. v. Biological Diversity v. Mullin*,
  No. 25-00365, 2026 WL 836278 (D. Ariz. Mar. 26, 2026) ........................................... 7

*Davilla v. Enable Midstream Partners L.P.*,
  913 F.3d 959 (10th Cir. 2019) ......................................................................................... 31

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) ........................................................................... 26

*Defs. of Wildlife v. Chertoff*,
  527 F. Supp. 2d 119 (D.D.C. 2007) ................................................................ 7, 26

*Edwardsen v. Morton*,
  369 F. Supp. 1359 (D.D.C. 1973) ............................................................ 29, 30, 33

*El Paso Nat. Gas Co. LLC v. United States*,
  No. CV-14-08165-PCT-DGC, 2017 WL 3492993 (D. Ariz. Aug. 15, 2017) .................... 28, 32

*Estep v. United States*,
  327 U.S. 114 (1946) ......................................................................................... 26

*Fed. Express Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ........................................................................... 13

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*,
  830 F.3d 515 (D.C. Cir. 2016) ...................................................................... 13, 16

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) ........................................................................... 41

*Hernandez v. Mesa*,
  589 U.S. 93 (2020) ........................................................................................... 38

*Hunter v. FERC*,
  527 F. Supp. 2d 9 (D.D.C. 2007) .................................................................. 13, 16

*In re: Border Infrastructure Env't Litig.*,
  284 F. Supp. 3d 1092 (S.D. Cal. 2018) ................................................................. 7

*Kucana v. Holder*,
  558 U.S. 233 (2010) ......................................................................................... 26

*Landon v. Plasencia*,
  459 U.S. 21 (1982) ........................................................................................... 36

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ......................................................................................... 13

*Mariana Islands v. United States*,
  670 F. Supp. 2d 65 (D.D.C. 2009) ..................................................................... 37

*\*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ......................................................................................... 19

*Munaf v. Geren*,
  553 U.S. 674 (2008) ......................................................................................... 12

*N. Am. Butterfly Ass'n v. Nielsen*,
  368 F. Supp. 3d 1 (D.D.C. 2019) ......................................................................... 7

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ................................................................................................ 34

*Nat'l Treasury Emps. Union v. Trump*,
    No. 25-5157, 2025 WL 1441563 n.4 (D.C. Cir. May 16, 2025) .............................................. 45

*Nat'l Treasury Emps. Union v. Von Raab*,
    489 U.S. 656 (1989) ......................................................................................... 37, 40

*Navajo Nation v. United States*,
    171 Fed. Cl. 246 (2024) ....................................................................................... 30

*Navajo Nation v. United States*,
    175 Fed. Cl. 114 (2025) ....................................................................................... 30

*Nebraska v. Parker*,
    577 U.S. 481 (2016) ............................................................................................. 17

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................. 35

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ................................................................................... 12, 13, 14

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) .......................................................................... 12, 13

*Oneida County v. Oneida Indian Nation of N.Y. State*,
    470 U.S. 226 (1974) ............................................................................................. 29

*Ralpho v. Bell*,
    569 F.2d 607 (D.C. Cir. 1977) ............................................................................... 27

*Rodriguez v. Fed. Deposit Ins. Corp.*,
    589 US. 132 (2020) .............................................................................................. 29

*Rosebud Sioux Tribe v. Kneip*,
    430 U.S. 584 (1977) ............................................................................................. 18

*Sanchez-Mercedes v. Bureau of Prisons*,
    453 F. Supp. 3d 404 (D.D.C. 2020) ....................................................................... 32

*Save Our Heritage Org. v. Gonzalez*,
    533 F. Supp. 2d 58 (D.D.C. 2008) ........................................................................... 7

*Seymour v. Superintendent of Washington State Penitentiary*,
    368 U.S. 351 (1962) ............................................................................................. 18

*Shoshone Indian Tribe of Wind River Reserv. v. United States*,
    52 Fed. Cl. 614 (2002) ......................................................................................... 30

*Sierra Club v. Ashcroft*,
    No. 04CV0272, 2005 WL 8153059 (S.D. Cal. Dec. 13, 2005) ...................................... 7

*Sierra Club v. Trump*,
  379 F. Supp. 3d 883 (N.D. Cal. 2019) .................................................................. 7

*Simpkins v. D.C. Gov't*,
  108 F.3d 366 (D.C. Cir. 1997) ............................................................................ 32

*\*Skokomish Indian Tribe v. United States*,
  410 F.3d 506 (9th Cir. 2005) .............................................................................. 30

*\*Solem v. Bartlett*,
  465 U.S. 463 (1984) ...................................................................................... 17, 18

*Tee-Hit-Ton Indians v. United States*,
  348 U.S. 272 (1955) .............................................................................. 21, 29, 30

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................ 44

*Trump v. Sierra Club*,
  140 S. Ct. 1 (2019) .............................................................................................. 36

*Trump v. Sierra Club*,
  591 U.S. 1065 (2020) .......................................................................................... 36

*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*,
  775 F.3d 128 (2d Cir. 2014) ............................................................................... 45

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
  998 F.3d 926 (D.C. Cir. 2021) ........................................................................... 45

*United States v. Aguilar*,
  883 F.2d 662 (9th Cir. 1989) .............................................................................. 37

*United States v. Jicarilla Apache Nation*,
  564 U.S. 162 (2011) ............................................................................................ 28

*United States v. Lara*,
  541 U.S. 193 (2004) ............................................................................................ 40

*United States v. Milner*,
  583 F.3d 1174 (9th Cir. 2009) ............................................................................ 29

*United States v. Montoya de Hernandez*,
  473 U.S. 531 (1985) .............................................................................................. 1

*\*United States v. S. Pac. Transp. Co.*,
  543 F.2d 676 (9th Cir. 1976) .............................................................. 20, 28, 31

*United States v. Smith*,
  499 U.S. 160 (1991) ............................................................................................ 31

*Water Keeper Alliance* v. *Dep't of Def.*,
  271 F.3d 21 (1st Cir. 2001) ................................................................................ 41

*Weinberger v. Romero- Barcelo*,
  456 U.S. 305 (1982) ................................................................................... 35

*\*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................ 12, 35, 36, 39

*Yankton Sioux Tribe v. Podhradsky*,
  606 F.3d 994 (8th Cir.2010) .................................................................... 20

**Statutes**

16 U.S.C. §§ 1536-44 ....................................................................................... 7

25 U.S.C. § 398d ................................................................................ 2, 14, 16, 19

25 U.S.C. § 70a (1946) ................................................................................... 22

28 U.S.C. § 1346(b)(1) ................................................................................... 32

28 U.S.C. § 2675(a) ........................................................................................ 32

35 Stat. 2136 (May 27, 1907) ................................................................. passim

42 U.S.C. §§ 4321-4370m-12 ......................................................................... 7

5 U.S.C. §§ 551-59 ........................................................................................... 7

6 U.S.C. § 202(1) .............................................................................................. 3

6 U.S.C. § 202(2) .............................................................................................. 3

8 U.S.C. § 1103 note ..................................................................................... 1, 4

8 U.S.C. § 1357(a)(3) ....................................................................................... 4

8 U.S.C. § 1701 note ........................................................................................ 3

Pub. L. No. 104-208, 110 Stat. 3009 (1997) ........................................... passim

Pub. L. No. 107-296, 116 Stat. 2135 (2002) .................................................... 4

Pub. L. No. 109-13, 119 Stat. 231 (2005) ........................................................ 4

Pub. L. No. 109-367, 120 Stat. 2638 (2006) ............................................. 3, 4, 5

Pub. L. No. 110-161, 121 Stat. 1844 (2008) .................................................. 4, 5

Pub. L. No. 119-21, 139 Stat. 72 (2025) .......................................................... 6

Pub. L. No. 75-217, 50 Stat. 536 (1937) ...................................................... 9, 24

Pub. L. No. 79-709, 46 Stat. 1202 (1931) ........................................................ 9

**Rules**

Fed. R. Civ. P. 65(c) ....................................................................................... 45

**Other Authorities**

70 Fed. Reg. 55622 (Sept. 22, 2005) ................................................................................. 7

72 Fed. Reg. 60870 (Oct. 26, 2007) .................................................................................. 7

73 Fed. Reg. 18293 (April 3, 2008) ................................................................................... 7

73 Fed. Reg. 19078 (Apr. 8, 2008) .................................................................................... 6

82 Fed. Reg. 35984 (Aug. 2, 2017) .................................................................................... 6

82 Fed. Reg. 42829 (Sept. 12, 2017) ................................................................................. 6

84 Fed. Reg. 21798 (May 15, 2019) ................................................................................... 6

90 Fed. Reg. 23946 (June 5, 2025) .................................................................................... 6

90 Fed. Reg. 8327 (Jan. 20, 2025) ................................................................................... 38

90 Fed. Reg. 8443 (Jan. 20, 2025) ............................................................................... 37, 38

90 Fed. Reg. 8467 (Jan. 20, 2025) ...................................................................... 1, 4, 31, 38

H.R. Rep. 109-72 (2005) ................................................................................................. 4, 6

**INTRODUCTION**

All three branches of the Federal Government share a "longstanding concern for the protection of the integrity of the border."[1] Congress has been crystal clear about this. In four separate acts, Congress has directed the Secretary of Homeland Security to install necessary barriers and roads to secure the border. Most recently, Congress expressly instructed the Secretary to gain operational control of the southwest border. Congress has empowered the Secretary to waive all legal requirement (when necessary) to accomplish this goal. And Congress has repeatedly funded this directive to the tune of tens of billions of dollars. Given Congress's explicit directive, no court has ever concluded that building a border barrier under these laws is *ultra vires*.

According to Plaintiff Tohono O'odham Nation, however, Congress silently left a sixty-two mile stretch of the Arizona border unprotected. That stretch, Plaintiff says, shares a border with its reservation (the Tribal Reservation). As Plaintiff tells it, the Secretary may secure that portion of the border only if it agrees. Under this theory Plaintiff wields veto power over any border-barrier project in this area.

Plaintiff's theory would, to say the least, break new legal ground. This novel theory is the basis for Plaintiff's extraordinary request for emergency relief: an injunction blocking the United States from constructing a barrier on this stretch of the U.S. border. We are unaware of any case—and Plaintiff cites none—where a court blocked the United States from securing its border for lack of tribal consent. It is thus unsurprising that Plaintiff cites no case that has accepted either of its legal claims.

---

[1] *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985); *see* Exec. Order 14165, § 2(a), 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025) (noting "[i]t is the policy of the United States to take all appropriate action to secure the borders of our Nation," including by "[e]stablishing a physical wall and other barrier"); *see generally* 8 U.S.C. § 1103 note.

Plaintiff first claims that a border wall would impermissibly change the legal status of the Tribal Reservation and violate a statute that says only Congress may change the boundary of certain reservations. *See* 25 U.S.C. § 398d. At the outset, a barrier at the border does not change the boundary of Plaintiff's Reservation. It would not even prevent members of the Nation from accessing the border themselves, provided gates were installed. Indeed, Plaintiff supported a vehicle barrier in the same location roughly twenty years ago. It presumably did not think that barrier changed the boundary of its Reservation.

Setting aside that fundamental flaw, the Tohono O'odham Reservation has always been encumbered by the United States' preexisting right to secure the border, so exercising that right can hardly be deemed to change the reservation's legal status or its boundaries. A 1907 presidential proclamation "set apart as a public reservation, all public lands within sixty feet of the international boundary between the United States and Mexico." Proclamation No. 60, 35 Stat. 2136, 2136 (May 27, 1907) (1907 Proclamation) (Attachment A). The United States retained the right to use that land, called the Roosevelt Reservation, for border security and has done so for more than 100 years, including by constructing fifty-two miles of vehicle barrier not twenty years ago.

Plaintiff's common-law trespass claim fares no better. The common law fills gaps left by Congress, but Congress left no gap here. The land at issue is held by the United States in trust, and treaties, statutes, and regulations govern the relationship between the United States and tribes. But Plaintiff does not seek to enforce any alleged breach of a duty owed to it. Instead, Plaintiff brings a claim for a common law tort. But when it comes to torts, the Federal Tort Claims Act ("FTCA") is the means by which parties may sue the United States. Plaintiff cites no case in which the United States has been deemed to have trespassed on a tribal reservation. Nor does it cite any case in which a common law tort suit was available to challenge the United States' use of land that it holds

2

in trust. Such an outcome would be quite unusual since the United States is the legal owner of (and Congress has plenary authority over) land that it holds in trust for tribes. Plaintiff may have pled a common law claim to evade the FTCA's limits on equitable relief. The potentially applicable waivers of sovereign immunity for trespass or other torts allow only money damages, and Plaintiff seeks injunctive relief. This Court should not be the first to endorse this gambit.

Plaintiff's difficulties don't stop there. Review is unavailable under the Administrative Procedure Act ("APA") because the Secretary of Homeland Security waived the APA's requirements. Plaintiff must show that building a barrier would be *ultra vires*. But Plaintiff's theories are run-of-the-mill claims that fall short of the high bar for *ultra vires* relief, especially since Congress has expressly directed the Secretary to build a border barrier.

All said, Plaintiff has not shown that its lack of consent to constructing the border wall on the relevant land converts the construction into an *ultra vires* action or one that can give rise to a trespass claim for equitable relief. While the United States has worked—and will continue to work—cooperatively with Plaintiff to promote their shared interest in border security, Plaintiff does not hold veto power over the United States' sovereign duty to secure its borders.

**BACKGROUND**

**I.      DHS employs border barriers as part of its border security mission.**

The Department of Homeland Security (DHS) is responsible for border security and the detection and prevention of illegal entry into the United States. *See, e.g.*, 6 U.S.C. § 202(1), (2) . Congress has directed DHS to achieve and maintain operational control of the international land border. *See* Secure Fence Act of 2006, Pub. L. No. 109-367, § 2(a), 120 Stat. 2638, 2638 (codified at 8 U.S.C. § 1701 note). "Operational control" means "prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism,

narcotics, and other contraband." *Id*. § 2(b) . Consistent with that mandate, the President has directed the Secretary of Homeland Security to "take all appropriate action to deploy and construct . . . physical barriers to ensure complete operational control of the southern border of the United States." Exec. Order 14165, § 3, 90 Fed. Reg. at 8468. DHS has additional border-protection authorities, including authority for warrantless "access to private lands, but not dwellings," within twenty-five miles of any United States border "for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3).

### A.      IIRIRA Section 102: improvement of barriers at the border.

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (IIRIRA § 102), is among the statutory authorities on which DHS relies to protect this country's security at the border. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 102, 110 Stat. 3009, 3009-554 (1996) (codified at 8 U.S.C § 1103 note and appended to this memorandum, as amended). Section 102 has been amended several times.[2]

In its current form, Section 102(a) directs the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a) .[3] Section 102(b) provides additional requirements for implementing the broad mandate laid out in Section

---

[2] Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090-91 (2007); Secure Fence Act of 2006, § 3, 120 Stat. at 2638-39; Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, § 102, 119 Stat. 231, 302, 306 (Div. B, Title I, Real ID Act of 2005).

[3] In 1996, responsibility for border enforcement lay with the Attorney General. The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, created DHS and transferred border enforcement authority to it. In 2005, IIRIRA § 102 was amended to refer to the DHS Secretary. *See* H.R. Rep. 109-72 at 171 (2005) (Conf. Rep.).

102(a).[4] In the most recent amendment, Congress required "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border" but gave the Secretary discretion to determine "where fencing would be most practical and effective" with the goal "to gain operational control of the southwest border." § 564, 121 Stat. at 2090 (amending IIRIRA § 102(b)(1)(A)). This amendment also confirmed DHS's sole discretion to determine the appropriate placement of border barriers by clarifying that, notiwthstanding the mandatory language in IIRIRA section 102(b)(1)(A), IIRIRA did not require DHS to build infrastructure at a particular site "*if the Secretary determines* that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location." *Id.* (emphasis added).

In addition to these guidelines, Congress provided two mechanisms to ensure expeditious barrier construction. First, Congress granted the Secretary of Homeland Security "the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1) . Congress originally limited this provision to the Endangered Species Act (ESA) and the National Environmental Policy Act (NEPA), *see* § 102(c), 110 Stat. at 3009-555, but later expanded it to include "all legal requirements." § 102(c)(1), 119 Stat. at 306; *see also* H.R. Rep.

---

[4] These requirements of Section 102(a) have varied over the years. For example, in 1996, Congress specified that, in "carrying out subsection (a), the [agency] shall provide for the construction . . . of second and third fences, in addition to the existing reinforced fence, and for roads between the fences" in a fourteen-mile section near San Diego. § 102(b)(1), 110 Stat. at 3009-554. Then, in the Secure Fence Act of 2006, Congress struck the reference to San Diego and required construction of "at least 2 layers of reinforced fencing, [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five designated areas along the southern border. § 3, 120 Stat. at 2639. The locations where Congress identified a need for these security features included the area "extending from 10 miles west of the Calexico, California, port of entry to 5 miles east of the Douglas, Arizona, port of entry," which includes the area where the Tohono O'odham Reservation is located. *Id.*

5

109-72, at 171  (explaining "Congress' intent that the . . . waiver authority extends to any local, state or federal statute, regulation, or administrative order that could impede expeditious construction of border security infrastructure").

Second, Congress created a streamlined system of judicial review for challenges to the Secretary's waiver authority. It gave federal district courts "exclusive jurisdiction" over "any action undertaken, or any decision made, by the Secretary" pursuant to IIRIRA's waiver authority. IIRIRA §102(c)(2)(A). Only constitutional challenges over such actions or decisions are permitted. *Id*. Legal challenges must be brought within sixty days, and the only appellate review is a certiorari petition to the U.S. Supreme Court. *Id*. § 102(c)(2)(B), (C) . The strict limits on judicial review were designed "to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver." H.R. Rep. 109-72 at 172.

Congress continues to fund border barrier construction. In 2025, Congress appropriated $46.5 billion for the "(1) Construction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers. (2) Access roads. (3) Barrier system attributes … [and] (4) Any work necessary to prepare the ground at or near the border to allow [CBP] to conduct its operations, including the construction and maintenance of the barrier system." One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72, 357-58 (2025).

**B.      The Secretary's exercise of waiver authority.**

Since 2005, the Secretary of Homeland Security has consistently issued waiver determinations under the IIRIRA to ensure expeditious construction of barriers and roads along the border. *See, e.g.*, 90 Fed. Reg. 23946 (June 5, 2025); 84 Fed. Reg. 21798 (May 15, 2019); 82 Fed. Reg. 42829 (Sept. 12, 2017); 82 Fed. Reg. 35984 (Aug. 2, 2017); 73 Fed. Reg. 19078 (Apr.

6

8, 2008); 72 Fed. Reg. 60870 (Oct. 26, 2007); 70 Fed. Reg. 55622 (Sept. 22, 2005). Every judicial challenge to these determinations has been denied or dismissed.[5]

To achieve and maintain operational control over the border and ensure expeditious construction of barriers over land in California, Arizona, New Mexico, and Texas that includes the Tribal Reservation, the Secretary issued a determination to "waive in their entirety" the requirements of numerous laws, including the National Environmental Policy Act (42 U.S.C. §§ 4321-4370m-12), the Endangered Species Act (16 U.S.C. §§ 1536-44), and the APA (5 U.S.C. §§ 551-59). *Determination Pursuant to § 102 of the IIRIRA of 1996, as Amended*, 73 Fed. Reg. 18293 (Apr. 3, 2008). DHS has determined that there is a critical need for border barrier in the particular sixty-two-mile stretch along the Tribal Reservation. *See* Hollinder Decl. ¶¶ 5, 8 (explaining why barrier is needed to maintain operational control at this location to address specific law enforcement, operational, and geographic challenges);[6] Enriquez Decl. ¶¶ 8-15 (explaining the effectiveness of border barrier to impede smugglers and aliens and anticipating that, after

---

[5] *See Ctr. v. Biological Diversity v. Mullin*, No. 25-00365, 2026 WL 836278 (D. Ariz. Mar. 26, 2026); *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218 (D.D.C. 2019); *In re: Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal. 2018), *aff'd*, 915 F.3d 1213 (9th Cir. 2019); *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 922-23 (N.D. Cal. 2019), *aff'd*, 963 F.3d 874 (9th Cir. 2020), *vacated and remanded sub. nom. Biden v. Sierra Club*, 142 S. Ct. 46 (Mem.) (2021); *N. Am. Butterfly Ass'n v. Nielsen*, 368 F. Supp. 3d 1 (D.D.C. 2019), *aff'd in part, rev'd in part sub. nom. N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020); *Cnty. of El Paso v. Chertoff*, No. EP-08-CA-196, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008); *Save Our Heritage Org. v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007); *Sierra Club v. Ashcroft*, No. 04CV0272, 2005 WL 8153059 (S.D. Cal. Dec. 13, 2005).

[6] A redacted version of Mr. Hollinder's declaration is being submitted in support of this Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction. The redacted portions of the declaration contain law enforcement sensitive (LES) information not appropriate for public release; Defendants will seek to reach agreement with Plaintiff on an appropriate protective order that would allow for release of the LES information to Plaintiff, subject to limitations on disclosure and handling, as well as submission to the Court under seal.

completion of other planned barrier projects at the Arizona-Sonora border, the area along the Tribal Reservation would be one of the few remaining areas without a border barrier system intended to deter illegal pedestrian and vehicle crossings). Plaintiff recognizes that the Tribal Reservation's location on the border creates law enforcement challenges, including vulnerability to illegal drug activity and transnational organizational crime. *See* V. Jose Decl., Attach. D, at 2–3 (Dkt. #3-2, 39-40) (Testimony of the Honorable Verlon Jose, Chairman, Before the H. Comm. on Natural Resources, Subcomm. on Oversight & Investigations, 118th Cong. (Apr. 10, 2024)).

Even where the Secretary has waived environmental and other laws, U.S. Customs and Border Protection ("CBP") still consults with relevant stakeholders pursuant to IIRIRA Section 102(b)(1)(C). In carrying out his authority to install physical barriers at the border under IIRIRA, the Secretary is required to consult with certain groups, including "Indian tribes," regarding potential impacts to the areas where barrier will be constructed. IIRIRA § 102(b)(1)(C)(i) .[7] However, Section 102 specifically provides that the statutory consultation obligation does not "create or negate any right of action" or "affect the eminent domain laws of the United States or of any State." *Id*. § 102(b)(1)(C)(ii)(I) and (II) .

II.    **The Roosevelt Reservation was established along the U.S.-Mexico border before the Tribal Reservation was established.**

A.    **Roosevelt Reservation**

In 1907, President Roosevelt issued a Proclamation that reserved a sixty-foot strip of public land along the US-Mexico border, running from California through the Territories of Arizona and New Mexico, "from the operation of the public land laws." 1907 Proclamation, 35 Stat. at 2136.

---

[7] IIRIRA § 102(b)(1)(C)(i)  ("In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.").

This land, set aside "as a public reservation," known as the "Roosevelt Reservation," excluded land that was "embraced in any legal entry or covered by any lawful filing …, or upon which any valid settlement has been made pursuant to law." *Id*. Reciting the need to keep the land along the border "free from obstruction as a protection against the smuggling of goods, the Proclamation set the land aside "as a public reservation" that could be "used for public highways but for no other purpose whatever." *Id*. at 2136-37.

### B.      The Tribal Reservation

The Tribal Reservation was initially established by executive order, and its boundaries were defined by reference to existing township maps, including townships along the U.S.-Mexico border. In 1917, Executive Order 2524 set apart "all surveyed land and all unsurveyed land" within a defined area "as a reservation for the benefit of the" Nation, while preserving "any existing legal right of any person to any of the lands" within these boundaries. Exec. Order 2524, *Reserving Certain Lands in the State of Arizona for the [Nation]* (Feb. 1, 1917) (the 1917 Order).

In 1931, Congress enacted legislation recognizing that the 1917 Order had "creat[ed] the [Tribal] Reservation" and expanding it, Pub. L. No. 79-709, 46 Stat. 1202, 1202 (1931), with additional expansions following in subsequent years. A 1937 expansion included lands along the US-Mexico border, lengthening the southern boundary of the Tribal Reservation. Pub. L. No. 75-217, 50 Stat. 536, 536 (1937) (1937 Act) (Attachment B). The 1937 Act provided that the "extension shall not affect any valid rights initiated prior to the approval hereof nor the reservation of a *strip of land sixty feet wide along the United States-Mexico boundary* made by proclamation of the President dated May 27, 1907 (35 Stat. 3136)." *Id*. (emphasis added). Congress further stated that "lands herein described when added to the [Tribal Reservation] as provided in this Act shall

9

become a part of said reservation in all respects and upon all the same terms as if said lands had been included in the Executive order issued by the President on February 1, 1917." *Id.*

**III.    The United States has historically used the Roosevelt Reservation for barriers to protect the border, and developed the Tucson 5 Project to continue that mission.**

### A.    The Current Border Barrier System

As Plaintiff sets out, DHS presently maintains "vehicle barriers stretching the length of the Reservation border except where the terrain does not allow." Pl. Mem. at 1–2 (Dkt. #3-1, at 11-12). DHS constructed the existing barriers—which cover approximately 52 miles, and are in proximity to the international border—between 2007 and 2009. Enriquez Decl. ¶ 15 ("It is my understanding that the approximately 52 miles of vehicle barrier are all located within 60 feet of the international border.") These barriers are "approximately four feet tall and are intended to stop vehicles, not pedestrians." *Id.* ("Pedestrians are able to climb over or go under the vehicle barriers.").[8]

Before the current barriers were built, the Tohono O'odham Legislative Council passed a resolution supporting DHS's "border vehicle barriers and all-weather road construction proposal along the entire International Boundary within the [Tohono O'odham Nation]." Tohono O'odham Nation Resolution No. 04-095 (Mar. 5, 2004) (Res. No. 04-095) at 2 (Attachment D). The Resolution expressly acknowledged the existence of a "sixty-foot strip of United States reserved land." *Id.* at 2 ¶ 1; *see also id.* at 2 (reciting CBP plan to build "entirely within the sixty-foot strip of land reserved by the Presidential Proclamation of President Theodore Roosevelt dated May 27, 1907 for customs enforcement purposes along the entire International boundary, except for small areas [where needed] to avoid a natural barrier"). The Resolution provided approval for any easements needed for "segments where the road is constructed *outside* the sixty-foot strip of United

---

[8] The historic records Plaintiff cites also make clear that the United States used the Roosevelt Reservation area for border purposes in the period immediately following the Tribal Reservation's establishment. *See* Pl. Mem. at 7 (Dkt. #3-1, at 17) & Kanji Decl. Attach. A-D.

States reserved land" but recognized the United States' ability to construct *within* the Roosevelt Reservation without supplemental rights of way. *Id*. at 2-3 (emphasis added). In addition, the Resolution recognized that the additional border security measures would further the Nation's interests in stopping the "illegal immigration and narcotics trafficking and the use of motor vehicles in the furtherance of these crimes [that had] become an increasing problem along the International Boundary." *Id*. at 1. The Resolution also reflects DHS's commitment to work with Plaintiff on construction of the barriers to protect Plaintiff's interests, and Plaintiff recognizes that DHS followed through on that commitment. *See generally* Pl. Mem. at 12–13 (Dkt. #3-1, 22–23); V. Jose Decl. ¶¶ 17, 20, (Dkt. #3-2, 6–7); Cook Decl. ¶¶ 13-15 (Dkt. #3-5, 5–6).

### B.      The Tucson 5 Project

The project at issue in this litigation, referred to as the Tucson 5 Project, involves the construction of approximately sixty-two miles of border barrier system in the United States Border Patrol's Tucson Sector. *See* Enriquez Decl. ¶ 9. The border barrier system includes a physical barrier, roads, and attributes such as cameras, lights, sensors, and other detection technology. *Id.* The Tucson 5 Project was awarded on June 26, 2026. *Id.* ¶ 11. The contract award includes work on primary physical barrier and barrier system attributes. *Id*. There is also an option for the construction of secondary physical barrier in the contract, but that option has not been exercised. *Id.*

The Tucson 5 Project is a design-build project. *See* Enriquez Decl. ¶ 13. As such, the contractor is responsible for completing a design of the project before constructing it. *Id*. Construction activities are not anticipated to start before October 12, 2026, but the timeline is contingent on contract planning. *See* Enriquez Decl. ¶ 14. Design work for the project will begin

11

by July 10, 2026. *Id*. Geotechnical testing that involves soil boring will occur as part of the design process, since such testing is necessary to the development of a design for the barrier. *Id.*

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking this relief bears the burden of establishing that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id*. at 20.

**ARGUMENT**

**I.    Plaintiff is unlikely to succeed on the merits.**

**A.    Plaintiff is unlikely to satisfy the high bar that it must meet to assert an *ultra vires* challenge to agency activity.**

*Ultra vires* review is "strictly limited" and applies "only when an agency has taken action *entirely in excess* of its delegated powers and *contrary to a specific prohibition* in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (emphasis added; citation omitted). The Supreme Court has cautioned against allowing nonstatutory *ultra vires* review to "become an easy end-run around the limitations of … judicial-review statutes." *Id*. To assert such a claim, the D.C. Circuit has emphasized, a plaintiff must show "extreme error," which is a "very stringent standard." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). Moreover, *ultra vires* review is unavailable where "Congress has spoken clearly and directly" to preclude review. *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991); *see also Ctr for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 242 (D.C. Cir.

2019) (dismissing challenges to allegedly *ultra vires* action where Congress "plainly and unequivocally expresse[d its] intent . . . to restrict[] judicial review").

Since the enactment of the APA, the Supreme Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries'" set forth in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Nuclear Regul. Comm'n*, 605 U.S. at 681 (citation omitted). Given the stringency of those boundaries, such a claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449. "*Ultra vires* claims are confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (citation modified).

"Only error that is patently a misconstruction of the Act, that disregards a specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (citation omitted). As this Court has said, the challenged agency action must amount to "brazen defiance" of statutory constraints before it triggers *ultra vires* relief. *Hunter v. FERC*, 527 F. Supp. 2d 9, 17 n.6 (D.D.C. 2007) (Leon, J.) (citation omitted). Or, put slightly differently, a plaintiff must show that an agency's action was "*obviously* beyond the terms of the statute." *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (emphasis added). This error must be "so extreme that one may view it as jurisdictional or nearly so." *Changji Esquel Textile Co.*, 40 F.4th at 722 (citation omitted).

Plaintiff is unlikely to succeed under an *ultra vires* theory. Congress has provided DHS with clear authority to construct physical barriers along the U.S.-Mexico border, and to do so

13

expeditiously in the face of potential litigation. IIRIRA § 102(a), (b) . That is precisely what the agency proposes to do here. And, indeed, Plaintiff does not challenge DHS's actions under IIRIRA. Instead, Plaintiff attempts to circumvent IIRIRA by recharacterizing DHS's actions. But this effort fails. DHS has never purported to—*and its actions could not and would not*—change the legal status or the boundaries of the Tribal Reservation. Plaintiff's attempt to frame its claims to evade Congress's restriction on judicial review is precisely what the Supreme Court warned against: an attempt to "dress up a typical statutory-authority argument as an ultra vires claim." *Nuclear Reg. Comm'n*, 605 U.S. at 682.

Plaintiff offers two different arguments for why DHS's construction of the Tucson 5 Project on the Roosevelt Reservation would be *ultra vires*. Both fail. Plaintiff argues first that the project would "disestablish the *reservation status* of the lands" and thereby impermissibly diminish the Tribal Reservation. Pl. Mem. at 32 (Dkt. #3-1; emphasis added). But the "reservation status" of the land is a *legal question* that in no way hinges on whether a border barrier or other infrastructure stands on the land. The test that the Supreme Court developed to determine whether a reservation has been disestablished, or whether its lands have been diminished, is a stringent one. But this test has never been employed to determine what actions an agency may conduct or to *prospectively enjoin* an agency from taking action. It therefore cannot sustain Plaintiff's *ultra vires* charge. Plaintiff next argues that the Tucson 5 Project would "change the boundaries" of its reservation, in violation of 25 U.S.C. § 398d. This is simply not so. Where a reservation's boundaries are located is a legal question; building the Tucson 5 Project would not, as a matter of law, change those boundaries. Indeed, Plaintiff cannot point to a single instance in which an agency "violation" of 25 U.S.C. § 398d has been found. This argument, too, must fail.

14

Plaintiff's *ultra vires* claim is unlikely to succeed for an additional reason: its arguments are premised on the mistaken claim that the United States lacks authority to use the Roosevelt Reservation for border protection. While the court need not reach this issue—barrier construction cannot affect the legal status or boundaries of the Tribal Reservation, regardless of the existence of the Roosevelt Reservation—it provides another justification for rejecting Plaintiff's request for injunctive relief.

### 1. Congress has authorized and directed DHS to build a barrier to secure the U.S. border.

In IIRIRA, Congress expressly authorized DHS to undertake the actions that Plaintiff seeks to enjoin here. Congress authorized DHS to "*take such actions as may be necessary* to install … physical barriers … in the vicinity of the United States border." IIRIRA § 102(a)  (emphasis added). Congress further specified that DHS "*shall construct* reinforced fencing along not less than 700 miles of the southwest border … and provide for the installation of additional physical [and other infrastructure] to *gain operational control* of the southwest border." IIRIRA § 102(b)(1)(A)  (emphasis added).

Pursuant to the mandate in IIRIRA Section 102, DHS has installed "over 729 miles of primary border, 102 miles of secondary barrier, and 19 miles of water barrier" along the southwest border, and there are "30 barrier projects currently in various stages of planning and construction." Enriquez Decl. ¶ 8. DHS has determined that the Tucson 5 Project is "necessary for DHS to maintain operational control of the border and address critical national security and public safety threats." Hollinder ¶ 22.. There can be no doubt that DHS's construction of border barrier, including the Tucson 5 Project, is well within its authorities and is not *ultra vires*.

### 2. Plaintiff cannot show that the challenged Tucson 5 Project is "entirely in excess" of DHS's delegated authority.

In the face of this plain authority, Plaintiff alleges that DHS's anticipated construction would be *ultra vires* because of its alleged effects on the *legal status* of the Tribal Reservation. Not only is this argument incorrect, it is not the type of claim that can justify *ultra vires* review.

Plaintiff's *ultra vires* claims necessarily fail because DHS has never asserted and does not need the authority Plaintiff claims DHS will exercise unlawfully. Plaintiff argues that DHS cannot build the border barrier because DHS lacks the authority to "disestablish the reservation status" of lands within the Tribal Reservation or to "move the Reservation boundary." Pl. Mem. at 32 (Dkt. #3-1, at 42) (relying on case law on reservation disestablishment as well as 25 U.S.C. § 398d, which prohibits "[c]hanges in the boundaries of reservations"). But DHS has never claimed such authority, and it need not do so now. The only authority DHS needs is the authority it has to build the border barrier. Building congressionally authorized infrastructure on a tribal reservation does not, as a matter of law, change either the legal status or the boundaries of that reservation, and Plaintiff cites nothing to suggest otherwise.

Nor does Plaintiff cite anything to suggest that a court can enjoin congressionally authorized action as *ultra vires* on the ground that the act could affect the legal status of a tribal reservation. Plaintiff cannot meet the high bar needed to establish that DHS's activities would be in "brazen defiance" of its statutory authority. *Cf. Hunter*, 527 F. Supp. 2d at 17 n.6 (citation omitted). Plaintiff does not argue that DHS's actions exceed its authority under IIRIRA. Instead, Plaintiff tries to frame objections to the alleged *consequences* of lawful actions that DHS is taking under IIRIRA as an *ultra vires* challenge. *Cf. Fla. Health Scs. Ctr*, 830 F.3d at 522 rejecting plaintiff's attempt to "repackage" arguments that Congress had foreclosed by framing them as *ultra vires* claims where challenged action was not "*obviously beyond*" the terms of the statute)

16

(emphasis added). Here, Plaintiff's reframing mistakes the nature and legal effect of DHS's proposed actions. DHS is not attempting to, and its actions would not, change the legal status of the lands at issue, thus diminishing the Tribal Reservation or changing its borders. Plaintiff cannot manufacture an *ultra vires* claim by alleging otherwise.

### a.    As a matter of law, constructing a border barrier would not "diminish" the Tribal Reservation.

Plaintiff's *ultra vires* argument relies first on a line of cases examining the legal effect of congressional actions that authorized non-Indian settlement on tribal reservations. Pl. Mem. at 32-33 (Dkt. #3-1, at 42-43). The Supreme Court has described these "diminishment" cases as the "modern legacy of the surplus land acts" that "carved" tribal reservations into "individual allotments" for tribal members while "open[ing] up unallotted lands *for non-Indian settlement*." *Solem v. Bartlett*, 465 U.S. 463, 466-67 (1984) (emphasis added). As the Supreme Court explained, this led to "a spate of jurisdictional disputes" as to the legal status of the lands that "passed out of Indian ownership." *Id.* at 467. Although it was clear in these cases that some lands on tribal reservations were no longer owned by or on behalf of tribes or their members, the question that remained was whether this changed the "reservation status" of those lands:

> As a doctrinal matter, the States have jurisdiction over unallotted opened lands if the applicable surplus land act *freed that land of its reservation status and thereby diminished the reservation boundaries*. On the other hand, Federal, State, and Tribal authorities share jurisdiction over these lands if the relevant surplus land act *did not diminish the existing Indian reservation* . . . .

*Id.* (emphasis added); *see also Nebraska v. Parker*, 577 U.S. 481, 487-90 (2016) (describing operation of surplus land acts and potential effects on reservation status).

The only question in such cases is whether, as a matter of law, Congress's "opening" of the reservation and the subsequent passage of reservation land into private (often non-Indian) ownership "diminished the reservation boundaries." *Solem*, 465 U.S. at 467. The Supreme Court

17

has held that this determination depends on whether there is "clear evidence" that Congress intended to change the boundaries of the reservation. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586-87, 614-15 (1977) (finding that language and legislative history of statutes that "successively disposed of all unallotted lands" in a large portion of the Rosebud Indian Reservation demonstrated Congress's intent to remove those lands from the reservation and thus "diminish the Reservation boundaries"); *see also Solem*, 465 U.S. at 467-72 & notes (describing framework for analysis and case examples). If not, then, as a matter of law, the legislation "did not diminish the existing Indian reservation," and the reservation's boundaries remain unchanged, even though the legislation limited the tribe's rights and access to some areas within the reservation. *Id*. It is not the *practical effect* of the federal action but its *legal effect* that matters.

These cases do not support Plaintiff's argument that DHS's construction of the border barrier would be *ultra vires*. On the contrary, the cases underscore that DHS's actions under IIRIRA would not—indeed, could not—change the "reservation status" of the underlying lands. The Supreme Court's analysis in *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962), is instructive. There, the Supreme Court assessed the impact of a statute that authorized the entry of non-Indians onto "surplus lands" on the tribal reservation, that is, lands that had not been included in any of the allotments made to tribal members. *Id.* at 354-58. The State of Washington argued that this law diminished the reservation's limits because the land that had been purchased by non-Indians could no longer "be said to be reserved for Indians." *Id*. at 357. The Supreme Court rejected that argument, concluding that Congress had never "restor[ed] that land to the public domain" or otherwise expressed an intent to change the reservation status of lands within the reservation's boundaries. *Id*. at 355-59. Recently, in *McGirt*, a majority of the Supreme Court recognized that the Muscogee (Creek) Reservation retains its status as a tribal reservation,

18

despite significant demographic change, because Congress had not explicitly indicated otherwise. *McGirt v. Oklahoma*, 591 U.S. 894, 913-16 (2020) (emphasizing that reservation status depends only on congressional intent, as expressed in statute, regardless of extratextual factors such as demographic makeup or subsequent historical events); 591 U.S. at 938, 970-71 (Roberts, J., dissenting) (criticizing majority's recognition of continued existence of reservation that occupies "a huge swathe of Oklahoma" and has a population that is "approximately 85%-90% non-Indian"). These cases confirm that there is no possible "diminishment" at issue here.

Nor do the diminishment cases support Plaintiff's request for the "extraordinary relief" of an injunction. They focus on the legal effect of past actions and do not even consider, much less impose, restraints on future actions. But Plaintiff is not asking this Court to determine the legal effect of border construction or to declare that the legal status and boundaries of the Tribal Reservation will be unaffected by DHS's actions. Quite the opposite: Plaintiff alleges that DHS's construction will diminish the Reservation and asks the court to *enjoin the construction* itself, rather than the allegedly *ultra vires* effect of that construction on the Reservation's legal status. The disconnect between the conduct Plaintiff purports to challenge and the remedy it seeks confirms that *ultra vires* review is not warranted here.

**b.    Section 398d does not prohibit construction of a border barrier.**

Plaintiff's argument that 25 U.S.C. § 398d "unambiguously prohibits" DHS's construction of a border barrier is equally unavailing. The law on which Plaintiff relies provides simply that "hereafter changes in the boundaries of reservations *created by Executive order*, proclamation, or otherwise for the use and occupation of Indians shall not be made except by Act of Congress." Act of March 3, 1927, ch. 299, § 4, 44 Stat. 1347 (codified at 25 U.S.C. § 398d) (emphasis added) (Attachment C). But as Plaintiff has laid out, Congress ratified the existence of the Tribal

19

Reservation, as established by executive order, and expanded the reservation over the years, and the boundaries of the Tribal Reservation are established by the relevant orders and statutes. Pl. Mem. at 6–8 (Dkt. No.3-1, 16–18). The statute on which plaintiff relies was part of Congress's shift away from use of executive orders to establish reservations. *See Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1015–16 (8th Cir.2010) ("The language of the 1927 Act does indeed limit its application to executive order reservations."); *United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 686 (9th Cir. 1976) (describing context of enactment). It has no relevance to the present dispute. Plaintiff cites nothing to suggest that placing new border barriers on Reservation lands—lands that are already used for border-security purposes—could possibly affect the legal boundaries of the Tribal Reservation. Because DHS's construction of the border barrier will not, and cannot, change the boundaries of the Tribal Reservation, Section 398d is not implicated here.

To the extent Plaintiff's argument from Section 398d is based on concern that that a border barrier will render a narrow strip of the reservation inaccessible to the Nation's members, that concern is unrelated to the reservation's legal boundaries, and it is premature: border barrier routinely includes gates to facilitate access, and the design phase of the Tucson 5 Project that would determine the placement of such gates has not even begun. Enriquez Decl. ¶ 33.

      c.      **In any event, the United States' continuing use of the Roosevelt Reservation lands for border security purposes is not *ultra vires*.**

Plaintiff's *ultra vires* claim is unlikely to succeed because it is premised on the incorrect assertion that the lands at the southern boundary of the Tribal Reservation never became part of the Roosevelt Reservation. This is not so.

When the Roosevelt Reservation was established in 1907, it "set apart as a public reservation, all public lands within sixty feet of the international boundary between the United

States and the Republic of Mexico." 1907 Proclamation, 35 Stat. at 2136. These lands were thereby "reserved from the operation of the public land laws . . . as a protection against the smuggling of goods between the United States" and Mexico. *Id*. The Roosevelt Reservation was established ten years before the Tribal Reservation, as Plaintiff concedes. Pl. Mem. at 3, 26 (Dkt. #3-1, at 13, 16). Plaintiff nonetheless relies on its aboriginal use of the lands that later became the Tribal Reservation to argue that the "Roosevelt Reservation never attached to those lands" because it was "well understood" in 1907 that the lands "were not public lands." [9] *Id*. That is not the case.[10]

In fact, the lands that now comprise the Tribal Reservation were plainly considered public lands, and treated as subject to the federal public lands laws, until the United States formally set the lands aside for the Nation. *See generally* Solicitor's Memorandum Opinion M-27656 (Mar. 1, 1934) (recounting the history of the area after the Gadsden Purchase and rejecting claims the Nation asserted under the Gadsden Treaty), *later supplemented by* M-27656 (Supp.) (May 7, 1934)) (Attachment E). In 1934, the Solicitor of the Interior was asked to opine on the Nation's claim that it held title in fee to certain land rights "vested . . . before the area in question came under the sovereignty of the United States" and that the lands "[t]herefore, … *never became part of the public domain* of the United States." *Id.* at 360 (emphasis added). While recognizing that

---

[9] The Supreme Court has explained that "aboriginal Indian interest in land . . . means mere possession *not specifically recognized as ownership* by Congress." *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 278-80 (1955) (emphasis added). Under United States law, aboriginal title is "not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties," but which the sovereign may terminate. *Id.* at 279. By contrast, where Congress has "recognized" a tribal interest by "declar[ing] that thereafter Indians were to hold the lands permanently, compensation must be paid for subsequent taking." *Id*. at 277–78.

[10] The Roosevelt Reservation protected pre-existing property interests in land along the border by excepting lands "embraced in any legal entry[, those] upon which any valid settlement [had] been made," and those reserved for purposes inconsistent with the Roosevelt Reservation, but Plaintiff does not claim that its aboriginal lands fall within any of the express exceptions.

21

the Nation has "long occupied the [area] and should be protected in that occupancy," and that its surface rights were recognized in the 1917 Executive Order establishing the Tribal Reservation, the Solicitor concluded that Plaintiff's aboriginal rights were "subordinate to a superior proprietorship in the United States" rather than a "perfected title in fee" that could prevent application of the federal land laws. *Id*. at 360-63.

Although Plaintiff relies heavily on proceedings before the Indian Claims Commission ("ICC"), those proceedings do not support its theory. *Contra* Pl. Mem. at 26–31 (Dkt. #3-1, at 36–41), The ICC Act provided a venue for tribes to assert claims in law or equity against the United States under a range of theories, including for the uncompensated take of aboriginal lands. 60 Stat. 1049, § 2 (1946) (formerly codified at 25 U.S.C. §§ 70a (1946)). Plaintiff filed a petition before the ICC seeking compensation for and the uncompensated taking of its aboriginal lands and was ultimately successful on those claims. *Papago Tribe of Arizona v. United States*, 38 Ind. Cl. Comm. 542 (Dkt. #102 and #345, July 21, 1976). In the present litigation, Plaintiff cites the ICC findings and opinion to confirm its aboriginal title in what is now the Tribal Reservation. Pl. Mem. at 30 (Dkt. #3-1, 40). To be sure, the ICC confirmed Plaintiff's aboriginal title in the Tribal Reservation and in additional lands that extended well beyond the current Tribal Reservation. But the ICC findings also unequivocally refute Plaintiff's claim that it was "understood" in 1907 that these were not public lands:

> The Gadsden Purchase of 1854 brought the subject lands under United States sovereignty and *they became public lands* by the Act of July 22, 1854 (10 Stat. 309) . . . . [T]he United States opened the Arizona public lands to homesteaders by the Act of July 26, 1866 (14 Stat. 251). The United States also disposed of some of the subject lands to railroads, and for parks, schools and national forests.
>
> The laws mentioned above caused a large incursion of non-Indian settlers into the subject lands. The settlers *established homes and ranches, and staked out mining claims*.

*Papago Tribe of Arizona v. United States*, 19 Ind. Cl. Comm. 394, 432 (Dkt. #345 Sept. 10, 1968), *attached to* Pl. Mem. at 3-15 (Dkt. #3-15, 58); *see also id.*, 19 Ind. Cl. Comm. at 413–15, *attached to* Pl. Mem. at 3-15 (Dkt. #3-15, 38-40). This confirms that the United States recognized these lands as public lands until the Tribal Reservation was formally established.

Plaintiff tries to dismiss the ICC's view of the pre-Reservation status of these lands by characterizing it as "dicta [that] is simply incorrect, as it conflicts with the ICC's own holding and Supreme Court precedent." Pl. Mem. at 31 n.12 (Dkt. #3-1, 41). Plaintiff is mistaken: there is no inconsistency in recognizing that all of Plaintiff's aboriginal lands—including those that later became part of the Tribal Reservation and those that did not—"were understood" to be public lands in 1907 (and so available for inclusion in the Roosevelt Reservation) even though the ICC later held that the Nation was entitled to compensation, under the ICC Act, for the previously uncompensated disposal of aboriginal lands that were outside the boundaries of the Tribal Reservation.[11] To the extent Plaintiff equates lack of compensation for the United States' reservation of the right to use a 60-foot strip of land along the southern boundary of the Tribal Reservation for border security purposes with an ICC "holding" that the Roosevelt Reservation never attached to those lands, Plaintiff is mistaken. Although the ICC recognized that the United States had allowed non-Indian settlers to acquire some lands on what later became the Tribal Reservation, it did not find this to be a "take" of aboriginal lands requiring compensation.

Consistent with this, when Congress extended the Tribal Reservation in 1937, it confirmed that the Roosevelt Reservation had indeed attached to the Nation's aboriginal lands in 1907, while

---

[11] Moreover, Plaintiff's analysis does not account for the multiple areas along the U.S.-Mexico border where aboriginal tribal lands were opened under the federal public land laws and not later reserved for tribal use. It has long been recognized that the Roosevelt Reservation runs along these lands, and it is not clear how this would be so had the Roosevelt Reservation not attached to any of these lands in 1907.

simultaneously expanding the Tribal Reservation's land. *See* 1937 Act, 50 Stat. at 536. Even when Congress increased the size of the Tribal Reservation, it explicitly retained the sixty-foot Roosevelt Reservation. As Plaintiff acknowledges, Congress affirmed the existence of the Tribal Reservation, as established by executive order, multiple times, including in legislation that added tracts of land to the Reservation. The 1937 Act was the only one of these laws that expanded the southern boundary of the Tribal Reservation along the U.S.-Mexico border. In the 1937 Act, Congress provided that the "extension" of the reservation "shall not affect any valid rights initiated prior to the approval hereof *nor the reservation of a strip of land sixty feet wide* along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907 (35 Stat. 2136)." 1937 Act, 50 Stat. at 536 (emphasis added). This both confirmed Congress's understanding that the Roosevelt Reservation had attached to the Nation's aboriginal lands in 1907 *and* affirmed its view that the Roosevelt Reservation is compatible with, and not subordinate to, the Tribal Reservation. The various legislative and administrative records that Plaintiff cites regarding the federal government's "construction of the fence along the International Boundary line between Mexico and the [Tribal] Reservation," Pl. Mem. at 7-8 (Dkt. #3-1, at 17-18) (citation omitted), further support this position: Congress's repeated authorization of the expenditure of funds to construct a border fence along the Tribal Reservation's southern boundary demonstrates Congress's understanding that the federal government could continue to use this land for border-security purposes.

Finally, Plaintiff's own past treatment of the Roosevelt Reservation confirms that the anticipated construction activities could not be considered a change to the Tribal Reservation's borders or to the legal status of its lands. Indeed, Plaintiff has previously recognized the existence of the Roosevelt Reservation and acknowledged DHS's authority to use that area for infrastructure

24

to protect the border. Res. No. 04-095. In a resolution supporting DHS's "border vehicle barrier and all-weather road construction proposal along the entire International Boundary within the" Tribal Reservation, the Tohono O'odham Legislative Council acknowledged the United States' authority to construct border barriers—without rights-of-way—within the "sixty-foot strip of *United States reserved land*." *Id*. at 2–3 & ¶ 1 (emphasis added); *see also id.* at 2 (citing the proclamation that established the Roosevelt Reservation); *see generally supra* at 8–10. Indeed, Plaintiff has also acknowledged that the federal government's border-protection measures have addressed significant tribal problems. *See*, *e.g.*, V. Jose Decl. ¶ 17 (Dkt. 3-2, 6) (discussing tribal concerns about cattle rustlers and abandoned vehicles).

### 3. Allowing use of *ultra vires* claims as a collateral attack on border barriers would defeat the limits on judicial review that Congress established in IIRIRA.

Plaintiff cannot use *ultra vires* review to obtain judicial review of statutory actions that Congress has withdrawn from the court's jurisdiction. In IIRIRA, Congress authorized DHS to waive statutory requirements "to ensure expeditious construction" of border barrier and limited judicial review of such waivers to constitutional challenges. IIRIRA § 102(c)(1) ("The court shall not have jurisdiction to hear any claim not specified in this subparagraph."). Plaintiff recognizes this and, indeed, cites DHS's waiver of the APA as a premise for its ability to assert *ultra vires* claims. Pl. Mem. at 21 (Dkt. #3-1, at 31). But when Congress established a limited-review scheme in IIRIRA, it surely did not intend that limitation to justify collateral attacks on the construction of border barrier through the *ultra vires* process. *See Ctr. for Biological Diversity*, 404 F. Supp. 3d at 235 ("Congress has made it abundantly clear that Plaintiffs' *ultra vires* claims cannot proceed in federal court.").

*Ultra vires* review is simply an application of "the 'familiar proposition' that judicial review is presumed to be available absent a clear statute to the contrary." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (quoting *MCorp Fin.*, 502 U.S. at 44). That is to say, when courts permit *ultra vires* relief, this is based "on the well-established strong presumption that Congress did not mean to prohibit *all* judicial review." *Ctr. For Biological Diversity*, 404 F. Supp. 3d at 236 (citation omitted). But that presumption is only an "interpretive guide" that is "dislodge[d]" when Congress provides "clear and convincing evidence" that it intends to preclude judicial review. *Kucana v. Holder*, 558 U.S. 233, 251-52 (2010) (citation omitted); *see also MCorp Fin.*, 502 U.S. at 44 (*ultra vires* review is unavailable where "Congress has spoken clearly and directly" to preclude review). Thus, the presumption in favor of review "can be overcome by an unambiguous statutory provision that plainly precludes jurisdiction, or narrowly restricts the available causes of action, or both." *Ctr. For Biological Diversity*, 404 F. Supp. 3d at 236.

In IIRIRA, Congress did both. Section 102 expressly limits reviewable claims to constitutional challenges to DHS's exercise of waiver authority, and it unambiguously deprives the courts of jurisdiction to hear any others:

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim *may only be brought* alleging a violation of the Constitution of the United States. The court *shall not have jurisdiction* to hear any claim not specified in this subparagraph.

IIRIRA § 102(c)(2)(A)  (emphasis added). This emphatic and comprehensive language presents the unusual circumstance in which Congress has barred *ultra vires* review as well as merits review of the agency's action. *See Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 122 (D.D.C. 2007) (straightforwardly interpreting § 102(c) to "allow[] the district courts to consider only those claims that allege a violation of the Constitution"); *see also Estep v. United States*, 327 U.S. 114, 120

26

(1946) ("[E]xcept when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses."). After all, courts do not provide the only form of accountability to keep an agency within its bounds; Congress can choose to exclusively police those bounds itself. *See Ralpho v. Bell*, 569 F.2d 607, 622 & n.101 (D.C. Cir. 1977) (observing that nothing "prevent[s] [Congress] from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated").

Plaintiff argues that it can bring *ultra vires* claims here in part *because of* DHS's waiver of the APA pursuant to Congress's authorization in IIRIRA Section 102(c)(1). This is not so: *ultra vires* claims are not an alternative that becomes available to address issues that Congress has determined should not be subject to judicial review. *See, e.g.*, *MCorp Fin.*, 502 U.S. at 44 (jurisdiction-stripping provision provides "clear and convincing evidence" that court lacked authority to review claims that agency allegedly exceeded its statutory authority); *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 ("[R]espondents cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement.").

As then-Judge Jackson explained, IIRIRA's jurisdiction-stripping provision, Section 102(c)(2)(A), "plainly and unequivocally expresses Congress's intent with respect to restricting judicial review of legal challenges to section 102(c)(1) waiver determinations, in a manner that overcomes even the strong presumption that Congress ordinarily intends for agency actions to be subject to review by the federal courts." *Ctr. for Biological Diversity*, 404 F. Supp. 3d at 242. Plaintiff should not be permitted to circumvent this provision—which was intended to prevent litigation from interfering with "expeditious construction" of border barrier—by framing its challenge to construction as an *ultra vires* claim.

27

B.      **Plaintiff's common law trespass claim is unlikely to succeed.**

Plaintiff cannot state a common law trespass claim against the federal government's construction of the Tucson 5 Project. *Contra* Pl. Mem. at 37-41 (Dkt. #3-1, at 47-51). Claims premised on the allegedly impermissible use or confiscation of tribal trust lands sound in breach of trust or takings, not in trespass. Even if Plaintiff could challenge a federal project as a trespass on federally owned lands, Plaintiff would need to establish that the United States had waived its sovereign immunity for such a claim and for Plaintiff's requested relief; Plaintiff's *ultra vires* allegations do not suffice. Finally, Plaintiff's trespass claim is unripe in that it relies on speculation about design details (like staging areas for equipment and materials) that have not yet been finalized.

### 1.      A tribal challenge to federal actions on federally owned tribal trust lands is not governed by the common law of torts.

"[T]he Indian trust relationship . . . is a sovereign function subject to the plenary authority of Congress." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 175 (2011) (Congress's authority includes "full power to legislate concerning their tribal property"); *see U.S. v. S. Pac. Transp. Co.*, 543 F.2d 676, 687 (9th Cir. 1976) ("Congress has plenary authority to control use, grant adverse interests or extinguish the Indian title" in reservation trust lands.). The government's trust obligations to the tribes are "defined and governed by statute, rather than the common law." *Jicarilla Apache Nation*, 564 U.S. at 174; *see also El Paso Nat. Gas Co. LLC v. United States*, No. CV-14-08165-PCT-DGC, 2017 WL 3492993, at *4-5 (D. Ariz. Aug. 15, 2017) (Congress has "superseded" tribal authority to exclude in "many statutes authorizing and directing officers and agents of the United States to enter upon Indian lands for various purposes) (citation omitted).

Because federal trust responsibilities are statutorily defined, common law tort claims are simply not available to address the issues Plaintiff raises here. Federal common law is "resorted to

28

in absence of an applicable Act of Congress." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313-14 (1981) (quoting *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367 (1943)); *see generally Rodriguez v. Fed. Deposit Ins. Corp.*, 589 US. 132, 136 (2020) (explaining that federal common law plays a "limited" role in light of "a Constitution that vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States"). Because federal trust duties are governed by statute, there is no gap for tort law to fill here, and Plaintiff is therefore unlikely to succeed in asserting common law trespass claims against the United States.

Indeed, Plaintiff is unable to cite a single case (and we are aware of none) where a court has held that United States officials trespassed on federally owned lands held in trust for a tribe. *Cf.* Pl. Mem. at 37-41 (Dkt. #3-1, 50-54 (citing, *e.g.*, *United States v. Milner*, 583 F.3d 1174 (9th Cir. 2009) (United States suit against third party for trespass on tribal lands), *Cramer v. United States*, 261 U.S. 219 (1923) (suit by United States to cancel patents to protect possessory rights of Indians), *Tee-Hit-Ton Indians*, 348 U.S. 272 (takings claims against United States for sale of timber on aboriginal lands), and *Oneida County v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226 (1974) (tribal suit against counties alleging right to possession under federal law)).

Contrary to Plaintiff's assertion, *Edwardsen v. Morton*, 369 F. Supp. 1359 (D.D.C. 1973), does not establish that tribes "have a right of action [that] includes actions against federal officials [for] trespass." *Contra* Pl. Mem. at 38 (Dkt. #3-1, 51). That case involved allegations that federal officials had "facilitat[ed] allegedly unlawful transfers of land [and] issu[ed] purported authorizations for third-party trespasses" on the lands in question. *Edwardsen*, 369 F. Supp. at 1362. Although the court speculated about the potential availability of a trespass claim against federal officials "if their actions caused third parties to enter the land," the court concluded that "resort to that principle of tort law actually is unnecessary in view of the fiduciary duty of the

29

federal government and its agents to protect the interests of Native Americans." *Id*. at 1371. The court analyzed whether defendants violated "the Federal Fiduciary Duty, Department of Interior Regulations, and Due Process," but did not consider whether—much less hold that—a tort suit was available. *Id*. at 1375.

Courts have confirmed that trespass is not the appropriate mechanism for challenges to alleged federal mismanagement of tribal lands and resources by re-fashioning trespass claims against the federal government into breach of trust claims. *See, e.g.*, *Navajo Nation v. United States*, 171 Fed. Cl. 246, 272 (2024) (dismissing trespass claims against the United States but noting that "any failure of the United States to prevent grazing trespass, if proven at trial, would be compensable as damages for breach of trust"), *reconsideration denied*, 175 Fed. Cl. 114 (2025); *Shoshone Indian Tribe of Wind River Reserv. v. United States*, 52 Fed. Cl. 614, 628 (2002) (same); *cf. Tee-Hit-Ton Indians*, 348 U.S. at 273-74 (takings claim). In *Navajo Nation v. United States*, 175 Fed. Cl. 114 (2025), the court confirmed its earlier dismissal of regulatory trespass claims against the United States, reasoning that "the United States holds lands in trust for the Nation" and the Nation could instead seek damages for "failure to obtain range value and permit fees, … under-market services, maladministration of lands and resources, and liquidated damages for breach of fiduciary duty." 175 Fed. Cl. at 130. Similarly, when a tribe asserted tort claims under the FTCA to challenge operation of a hydroelectric project on its reservation, the Ninth Circuit concluded that the "Tribe's claims against the United States are properly characterized not as tort claims, but as claims that the United States violated its obligations under the Treaty." *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 510 (9th Cir. 2005).[12]

---

[12] Alternatively, depending on the circumstances and nature of the interest at issue (and without conceding the merits as applied here), a claim could be brought alleging a Fifth Amendment taking without just compensation. *Cf. Tee-Hit-Ton Indians*, 348 U.S. at 273–74, 277–80 (recognizing potential viability of Fifth Amendment takings claims where tribes have

Moreover, even when federal courts employ common law claims available under state law, such as trespass, they import such laws only "to the extent it comports with federal policy." *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 965 (10th Cir. 2019) (citations omitted). Even if a tribe could ordinarily rely on tort law to challenge federal actions on trust lands—which, as laid out above, it cannot—Plaintiff could not assert such claims here because it would not "comport[] with federal policy." Federal Indian policy recognizes that "Congress has plenary authority to control use, grant adverse interests or extinguish the Indian title" of the subject Reservation. *S. Pac. Transp. Co.*, 543 F.2d at 687. As explained above, Congress has authorized, even directed, the Secretary of Homeland Security to construct an international border barrier to protect the United States' national security interests, and it has created a streamlined judicial review process to prevent litigation from interfering with construction. And the President has established the federal policy of deploying "permanent physical barriers to ensure complete operational control of the southern border of the United States." Exec. Order 14165, § 3. Thus, allowing a common law trespass claim to interfere with the Tucson 5 Project would conflict with federal policy established by both the legislative and executive branches.

### 2. Plaintiff's trespass claim would otherwise be barred by the United States' sovereign immunity.

Even if Plaintiff could bring a tort claim against the United States, that claim must be brought under the FTCA, which waives sovereign immunity only for damages, not the injunctive relief Plaintiff seeks. Tort claims against the United States are exclusively cognizable under the FTCA. *See United States v. Smith*, 499 U.S. 160, 166 (1991) (holding that the FTCA is "the

---

compensable interests in federal lands or resources). And, as with any potential breach of trust claim, such a claim would be unavailable at this time given that a use allegedly conflicting with the tribe's interest has yet to occur. *See also infra* at 33–35.

exclusive mode of recovery for the tort of a government employee even when the FTCA itself precludes Government liability").[13] But the FTCA's waiver of sovereign immunity has limits that are to be "strictly observed." *See Block v. North Dakota*, 461 U.S. 273, 287 (1983). Applicable here, the FTCA's consent to suit for tort claims against the United States allows a plaintiff to seek only money damages. 28 U.S.C. § 1346(b)(1). By expressly permitting suit for money damages, the FTCA impliedly precluded claims for equitable relief, such as the injunctive relief Plaintiff seeks. *Sanchez-Mercedes v. Bureau of Prisons*, 453 F. Supp. 3d 404, 426 n.14 (D.D.C. 2020) ("[A]n FTCA claim is for damages, not injunctive relief." (citing 28 U.S.C. § 1346(b)(1))), *aff'd per curiam*, No. 19-cv-00054, 2021 WL 2525679 (D.C. Cir. June 2, 2021).[14] Thus, the FTCA would provide no waiver of sovereign immunity over Plaintiff's claims for injunctive relief.

The sovereign immunity bar on Plaintiff's claim distinguishes it from all cases cited by Plaintiff against non-federal defendants. *Cf.* Pl. Mem. at 38 (Dkt. #3-1, 51). As we have explained, a tribe's relationship with the United States is very different from its relationship with other third parties. *See, e.g.*, *El Paso*, 2017 WL 3492993, at *4 ("[A]lthough the Navajo Nation has the authority to exclude others from the reservation, *this authority does not apply against the United States*. Tribes 'may exclude private individuals from the territory within [their respective] jurisdiction[s], or prescribe the conditions upon which such entry will be permitted,' *but this power of exclusion 'has been superseded by many statutes* authorizing and directing officers and agents

---

[13] Although some have raised questions as to whether tort claims can be brought against federal agencies through the Administrative Procedure Act, that issue is not relevant here because Plaintiff frames its claim as a common law tort claim.

[14] To the extent Plaintiff wished to invoke the FTCA waiver of sovereign immunity, it would need to first satisfy the FTCA's requirement that a claimant first submit his claim to the relevant agency and have it "finally denied" before suing in federal court. 28 U.S.C. § 2675(a); *Simpkins v. D.C. Gov't*, 108 F.3d 366, 371 (D.C. Cir. 1997) (recognizing this presentment requirement as jurisdictional). Because Plaintiff has not filed any administrative complaint, it cannot meet the FTCA's presentment requirement.

of the United States to enter upon Indian lands for various purposes.'") (emphasis added; citation omitted). The only case Plaintiff cites for the proposition that a Tribe can bring a Federal common-law trespass claim against the United States is *Edwardsen*. As explained above, though, that case proceeded as a breach of trust claim and not a tort claim. *Edwardsen*, 369 F. Supp. at 1371. *Edwardsen* is further distinguishable because it only speaks to the government's potential liability for trespass of "third parties," not trespass by the United States itself, as alleged here. *Id*.

Plaintiff argues that it needs no waiver of sovereign immunity for its trespass claim because it is seeking to enjoin allegedly *ultra vires* actions. Pl. Mem. at 19 (Dkt. #3-1, 32). Not so. DHS is carrying out an express directive from Congress. Leaving that aside, though, Plaintiff offers no justification for using this *ultra vires* theory as a mechanism to bring a tort claim outside the parameters of the FTCA. Indeed, Plaintiff simply ignores the constraints imposed by the FTCA, and neither of the two cases it cites to support this approach is a tort case. *See* Pl. Mem. at 19-20 (Dkt. #3-1, at 32-33) (citing *Schilling v. U.S. House of Representatives*, 102 F. 4th 503 (D.C. Cir. 2024) (public right of access) and *Leopold v. Sullivan*, 823 F. Supp. 3d 59 (D.D.C. 2026) (same)).

Plaintiff cannot challenge the United States' construction of Congressionally authorized border barrier without a waiver of sovereign immunity. It has failed to point to one, and it cannot evade this requirement by giving its claim a common-law label.

### 3. Plaintiff's trespass claim is not ripe.

Even if the federal government could somehow trespass on federal land, and even if Plaintiff could invoke a waiver of sovereign immunity, Plaintiff's trespass claim would not be ripe. "The ripeness doctrine generally deals with when a federal court can or should decide a case. Part of the doctrine is subsumed into the Article III requirement of standing, which requires a petitioner to allege inter alia an injury-in-fact that is 'imminent' or certainly 'impending.'" *Am. Petroleum*

*Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012) (citation omitted). However, there may be "prudential reasons for refusing to exercise jurisdiction" over a case even if it is "constitutionally ripe." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Courts focus on two issues when determining prudential ripeness: "the fitness of the issues for judicial decision and the extent to which withholding a decision will cause hardship to the parties." *American Petroleum Institute*, 683 F.3d at 387 (citation omitted).

Both elements indicate that Plaintiff's trespass claim is not prudentially ripe. The fitness requirement "depends on whether [a claim] is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (internal quotation marks and citation omitted). Plaintiff's trespass claim is not fit for judicial decision because the Court's consideration of the claim would benefit from a more concrete setting. At this juncture, Plaintiff can only speculate whether any alleged trespass might occur in connection with the border barrier section at issue. Under the terms of the Tucson 5 contact, CBP has instructed the contractor to confine the project footprint to the 60-foot Roosevelt Reservation to construct the border barrier. Enriquez Decl. ¶ 13. But the actual plans for construction are still being developed, and such facts are crucial to any determination by the Court on the likelihood of a construction-related "trespass." Nor has the agency finally determined whether construction will include a secondary barrier, which also would inform the Court's determination. The development of these presently unsettled facts would benefit any consideration the Court may afford the Plaintiff's trespass claim.

Moreover, withholding a decision on Plaintiff's trespass claim until the agency's plans are more concrete will not cause Plaintiff undue hardship. "To outweigh the[] institutional interests in the deferral of review, any hardship caused by that deferral must be immediate and significant."

*Am. Petroleum Inst.*, 683 F.3d at 389 (citation omitted). "Considerations of hardship that might result from delaying review will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions." *Id.* (citation omitted). Such is the case here. Plaintiff cannot claim any cognizable hardship until the plans are completed and construction is underway. Because Plaintiff cannot show that its alleged hardships will be immediate or significant, the Court's institutional interest in the deferral of review make Plaintiff's claim unripe. *See infra* at 39–43.

In sum, Plaintiff's trespass claim has no likelihood of success on the merits and thus cannot support a preliminary injunction.

## II.    Plaintiff has failed to establish irreparable harm, and the balance of equities and public interest weigh against a preliminary injunction.

The Court should also deny Plaintiff's request for an injunction because Plaintiff has failed to establish irreparable harm, and the balance of equities and public interest favor Defendants. In considering the extraordinary remedy of a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation modified). And "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences" that would issue from an injunction. *Weinberger v. Romero- Barcelo*, 456 U.S. 305, 312 (1982). Where, as here, an injunction is sought against the government, these inquiries largely merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). These longstanding principles of equity dictate that the Court should deny this application for a preliminary injunction because the interests of the federal government in securing the Southwest border greatly outweigh the potential harm that the project may cause Plaintiff, especially when the United States' mitigation efforts are considered.

35

The Supreme Court's analysis in *Winter* is instructive as to the correct application of equitable principles in a national security context. In *Winter*, the Court reversed a preliminary injunction prohibiting the Navy from using sonar technology in training exercises at sea, where plaintiffs claimed the sonar would injure them because they "observ[ed]" and "photograph[ed]" marine mammals in the area and "conduct[ed] scientific research." 555 U.S. at 13-14, 25-26. The Court explained that "the District Court and the Ninth Circuit significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense," which "plainly outweighed" the harms asserted by the plaintiffs. *Id.* at 24, 33.

The Court applied these principles to border barrier construction in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019). There, the Supreme Court stayed an injunction prohibiting construction of various border barrier construction projects. In issuing the stay, the Supreme Court necessarily determined that the harm to the government from an injunction prohibiting border barrier construction outweighed the environmental interests advanced by the plaintiffs. *See id.* at 1 ("*Among the reasons* [for the stay] is that the government has made a sufficient showing . . . that the plaintiffs have no cause of action.") (emphasis added); *see also Trump v. Sierra Club*, 591 U.S. 1065 (2020) (denying Sierra Club's motion to lift stay).

The environmental, cultural, religious, and property interests that Plaintiff asserts in this case are similar to those advanced by the plaintiffs in *Winter* and *Sierra Club*, and the balance of equities similarly favors Defendants here. Taken as a whole, Plaintiff's allegations of harm are highly speculative and cannot support the issuance of a preliminary injunction, particularly when weighed against the federal government's acute need to secure the Southwest border.

## A. An injunction will impose substantial and irreparable harms on the United States.

Enjoining the Tucson 5 Project would compromise the government's "weighty" interests in border security, enforcing the immigration laws, and preventing the influx of narcotics into the interior. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The government's interest in efficient

administration of the immigration laws at the border . . . is weighty."); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989) (recognizing that the government has "compelling interests in safety and in the integrity of our borders"); *United States v. Aguilar*, 883 F.2d 662, 695 (9th Cir. 1989) ("The proposition that the government has a compelling interest in regulating its border hardly needs testimonial documentation."); *N. Mariana Islands v. United States*, 670 F. Supp. 2d 65, 87–88 (D.D.C. 2009) (recognizing "weighty and legitimate" federal interests in "ensur[ing]" "effective border control procedures" because "a sovereign's interests in foreign affairs and security are served by controlling the borders over which it possesses sovereignty").

Enforcing our nation's immigration laws is critically important to the national security and public safety of the United States. "The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing cases). The government's compelling interest is even stronger in the current context because of the "unprecedented flood of illegal immigration" that has occurred over the past several years. Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). As the President has recognized, "[m]illions of illegal aliens crossed our borders . . . and allowed to settle in American communities, in violation of longstanding Federal laws." *Id*. The numbers are staggering. As documented by the House Committee on Homeland Security, "U.S. Customs and Border Protection has reported more than 8.2 million encounters of inadmissible aliens at the Southwest border, a number that grows to more than 10.1 million when factoring in America's borders and ports of entry nationwide." *See* House Committee on Homeland Security, *Crisis by Design: A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis* at 3 (Sept. 18, 2024)[15] (citation omitted); *Biden v.*

---

[15] Available at https://homeland.house.gov/wp-content/uploads/2024/09/September-2024-Border-Report.pdf.

*Texas*, 597 U.S. 785, 816-17 (2022) (Alito, J., dissenting) ("In fiscal year 2021, the Border Patrol reported more than 1.7 million encounters with aliens along the Mexican border.").

This massive increase in illegal immigration has imposed significant harms on Americans. The recent influx has "cost taxpayers billions of dollars at the Federal, State, and local levels." Exec. Order No. 14159, 90 Fed. Reg. at 8443. "Deadly narcotics and other illicit materials have flowed across the border[.]" Exec. Order No. 14165, *Securing Our Borders*, 90 Fed. Reg. 8467 (Jan. 20, 2025); *see also Hernandez v. Mesa*, 589 U.S. 93, 107 (2020) ("During the last fiscal year, approximately 850,000 persons were apprehended attempting to enter the United States illegally from Mexico, and large quantities of drugs were smuggled across the border"). "Foreign criminal gangs and cartels" have extended their influence beyond the southern border into American cities. Proclamation 10886, *Declaring a National Emergency at the S. Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025). "Many of these aliens unlawfully within the United States present significant threats to national security and public safety," thus the government must take appropriate action to "protect[] the American people by faithfully executing the immigration laws of the United States." Exec. Order No. 14159, 90 Fed. Reg. at 8443; *see also* Exec. Order No. 14165, 90 Fed. Reg. at 8467; Proclamation No. 10866, 90 Fed. Reg. at 8327.

Border barriers are an extremely effective tool for deterring and impeding illegal crossings into the United States and protecting Border Patrol officers. Physical barriers are an essential component to the CBP's layered border security approach and provide numerous benefits including: (1) barriers protect Border Patrol agents, (2) barriers assist Border Patrol in gaining and maintaining operational control of the border, and (3) barriers support a safe and secure border community. Enriquez Decl. ¶ 8. Border barriers also allow USBP agents to gain more control and situational awareness in the area near the U.S.-Mexico border. In short, barriers deter and impede

38

smugglers and aliens from entering the U.S. illegally and increase the effectiveness of Border Patrol agents. *Id.*

Accordingly, an injunction thwarting the Tucson 5 Project without regard to any of the project's implementation specifics would cause irreparable harm to the United States. The 62-mile stretch of border at issue here is an area of high illegal entry this is exploited by transnational criminal organizations. Hollinder Decl. ¶¶ 7, 8; *see also* Enriquez Decl. ¶ 10 (recounting that, in the Tucson Sector, U.S. Border Patrol apprehended over 1.3 million illegal aliens and seized over 3,000 pounds of fentanyl, among other drugs, between fiscal year 2021 and June 1, 2026). If the Tucson 5 Project is not constructed, transnational criminal organizations will continue to exploit vulnerabilities in this unique geographic area. Hollinder Decl. ¶ 8. Indeed, the problem will get worse. After completion of planned border projects, this stretch of border would be one of the few remaining areas along the U.S.-Sonora border without a border barrier that will deter illegal crossings of people and vehicles, Enriquez Decl. ¶ 12, contributing to a funneling point for illegal crossings on the Southwest border. Hollinger Decl. ¶ 5. DHS reasonably expects, based on its extensive experience conducting law enforcement operations at the Southwest border, an influx of illegal aliens, illicit drugs, and human smuggling activities through this stretch of border if it is prevented from constructing the Tucson 5 Project. *Id.* ¶¶ 22–23.

**B.      The United States' interests decisively outweigh Plaintiff's speculative harms.**

Defendants' compelling interests "plainly outweigh[]" Plaintiff's asserted injuries, for two reasons. *Winter*, 555 U.S. at 26, 33. First, the injuries are based on speculation as to the impact the project will have on the Tribal Reservation, prior to any actual planning or consultation between Plaintiff and DHS that may avoid, or mitigate, the concerns. Importantly, as noted, the United States does not have a final design for the Tucson 5 project. *See* Enriquez Decl. ¶ 13. Moreover,

39

continued consultation between Plaintiff and DHS may avoid or mitigate the concerns cited by Plaintiff. *See id*. ⁋ 33. Second, as was the case in *Winter* and *Sierra Club*, the harms asserted by Plaintiff do not, as a matter of law, take precedence over the government's "compelling interests in safety and in the integrity of our borders." *Von Raab*, 489 U.S. at 672.

For example, Plaintiff asserts that the Tucson 5 Project would undermine Plaintiff's sovereign and proprietary control over the use of its lands. Pl. Mem. at 41-42 (Dkt. #3-1, 51–52). To the extent this assertion of harm hinges on the Tribe's supposition that construction of the Tucson 5 Project will change the boundaries of the Reservation, that argument fails for the reasons explained above. *See supra*, at 17–20. In any event, Congress has directed DHS to construct the border barrier, and the Tucson 5 Project will occur on lands that the United States has reserved for border security—the federal government's own lands—to vindicate a sovereign interest that the Supreme Court has held is compelling. Thus, any interest the Tribe asserts in the land at issue cannot outweigh the United States's interest in securing the border. Congress has plenary authority over tribal property and tribal rights, so that tribes cannot be said to have "sovereign" and "proprietary" interests that can prevent the federal government from carrying out congressional directives. Because Congress's adoption of "major policy changes" and enactment of legislation affecting tribe will "inevitably involve major changes in the metes and bounds of tribal sovereignty," *United States v. Lara*, 541 U.S. 193, 200–07 (2004), such changes cannot be considered irreparable harms.

Plaintiff further asserts that the Tucson 5 Project will "reshape the Reservation landscape," Pl. Mem. at 41 (Dkt. #3-1, at 51). This is not something Plaintiff could possibly prove prior to the development of a final design, which has yet to occur. *See* Enriquez Decl. ¶ 13 (explaining that the contractor is responsible for designing the Tucson 5 Project). Even so, the assertion is implausible,

40

as the narrow area that will be affected by the Tucson 5 Project pales in comparison to Plaintiff's Reservation. The Reservation encompasses 2.8 million acres, or 4,460 square miles, which is larger than the State of Connecticut. *Id*. ¶ 20. By contrast, the Tucson 5 Project spans just 62 miles and the contractor has been instructed to confine the project footprint to the 60-foot strip of federal land adjacent to the U.S.-Mexico border. *See id*. ¶ 13.

Next, Plaintiff invokes the potential for environmental harm arising from the project. *See* Pl. Mem. at 42 (Dkt. #3-1, at 52). In enacting IIRIRA, Congress stated an explicit preference for "expeditious construction" of border infrastructure over the very environmental interests that Plaintiff asserts. *See* IIRIRA § 102(c)(1) (granting the DHS Secretary "authority to waive all legal requirements," including the National Environmental Policy Act and the Endangered Species Act, that the Secretary "determines necessary to ensure expeditious construction of the barriers and roads under this section"). In any event, Plaintiff's asserted environmental harms do not amount to the requisite showing of irreparable harm. For instance, Plaintiff claims that the Tucson 5 Project will "end the recovery" of the ocelot. *See* Traphagen Decl. ¶ 17 (Dkt. #3-12). But Plaintiff does not provide any evidence that ocelots routinely inhabit the Reservation. Rather, Plaintiff suggests that the Reservation *could* provide habitat for the ocelot, noting that a single ocelot was photographed approximately 20 miles from the Reservation in 2024. *Id.* ¶ 42. Plaintiff has therefore not shown, as it must, that constructing the Tucson 5 Project "will irretrievably damage" the ocelot species. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (per curiam) (holding that a party seeking a preliminary injunction "must raise a substantial possibility that the [challenged action] will irretrievably damage the species"); *see also Water Keeper Alliance v. Dep't of Def.*, 271 F.3d 21, 34 (1st Cir. 2001) (death of "single member of an endangered

species" does not qualify as irreparable harm absent showing of how "probable deaths . . . may impact the species") (citation omitted).[16]

Plaintiff also asserts that construction of the Tucson 5 Project will "seriously burden O'odham religious exercise, interfering with the ability of Nation members to engage in ages-old religious observances," *see* Pl. Mem. at 43 (Dkt. #3-1, 53). In particular, Plaintiff claims that once constructed, the barrier will prevent tribal members from crossing the border to participate in cultural and religious activities, *see* V. Jose Decl. ¶ 21 (Dkt. #3-2), K. Jose Decl. ¶¶ 11, 14, 18, 24, 25 (Dkt. #3-4). No matter how sympathetic Plaintiff's proffered reasons may be, they do not outweigh the federal government's compelling interest in securing the border and preventing narcotics from entering the country. Even so, CBP has a long history of working with tribal leadership and could work with them to identify locations used for ceremonies and cultural events and consider installing appropriate infrastructure at those places that will permit them to continue. *See* Enriquez Decl. ¶ 33.

As for Plaintiff's concerns about impacts to cultural sites and ancestral remains, CBP has robust protocols in place for avoiding or minimizing impacts to such sensitive resources. *See* Enriquez Decl. ¶ 29. In keeping with those protocols, CBP will conduct cultural resource surveys of the project area before construction begins and consult with Plaintiff to identify cultural resources that may occur within the project area. *See id*. CBP will coordinate with Plaintiff to

---

[16] Plaintiff's contentions with respect to the jaguar and Sonoran pronghorn similarly fall short. *See* Enriquez Decl. ¶¶ 35 (explaining that "the jaguar is an international species with the vast majority of its range outside of the U.S." (citing the U.S. Fish & Wildlife's 2018 Recovery Plan for Jaguar)) and Enriquez Decl. ¶¶ 38 (explaining that recovery of Sonoran pronghorn does not depend on natural cross-border migration (citing the U.S. Fish & Wildlife's Recovery Plan for the Sonoran Pronghorn)). Even if there were species that depended on the migration corridor between the U.S. and Mexico, Plaintiff's concerns about "walling off" that migration corridor, *see* Traphagen Decl. ¶ 17, are overstated because CBP will install small wildlife passages in the border barrier to facilitate the passage of animals. *See* Enriquez Decl. ¶ 36.

identify an alignment for the barrier that avoids identified sacred sites and burial sites. *See id*. Indeed, the Tucson 5 Project best management practices expressly state that the project corridor will deviate in certain areas to avoid sensitive resources to the greatest extent practicable. *Id*. And in the event impacts to sensitive resources are unavoidable, CBP will take measures including developing treatment or recovery plans where possible. *See id*.

Finally, Plaintiff asserts that the government has no interest in the perpetuation of unlawful agency action, *see* Pl. Mem. at 44 (Dkt. #3-1, at 54). But that argument presupposes the success of Plaintiff's incorrect view of the merits.

## III.    Any injunctive relief must be narrowly tailored, and a bond should accompany any injunctive relief.

For the reasons explained above, any injunction in this case would be improper. If the Court were to grant Plaintiff's motion, it should take steps to minimize the harm such relief would impose on the government by narrowly tailoring such an injunction and requiring a bond.

### A.    Plaintiff's request for injunctive relief is overbroad and any injunction must be narrowly tailored.

Plaintiff alleges it will suffer harm from future construction activities, *see*, *e.g.*, Compl. ¶¶ 55, 57 (Dkt. #1), and seeks to enjoin DHS from taking "*any steps* in furtherance of construction of the planned border wall or associated infrastructure on the Tribal Reservation, including entering into any contracts or agreements in furtherance of such construction." Pl. Mem. at 1 (Dkt. #3-1, 1) (emphasis added). Plaintiff is not entitled to relief absent an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (plaintiff must establish imminent injury for "each form of relief" it seeks).

43

Plaintiff's alleged harms would flow from actual construction, and Plaintiff lacks any basis to request an injunction for pre-construction activities. No construction is anticipated before October 12, 2026. Enriquez Decl. ¶ 14. Plaintiff does not—and could not plausibly—allege any harm from planning, design, or other pre-construction activities.

Plaintiff cannot obtain extraordinary emergency relief based on mere "allegations of possible future injury." *Clapper*, 568 U.S. at 409 (citation modified). But that is all Plaintiff can offer here. The injuries that Plaintiff has alleged rest on an "attenuated chain of possibilities." *Id.* at 410. The Tucson 5 Project is a design-build contract, meaning the design must be completed before construction can begin. Enriquez Decl. ¶ 13. But no design exists yet. Plaintiff's claim of harm depends on speculation about discretionary design decisions that have yet to be made. Plaintiff's assumptions include that the infrastructure will be built at particular cultural sites rather than avoiding them, *compare* Compl. ¶ 57 *with* Enriquez Decl. ¶¶ 29–33; that CBP will exercise the secondary-barrier option it has not yet awarded, *compare* Compl. ¶¶ 5, 49–50 *with* Enriquez Decl. ¶ 11; that the barrier will harm natural landscapes, plants, and animals despite best management practices such as relocating Saguaro cacti and possible wildlife passages, *compare* Compl. ¶ 57 *with* Enriquez Decl. ¶¶ 21–28, 36; and that traditional crossing gates and trails will be closed off, rather than incorporated as part of the design, K. Jose Decl. ¶¶ 13-18 (Dkt. #3-4); Decl. ¶ 33. Plaintiff's "predictions of how agencies will exercise discretion in future proceedings" fail to establish a certainly impending injury. *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021).

Plaintiff cannot establish that it will suffer any consequences, much less "imminent" and harmful consequences, from pre-construction planning activities. Because the harms that Plaintiff

alleges are many steps down the line from such activities, any injunctive relief would need to be tailored to avoid such activities.

### B.    A bond should accompany any injunctive relief.

The government respectfully requests that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *See also U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 135 (2d Cir. 2014) (explaining that the bond's purpose is to protect defendants who "may have already suffered harm while the TRO was in effect even if the TRO is subsequently dissolved"). "[I]njunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). If the Court were to enter an injunction, the government asks that the bond amount reflect the costs that would be sustained by the government due to the delay in commencing construction.

### CONCLUSION

The Court should deny Plaintiff's motion.

Dated: July 7, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON, D.C. Bar 1010952
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
Environment and Natural Resources Division

BRETT A. SHUMATE
Assistant Attorney General, Civil Division
ANDREW I. WARDEN
Assistant Branch Director, Federal Programs

/s/ *Stacy R. Stoller*
Marissa A. Piropato
Deputy Chief
Andrew A. Smith
Senior Trial Attorney
Hayley A. Carpenter
Natural Resources Section
Judith B. Harvey, D.C. Bar 479903
Stacy R. Stoller, D.C. Bar 475035
Law & Policy Section
Environment and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, DC 20530
Phone: (202) 598-3555 (Stacy Stoller)
Stacy.Stoller@usdoj.gov

Elisabeth J. Neylan
Trial Attorney
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 616-3519
Email: elisabeth.j.neylan@usdoj.gov

*Attorneys for Federal Defendants*

46

## Certificate of Service

I certify that on July 7, 2026, this document was served on all parties or their counsel of record through the CM/ECF system.

_\_\_\_/s/ Stacy R. Stoller_

**APPENDIX: 8 U.S.C. § 1103 NOTE**
**(excerpt codifying IIRIRA § 102, as amended)**

IMPROVEMENT OF BARRIERS AT BORDER

Pub. L. 104–208, div. C, title I, § 102(a)–(c), Sept. 30, 1996, 110 Stat. 3009–554, 3009–555, as amended by Pub. L. 109–13, div. B, title I, § 102, May 11, 2005, 119 Stat. 306; Pub. L. 109–367, § 3, Oct. 26, 2006, 120 Stat. 2638; Pub. L. 110–161, div. E, title V, § 564(a), Decl. 26, 2007, 121 Stat. 2090, provided that:

"(a) IN GENERAL.—The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

"(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS ALONG THE BORDER.—

   "(1) ADDITIONAL FENCING ALONG SOUTHWEST BORDER.—

   "(A) REINFORCED FENCING.—In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

   "(B) PRIORITY AREAS.—In carrying out this section [amending this section],[*] the Secretary of Homeland Security shall—

      "(i)   identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

      "(ii)   not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

   "(C) CONSULTATION.—

      "(i) IN GENERAL.—In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

---

[*] The brackets in the text reflect editorial notes by Office of Law Revision Counsel in preparing the text for publication in the U.S. Code.  *See* Office of Law Revision Counsel, Detailed Guide to the United States Code Content and Features, § II(A) (link) (describing "inserting bracketed citation information in the text following a cross reference").

**"(ii) SAVINGS PROVISION.**—Nothing in this subparagraph may be construed to—

"(I)  create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

"(II)  affect the eminent domain laws of the United States or of any State.

**"(D) LIMITATION ON REQUIREMENTS.**—Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

**"(2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.**—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act [8 U.S.C. 1103(b)] (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

**"(3) SAFETY FEATURES.**—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

**"(4) AUTHORIZATION OF APPROPRIATIONS.**—There are authorized to be appropriated such sums as may be necessary to carry out this subsection. Amounts appropriated under this paragraph are authorized to remain available until expended.

**"(c) WAIVER.**—

**"(1) IN GENERAL.**—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section [amending this section]. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

**"(2) FEDERAL COURT REVIEW.**—

**"(A) IN GENERAL.**—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

**"(B) TIME FOR FILING OF COMPLAINT.**—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

**"(C) ABILITY TO SEEK APPELLATE REVIEW.**—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States."