**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian Tribe,<br><br>*Plaintiff,*<br><br>*v.*<br><br>MARKWAYNE MULLIN, et al.<br><br>*Defendants.* | Civil Action No. 26-cv-2127 |

**DECLARATION OF PAUL ENRIQUEZ**

I, Paul Enriquez, declare as follows:

1. I am the Director, Infrastructure Portfolio, U.S. Border Patrol Program Management Office Directorate ("PMOD"), a division of U.S. Customs and Border Protection ("CBP"), which is itself an agency of the Department of Homeland Security ("DHS"). I have held this position since January 2023 and support the planning and execution of border infrastructure projects from construction to maintenance. From May 2021 to December 2022, I served as the Deputy Director for the Infrastructure Portfolio. From August 2018 to May 2021, I served as the Real Estate and Environmental Director for the Infrastructure Portfolio. From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM"), Facilities Management and

Engineering, Office of Facilities and Asset Management. From 2011 to 2013, I was employed as an Environmental Protection Specialist in the BPAM office. In that role, I performed environmental analyses for various border infrastructure projects. From 2008 to 2011, I was a contractor assigned to the BPAM office and provided environmental support on various border infrastructure projects.

2. CBP is the DHS component with primary responsibility for border security. CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.
3. Within CBP, PMOD has expertise in managing and executing border infrastructure projects. PMOD is tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.
4. Based upon my current and past job duties, I am familiar with CBP's planned and on-going border barrier construction on the southern border, including the border barrier construction at issue in this litigation.
5. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

**BACKGROUND**

6. In section 3 of Executive Order 14165, issued on January 20, 2025, the Secretary of Homeland Security was directed to take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure operational of the southern border.
7. In July 2025, Congress appropriated $46,550,000,000 to CBP for border infrastructure and wall system, including "construction, installation, or improvement, or new or replacement primary, waterborne, and secondary barriers," "access roads," "barrier system attributes including cameras, lights, sensors, and other detection technology." Public Law 119-21, Title IX, Subtitle A, Section 90001.
8. Physical barriers are an essential component to the United States Border Patrol's ("USBP") layered border security approach and provide numerous benefits including: (1) barriers protect

USBP agents, (2) barriers assist USBP in gaining and maintaining operational control of the border, and (3) barriers support a safe and secure border community. Border barriers allow USBP agents to gain more control and situational awareness in the area near the U.S.-Mexico border. Barriers deter and impede smugglers and aliens from entering the U.S. illegally and increase the effectiveness of USBP. There are over 729 miles of primary border barrier, 102 miles of secondary barrier, and 19 miles of water barrier along the United States – Mexico border. CBP also has 30 barrier projects currently in various stages of planning and construction.

9. The project at issue in this litigation, referred to as the Tucson 5 Project, involves the construction of approximately 62 miles of border barrier system in the USBP Tucson Sector. The elements of the border barrier system include a physical barrier, roads, and barrier system attributes, including cameras, lights, sensors, and other detection technology.

10. The Tucson Sector experiences significant illegal entry and drug smuggling activity. Between fiscal year 2021 and June 1, 2026, USBP apprehended over 1,333,000 illegal aliens attempting to enter the United States between border crossings in the Tucson Sector. In that same time period Border Patrol seized over 17,200 pounds of marijuana, over 750 pounds of cocaine, over 150 pounds of heroin, over 11,750 pounds of methamphetamine, and over 3,475 pounds of fentanyl.

11. The Tucson 5 Project was awarded on June 26, 2026. The contract award includes work on primary physical barrier and barrier system attributes. The contract includes an option for the construction of secondary physical barrier, which was not exercised. Should CBP choose to award the option for secondary physical barrier, it must provide notice to the contractor of its intent to exercise the option.

12. If the Tucson 5 Project is not constructed, after the completion of other planned border barrier system construction projects, CBP expects that this approximately 62-mile stretch of border would be one of the few remaining areas on the Arizona-Sonora border without border barrier system that is intended to deter illegal crossings of pedestrians and vehicles.

13. The contract for the Tucson 5 Project is a design-build project. As such, the contractor is responsible for designing the project as well as the construction activities. Prior to the start of barrier construction activities, the contractor must complete a design of the Tucson 5 Project. The design will not include secondary barrier because secondary barrier is not a part of the currently awarded contract. If the option for secondary barrier is awarded, the contractor would then be tasked with designing and constructing secondary barrier. Under the current terms of the contract, the contractor has been instructed to confine the project footprint, which includes, among other things, the alignment of the barrier system and temporary staging areas, to the 60-foot federal Roosevelt Reservation. During the design phase, CBP and its contractor will gather additional information and data that may impact, among other things, the final barrier alignment and the location of temporary staging areas and batch plants.

14. At present, CBP does not anticipate construction activities starting prior to October 12, 2026. CBP anticipates that design work for the project will commence no later than July 10, 2026. As part of the design process, the contractor will need to do some minimally invasive geotechnical borings in the project area. The geotechnical testing is necessary to development of a design for the barrier.

15. The Tucson 5 Project includes the removal of existing vehicle barriers that are located within the project area. The existing vehicle barriers are approximately four feet tall and are intended to stop vehicles, not pedestrians. Pedestrians are able to climb over or go under the vehicle barriers. Between 2007-2009, CBP constructed approximately 52 miles of vehicle barriers within the Tucson 5 Project area. The vehicle barriers are located within the United States and in close proximity to the international border. It is my understanding that the approximately 52 miles of vehicle barrier are all located within 60 feet of the international border.

## ENVIRONMENTAL PLANNING AND CONSULTATION

16. CBP has long had a border security presence in and near the Tucson 5 Project area. Through the planning of and development of past projects, CBP has developed an understanding and

awareness of the natural, biological, historic, and cultural resources in and around the Tucson 5 Project area. For example, in addition to the construction of the vehicle barrier within 60-feet of the international border, CBP has also constructed Integrated Fixed Towers and Forward Operating Bases near the Tucson 5 Project area.

17. CBP is currently engaged in new environmental planning efforts for the Tucson 5 Project, which includes coordination with Plaintiff. To identify resources within the Tucson 5 Project area, CBP will conduct cultural and biological surveys. The results of those surveys will be used in conjunction with the results of prior surveys, other existing data and literature, and any information provided by Plaintiffs and federal resource managers. Where there are identified resources, CBP will develop means to avoid or minimize impacts where it is possible. CBP is also actively coordinating with stakeholders. CBP has engaged with federal resource managers to discuss the project and its potential impacts. CBP has also engaged with Plaintiffs. CBP's initial engagement with Plaintiff's resource team started in late-May 2026 and is on-going. Additionally, Plaintiff attended the site-visit for prospective contractors that CBP hosted in early-June 2026. CBP expects that its engagement and coordination with Plaintiff will continue through design and project execution.

**PLAINTIFF'S ALLEGATIONS**

18. Plaintiff alleges that it will suffer irreparable injury as a result of the Tucson 5 Project, which as of now involves the construction of primary barrier and barrier system attributes. Plaintiff's alleged harms, however, are speculative and overstated.

***Landscape Impacts***

19. Plaintiff claims that the Tucson 5 Project will result in "sweeping changes to the landscape." Pl. Motion at 15. That claim is exaggerated.

20. Plaintiff's Reservation is over 2.8 million acres. V. Jose Decl. ¶ 2. The 2.8 million acres accounts for approximately 4,460 square miles and is roughly size of the State of Connecticut. *See* About Tohono O'odham Nation - Tohono O'odham Nation. The northernmost boundary of the Reservation is 83 miles from the southern border. By contrast, of those 4,460 square

files, the Tucson 5 Project will be approximately 62 linear miles, and the contractor has been instructed to confine the project footprint to the 60-foot Roosevelt Reservation, a strip of land that is immediately adjacent to the United States – Mexico border that has been set aside for law enforcement purposes. Much of that 60-foot strip has already been disturbed as the result of prior use and construction of border infrastructure, including a border road and vehicle barrier. Additionally, even if as a result of the design process CBP learns Tucson 5 Project may need to deviate north of the 60-foot corridor, CBP will attempt to keep the project footprint as close to the international border as possible. If CBP were required to use areas north of the 60-foot corridor for temporary staging areas, CBP expects these areas will also be in the immediate vicinity of the international border, in most instances no more than 300 – 400 feet north of the border. And as explained further below, any such impacts would be temporary, as CBP will take appropriate steps to restore these areas following demobilization of the project equipment. Thus, given the planned footprint of the Tucson 5 Project relative to the vastness of Plaintiff's 2.8 million-acre Reservation, the Project will not result in "sweeping changes to the landscape."

***Construction-Related Impacts***

21. A number of Plaintiff's more specific claims regarding the potential construction-related impacts from the Tucson 5 Project are also incorrect or overstated. For example, Plaintiff suggests that CBP will need to construct numerous access roads to execute the Tucson 5 Project and that "subsequent abandonment of these roads will permanently alter desert pavement, natural drainage patterns, and landscape features." Senseney Decl. ¶ 43. That is incorrect. CBP does not plan to construct any new north-south access roads as part of the Tucson 5 Project. While the Tucson 5 Project may involve the construction of new segments of patrol road along the border, they would be confined to the 60-foot Roosevelt Reservation. There would be no abandonment of those segments because, after construction, they would be used as part of the contiguous east-west patrol road that is part of the barrier system. Moreover, any new segments of patrol road that would be constructed as part of the Tucson 5

Project would be engineered to ensure they do not significantly alter the natural drainage and hydrology patterns of the surrounding area.

22. Similarly, Plaintiff claims that areas north of the 60-foot corridor that may be needed for temporary staging areas, batch plants, or other project-related needs will not be "fully reclaimed for centuries." *Id.* That is overstated. Again, under the current terms of the contract, the contractor has been instructed to confine the project footprint to the Roosevelt Reservation. Regardless of whether temporary staging areas are in the Roosevelt Reservation or, as a result of the design process, must be placed outside the Roosevelt Reservation, and consistent with every border barrier project, the Best Management Practices ("BMPs") that will be incorporated into the Tucson 5 Project contract, a copy of which is attached hereto as Exhibit A, require that contractors use previously-disturbed areas for temporary construction areas and, after, project completion, "return existing roads and staging areas to pre-construction conditions." (BMP 11, 13.) This is a routine post-construction practice for CBP border barrier projects. Further, during construction, contractors are required to take steps to minimize the spread of invasive species. (BMP 16-17.)

23. Plaintiff also alleges that the Tucson 5 Project has the potential to permanently alter natural hydrology and drainage patterns, which could increase flood risks and harm vegetation or habitat. *Id.*; Fayuant Decl. ¶ 20; Nabhan Decl. ¶ 26-27. Plaintiff cites to an incident at Vamori Wash as purportedly demonstrating the expected impacts from the Tucson 5 Project. Fayuant Decl. ¶ 22-23. These alleged harms are speculative and overstated, and the Vamori Wash example is inapt.

24. After more than 20 years of constructing barrier on the southwest border, CBP has extensive experience executing projects in the dry and arid environment along the southwest border, which includes summer monsoons and winter storm events that can cause extreme surface water flows that cross the international boundary. CBP well understands that constructing safe and effective barrier in these areas requires the appropriate water conveyance, drainage and erosion control measures. These are longstanding components of CBP's border wall design

and are intended to channel or direct water away from the barrier and accompanying patrol road, thereby ensuring the stability of the barrier and minimizing the barrier's impact on storm related surface water flows as well as water flows in creeks and rivers that cross or abut the international border. Thus, as part of the design of every border barrier segment, including the Tucson 5 Project, CBP's construction contractor must prepare hydraulic and hydrologic (H&H) analysis that informs the design and allows CBP to determine, among other things, where to place drainage gates into the barrier, which drainage and erosion control measures should be incorporated into the design, and where the alignment of the barrier needs to be adjusted. All of these steps are taken to ensure that the barrier does not significantly alter the natural drainage and hydrology patterns of the surrounding area. It is not simply helpful to the environment, it is required for the proper functioning and structural integrity of the barrier itself. Similarly, every border barrier contract, including the Tucson 5 Project contract, includes in the BMPs a requirement that the construction contractor develop a Stormwater Pollution Prevention Plan ("SWPPP"). (BMP 8.) The SWPPP minimizes impacts from stormwater flows during construction.

25. Plaintiff points to the Vamori Wash as a purported example of what can be expected once CBP completes the Tucson 5 Project, but the Vamori Crossing was under construction when, in 2022, a significant monsoon storm damaged the crossing. In other words, the project was incomplete, which was the principal reason for the damage. Additionally, the significant monsoon event allowed CBP and its contractor to revisit and refine the design to account for higher volumes of water.

26. Plaintiff alleges that blasting activities associated with the Tucson 5 Project will result in permanent alterations to the natural landscape and topography of the Reservation. Senseney Decl. ¶ 43. As noted in paragraph 20 above, the Reservation is over 2.8 million acres. Within those 2.8 million acres, Plaintiff identified four particular mountainous locations along the 62-mile project footprint as possibly requiring blasting activities. Senseney Decl. ¶ 25-28. These four locations represent a small percentage of the 62-mile Tucson 5 Project. Moreover, these

four areas represent an even smaller percentage of the natural landscape and topography of the 2.8 million acre Reservation. Put another way, the overwhelming majority of the Tucson 5 Project will not require any blasting activity, nor will vast areas of the natural landscape and topography located outside of the project footprint be altered by blasting. With that said, CBP does not take blasting activities lightly. Depending upon the specific location, CBP may conduct controlled blasting for the purpose of loosening rock. When blasting is required, natural and cultural resource monitors will be given the opportunity to survey the area in advance and will be present during blasting to ensure that construction best management practices are being followed and implemented. CBP will also give Plaintiff the opportunity to have tribal cultural monitors on-site. CBP's controlled detonation procedures require the contractor to submit a blast plan for approval by CBP. Additionally, contractors must then provide more specific and detailed advanced notice plans no less than 72 hours in advance of the proposed detonation so that CBP can notify appropriate organizations/entities, including local land managers, tribal governments, state and local government, and Mexican law enforcement.

***Cultural Resources***

27. Plaintiff alleges that construction of the Tucson 5 Project will harm Saguaro cacti in the project area. Nabhan Decl. ¶ 24. CBP understands and appreciates the importance of the Saguaro. To that end, all contracts for the construction of border barrier system, including the Tucson 5 Project contract, include best management practices that address the handling of Saguaro. (BMP 41.) These include subcontracting with a certified arborist for the relocation of cacti 10 feet or taller. The contractor will work with the arborist in preparing a relocation plan prior to work being performed in areas with Saguaro. Moreover, the arborist must relocate the Saguaro north of the project area with minimum clearance distances from proposed lighting and electrical features. The north face of the relocated cacti will be marked so that they face the same direction when relocated. The arborist must also establish procedures for feeding and watering, if applicable, and establish a monitoring plan for relocated species. Cacti less

than 10 feet in height that are impacted by construction are to be replaced at a 3:1 ratio. As part of prior barrier system projects in Arizona in 2019 and 2020, hundreds of Saguaro and other columnar catci were translocated and continue to survive today. Additionally, the BMPs direct construction crews to avoid traversing areas during Saguaro fruit harvesting areas during the Saguaro fruit gathering festival to the maximum extent practicable. (BMP 43.) And, as with other resources, Saguaro in the vast areas of the Reservation that are not within or near the project footprint will not be impacted by the Tucson 5 Project.

28. Plaintiff also alleges that construction of the Tucson 5 Project may harm Plaintiff's ability to collect or use 28 species of sacred plants. Nabhan Decl. ¶ 16. Though Plaintiff notes that these 28 species may be found near the border, it does not appear that these species of plants can *only* be found along the border. In fact, of the 28 species listed by Plaintiff, the vast majority are noted as occurring in various locations within the Reservation, including species that are found "all over the TO reservation." Nabhan Decl. Attachment C. The remaining species that are not listed as having various or widespread locations are noted as occurring in locations such as "Just N&S of border," "25 km N of border," or "Just a little N of the boundary line by less than a mile." *Id.* Thus, Plaintiff's claim appears to be exaggerated, as there is nothing to suggest that the Tucson 5 Project area is the only place where Plaintiff may access or collect these sacred plants.

29. Plaintiff also expresses concerns about cultural sites or ancestral remains that could be impacted by construction of the Tucson 5 Project. Fayuant Decl. ¶¶ 34-35. CBP, however, has robust protocols for avoiding or minimizing impacts to cultural resources. As noted, through the planning of and development of past projects, CBP has developed an understanding and awareness of cultural resources in and around the Tucson 5 Project area. Additionally, before construction will begin, CBP will perform additional cultural resource surveys of the Project area, and, as described above, CBP has and intends to continue to coordinate with Plaintiff to identify cultural resources that may occur with the Project area. In its communications with the Plaintiff, CBP has stated that it will coordinate with Plaintiff to

identify an alignment for the barrier that avoids identified sacred sites and burials. In areas where there are known or identified cultural resources within the Project area, CBP is also prepared to work with Plaintiff on measures to avoid or minimize impacts. These steps may include shifting the alignment of the barrier to avoid cultural sites or cordoning off areas during construction. In fact, the Tucson 5 Project BMPs expressly state that the Project corridor will deviate in certain areas to avoid sensitive resources to the greatest extent practicable. (BMP 44.) Other measures may include the development of treatment or recovery plans where impacts may be unavoidable.

30. Though Plaintiff cites examples where CBP's protocols may have failed, as was the case with the recent damage to the Las Playas Intaglio, V. Jose Decl. ¶ 28, CBP has a long track record of working with tribes to avoid or minimize impacts to cultural resources. For example, as part of the construction of border barrier system in the El Centro Sector in 2020, tribal cultural monitors that were onsite during construction noted the presence of a possible cultural site. Work in the area was immediately halted and the area was cordoned off to protect it from impacts until further investigation of the site could be completed. CBP hosted site visits for local tribes, including the tribes' cultural resource experts, who determined, in consultation with CBP's archeological team, that area contained a potentially significant cultural site. CBP continued to avoid the area during the remainder of the project. After construction was complete, CBP worked with local tribes to develop a treatment plan for the site, which was implemented by CBP. Additionally, since the incident with the Las Playas Intaglio, CBP has developed additional protocols to ensure that known resources can be avoided wherever possible.

31. Plaintiffs cite Monument Hill as an instance where CBP allegedly ignored concerns about impacts on cultural resources; however, based on cultural resource surveys and stakeholder consultation prior to construction, no cultural, historical, or burial sites were identified within or adjacent to the project area at Monument Hill. Further, at no time were burial sites or other resources encountered or disturbed during construction.

32. CBP has also developed protocols regarding inadvertent discoveries. As part of every border barrier project, including the Tucson 5 Project, CBP has natural and cultural resource monitors on site to observe construction. For the Tucson 5 Project, CBP has also offered to have tribal cultural monitors on site to observe construction. Additionally, the BMPs that are part of the Tucson 5 Project contract state that if cultural resources are encountered, work is required to stop in the immediate area until the environmental monitor can assess the significance of the find. (BMP 27.) If human remains are encountered, work is required to stop within 250 feet of the find. The BMPs also call for consultation with Tribal, Federal, and State agencies to ensure appropriate treatment of human remains. (BMP 28.)

33. Plaintiff alleges that the Tucson 5 Project will prevent members of the Nation from crossing the border at three traditional crossing locations referred to as the San Miguel Gate, the Papago Farms Gate, and Serapo's Gate. V. Jose Decl. ¶ 21, K. Jose Decl. ¶ 11. Similarly, the Nation alleges that the Tucson 5 Project will prevent members of the Nation from crossing the border to participate in various ceremonial runs, gathering activities, and other cultural and religious activities. V. Jose Decl. ¶ 21, K. Jose Decl. ¶ 11, 14, 18, 24, 25. Those concerns are speculative. CBP has a long history of incorporating gates into barrier system to facilitate access for various activities. Gates have been added throughout the southwest border to allow access to facilitate access to border monuments and to address other concerns. For example, the USBP Rio Grande Valley Sector, where barrier is constructed off the border to address treaty and floodplain issues, gates have been added to ensure access for emergency medical services and for farm machinery/equipment. As part of the design process, CBP could incorporate gates at the three traditional crossing locations. Additionally, as part of the design process, CBP could work with Plaintiff to identify locations used for various ceremonies and cultural events and consider installing gates at those locations. CBP intends to consult with Plaintiff about these access issues early in the design process to come to an agreement on number of gates and locations. Once this information is finalized CBP will coordinate these requests with the CBP construction contractor.

***Animal Migration***

34. Plaintiff alleges that the Tucson 5 Project will "end the recovery" of the jaguar, Sonoran pronghorn, and ocelot. Traphagen Decl. ¶ 17. That claim is overstated.

35. As part of the 2018 Recovery Plan for jaguar, U.S. Fish and Wildlife Service ("USFWS") stated that jaguar is "an international species with the vast majority of this range outside the United States." Recovery Plan at 2, available at: Recovery Outline for the Jaguar. Though the jaguar's Northwest Recover Unit ("NRU") includes areas in the United States, USFWS further noted that "Mexico will be the primary contributor to recovery of jaguar because 95 percent of the species' suitable habitat in the NRU exists within the borders of Mexico." *Id.* As to the jaguars' presence in the United States, though there have been documented sightings, including those noted by Plaintiff, Traphagen Decl. ¶¶ 24 – 25, the Recovery Plan notes that the last records of females with cubs in the United States was documented in 1910. There have been no females confirmed in the United States since 1963. As such, the suggestion that the Tucson 5 Project will end the recovery of jaguar or "render the recovery of the species impossible," Traphagen Decl. ¶ 3, is overstated.

36. Plaintiff's assertion that the Tucson 5 Project will threaten the continued existence of jaguar on the Reservation also may be overstated. Traphagen Decl. ¶¶ 29-30. CBP will install small wildlife passages in the border barrier that will be constructed as part of the Tucson 5 Project. Small wildlife passages are approximately 8" x 10" gaps that are installed in the bottom of the barrier. They are intended to facilitate the passage of animals, while still being too small for a person to pass through. CBP works in coordination with USFWS to identify locations for small wildlife passages to facilitate animal migration. Though they are intended primarily for smaller animals, larger mammals also use the small wildlife passages. In addition to small wildlife passages, there may be drainage gates that are installed in the barrier to facilitate the follow of water. CBP often leaves drainage gates open during monsoon season, which provides additional opportunities for animal migration, including by the jaguar. The photos that are attached as Exhibit B, which were captured in 2023, document larger mammals' use

of small wildlife passages and drainage gates.

37. Notably, regarding ocelot, Plaintiff does not provide any evidence that ocelot routinely occur on the Reservation or that there are documented instances of ocelot using the Reservation as part of a migration corridor. Plaintiff simply suggests the Reservation *could* provide habitat for the ocelot, noting that a single ocelot was photographed approximately 20 miles from the Reservation in 2024. Traphagen Decl. ¶ 42. This is consistent with information that is outlined in the Recovery Plan for ocelot, which notes that there are no population estimates for ocelot in Arizona, and that monitoring between 2009 and 2016 only noted information about five male ocelots. Recovery Plan at 13, available at: *Ocelot Final Recovery Plan_Signed_July 2016_new (1).pdf. Given that there are no documented instances of ocelot occurring on the Reservation, and given how infrequently they occur in Arizona more generally, it is an exaggeration to suggest that the Tucson 5 Project will end recovery of the species. Further, given the small wildlife passages and drainage gates that are expected to be included in the Tucson 5 Project, ocelots may still have the ability to migrate between the Mexico and the Reservation.

38. Plaintiff also claims that construction of the Tucson 5 Project will have severe impacts on Sonoran pronghorn because the border barrier will inhibit the species ability to access habitat in Mexico. Traphagen Decl. ¶¶ 37-40. According to the 2016 Recovery Plan for Sonoran pronghorn, however, recovery of the Sonoran pronghorn does not depend on natural cross-border migration of the species. Although the Recovery Plan considers the Sonoran pronghorn throughout its range, it specifically designates two conservation units containing two separate populations of the species: one in the United States and one in Mexico. Recovery Plan at 91, available at: FINAL Sonoran Pronghorn Recovery Plan, 2nd Revision 11.16.16.pdf. USFWS has noted that the species would likely benefit from habitat connectivity between Sonoran pronghorn populations. *Id*. at 30. However, the Recovery Plan makes clear that recovery of Sonoran pronghorn does not depend on such natural cross-border migration, as Sonoran pronghorn in the United States are already “effectively geographically separated from Sonoran

pronghorn populations in Mexico due to the physical barriers of Mexican Highway 2 and associated fencing." *Id.* at 92. In addition, the Recovery Plan states that having viable populations in both the United States and Mexico serves the aims of "representation, redundancy, and resiliency across its range," which decreases the changes that a "single stochastic event would cause the entire subspecies to go extinct." *Id.* at 99. Thus, here again, Plaintiff's assertion that the Tucson 5 Project may end recovery of the species is overstated.

* * *

This declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __ day of July, 2026.

Paul Enriquez

Digitally signed by Paul Enriquez
Date: 2026.07.07 17:24:30 -04'00'

Paul Enriquez
Infrastructure Portfolio Director
Program Management Office Directorate
U.S. Border Patrol

# EXHIBIT A

# ATTACHMENT B

## Best Management Practices (BMPs)

**TCA-5 Tohono O'odham**
**Vertical Barrier & Attributes**
**Design Build Construction Project**

Pima County, AZ

US CUSTOMS and BORDER PROTECTION (CBP) BORDER PATROL PROGRAM MANAGEMENT OFFICE DIRECTORATE (PMOD)

## Customs and Border Protection Best Management Practices

| | |
|---|---|
| Project Name: | TCA-5 |
| Project Type: | Replacement Vehicle Barrier and Secondary Border Wall |
| Created: | April 2026 |
| Updated: | |

**General Construction Activities**

1. Implement Customs and Border Protection (CBP) best management practices (BMPs) during all construction activities including proper handling, storage, and disposal of hazardous or regulated materials.
2. Collect and store all fuels, waste oils, and solvents in tanks or drums within a secondary containment system that consists of an impervious floor and earthen dike capable of containing 125 percent of the volume of the containers stored therein. These materials will be removed from the site during demobilization.
3. Refuel machinery following accepted guidelines, including refueling and storage shall take place away from the aquatic habitat; (not within 100 feet of a drainage channel, wetland, or other surface waters). A designated refueling area with spill protections readily available shall be reviewed by CBP prior to implementation. A contingency plan to control petroleum products accidentally spilled during the project shall be developed as part of all aquatic/in-water projects.
4. A CBP-approved Spill Protection Plan (SPP) must be prepared and implemented by the contractor at the construction site to ensure that toxic substances are properly handled, stored, and disposed of. Contain spills immediately and use an absorbent (e.g., granular, pillow, sock) to absorb and contain the spill. Immediately report any spill of a hazardous or regulated substance to the CBP Project Manager and on-site environmental monitor. Drip pans will be used beneath equipment, and containment zones will be used when equipment is not being used, or when refueling vehicles and equipment.
5. Collect non-hazardous solid waste (trash and waste construction materials) and deposit in on-site receptacles. Maintain solid waste receptacles and dispose as required.
6. Only authorized contractors and Government personnel are allowed within the construction site. With the exception of service dogs, no pets including emotional support pets, owned or under the care of any and all construction workers will be permitted inside the project's construction boundaries, adjacent native habitats, or other associated work areas. Service animals shall have formal official documentation from a licensed physician for CBP approval prior to being allowed onsite.
7. If construction or maintenance work activities will occur during nighttime hours, all lights will be shielded to direct light only onto the work site, the minimum wattage needed will be used, and the number of lights will be minimized. If birds are roosting on temporary light poles and other pole-like structures used for construction activities, then anti- perch devices would be used to discourage roosting by birds. Light poles will be designed to prevent hunting perches for ravens and raptors. Unnecessary lights will be turned off to avoid attracting wildlife.
8. A Stormwater Pollution Prevention Plan (SWPPP) will be prepared prior to construction activities. Additional site-specific BMPs will be implemented as described in the SWPPP to reduce erosion and the impact of non-point source pollution during construction

activities, giving special consideration to areas with highly erodible soils. Address highly erodible soils in the SWPPP. BMPs include such things as buffers around washes to reduce the risk of siltation and installation of water bars to slow the flow of water downhill.

9. Vehicular traffic associated with the construction activities must remain on established roads to the maximum extent practicable. No off-road vehicle activity will occur outside of the project footprint. Vehicle parking will be confined to the project footprint. Vehicles will not exceed 25 mph within the project area.
10. The project site will be accessed exclusively via designated access roads. Any new or improved access roads will include road construction and maintenance BMPs in their design and plan.
11. Maintain existing roads during construction and return the existing roads and staging areas to pre-construction conditions, if requested by the Government, once construction is complete. The widening of existing or created roadbed beyond the design parameters due to improper maintenance and use will be avoided or minimized. The width of all roads that are created or maintained by CBP should be measured and recorded using GPS coordinates and provided to the Government. Photo document and provide GPS coordinates where correction is needed. Government to acquire GIS shape files from construction contractor at end of project.
12. The minimum number of roads needed for proposed actions must be constructed and maintained to proper standards. Roads constructed for project access must be closed and restored to natural surface and topography using appropriate techniques once no longer needed for the project. The GPS coordinates of roads that are thus closed must be recorded and provided to the Government. A record of acreage or miles of roads taken out of use must be maintained. Photo document efforts if they occur prior to completion of project. GIS files from the Contractor must be provided to CBP.
13. Areas disturbed by past activities must be used for staging, parking, and equipment storage. All staging, parking, equipment storage areas, and access roads, with their requested uses, will be approved by CBP. Prior to beginning any construction activity (including equipment mobilization, tree- trimming, clearing and grubbing, and road grading), contractor must stake and flag the perimeter of the work area, access routes, laydown yards, staging areas, turnarounds, and other areas approved for use. Recommend flagging and staking occur every 25-linear feet to prevent unauthorized impacts outside of the approved work area. Photo document and provide GPS coordinates of these areas to CBP.
14. If soil-binding agents are utilized, they must be applied during the late summer/early fall months to avoid impacts on federally listed species. Soil-binding agents must not be used in or near surface (within 100 feet) of waters (e.g., wetlands, perennial streams, intermittent streams, washes). Only apply soil-binding agents to areas that lack any vegetation.
15. All disturbed soils not paved that will not be landscaped or otherwise permanently stabilized by construction must have topsoil set aside to be used with species native to the project vicinity. CBP will provide a list of seed mix for each project area.
16. To prevent invasive species seeds, all hauling and construction equipment, including work and personal vehicles, must be washed at the identified facility prior to mobilization to the project area. All vehicles and equipment must be free of all attached soil, mud, vegetation, and other debris prior to mobilization to the construction site.
17. Invasive plants on any work area must be treated through chemical or mechanical means. Herbicides must be used according to label directions. Herbicide application must be

conducted by a licensed applicator, and daily report of chemical application rate must be reported to CBP Construction Project Manager or Environmental. Mechanical removal must be done in ways that eliminate the entire plant and remove all plant parts to a disposal area, with the exception of root mass left in-place for bank stabilization.

18. Any off-site materials (e.g., fill and gravel, straw bales, wattles, fiber rolls) must be weed-free to prevent the introduction of non-native species.
19. Preventative measures will be implemented to avoid the introduction of invasive plant species, including soil sourcing, topsoil oversight, and material inspection.
20. Dust control measures will be implemented to prevent hazardous conditions in terrestrial land associated with the project (staging areas, access roads).
21. Concrete wash water will be collected in an area with an impervious floor and removed off-site for proper disposal to prevent toxicity to aquatic life.
22. A CBP-approved Fire Prevention and Suppression Plan (FPSP) must be developed and implemented for all activities that require welding or otherwise have a risk of starting a fire.
23. Groundwater extraction can occur with written approval by CBP. Groundwater wells shall be metered daily and meter readings provided to the onsite environmental monitor and CBP Project Manager daily.
24. Activities will pause during heavy rain or hazardous weather conditions, including avoiding traversing vehicles or equipment across flowing or standing watercourses.
25. Spray painting bollards shall be performed using equipment designed to minimize overspray. Spray painting bollards should not be conducted in high winds to prevent over spraying into adjacent vegetation.
26. Areas that are hydro-seeded for temporary erosion-control measures must use only native plant species appropriate to surrounding habitat types. Seed list must be approved by CBP Environmental prior to application.
27. If cultural resources (artifacts, features, sites, structures) are encountered work shall stop in the immediate area (100-foot radius) until the environmental monitor can assess the significance of the find.
28. If human remains are encountered, work will stop within 250 feet of the find. Appropriate Tribal, Federal and State agencies will be consulted for a path forward.
29. Areas around and beneath equipment in terrestrial and aquatic settings must be checked for listed species and wildlife to avoid "take" situations.
30. Tree and brush removal in threatened and endangered species habitats will be minimized and will not interfere with active nesting as per the Migratory Bird Treaty Act.
31. Ground disturbing activities (e.g. vehicular travel, grubbing, vegetation removal, grading, storage of materials, installation of aerial targets, excavation, scraping, removal of large boulders etc.) shall not be undertaken outside the approved project area.
32. Prior to ground disturbing activities, vegetation removal or trimming, a Government biologist will present an environmental awareness program to all personnel who will be onsite, including but not limited to Government employees, contractors, contractor employees, supervisors, inspectors, and subcontractors. Included also will be general identification of the species, description of habitat, sensitivity of the species to human activity and describe measures for avoidance and protection of the species during construction. Following the education program, the photograph of the species will be posted in the office of the Contractor and resident engineer, where they must remain

through the duration of the project. The Contractor will be responsible for ensuring that all their employees are aware of these species and that they may be present within the project area.

33. If construction or clearing activities are scheduled during the nesting season (typically March 1 - September 15) the Government will perform a preconstruction survey for migratory bird species to identify active nests prior to the start of any construction or clearing activity. If construction activities will result in the disturbance or harm of a migratory bird, then CBP may coordinate with the U.S. Fish and Wildlife Service (USFWS). Establish buffer zones around active nests until nestlings have fledged and abandoned the nest.
34. When an individual of a federally listed species is found within the project limits, notify the Project Manager or CBP Construction Site Manager. Work may resume when the Government biologist safely removes the individual, or it moves away on its own. Individuals of federally listed species found in the project area and requiring relocation will be relocated by the Government biologist.
35. To prevent entrapment of wildlife species during construction, all excavated, steep walled holes or trenches more than 2-feet deep will either be entirely covered at the close of each working day with plywood or trench cover plates or provided with one or more escape ramps constructed of earth fill or wooden planks. The ramps will be located at no greater than 1,000-foot intervals and will be sloped less than 45 degrees. Each morning before the start of construction and before such holes or trenches are filled, they will be thoroughly inspected for trapped animals. Any animals discovered will be allowed to escape voluntarily (by escape ramps or temporary structures), without harassment, before construction activities resume, or removed from the trench or hole by a qualified biologist and allowed to escape unimpeded.

**Species Specific**

36. <u>Cactus Ferruginous Pygmy-owl (*Glaucidium brasilianum cactorum*):</u> In Arizona, this species can nest in columnar cacti. Pre-construction surveys will be performed by Government biologists in suitable habitat of the pygmy-owl to determine the presence or absence of the species prior to any clearing or grubbing. If present, a buffer of a 1,000-foot radius will be marked for avoidance. If a pygmy-owl is sighted, the construction contractor should immediately inform the environmental monitor and the CBP Project Manager. CBP Environmental will contact the US Fish and Wildlife Service to report sightings. The environmental monitor will document and report any sightings.
37. <u>Sonoyta Mud Turtle (*Kinosternon sonoriense longifemorale*):</u> No in-water work would occur within ponds, pools, streams or other waterbodies with known occurrences, suitable habitat or designated critical habitat for the Sonoyta Mud Turtle without CBP approval. To the extent practicable, removal of riparian vegetation within 100 feet of aquatic habitats would be avoided to provide a buffer area to protect the habitat from sedimentation. Cleaning or modification of culverts and other work within drainages that could cause sedimentation or otherwise affect water quality or quantity would not occur within, or within, 0.25 miles upstream of, critical habitat or other suitable habitat without further CBP approval.
38. <u>Chiricahua Leopard Frog (*Rana chiricahuensis*):</u> Endangered and sensitive aquatic and riparian species are known to occur in this project area. Prior to construction activities,

CBP biologist would survey project footprint and mark areas for avoidance. If construction is to occur in an intermittent or perennial waterway, species relocation may be required.

39. Snakes: If more than 5 venomous snakes a day are appearing in the construction area, contractor must hire a snake relocation company to survey the project area at the start of every day.
40. Mesquite: All removed mesquite with a diameter of 4 inches or more shall be salvaged.
41. Columnar Cactus: The Contractor will subcontract a certified arborist for the relocation of columnar cacti 10 feet in height or greater. Cacti less than 10 feet in height would be replaced with a nursery stock at a 3:1 ratio in an area proximate to the project area. The Contractor will work with a certified arborist in preparing and modifying a relocation plan, prior to scheduled work in impacted areas. CBP's Natural Resources SME will oversee the operation of the relocations.
    - Relocate affected plants north of the project area. Species should be relocated a minimum of 10' away from proposed lighting & electrical features.
    - The north face of cactus will be marked so that the species are translocated in the same position.
    - Provide a 12-month establishment period for all relocated affected plant species.
    - Impacts to all saguaros that provide the suitable nesting habitat for the cactus ferruginous pygmy-owl (*Glaucidium brasilianum cactorum*) will be avoided. If any saguaros are damaged during construction activities, CBP will be notified and the Contractor shall replace at an appropriate ratio. Qualifications - Certified Arborist
    - The certified arborist must adhere to the existing plant relocation BMPs. The relocation of the saguaro and organ pipe cacti will be scheduled prior to any impacts from work in designated areas.
        - The certified arborist subcontractor must provide the following prior to plant salvage and relocation:
        - Record of certification;
        - Method of removal and placement;
        - Procedures for feeding & watering, if applicable;
        - Methods of bracing & for providing physical stability;
        - Marking provisions for relocated plants identifiable during establishment period;
        - Establishment period measures to be employed; and
        - A monitoring plan for relocated species.

**Tribal Specific**

42. For any maintenance and repair service to access roadways outside of the immediate project area: CBP will provide written notice via email, including a scope of work and schedule, in advance to the Tohono O'odham Nation (TON).
43. Construction and maintenance crews will avoid traversing roads through saguaro fruit harvesting areas during the saguaro cactus harvesting festival to the maximum extent practicable.
44. The project corridor will deviate in certain areas to avoid sensitive resources to the greatest extent possible.
45. Construction crew will be respectful to the cultural heritage of the Tohono O'odham.

# EXHIBIT B




SKY ISLAND ALLIANCE
WILDLANDS NETWORK
08/16/2023 06:14AM


SKY ISLAND ALLIANCE
WILDLANDS NETWORK
06/11/2023 03:56AM