# ATTACHMENT E

## LANDS OF PAPAGO INDIANS

*Opinion, March 7, 1934*

PAPAGO INDIAN LANDS—TITLE—PROPRIETORSHIP OF THE UNITED STATES—INDIAN RIGHT OF OCCUPANCY—RIGHT TO MINERALS.

*Held,* That under dominion of Spain and Mexico the Papago Indians did not have title in fee to the lands they occupied; that in 1853, through the Gadsden Purchase, the United States acquired title to these lands, subject to an Indian right of occupancy of an area not exactly determined; that no interest in minerals was accessory or incidental to whatever surface rights the Indians may have enjoyed; that complete and unincumbered title to minerals in the land was formerly vested in the Mexican State and passed to the United States upon cession of the territory; that the appropriate manner of protecting the Papagos in their possession is a matter exclusively of political cognizance.

INDIANS AND INDIAN LANDS—JURISDICTION AND OWNERSHIP RESULTING FROM DISCOVERY—TITLE TO SPANISH AND MEXICAN LANDS—SUCCESSORSHIP.

It was accepted legal theory of the European nations which colonized America that upon discovery of any new lands complete jurisdiction and ownership became vested in the sovereign to whom the discoverer owed allegiance, from which it follows that all rights or titles to lands once a part of Mexico, vested in private persons, severally or in groups, must derive their legal character from the Spanish crown or succeeding proprietors.

PAPAGO INDIAN LANDS—LAW GOVERNING LAND TITLES.

Spanish and Mexican law are decisive of the question of the title under which the lands of the Papago Indians are held.

INDIANS AND INDIAN LANDS—NATURE OF GRANT BY SPANISH CROWN.

The numerous decrees of the monarchs of Spain protecting Indians in their occupation of lands are not in effect a grant of complete title to Indian communities in possession generally.

PAPAGO INDIAN LANDS—TITLE BY COMMUNITY OWNERSHIP—REQUISITES.

A claim of tribal ownership of a large land area cannot be established without a fixing of boundaries, and ownership by village communities can be established only if such communities can be defined.

INDIAN LANDS—TITLE—UNITED STATES COURTS—CONFIRMATION OF GRANTS MADE BY SPANISH OFFICERS.

By confirming the acts of Spanish officers in granting lands which were in Indian possession, United States courts, Federal and State, have accorded recognition to the doctrine that title to lands held by Indians in Mexico was not a fee simple title.

PAPAGO INDIAN LANDS—OWNERSHIP OF MINERALS BY THE SPANISH CROWN—SUCCESSORSHIP BY THE UNITED STATES.

Since the cession to the United States of the territory which embraces the Papago lands, the courts in this country have recognized the ownership of mines by Spain and Mexico before the cession as well as the succession of the United States to that ownership, and the Supreme Court has stated expressly that under Spanish law minerals in Indian lands were the property of the Crown; also the Executive and Legislative branches of the Federal Government have likewise recognized the succession of the Federal

Case 1:26-cv-02127-RJL Document 18-7 Filed 07/07/26 Page 3 of 16



Government to the ownership of mines in what was formerly Spanish and Mexican territory.

INDIANS AND INDIAN LANDS—SPANISH LAWS—INCOMPATIBILITY WITH RECOGNITION OF ULTIMATE TITLE.

Certain laws of the Spanish regime are incompatible with recognition of ultimate title in the Indians, as, for instance, the law (Law 23, Book 4, Title 7, "Compilation of the Indies") permitting Spaniards to make new settlements in Indian territory, peaceably, if possible, but otherwise if necessary.

PAPAGO INDIAN LANDS—EXECUTIVE ORDER CREATING RESERVATION—MINERAL DEPOSITS EXCEPTED.

The Executive order of February 1, 1917, reserving lands for the Papago Indians, excepted mineral deposits and provided that the reservation area should be open to entry and location under the mining laws of the United States.

INDIANS AND INDIAN LANDS—PRESCRIPTIVE RIGHT AS AGAINST THE CROWN—FORMAL PROCEDURE ESSENTIAL.

Even if prescriptive right, as against the Crown, resulting from immemorial possession, was recognized by the Spanish law, an appropriate formal procedure was necessary to a complete title. Case of *Carino* v. *The Insular Government of the Philippine Islands* (212 U.S. 449, 461) distinguished.

MARGOLD, *Solicitor:*

At the suggestion of the Commissioner of Indian Affairs, there has been referred to me for opinion the question of the validity of certain claims of surface and mineral rights asserted by the Indians of the Papago Tribe. These claims embrace an existing Indian reservation of more than two and one-half million acres, and a large amount of adjacent land in southern Arizona. The area is bounded, in a general way, by the Gila River, the Santa Cruz River, the Mexican boundary, and the Growler Mountains. For centuries it has been, and it still is, the home of the Papago Indians.

The Papagos claim that both surface and minerals belong to them in fee by virtue of a title vested in them before the area in question came under the sovereignty of the United States. Therefore, they allege, the land never became part of the public domain of the United States.

In 1853, this territory, then a part of Mexico, was acquired by the United States as a part of the Gadsden Purchase. 10 Stat. 1031 (1854). By Act of July 22, 1854, Congress established the office of Surveyor General of the Territory of New Mexico and placed under the jurisdiction of the Surveyor General the examination of all claims to land asserted under the laws, usages, and customs of Spain and Mexico. Ultimate confirmation and rejection of such claims was made a function of Congress acting upon such report and recommendation as the Surveyor General might make. 10 Stat. 308 (1854). After Arizona became a separate territory, similar legis-

lation was enacted creating the office of Surveyor General of Arizona and defining the duties of that office. 16 Stat. 291 (1870). In 1891 Congress created the Court of Private Land Claims and conferred upon it jurisdiction to hear and adjudicate claims asserted under the Spanish and Mexican law. 26 Stat. 854 (1891). As early as 1874 the President of the United States, by Executive order, set apart a small tract of land within the Papago country, immediately around the old Jesuit Mission and Indian village of San Xavier del Bac, as an Indian reservation. Other comparatively unimportant reservations followed until Executive Order No. 2524, dated February 1, 1917, effected the reservation of more than two million acres in the Papago country for the Indian inhabitants, but excepted mineral deposits and provided that the reservation area be open to entry and location under the mining laws of the United States. Congress recently has added to this reservation a contiguous strip of some three hundred thousand acres with the same exception and provision concerning minerals. 46 Stat. 1202 (1931). From time to time the United States has issued patents to white settlers and miners within the Papago country. It is to be remarked that during all these years of Indian occupancy and of Federal action presupposing the inclusion of the land in question within the public domain, only one instance of formal assertion of Indian title is recorded. In that case the Supreme Court of the United States considered an Indian claim to a particular small area within the Papago country. The litigation was indecisive. *Lane* v. *Pueblo of Santa Rosa*, 249 U.S. 110 (1919); *Pueblo of Santa Rosa* v. *Fall*, 273 U.S. 315 (1927). Under these circumstances and at this late date, those who assert that the Indians hold fee simple title to this land must bear a substantial burden of persuasion.

A number of surveys and studies have been made of the Papago Indians and the territory they occupy. From such sources it is possible to draw a significant picture of the factual relation between these Indians and the land in controversy. The Geological Survey has published a monograph embodying the results of a recent survey. Bryan, "The Papago Country, Arizona" (1925). Ten years earlier the United States Indian Service, through the agency of H. V. Clotts, assistant engineer, completed a comprehensive survey of the Papago country. Also valuable is an unofficial study by Carl Lumholtz, published in 1912, in his book "New Trails in Mexico." Studies by the Bureau of American Ethnology, official Census reports, and reports of the Secretary of the Interior, the Commissioner of Indian Affairs, the Surveyors General of New Mexico and Arizona and subordinate officials in the Indian Service, complete the picture.

Lumholtz writes the following description:

The Papago Indians of today, the principal natives of the desert, live in Arizona to the west and southwest of Tucson, as far as the Growler Mountains in the west, the Gila River in the north, and the range of Baboquivari in the east. * * * Until recent times they were found as far as the Colorado River. They occupy much the same land as they did when first discovered in the seventeenth century by the Spaniards. The region was early named Papagueria, or, in its greater extension, Primeria Alta. It is part of the great arid region called the Sonora Desert. * * *

The greater part of the tribe never could be induced to live in pueblos, or villages, which was always the policy of the Spanish missionary. In spite of the efforts of the Jesuits and Franciscans, the Papagoes are still living in their *rancherias* as of old, half nomadic in habit, resorting in the winter to the sierras where water is more plentiful and where their cattle, horses, mules and donkeys find good grazing ground. In the summer they move to the broad, flat valleys to devote themselves to agriculture which is made possible by the aid of the showers that fall in July and August. (At pp. 16, 25.)

See also Bryan at p. 1; Indians Taxed and Indians Not Taxed in the United States at the 11th Census, 1890 (Dept. of Interior, Census Office, 1894) 142 ff.

The character and location of the Indian communities in the so-called Papagueria have been the subject of census. Clotts, Bryan and Lumholtz report the Indian communities in some detail. Clotts describes 62 inhabited villages, aggregating 1,013 houses, with a total population of 5,560 persons and with 9,200 acres under cultivation. Lumholtz, similarly, lists 88 rancherias. Bryan devotes more than 150 pages to a description of all traveled routes through the Papagueria, and names and describes the scores of inhabited places to be observed along these routes. Earlier reports, apparently not predicated upon any detailed survey, show a much smaller number of communities. Soon after the Gadsden Purchase, Gov. Meriwether, Superintendent *ex officio* of Indian Affairs in New Mexico, reported, " from the most reliable information in my possession ", that the Indians within the area of the Gadsden Purchase were concentrated in " six pueblos, or villages ", near Tucson. 2 Sen. ex. doc., 34 Cong., 3d sess. (1856–57) 734. The Surveyor General of New Mexico appended to his annual report for the year 1861 a table in which he attempted to include " all the pueblos whether in New Mexico proper or in Arizona." He listed therein 11 " Papago pueblos " located in Arizona, all of them, however, unsurveyed and of unknown area. 1 Sen. ex. doc., 37 Cong., 2d sess. (1861–62) 574, 578, 580, 581. In 1863, Charles D. Poston, the first Superintendent of Indian Affairs in the Territory of Arizona, listed 18 Papago villages within his jurisdiction. 3 H. R. ex. doc. 38 Cong. 1st sess. (1863–64) 503, 504.

The discrepancy between the earlier and later reports seems to reflect both incompleteness of the earlier data and some recent migrations of the Indians.

The primitive condition of Papago society is giving way to the new. * * * Formerly they lived in large rancherias, but in the last twenty years the tendency has been to scatter. They have been touched by Americanism and are now showing energy in acquiring cattle and other properties. * * * During the last twenty years the tribe has acquired a considerable number of live stock, often 20 cows, and from 10 to 12 horses to a family. Lumholtz, at pp. 363, 364.

Comparison of the recent reports with the older ones confirms the quoted statement. Most of the communities named in the earlier reports appear in the recent ones, but with decreased population. This much seems clear: the life of the Papagos, conditioned by the aridity of the Papagueria, has not been sedentary. It is their habit to make seasonal migrations of some regularity between winter rancherias and summer rancherias. The search for pasturage and water for herds and flocks has necessitated even more extended wanderings than the exigencies of human life in an arid country alone would require. Yet, certain villages have existed for centuries. No survey of any of them seems to have been made at any time during the Spanish or Mexican dominion. Grazing lands throughout the Papagueria seem to have been common to the entire tribe regardless of village affiliations.

From so much as already has been said by way of description, it must be apparent that, at the outset, the proponents of Indian title must face serious difficulties of proof in defining the area claimed and identifying the claimants to that area. Ownership in severalty is not asserted. Ownership by village communities can be established only if such communities can be defined. Moreover, a great part of the Papago country seems not to be part of any village community. A claim of tribal ownership of the entire Papagueria cannot be established without a fixing of boundaries. Certainly, the present arbitrary reservation is less extensive than the area over which the Papagos formerly roamed. The evidence at hand is insufficient for decision upon questions of boundary, but these difficulties of proof deserve mention, at least, before the general law of Indian tenure, and of mines, is considered.

The question of Indian tenure to be decided is this: Must the interest of the Papagos in the land they claim be subordinate to a superior proprietorship in the United States, or can these Indians have a perfected title in fee which precludes the United States from exercising any proprietorship over the land? That the Papagos have long occupied the Papagueria and should be protected in that occupancy, is not disputed. Indeed, the Executive order of February 1, 1917, is a recognition of an obligation which officials in the Indian Service have pointed out repeatedly ever since the annexation of the territory in question. That order, however, confirms and confers surface rights only. The contention now is that at the time of

cession the Papagos had a perfected communal title in fee, no more subject to interference by the Federal Government, whether by creation of a reservation for the occupants, or by alienation of their land or its mineral wealth, than the fee simple title of any individual owner.

Had the land been part of the original territory of the United States, it is clear that the contention advanced on behalf of the Indians would fail. *Spalding* v. *Chandler*, 160 U.S. 394 (1896); *Cherokee Nation* v. *Georgia*, 5 Pet. 1 (1831). However, Spanish and Mexican law are decisive of the question here presented.

It was the accepted legal theory of the European nations which colonized America that upon discovery of any new lands complete jurisdiction and ownership, both *imperium* and *dominium*, became vested in the sovereign to whom the discoverer owed allegiance. For a convenient compendium, see "Indian Land Cessions in the United States" (Ethnology Bureau, 1897), H. R. doc. 118, 56 Cong. 1st sess. (1899–1900) 527ff. The King of Spain asserted a twofold claim to the vast area of New Spain and Mexico, predicating his title not alone on the right of discovery, but also upon a grant from the Pope contained in the Papal Bull of 1493. See *Johnson* v. *McIntosh*, 8 Wheat. 543, 573 (1823); Hall, "Laws of Mexico" (1885), secs. 1, 2; Solorzano, "Politica Indiana," bk. 1, ch. 9, sec. 16; *id.* bk. 6, ch. 12, sec. 3. It follows that all rights or titles vested in private persons, severally or in groups, must derive their legal character from the Spanish Crown or succeeding proprietors.

It is not claimed that a particular grant to the Papago Indians as a tribal group was ever made by Spain. It is contended, however, that the numerous decrees of the Spanish King protecting Indians in their occupation of land are in effect a grant of complete title to Indian communities in possession generally.

The laws governing the disposition of Crown lands in Mexico under the Spanish regime appear principally in title 12 of book 4 of the "Recopilacion of the Indies," and in a few uncompiled royal decrees. Law 14 of book 4, title 12 (apparently issued originally in 1578, but amended or republished in final form in 1591) is a convenient starting point.

> Whereas we have fully inherited the dominion of the Indies; and whereas the waste lands and soil which were not granted by the Kings, our predecessors, or by ourselves, or in our name, belong to our patrimony and royal crown, it is expedient that all the land which is held without just and true titles be restored, as belonging to us, in order that we may retain, before all things, all the lands which may appear to us and to our Viceroys, Audiences and Governors, to be necessary for public squares, liberties (*exidos*), reservations (*propios*), pastures, and commons, to be granted to the villages and councils already settled, with due regard to their present condition as to their future state, and to the increase they may receive, and after distributing among the Indians whatever they may

justly want to cultivate, sow and raise cattle, confirming to them what they may want besides, all the remaining land may be reserved to us, clear of any incumbrance, for the purpose of being given as rewards, or disposed of according to our pleasure. For all this we order and command the Viceroys, Presidents and Pretorial Audiencies, whenever they shall think fit, to appoint a sufficient time for the owners of land to exhibit before them and the ministers of their audiences, whom they shall appoint for that purpose, the titles to lands, estates, Indian settlements, and *caballerias*, who, after confirming the possession of such as hold the same by virtue of good and legal titles, or by a just prescription, shall restore to us the remainder, to be disposed of according to our pleasure. See Reynolds, " Spanish and Mexican Laws " (1895) 47.

Supplementing this law is a separate decree of the same date. providing that lands occupied without lawful title—which lands are to be restored to the Crown under Law 14, *supra*—" may be admitted to some convenient composition " and thereby confirmed to the possessor, thus providing much needed accessions to the King's revenue. Exceptions are made, including a reservation " to the Indians what may be necessary for them to sow, cultivate and raise stock." Among the lands to be admitted to composition are " *chacaras* " which seem to have been Indian farms or settlements. Unoccupied " *chacaras* " may be conceded to those who present proper petitions. The execution of this decree is entrusted to the Viceroy and the Council of the Indies. Hall, 11, 12. In 1735, another decree made it necessary that grants of Crown lands be confirmed by the King himself. The great inconvenience of this system resulted in the decree of October 15, 1754 (Galvan's " Ordinances on Land and Water ") in which formal confirmation was entrusted to local officers and their procedure and jurisdiction defined. Section 2 of that decree provided:

The judges and officers in whom is delegated the jurisdiction over the sale and composition of crown lands shall act with lenity, forbearance and moderation, with verbal and not judicial process, in questions of lands held by Indians, and of others where it may be necessary, and in particular where their farms. farming and stock-raising are in question; since in regard to community lands and those granted their towns for pastures and commons, there is no occasion to do anything new but to maintain them in possession thereof and to restore to them those that have been taken from them and give them more land as the exigencies of the population require, and do not use rigor in regard to those held by Spaniards and people of other castes, keeping in mind the provisions of Laws 14, 15, 17, 18 and 19, Title XII, Book IV, of the Compilation of the Indies. Reynolds, 51.

Without further setting out in detail the text of title 12 of book 4, it seems a fair generalization that the several laws therein protect the Indians in their occupancy without defining any estate. Moreover, it seems a clear implication of Law 14, and of the Ordinance of 1754, that Indian lands are Crown lands and a part of the royal patrimony, the occupancy of which is surrounded by a special protection. This conclusion is supported by inference to be drawn

from other laws of the Indies concerning Indians. In titles 2 and 3 of book 6 appear laws for the assembling of the Indians in villages. Law 23, in book 4, title 7, permits Spaniards to make new settlements in Indian territory, peaceably, if possible, but otherwise "without doing any greater damage than shall be necessary for the protection of the settlements and to remove obstacles to the settlement." Such laws are incompatible with any recognition of ultimate title in the Indians. Again, the several laws with respect to compositions, quoted above, are significant in their reference to Indians. They indicate that occupants without grants from the Crown, whether Indians or Spaniards, remained in possession by sufferance only. Although the Indian occupant enjoyed a particular paternal protection, neither Indian nor Spaniard could obtain title except by formal composition. The Papagos might have perfected their title by formal proceeding, but, failing to do so, they continued in a protected possession subject to the superior title of the Crown.

Our courts have accorded significant recognition to this legal situation by confirming the power of Spanish officers to grant lands while still in the possession of the Indians. *United States* v. *Fernandez*, 10 Pet. 303 (1836); *Breaux* v. *Johns*, 4 La. Ann. 141 (1849); *cf. United States* v. *Arredondo*, 6 Pet. 691 (1832).

It is next contended on behalf of the Indians that even if no grant to them can be proved, lapse of time has resulted in the vesting of perfect title in them.

It has been asserted by the Supreme Court of the United States that prescription as against the Crown was recognized by the Spanish law. See Holmes, J., in *Carino* v. *The Insular Government of the Philippine Islands*, 212 U.S. 449, 461 (1909); *cf. United States* v. *Pendell*, 185 U.S. 189 (1902); *United States* v. *Chavez*, 175 U.S. 509 (1899). But see Field, J., in *Harrison* v. *Ulrichs*, 39 Fed. 654 (C.C.S.D. Cal., 1889); *Crespin* v. *United States*, 168 U.S. 208, 218 (1897). But, under Spanish law, the prescriptive right which resulted from immemorial possession seems to have been no more than a privilege of acquiring title by appropriate formal procedure. See Ordinance of October 15, 1754, section 4 (Reynolds, 50): "Novisima Recopilacion," bk. 11, tit. 8, law 4 (2 White, "New Recopilacion," 154); Hall, section 56; *Balanton* v. *Murciano*, 3 Philippine Reports, 537 (1904). In the *Carino* case, *supra*, where the question was whether the United States should confirm the title of an individual owner based on immemorial possession of a defined tract, no such formal proceeding had ever occurred. The Supreme Court avoided this difficulty by resort to the power of the United States, as a sovereign, to ignore "refined interpretation of an almost forgotten law of Spain," and to "recognize actual fact" in an effort to achieve what the court considered an essentially just result. In contrast, the

present question is essentially a formal one, although its decision must affect substantial claims. But more fundamental distinctions are to be observed: (1) This is a case of Indian tribal occupancy which seems to have been permissive and under royal protection. (2) The tract in question is not clearly defined. (3) The claim is one of communal ownership, whether by tribe or by villages.

This last consideration is decisive in itself. The nature of municipal and communal ownership of land under Spanish law too often has been adjudicated by the Supreme Court any longer to be a subject of controversy. The question has arisen most frequently with respect to the title of Spanish and Mexican pueblos rather than communities or tribes of Indians. Mr. Justice Field has thus described the tenure by which common lands within any community were held:

By the laws of Mexico, in force at the date of the acquisition of the country, pueblos or towns were entitled, for their benefit and the benefit of their inhabitants, to the use of lands constituting the site of such pueblos and towns, and of adjoining lands, within certain prescribed limits. This right appears to have been common to the cities and towns of Spain from an early period in her history, and was recognized in the laws and ordinances for the settlement and government of her colonies on this continent. * * * It may be difficult to state with precision the exact nature of the right or title which the pueblos held in these lands.

It was not an indefeasible estate, ownership of the lands in the pueblos could not in strictness be affirmed. It amounted in truth to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasturelands, or as a source of revenue, or for other public purposes. *The right of disposition and use was, in all particulars, subject to the control of the government of the country.* (Emphasis added.) *Townsend* v. *Greely*, 5 Wall. 326, 336 (U. S. 1866). Accord *United States* v. *Sandoval*, 167 U.S. 278, 295–298 (1897); *United States* v. *Santa Fe*, 165 U.S. 675, 707–711 (1897); *Grisor* v. *McDowell*, 6 Wall. 363, 372–3 (1867); *United States* v. *Pico*, 5 Wall. 536, 540 (1866); *State* v. *Gallardo*, 106 Tex. 274, 166 S.W., 369, 372 (1914).

It is clear that the fee to all community land within the limits of any pueblo remained in the sovereign. Lapse of time did not improve the communal title of the group. There is no basis for any contention that the communal title of Indians, whether claimed by villages or by tribe, attained any greater estate. Indeed, in the case of the Papagos, where the greater part of the area involved is grazing land, both within and outside of the limits of particular villages, prescription is further impeded by specific provision of the law of the Indies that pastures are common to all persons. Bk. 4, tit. 17, law 5 (2 White, 56). The Papago claim to ownership in fee under the Spanish and Mexican law, whether based on grant or prescription, must fail.

Other and additional considerations make it clear that the Papagos enjoy no estate in the minerals contained in the land. The Spanish law concerning mines, as it existed from medieval times down to 1783, is conveniently summarized in an opinion of Chief Judge (later Mr. Justice) Field. See *Moore* v. *Smaw*, 17 Cal. 199, 213–215 (1861). The modern Spanish and Mexican mining law begins with a complete mining code for Spain and its colonies, issued in 1783 and promulgated in Mexico the next year. For translations, see Hamilton, "Mexican Law" (1882), 235ff.; 1 Rockwell, "A Compilation of Spanish and Mexican Mining Law" (1851), 49 ff. This code, commonly called the Ordinance of 1783, remained authoritative in New Spain and in the Republic of Mexico until after the Gadsden Purchase. See *United States* v. *Castillero*, 2 Black, 17, 167 (U.S. 1862); Hall, p. 357. Title 5 of the ordinance concerns the ownership of mines.

Sec. 1. The mines are the property of my royal Crown * * *.

Sec. 2. Without separating them from my royal patrimony I grant them to my subjects in property and possession * * *.

That section 2, *supra*, is not a present grant and does no more than make possible specific transfers of a qualified property right in the future is made clear in title 6 of the ordinance. In that title the manner in which new mines may be discovered and the formal proceeding of denouncement and registry, whereby a qualified title to any particular mine may be acquired from the Crown, are described. The exact language of certain sections may indicate more clearly the purport of this title.

Sec. 14. Anyone may discover and denounce a vein, not only on common land, but also on the property of any individual, providing he pays for the extent of surface above the same, and the damage which immediately ensues therefrom * * *

Sec. 18. Beds of ore (*placeres*) and all other deposits (*criadores*) of gold and silver, on being discovered, shall be registered and denounced in the same manner as mines or veins, the same being understood of all species of metal.

Section 22 makes the ordinance applicable to deposits of copper, tin, lead, quicksilver, and other metals.

In the "Laws of the Indies" special provisions were made to bring the Indians within the general mining laws. The occasion seems to have been a loss of royal revenue caused by the failure of Indians to disclose mines for fear of confiscation. See Gamboa, "Commentaries on Mining Ordinances of Spain" (Heathfield's Trs., 1830) 34. In book 4, title 19, it is provided that all persons, including Indians, may discover and work mines, but that in doing so they must refrain from injuring Indians or other persons. Law 14 prohibits any restriction from being "imposed on their (the Indians) discovering, holding and occupying mines of gold and

silver or other metals, * * * in conformity with the ordinance of any province." Law 16 provides that groups of Indian discoverers shall share in a mine in the same way as Spaniards. In brief, under the mining laws of Spain and Mexico the Indian enjoyed the same status and privileges as persons of Spanish descent. The legal situation as it existed down to the time of the Gadsden Purchase is summarized in two statements, one a judicial opinion of the Mexican Supreme Court of Justice, the other a text by a Spanish jurisconsult, preeminent in the field of mining law.

"The ordinance (of 1783) disallows and condemns the system of accession, preserving the principles by which mines may be denounced upon the land of another person, and establishing the right upon the owner of the land to demand its estimated value (*pro tanto*) thus declaring that mines are not accessories to the soil; 5th, as a consequence of this principle, independent in their judicial relations, the ownership of the mine and that of the soil, create two separate and diverse proprietors." Opinion of Chief Justice Vallarta, June 24, 1880, Hamilton, Appendix VIII.

The correct opinion then seems to be that the property of the mines remained in the Crown, and that as the Sovereign can not work them on his own account, he has given his subjects a partial interest in them under various restrictions." Gamboa, at 24.

Since the cession to the United States, the courts in this country have recognized both the ownership of mines by Spain and Mexico before the cession, and the succession of the United States to that ownership. See *United States* v. *Castillero*, *supra*, at p. 190; *Chouteau* v. *Molony*, 16 How. 203, 228 ff. (U.S. 1853); *Moore* v. *Smaw*, *supra*, at 217; *Boggs* v. *Merced Mining Co.*, 14 Cal. 279, 308–313 (1859). The Supreme Court has stated expressly that under Spanish law minerals in Indian lands were the property of the crown,

"but the privilege to work the mines in lands still in the occupancy of the Indians, he (the Spanish Governor) could give, because the mines were a part of the royal patrimony of the Crown, and the King had directed that they might be searched for and worked in all his dominions by his subjects, both Spaniards and Indians." *Chouteau* v. *Molony*, *supra*, at 240.

The executive and legislative branches of the Federal Government likewise have recognized the succession of the Federal Government to the ownership of mines in what was formerly Spanish and Mexican territory. The Secretary of the Interior in his annual report for 1849 made the following statement:

By the laws of Spain these mines did not pass by a grant of the land, but remained in the crown, subject to be disposed of according to such ordinances and regulations as might be from time to time adopted. Any individual might enter upon the lands of another to search for ores of the precious metals; and having discovered a mine, he might register and thus acquire the right to work it on paying to the owner the damage done to the surface, and to the crown, whose property it was, a fifth or tenth, according to the quality of the mine.

If the finder neglected to work, or worked it imperfectly, it might be denounced by any other person, whereby he would become entitled.

This right to the mines of precious metals, which, by the laws of Spain, remained in the crown, is believed to have been also retained by Mexico while she was sovereign of the Territory, and to have passed by her transfer to the United States. It is a right of the sovereign in the soil as perfect as if it had been expressly reserved in the body of the grant, and it will rest with Congress to determine whether, in those cases where lands duly granted contain gold, this right shall be asserted or relinquished. If relinquished, it will require an express law to effect the object; and if retained, legislation will be necessary to provide a mode by which it shall be exercised. For it is to be observed that the regulation permitting the acquisition of a right in the mines by registry or by denouncement was simply a mode of exercising by the sovereign the proprietary right which he had in the treasure as it lay in and was connected with the soil. Consequently, whenever that right was transferred by the transfer of the eminent domain, the mode adopted for its exercise ceased to be legal, for the same reason that the Spanish mode of disposing of the public lands in the first instance ceased to be legal after the transfer of the sovereignty. 2 Sen. ex. doc., 31st Cong., 1st Sess., 1849–50, 9–10.

When Congress created the office of Surveyor General of New Mexico and provided machinery for the establishment and confirmation of land claims existing under the Spanish and Mexican law, it expressly excluded mineral lands from the operation of the statute. 10 Stat. 308, sec. 4 (1854). In the Court of Private Land Claims Act it is provided:

*Third.* No allowance or confirmation of any claim shall confer any right or title to any gold, silver or quicksilver mines or minerals of the same unless the grant claimed effect the donations of such mines or minerals to the grantee or unless such grantee has become otherwise entitled thereto in law or in equity; but all such mines and minerals shall remain in the property of the United States. 26 Stat. at L. 854, 860 (1891); see *Lockhart* v. *Johnson*, 181 U.S. 516, 524 (1900).

Upon the whole case, in the light of the facts now at hand, it is my opinion that in 1853 the United States acquired title to the land in question subject to an Indian right of occupancy of an area not exactly determined; that whatever surface rights the Papago Indians may have enjoyed, no interest in minerals was accessory or incidental to those surface rights; that complete and unencumbered title to minerals in the land was vested formerly in the Mexican State and passed to the United States upon cession of the territory. It follows that the question of the appropriate manner of protecting the Papagos in their possession was, and still is, a matter exclusively of political cognizance. *Cf. United States* v. *Santa Fe*, 165 U.S. 675 (1896); *Les Bois* v. *Bramell*, 4 How. 449 (1846). The present measure of the legal rights of the Papagos is the Executive order of February 1, 1917, as modified by the act of February 21, 1931. The Papagos have no independent title which can make that action

ineffective or embarrass any future action that to Congress may seem appropriate in the premises.

Approved:

OSCAR L. CHAPMAN,
*Assistant Secretary.*

---

## PRODUCERS AND REFINERS CORPORATION

*Opinion, March 10, 1934*

OIL AND GAS LANDS—SALE OF INTERESTS IN PROSPECTING PERMITS—SEC. 27, ACT OF FEBRUARY 25, 1920, AS AMENDED—INTEREST ACQUIRED BY PURCHASER.

Where interests in Government lands are in the form of agreements held by a corporation organized for the operation, drilling, or production of lands held by others under oil and gas *prospecting permits*, such interests pass, by a sale thereof, unincumbered by the acreage limitations of section 27 of the Leasing Act of February 25, 1920 (41 Stat. 437), as amended, since such agreements create only a potential interest in any oil or gas which may be discovered, which interest may be divested if the agreement is canceled or forfeited prior to the discovery of oil or gas and the resulting issuance of a lease.

OIL AND GAS LANDS—SALE OF INTERESTS IN LEASES UNDER SECTIONS 14 AND 17 OF LEASING ACT—WHAT PURCHASER ACQUIRES—QUALIFICATIONS REQUIRED.

The purchaser of interests in Government lands included within oil and gas *leases* held by others under sections 14 and 17 of the Leasing Act, will not automatically become entitled to the benefits of the fifth proviso of section 27 of the Leasing Act as amended by the Act of March 4, 1931, which, under certain conditions, waives acreage limitations, but such purchaser must qualify as required by Circular No. 1252.

OIL AND GAS LANDS—INTERESTS ORIGINALLY OBTAINED UNDER SECTIONS 18 AND 19 OF LEASING ACT—SALE—INTEREST ACQUIRED BY PURCHASER.

Where interests in oil and gas lands comprised within the public domain, whether operating agreements or actual permits and leases, were obtained originally under the so-called " relief sections " of the Leasing Act, and are sold, the purchaser acquires the interest purchased, unless it be an interest in a prospecting permit under section 19 of the Leasing Act, free from any charge under the acreage limitations of section 27, and this whether the holder of the interest conveyed was an original holder or an assignee.

OIL AND GAS LANDS—SECTION 27, LEASING ACT—SCOPE AS TO CLASSES OF BENEFICIARIES.

The class of persons entitled to the benefit of the exemptions of section 27 of the Leasing Act is not limited to original claimants under section 18 of that act, but includes their assignees.

Cases of *Midland Oilfields Company* (50 L.D. 620) and *Kanawha Oil and Gas Company, Assignee* (50 L.D. 639) overruled, in so far as in conflict.

## LANDS OF PAPAGO INDIANS—CHARACTER OF LAND AS MINERAL OR NONMINERAL AS AFFECTING INDIAN RIGHT OF OCCUPANCY

*Opinion, May 7, 1934*

INDIAN LANDS—PAPAGOS—CHARACTER OF LANDS AS MINERAL OR NONMINERAL —RIGHT OF SURFACE OCCUPANCY UNAFFECTED.

The Indian right of surface occupancy within the exterior boundaries of the Papago Indian Reservation, Arizona, is quite independent of the mineral or nonmineral character of the land.

INDIAN LANDS—EXECUTIVE ORDER OF JANUARY 14, 1916—RIGHT OF INDIANS TO OCCUPANCY—BASIS OF RIGHT.

The presence, in an administrative recommendation (see 45 L. D. 537), of an observation that "ample protection will be given the Indians in the occupation and use of their mineral lands," is no sufficient basis for an inference that the Department has ruled or should now rule that Indian surface rights are restricted to nonmineral lands.

MARGOLD, *Solicitor:*

The following question, propounded by the Commissioner of Indian Affairs, has been referred to me for opinion:

What effect, if any, has the mineral or nonmineral character of land within the Papago Indian Reservation upon the Indian right of surface occupancy?

Decision upon this question is essentially supplemental to a Solicitor's opinion, dated March 7, 1934 (see page 359), in which surface and mineral rights within the Papago Reservation were considered. In the last paragraph of that opinion appears the conclusion "that in 1853 the United States acquired title to the land in question subject to an Indian right to occupancy of an area not exactly determined". Earlier in the opinion it was pointed out that under Spanish and Mexican law mineral deposits constituted a tenement distinct from the surface which covered them. It was not intended to suggest in any way that the Indian right of surface occupancy is limited to "nonmineral" lands. Indeed, no formal classification of the land seems ever to have been made.

When the United States acquired the Papago country as a part of the Gadsden Purchase, the area now included within the Papago Reservation was in the possession of the Papago Indians. The fact of immemorial Indian occupancy of this entire area is not disputed. The courts have consistently recognized such possession as vesting a legally protected possessory interest in the Indians. "The Indian's right of occupancy has always been held to be sacred; something not to be taken from him except by his consent." See *Minnesota* v. *Hitchcock*, 185 U.S. 373 (1902). No reason appears for denying such recognition with respect to Indian country acquired from Spain

or Mexico. See *Chouteau* v. *Molony*, 16 How. 203 (1853). Nor does any basis appear for limitation of Indian right of surface occupancy to nonmineral lands when the factual immemorial possession upon which their right is based has continuously embraced the entire controverted area, quite irrespective of the mineral or nonmineral character of any tract.

The Indian right of surface occupancy was confirmed by Executive Order of February 1, 1917. That order reserved " *all* surveyed and *all* unsurveyed lands " within the controverted area for the benefit of the Indians, excepting only the " minerals *therein* contained ". (Emphasis added.) A similar general reservation with the same limited exception of minerals appears in the Act of February 21, 1931 (46 Stat. 1202), which extended the reservation to its present area. It must be clear, therefore, that the Indian right of occupancy within the exterior boundaries of the Papago Reservation is quite independent of the mineral or nonmineral character of any land.

It has been contended that a regulation of this Department, approved April 19, 1916 (45 L.D. 537), recognizes a restriction of Indian surface rights to those lands which are nonmineral in character. In fact, that regulation does no more than to declare that certain general mining regulations, with minor modifications, shall be applicable to mining operations within the reservation as permitted by Executive Order of January 14, 1916—an order superseded by the presently effective Executive Order of February 1, 1917. The regulation is in form a recommendation by the Commissioner of Indian Affairs, approved by the First Assistant Secretary of the Interior. In his recommendation the Commissioner remarked that " ample protection will be given the Indians in the occupation and use of their nonmineral lands "

No such dictum in an administrative recommendation may be used as a basis for any inference that this Department has ruled or should now rule that Indian surface rights are restricted to nonmineral lands. The Indian right of surface occupancy extends over the entire reservation, and the Executive Order and statute which created the present reservation so declared. Any situation in which there exists the possibility of a progressive abridgment of those surface rights, without the consent of the Indians and without compensation to them, is anomalous and " paradoxical." See statement of Senator Wheeler in Vol. 17, Hearings Before Subcommittee of Committee on Indian Affairs of the United States Senate (1929–1932) at pages 8413, 8414.

Approved: May 7, 1934.

Oscar L. Chapman,

*Assistant Secretary.*