**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127-RJL |

**SUPPLEMENTAL MEMORANDUM OF THE TOHONO O'ODHAM NATION**
**IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ ii

GLOSSARY ............................................................................................................................... iv

ARGUMENT ............................................................................................................................... 1

I.      Only Congress Can Abrogate the Nation's Rights. ............................................................ 1

II.     The Secretary's Actions Rest on an Unauthorized Alteration of Reservation Boundaries. ...................................................................................................................... 2

III.    The Secretary Has Contracted for Actions that Will Necessarily Result in Significant Trespasses on the Nation's Lands and Are Ripe for Resolution. ...................... 5

IV.    The Nation Will Suffer Irreparable Harm Absent an Injunction, and the Public Interest and Precedent Counsel Its Issuance. ...................................................................... 9

# TABLE OF AUTHORITIES

**Cases**

*Federal Express Corp. v. U.S. Department of Commerce,*
  39 F.4th 756 (2022)..................................................................................... 2

* *Hualapai Indian Tribe v. Haaland,*
  755 F.Supp.3d 1165 (D. Ariz. 2024) ......................................................... 12

* *Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022)..................................................................... 10

*Jenner & Block LLP v. U.S. Department of Justice,*
  784 F.Supp.3d 76 (D.D.C. 2025).................................................................. 7

*Mashpee Wampanoag Tribe v. Bernhardt,*
  Civil Action No. 18-2242 (PLF), 2020 WL 3034854 (D.D.C. June 5, 2020) .......................... 10

*Mattz v. Arnett,*
  412 U.S. 481 (1973)...................................................................................... 2

* *McGirt v. Oklahoma,*
  591 U.S. 894 (2020)...................................................................................... 1

* *Michigan v. Bay Mills Indian Community,*
  572 U.S. 782 (2014)...................................................................................... 1

* *National Trust for Historic Preservation v. National Park Service,*
  827 F.Supp.3d 93 (D.D.C. 2026)................................................................... 2

* *Nebraska v. Parker,*
  577 U.S. 481 (2016)...................................................................................... 1

*Seymour v. Superintendent of Washington State Penitentiary,*
  368 U.S. 351 (1962)...................................................................................... 2

* *Shoshone Tribe of Indians of Wind River Reservation v. United States,*
  299 U.S. 476 (1937)................................................................................... 2, 3

* *Singh v. Berger,*
  56 F.4th 88 (D.C. Cir. 2022)......................................................................... 8

* *United States v. Alcea Band of Tillamooks,*
  329 U.S. 40 (1946)........................................................................................ 3

* *United States v. Santa Fe Pacific Railroad Co.,*
  314 U.S. 339 (1941)...................................................................................... 5

ii

**Statutes**

25 U.S.C. § 398d.................................................................................................................... 2

Act of May 25, 1918, ch. 86, 40 Stat. 561 ........................................................................3

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of
    1966, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes:
    Improvement of Barriers at Border)...............................................................................2

**Other Authorities**

Press Release, Committee on Homeland Security (July 2, 2026)........................................8

Proclamation of May 27, 1907, 35 Stat. 2136 ...................................................................4

**GLOSSARY**

| Abbreviation | Term |
|---|---|
| CBP | Customs and Border Protection |
| Enriquez Decl. | Declaration of Paul Enriquez (Dkt. 18-2) |
| ICC Opinion | Indian Claims Commission Opinion, *Papago Tribe of Arizona v. United States*, 19 Ind. Cl. Comm. 394 (Sept. 10, 1968) (Dkt. 3-15 at PDF pp. 18–62) |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) |
| Interior | United States Department of the Interior |
| K. Jose Decl. | Declaration of Kendall Jose (Dkt. 3-4) |
| Margold Op. | Solicitor Margold's Opinion re: Lands of Papago Indians (March 7, 1934) and Supplemental Opinion re: Lands of Papago Indians (May 7, 1934) (Dkt. 18-7) |
| Nabhan Decl. | Declaration of Gary Nabhan, Ph.D (Dkt. 3-9) |
| Nation Mem. | Memorandum of Points and Authorities in Support of The Tohono O'odham Nation's Motion for Preliminary Injunction (Dkt. 3-1) |
| Nation Reply | Reply Memorandum of The Tohono O'odham Nation in Support of Its Motion for Preliminary Injunction (Dkt. 25) |
| Secretary | The Secretary of U.S. Department of Homeland Security; the Commissioner of U.S. Customs and Border Protection; and the Chief of U.S. Border Patrol |
| Sec'y Mem. | Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction [Corrected] (Dkt. 19-1) |
| Section 102 | Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1966, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) |
| Senseney Decl. | Declaration of Christopher T. Senseney, PhD. P.E. (Dkt. 3-3) |
| Tr. | Transcript of Motion Hearing Held Before the Honorable Judge Richard J. Leon, United States District Judge (July 22, 2026) |
| V. Jose Decl. | Declaration of Chairman Verlon M. Jose (Dkt. 3-2) |
| Welch Decl. | Declaration of John Robert Welch, Ph.D (Dkt. 3-13) |

**ARGUMENT**

**I.    Only Congress Can Abrogate the Nation's Rights.**

1.  This case does not call for the Court to "balance … the sovereign control of [the] Nation [against] the sovereign control of the United States[.]" Tr. 34:18–20. The Court described that as a "heavy weighing process," *id.* at 34:20, and it is one for Congress to undertake if it wishes, Nation Mem. 32–33, 35–37. Congress might well determine that respect for the Nation's rights is called for, particularly given the Nation's commitment to multiple measures of border security short of a physical wall. Or it might decide to abrogate those rights. But unless Congress expressly takes the latter course, the rights remain intact. "Judicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 803 (2014) (citation omitted). Thus, where tribal rights are implicated, courts do not "lightly infer [their] breach" but instead insist on the "pass[age of] new legislation [which] is a deliberately hard business under our Constitution." *McGirt v. Oklahoma*, 591 U.S. 894, 903 (2020).

2.  IIRIRA cannot be interpreted to authorize the Secretary's actions here. It is settled beyond doubt that a statutory diminishment of tribal rights requires clear evidence that Congress considered the conflict between the statute and those rights and explicitly chose to abrogate the latter. Tr. 14–15, 18–19, 25–26; *see also* Nation Mem. 33 (citing cases). The Supreme Court has enforced that standard stringently, including in the reservation diminishment context, requiring that Congress address a specific tribe's rights in its reservation and use "language evidencing the present and total surrender of all tribal interests" in the land, *Nebraska v. Parker*, 577 U.S. 481, 488, 489 (2016) (citation omitted); *McGirt*, 591 U.S. at 904 (same). And the Court has consistently applied this standard to executive order reservations. *See, e.g.*,

1

*Mattz v. Arnett*, 412 U.S. 481, 504 (1973) ("[C]lear termination language was not employed[.]");
*Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 355–56 (1962) (same).

3.  The relevant provisions of IIRIRA are a far cry from the tribe-specific language required to extinguish the Nation's rights of use and occupancy on its Reservation. The statute disclaims any intent to mandate construction of the wall "in [any] particular location." Nation Reply 4 (citing Section 102(b)(1)(D)). It contains no reference to the Nation or its Reservation at all, let alone explicit evidence that Congress understood itself to be authorizing the Secretary to override the Nation's rights in favor of a border wall. This is not the stuff of abrogation.

## II.    The Secretary's Actions Rest on an Unauthorized Alteration of Reservation Boundaries.

1.  While "[u]*ltra vires* review is a high bar …. it is not insurmountable." *Nat'l Tr. for Hist. Preservation v. Nat'l Park Serv.*, 827 F.Supp.3d 93,104 (D.D.C. 2026) (citation omitted). This very much is a situation "like the White House ballroom case where … Congress had specifically prohibited certain types of behavior without [its] permission." Tr. 13:20–23. Section 398d clearly provides: "Changes in the boundaries of reservations created by Executive order … for the use and occupancy of Indians *shall not be made except by Act of Congress.*" 25 U.S.C. § 398d (emphasis added). This "specific and unambiguous statutory directive," *Nat'l Tr.*, 827 F.Supp.3d at 109 (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (2022)), precludes federal officials from altering reservations absent congressional authorization.

2.  The Secretary seeks to adjust the Nation's boundaries. The tribal right of use and occupancy is a core incident of reservation status. *Shoshone Tribe of Indians of Wind River Rsrv. v. United States*, 299 U.S. 476, 496 (1937). The Secretary would vaporize that right along the entire sixty-two-mile stretch of the border. While the Nation's Reservation is 2.8 million acres, Tr. 6:5–7, there would be nothing de minimis about such action. For one thing, that stretch

2

includes four separate mountainous areas, *see* Senseney Decl. ¶¶ 24–28, with peaks sacred to the Nation, V. Jose Decl. ¶ 30; K. Jose Decl. ¶¶ 14–15; Welch Decl. ¶¶ 28–31. Contractors would have to blast and level those mountains, Senseney Decl. ¶¶ 29, 32, as they have done adjacent to the Reservation. Appendix. They will also need to construct access roads and laydown yards that will transform the landscape along the entire border. Senseney Decl. ¶¶ 13–23. It is hard to imagine a more serious evisceration of occupancy rights than the destruction of sacred mountain peaks and lands along the border that the O'odham have occupied for millennia.

Only Congress can extinguish reservation use and occupancy rights, *see* Nation Reply 5 (citing *United States v. Alcea Band of Tillamooks*, 329 U.S. 40 (1946), and *Shoshone Tribe*, 299 U.S. 476), and the Secretary does not claim that Congress has done so since the Reservation's creation. The only way the Secretary's actions could be legal, then, is if the Reservation boundary, and hence the Nation's rights, stopped well short of the international border in 1917. But that position is not tenable and would, if accepted, alter the Reservation's boundaries. The Executive Order drew the reservation boundary at the border. Nation Mem. 6–7. Congress promptly ratified that boundary when it appropriated funds "[f]or the construction of a fence along the international boundary line between Mexico and the Papago Indian Reservation," Act of May 25, 1918, ch. 86, sec. 2, 40 Stat. 561, 569. It did so at the urging of the Nation and Interior officials, who recognized the need to protect "Papago grazing lands" as an important factor in establishing the Reservation and that the fence was needed because "cattle graze over practically the whole [border] area," Nation Reply 6 (citing sources). As both political branches understood, the O'odham were engaged at the time of the Reservation's creation in the quintessential use and occupancy of lands up to the international boundary. The Secretary's plan to extinguish those rights is an effort to rewrite history and redraw the Reservation lines.

3

3.  By its plain terms, the Roosevelt Reservation does not exist on the Nation's lands because it attached only to "public lands," Proclamation of May 27, 1907, 35 Stat. 2136, 2136. In 1907, the Nation enjoyed unextinguished aboriginal title to the lands that became its Reservation. Nation Mem. 26–31. Supreme Court precedent is clear that, unless and until such rights are extinguished—which the Secretary has nowhere argued occurred here—the lands are not public lands, *id.* at 24 (citing cases). The Roosevelt Reservation accordingly does not apply to them.

The Secretary's arguments for expanding the Roosevelt Reservation beyond its text look instead to sources that post-date the Proclamation by decades and that undermine his position in any event. The Secretary's reliance on Solicitor Margold's Opinion, Tr. 20:13–17; Sec'y Mem. 21–22, is a prime example. The 1917 Executive Order expressly excluded mineral rights. In 1934, Nation members argued that the Nation held fee simple title dating back to Spanish and Mexican grants, such that the government lacked authority to withhold their mineral rights or even to have created the Reservation. Margold Op. at PDF pp. 6–7. It was in this sense that they argued the Reservation "never became part of the public domain[.]" *Id.* at PDF p. 3. Solicitor Margold rejected their claim to fee title, but in terms that squarely support the Nation's position:

> That the Papagos have long occupied the [Reservation] and should be protected in that occupancy, is not disputed. Indeed, the Executive order of February 1, 1917, is a recognition of an obligation which officials in the Indian Service have pointed out repeatedly ever since the annexation of the territory in question. That order, however, confirms and confers surface rights only.

*Id.* at PDF p. 6. So according to the Solicitor, the surface lands of the Reservation—the only lands to which the Roosevelt Reservation might conceivably apply—never became public lands. And Solicitor Margold reiterated this view in a supplemental opinion two months later:

> The Indian right of surface occupancy extends over the entire reservation, and the Executive Order and statute which created the present reservation so declared. Any … abridgement of those surface rights, without the consent of the Indians and without compensation to them, is anomalous and "paradoxical."

4

*Id.* at PDF p. 16. It is difficult to conceive a more decisive rejection of the Secretary's position.

The Secretary's reliance on the ICC's conclusion that the Gadsden Purchase lands "became public lands by the Act of July 22, 1854," Tr. 20:21–23; Sec'y Mem. 22, likewise fails. The ICC recognized that the 1854 Act did not reach "lands covered by claims based on Spanish or Mexican law," Nation Reply 7–8, and *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339 (1941), squarely holds that lands subject to unextinguished aboriginal title fall within this proviso, *id*. at 349–51. No more helpful to the Secretary are the 1937 statute, Nation Reply 8–10, or recent party statements. The Secretary points to statements from 2004, Tr. 15:15–23; Sec'y Mem. 24–25, while ignoring that in 2019 the Trump Administration and the Nation evidenced the understanding that border infrastructure can be installed on the Reservation not because of the Roosevelt Reservation but only with the Nation's consent, Nation Reply 10–11. Cherrypicked views expressed a century after promulgation of a law have no bearing on its proper interpretation. *See* Nation Reply 10.

III.    **The Secretary Has Contracted for Actions that Will Necessarily Result in Significant Trespasses on the Nation's Lands and Are Ripe for Resolution.**

1.  The Nation's trespass claim received less attention at the hearing than its ultra vires argument. The Nation wishes to emphasize that trespass provides an independent, compelling basis for injunctive relief. To begin, the Secretary's proposed actions—to enter or cause his agents to enter the Nation's lands for purposes not authorized by the Nation, alter the border landscape, and leave behind at least one thirty-foot-high wall, a network of roads, and associated infrastructure—are quintessential acts of trespass. Nation Mem. 38–41. And even if the Court holds the Roosevelt Reservation to exist on the Nation's lands, or reserves the question, serious trespasses will still occur. The Court noted that "I don't think the Government is trying to go

5

outside of that 60-foot strip." Tr. 36:7–8. The Secretary has indeed so stated, but the Court is not required to turn a blind eye to what the Secretary's contracted-for plans promise in practice.

The hearing confirmed that the Secretary cannot limit his actions to within sixty feet of the border. He conceded that because of the mountainous areas, "if you … restrict us to the 60-foot zone, then you've got difficult engineering challenges ahead of you[.]" Tr. 19:18–20. The Secretary and his agents would need to blast through and level mountains, activity that cannot be contained to sixty feet. Senseney Decl. ¶¶ 24–32; *see also* Appendix (showing mountain blasting impacts). Mr. Enriquez does not claim otherwise. Enriquez Decl. ¶ 21. The Secretary argued that he could instead seek the Nation's consent for the wall to "meander[]" inland, Tr. 20:5–7, but the Nation will not provide such consent because that would divide the Reservation, with the Nation's citizenry on one side of the wall and its sacred peaks and substantial borderlands on the other. No amount of design planning can change the fact that either of the two available options—mountain blasting or reservation partition—will constitute a trespass.

Nor has the Secretary countered Professor Senseney's conclusion that given Reservation topography, it will be impossible to confine even a single wall to a sixty-foot strip. Senseney Decl. ¶ 35. Moreover, as the Secretary all but acknowledges, Enriquez Decl. ¶ 20, he will need to construct laydown yards and concrete batching plants extending hundreds of feet north of the border, *see* Senseney Decl. ¶¶ 14–19. He asserts that any such trespass will be temporary, Enriquez Decl. ¶ 20, but has no expert to counter the opinions of Professors Senseney and Nabhan that the damage to the desert biocrust will be permanent and irremediable, Senseney Decl. ¶ 19; Nabhan Decl. ¶ 26. Finally, the Secretary's claim that he will not need to build access roads is simply not credible. As Professor Senseney substantiates, and the extensive use of access roads immediately outside the Reservation confirms, the Secretary's contractors cannot move

6

heavy equipment and materials along the same road that CBP requires for patrol operations and where construction will be taking place, Nation Reply 21. Little wonder, then, that the Secretary interposes obstacles to reaching the trespass merits. These distill to the proposition that tribes cannot prevent federal officials from sanctioning trespasses on their lands and may at most collect damages afterwards—which unsurprisingly is not the law, Nation Reply 11–16.

2.  The Secretary argues that the Court should wait to rule on injunctive relief until his contractors have completed their "design phase." Tr. 19:17. But the threat is imminent: The Secretary has contractually committed to proceeding with construction and will be ready to do so by October 12, 2026, Enriquez Decl. ¶ 14, or less than two months after this Court is likely to issue its decision, Tr. 32:17–23. The Court has ample information, moreover, on which to base injunctive relief. As discussed, no amount of design planning can change the fact that the Secretary will have to trespass on the Nation's lands (whether the Roosevelt Reservation exists or not)—either by blasting through mountains or going around them, and by building laydown yards, access roads, and the wall itself. "[T]his is a question of degree, nothing more." *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F.Supp.3d 76, 112 (D.D.C. 2025).

Nor would it be prudent to wait. Doing so would leave the Secretary and his agents unconstrained to trespass and commence construction with very little notice to the Nation or the Court. The Secretary states that he will conduct geotechnical borings on the Reservation in coming weeks, Enriquez Decl. ¶ 14, without identifying the source of his authority to do so. He has not committed to producing his design plans to the Nation or the Court, and absent court order there is little reason to think he will. He has yet to even provide the contract for Reservation construction despite multiple requests. All of this means construction could begin on very little notice. Even for blasting activities, the Secretary's practice is to provide stakeholders

7

with as little as seventy-two hours' notice, Enriquez Decl. ¶ 26, and the Secretary has made plain his view that the Nation "cannot claim any cognizable hardship until the [design] plans are completed and construction is underway," Sec'y Mem. 35. Nor will that construction "take years," Tr. 29:6–7, with the Secretary recently testifying to Congress that the wall along the entire U.S.-Mexico border will be complete by next June. Press Release, Committee on Homeland Security (July 2, 2026), https://bit.ly/4pQPA6y.

The Nation filed its motion with sufficient time to allow for orderly process in this Court and the Circuit, while the Secretary's approach invites chaos, with the Nation and the courts having to move hastily in the face of action the effects of which cannot be undone. By contrast, if the Court were to issue an injunction now, and the Secretary then formulated a design purporting to confine the wall and construction to a sixty-foot strip, the Court could assess its viability (presumably with the opportunity for the Nation to submit an updated expert assessment) while also determining the existence of the Roosevelt Reservation if it has not yet decided that issue. Were the Court to side with the Secretary on both issues, it could lift the injunction. The Secretary could not claim harm, as he has stated that he will not begin construction until the design plan is finished—the injunction would simply ensure preservation of a status quo that has existed for millennia. *Cf. Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) ("[C]ourts are institutionally wary of granting relief that disrupts, rather than preserves, the status quo[.]"). Alternatively, the Court could issue an injunction time-limited to when the Secretary produces a design and the Court assesses it. The Secretary again could not claim harm, while the threat to the Nation of trespasses commencing without a proper opportunity for judicial consideration would be allayed.

IV.    **The Nation Will Suffer Irreparable Harm Absent an Injunction, and the Public Interest and Precedent Counsel Its Issuance.**

1.  The Nation has detailed four forms of irreparable harms it will suffer: harms to its sovereign and proprietary interests, environmental harms, and infringement on its free exercise rights. None of these can be cured with money damages, and thus all are recognized as quintessential forms of irreparable harm. Nation Mem. 41–43. For Nation members, the land is not merely a place of residence but the foundation of their identity, history, and spiritual beliefs. Nation Mem. 9–10, 15 (citing declarations). The desert and mountains that will be permanently marred by wall construction are inseparable from the O'odham creation accounts, traditional teachings, and ongoing ceremonial practices that have been passed down through generations. *Id*. The mountains, for example, are not simply natural landmarks but living components of a sacred landscape that embodies the Nation's history, spirituality, and enduring relationship with the Creator. *Id*.; Welch Decl. ¶¶ 13, 34. The Secretary's argument that construction will only desecrate a small percentage of the landscape, Sec'y Mem. 40–41, fundamentally misconstrues the nature of the relationship of the Tohono O'odham with the land and in no way excuses the seriousness of the harm he seeks to inflict. *See*, *e.g.*, *Hualapai Indian Tribe v. Haaland*, 755 F.Supp.3d 1165, 1197 (D. Ariz. 2024) ("Damage to or destruction of any cultural or religious sites easily meets the irreparable harm requirement.") (quotation marks omitted).

Nor does the Secretary's promise of consultation mitigate the threats. Consultation has been ongoing, and at every step the Secretary has insisted that he will build a wall on the Reservation. He has now contracted to do just that. While features such as gates may allay some forms of harm, they will do nothing to mitigate other searing harms the Nation will incur.

The harms likewise cannot be justified by the Secretary's border security concerns. He overstates those concerns, citing statistics from 2021–2026 that mask the stark drop in border

9

incidents in recent years. Nation Reply 22. The Secretary's recent decision to forego a wall along 350 miles of border in the Big Bend sector and to instead rely on the same vehicle barriers and surveillance technology already present on the Nation's Reservation further belies his claims. *Id.* at 23–24.

2.  Most fundamentally, the public interest lies in holding the Secretary to the law and respecting the separation of powers. Nation Mem. 44–45. As the Court noted, the circumstances here are unprecedented. Tr. 11:14–16. To the Nation's knowledge, never in the modern era have executive branch officials claimed authority—absent specific authorization from Congress—to come uninvited onto a reservation, fundamentally alter and destroy reservation resources, and leave behind massive infrastructure rendering a portion of the reservation unusable. What would not be unprecedented would be to enjoin those acts. Just recently, the D.C. Circuit noted approvingly situations in which courts have halted action taken in disregard of limits on executive authority, no matter how compelling the proffered justifications—including the district court's famous injunction, affirmed by the Supreme Court, upholding the separation of powers over a President's claims of wartime necessity. Nation Mem. 44–45 (discussing *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)); *see also, e.g.*, *Mashpee Wampanoag Tribe v. Bernhardt*, Civil Action No. 18-2242 (PLF), 2020 WL 3034854, at *4 (D.D.C. June 5, 2020) (preliminarily enjoining Secretary of Interior from taking tribe's land out of trust because "doubts … as to whether Congress has ever authorized such action certainly weigh in favor of maintaining the status quo for now and …. [a]s always, there is a weighty interest indeed in requiring the Executive Branch … to comply with the law"). The Nation asks this Court to likewise enjoin the unbridled executive action threatened here, and to do so before it is too late.

Dated: July 30, 2026                         Respectfully submitted,

                                             /s/ *Riyaz A. Kanji*
Howard M. Shanker, D.C. Bar 426359*          Riyaz A. Kanji, D.C. Bar 455165
Attorney General                             David A. Giampetroni*
Logan Takao Cooper*                          KANJI & KATZEN, P.L.L.C.
Assistant Attorney General                   P.O. Box 3971
TOHONO O'ODHAM NATION                        Ann Arbor, MI 48106
P.O. Box 830                                 (734) 769-5400
Sells, AZ 85634                              rkanji@kanjikatzen.com
Howard.Shanker@tonation-nsn.gov              dgiampetroni@kanjikatzen.com
Logan.Cooper@tonation-nsn.gov
                                             Philip H. Tinker*
                                             KANJI & KATZEN, P.L.L.C.
                                             12 N. Cheyenne Ave., Ste. 220
                                             Tulsa, OK 74103
                                             (206) 344-8100
                                             ptinker@kanjikatzen.com

              *Counsel for Plaintiff Tohono O'odham Nation*

*Pro Hac Vice Admission

11

**CERTIFICATE OF SERVICE**

I certify that on July 30, 2026, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji