**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION, <br> a federally recognized Indian tribe, <br><br> *Plaintiff,* <br><br> v. <br><br> MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol, <br><br>       *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 26-cv-2127-RJL |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................1

    I.      IIRIRA's limits on judicial review bar Plaintiff's *ultra vires* claim. ........................1

    II.     Plaintiff's *ultra vires* claim fails because it cannot show that constructing a barrier changes the boundaries of its Reservation. ..................................................4

    III.    Plaintiff is not entitled to the unprecedented and extraordinary relief it seeks. ...................................................................................................................8

CONCLUSION.....................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991)......................................................................................................... 2, 4

*Ctr. for Biological Diversity v. McAleenan*,
404 F. Supp. 3d 218 (D.D.C. 2019) ................................................................................. 3

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019)....................................................................................... 2, 4

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020)......................................................................................... 3

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025)....................................................................................................... 2, 4

*United States v. Santa Fe Pacific Railroad Co.*,
314 U.S. 339 (1941)........................................................................................................... 7

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................................................................... 9

**Statutes**

14 Stat. 294 ........................................................................................................................ 7

14 Stat. 294 § 2 .................................................................................................................. 7

50 Stat. 536 ........................................................................................................................ 8

8 U.S.C. § 1102(c)(1)......................................................................................................... 2

8 U.S.C. § 1103................................................................................................................... 1

IIRIRA § 102(b)(1)(i) ........................................................................................................ 6

IIRIRA § 102(c)(2)(A)..................................................................................................... 2, 3

**Other Authorities**

91 Fed. Reg. 45823 ............................................................................................................. 2

**INTRODUCTION**

Defendants submit this supplemental brief to address three issues raised at the hearing on Plaintiff's motion for a preliminary injunction. *See* July 23, 2026 Minute Order. First, congressional limits on judicial review bar Plaintiff's *ultra vires* claim. Plaintiff misreads D.C. Circuit precedent in arguing otherwise. Second, Plaintiff has not shown—and cannot show—that federal officials lack authority to construct a border barrier on a strip of land that no party disputes is owned by the United States and that the United States reserved for border security purposes more than one hundred years ago, much less that this is so plainly in excess of federal authorities as to support an *ultra vires* claim. Third, Plaintiff cannot justify the extraordinary relief it seeks here: it has not shown that the challenged project will necessarily extend beyond the land reserved for it, that there is imminent risk of Plaintiff suffering irreparable harm, or that the balance of equities favors shutting down a project that will secure the United States' borders.

The Court should conclude that Plaintiff is unlikely to succeed on the merits because no factual development can save Plaintiff's claims. At a minimum, because the United States' interest in securing the border outweighs Plaintiff's claimed harms, the Court should conclusively deny the motion.

**I.    IIRIRA's limits on judicial review bar Plaintiff's *ultra vires* claim.**

Congress has directed the Secretary of Homeland Security ("Secretary" or "DHS") to gain "operational control of the southwest border" by constructing reinforced fencing and other infrastructure. 8 U.S.C. § 1103 note (b)(1)(A) (codifying section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended) ("IIRIRA § 102"). Congress also authorized the Secretary to "waive all legal requirements" that the Secretary, in his "sole discretion, determines necessary to ensure expeditious construction" of this border barrier. IIRIRA

§ 102(c)(1) . Congress barred judicial review of any claims "*arising from* any action undertaken, or any decision made by the Secretary of Homeland Security, pursuant to" § 102(c)(1), except for challenges alleging a constitutional violation. IIRIRA § 102(c)(2)(A) (emphasis added) .

**A.** The Secretary has determined that a barrier along a sixty-two mile stretch of the Arizona border with Mexico (the "Project") is needed to fulfill IIRIRA's mandate and has waived the Administrative Procedure Act ("APA") and other legal requirements to ensure expeditious construction.[1] Plaintiff admits the waiver forecloses it from challenging the Project under the APA. But Plaintiff tries to skirt this bar by framing its challenge as an *ultra vires* claim. It cannot.

The Supreme Court has cautioned that *ultra vires* review should not "become an easy end-run around the limitations of … judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) ("*NRC*"). When, as here, a statutory "bar on judicial review is express," *ultra vires* claims are wholly foreclosed. *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (rejecting attempt to "recast" foreclosed statutory claim as *ultra vires* claim). As the Supreme Court confirmed in *NRC*, *ultra vires* review is entirely "unavailable if … a statutory review scheme forecloses all other forms of judicial review." *NRC*, 605 U.S. at 681 (citing *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991)). That is the case here because the statutory bar is express rather than implied. *DCH*, 925 F.3d at 509.

Plaintiff acknowledges that, to assert an *ultra vires* claim, it must show that "there is no alternative procedure for review of [its] statutory claim" *and* that "review is not expressly

---

[1] *See generally* Defs'. Opp. to Pl. Mtn. for Prelim. Inj., as corrected ("Opp."), 6–8, 11–12 (Dkt. #19-1, at 15–17, 20–21); Enriquez Decl. (Dkt. #18-2); Hollinder Decl. (Dkt. #18-1). The Secretary issued a further determination pursuant to section 102 of IIRIRA specific to the Project on July 21, 2026, confirming the "acute and immediate need" for the barrier as well as the need to waive certain legal requirements to "ensure the expeditious construction of additional physical barriers and roads in the project area." 91 Fed. Reg. 45823, 45823 (July 21, 2026).

precluded by statute." Pl. Mem. at 21 (Dkt. #3-1, at 31). Plaintiff purports to rely on its inability to bring an APA challenge to justify its *ultra vires* claim. *Id.* (describing the APA as "the only alternative procedure for review of the Nation's statutory claim"). But the APA is unavailable precisely because it "has been waived" under IIRIRA section 102(c)(1). *See id.*

Section 102(c)(2) of IIRIRA thus forecloses Plaintiff's attempt to supplant a barred APA claim with an *ultra vires* claim. *See generally* Opp., 25–27 (Dkt. #19-1, at 34–36); *see also Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 239 (D.D.C. 2019) ("Congress intended to eliminate litigation that would delay the expeditious construction of border security infrastructure, to the fullest extent possible, *i.e.*, to the extent constitutionally allowed.")

**B.** Plaintiff argues that IIRIRA § 102(c)(2) is inapplicable because Plaintiff is not challenging "the validity of a secretarial waiver," relying on *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020). Pl. Reply, at 3 (Dkt. #25, at 11); *see also* Hearing Tr. ("Tr.") at 24–25. Neither that case, nor the plain language of IIRIRA section 102(c)(2)(A), supports Plaintiff's position. In *North American Butterfly*, the Circuit held that IIRIRA's jurisdiction-stripping provision did not cover claims that *predated*—and so did not *arise from*—an IIRIRA waiver, *see* IIRIRA § 102(c)(2)(A),  but it never suggested that the provision was limited to claims challenging a waiver's validity. 977 F.3d at 1259–61 ("[T]he jurisdictional questions here … depend on whether the respective claims 'aris[e] from' the Waiver Determination.").

Here, by contrast, Plaintiff's own argument shows that its *ultra vires* claim arises from DHS's decision to waive the APA. It is the waiver decision that, Plaintiff claims, prevents it from using the APA for "review of [its] statutory claim." Pl. Mem. at 21 (Dkt. #3-1, at 31). In relying on DHS's APA waiver to satisfy an element of its *ultra vires* claim, Plaintiff makes plain both that this is a "statutory claim" and that it "arises from" the waiver decision. *Id.* Under section

3

102(c)(2)(A) of IIRIRA, courts lack jurisdiction over non-constitutional claims "arising from" DHS waiver decisions, including the *ultra vires* claim that Plaintiff asserts here. If this were permissible, it would defeat the Secretary's waiver of the APA. *DCH*, 925 F.3d at 509. Even the "Hail Mary" standard does not apply. *See id.*; *MCorp*, 502 U.S. at 44.

Because Plaintiff's *ultra vires* claim is actually premised on an IIRIRA waiver, it is plainly an "end run around" IIRIRA's express limitations on judicial review. *Cf. NRC*, 605 U.S. at 681. Congress has the authority to foreclose judicial review of certain claims. When it does, *ultra vires* claims are not available as an alternative means of obtaining review of the same claims. That is precisely the issue here: Congress established IIRIRA's jurisdictional scheme—including both the section 102(c)(1) waiver provision *and* the section 102(c)(2) jurisdiction-stripping provision—so that DHS could ensure expeditious construction. When DHS implemented this statutory framework by waiving the APA, that eliminated the sovereign immunity waiver that generally permits review of federal agency actions. Plaintiff cannot now reframe an APA claim as an *ultra vires* claim to get around the need for a sovereign immunity waiver. *Cf. DCH*, 925 F.3d at 509 (rejecting attempt to "recast" claims to evade express bar on judicial review).

## II.    Plaintiff's *ultra vires* claim fails because it cannot show that constructing a barrier changes the boundaries of its Reservation.

**A.** Even if the express bar on judicial review did not foreclose an *ultra vires* claim, Plaintiff would be required to show that DHS will "take[] action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *NRC*, 605 U.S. at 681 (citation omitted). The statutory prohibition must be "clear and mandatory." *DCH*, 925 F.3d at 509 (citation omitted). This "covers only extreme agency error, not merely garden-variety errors of law or fact." *Id.* (cleaned up). Plaintiff comes nowhere close to meeting this standard because Congress clearly authorized DHS to build a border barrier. Opp., 15 (Dkt. #19-1, at 24). "This is not th[e] kind of

4

situation" "where Congress had specifically prohibited certain types of behavior without [Congress's] permission." Tr. at 13, 22-24. This dooms Plaintiff's *ultra vires* claim.

**B.** Regardless, the border barrier will not move, alter, or diminish the legal boundary of Plaintiff's Reservation. Plaintiff cannot show otherwise by arguing that the barrier will interfere with Plaintiff's right of "exclusive use and occupancy" of this strip of land. *See* Tr. at 6. At the outset, the federal government reserved this strip of land for border security ten years before the Tribal Reservation was established, and Plaintiff has no right to prevent the United States from using the land for this purpose. Separately, this alleged interference has nothing to do with the Tribal Reservation's legal boundaries. Plaintiff cites no support for its argument that interference with exclusive use or occupancy necessarily changes a reservation's legal boundaries. Under Plaintiff's theory, any number of national security, law enforcement and even private landowner activities would alter the Tribal Reservation's boundaries. The Court should reject this argument, which conflates two materially distinct concepts. Indeed, the line of cases that Plaintiff relies on confirms that interfering with a tribe's exclusive use and occupancy rights in some lands on the tribe's reservation does not change the status or boundaries of that reservation. *See* Opp., 17–19 (Dkt. #19-1, at 26–28) (citing cases where transfers of tribal trust lands to non-Indians didn't diminish tribal reservations). Rather, these cases show that constructing a border barrier is not the type of action that could change the status or boundaries of a reservation.

Plaintiff fares no better when arguing that no statute shows Congress clearly intended to abrogate Plaintiff's rights. *See* Tr. at 14. That standard is not relevant here: Plaintiff claims the Project would exceed DHS's authorities because DHS lacks authority to diminish reservations or change reservation boundaries under 25 U.S.C. § 398d. But DHS is not purporting to change the legal status or size of the reservation, and Plaintiff has not shown that constructing a border barrier

5

would abrogate tribal rights. That said, Congress plainly understood that building a border barrier could implicate tribal interests. *See* IIRIRA § 102(b)(1)(C)(i)  (requiring the Secretary to consult with "Indian tribes … located near the sites at which such fencing is to be constructed"). But it left the ultimate decision of how best to achieve operational control of the border to the Secretary.

Tellingly, when arguing that a border barrier is *ultra vires* because it would alter the Reservation's boundary, Plaintiff never discusses the substantial vehicle barrier and associated U.S. Customs and Border Protection ("CBP") border road that are currently present on this stretch of the border. Rather, Plaintiff contends that the Nation's borders include the vehicle barrier and border road. But if these features have not altered or diminished the boundaries of Plaintiff's Reservation, it logically follows that a border barrier will not do so either. It is incongruous to suggest that a border barrier is so different from these existing features that it would transform the Project into *ultra vires* action.

**C.** On its own terms, Plaintiff's *ultra vires* theory boils down to a disagreement about the legal effect of a 1907 proclamation. There, President Roosevelt "set apart as a public reservation, all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico," to be "kept free from obstruction as a protection against the smuggling of goods." Proclamation, 35 Stat. 2136 (1907). For more than 100 years, the United States has understood this strip of land (the "Roosevelt Reservation") to include the land along what is now the southern boundary of the Tohono O'odham Reservation. Until recently, that was the parties' shared understanding. *See generally* Opp., 10–11, 24–25 (Dkt. #19-1, at 19–20, 33–34).

Plaintiff argues that its aboriginal lands never became part of the Roosevelt Reservation because the Roosevelt Reservation was comprised of "public lands," *see* Tr. at 9, and, Plaintiff says, its aboriginal lands "were not public lands," Pl. Reply, 7–8 (Dkt. #25, at 15–16). For this

point, Plaintiff relies heavily on *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339 (1941), but *Santa Fe* does not support Plaintiff's argument. *Contra id.*; Pl. Mem., 23–25 (Dkt. #3-1, at 33–35). There, the Supreme Court interpreted a railroad right-of-way statute that expressly protected "Indian title"—also known as tribal rights of occupancy or aboriginal rights—within rights-of-way that crossed a tribal reservation. 314 U.S. at 344 (citing Act of July 27, 1866, § 2, 14 Stat. 294 (the "1866 Act")).[2] The Supreme Court did not address whether aboriginal tribal lands should be considered "public lands." More than that, the statute in *Santa Fe* is plainly inconsistent with Plaintiff's position on the meaning of public lands. That statute grants rights-of-way for railroad construction "through the public lands." § 2, 14 Stat. 294. The same section goes on to say that "[t]he United States shall extinguish … Indian title to all lands falling under the operation of this act." *Id.* This confirms that the "public lands" through which the rights-of-way were granted included lands where Congress had not extinguished "Indian title," that is, aboriginal lands. Plaintiff's opposite view—that references to "public lands," including the reference in the 1907 proclamation that established the Roosevelt Reservation, automatically excluded unextinguished aboriginal tribal lands—finds no support in *Santa Fe*.

Plaintiff also suggests that *Santa Fe* supports its argument that Plaintiff's aboriginal claims were protected by the Treaty of Guadalupe Hidalgo and the Gadsden Purchase, Tr. at 9–11, but the United States did not treat aboriginal tribal rights as property rights "covered by" those agreements. *See generally* Opp. Att. E (Dkt. #18-7) (Solicitor's Memorandum Opinion M-27656

---

[2] Under the 1866 Act, the United States had to "extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands" within the rights-of-way. *See* 14 Stat. 294. Because Congress protected "Indian title" from extinguishment without tribal consent, and the tribe had not ceded the lands on its reservation, the tribe retained its occupancy rights in the rights-of-way crossing its reservation. *Id.* at 347, 359–60.

(Mar. 7, 1934) . Instead, the United States recognized only claims based on Spanish or Mexican law. *Id.* Aboriginal tribal rights, by contrast, pre-existed and did not derive from Spanish or Mexican land grants. Plaintiff is wrong to suggest that *Santa Fe* somehow changed this well-established rule or otherwise prevented aboriginal tribal lands from being treated as public lands.

Plaintiff has no answer to the 1937 Act. *See* Act of July 28, 1937, ch. 527, § 1, 50 Stat. 536; Tr. at 20. There, Congress added aboriginal tribal lands along the U.S.-Mexico border to Plaintiff's Reservation and said the extension "shall not affect … the reservation of a strip of land sixty feet wide" along the border. § 1, 50 Stat. at 536. Plaintiff argues the 1937 Act is "agnostic as to the existence of the Roosevelt Reservation," Reply at 9 (Dkt. #25, at 17), but Congress would have had no reason to refer to the Roosevelt Reservation if it never attached to those lands. The Tribe's history of grazing cattle near the border does not change the analysis. *Contra* Tr. at 6-7. There is no conflict between the federal government's reservation of the land for national security purposes and transient uses like grazing. Moreover, the Roosevelt Reservation's limitation on uses binds third parties, not the federal government. So the federal government did not waive its rights on the Roosevelt Reservation by tolerating tribal grazing, and the Tribe makes no argument to that effect.

At bottom, the nature of Plaintiff's claim, which turns on esoteric interpretation of historic documents, shows that this is not a proper case for *ultra vires* relief.

### III.    Plaintiff is not entitled to the unprecedented and extraordinary relief it seeks.

**A.** "[N]o judge ever has granted [a] preliminary injunction [i]n circumstances of this kind." Tr. at 11. Building a border barrier protects the sovereignty of the United States, *see id.* at 13, and addresses national security threats, *see* Opp., 36–37 (Dkt. #19-1, at 45–46). Given these weighty interests, a preliminary injunction is not appropriate. "Even if plaintiffs have shown irreparable

8

injury from" the Project moving forward, "any such injury is outweighed by the public interest" in maintaining a sovereign border. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).

**B.** In any event, Plaintiff has made no such showing. Plaintiff speculates about two kinds of harms: (1) harms emanating from design-related work, including geotechnical testing and (2) harms from the actual construction work. Each falls short.

First, Plaintiff suggests that CBP's contractor may "trespass" on Plaintiff's land to perform geotechnical testing or other design-related work outside the Roosevelt Reservation. *E.g.*, Tr. at 31–32. But under the terms of Project contract, CBP has instructed the contractor to confine the project footprint to the sixty-foot Roosevelt Reservation. Enriquez Decl. ¶ 13 (Dkt. No. 18-2, at 9); *see also* Declaration of Donna McMullen ("McMullen Decl."), Ex. 5 at 01 10 00 – 04 (stating "[t]he vertical barrier and patrol road and any construction related impacts shall be contained within the Roosevelt Reservation"). Thus, design-related work, including geotechnical testing and surveys, will also be confined to the Roosevelt Reservation.

Second, Plaintiff speculates about future construction activities, arguing that the Tucson 5 project will require blasting of mountains that the Tribe considers sacred, *e.g.*, Tr. at 12, 28, and that CBP's contractor will be unable to complete the Project within the 60-foot Roosevelt Reservation, e.g., Tr. at. at 27, 29; *see also* Senseney Decl. ¶¶ 25-32, 35 (Dkt. No. 3-3, at 11–17). In light of the ongoing design process for the Project which entails consultation with the Tribe, it is premature to speculate about the ultimate path of the wall. Information gathered during the design phase may impact the final alignment of the barrier and other Project features. Enriquez Decl. ¶ 13 (Dkt. No. 18-2, at 4). Again, CBP has instructed the contractor to confine the project footprint to the Roosevelt Reservation. Enriquez Decl. ¶ 13 (Dkt. No. 18-2, at 4); McMullen Decl.,

Ex. 5 at 10 00 - 04. Any deviation from the Roosevelt Reservation would follow consultation with the Tribe.

**C.** Finally, CBP is willing to work with Plaintiff to address its concerns about Project impacts, potentially obviating Plaintiff's claimed harms. CBP has engaged with Plaintiff and expects that engagement and coordination to continue through design and execution of the Project. Enriquez Decl. ¶ 17 (Dkt. No. 18-2, at 5). CBP is willing to identify an alignment for the barrier that avoids identified cultural sites. Enriquez Decl. ¶ 29 (Dkt. No. 18-2, at 10–11). CBP would be confined to work within the 60-foot Roosevelt Reservation and undertake the blasting that path entails—only if Plaintiff is unwilling to consult on a barrier alignment that avoids or minimizes impacts to cultural resources. If Plaintiff would work with CBP on a barrier alignment that deviates from the Roosevelt Reservation, it could obviate the need to blast in certain areas or minimize the amount of blasting required. CBP will also address Plaintiff's other concerns by minimizing impacts to natural drainage and hydrology, relocating Saguaro, and returning staging areas to pre-construction conditions. Enriquez Decl. ¶¶ 22, 24, 27 (Dkt. No. 18-2, at 7, 9); *see also* McMullen Decl., Ex. 5 at 01 10 00 - 12-13 (Local Drainage & Erosion Requirements); *id.* at 01 57 23 - 1-2 (Storm Water Pollution Control); McMullen Decl., Ex. 4 ¶ 12 (Stormwater Pollution Prevention Plan); McMullen Decl., Ex. 5 at 01 10 00 - 12 (Protected Plant Species Relocation); McMullen Decl., Ex. 4 ¶ 60 (Columnar Cactus); *id.* ¶ 15 ("return...staging areas to pre-construction conditions"). In short, CBP will continue to engage with Plaintiff to address any potential harm.

## CONCLUSION

The Court should conclusively deny Plaintiff's motion.

Respectfully submitted,

ADAM R.F. GUSTAFSON, D.C. Bar 1010952
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

JUDITH B. HARVEY, D.C. Bar 1615789
Chief, Law & Policy Section

MARISSA A. PIROPATO
Deputy Chief, Natural Resources Section


/s/*Marissa Piropato*
Marissa Piropato (MA Bar No. 651630)
Deputy Chief
Natural Resources Section
Environment and Natural Resources Division
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 532-3182
Email: marissa.piropato@usdoj.gov

*Counsel for Defendants*

11