**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TOHONO O'ODHAM NATION,
a federally recognized Indian tribe,

*Plaintiff*,

v.

MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,

*Defendants*.

Case No. 26-cv-2127-RJL

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE TOHONO O'ODHAM NATION'S MOTION FOR INJUNCTION PENDING APPEAL**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

GLOSSARY .......... vi

INTRODUCTION .......... 1

ARGUMENT .......... 4

I. Standard of Review .......... 4

II. Serious Legal Questions Exist as to the Merits of the Nation's Trespass Claim. .......... 5

A. A Serious Legal Question Exists Regarding the Secretary's Sovereign Immunity to the Nation's Trespass Claim. .......... 6

B. A Serious Legal Question Exists as to Whether the Nation Has a Trespass Cause of Action Against Federal Officials. .......... 8

C. A Serious Legal Question Exists as to Whether the Secretary's Planned Conduct Will Constitute Trespass. .......... 9

III. Serious Legal Questions Exist as to the Merits of the Nation's Ultra Vires Claim. .......... 13

A. The Nation Has Raised a Serious Question as to Whether the Roosevelt Reservation Extends Across its Southern Boundary. .......... 13

B. A Serious Legal Question Exists Regarding Whether the Secretary's Border Wall Would Change the Nation's Reservation Boundary. .......... 15

IV. The Nation Will Suffer Irreparable Harm Absent an Injunction. .......... 17

V. The Equities Strongly Favor an Injunction Pending Appeal. .......... 19

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Cases**

* *A.B.-B. v. Morgan*,
548 F.Supp.3d 209 (D.D.C. 2020) ..... 18

* *Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) ..... 19

* *Bardon v. Northern Pacific Railroad Co.*,
145 U.S. 535 (1892) ..... 13

*Biden v. Texas*,
597 U.S. 785 (2022) ..... 21

* *Chamber of Commerce of the United States v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ..... 7

* *Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..... 18

* *Cigar Association of America v. U.S. Food and Drug Administration*,
317 F.Supp.3d 555 (D.D.C. 2018) ..... 5

* *County of Oneida v. Oneida Indian Nation*,
470 U.S. 226 (1985) ..... 8

* *Edwardsen v. Morton*,
369 F.Supp. 1359 (D.D.C. 1973) ..... 8

* *Friends of the Ruidosa Church v. Mullin*,
Case No. 3:26-cv-01099-KC (W.D. Tex. June 22, 2026) ..... 20

*Heritage Foundation v. Department of Justice*,
No. 24-cv-645 (DLF), 2026 WL 1770708 (D.D.C. June 19, 2026) ..... 5

*Hernandez v. Mesa*,
589 U.S. 93 (2020) ..... 21

* *Leopold v. Manger*,
102 F.4th 491 (D.C. Cir. 2024) ..... 6

* *Nebraska v. Parker*,
577 U.S. 481 (2016) ..... 15, 16, 17

*Neurelis, Inc. v. Califf*,
Case No. 24-cv-1576 (APM), 2025 WL 1010222 (D.D.C. Mar. 19, 2025) ............ 5

*Rosebud Sioux Tribe v. Kneip*,
430 U.S. 584 (1977) ............ 16

* *Schilling v. U.S. House of Representatives*,
102 F.4th 503 (D.C. Cir. 2024) ............ 6

* *Seymour v. Superintendent of Washington State Penitentiary*,
368 U.S. 351 (1962) ............ 15, 16

*Solem v. Bartlett*,
465 U.S. 463 (1984) ............ 16

*Trudeau v. Federal Trade Commission*,
456 F.3d 178 (D.C. Cir. 2006) ............ 7

* *Trump v. Cook*,
609 U.S. ___, 2026 WL 1855613 (June 29, 2026) ............ 6

* *United States v. Santa Fe Pacific Railroad Co.*,
314 U.S. 339 (1941) ............ 13, 14

* *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ............ 5

**Statutes**

5 U.S.C. § 702 ............ 7

25 U.S.C. § 398d ............ 16, 17

Act of Mar. 3, 1851, ch. 41, 9 Stat. 631 ............ 14

Act of July 22, 1854, ch. 103, 10 Stat. 308 ............ 14

Act of July 27, 1866, ch. 278, 14 Stat. 292 ............ 13

Act of May 25, 1918, ch. 86, 40 Stat. 561 ............ 15

Act of July 28, 1937, ch. 527, 50 Stat. 536 ............ 15

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) ............ 7

**Rules**

Fed. R. App. P. 8(a)(1)(C) .......... 1

Fed. R. Civ. P. 62 .......... 1, 4, 5

**Regulations**

Determination Pursuant to Section 102 of Illegal Immigrant Reform and Immigrant Responsibility Act of 1996, as Amended, 73 Fed. Reg. 19078-01 (Apr. 8, 2008) .......... 7

Executive Order No. 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443 (Jan. 20, 2025) .......... 21

Executive Order No. 14165, Securing Our Borders, 90 Fed. Reg. 8467 (Jan. 20, 2025) .......... 21

Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025) .......... 21

**Other Authorities**

Alejandro Santos Cid, *Texas Land Commissioner Orders Feds to Stop "Illegally" Clearing State Border Tract*, The Tex. Trib. (July 31, 2026) .......... 24

Camilo Montoya-Galvez, *Illegal Crossings Along U.S.-Mexico Border Plummet to Lowest Annual Level Since 1970*, CBS News (Oct. 7, 2025) .......... 4

House Committee on Homeland Security, "Crisis by Design": A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis (Sept. 18, 2024) .......... 21

J. David Goodman, *Trump Backed Away from a Wall at Big Bend. But the Bulldozers Are Here.*, The New York Times (Aug. 15, 2026) .......... 2, 20

John Gramlich, *Migrant Encounters at the U.S.-Mexican Border Are at Their Lowest Level in More than 50 Years*, Pew Rsch. Ctr. (Feb. 2, 2026) .......... 22

Kristian Jaime, *Abbott Cites DHS Commitment to Block Border Wall at Big Bend*, El Paso Times (Aug. 20, 2026) .......... 20

Letter from Dawn Buckingham, Comm'r, Tex. Gen. Land Off., to Barnard Construction (July 31, 2026) .......... 24

Matt Loeschman, *Border Crossings in Arizona Fall Dramatically*, The Daily Independent (July 14, 2026) .......... 23

Press Release, Texas General Land Office (Jul. 31, 2026) .......... 24

Press Release, U.S. Customs and Border Protection (Feb. 18, 2026) .......... 13

Press Release, U.S. Department of Homeland Security (Jan. 16, 2026) .......... 22

Press Release, U.S. Department of Homeland Security (Apr. 9, 2026) .......... 22

Press Release, U.S. Department of Homeland Security (May 15, 2026) .......... 22

Press Release, U.S. Department of Homeland Security (June 19, 2026) .......... 23

Press Release, U.S. Department of Homeland Security (July 16, 2026) .......... 4

Press Release, U.S. Department of Homeland Security (Aug. 13, 2026) .......... 23

Proclamation of May 27, 1907, 35 Stat. 2136 .......... 13, 15

Rebecca Santana, *Trump Administration Briefly Pauses Contentious Border Project in Texas' Big Bend National Park*, AP (Aug. 17, 2026) .......... 4, 20

Texas Monthly, *Photos: Construction Begins in Big Bend National Park* (Aug. 12, 2026) .......... 3, 4, 20

U.S. Customs and Border Prot., Southwest Land Border Encounters (By Component) .......... 4

Zoe Kurland, *Big Bend Area Border Wall Threatens to Destroy the Porvenir Massacre Site*, Marfa Public Radio (Aug. 20, 2026) .......... 25

# GLOSSARY

| Abbreviation | Term |
|---|---|
| CBP | United States Customs and Border Protection |
| Cook Decl. | Declaration of Tohono O'odham Police Department Interim Chief James Cook (Dkt. 3-5) |
| Ehlerman Decl. | Declaration of Paul Michael Ehlerman (Dkt. 26) |
| Enriquez Decl. | Declaration of Paul Enriquez (Dkt. 18-2) |
| ICC Op. | Indian Claims Commission Opinion, *Papago Tribe of Arizona v. United States*, 19 Ind. Cl. Comm. 394 (Sept. 10, 1968) (Dkt. 3-15 at PDF pp. 18–62) |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) |
| Margold Op. | Opinion of Solicitor of the Interior Margold re: Lands of Papago Indians (March 7, 1934) and Supplemental Opinion re: Lands of Papago Indians (May 7, 1934) (Dkt. 18-7) |
| McMullen Decl. | Declaration of Donna McMullen (Dkt. 38-1) |
| Nation Mem. | Memorandum of Points and Authorities in Support of The Tohono O'odham Nation's Motion for Preliminary Injunction (Dkt. 3-1) |
| Nation Reply | Reply Memorandum of The Tohono O'odham Nation in Support of Its Motion for Preliminary Injunction (Dkt. 25) |
| Nation Suppl. Mem. | Supplemental Memorandum of The Tohono O'odham Nation in Support of Its Motion for Preliminary Injunction (Dkt. 37) |
| Secretary | The Secretary of the United States Department of Homeland Security; the Commissioner of United States Customs and Border Protection; and the Chief of United States Border Patrol |
| Sec'y Mem. | Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction [Corrected] (Dkt. 19-1) |
| Sec'y Suppl. Mem. | Defendants' Supplemental Brief in Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 38) |
| Section 102 | Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1966, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) |
| Senseney Decl. | Declaration of Christopher T. Senseney, PhD. P.E. (Dkt. 3-3) |

| | |
|---|---|
| Tr. | Transcript of Motion Hearing Held Before the Honorable Judge Richard J. Leon, United States District Judge (July 22, 2026) |
| U.S. ICC Br. | United States' Requested Findings of Fact, Objections to Petitioner's Proposed Findings of Fact, and Brief, *Papago Tribe of Ariz. v. United States*, Docket No. 345 (Ind. Cl. Comm. 1965) (Dkt. 3-15 at PDF pp. 80–194) |

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1)(C), the Tohono O'odham Nation ("Nation") moves for an injunction to preserve the status quo pending appeal. The requested injunction would prohibit the Secretary from engaging in or directing activity (including by designated contractors) in furtherance of the construction of a border wall or related infrastructure on the Nation's Reservation. The Nation has filed a Notice of Appeal (Dkt. 48) from this Court's denial of its Motion for Preliminary Injunction and is filing a Motion for Expedited Appeal in the D.C. Circuit, which the United States has consented to and which asks the Circuit to enter a briefing schedule that will conclude on October 21, 2026. Under Circuit practice, if the motion to expedite is granted, oral argument will likely take place by early November. As the government "does not anticipate construction activities starting prior to October 12, 2026," Memorandum Opinion (Dkt. 45) ("Mem. Op.") at 5 (citation omitted), the injunction would pause such activities for only a brief period of time before the Circuit issues a decision.

The Court denied the Nation's request for a preliminary injunction on August 14, 2026. Mem. Op. In filing this Motion, the Nation is not asking the Court to reconsider that denial. To prevail on the Motion, the Nation need not show that it is likely to succeed on the merits of its claims, but rather that it has at least raised serious legal questions going to its entitlement to relief. As discussed below, it plainly has. The Nation must further demonstrate that it would suffer irreparable harm absent the injunction and that such harm would outweigh the harm to the Secretary during the time-limited period that the injunction is in effect. Because the Nation can likewise make these showings, an injunction pending appeal is warranted.

The government plainly feels emboldened by the Court's order. Within hours of its issuance, James Percival, General Counsel for the Department of Homeland Security ("Department"), publicly proclaimed:




James Percival (@DHSGenCounsel), X (Aug. 14, 2026, at 1:14 PM).[1] These declarations that "RESISTANCE IS FUTILE" and that "[t]his wall is getting built" presume that this Court's preliminary injunction ruling is its final word in this case, and they elide entirely the role of the appellate courts in the judicial process. They portend the same no-holds-barred approach to construction that the Secretary has taken elsewhere even while significant litigation is ongoing.

Recently at Big Bend National Park, for example, with the legality of construction still highly unsettled and in contravention of a promise not to act without ample notice, the Secretary sent bulldozers into the Park that "ripped through mesquite trees and brush and leveled the ground for more than a mile of what appeared to be a future roadway." J. David Goodman, *Trump Backed Away from a Wall at Big Bend. But the Bulldozers Are Here.*, The New York

[1] https://x.com/DHSGenCounsel/status/2088313210797441387.

Times (Aug. 15, 2026).[2] CBP Commissioner Scott dismissed the activity as mere "survey and design work." *Id.*; *see also* Texas Monthly, *supra* note 2.

Even more to the point, on August 25, the Department sent a convoy of federal officers and contractors onto the Nation's Reservation before dawn. The Department notified the Nation at 4:59 a.m. that the contractors "will begin identifying drill sites at 0500 hours, with geotechnical testing operations scheduled to begin at 1100 hours." Third Decl. of Riyaz A. Kanji ("Third Kanji Decl.") ¶ 2 & Attach. A at 1. In that same notice, the Department invited the Nation "to have cultural monitors present" (for work that would begin one minute hence) and stated that these overtures reflected "CBP's commitment to ongoing coordination" with the Nation. *Id*. at 2. Such an assertion makes a mockery of this Court's admonition that the government "follow through on its guarantees of consultation and cooperation with the Nation," Mem. Op. 18. The Secretary has chosen instead to engage in a show of force, with his contractors trespassing on the Reservation and federal officers taking it upon themselves to blockade Nation roads. *Infra* pp. 9–12. An injunction pending appeal would forestall disastrous consequences for the Nation by ensuring that the serious legal claims it has raised receive due consideration by the Circuit prior to irreversible actions by the Secretary and his contractors.

Nor will a brief delay in construction unduly harm the Secretary. Indeed, the Secretary has already agreed to indefinitely "paus[e]" construction activities in Big Bend—a 118-mile span of the border—following the public outcry about the Secretary's damaging construction activities, as well as political pressure from Texas's governor. Rebecca Santana, *Trump*

---

[2] https://www.nytimes.com/2026/08/15/us/border-big-bend-texas.html?unlocked_article_code=1.7FA.oXsp.OzFG4PyUaYQX&smid=url-share; *see also* Texas Monthly, *Photos: Construction Begins in Big Bend National Park* (Aug. 12, 2026), https://www.texasmonthly.com/news-politics/big-bend-border-wall-photos/.

*Administration Briefly Pauses Contentious Border Project in Texas' Big Bend National Park*, AP (Aug. 17, 2026).[3] And as Secretary Mullin has recently put it, the "border is CLOSED to lawbreakers." Press Release, U.S. Dep't of Homeland Sec. (July 16, 2026).[4] Federal data support these claims.[5] And this is as true for the Nation's southern boundary—where robust border security measures are in place under active cooperation between the Nation and the United States—as it is elsewhere along the international border.[6] A brief pause in wall-related activity on the Reservation accordingly will allow the D.C. Circuit to address the serious legal questions raised by this case without causing significant injury to the Secretary, all while forestalling actions that, once taken, will make it impossible to vindicate the Nation's rights.[7]

## ARGUMENT

### I. Standard of Review

To obtain an injunction pending appeal under Federal Rule of Civil Procedure 62(d), a movant must show "the same four criteria as a motion for preliminary injunction," except that it may "remedy a lesser showing of likelihood of success on the merits with a strong showing as to the other three factors, provided that the issue on appeal presents a 'serious legal question' on the

[3] https://bit.ly/trump_border_big_bend_national_park_immigration.

[4] https://www.dhs.gov/news/2026/07/16/trump-administration-delivers-14-straight-months-zero-releases-border.

[5] *See* Camilo Montoya-Galvez, *Illegal Crossings Along U.S.-Mexico Border Plummet to Lowest Annual Level Since 1970*, CBS News (Oct. 7, 2025), https://www.cbsnews.com/news/illegal-crossings-immigration-us-mexico-southern-border-lowest-level-1970-trump-dhs/ (stating that according to Department data, "[u]nlawful crossings along the U.S.-Mexico border in fiscal year 2025 plummeted to the lowest annual level since the early 1970s").

[6] *See* U.S. Customs and Border Prot., Southwest Land Border Encounters (By Component) https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component (showing 62% decrease in migrant encounters in Tucson Sector and average 63.7% decrease for entire border between FY2025 and FY 2026).

[7] The Secretary has declined to consent to this motion or to consider any pause on construction-related activities during the pendency of an appeal.

merits." *Cigar Ass'n of Am. v. U.S. Food and Drug Admin*., 317 F.Supp.3d 555, 560 (D.D.C. 2018) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc*., 559 F.2d 841, 842–44 (D.C. Cir. 1977)); *Heritage Found. v. Dep't of Just.*, No. 24-cv-645 (DLF), 2026 WL 1770708, at *1 (D.D.C. June 19, 2026) (same).[8] "Thus, the court may … issue an injunction pending appeal if a 'serious legal question is presented, ... little if any harm will befall other interested persons or the public, and ... denial of the order would inflict irreparable injury on [Plaintiffs].'" *Cigar Ass'n*, 317 F.Supp.3d at 560–61 (quoting *Holiday Tours*, 559 F.2d at 844 (ellipses and brackets in original)); *Neurelis, Inc. v. Califf*, Case No. 24-cv-1576 (APM), 2025 WL 1010222, at *2 (D.D.C. Mar. 19, 2025) (same); *see also Heritage Found.*, 2026 WL 1770708, at *1 ("[A] Rule 62(d) injunction may be appropriate, even if the Court believes its analysis in denying preliminary injunctive relief is correct." (citation modified)).

## II. Serious Legal Questions Exist as to the Merits of the Nation's Trespass Claim.

The Nation has at the very least raised "serious legal question[s]," *Cigar Ass'n*, 317 F.Supp.3d at 560, regarding its trespass claim that warrant Circuit review before it is too late. While this Court has described the Nation's trespass claim as "a fallback," Mem. Op. 14, the Nation has never presented it as subordinate to its ultra vires claim. It in fact sought to argue trespass first at the preliminary injunction hearing, Tr. at 5:4, given the certainty that the Secretary will need to engage in irreversible acts of trespass on the Nation's lands to carry out his border wall plans.

---

[8] While the Court in *Cigar Association* referred to Rule 62(c), that rule is now found in subsection (d). *See* Fed. R. Civ. P. 62 advisory committee's notes to 2018 amendments ("Subdivisions (a), (b), (c), and (d) of former Rule 62 are reorganized …. There is no change in meaning.").

### A. A Serious Legal Question Exists Regarding the Secretary's Sovereign Immunity to the Nation's Trespass Claim.

The D.C. Circuit has squarely held that "the *Larson-Dugan* [rule allowing for suits against federal officers] is triggered" where "defendants acted outside of the scope of their duty … imposed by the common law," *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024); *see also Leopold v. Manger*, 102 F.4th 491, 495 (D.C. Cir. 2024) ("[S]overeign immunity does not prevent an injunction against a state officer who abridges a common law duty without statutory authorization."). In its preliminary injunction ruling, this Court noted that these cases do not deal directly with trespass claims and stated that, "[a]s far as I can tell, no court has extended … *Larson-Dugan*" to them. Mem. Op. 15. But by the same token, the Secretary has cited no case rejecting application of the rule to trespass claims. And given that no such case exists, the Nation has at the very least raised a serious question that a rule framed broadly in terms of all common law claims applies to the common law claim of trespass. *See Leopold*, 102 F.4th at 496 (that a claimant "alleges a violation of federal common law does not foreclose application of the *Larson-Dugan* exception"). Nor does this Court's ruling account for the Supreme Court's recent and similarly broad affirmation that a plaintiff "may sue in equity *without a congressionally-provided cause of action* to prevent an injurious act by a [federal] public officer," *Trump v. Cook*, 609 U.S. ___, 2026 WL 1855613, at *11 n.2 (June 29, 2026) (citation modified); Nation Reply 15, which further underscores the availability of common law claims against federal officers. The Circuit should have the opportunity to consider the scope of its *Larson-Dugan* precedents before the Secretary's bulldozers and detonators descend on the Reservation.

Indeed, 50 years ago, Congress reaffirmed that the United States may not assert sovereign immunity over claims such as the Nation's. In 1976, Congress enacted 5 U.S.C. § 702, which provides in relevant part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

To prevail on sovereign immunity, in other words, the Secretary must make one of three arguments. He must argue [1] that the Nation has not sued "in a court of the United States." Or he must argue [2] that the Nation is in fact "seeking … money damages." Or he must argue [3] that the Nation's suit is not brought against him based on conduct "in an official capacity or under color of legal authority." Because the Secretary cannot succeed on any of these arguments, he is not immune from suit.

Although it is true that § 702 appears in the APA, § 702's "waiver of sovereign immunity applies to any suit whether under the APA or not," *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006). And although the Secretary has waived application of the APA pursuant to his authority "to waive all legal requirements … necessary to ensure expeditious construction of [border] barriers," IIRIRA Section 102(c)(1); *see* Determination Pursuant to Section 102 of IIRIRA, as Amended, 73 Fed. Reg. 19078-01, 19080 (Apr. 8, 2008) (waiving "the Administrative Procedure Act (5 U.S.C. 551 et seq.)"), § 702's waiver of sovereign immunity is not a "legal requirement[]" to which an agency must adhere. The Secretary may bypass laws that typically dictate how the agency operates—but he may not strip this Court of jurisdiction to decide the Nation's claim.

### B. A Serious Legal Question Exists as to Whether the Nation Has a Trespass Cause of Action Against Federal Officials.

This Court further concluded that "the availability of a federal common law trespass claim by an Indian tribe against the federal government is at best uncertain" because the Nation "has not identified any [such] case[.]" Mem. Op. 15–16. But once again, the Secretary has not identified a countervailing decision, and as a matter of first principles it is entirely unclear why tribal nations should lack the same common law protections against trespasses by federal officials that they possess with respect to trespasses by others. Nation Reply 11–15.

Indeed, the Supreme Court has held that "the Indians' common-law right to sue" for trespass "is firmly established." *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 233 (1985). In coming to that conclusion, the Court did not carve out federal officials; if anything, it intentionally included them. As an example of the applicable federal common law, the *Oneida* Court cited *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C. 1973)—a case brought "against federal officers" "for trespass," *id.* at 1378–79; *see also Oneida*, 470 U.S. at 236 n.6 (describing *Edwardsen* as "upholding [a] trespass action"). And *Edwardsen* could hardly have been clearer in scope. *See* 369 F.Supp. at 1378–79 (explaining that "a cause of action for trespass" lies "against federal officers" "[i]f plaintiffs were in fact disturbed in their use and occupancy"); *id.* at 1371 (reiterating that "the officers are themselves liable in trespass" if they ignore the tribe's rights). Dicta or no, the Supreme Court has understood *Edwardsen* as the Nation does; at the very least, *Oneida*'s unequivocal statement presents a serious legal question as to the merits of the Nation's claim against the Secretary. The Circuit should have the opportunity to consider that claim before the Secretary and his agents trespass yet again on the Nation's land.

### C. A Serious Legal Question Exists as to Whether the Secretary's Planned Conduct Will Constitute Trespass.

Third and finally with respect to the Nation's trespass claim, this Court concluded that "significant uncertainties remain about the actual scope of construction activities and the extent to which they may interfere with the Nation's lands outside the Roosevelt Reservation" because the "'contractor has been instructed to confine the project footprint … to the 60-foot federal Roosevelt Reservation,'" Mem. Op. 16 (ellipsis in original) (citing Enriquez Decl. ¶ 13).

To begin, a serious legal question exists regarding whether the Roosevelt Reservation lies across the Nation's southern boundary, and hence whether there is any area where the Secretary or his contractors can engage in wall construction and related activities without trespassing on the Nation's lands. To avoid duplicative briefing, the Nation addresses that issue in its ultra vires discussion (as did the Court) and incorporates it here. *See infra* pp. 13–15.

But even if the Roosevelt Reservation exists along the Nation's border, the "significant uncertainties" the Court referenced regarding the scope of contractor activity have matured into certainty. There is no question that the Secretary and his contractors will need to trespass on the Nation's lands to carry out the construction of the border wall on the Nation's Reservation—indeed, they already have, and show every intention of continuing. Between August 10 and August 12, 2026, Nation law enforcement personnel encountered at least eleven contractor vehicles on the Reservation with the intent of engaging in border-wall-related activity (principally geotechnical borings as a prelude to wall construction). Each vehicle was more than sixty feet from the southern border, and at least one was discovered in trespass on the Nation's roads outside any valid right of way. Second Decl. of James Cook ("Sec. Cook Decl.") ¶¶ 2–6. There are no means by which contractors can access the border through the Reservation without using private roads to which the federal government does not have a right-of-way agreement for

border wall construction purposes, Decl. of Beverly Matthews ("Matthews Decl.") ¶ 16, and hence even those contractors encountered on public roads were set on committing acts of trespass.

Only three public roads lead to the southern portion of the Reservation from State Highway 86 (the main east-west corridor across the Reservation): BIA Routes 1, 19, and 21. *Id.* ¶¶ 7–8. The public rights of way on these roads terminate well north of the border. *Id.* ¶¶ 9–11. From these public rights of way, the Department uses private roads—including one road called the Traditional Northern Road (TNR), which "runs roughly parallel to the international border for most of its duration," *id.* ¶ 12, and two north-south connector roads from BIA Routes 1 and 19, *id.* ¶¶ 9, 11—to access and patrol the border. The Department does so with the knowledge and consent of the Nation. The Department also uses the two connector roads and the TNR to access ten surveillance towers whose presence on the southern boundary of the Reservation the Nation has consented to, subject to the narrow terms and conditions of a 2019 Integrated Fixed Tower (IFT) Agreement. Ehlerman Decl. ¶¶ 3–4 & Attach. A. In addition to tower-site access rights, the IFT Agreement grants the Department a limited right-of-way on the two connector roads and the TNR "'for construction, maintenance, operation and repair of portions of the Traditional Northern Road, including necessary and related improvements to that road, such as drainage culverts, low-water crossings, and signage.'" Matthews Decl. ¶ 14. The easement is explicitly limited to this "'purpose above specified'" and provides that the Department must negotiate with the Nation "'as necessary to authorize CBP's use of Nation's lands outside of the … easement for rights of way identified in this Agreement.'" *Id.* ¶ 15.

Accordingly, even if this Court were correct in concluding that the Roosevelt Reservation likely exists, it is plainly not possible for the Secretary's contractors to confine their border wall

activities to it, as they cannot even reach the border for purposes unconsented to by the Nation without trespassing across Nation lands. The contract entered into between the Secretary and his contractor for the border wall project—which the government did not produce to the Court or the Nation until after the preliminary injunction hearing and the Nation's submission of its post-hearing brief—seemingly recognizes the lack of any legal right of access across the Reservation. It provides that "[n]o [interior Reservation] roads are currently approved for accessing the project area" and that "the contractor shall not assume they will be permitted to access the project location from the North through the Tohono O'odham Reservation." McMullen Decl. PDF p. 18 § 8.2. Rather, the contract requires that contractors access the Reservation "from the Roosevelt Reservation corridor on either the West or East[.]" *Id.* But there is no road access to the disputed sixty-foot strip at either its east or west end because those areas are bounded by rugged mountain peaks with no roads. Matthews Decl. ¶ 2. The contractors accordingly would have to blast their way through the mountains in order to establish road access, and it is fanciful to think that they can do so while staying within sixty feet of the border. Senseney Decl. ¶¶ 24–32. The very contract that the Court pointed to as suggesting that the Secretary and his contractors might not trespass on the Nation's lands in fact undermines that suggestion.

All of this notwithstanding, in the early morning hours of August 25, 2026, a convoy of contractors and CBP officials descended on the Nation, providing the Nation with one minute of notice before commencing the process of conducting geotechnical borings in anticipation of wall construction. *Supra* p. 3; Sec. Cook Decl. ¶ 8. The convoy traveled down the Route 19 connector road, which again is not public, and then eastward on the TNR, which again is not public, to reach the boring sites (which are within the disputed sixty-foot corridor). *Id.* ¶¶ 8–9. Remarkably, when the Nation's interim police chief and other law enforcement officers sought to

travel along the TNR for the sole purpose of monitoring the drilling activities, they were stopped at a roadblock established by Border Patrol. *Id.* ¶ 9. The interactions that ensued were thankfully professional, and Border Patrol "allowed" the Nation's officers to observe the drilling activity, *id.*, but it was never their permission to grant in the first instance. The ability of the Nation's law enforcement officers to use the Nation's roads is now being controlled and impaired by Department officers who are authorized to be on those roads for only limited purposes—purposes that decidedly do not include border wall construction or impeding Nation law enforcement. The severity of the trespass could not be clearer.

And leaving aside access, uncontroverted evidence establishes that the construction of the wall cannot be confined to within sixty feet of the border. *See* Nation Suppl. Mem. 6–7 (citing testimony of Nation's expert that the leveling and blasting of mountains along the path of the border wall, the establishment of equipment staging areas and concrete batching plants, and the building of access roads will all require the Secretary's contractors to go well beyond sixty feet from the border, *see* Senseney Decl. ¶¶ 14–19, 24–32, 35); Enriquez Decl. ¶ 26 (nowhere denying that construction of even a single wall will require blasting through "four particular mountainous locations"); *id.* ¶ 20 (acknowledging potential for staging areas ranging "300–400 feet north of the border"). Indeed, counsel for the Secretary forthrightly acknowledged at the preliminary injunction hearing that "if you … restrict us to the 60-foot zone, then you've got difficult engineering challenges ahead of you[.]" Tr. at 19:18–20. The Court's decision declines to impose any such restriction on the Secretary, leaving the Nation at the mercy of the Secretary's resolution of his engineering challenges. The Circuit should have the opportunity to consider the Nation's claims before the Secretary takes actions—many of which promise to be highly destructive—that cannot then be undone.

## III. Serious Legal Questions Exist as to the Merits of the Nation's Ultra Vires Claim.

### A. The Nation Has Raised a Serious Question as to Whether the Roosevelt Reservation Extends Across its Southern Boundary.

This Court held that the Nation is unlikely to succeed on the merits of its ultra vires claim in part because "the Roosevelt Reservation likely exists along the international border." Mem. Op. 11. Again, the Nation does not ask the Court to reverse that determination but instead to conclude that the Nation has at least raised serious questions regarding it.

By its terms, the Roosevelt Reservation is confined to "public lands," Proclamation of May 27, 1907, 35 Stat. 2136, 2136. It is undisputed—as the United States acknowledged in the ICC proceedings, *see* Nation Mem. 26–31, and has not disputed here—that the Nation held aboriginal title to the lands that became its Reservation when the Roosevelt Reservation was proclaimed in 1907. In *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339 (1941), the Supreme Court addressed whether certain lands in Arizona fell within a statutory grant to a railroad of a "right of way through the public lands," Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292, 294, and squarely held that if the tribe had aboriginal title at the time of the grant, then those lands were not public and "unless extinguished survived the railroad grant of 1866." *Santa Fe*, 314 U.S. at 345; *see also, e.g.*, *Bardon v. N. Pac. R.R. Co.*, 145 U.S. 535, 538 (1892) ("[B]y 'public land,' as it has been long settled, is meant such land as is open to sale or other disposition under general laws. All land, to which any claims or rights of others have attached, does not fall within the designation of 'public land.'").

This Court concluded that *Santa Fe* does not support the Nation's argument "outright" because the *Santa Fe* Court stated that certain statutes making lands within the Mexican cession part of the public domain were not "concerned … with the problem of ascertaining the boundaries of Indian country," Mem. Op. 13 (quoting *Santa Fe*, 314 U.S. at 351). Respectfully,

the Court has misread the import of that passage. The opinion explains that the statutes expressly required "action of Congress" to extinguish aboriginal title after their enactment and that "[w]e are not advised that Congress took any such action." 314 U.S. at 351. It further notes Congress's directive that "until the final action of Congress," the lands "shall be reserved from sale or other disposal by the government," *id.* at 350 (quoting Act of July 22, 1854, ch. 103, § 8, 10 Stat. 308, 309). Accordingly, "[t]hese acts did not extinguish any Indian title based on aboriginal occupancy," *id*., and the language quoted by this Court is in fact a rejection of the railroad's argument that they did. *See also id*. (distinguishing a "quite different" statute under which lands in California subject to Indian title became "'part of the public domain of the United States'" (quoting Act of Mar. 3, 1851, ch. 41, § 13, 9 Stat. 631, 633)). And even if there were any ambiguity in this regard, there is no gainsaying that *Santa Fe* at the very least provides serious support for the Nation's position.

The materials relied on by the Court, Mem. Op. 11–13, do not undermine that support. For example, far from deeming the Nation's territory to be public lands, Solicitor Margold concluded that the Nation held those lands under "an Indian right of occupancy" subject to federal protection, Margold Op. at PDF 13, which is the same form of title that *Santa Fe* held not to fall within a grant of public lands to a railroad, *see* 314 U.S. at 345–47. And while the 1968 ICC opinion posits that the lands of the Mexican cession became public lands by virtue of the Act of July 22, 1854, *Santa Fe* states that "we do not agree that … [the 1854] Act instituted a policy of non-recognition of Indian title. Nor do we think that it effected any extinguishment of that title" so as to bring the lands within the terms of the 1866 railroad grant, 314 U.S. at 348. There is at the very least a serious question as to whether dicta from an ICC opinion should be

credited when the Supreme Court has addressed the very same statute and come to the opposite conclusion.

Finally, the Court referenced the 1937 statute that added lands to the Nation's reservation. Mem. Op. 12 (citing Act of July 28, 1937, ch. 527, 50 Stat. 536). But that statute speaks of the Roosevelt Reservation in agnostic terms and in any event was limited to the 1937 land addition. *See* Nation Reply 8–10. In the far more contemporaneous Act of May 25, 1918, ch. 86, 40 Stat. 561, Congress authorized a fence for Nation cattle raising right up to the international border along the entire 1917 southern boundary, Nation Mem. 7–8 & n.3; Nation Reply 5–6, a use in direct conflict with the Roosevelt Reservation's restriction that the lands reserved by it "may be used for public highways *but for no other purpose whatever*," 35 Stat. at 2137 (emphasis added). It is at the very least difficult to square the conclusion that the Roosevelt Reservation likely exists on the Nation's Reservation with Congress's contemporary facilitation of contrary uses. The Circuit should have the opportunity to address that interplay, and to do so before the Secretary and his contractors engage in irreversible acts on the Nation's lands.

### B. A Serious Legal Question Exists Regarding Whether the Secretary's Border Wall Would Change the Nation's Reservation Boundary.

This Court concluded that even if the Roosevelt Reservation does not exist at the Nation's southern boundary, it is "not aware of any case holding that construction of a border wall adjacent to a Reservation—with the possibility of activities that may interfere with the Nation's use and occupancy rights—necessarily diminishes the Reservation's boundaries" and noted that even "the establishment of non-Indian towns, or the sale of property to non-Indians, does *not* change the reservation status of the lands." Mem. Op. 13–14 (citing *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 358–59 (1962)). But in *Nebraska v. Parker*, 577 U.S. 481 (2016), the Court identified as among the "hallmarks of diminishment"

federal action "to extinguish the land's prior use … as an Indian reservation—and … set [it] aside for other public purposes," 577 U.S. at 489. That is precisely what the Secretary proposes to do here. He has identified no conceivable "use … as an Indian reservation" the Nation could make of the lands along its southern boundary if they are buried forever beneath the Secretary's steel walls or the new federally controlled roads adjacent to them. Nor is that question any less serious because the affected lands comprise a relatively small portion of the Nation's Reservation. Section 398d prohibits "[*c*]*hanges* in the boundaries of reservations" absent an act of Congress, 25 U.S.C. § 398d (emphasis added), leaving no room for a judicial determination as to what degree of change might nevertheless be permissible.

In addition, *Seymour* raises more questions than it answers. While *Seymour* held that an act authorizing the sale of lands did not diminish the reservation in question, it did not purport to establish a categorical rule. Rather, it is well-established that some such acts "diminished reservations and other[s] … did not," *Solem v. Bartlett*, 465 U.S. 463, 469 (1984) (citations omitted); *see, e.g.*, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 588 (1977) (holding that act that "opened the land for settlement … diminished the boundaries of the Reservation"). In *Seymour*, the sale of lands to non-Indians was held not to accomplish diminishment because: (1) it was specifically intended to "open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards," 368 U.S. at 356; and (2) the lands at issue were scattered throughout the interior of the reservation, which would have resulted in "an impractical pattern of checkerboard jurisdiction" if diminishment were found, *id.* at 358. Neither of those factors applies here, such that *Seymour* by itself does not resolve the diminishment question in this case.

While it is true that the Secretary argued that "'constructing a border barrier is not the type of action that could change the status or boundaries of a reservation,'" Mem. Op. 14 (quoting Sec'y Suppl. Mem. 5), the basis for the Secretary's argument is faulty. The Secretary's argument rests on the contention that "[i]t is not the *practical effect* of the federal action but its *legal effect* that matters," and since only Congress has the legal authority to diminish a Reservation, no executive branch action (regardless of the extent of the deprivation of a tribe's rights) can ever do so, Sec'y Mem. 18. That is a sweeping proposition, and one that raises numerous questions, including whether its acceptance would eviscerate the bedrock separation of powers command that "only Congress can divest a reservation of its land and diminish its boundaries and its intent to do so must be clear," *Parker*, 577 U.S. at 488–89 (citation modified), and in the process render § 398d a nullity. Section 398d, after all, specifically contemplates that another branch might act to change a reservation's boundaries without congressional authorization, and Congress does not legislate to prohibit the impossible.

Once again, the Circuit should have the opportunity to address these highly consequential issues before the Secretary and his contractors begin reshaping the Nation's southern boundary.

**IV. The Nation Will Suffer Irreparable Harm Absent an Injunction.**

The Nation has identified four categories of irreparable harm that it will suffer if the Secretary moves forward with his plans: the loss of sovereign control over its lands; the loss of proprietary control; environmental injury; and interference with First Amendment freedoms. Nation Mem. 41–43. The Nation has set forth considerable case law establishing each category as a quintessential form of irreparable harm, *see id.* at 41–43; Nation Suppl. Mem. 9–10, and neither this Court nor the Secretary has seriously disputed that they so qualify.

This Court, however, concluded that "Plaintiff's alleged harms based on its claim to the land leading up to the international border are not likely to materialize because … the Roosevelt Reservation likely exists along the Nation's border, and defendants have not yet articulated plans to construct outside the Roosevelt Reservation." Mem. Op. 17. But the D.C. Circuit has explained that "[w]ithin the irreparable harm analysis itself—which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law—we examine only whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) (emphasis added); *see also, e.g.*, *A.B.-B. v. Morgan*, 548 F.Supp.3d 209, 221 (D.D.C. 2020) (Leon, J.) ("[T]he Court must assume plaintiffs' likelihood of success on the merits when assessing whether irreparable harm exists." (citing *Chaplaincy*, 454 F.3d at 303)). Assuming—as precedent requires—that the Roosevelt Reservation does not exist at the Nation's southern boundary and that the Secretary's planned wall will diminish that boundary in violation of Section 398d, there is no question that the Nation would suffer irreparable injury if the Secretary can move forward with his plans unchecked.

This is likewise true if one assumes—as precedent again requires—that the Secretary cannot confine the actions of his contractors to the asserted Roosevelt Reservation. The Secretary has not contested that the blasting and leveling of mountain peaks that lie along the border cannot be confined to within sixty feet of the border, Enriquez Decl. ¶¶ 20, 26, and the Nation has likewise adduced highly credible expert testimony that the Secretary will need to go well beyond the corridor to build staging areas, concrete batching plants, and access roads, Senseney Decl. ¶¶ 14–19, 24–32, 35. The resulting environmental destruction and affront to the Nation's sovereignty and proprietary interests again qualify as quintessential forms of irreparable harm,

and this is no less true by virtue of the suggestion that the harms might be "mitigated through [federal] consultation with the Nation and accommodations, such as crossing gates to enable members of the Nation to access the international border," Mem. Op. 17. No number of gates and no amount of consultation will reduce the harms from the blasting and leveling of mountain peaks and transformation of unsullied lands into roads and staging areas. The Secretary has not wavered in his stated intent to build a wall along the entire sixty-two-mile length of the Nation's southern boundary, nor has he denied that significant bulldozing and blasting will be required in the process. *See* Enriquez Decl. ¶ 26. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). That such injury will occur here absent an injunction is nothing less than a certainty.

## V. The Equities Strongly Favor an Injunction Pending Appeal.

This Court has thus far determined that the equities weigh against injunctive relief. Mem. Op. 17–18. However, that determination was made in the context of the Nation's motion for a preliminary injunction. The instant motion seeks an injunction only until the conclusion of the Nation's appeal, which the Nation is moving to expedite. If the Nation's proposed schedule (to which the Secretary has consented) is adopted, the requested injunction would preserve the status quo for only a short period while the Circuit deliberates. *See supra* p. 1.

"[T]he Government's interests in securing the border, enforcing immigration laws, and ensuring public safety," Mem. Op. 17, will not be impaired by preserving the status quo for such a limited time. Indeed, the Secretary has recently agreed to pause construction on other portions of the border wall at the behest of other governmental actors—although only after extensive damage had been done.

At Big Bend National Park, for example, the Secretary had entered into a written agreement to refrain from "ground disturbing activities" without thirty days' prior notice to plaintiffs challenging the wall. Joint Mot. for Scheduling Order at 4, *Friends of the Ruidosa Church v. Mullin*, Case No. 3:26-cv-01099-KC (W.D. Tex. June 22, 2026). But in early August, without providing the agreed-upon notice, Pls.' Emergency Mot. for a TRO or Prelim. Inj. at 4, *Friends of the Ruidosa Church*, the Secretary deployed bulldozers and excavators within the Park that "ripped through mesquite trees and brush and leveled the ground for more than a mile of what appeared to be a future roadway." Goodman, *supra* note 2; *see also* Texas Monthly, *supra* note 2. While CBP Commissioner Scott sought to dismiss the activity as mere "'survey and design work,'" Goodman, *supra* note 2; *see also* Texas Monthly, *supra* note 2, it included "two different staging areas and one active worksite," Declaration of Laiken Jordahl ¶ 5, *Friends of the Ruidosa Church*, with "road construction equipment and a steamroller," *id.*, and "an active bulldozer and excavator carving into a hillside," *id.* ¶ 7. Images of these construction activities at Big Bend are included in Appendix A to this brief.

Notably, in response to fierce criticism from both the public and the political leadership in Texas, CBP Commissioner Scott announced on August 17 that the CBP would be "'pausing all construction activity in Big Bend National Park while I visit and conduct a personal, on-the-ground evaluation'" and "'listen to local leadership, community members and stakeholders.'" Santana, *supra* note 3. And Governor Abbott has since pronounced, after talks with the Department, that there will be no wall, fence, or vehicle barrier in the park. Kristian Jaime,

*Abbott Cites DHS Commitment to Block Border Wall at Big Bend*, El Paso Times (Aug. 20, 2026).[9]

Unlike the parties to the Big Bend litigation, the Nation cannot invoke any agreement with the Secretary to protect it from the immediate commencement of construction activities. The Nation is fully dependent on this Court and the appellate courts to vindicate its federal rights. But absent an injunction, the Secretary has already demonstrated his willingness to move forward in a manner that will destroy those rights before they receive full judicial consideration.

The empirical evidence also confirms that the Secretary and the public will not be harmed by a brief pause in construction. At the preliminary injunction stage, the Secretary asserted that "[t]he government's compelling interest is even stronger in the current context because of the unprecedented flood of illegal immigration that has occurred over the past several years," Sec'y Mem. 37 (quotation marks omitted), which he described as "staggering," *id.*, and a "massive increase," *id.* at 38. But every source the Secretary cited for that assertion reflects data from 2024 and earlier.[10] As evidenced by the Secretary's own data, the "current context" is that a massive influx no longer exists.

[9] https://www.elpasotimes.com/story/news/immigration/2026/08/20/texas-gov-abbott-no-border-wall-coming-to-big-bend-national-park/91385290007/.

[10] *See* Sec'y Mem. 37–38 (citing Exec. Order No. 14159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025) (citing figures under "the prior administration"); House Committee on Homeland Security, "Crisis by Design": A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis at 3 (Sept. 18, 2024), https://homeland.house.gov/wp-content/uploads/2024/09/September-2024-Border-Report.pdf (citing figures through FY 2024); *Biden v. Texas*, 597 U.S. 785, 816–17 (2022) (Alito, J., dissenting) (citing figures from "fiscal year 2021"); Exec. Order No. 14165, Securing Our Borders, 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025) (citing figures from 2021–2024); *Hernandez v. Mesa*, 589 U.S. 93, 107 (2020) (citing figures from 2019); Proclamation 10886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025) (citing figures from 2021–2024)).

At the end of 2025, "U.S. Border Patrol encounters with migrants crossing into the United States from Mexico ha[d] fallen to their lowest level in more than 50 years …. The 2025 total was the lowest in any fiscal year since 1970, according to historical data from the Border Patrol." John Gramlich, *Migrant Encounters at the U.S.-Mexican Border Are at Their Lowest Level in More than 50 Years*, Pew Rsch. Ctr. (Feb. 2, 2026).[11] That trend has continued unabated this year. In January 2026, the Department reported that "America's borders are safer than any time in our nation's history" and "we have a record low number of encounters at the [Southwest] border and the 8th straight month of zero releases." Press Release, U.S. Dep't of Homeland Sec. (Jan. 16, 2026) (quotation marks omitted).[12] In February, CBP Commissioner Scott stated that "'Border Patrol apprehensions are down 96% from the previous administration's monthly average[.]'" Press Release, U.S. Customs and Border Prot. (Feb. 18, 2026).[13] In April, the Department announced that "[b]order encounters for first six months of the fiscal year are the lowest in recorded history," with CBP Commissioner Scott stating that "'[t]his isn't temporary—it's the new normal.'" Press Release, U.S. Dep't of Homeland Sec. (Apr. 9, 2026).[14] In May, the Department reported that "the border remains more secure than at any point in history." Press Release, U.S. Dep't of Homeland Sec. (May 15, 2026).[15] In June, Commissioner Scott reported continuing "'historically low illegal crossings'" demonstrating that "'[o]ur robust enforcement policies are working, and we are delivering unprecedented results in border security, drug

---

[11] https://www.pewresearch.org/short-reads/2026/02/02/migrant-encounters-at-the-us-mexico-border-are-at-their-lowest-level-in-more-than-50-years/.
[12] https://www.dhs.gov/news/2026/01/16/usbp-records-zero-releases-eighth-consecutive-month.
[13] https://www.cbp.gov/newsroom/national-media-release/one-year-most-secure-border-history.
[14] https://www.dhs.gov/news/2026/04/09/trump-administration-delivers-11-straight-months-zero-releases-border.
[15] https://www.dhs.gov/news/2026/05/15/trump-administration-delivers-full-year-zero-releases-border.

interdiction, and trade enforcement[.]'" Press Release, U.S. Dep't of Homeland Sec. (June 19, 2026).[16] And in July, the unabated trends led the Department to declare that "[w]ith daily apprehensions down 94% from the previous administration, the border remains more secure than at any point in history," and Secretary Mullin to pronounce simply that "'[o]ur border is CLOSED to lawbreakers." Press Release, U.S. Dep't of Homeland Sec. (July 16, 2026).[17]

These trends are no different at the Nation's southern boundary, where the Nation and the United States continue to cooperate extensively on robust border security measures. Mem. Op. 4. The CBP reports a 62% decrease in border encounters in the Tucson Sector between FY 2025 and FY 2026, virtually identical to the average 63.7% decrease for the entire border for that same period. *Supra* note 6; *see also, e.g.*, Matt Loeschman, *Border Crossings in Arizona Fall Dramatically*, The Daily Independent (July 14, 2026) (reporting that "[a]fter years of record-breaking migrant crossings, Arizona's southern border is experiencing a dramatic slowdown," including "an 88% decrease" between FY 2024 and FY 2025 "according to data from U.S. Customs and Border Protection" and that "[t]he recent decline marks one of the sharpest year-over-year decreases in border apprehensions in recent history…. Border agents are encountering fewer migrants, shelters that once struggled to accommodate daily arrivals have seen demand ease, and local officials are adjusting to a landscape that looks far different from the record-setting migration surges of just two years ago").[18] *See also* Cook Decl. ¶ 21.

---

[16] https://www.dhs.gov/news/2026/06/19/trump-administration-delivers-13-straight-months-zero-releases-border.
[17] https://www.dhs.gov/news/2026/07/16/trump-administration-delivers-14-straight-months-zero-releases-border. The government's assessment in August is the same. *See* Press Release, U.S. Dep't of Homeland Sec. (Aug. 13, 2026), https://www.dhs.gov/news/2026/08/13/trump-administration-delivers-15-straight-months-zero-releases-border (announcing "15 consecutive months of zero releases at the border, continuing the unprecedented trend of historically low border crossings").
[18] https://www.yourvalley.net/stories/border-crossings-in-arizona-falling-dramatically,704478.

With this context in mind, the Secretary will be guilty of serious exaggeration if he claims that he will suffer significant harm from a short-term preservation of the status quo on the Reservation—with the proposed pause indeed paling in comparison to the Secretary's decision to maintain the status quo indefinitely at Big Bend.

By contrast, the harm to Nation will be severe absent the requested relief. The Department, which has declared that its "authority is beyond dispute" and the Nation's resistance is "FUTILE," has already begun flooding the Reservation with contractors engaged in substantial preparatory work. *See supra* pp. 2. In the Secretary's view, nothing exists to prevent the Department from aggressively moving forward while the Nation's claims remain pending, and the Department has indeed demonstrated a pattern of doing just that. The bulldozers in Big Bend, discussed above, are hardly an outlier. The Nation has firsthand experience with the destruction that the Secretary and his contractors have caused in their haste to build the border wall. Nation Mem. 16 (describing, for example, the very recent destruction—just to the east of the Reservation—of a portion of the Las Playas Intaglio, which was created by O'odham ancestors at least a thousand years ago.) In Presidio County, Texas, despite ongoing litigation, a federal contractor "illegally cleared over a mile of state land," Press Release, Tex. Gen. Land Off. (Jul. 31, 2026),[19] with "heavy construction equipment," Alejandro Santos Cid, *Texas Land Commissioner Orders Feds to Stop "Illegally" Clearing State Border Tract*, The Tex. Trib. (July 31, 2026),[20] removing "all vegetation in its path," *id.*, and causing "extensive damage" to the state-leased grazing lands, Letter from Dawn Buckingham, Comm'r, Tex. Gen. Land Off., to

[19] https://www.glo.texas.gov/about-glo/press-releases/dont-tread-texas-commissioner-buckingham-orders-federal-contractors-cease.

[20] https://www.texastribune.org/2026/07/31/texas-border-wall-cbp-cease-and-desist-presidio-county/.

Barnard Construction (July 31, 2026).[21] An "irreplaceable" archeological site has already been razed, with a new access road running right through its core. Zoe Kurland, *Big Bend Area Border Wall Threatens to Destroy the Porvenir Massacre Site*, Marfa Public Radio (Aug. 20, 2026).[22] An image of the damaged land from the Texas General Land Office is included in Appendix B to this Brief. On July 31, 2026, the Texas General Land Office issued a cease and desist letter to the Secretary and his contractors, directing them to halt all excavation and construction. Letter, *supra* note 21. A spokesperson for the Secretary thereafter stated that CBP is "working to resolve this issue," Cid, *supra* note 20, but by then the damage had already been done. A temporary pause is warranted to ensure that the Nation's lands do not suffer the same fate.

* * *

As the Court recognized at the preliminary injunction hearing, "[t]his is a novel case with novel issues of great significance" to both the United States and the Nation. Tr. at 32:19–20. The Nation shares the government's border security objectives. But an assertion by the executive branch that it may blast and bulldoze and permanently dispossess a sovereign tribe of its lands absent Congress's assent is unprecedented in the modern era. The judiciary's resolution of this case will have sweeping implications for the Nation, and for tribes across the country. Because serious legal questions exist as to whether the Secretary's planned activities are consistent with federal law, and because the harms that will befall the Nation absent issuance of an injunction pending appeal far outweigh any injury to the Secretary from granting one, the modest relief the Nation seeks here is amply warranted.

---

[21] https://www.glo.texas.gov/sites/default/files/2026-07/letters.pdf?utm_medium=email&utm_source=govdelivery.

[22] https://www.marfapublicradio.org/news/2026-08-20/big-bend-area-border-wall-threatens-to-destroy-the-porvenir-massacre-site.

## CONCLUSION

The Nation respectfully requests that this Court grant its Motion for Injunction Pending Appeal.

Dated: August 27, 2026

Respectfully submitted,

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji, D.C. Bar 455165
David A. Giampetroni*
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com

Philip H. Tinker*
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Howard M. Shanker, D.C. Bar 426359*
Attorney General
Logan Takao Cooper*
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Plaintiff Tohono O'odham Nation*

*Pro Hac Vice Admission

**CERTIFICATE OF SERVICE**

I certify that on August 27, 2026, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji