**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security, RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:26-CV-02127-RJL |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR INJUNCTION PENDING APPEAL**

## TABLE OF CONTENTS


I. Overview ....................................................................................................1

II. Legal Standard ...........................................................................................3

III. Argument ...................................................................................................5

A. Plaintiff is not entitled to a stay pending appeal on its trespass claim.....................5

1. Plaintiff is still unlikely to prevail on its trespass claim because there is no applicable waiver of sovereign immunity. .........................................5

2. Plaintiff is still unlikely to succeed on its common-law trespass claim because it has not shown that such a claim is available against the United States. ..........................................................................................7

3. Plaintiff is still unlikely to prevail on its trespass claim because it has not established any trespass will occur. ......................................................8

a. Plaintiff cannot plead a new trespass claim through briefing or introduce a new legal theory in seeking relief pending appeal. ...........................................................................................9

b. Plaintiff's novel right-of-way argument also fails on the merits.........................................................................................11

B. Plaintiff is not entitled to a stay pending appeal on its *Ultra Vires* claim. ............13

1. Plaintiff has not raised a "serious legal question," much less shown a likelihood of success, as to whether the Roosevelt Reservation attached to its aboriginal lands.................................................................13

2. Plaintiff has not raised a "serious legal question," much less shown a likelihood of success, as to whether building a border wall would change the boundary of the Tribal Reservation. ........................................16

IV. Remaining Factors for Injunctive Relief...............................................................17

A. Irreparable Harm ..........................................................................................17

B. Equities and Public Interest ...........................................................................18

V. Distractions and Red Herrings...........................................................................20

VI. Conclusion ................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Al–Anazi v. Bush*,
370 F. Supp. 2d 188 (D.D.C. 2005) .... 4

*Bardon v. N. Pac. R.R. Co.*,
145 U.S. 535 (1892) .... 14

*Benisek v. Lamone*,
585 U.S. 155 (2018) .... 17

*Bird v. Barr*,
No. 19-cv-1581, 2020 WL 4219784 (D.D.C. July 23, 2020) .... 10

*Bristol-Myers Squibb Co. v. Shalala*,
923 F. Supp. 212 (D.D.C. 1996) .... 4

*Changji Esquel Textile Co. Ltd. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .... 19

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .... 17

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
317 F. Supp. 3d 555 (D.D.C. 2018) .... 3, 4

*Clevinger v. Advoc. Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .... 4

*Cnty. of Oneida v. Oneida Indian Nation*,
470 U.S. 226 (1985) .... 7

*Davis v. Pension Benefit Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .... 5

**Delaware & H. Ry. Co. v. United Transp. Union*,
450 F.2d 603 (D.C. Cir. 1971) .... 17, 18

*Denver Bible Church v. Becerra*,
No. 20-cv-02362, 2021 WL 1220758 (D. Colo. Mar. 28, 2021) .... 6, 10

*Edwardsen v. Morton*,
369 F. Supp. 1359 (D.D.C. 1973) .... 7, 8

*Escalante v. Noem*,
No. 9:25-CV-00182, 2025 WL 2491782 (E.D. Tex. July 18, 2025) .... 19

*Fed. Aviation Admin. v. Cooper*,
566 U.S. 284 (2012) .... 5

*Fed. Deposit Ins. Corp. v. Meyer*,
510 U.S. 471 (1994) .... 5

**Independent Petroleum Ass'n of Am. v. Babbitt*,
235 F.3d 588 (D.C. Cir. 2001) .......... 10

*Int'l Bhd. of Elec. Workers v. Washington Terminal Co.*,
473 F.2d 1156 (D.C. Cir. 1972) .......... 17

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
849 F.3d 1129 (D.C. Cir. 2017) .......... 3

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
No. 21-10572, 2023 WL 2407405 (D. Mass. Feb. 16, 2023) .......... 19

*Landon v. Plasencia*,
459 U.S. 21 (1982) .......... 18

*Mass. L. Reform Inst. v. Legal Servs. Corp.*,
581 F. Supp. 1179 (D.D.C. 1984) .......... 4

**Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .......... 6

*MediNatura, Inc. v. Food & Drug Admin.*,
No. 20-cv-02066, 2021 WL 1025835 (D.D.C. Mar. 16, 2021) .......... 3

*Mexichem Specialty Resins, Inc. v. EPA*,
787 F.3d 544 (D.C. Cir. 2015) .......... 18

*Mylan Labs., Inc. v. Leavitt*,
495 F. Supp. 2d 43 (D.D.C. 2007) .......... 3

*Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to Assignment & Assumption of Leasehold Int. Made as of Jan.* 25, 2007,
No. 22-cv-1043, 2024 WL 3443596 (D.D.C. July 15, 2024) .......... 6

*Nat'l Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989) .......... 18

*People for Ethical Treatment of Animals, Inc. v. Barshefsky*,
925 F. Supp. 844 (D.D.C. 1996) .......... 4

*Petty v. Am. Fed'n of Gov't Emps*.,
No. 21-cv-3161, 2026 WL 914934 (D.D.C. Apr. 3, 2026) .......... 10

*Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth*.,
No. 20-cv-03157, 2021 WL 663191 (D.D.C. Feb. 19, 2021) .......... 3

**Soundboard Ass'n v. FTC*,
254 F. Supp. 3d 7 (D.D.C. 2017) .......... 10

**United States v. S. Pac. Transportation Co.*,
543 F.2d 676 (9th Cir. 1976) .......... 16

*United States v. Santa Fe Pacific Railroad Co.*,
314 U.S. 339 (1941) .......... 13, 14

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ........ 3

**Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ........ 4, 5

**Statutes**

5 U.S.C. § 702 ........ 6, 7

25 U.S.C. § 398d ........ 16

**Statutes**

5 U.S.C. § 702 ........ 6, 7

25 U.S.C. § 398d ........ 16

Act of July 28, 1937,
ch. 527, 50 Stat. 536 (1937) ........ 17

Act of July 27, 1866,
ch. 278, § 2, 14 Stat. 292 (1866) ........ 13, 14

Act of July 22, 1854,
10 Stat. 308 (1854) ........ 14

**Rules**

Fed. R. Civ. P. 62(d) ........ 3

**Other Authorities**

91 Fed. Reg. 45,823 (July 21, 2026) ........ 7

## INTRODUCTION

On August 14, 2026, this Court denied Plaintiff's motion for a preliminary injunction. Dkt. #45, #46. The Court rightly found that Plaintiff was not likely to succeed on its claims challenging CBP's construction of a barrier along the U.S.-Mexico border within the Tohono O'odham Reservation ("Tribal Reservation") and that all factors relevant to injunctive relief favored the Federal Defendants. Dkt. #46 at 16. Plaintiff is now seeking appellate review of the Court's order, Dkt. #48, and is asking this Court for an injunction pending appeal. Dkt. #50. Its arguments fall into one of two categories: (1) recycled arguments that Plaintiff again asks the Court to accept because, under its telling, it's easier to get an injunction pending appeal than it is to get a preliminary injunction, and (2) arguments raised for the first time in its motion. All of these arguments—old and new—fail, and the Court should again deny Plaintiff's request for extraordinary relief.

## I. OVERVIEW

Plaintiff filed suit on June 16, 2026, alleging that CBP could not build a border barrier along "approximately sixty-two miles of the international border" between the United States and Mexico. Dkt. #1 ¶ 2. Plaintiff alleged that such activity is unlawful because it would occur "on its Reservation," the southern boundary of which lies along the international border. *Id.* ¶ 8. Plaintiff brought two claims, one for *ultra vires* diminishment of the Tribal Reservation and one alleging federal common law trespass. *Id.* ¶¶ 58–63. In essence, Plaintiff alleged that the Federal Defendants lack authority to protect this stretch of the international border, as directed by Congress, unless Plaintiff consents. This Court correctly rejected both claims in denying Plaintiff's motion for a preliminary injunction. Dkt. #46.

The Court concluded that Plaintiff was unlikely to succeed on its *ultra vires* claim, which would require showing that construction of the planned project (known as the Tucson 5 Project)

would plainly exceed the Federal Defendants' authority. Dkt. #45 at 10–11. The Court recognized that the United States had reserved a sixty-foot strip of land along the U.S-Mexico border for border security purposes in 1907 (the "Roosevelt Reservation"), ten years before the Tribal Reservation was established, and rejected Plaintiff's argument that the Roosevelt Reservation "never existed" on the Tribal Reservation. *Id.* at 11. The Court found that Plaintiff could not show either that the federal government lacks authority to build the Tucson 5 Project within the Roosevelt Reservation or that doing so would impermissibly diminish or change the boundaries of the Tribal Reservation. *Id.* at 13. Second, the Court found that Plaintiff's trespass claim was also likely to fail as it is barred by sovereign immunity and, in any event, it is "at best uncertain" whether Plaintiff could assert a trespass claim against a federal agency for its implementation of federal law, as it tries to do here. *Id.* at 14–16. The Court also questioned whether Plaintiff could succeed on its trespass claim as Plaintiff had not shown that any construction activities would occur outside of the Roosevelt Reservation. *Id.* at 16.

After finding that Plaintiff was "unlikely to succeed on the merits" of either claim, the Court found that none of the remaining *Winter* factors supported Plaintiff's request for preliminary injunctive relief. *Id.* at 16–18. The Court questioned Plaintiff's showing of irreparable harm and properly recognized that any harm Plaintiff could establish at this point was outweighed by "the Government's interests in securing the border, enforcing immigration laws, and ensuring public safety." Dkt. #45, 17. The Court emphasized that Congress "has identified physical border walls as a key component of border security" and found deference to the Government appropriate, given "the national security and foreign policy considerations related to the border wall." *Id.* at 18.

Plaintiff has since filed a notice of appeal and is seeking an expedited hearing, with briefing to conclude in October and oral argument in November. Dkt. #50-1 at 9. Even though Federal

Defendants consented to that request, Plaintiff still moved for an injunction pending appeal. *Id.* The Court's prior analysis provides all the justification needed to reject Plaintiff's rehashed arguments, and the Court should deny Plaintiff's motion.

## II. LEGAL STANDARD

A district court's authority to issue an injunction pending appeal comes from Federal Rule of Civil Procedure 62(d). Fed. R. Civ. P. 62(d). "An injunction pending appeal is an 'extraordinary remedy.'" *Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*, No. 20-cv-03157, 2021 WL 663191, at *1 (D.D.C. Feb. 19, 2021) (quoting *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017)). As court after court in the D.C. Circuit—and the D.C. Circuit itself—has held, an injunction pending appeal is "subject to the same four-factor test as [a] motion for preliminary injunction." *MediNatura, Inc. v. Food & Drug Admin.*, No. 20-cv-02066, 2021 WL 1025835, at *3 (D.D.C. Mar. 16, 2021); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842–43 (D.C. Cir. 1977); *Mylan Labs., Inc. v. Leavitt*, 495 F. Supp. 2d 43, 46 (D.D.C. 2007) (citing *Holiday Tours*, 559 F.2d at 842–43); *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (same). Having already applied that "same four-factor test" on the motion for preliminary injunction, *MediNatura,* 2021 WL 1025835 at *3, the Court should come to the same conclusion here and deny the motion for a stay pending appeal. Plaintiff resists this outcome by insisting that it "is not asking the Court to reconsider [its previous] denial," Dkt. #50-1 at 9. Instead, Plaintiff argues that the standard for an injunction pending appeal is lower than that for a preliminary injunction, requiring a movant to show only that it "has at least raised serious legal questions"—not that it is "likely" to succeed—on the merits. *Id.* at 12–13. Not so.

The central problem with this formulation is that the "serious legal question" standard, where employed, has never been distinct from the traditional preliminary injunction test; rather, it

is an application of that analysis—and an erroneous one at that. Some courts have found that when weighing the four injunction factors, if the other three factors—that is, the factors besides success on the merits—are strong, a lesser showing than "likely" can be made as to success on the merits. *See, e.g.*, *Mass. L. Reform Inst. v. Legal Servs. Corp.*, 581 F. Supp. 1179, 1184 (D.D.C. 1984); *Cigar Ass'n*, 317 F. Supp. 3d at 560 (adopting a sliding approach whereby a strong showing on some factors can make up for weaker showings on others). This balancing approach had been applied to both injunctions pending appeal and preliminary injunctions. *See, e.g.*, *People for Ethical Treatment of Animals, Inc. v. Barshefsky*, 925 F. Supp. 844, 847 (D.D.C. 1996); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215–16 (D.D.C. 1996). The "serious legal question" determination is simply the name for this lesser showing—i.e., it is simply an articulation of the proposition that other injunction considerations, such as the harms and equities, can compensate for a weaker merits showing. *See, e.g.*, *Al–Anazi v. Bush*, 370 F. Supp. 2d 188, 193 n.5 (D.D.C. 2005) (observing, when considering a request for an injunction pending appeal, that the analysis "requir[es] only that the movant demonstrate a serious legal question on appeal" because the other factors strongly favored a stay).

The first problem is that this sliding scale approach is inconsistent with and did not survive the Supreme Court's seminal ruling in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008), which requires a likelihood as to all four factors, including success on the merits. Although the D.C. Circuit has reserved the question, it has recognized the sliding scale approach's "tension" with *Winter*. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235 (D.C. Cir. 2025). Put simply, an injunction pending appeal is not subject to a laxer standard than a preliminary injunction; the standard for both is "the same." *Cigar Ass'n*, 317 F.Supp.3d at 560. And after *Winter*, even a "very strong" showing on other factors cannot make up for a failure to show a

likelihood of success, which is an "independent, free-standing requirement." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

The second problem is that even if a sliding scale approach were good law after *Winter*, the "serious legal question" standard would be inapplicable here. The central premise behind this laxer standard for likelihood of success is that it may be appropriate where the other factors strongly favor relief. But that is not the case here, where this Court has already considered the harms and equities, and found that all the other factors also favor Federal Defendants. *See* Dkt. #45 at 16 ("Because plaintiff is unlikely to succeed on the merits, I could deny relief on that basis alone . . . [b]ut for the sake of completeness, I will briefly address the remaining *Winter* factors, *all of which favor defendants*." (emphasis added)). Therefore, Plaintiff "must establish that he is likely to succeed on the merits." *Winter*, 555 U.S. at 20. This Court has already concluded that it cannot. Having already applied the same analysis on the motion for preliminary injunction, the Court should come to the same conclusion here and deny the motion for an injunction pending appeal.

## III. ARGUMENT

### A. PLAINTIFF IS NOT ENTITLED TO A STAY PENDING APPEAL ON ITS TRESPASS CLAIM

#### 1. Plaintiff is still unlikely to prevail on its trespass claim because there is no applicable waiver of sovereign immunity.

The Court properly held that Plaintiff is unlikely to succeed in its common law trespass claim because "the federal government's sovereign immunity bars its claim." Dkt. #45 at 14. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). A sovereign immunity waiver must be expressed "unequivocally," with any ambiguities in its scope construed "in favor of the sovereign." *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 290–91 (2012).

Plaintiff failed to identify an applicable sovereign immunity waiver in any of its three memoranda in support of its preliminary injunction motion. Dkt. #3-1, #25, #37. The Court correctly recognized Plaintiff's failure to do so: "Plaintiff *does not argue* that any statute waives sovereign immunity here. It couldn't!" Dkt. #45 at 14 (emphasis added). Rather, Plaintiff expressly and repeatedly relied on what it calls the *Larson-Dugan* exception to sovereign immunity. *See, e.g.*, Dkt. #3-1 at 29. But now that the Court has correctly rejected Plaintiff's argument, Dkt. #45 at 14, Plaintiff pivots and for the first time asserts that the sovereign immunity waiver in the Administrative Procedure Act (APA), 5 U.S.C. § 702, allows its claim to proceed. This new theory cannot support Plaintiff's request for an injunction pending appeal and is, in any event, incorrect.

First, Plaintiff cannot obtain relief pending appeal based on a new legal theory that will be unavailable in its appeal. Because Plaintiff did not raise this issue in its motion for a preliminary injunction (or even the reply or supplemental brief in support of that motion), it has forfeited the right to raise it in the D.C. Circuit. *See, e.g.*, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584–85 (D.C. Cir. 2025) (in appeal from a preliminary injunction, party had forfeited legal argument "by failing to raise the issue before the District Court"). And because this theory is not properly part of the appeal, it cannot establish a "likelihood of success," or even a "substantial question," at this stage. *See, e.g.*, *Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to Assignment & Assumption of Leasehold Int. Made as of Jan. 25, 2007*, No. 22-cv-1043, 2024 WL 3443596, at *4, *7 (D.D.C. July 15, 2024) ("This argument, too, is new and thus forfeited and, for that reason alone, does not raise a 'substantial' question.") (denying motion for stay pending appeal); *Denver Bible Church v. Becerra*, No. 20-cv-02362, 2021 WL 1220758, at *3

(D. Colo. Mar. 28, 2021) ("A motion for injunction pending appeal should not be used to raise new arguments that could have been made at the outset in the preliminary-injunction motion[.]").

Second, Plaintiff cannot rely on Section 702 to challenge the Tucson 5 Project because the Secretary of Homeland Security waived the APA "with respect to the construction of physical barriers and roads … in the project area[.]" Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, as Amended, 91 Fed. Reg. 45,823, 45,823–24 (July 21, 2026). Plaintiff acknowledges this but raises the novel argument that the Secretary's waiver does not cover "§ 702's waiver of sovereign immunity." Dkt. #50-1 at 7. Plaintiff does not cite a single case to support this proposition. *Id.* Moreover, its new-found argument is undermined by Plaintiff's prior recognition that the Secretary's APA waiver encompassed the APA's judicial review provision, which is also found in Section 702. *Compare* Dkt. #3-1 at 31 (The "procedure for review of the Nation's statutory claim would have been the APA, *which has been waived.*") (emphasis added), *with* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action … is entitled to judicial review thereof."). Plaintiff does not even acknowledge this inconsistency, much less try to explain why it believes that the Secretary's waiver of the APA was effective as to the *first* sentence of Section 702 but not the *second* sentence of that provision.

**2. <u>Plaintiff is still unlikely to succeed on its common-law trespass claim because it has not shown that such a claim is available against the United States.</u>**

The Court properly found it "at best uncertain" whether an Indian tribe can assert a federal common law trespass claim … against the federal government." Dkt. #45 at 15. In response, Plaintiff merely reiterates its prior arguments. Dkt. #50-1 at 16 (relying primarily on a citation to *Edwardsen v. Morton*, 369 F. Supp. 1359 (D.D.C. 1973), in a footnote in *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 236 n.6 (1985)). But neither *Edwardsen* nor *Oneida* suggests that a

tribe can use a common law trespass action to challenge a federal agency's authority to implement a congressional mandate. In *Edwardsen*, the alleged trespasses were "third-party intrusions," allegedly permitted by the federal government, and not federal agency actions. *Edwardsen*, 369 F. Supp. at 1378. Here, by contrast, Plaintiff alleges that the United States would be in trespass if it carries out its congressionally assigned responsibilities.

The present case is—as the Court stated and Plaintiff reiterated—"a novel case with novel issues." Dkt. #50-1 at 33 (quoting Prelim. Inj. Hrg. (July 23, 2026) Tr. at 32:19–20). The issues at hand relate to federal authorities and obligations, to tribal lands and tribal rights, and to national security and border protection. The common law of torts is not the correct law to govern such a dispute. *See generally* Dkt. 19-1 at 37–40. This Court should confirm its prior conclusion and reject Plaintiff's attempt to shoehorn this dispute into an improper framework.

### 3. Plaintiff is still unlikely to prevail on its trespass claim because it has not established any trespass will occur.

The Court properly recognized that Plaintiff had not established a likelihood of success on its trespass claim because Plaintiff failed to show that "construction activities" would "interfere with [its] land outside the Roosevelt Reservation." Dkt. #45 at 16. In response, Plaintiff now proffers an entirely new trespass theory. As pled and briefed, this litigation has focused on the United States' authority to construct the border barrier at the international boundary between the United States and Mexico. Having failed to convince the Court that it can exclude the U.S. Government from its own international border, Plaintiff now tries to effectively evade that ruling by arguing for the first time that CBP and its contractors would trespass on the Tribal Reservation merely by traversing it—on roads CBP regularly uses—"for border wall construction purposes." Dkt. #50-1 at 17–18. But Plaintiff did not plead this claim in its complaint, and it cannot amend its complaint through briefing. *Compare id*. *with* Dkt. #1 ¶¶ 61–63 (Count II). Nor can Plaintiff

secure a stay pending appeal by relying on a theory it failed to raise in its initial motion for a preliminary injunction. In any event, Plaintiff has not shown (and cannot show) that it is entitled to the extraordinary remedy of preliminary relief based on either its initial claim or this new claim, both of which are barred by sovereign immunity.

a. Plaintiff cannot plead a new trespass claim through briefing or introduce a new legal theory in seeking relief pending appeal.

As pleaded, Plaintiff's trespass claim alleged that the "planned *construction* … will entail *destructive activities* that will permanently alter and degrade Reservation lands and features extending well beyond the border itself." Dkt. #1 ¶ 63 (emphasis added). Plaintiff did not allege—in its complaint or elsewhere—that CBP lacked the authority to use existing roads on the Tribal Reservation to reach the Roosevelt Reservation, whether for border construction or otherwise.[1] This stands in sharp contrast to Plaintiff's current assertion that CBP and its contractors "already have" trespassed on tribal lands merely by traversing existing roads on the Tribal Reservation "with the intent of engaging in border-wall-related activity." Dkt. #50-1 at 17. These new factual allegations and new legal theories do not support the trespass claim that Plaintiff actually pleaded. After all, Plaintiff cannot (and does not) assert that the act of driving "with … intent" constitutes "construction" that is so "destructive" it will "permanently alter and degrade" tribal lands.[2]

[1] Plaintiff's new claim that CBP's *use of existing roads* would constitute trespass is both legally and factually distinct from Plaintiff's previous allegations that the *actual construction* would constitute trespass because it would require "*building* of miles of access roads … that will stretch far inland from the border" and entail "*grading* [] a network of *additional* access roads." *Compare* Dkt. #50-1 at 18 *with* Dkt. #1 ¶ 7 at 3, ¶ 55; Dkt. #3 at 14. The Court has already (and correctly) concluded that Plaintiff's prior allegations failed to show that the planned construction would "interfere with the Nation's land outside the Roosevelt Reservation." Dkt. #45 at 16.

[2] Plaintiff does not provide any justification for failing to raise this claim earlier. Plaintiff knows that CBP has long relied on road rights-of-way it acquired from Plaintiff, along with the public roads on the Tribal Reservation, to access the border. *See*, *e.g.*, Dkt. #50-1 at 17–18; *see generally* Decl. of Beverly Matthews (Aug. 25, 2026) (Dkt. #50-4). And Plaintiff does not (and

(continue)

Again, it is well-established that new claims and theories may not be raised for the first time on appeal. *See, e.g.*, *Independent Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 597–98 (D.C. Cir. 2001). Plaintiff's new, unpled trespass claim and its new factual and legal theories will not be properly before the D.C. Circuit. Because Plaintiff cannot rely on these newly raised issues to challenge the Court's denial of its motion for a preliminary injunction, these arguments cannot supply the basis for an injunction pending appeal. *See, e.g*., *Soundboard Ass'n v. FTC*, 254 F. Supp. 3d 7, 12 (D.D.C. 2017) (holding that "Plaintiff cannot obtain injunctive relief pending appeal on a claim that it [never] pleaded in its Complaint"); *Denver Bible Church v. Becerra*, 2021 WL 1220758, at *3. Plaintiff's failure to plead this new trespass claim means that its new allegations could not have sustained its initial motion for a preliminary injunction any more than its current motion for injunctive relief pending appeal. "Allegations not raised in the pleadings 'may not be the subject of preliminary injunctive relief since plaintiff can show no likelihood of success on a claim that is not even asserted.'" *Petty v. Am. Fed'n of Gov't Emps*., No. 21-cv-3161, 2026 WL 914934, at *3 (D.D.C. Apr. 3, 2026) (citation omitted); *see also Bird v. Barr*, No. 19-cv-1581, 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (Brown Jackson, J.) (A "proper motion for a preliminary injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to the completion of the litigation, and without such a connection between the claim and requested injunction, there is simply no jurisdictional basis for … preliminary relief.") (emphasis added).

This new claim is a distraction as it cannot raise "serious legal questions" about, much less show a likelihood of success on, the claims Plaintiff actually pleaded—claims the Court has

---

cannot) claim that CBP's use of these roads to access the Roosevelt Reservation for geotechnical testing is unexpected. *See*, *e.g.*, Dkt. #50-4 at ¶2 ("There is … no road access to the international border directly from either the east or the west, and [the government and its contractors] therefore need to cross southward through the [tribal] Reservation's interior in order to reach the Reservation's southern border.") (emphasis added).

already found Plaintiff unlikely to succeed on, Dkt. #45 at 16—and has no bearing on the resolution of this motion.

b. Plaintiff's novel right-of-way argument also fails on the merits.

Although Plaintiff's new argument is not properly before the Court, its theory is erroneous and cannot justify the relief sought. Plaintiff's newly discovered interpretation of CBP's right-of-way as foreclosing any "border-wall-related activity" is incorrect. *Contra* Dkt. #50-1 at 17. Plaintiff acknowledges that it granted CBP an "easement for right-of-way for construction, maintenance, operation and repair of portions of the Traditional Northern Road, including necessary and related improvements to that road, such as drainage culverts, low-water crossings, and signage." Dkt. #50-4 ¶ 14 (quoting 2019 Grant of Right-of-Way for Portions of the Traditional Northern Road, BIA TAAMS No. 4200185226 ("TNR ROW") (Dkt. #50-4 at 39 (Attach. F at ¶1))). And Plaintiff recognizes that the TNR ROW covers the BIA 1 Connector Road and the BIA 19 Connector Road—both of which, Plaintiff admits, provide "access … to the border" from public roads on the Tribal Reservation. *Id.* ¶¶ 9, 11; Dkt. #50-1 at 18.

Even though the roads covered by the TNR ROW physically link the public roads on the Tribal Reservation to the border, Plaintiff claims there is no "continuous pathway across the Nation's lands *for purposes of border wall construction*." Dkt. #50-4 at ¶ 16 (emphasis added). This is not so. The TNR ROW does not bar use of covered roads "for border wall construction" or set any express limits on the purpose for which CBP can use the right-of-way, and Plaintiff does not claim otherwise.[3] Instead, Plaintiff appears to argue that a related agreement—which is

[3] Nor can Plaintiff argue that the TNR ROW *implicitly* precludes CBP's use of the covered roads for border construction merely because it does not specify "border construction" as the purpose of the right-of-way. The TNR ROW sets out "construction, maintenance, operation and repair of" the covered roads as its "purpose." Dkt. #50-4 at 39 (Attach. F. ¶1). This list is focused

(continue)

incorporated as "Exhibit F" in the TNR ROW ("Exhibit F")—limits the TNR ROW to uses related to the Integrated Fence Tower ("IFT") system. Dkt. #50-1 at 18; Dkt. #50-4 at 42 (Attach. F ¶ 18).[4] In fact, Exhibit F plainly recognizes a distinction between the TNR ROW and the rights-of-way associated with the IFT System. Dkt. #26 at 6–7 (Attach. A ¶ 1) (describing easements for "(A) individual IFT sites" and "(B) portions of the TNR, Access and Approach Roads" in different terms). Exhibit F does not purport to limit the purposes for which CBP can operate the roads covered by the TNR ROW.[5] Moreover, Exhibit F makes plain that any conditions it imposes are inapplicable if "inconsistent with, or in addition to, the specific terms applicable to each grant of easement for right of way, in which case the specific terms of each individual grant of easement for right of way shall control." *Id*. at 7 (Attach. A) (emphasis added). Thus, the TNR ROW allows CBP and its contractors access to the Roosevelt Reservation, without limitation based on the purpose for which access is used.

---

on the *ways in which* CBP can use the right-of-way and not on the *purposes for which* CBP can use the right-of-way. The plain import is that the TNR ROW *does not limit* the purposes for which CBP can use the roads, not that CBP needs Plaintiff to approve each purpose (or indeed any of the purposes) for which it uses the TNR ROW. *Contra* Dkt. #50-1 at 18 (suggesting that CBP's ability to use the TNR and the Connector Roads for border patrol depends on some further approval by Plaintiff, *beyond* the TNR ROW).

[4] Plaintiff incorrectly refers to Exhibit F as the "2019 IFT Agreement." Dkt. #50-1 at 19 (citing Dkt. #26, Att. A). But the description of this agreement in the TNR ROW shows that it is not limited to the IFT System: "Agreement Between the Tohono O'odham Nation and United States Customs and Border Protection concerning Grants of Easement for Rights-of-Way for Integrated Fixed Tower sites (including Access Roads and Approach Roads), *portions of the Traditional Northern Road*, and Low Water Crossings." Dkt. #50-4 at 42 (emphasis added).

[5] The language Plaintiff quotes from Exhibit F does not support its argument. *Contra* Dkt. #50-1 at 19 (quoting Dkt. #50-4 at ¶ 15 (quoting Dkt. #26, Attach. A ¶ 25)). The quoted language contemplates the need for future rights-of-way "to authorize CBP's *use of Nation's lands outside of*" those listed in Exhibit F; it does not suggest that new easements may be needed based on the *purpose for which* CBP uses a right-of-way. Dkt. #26, Attach. A ¶ 25 (emphasis added).

### B. Plaintiff is not entitled to a stay pending appeal on its *Ultra Vires* claim.

The lower standard of review that Plaintiff seeks to apply at this stage is particularly inappropriate as to its *ultra vires* claim. As the Court recognized, "*ultra vires* review is a high bar," and Plaintiff must show not merely that an agency exceeded its authority but that it acted "so plainly" or "clearly in defiance of" the statutory bounds that one may view the agency's legal error "as jurisdictional or nearly so." Dkt. #45 at 10 (quoting cases). Even if Plaintiff could show a "serious question" as to CBP's authority to build the Tucson 5 Project (which it cannot), that would not be the type of extreme error needed for an *ultra vires* claim and so could not justify preliminary relief pending appeal. Plaintiff premises its claim on "conflicting historical evidence," which "is not the stuff of successful *ultra vires* claims." *Id.* at 13.

#### 1. **<u>Plaintiff has not raised a "serious legal question," much less shown a likelihood of success, as to whether the Roosevelt Reservation attached to its aboriginal lands.</u>**

The Court properly rejected Plaintiff's argument that the Roosevelt Reservation "never existed" on the Tribal Reservation, which was based on Plaintiff's claim that its aboriginal lands were not public and so not subject to the Roosevelt Reservation. Dkt. #45 at 11–13. Although Plaintiff claims it is not seeking reconsideration, Dkt. #40-1 at 9, its primary argument is that the Court "misread" the lone case on which Plaintiff relies to argue that aboriginal tribal lands are not public lands, *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339 (1941). Dkt. #50-1 at 20–22. But it is Plaintiff who misreads *Santa Fe*, failing to recognize that its holding was based on specific statutory language protecting aboriginal title, not the general nature of aboriginal title.

The statute at issue in *Santa Fe* granted a "right of way *through the public lands*" for a railroad. Act of July 27, 1866, ch. 278, § 2, 14 Stat. 292, 294 ("1866 Act § 2") (emphasis added). Recognizing that some lands with "Indian title" (*i.e.*, aboriginal tribal lands) fell "under the

operation of this act," Congress provided express protection for the Indians occupying those lands by requiring that this "Indian title" be extinguished "consistent with public policy and the welfare of the Indians, and *only by their voluntary cession*." *Id*. (emphasis added) (quoted in *Santa* Fe, 314 U.S. at 344). While the Supreme Court affirmed in *Santa Fe* that Congress could protect aboriginal tribal lands in this way, 314 U.S. at 344–47, it never suggested that such lands "were not public," as Plaintiff mistakenly claims. *Contra* Dkt. #50-1 at 13. On the contrary: it is only because aboriginal lands *were considered public lands* that they fell within the right-of-way that the 1866 Act granted "through public lands." 1866 Act § 2.

Plaintiff ignores the import of this plain reference to "public lands" in the 1866 Act and focuses on the *Santa Fe* court's analysis of whether prior statutes had extinguished all aboriginal title in the relevant lands and so prevented Congress from protecting "Indian title" in the 1866 Act. Dkt. #50-1 at 14–15. Plaintiff quotes the *Santa Fe* court as disagreeing that the Act of July 22, 1854, 10 Stat. 308 ("1854 Act") "instituted a policy of non-recognition of Indian title" or "extinguished" Indian title, *id*., but fails to recognize that the Supreme Court expressly limited its analysis to the effect of the 1854 Act on aboriginal land that *was not claimed* under the 1854 Act. *Santa Fe*, 314 U.S. at 349 ("The issue here, however, is not between a settler claiming under the 1854 Act and the Walapais. … Respondent does not claim under that Act and hence can derive no rights from it."). The Supreme Court did not question whether the 1854 Act opened up aboriginal tribal lands for settlement, thus treating them as public lands. *Cf.* Dkt. 50-1 at 13 (land that is "*open to* sale or other disposition under general laws" is "public land") (emphasis added) (quoting *Bardon v. N. Pac. R.R. Co.*, 145 U.S. 535, 538 (1892)). It concluded only that the 1854 Act did not extinguish aboriginal title to *unclaimed* lands. But that is equally true of all public lands that the 1854 Act opened to settlement (*i.e.*, any unclaimed public lands retained their status)

and so cannot distinguish aboriginal tribal lands from other public lands. As of 1907, Plaintiff's aboriginal lands were considered open under the public land laws, and those lands within 60 feet of the U.S.-Mexico border were thus included in the Roosevelt Reservation when it was established. *See generally* Dkt. #19-1 at 29–32; Dkt. #39-1 at 9–11. *Santa Fe* does not suggest otherwise.

Next, Plaintiff reiterates its argument that the "1937 statute that added lands to the Nation's reservation" was "agnostic" as to the existence of the Roosevelt Reservation. Dkt. #50-1 at 15 (citing Dkt. #25 at 16–18 (discussing Act of July 28, 1937, ch. 527, 50 Stat. 536 ("1937 Act"))). But this Court properly recognized that Congress actually "*acknowledged* the existence of the Roosevelt Reservation" in the 1937 Act by providing that the expansion of the Tribal Reservation "'shall not affect … *the reservation of a strip of land sixty feet wide* along the United States-Mexico boundary made by proclamation of the President dated May 27, 1907.'" Dkt. #45 at 12 (quoting 1937 Act). Plaintiff tries, but fails, to blunt the impact of the 1937 Act by comparing it to the proclamation that set apart the Organ Pipe Cactus National Monument, which Plaintiff admits "*unambiguously acknowledg[ed]* the existence of the Roosevelt Reservation." Dkt. #25 at 17–18. But this in fact undercuts Plaintiff's theory because these lands, too, were among Plaintiff's aboriginal lands. *See*, *e.g.*, Dkt. #3-1 at 37 (map showing Plaintiff's aboriginal lands as including what is now Organ Pipe Cactus National Monument). If Plaintiff's theory were correct, the Roosevelt Reservation would thus never have attached to these lands. The proclamation Plaintiff cites is thus another example of the government recognizing that aboriginal tribal lands were among the public lands reserved for border security as part of the Roosevelt Reservation in 1907.

**2. Plaintiff has not raised a "serious legal question," much less shown a likelihood of success, as to whether building a border wall would change the boundary of the Tribal Reservation.**

Plaintiff reiterates its claim that construction of the Tucson 5 Project would violate 25 U.S.C. § 398d but again provides no authority for applying Section 398d in this manner. Dkt. #50-1 at 15–17. Indeed, Plaintiff has not identified a single case in which a federal agency has been found to "violate" Section 398d. This is not surprising: Section 398d was enacted to end the then-common practice of using executive orders to modify or terminate executive order reservations, and it succeeded in doing so. *See, e.g.*, *United States v. S. Pac. Transportation Co.*, 543 F.2d 676, 686 (9th Cir. 1976) ("Before Congress prohibited future changes in Indian reservations by executive order, it was common practice for the President to terminate or reduce in size executive order reservations without payment of compensation."). Plaintiff ignores this history when it wrongly suggests that Section 398d must apply here because "Congress does not legislate to prohibit the impossible." Dkt. #50-1 at 17. Section 398d did not, of course, prohibit the "impossible." Instead, it foreclosed what was then common and is only now seen as "impossible" because Congress succeeded in consolidating its exclusive authority over the legal status of reservations. That Plaintiff is attempting to rely on law that is simply inapplicable to the circumstances is further confirmed by the fact that Plaintiff cites only to "diminishment" cases, that is, cases focused on whether Congress intended a particular statute that authorized disposal of certain tribal lands to affect the legal status of those lands. Dkt. #50-1 at 17. Here, by contrast, the Secretary of Homeland Security is implementing a federal statute that directs it to protect the southwest border of the United States. This is simply not an action that can affect the legal status of tribal lands.

The Court properly rejected Plaintiff's arguments that construction of the Tucson 5 Project would "diminish" the Tribal Reservation, Dkt. #45 at 13, and should do so again.

## IV. REMAINING FACTORS FOR INJUNCTIVE RELIEF

While Plaintiff disputes that it must show a likelihood of success on the merits (*see supra* Br. at 3), it admits that the remaining three factors are the same as on a motion for preliminary injunction. *See* Dkt. #50-1 at 12. The Court has already considered these remaining *Winter* factors—irreparable harm, the equities, and the public interest—and found that they all favor Federal Defendants. Indeed, the motion can be denied on this analysis alone. *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (explaining that the latter three factors can lead to denial of a preliminary injunction, even upon a showing of likelihood of success).

### A. IRREPARABLE HARM

On irreparable harm, Plaintiff cites the same harms it offered in briefing the motion for preliminary injunction. *See* Dkt. #50-1 at 25–26. Based on its conclusion that the Roosevelt Reservation "likely exists along the Nation's border," the Court rightly concluded that Plaintiff had not established that border wall construction within the Roosevelt Reservation would harm its "sovereign and proprietary control over its lands." Dkt. #45 at 17. The Court also recognized that, because the potential environmental and First Amendment harms Plaintiff had identified "could be mitigated," Plaintiff had "not yet established irreparable harm that is 'certain' and 'great.' " *Id.* Now, on what is essentially a motion to reconsider, Plaintiff critiques this Court's prior ruling by arguing that, for an irreparable harm analysis, a deciding court must assume that the movant is successful on the merits. *See* Dkt. #50-1 at 26 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006)). But this flies in the face of D.C. Circuit precedent that says "the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant, but depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment." *Delaware & H. Ry. Co. v. United Transp. Union*, 450 F.2d 603, 619–20 (D.C. Cir. 1971); *see also Int'l Bhd. of Elec. Workers*

*v. Washington Terminal Co*., 473 F.2d 1156, 1167 (D.C. Cir. 1972) (citing *Delaware & H. Ry. Co*., 450 F.2d at 619–20). Indeed, were it otherwise, irreparable harm would be met in any case, no matter how frivolous, so long as the nature of the harm qualified.

Moreover, to be irreparable, an injury "must be both certain and great . . . and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). Plaintiff does not ask the Court to accept merely its legal conclusions as correct, but also its contested factual assertions—a wholly unsupported proposition. Plaintiff argues the Court is "require[d]" to assume that CBP cannot confine its construction activities to the Roosevelt Reservation, i.e., that it will bleed out of the 60-foot boundary as Plaintiff alleges. But the Court has already concluded that Plaintiff has not provided adequate support for this allegation in light of the "significant uncertainties … about the actual scope of construction activities." Dkt. #45 at 16–17. Essentially, Plaintiff's argument for irreparable harm is that such harm exists if the Court were to take Plaintiff's word on every single legal proposition and disputed fact; that proves far too much. This factor favors Federal Defendants, as this Court already correctly held.

### B. EQUITIES AND PUBLIC INTEREST

The equities and public interest remain the same as they were when this Court found "that the Government's interests in securing the border, enforcing immigration laws, and ensuring public safety outweigh" any of Plaintiff's interests. Dkt. #45 at 17. The law is plain that the Government has "compelling interests in safety and in the integrity of our borders." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989); *see also Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("The government's interest in efficient administration of the immigration laws at the border [] is weighty."). This Court agreed, and indeed observed, that "deference to the Government is warranted" in light of the "national security and policy considerations related to

the border wall." Dkt. #45 at 18 (citing *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 723 (D.C. Cir. 2022)).

Now attempting to re-litigate that prior denial, Plaintiff argues that an injunction pending appeal should be granted because it will be shorter than the preliminary injunction it previously sought. Plaintiff argues that, because it has moved (with the Federal Defendants' consent) to expedite the appeal, the requested injunction would only be "for . . . a short period while the Circuit deliberates." Dkt. #50-1 at 27. This argument attempts to wield Federal Defendants' goodwill as a weapon, pointing to their consent to expedited appeal as a reason for this Court to award relief that it already denied. In any event, it is unavailing as the duration of the injunction does not somehow shift the equities and public interest analysis to favor Plaintiff. To the contrary, as put by one court, "the standard for granting a preliminary injunction does not soften based on the fact that its endpoint might not be far off: a preliminary injunction is a preliminary injunction." *Escalante v. Noem*, No. 9:25-CV-00182, 2025 WL 2491782, at *5 n.7 (E.D. Tex. July 18, 2025). An injunction is either warranted or it is not—irrespective of how long it may ultimately last. *See, e.g.*, *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, No. 21-10572, 2023 WL 2407405, at *3 (D. Mass. Feb. 16, 2023) (explaining that "the mere passage of time" does not bear on whether to issue an injunction). Here, the Court correctly found that the third and fourth factors favor the Government. Even taking Plaintiff's point about the potentially shorter duration of an injunction, that means, at most, that this Court's prior holding applies for a shorter duration—not that its analysis somehow flip flops.

The public interest and equities remain the same, favoring the Government now just as it did mere weeks ago. Plaintiff's motion should therefore be denied.

## V. DISTRACTIONS AND RED HERRINGS

Plaintiff's brief is replete with allegations that have no relevance to the issues before the Court, including news articles about other construction projects, social media posts, and unsupported attacks on the conduct of federal officers. These issues are red herrings that should not distract the Court from the legal issues actually before it, which are addressed above. Here, Federal Defendants briefly note why such allegations—which include disappointing but significant mischaracterizations of the government's conduct—have no bearing on the present analysis.

Plaintiff relies, for example, on no fewer than eight news reports and press releases describing alleged border wall-related developments at Big Bend National Park. Dkt. #50-1 at 10–12, 28–29, 32–33. But only the Tucson 5 Project is at issue here, and construction-related activities in or near Big Bend National Park in Texas, or decisions made about security needs in that area, have no bearing on the issues before this Court. Plaintiff does not show otherwise or provide any legitimate basis for introducing these issues, which appear calculated to generate hostility and prejudice. Plaintiff's reference to a social media post as apparent "evidence" that the Federal Defendants do not recognize "the role of the appellate courts in the judicial process," Dkt. #50-1 at 10, makes little sense. It suggests that the Government should self-enjoin even though this Court denied Plaintiff's emergency motion simply because Plaintiff has appealed that decision. Far from "presum[ing] that this Court's preliminary injunction ruling is its final word in this case," Dkt. #50-1 at 2, the post recognizes the obvious reality that the Federal Government may move expeditiously to secure the border when no injunction bars it from doing so.

Plaintiff also falsely charges the government with having violated its "guarantees of consultation and cooperation" by engaging in geotechnical testing within the Roosevelt Reservation over Plaintiff's objections, allegedly with inadequate notice. Dkt. #50-1 at 11

(quoting Dkt. #45 at 18). In fact, Plaintiff has long known that the government planned to conduct this testing. *See*, *e.g*., Dkt. #25 at 25–26. Indeed, the Court rejected Plaintiff's argument that testing along the international border would cause Plaintiff irreparable harm, based on the likely existence of the Roosevelt Reservation "along the Nation's border." Dkt. #45 at 17; *see also* Prelim. Inj. Hrg. (July 23, 2026) Tr. at 31–32. Plaintiff has previously acknowledged that the United States notified it on August 5, 2026, of plans to begin testing on August 10, 2026, and invited it to send its cultural monitors to observe testing. Dkt. #41 at 1. That notice confirmed that "[a]ll of the geotech sites are in the Roosevelt Reservation [and that all were] reviewed against prior cultural resource surveys and other cultural resources data." Dkt. #41-1, Attach. Plaintiff responded by alleging—as it had never done before in this litigation, *see supra* Br. at 8–11—that crossing the Tribal Reservation to conduct geotechnical testing in the Roosevelt Reservation would constitute trespass. Dkt. #44 at 2–3; Dkt. #44-1. Yet Plaintiff ignores this context entirely in criticizing CBP for the additional notice it provided on the morning of August 25, 2026, in which CBP invited Plaintiff to send cultural monitors to observe testing later that morning. Dkt. #50-1 at 11. This notice was provided six hours before "geotechnical testing operations [were] scheduled to begin" (and not, as Plaintiff claims, "one minute" beforehand). *Compare* Dkt. #50-4, Attach. A *with* Dkt. #50-1 at 11. Notably, Plaintiff does not dispute that its cultural monitors were, in fact, able to observe the geotechnical testing.

Regardless, these allegations cannot support Plaintiff's renewed claim for injunctive relief. As explained above, *supra* Br. at 8–11, Plaintiff did not plead, and cannot seek relief based on, claims related to the use of existing roads on the Tribal Reservation. And this Court has already rejected Plaintiff's allegations that injunctive relief is warranted to stop the government from building (much less, as alleged here, testing) in the Roosevelt Reservation. Dkt. #45 at 11–14, 17.

As it does elsewhere, Plaintiff injects this discussion for no readily discernable reason apart from attempting to distract the Court with irrelevant considerations. These issues have no bearing on the actual legal questions that this case turns on, such as whether construction of a border barrier would alter the Reservation's boundaries or if federal presence on the Roosevelt Reservation constitutes an actionable trespass. Plaintiff has not pursued additional relief based on any of these misleading claims, and they are little more than drive-by smears.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff's attempt to re-litigate what this Court already decided is as unmeritorious now as it was mere weeks ago. The Court should deny Plaintiff's motion for injunction pending appeal.

Dated: September 10, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division
U.S. Department of Justice

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

JUDITH B. HARVEY, D.C. Bar 1615789
Chief Legal Advisor

MARISSA A. PIROPATO
Deputy Chief, Natural Resources Section

*/s/ Shawn D. Ren*___________
Shawn D. Ren, Trial Attorney
Natural Resources Section
999 18th St., N Terrace, Suite 600
Denver, CO 80202
Tel: (202) 598-3141
E-mail: shawn.ren2@usdoj.gov

Stacy R. Stoller, D.C. Bar 475035
Office of the Chief Legal Advisor
950 Pennsylvania Ave. NW
Washington, DC 20530
Tel: (202) 598-3555
Email: Stacy.Stoller@usdoj.gov

*Attorneys for Federal Defendants*