**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TOHONO O'ODHAM NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of U.S. Department of Homeland Security; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and ROSARIO VASQUEZ, in his official capacity as Chief of U.S. Border Patrol,<br><br>*Defendants*. | Case No. 26-cv-2127-RJL |

**REPLY MEMORANDUM OF THE TOHONO O'ODHAM NATION**
**IN SUPPORT OF ITS MOTION FOR INJUNCTION PENDING APPEAL**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ vi

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. The "Serious Legal Question" Standard Is the Governing and Appropriate Test for Injunctions Pending Appeal. ........ 1

II. Serious Legal Questions Exist as to the Merits of the Nation's Trespass Claim. ........ 3

A. The Secretary Lacks Sovereign Immunity. ........ 3

B. The Nation Has a Trespass Cause of Action Against Federal Officials. ........ 4

C. The Secretary's Planned Conduct Will Constitute Trespass. ........ 6

III. Serious Legal Questions Exist as to the Nation's Ultra Vires Claim. ........ 10

A. The Roosevelt Reservation Does Not Extend Across the Nation's Reservation Boundary. ........ 10

B. The Secretary's Border Wall Would Change the Nation's Reservation Boundary. ........ 12

IV. The Nation Will Suffer Irreparable Harm Absent an Injunction. ........ 15

V. The Equities Strongly Favor an Injunction Pending Appeal. ........ 17

VI. The Nation Is Appropriately Focused on the Protection of its Lands and Reservation. ........ 18

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Cases**

**A.B.-B. v. Morgan*,
548 F.Supp.3d 209 (D.D.C. 2020) .................... 15

**American Beverage Association v. City and County of San Francisco*,
No. 15-cv-03415, 2016 WL 9184999 (N.D. Cal. June 7, 2016) .................... 17

*American Federation of Labor & Congress of Industrial Organizations v. Department of Labor*,
2025 WL 1783899 (D.D.C. June 27, 2025) .................... 15

**Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) .................... 11

**Bardon v. Northern Pacific Railroad Co.*,
145 U.S. 535 (1892) .................... 11

**Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .................... 15

**Cigar Association of America v. U.S. Food and Drug Administration*,
317 F.Supp.3d 555 (D.D.C. 2018) .................... 2, 3

*Clevinger v. Advocacy Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .................... 2

*Coalition for Humane Immigrant Rights v. Noem,*
*805 F.Supp.3d 48 (D.D.C. 2025)* .................... 15

**County of Oneida v. Oneida Indian Nation*,
470 U.S. 226 (1985) .................... 4, 5, 11

**Cramer v. United States*,
261 U.S. 219 .................... 10, 12

*Davis v. Pension Benefit Guaranty Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .................... 2

*DeCoteau v. District County Court for Tenth Judicial District*,
420 U.S. 425 (1975) .................... 14

*Delaware & Hudson Railway Co. v. United Transportation Union*,
450 F.2d 603 (D.C. Cir. 1971) .................... 16

*Dellinger v. Bessent*,
No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ..................................................... 16

**Edwardsen v. Morton*,
369 F.Supp. 1359 (D.D.C. 1973)........................................................................................ 4, 5

**Entertainment Productions, Inc. v. Shelby County*,
2008 WL 11411138 (W.D. Tenn. Apr. 29, 2008) ............................................................... 17

*Escalante v. Noem,*
*2025 WL 2491782 (E.D. Tex. July 18, 2025)* .................................................................... 17

*Friends of Earth US v. Export-Import Bank of United States*,
2025 WL 3516161 (D.D.C. Oct. 10, 2025) ......................................................................... 15

*Hagen v. Utah*,
510 U.S. 399 (1994) ............................................................................................................ 14

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)........................................................................................... 16

*Harris v. Bessent*,
775 F.Supp.3d 86 (D.D.C. 2025)........................................................................................ 15

**Heritage Foundation v. Department of Justice*,
No. 24-cv-645, 2026 WL 1770708 (D.D.C. June 19, 2026) .............................................. 1, 2

*International Brotherhood of Workers v. Washington Terminal Co.*,
473 F.2d 1156 (D.C. Cir. 1972)........................................................................................... 16

*KPM Analytics North America Corp. v. Blue Sun Scientifc, LLC*,
2023 WL 2407405 (D. Mass. Feb. 16, 2023) ...................................................................... 17

*Mattz v. Arnett*,
412 U.S. 481 (1973) ............................................................................................................ 14

**McGirt v. Oklahoma*,
591 U.S. 894 (2020) ............................................................................................................ 13

**Nebraska v. Parker*,
577 U.S. 481 (2016) ....................................................................................................... 13, 14

**Neurelis, Inc. v. Califf*,
No. 24-cv-1576, 2025 WL 1010222 (D.D.C. Mar. 19, 2025).............................................. 2

*_Northern Lumber Co. v. O'Brien_,
204 U.S. 190 (1907) .......... 11

_Rosebud Sioux Tribe v. Kneip_,
430 U.S. 584 (1977) .......... 14

*_Schilling v. U.S. House of Representatives_,
102 F.4th 503 (D.C. Cir. 2024) .......... 3

_Seymour v. Superintendent of Washington State Penitentiary_,
368 U.S. 351 (1962) .......... 14

_Solem v. Bartlett_,
465 U.S. 463 (1984) .......... 13, 14

_South Dakota v. Yankton Sioux Tribe_,
522 U.S. 329 (1998) .......... 13

*_Swinomish Indian Tribal Community v. BNSF Railway Co._,
951 F.3d 1142 (9th Cir. 2020) .......... 6

*_Texas v. United States Department of Homeland Security_,
123 F.4th 186 (5th Cir. 2024) .......... 4, 6

*_Trump v. Cook_,
609 U.S. ___, 2026 WL 1855613 (June 29, 2026) .......... 3

*_United States v. Dion_,
476 U.S. 734 (1986) .......... 5, 14

_United States v. Facebook, Inc._,
No. CV 19-2184, 2024 WL 291739 (D.D.C. Jan. 12, 2024) .......... 3, 15

*_United States v. Lee_,
106 U.S. 196 (1882) .......... 5

*_United States v. Santa Fe Pacific Railroad Co._,
314 U.S. 339 (1941) .......... 10, 11

*_Winter v. Natural Resources Defense Council, Inc._,
555 U.S. 7 (2008) .......... 2

_Yee v. City of Escondido_,
503 U.S. 519 (1992) .......... 4

**Statutes**

5 U.S.C. § 702 .......... 3, 4

25 U.S.C. § 398d .......... 12, 13

Pub. L. No. 110-161, 121 Stat. 1844 .......... 5

Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) .......... 5, 14, 15

**Regulations**

25 C.F.R. § 169.107 .......... 10

**Other Authorities**

25 Am. Jur. 2d Easements and Licenses .......... 9

## GLOSSARY

| Abbreviation | Term |
|---|---|
| 1937 Presidential Proclamation | Proclamation 2232, President Franklin Roosevelt's 1937 Proclamation establishing the Organ Pipe Cactus National Monument. (Dkt. 27 Attach. B) |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551–559 |
| CBP | United States Customs and Border Protection |
| Department | United States Department of Homeland Security |
| Ehlerman Decl. | Declaration of Paul Michael Ehlerman (Dkt. 26) |
| Enriquez Decl. | Declaration of Paul Enriquez (Dkt. 18-2) |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009 (1996) |
| Kanji Decl. | Declaration of Riyaz A. Kanji (Dkt. 3-15) |
| Matthews Decl. | Declaration of Beverly Matthews (Dkt. 50-4) |
| McMullen Decl. | Declaration of Donna McMullen (Dkt. 39-2) |
| Mem. Op. | Memorandum Opinion (Dkt. 45) |
| Nation Mem. | Memorandum of Points and Authorities in Support of The Tohono O'odham Nation's Motion for Preliminary Injunction (Dkt. 3-1) |
| Nation Notice | Notice of United States' Planned Activity on Tohono O'odham Reservation (Dkt. 41) & Attach. (Dkt. 41-1) |
| Nation Reply App. A | Appendix A (Dkt. 29) to Reply Memorandum of The Tohono O'odham Nation in Support of Its Motion for Preliminary Injunction (Dkt. 25) |
| Opening Mem. | Memorandum of Points and Authorities in Support of The Tohono O'odham Nation's Motion for Injunction Pending Appeal (Dkt. 50-1) |
| Secretary | The Secretary of the United States Department of Homeland Security; the Commissioner of United States Customs and Border Protection; and the Chief of United States Border Patrol |
| Sec'y Resp. | Defendants' Response in Opposition to Plaintiff's Motion for Injunction Pending Appeal (Dkt. 53) |
| Section 102 | Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1966, as amended (and codified as amended at 8 U.S.C. § 1103 Statutory Notes: Improvement of Barriers at Border) |

| | |
|---|---|
| Section 398d | 25 U.S.C. § 398d |
| Senseney Decl. | Declaration of Christopher T. Senseney, PhD. P.E. (Dkt. 3-3) |
| Third Kanji Decl. | Third Declaration of Riyaz A. Kanji (Dkt. 50-5) |
| Tr. | Transcript of Motion Hearing Held Before the Honorable Judge Richard J. Leon, United States District Judge (July 22, 2026) |

## INTRODUCTION

The grant of an injunction pending appeal is ultimately an exercise in judicial humility. It constitutes a recognition by a court that, even though it saw fit to deny a request for a preliminary injunction, the court of appeals might see things differently given uncertainties in the law and facts governing a particular case. The Secretary's response distills to the proposition that this Court should dispense with all such humility—that even though the Court has recognized that "[t]his is a novel case with novel issues of great significance," Tr. 32:19–20, it should shut its mind to the possibility that the Circuit might disagree with even a single aspect of its holding.

The Secretary accordingly fails to engage with the Nation's key arguments as to why the Circuit might well hold that it is entitled to preliminary relief—arguments that, as explained in the Nation's motion and developed further below, amply warrant preservation of the status quo until the Circuit has an opportunity to complete its expedited review of the Nation's appeal. *See* Order at 1, No. 26-5306 (D.C. Cir. Sept. 9, 2026). The Secretary has made it clear that, if the Court does not act, he will feel at liberty to begin bulldozing and blasting the Nation's ancestral lands the moment his contractors are ready. It would be entirely appropriate and equitable for this Court to pause this irreversible and profoundly harmful activity for a brief period of time.

## ARGUMENT

### I. The "Serious Legal Question" Standard Is the Governing and Appropriate Test for Injunctions Pending Appeal.

In its opening memorandum, the Nation noted that courts in this District have repeatedly held that an injunction pending appeal may be granted if the other injunctive relief factors are satisfied and "a serious legal question" is presented, *Heritage Found. v. Dep't of Just.*, No. 24-cv-645, 2026 WL 1770708, at *1 (D.D.C. June 19, 2026) (citation omitted). The Secretary contends that "the 'serious legal question' standard" is "erroneous" and "did not survive the

Supreme Court's seminal ruling" in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Sec'y Resp. 3–4. But numerous post-*Winter* cases from this district apply the standard to motions for an injunction pending appeal. *See* Opening Mem. 4–5 (citing *Heritage Found.*, 2026 WL 1770708, at *1; *Neurelis, Inc. v. Califf*, No. 24-cv-1576, 2025 WL 1010222, at *2 (D.D.C. Mar. 19, 2025); *Cigar Ass'n of Am. v. U.S. Food and Drug Admin.*, 317 F.Supp.3d 555, 560 (D.D.C. 2018)).

The Secretary's cases do not suggest otherwise. Both *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230 (D.C. Cir. 2025), and *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288 (D.C. Cir. 2009), Sec'y Resp. 4–5, address the standard for a preliminary injunction, and neither says a word about injunctions pending appeal. *See Clevinger*, 134 F.4th at 1233; *Davis*, 571 F.3d at 1291. And *Cigar Association*, Sec'y Resp. 4, unequivocally declares that "the district judges in this Circuit continue to adhere to binding precedent" applying the serious legal question standard and that "[t]his court must do the same," 317 F.Supp.3d at 560.

There is no inconsistency between this approach and *Winter.* A district court can conclude that a plaintiff is unlikely to succeed on the merits while recognizing that a substantial enough question exists that the Circuit might hold otherwise. Indeed, if the Secretary's contrary approach were correct, injunctions pending appeal would be written out of the rulebook. A court could never grant such a motion after denying a preliminary injunction without reversing itself on the prior denial. That clearly is not the law:

> [B]y its own terms Rule 62(d) necessarily envisions situations in which a district court that has denied an injunction still grants an injunction pending appeal…. even if the court that just denied injunctive relief believes its analysis in denying relief is correct in that the movant cannot show a likelihood of success on the merits…. so long as the movant establishes a serious legal question on the merits and shows that the other three factors tip sharply in its favor.

*United States v. Facebook, Inc.*, No. CV 19-2184, 2024 WL 291739, at *1 (D.D.C. Jan. 12, 2024) (citation modified); *see also Cigar Ass'n*, 317 F.Supp.3d at 561 (an injunction pending appeal is appropriate where the movant has raised questions sufficiently difficult as to be "fair ground … for more deliberative investigation" by the Court of Appeals, which "might well disagree with this court's resolution" of the merits (citation omitted)).

## II. Serious Legal Questions Exist as to the Merits of the Nation's Trespass Claim.

### A. The Secretary Lacks Sovereign Immunity.

The D.C. Circuit has held that the *Larson-Dugan* doctrine allows for lawsuits against federal officials who act "outside of the scope of their duty … imposed by the common law." *Schilling v. U.S. House of Representatives*, 102 F.4th 503, 506 (D.C. Cir. 2024); *see* Opening Mem. 6. The Secretary again fails to identify any authority suggesting that this doctrine is inapplicable to common law trespass claims. Nor does he even attempt to explain why that would be the case, or how any such conclusion can be squared with the Supreme Court's recent reaffirmation that a plaintiff "may sue in equity without a congressionally-provided cause of action to prevent an injurious act by a [federal] public officer," *Trump v. Cook*, 609 U.S. ___, 2026 WL 1855613, at *11 n.2 (June 29, 2026) (citation modified); *see* Sec'y Resp. 5–6. The Secretary's lack of a response makes it is all the more possible that the Circuit could conclude that a rule framed squarely in terms of common law claims applies to a common law trespass claim.

Yet even if the Court were to conclude that there is no serious possibility that the Circuit will so hold, there would still exist a serious legal question regarding the availability of sovereign immunity due to the waiver in 5 U.S.C. § 702. *See* Opening Mem. 7. The Secretary insists that the Nation has forfeited any such argument, Sec'y Resp. 6, but that is incorrect, even leaving

aside the early stage of these proceedings: "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). On the substance of the argument, the Secretary barely puts up a fight. He has not disputed that § 702 applies to non-APA claims. *See* Opening Mem. 7 (citing cases); *see also Texas v. United States Dep't of Homeland Sec.*, 123 F.4th 186, 192 (5th Cir. 2024) (holding that § 702 waives sovereign immunity for common law trespass claims against the United States). Nor has he tried to explain how a waiver of sovereign immunity is a "legal requirement" subject to his waiver authority under the IIRIRA.

But to be crystal clear: The Nation is in no way "pivot[ing]," Sec'y Resp. 6, from its *Larson-Dugan* argument—to the contrary, it underscores here that it is willing to rest on that argument, which the Secretary entirely fails to counter. This Court need not reach the § 702 argument to conclude that sovereign immunity does not obtain where the Nation has alleged that the Secretary is acting in excess of legal authority.

**B. The Nation Has a Trespass Cause of Action Against Federal Officials.**

The Supreme Court has held that "the Indians' common-law right to sue" for trespass "is firmly established." *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 233 (1985); *see also id.* at 235–236 & n.6 (collecting cases). The Secretary maintains, however, that tribes have been uniquely dispossessed of the right to bring common law trespass claims for injunctive relief against federal officials. Sec'y Resp. 7–8.

The Secretary still has cited no case supporting his position, *see id.* 8–9, and his effort to distinguish *Edwardsen v. Morton*, 369 F.Supp. 1359 (D.D.C. 1973), only underscores its relevance. While *Edwardsen* involved "third-party intrusions," Sec'y Resp. 8, it expressly

recognized that tribes may bring an "action for trespass" "*against federal officers*" who enable those third parties to enter tribal land, 369 F.Supp. at 1378–79 (emphasis added). Indeed, the involvement of third parties makes *Edwardsen* particularly analogous to this case, where the Nation is suing federal officers to prevent them from directing federal contractors to trespass on the Reservation.

The Secretary also suggests that the Nation cannot sue him for trespass because he is "implement[ing] a congressional mandate" and "carr[ying] out [his] congressionally assigned responsibilities." Sec'y Resp. 8. But the fact that the Secretary's responsibilities include protecting the border does not mean that he may do anything and everything to accomplish that goal. Federal officials are limited to their congressionally delegated authority, and the Secretary has not identified any federal law authorizing him to trespass on the Nation's Reservation. The IIRIRA does not mandate construction of a wall "in [any] particular location," IIRIRA Section 102(b)(1)(D), and requires only that the Secretary "construct reinforced fencing along not less than 700 miles" of the approximately 2,000-mile southern border, Pub. L. No. 110-161, § 564, 121 Stat. 1844, 2090 (amending IIRIRA § 102(b)(1)(A)). None of this comes close to authorizing federal officials and their agents to trespass, let alone to trespass on tribal land—a step that would have required Congress to consider the conflict between the authorization of trespass and the Nation's rights and to have clearly and deliberately chosen to abrogate those rights. *See United States v. Dion*, 476 U.S. 734, 739–40 (1986); *see also Oneida*, 470 U.S. at 247–48 (applying standard to abrogation of tribal rights in "nontreaty" lands).

Moreover, the Secretary's position would have the inexplicable effect of depriving tribes of rights that other plaintiffs indisputably possess. It has long been understood that the tort of trespass runs against governmental officers. *See United States v. Lee*, 106 U.S. 196, 220–221

(1882) (rejecting "that the courts cannot give remedy when the citizen has been deprived of his property…, converted to the use of the government without any lawful authority … because the president has ordered it …. If such be the law of this country, it sanctions a tyranny"). That understanding has extended specifically to trespass actions for equitable relief against the Department, and the Secretary's predecessors-in-office, for conduct by federal agents at the southern border. *See Texas*, 123 F.4th at 192 (enjoining federal officials from allowing Border Patrol agents to continue cutting wire fencing that the State of Texas had placed along part of the border). It is entirely unclear why, as the Secretary contends, tribes would be uniquely dispossessed of the time-honored right to sue federal officials to prevent trespasses.

**C. The Secretary's Planned Conduct Will Constitute Trespass.**

A serious legal question exists as to whether the Roosevelt Reservation ever attached to the Nation's lands. Opening Mem. 9–15; *infra* 10–12. If it did not, then the Secretary's planned construction project would necessarily constitute significant trespass on lands with respect to which the Nation holds the right to occupy and exclude. *See Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1160 (9th Cir. 2020) (recognizing "federal common law right of tribes to exclude non-Indians from Indian lands").

But the Court need not revisit the Roosevelt Reservation issue to conclude that the Secretary will necessarily have to trespass on the Nation's lands to accomplish his wall project, as the Nation has adduced uncontroverted evidence that it will be impossible for the Secretary to confine construction activities to within sixty feet of the border. The Secretary's response entirely fails to engage with, let alone to refute, the following points.

<u>First</u>, building the wall along the border will require blasting through and leveling mountains, which cannot be contained within sixty feet. Senseney Decl. ¶¶ 24–32. Paul

Enriquez, CBP's Director of Infrastructure, has acknowledged that wall construction will require blasting through "four particular mountainous locations," Enriquez Decl. ¶ 26, and has nowhere claimed that such activity can be restricted to a sixty-foot corridor.

At the preliminary injunction hearing, counsel for the Secretary accordingly conceded that "if you … restrict us to the 60-foot zone, then you've got difficult engineering challenges ahead of you[.]" Tr. 19:18–20. Although counsel asserted that the Secretary could seek the Nation's consent for the wall to "meander[]" inland, Tr. 20:6, it is clear the Nation will not consent to construction that would divide the Reservation, with the Nation's citizenry on one side of the wall and its sacred peaks and substantial borderlands on the other. No amount of design work can change the fact that either of the two options—mountain blasting or reservation partition—will constitute a trespass.

Second, border wall construction necessarily "requires extensive staging areas, material storage, equipment parking, and portable concrete batch plants that extend hundreds to thousands of feet beyond the immediate border corridor[.]" Senseney Decl. ¶ 43. Director Enriquez has again acknowledged that such staging areas could stretch hundreds of feet north of the border. Enriquez Decl. ¶ 20.

Third, the project will require multiple east-west access roads to be constructed far beyond the sixty-foot corridor, as well as switchback roads for heavy machinery to access the mountainous areas of the Reservation. Senseney Decl. ¶¶ 24–32. Such roads have been commonplace in the Secretary's recent border wall projects. Nation Reply App. A. The contract between the Secretary and his border wall contractors, which the Secretary did not produce to the Court or the Nation until the filing of his supplemental brief, and which the Nation hence could

not previously rely on, confirms that "[t]he minimum number of roads needed for proposed actions must be constructed[.]" McMullen Decl. ¶ 6 & Ex. 4 ¶ 16 (filed July 30, 2026).

That last statement undermines any prior suggestion by the Secretary that no access roads will be needed for the project. *See, e.g.*, Enriquez Decl. ¶ 21. And it points to a fundamental flaw in the Secretary's trespass arguments. This Court never shut the door on the question whether the Nation will be able to establish trespass as a factual matter. Rather, it said that "[a]t this early stage, plaintiff has not established a clear showing of entitlement" to trespass relief, Mem. Op. 16 (quotation marks omitted).

No one has argued that access roads would be confined to within sixty feet of the border (they would serve no purpose if they were), and the claim that no access roads would be needed for the project was always fanciful. *See* Senseney Decl. ¶ 11 (cataloging the Secretary's extensive use of access roads on border wall project in proximity to the Reservation). Now that it is clear that the use of such roads is contemplated under the contract—and despite his complete failure to counter the other ways in which he will have to trespass—the Secretary nevertheless expects this Court to adhere to its prior assessment of the merits as if it were set in stone. This Court has never said that it was.

And there is more in this regard. In declining to grant preliminary relief, this Court also noted that "[t]he contractor has been instructed to confine the project footprint … to the 60-foot Roosevelt Reservation." Mem. Op. 16 (quoting Enriquez Decl. ¶ 13). However, as evidenced by facts that again were not available at the time of this Court's decision, the Secretary and his contractors have demonstrated the stipulations in their contract to be meaningless when it comes to the Nation's rights. The contract provides that "[n]o [interior Reservation] roads are currently approved for accessing the project area" and that "the contractor shall not assume they will be

permitted to access the project location from the North through the Tohono O'odham Reservation." McMullen Decl. ¶ 4 & Ex. 2 § 8.2. And yet, as described more fully in the Nation's opening memorandum, Opening Mem. 3, 11–12, Department contractors and an escort of CBP and Border Patrol officers entered the Reservation on August 25, 2026, to conduct "geotechnical surveying activities" in furtherance of the border wall project, Third Kanji Decl. ¶ 2 & Attach. A at 1. Over the Nation's strenuous objections, they (in the words of the contract) traveled "from the North through the … Reservation," McMullen Decl. ¶ 4 & Ex. 2 § 8.2.

The Secretary spills a great deal of ink in arguing that the Nation's accounting of the contractor events means that the Nation is improperly asserting a new claim not encompassed in its Complaint or requested injunction. Sec'y Resp. 9–11. But the Secretary's protestations should not be allowed to obscure the critical point about those events: The use of arterial roads deemed to be off limits by the contract clearly evidences that the Secretary and his contractors do not intend to hold themselves to the assurances in that contract. This Court relied on those assurances in finding that "significant uncertainties remain," Mem. Op. 16, about the scope of the project work. The assurances have evaporated, and so too should this Court's reliance on them.

Finally, the Secretary's contention that the CBP easement authorizes contractors to access the border wall for construction, Sec'y Resp. ¶¶ 11–12, is simply baffling. As an initial matter, the Traditional Northern Road runs parallel to and does not encompass any right of access to the putative Roosevelt Reservation. Matthews Decl. ¶ 12. Moreover, "[t]he scope of an easement is defined by the terms of the instrument creating it." 25 Am. Jur. 2d Easements and Licenses § 61. The limited scope of this easement, and the restrictions against any expansion of that scope, are plain on the document's face: It provides that the easement is "for construction, maintenance, operation and repair of portions of the Traditional Northern Road," Matthews Decl. ¶ 14 &

Attach F., that the easement will remain in force for twenty-five years or "so long as the right-of-way is used *for the purpose above specified*," *id.* (emphasis added), and that "changes in use [are] not permitted in the grant," *id.* § 3(A)(1). Nor can there be any argument that these limitations—to which CBP agreed when it negotiated the 2019 Integrated Fixed Tower Agreement pursuant to which the easement was granted, *see* Ehlerman Decl. ¶ 4 & Attach. A at PDF pp. 7–8—are not valid. *See* 25 C.F.R. § 169.107 ("For a right-of-way across tribal land, the applicant must obtain tribal consent," and the tribe "may impose restrictions or conditions[.]"). There is simply nothing in this easement instrument providing any support to the Secretary's notion that it grants contractors a right of access to the border for wall construction purposes.

## III. Serious Legal Questions Exist as to the Nation's Ultra Vires Claim.

### A. The Roosevelt Reservation Does Not Extend Across the Nation's Reservation Boundary.

As the Nation argued in its preliminary injunction briefing and in its opening brief on this motion, the Roosevelt Reservation attached only to "public lands" in 1907. Because the Nation then held its lands in unextinguished aboriginal title, and because lands subject to such title are not public lands, the Roosevelt Reservation did not attach to the lands at the Nation's southern boundary. *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339 (1941), was among the numerous Supreme Court precedents the Nation relied on in support of this argument.

Without grappling with any of those other precedents, the Secretary contends that the Nation "misreads *Santa Fe*, failing to recognize that its holding was based on specific statutory language protecting aboriginal title, not the general nature of aboriginal title." Sec'y Resp. 13. But *Santa Fe* is crystal clear in premising its analysis of aboriginal title on the latter:

> "Unquestionably it has been the policy of the federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States." *Cramer v. United States*, 261 U.S. 219,

> 227…. This policy was first recognized in *Johnson v. M'Intosh,* 8 Wheat. 543…, and has been repeatedly reaffirmed…. As stated in *Mitchel v. United States*, supra, 9 Pet. at page 746 …, Indian "right of occupancy is considered as sacred as the fee-simple of the whites." …. [L]ands within the Mexican Cession were not excepted from the policy to respect Indian right of occupancy.

314 U.S. at 345 (citations omitted).

The Supreme Court has described this same aboriginal right as "a right of exclusive use and occupancy," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 536 n.4 (1987) (citation omitted), and while the Secretary seeks to obscure the clear thrust of *Santa Fe* in a tangle of statutory particulars, Sec'y Resp. 13–14, he has no answer for *Santa Fe*'s unequivocal recognition that aboriginal title confers a "right … as sacred as the fee-simple of the whites," *Santa Fe*, 314 U.S. at 345 (quotation marks omitted). Indeed, more recently, in distilling over a century's worth of case law (including *Santa Fe*), the Supreme Court squarely held that aboriginal title confers "the unquestioned right of the Indians to the exclusive possession of their lands," which is "a *federal* right to the lands" that tribes may sue to enforce, including for ejectment and "against trespassers on their land," *Oneida*, 470 U.S. at 235–36 (quotation marks omitted). These are, of course, core property rights that cannot be extinguished absent "plain and unambiguous" action of Congress, *id*. at 247–48 (quoting *Santa Fe*, 314 U.S. at 346). It strains credulity well beyond the breaking point to suggest that lands to which such rights have attached are, at the same time, "considered open [to sale] under the public land laws," as the Secretary nakedly asserts. Sec'y Resp. 15.

Indeed, when the Roosevelt Reservation was established in 1907, it was "long settled" that "[a]ll land, to which *any claims or rights of others* have attached, does not fall within the designation of 'public land,'" *Bardon v. N. Pac. R. Co*., 145 U.S. 535, 538 (1892) (emphasis added), a principle the Court reaffirmed just months before the Roosevelt Reservation was established, *see N. Lumber Co. v. O'Brien*, 204 U.S. 190, 196 (1907) (quoting same); *see also,*

*e.g.*, *Cramer v. United States*, 261 U.S. 219 (1923) (interpreting statute excluding lands already "reserved … or otherwise disposed of" from grant of "public land" and concluding that "we have no doubt" that land subject to unextinguished aboriginal rights "falls within the clause of the grant excepting from its operation lands 'reserved * * * or otherwise disposed of'").

The Secretary next asserts that the reference to the Roosevelt Reservation in the 1937 Presidential Proclamation establishing the Organ Pipe National Monument "undercuts Plaintiff's theory because these lands, too, were among Plaintiff's aboriginal lands." Sec'y Resp. 15. The Secretary overlooks that when President Franklin Roosevelt issued that proclamation in 1937, it was the official position of the United States that the Nation's aboriginal rights were limited to the lands within its 1917 Reservation boundaries and that it never held such rights outside of those boundaries. *See* Kanji Decl. ¶ 9 & Attach. H. at 203 ("the boundaries" within which the Nation held aboriginal rights "substantially conform to the present boundaries of the Sells Reservation in southern Arizona"); *see also id*. at 67 ("The Sells Papago Reservation substantially includes the aboriginal use and occupancy areas of the Papagos[.]"). President Roosevelt would have had no reason in 1937 to view the status of the lands set apart by his proclamation in a manner contrary to the United States' official view.

### B. The Secretary's Border Wall Would Change the Nation's Reservation Boundary.

The Secretary asserts that "Plaintiff has not identified a single case in which a federal agency has been found to 'violate' Section 398d. That is not surprising: Section 398d was enacted to end the then-common practice of using executive orders to modify or terminate executive order reservations, and it succeeded in doing so." Sec'y Resp. 16. However, that no such case exists simply reflects that the executive branch has consistently respected the exclusive domain of Congress delineated with such unambiguous clarity in the statute. Longstanding

compliance with a statutory prohibition hardly renders it obsolete or, in the Secretary's terminology, "simply inapplicable," Sec'y Resp. 16. Indeed, the Secretary has pointed to not a single instance in the century since Section 398d was enacted in which an executive branch agency lawfully diminished an executive order reservation absent the explicit assent of Congress.

In addition to wishing away the applicability of Section 398d, the Secretary seeks to do the same with an entire body of Supreme Court precedent. To that end, he faults the Nation for citing "'diminishment' cases," *id*. But the Supreme Court's diminishment cases speak directly to the issue raised by the Nation's argument under Section 398d. *See, e.g.*, *Nebraska v. Parker*, 577 U.S. 481, 487–88 (2016) ("'[O]nly Congress can divest a reservation of its land and *diminish its boundaries*,' and its intent to do so must be clear." (emphasis added) (quoting *Solem v. Bartlett*, 465 U.S. 463, 470 (1984))); *McGirt v. Oklahoma*, 591 U.S. 894, 903 (2020) (same); *S. Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 333 (1998) (addressing whether "Congress diminished the boundaries of the Yankton Sioux Reservation").

This body of precedent accordingly sets forth the controlling standard of congressional clarity for determining whether "[c]hanges in the boundaries of reservations created by Executive order" have been "made … *by Act of Congress*," 25 U.S.C. § 398d (emphasis added). *See, e.g.*, *Solem*, 465 U.S. at 470 (stating that Congress's intent to alter the boundaries of an Indian reservation "will not be lightly inferred" but instead requires that "Congress clearly evince an intent to change boundaries" (citation modified)); *Parker*, 577 U.S. at 488 (Congress's "intent to do so must be clear"). Here, the Secretary asserts that he "is implementing a federal statute that directs [him] to protect the southwest border of the United States. This is simply not an action that can affect the legal status of tribal lands." Sec'y Resp. 16. The Nation spent several pages refuting this contention in its opening brief on this motion. *See* Opening Mem. 15–17. The

Secretary responds to none of that discussion, including the Supreme Court's clear admonition that foreclosing land's "use … as an Indian reservation—and … set[ting] [it] aside for other public purposes"—precisely what the Secretary seeks to do here—is among the "hallmarks of diminishment," *id*. at 15–16 (quoting *Parker*, 577 U.S. at 489). That cardinal principle undercuts any suggestion that reservation diminishment is not at stake in this case.

Nor has the Secretary ever suggested that the statutes under which he claims authority meet the standard requiring clear and unambiguous evidence of explicit congressional intent to curtail or abrogate tribal property rights. *See* Nation Mem. 32–33. And in every one of its diminishment precedents, the Supreme Court has applied that standard to statutes acting on a *specific* reservation belonging to a *specific* tribe, reflecting the requirement that "Congress actually considered the conflict between its intended action" and a tribe's rights "and chose to resolve that conflict by abrogating" the latter, *Dion*, 476 U.S. at 739–40.[1] As discussed above, the IIRIRA does not come close to meeting that standard. *See supra* p.5.[2]

---

[1] *See, e.g.*, *Solem*, 465 U.S. at 472–73 (finding no diminishment where statute authorized sale "of all that portion of the Cheyenne River and Standing Rock Indian reservations … within the following described boundaries"); *Hagen v. Utah*, 510 U.S. 399, 412 (1994) (finding diminishment of Uintah Reservation where statute restored certain lands "within *said reservation*" to the public domain (emphasis added)); *Mattz v. Arnett*, 412 U.S. 481, 494–95 (1973) (finding no diminishment where statute authorized "sale of lands known as the Klamath River Indian Reservation"); *Parker*, 577 U.S. at 483 (finding no diminishment where statute authorized sale of "the Tribe's land west of the right-of-way"); *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 355 (1962) (finding no diminishment where statute contained no language "expressly vacating the South Half of the [Colville] reservation"); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 613–14 (1977) (where statutes authorized sale "'of [a specific] portion of the Rosebud Indian Reservation' …. [t]he intent of Congress … was to change the boundaries of the … Rosebud Reservation"); *DeCoteau v. Dist. Cnty. Ct. for Tenth Jud. Dist.*, 420 U.S. 425, 445 (1975) (finding diminishment where statute ratified relinquishment of tribes' rights in "the unallotted lands within the limits of the reservation set apart to said bands of Indians as aforesaid").

[2] The IIRIRA's only reference to tribes appears in the general consultation requirement of Section 102(b)(1)(C)(i), which requires the Secretary to consult with numerous types of persons

In sum, the Secretary's responses on the Nation's ultra vires claim only act to underscore its seriousness. While the Court deemed it unlikely that the Nation would succeed on that claim, the fact that each of the Secretary's arguments is subject to a serious counter at the very least suggests that the Circuit could well see things differently, again warranting issuance of an injunction that will allow the Circuit to consider the claim before the Secretary's bulldozers descend on the Reservation.

**IV. The Nation Will Suffer Irreparable Harm Absent an Injunction.**

Under controlling D.C. Circuit precedent, a proper assessment of the irreparable harm test "assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). This Court has previously agreed. *See A.B.-B. v. Morgan*, 548 F.Supp.3d 209, 221 (D.D.C. 2020) (Leon, J.) ("[T]he Court must assume plaintiffs' likelihood of success on the merits when assessing whether irreparable harm exists." (citing *Chaplaincy*, 454 F.3d at 303)). So have other judges in this district who have recently addressed this issue. *See, e.g.*, *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, No. CV 25-339, 2025 WL 1783899, at *11 (D.D.C. June 27, 2025) (Bates, J.); *Friends of Earth US v. Exp.-Imp. Bank of United States*, No. 1:25-CV-02235, 2025 WL 3516161, at *13 n.16 (D.D.C. Oct. 10, 2025) (Nichols, J); *Coal. for Humane Immigrant Rts. v. Noem*, 805 F.Supp.3d 48, 100 (D.D.C. 2025) (Cobb, J.); *Harris v. Bessent*, 775 F.Supp.3d 86, 95 (D.D.C. 2025) (Contreras, J.); *United States v. Facebook, Inc.*, No. CV 19-2184, 2024 WL 291739, at *2 (D.D.C. Jan. 12, 2024) (Kelly, J.).

---

and entities, including "Indian tribes" and "property owners," "near the sites at which … fencing is to be constructed." But that duty is not specific to tribal interests or rights, it in no way contemplates the abrogation of those rights, and indeed it explicitly states that the consultation requirement does not "create or negate any right of action" of any "person or entity," *id.* § 102(b)(1)(C)(ii)(I).

The Secretary counters that this plethora of contemporary authority "flies in the face of D.C. Circuit precedent," citing two Circuit decisions issued more than half a century ago. Sec'y Resp. 17–18 (citing *Delaware & H. Ry. Co. v. United Transp. Union*, 450 F.2d 603, 619–20 (D.C. Cir. 1971), and *Int'l Bhd. of Elec. Workers v. Washington Terminal Co.*, 473 F.2d 1156, 1167 (D.C. Cir. 1972)). The Secretary's only argument as to why this Court should side with such stale authority over recent Circuit precedent and the overwhelming consensus of the lower courts in this district is that "were it otherwise, irreparable harm would be met in any case, no matter how frivolous, so long as the nature of the harm qualified," *id*. at 18. Yet the Secretary's incredulity is misplaced because the irreparable harm prong does in fact turn on whether "the nature of the harm qualifie[s]," *id.*, and must be determined by the Courts "before the merits are resolved," *Hanson v. D.C.*, 120 F.4th 223, 244 (D.C. Cir. 2024); *see also Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025) ("Rule 65 authorizes a district court to issue … a preliminary injunction to prevent irreparable injury and to preserve the status quo *while the district court assesses the merits of a case*." (emphasis added)).

The Secretary has nowhere responded to the Nation's arguments as to why the harms it has asserted qualify as irreparable, other than to say that the Nation "cites the same harms it offered in briefing the motion for preliminary injunction," Sec'y Resp. 17. That is true. The Nation does not need to concoct injuries. The ones it has identified—including affronts to its sovereign and proprietary interests in its lands, and grave environmental damage—constitute quintessential forms of irreparable harm. Opening Mem. 18–19. The Nation seeks only to forestall any imposition of these harms for long enough for the Circuit to assess the merits of its claims—on an expedited basis—which is precisely what Rule 62(d) contemplates in a case such

as this one, in which the potential harms are grave and irreparable, and the merits are at a minimum subject to serious legal question.

## V. The Equities Strongly Favor an Injunction Pending Appeal.

The Secretary asserts that "[t]he equities and public interest remain the same" as when the Court denied the Nation's motion, Sec'y Resp. 18, once again resting on the premise that the Court's denial of a preliminary injunction compels the same outcome here. To do so, the Secretary denies the relevance of a critical factor: that the instant motion seeks only to enjoin construction during the pendency of an expedited appeal, such that any harms to the government must accordingly be viewed through that lens.

Case law supports the Nation's position. In *American Beverage Association v. City and County of San Francisco*, No. 15-cv-03415, 2016 WL 9184999 (N.D. Cal. June 7, 2016), for example, the district court granted an injunction pending appeal after denying the requested preliminary injunction where there was a lack of clear precedent regarding the claims in issue and "there [was] a good chance that the injunction pending interlocutory appeal will be relatively brief because the appeal will likely be resolved on an expedited basis … and thus the hardship to the City may be limited[]." *Id.* at *2; *see also Ent. Prods., Inc. v. Shelby Cnty.*, No. 08-2047, 2008 WL 11411138, at *1 (W.D. Tenn. Apr. 29, 2008) (harms to the government from delay in implementing contested ordinance afforded "minimal weight as any delay will be brief and will be utilized for the critical purpose of appellate review of a serious legal question"). None of the Secretary's cited cases involve injunctions pending appeal or facts analogous to those presented here. *See Escalante v. Noem*, No. 9:25-CV-00182, 2025 WL 2491782, at *5 n.7 (E.D. Tex. July 18, 2025) (denying motion for preliminary injunction); *KPM Analytics N. Am. Corp. v. Blue Sun*

*Sci., LLC*, No. 21-10572, 2023 WL 2407405, at *1 (D. Mass. Feb. 16, 2023) (denying motion to dissolve preliminary injunction).

What is more, recent developments confirm that the Secretary understands that limited delays in his border wall project will not jeopardize national security. Opening Mem. 20–21. The Secretary calls the Nation's invocation of his decision to pause any construction at Big Bend a "red herring[]," Sec'y Resp. 20, but never explains why. The decision well evidences the Secretary's understanding that in the current border context, with the Department regularly proclaiming that border crossings and related crimes have fallen to historic lows, Opening Mem. 22–23, pauses in barrier construction hardly augur a crisis.

By contrast, absent an injunction, the Secretary has made it patently clear that he will feel no restraint in commencing bulldozing and blasting across the Nation's Reservation. Sec'y Resp. 20. The resulting harm will be irreversible, and the Nation requests that the Court grant its request for limited injunctive relief to forestall such an outcome.

## VI. The Nation Is Appropriately Focused on the Protection of its Lands and Reservation.

The Nation is utterly perplexed by the final section of the Secretary's brief. The Secretary's border wall plans pose an existential threat to the Nation, and it is accordingly driven to elucidate the law and facts directly relevant to countering that threat. As discussed above, it is no "red herring" for the Nation to point out to this Court that the Secretary has recently been willing to pause barrier construction elsewhere while claiming (with absolutely no substantiation) that a pause of one or two months here will cripple border security. Nor is the Nation attempting to "generate hostility and prejudice," Sec'y Resp. 20, by noting that the General Counsel of the Department immediately pronounced that "resistance is futile," Opening Mem. 2, after this Court's initial decision. His words are to be taken seriously, and they portend

the intent to move as fast as possible to begin wall construction on the Reservation. Indeed, the Secretary underscores that intent in his current briefing, Sec'y Resp. 20, and it bears directly on the likelihood that irreversible, destructive action will take place on the Reservation in the coming months.

Finally, it is not a "drive-by" smear, Sec'y Resp. 22, for the Nation to detail that the Secretary is honoring in the breach this Court's admonition that the Secretary "follow through on [his] guarantees of consultation and cooperation with the Nation to address the Nation's concerns regarding border wall construction!," Mem. Op. 18. The Secretary is correct—as the Nation then alerted the Court, Nation Notice ¶ 1 & Attach.—that he informed the Nation of his intent to begin geotechnical borings on the Reservation, Sec'y Resp. 21. The Nation then raised concerns about that boring, as the Secretary acknowledges. *Id.* The Secretary's response was not to engage with those concerns, but instead to send a convoy of masked and armed Department agents and contractors onto the Reservation. That was indeed with one-minute's notice (at 4:59 a.m.!) to the Nation's Chairman, Third Kanji Decl. ¶ 2 & Attach. A, and one minute is indeed the relevant timeframe. Not only did the sudden emergence of the convoy provoke widespread alarm among Nation citizens, but as the Secretary well knows, one of the important roles that cultural monitors play is to ensure that ground-disturbing activity does not take place in sensitive locations. Arriving on the scene after the contractors had already identified the drilling locations is far too late.

There is accordingly no disparagement in the Nation asserting that the Secretary has failed to address its concerns regarding border wall construction. And the further development of the facts has hopefully underscored for the Court that the Secretary simply cannot engage in such construction without overriding the Nation's sovereign interests—or at the very least that there is

a serious enough question in that regard that the Court should issue a temporary injunction pending appeal in order to allow the Circuit to make its own assessment before irreversible harm befalls the Nation and the lands it has safeguarded for centuries.

**CONCLUSION**

The Nation respectfully requests that this Court grant its Motion for Injunction Pending Appeal.

Dated: September 17, 2026

Respectfully submitted,

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji, D.C. Bar 455165
David A. Giampetroni*
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com

Philip H. Tinker*
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

Howard M. Shanker, D.C. Bar 426359*
Attorney General
Logan Takao Cooper*
Assistant Attorney General
TOHONO O'ODHAM NATION
P.O. Box 830
Sells, AZ 85634
Howard.Shanker@tonation-nsn.gov
Logan.Cooper@tonation-nsn.gov

*Counsel for Plaintiff Tohono O'odham Nation*

*Pro Hac Vice Admission

**CERTIFICATE OF SERVICE**

I certify that on September 17, 2026, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji